**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **THE COALITION FOR EQUITY AND EXCELLENCE IN MARYLAND HIGHER EDUCATION, INC., et al.,** | ) | Trial Date: June 27, 2011 |
| **Plaintiffs,** | ) | |
| **v.** | ) | Civil No. CCB-06-2773 |
| **MARYLAND HIGHER EDUCATION COMMISSION, et al.,** | ) | |
| **Defendants.** | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT REGARDING INTENTIONAL DISCRIMINATION AND MARYLAND'S FUNDING OF PUBLIC INSTITUTIONS OF HIGHER EDUCATION UNDER *FORDICE***

# TABLE OF CONTENTS


**Page**

**INTRODUCTION................................................................................................1**

**BACKGROUND ..................................................................................................3**

A. Maryland's Case Is Not Closed. .........................................................3
B. Maryland's Legal Obligation Continues.............................................6
C. Maryland's Failure to Remedy Continues. ..........................................8

**COUNTER-STATEMENT OF FUNDING FACTS.........................................13**

**SUMMARY JUDGMENT STANDARD ...........................................................15**

**ARGUMENT.........................................................................................................16**

I. PLAINTIFFS MEET THE *FORDICE* STANDARD BY SHOWING THE STATE'S FUNDING POLICIES ARE TRACEABLE TO THE *DE JURE* ERA.16

II. PLAINTIFFS HAVE DEMONSTRATED THAT THE STATE'S POLICIES ARE TRACEABLE AND HAVE DISPUTED ANY CONTRARY EVIDENCE.20

A. Defendants' Funding Policies Are Traceable Because They Follow The *De Jure* Practice Of Underfunding And Maintaining Structural Inequality.20
B. Defendants' Funding Formula Is Traceable Because It Allocates Funds Based On Mission Classifications That Follow Historical Racial Assignments. ..........................................................................23
1. The actual missions of the Maryland institutions are defined by the Carnegie Classification System. .............................................23
*2.* The Carnegie classifications follow historical racial designations 24
3. Maryland's funding formula is based on the Carnegie mission classifications. ...........................................................................26
C. Plaintiffs Dispute Defendants' Contention that Maryland's HBIs Have Received Adequate or Higher Levels of Funding In Comparison With The TWIs. ..........................................................................................28
D. Defendants Cannot Defend Their Funding Methodologies By Arguing They Were Created After The *De jure* Era Or Delegated To Lower State Officials...................................................................................33

III. SUBSEQUENT LOWER COURT OPINIONS CONFIRM THAT PLAINTIFFS HERE MEET THE SUPREME COURT'S *FORDICE* STANDARD. .................36

A. *Knight v. Alabama* ..........................................................................36
1. *Knight* shows that operations and capital funding methodologies such as Maryland's are traceable because they maintain the two-tier *de jure* era hierarchy between HBIs and TWIs. ......................37
2. *Knight* demonstrates the State's constitutional obligation to make its HBIs comparable and competitive so they can desegregate, not merely to improve their funding for a period of time. ..................40

**TABLE OF CONTENTS (CONT'D)**

**Page**

B. *Ayers v. Fordice* ....................42

IV. THERE ARE MATERIAL FACT DISPUTES AS TO WHETHER DEFENDANTS HAVE INTENTIONALLY DISCRIMINATED AGAINST AFRICAN AMERICAN STUDENTS AT THE HBIS. ....................44

V. RULE 56 IS NOT THE PROPER VEHICLE FOR DEFENDANTS TO SEEK PRELIMINARY FACTUAL RULINGS AS THEY DO HERE. ....................49

**CONCLUSION ....................49**

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adickes v. S.H. Kress & Co.*,
398 U.S. 144, 158-59 (1970) ........ 15

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 255 (1986) ........ 15

*Arlington Heights v. Metropolitan Housing Development Corp.*,
429 U.S. 252, 265-266 (1977). ........ 44, 45, 46, 48

*Ayers v. Allain*,
673 F. Supp 1523, 1540 (N.D. Miss. 1987) ........ 18, 19, 34

*Ayers v. Fordice*,
111 F.3d 1183, 1221-25 (5th Cir. 1997) ........ 20, 42, 43, 44

*Fischl v. Armitage*,
128 F.3d 50, 55 (2d Cir. 1997) ........ 15

*Franklin-Mason v. Penn*,
259 F.R.D. 9, 11 (D.D.C. 2009) ........ 49

*Knight v. Alabama*,
14 F.3d 1534, 1540-42 (11th Cir. 1994) ........ 17

*Knight v. Alabama*,
787 F. Supp. 1030, 1091 (N.D. Ala. 1991) ........ passim

*Knight v. Alabama*,
900 F. Supp. 272, 308 (N.D. Ala. 1995) ........ passim

*Pulliam Inv. Co. v. Cameo Props.*,
810 F.2d 1282, 1286 (4th Cir. 1987) ........ 15

*R.B. Ventures, Ltd. v. Shane*,
112 F.3d 54, 59 (2d Cir. 1997) ........ 15

*U.S. v. Fordice*,
505 U.S. 717 (1992) ........ passim

## STATUTES

Md. Code Ann. Educ. § 11-302(a) ........ 23, 35

Md. Code. Ann. Educ. §14-102(b) ........ 35

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

Md. Code. Ann. Educ. at § 12-104(k)(2) ........ 36

Md. Code. Ann. Educ. at §§12-102(e) ........ 35

Md. Code. Ann. Educ. at §11-105(b)(2)(i) ........ 36

Md. Code. Ann. Educ. at §11-105(i)(3) ........ 36

Md. Code. Ann. Educ. at §11-302(b)(ii) ........ 36

Md. Code. Ann. Educ. at §11-302(d) ........ 36

Md. Code. Ann. Educ. at §12-104(c)(1) ........ 36

Md. Code. Ann. Educ. at §12-109(a) ........ 35

Md. Code. Ann. Educ. at §14-104(a)(1) ........ 36

Md. Code. Ann. Educ. at §14-104(k)(1) ........ 35

**OTHER AUTHORITIES**

Md. Const. Art. 3, §52 ........ 36

**RULES**

Fed.R.Civ.P. 56(a) ........ 15

Rule 56 ........ 3, 16, 49

**LIST OF EXHIBITS TO PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT REGARDING INTENTIONAL DISCRIMINATION AND MARYLAND'S FUNDING OF PUBLIC INSTITUTIONS OF HIGHER EDUCATION UNDER *FORDICE***

| | |
|---|---|
| Exhibit 1 | Andrew Ujifusa, *Changes afoot for state colleges*, Gazette.net (Nov. 25, 2010) http://www.gazette.net/stories/11252010/polinew174354_32538.php |
| Exhibit 2 | *Changing the HBCU Narrative: From Corrective Action to Creative Investment – Remarks by Secretary Arne Duncan at the HBCU Symposium at North Carolina Central University Centennial*, Ed.gov (June 3, 2010), http://www.ed.gov/news/speeches/changing-hbcu-narrative |
| Exhibit 3 | MHEC, *Trends in Enrollment by Race & Gender Maryland Higher Education* (July 2009) |
| Exhibit 4 | Third Expert Report of Dr. Clifton F. Conrad (June 15, 2010) |
| Exhibit 5 | Transcript of Deposition of Joann Boughman (Feb. 23, 2010) |
| Exhibit 6 | Op. Ltr. from Attorney General to Burnett, 90 Md. Op. Att'y. Gen. 153, 2005 WL 3024511 (Nov. 8, 2005) |
| Exhibit 7 | *Maryland's Report and the Partnership Agreement Between the State of Maryland, U.S. Department of Education, Office for Civil Rights* (2000) |
| Exhibit 8 | Memo from McConkie to Oliver (April 20, 2005) |
| Exhibit 9 | Transcript of Deposition of Geoffrey Newman (Mar. 8, 2010) |
| Exhibit 10 | Transcript of Deposition of James Lyons Newman (Mar. 5, 2010) |
| Exhibit 11 | Facilities Expert Report of Dr. Harvey Kaiser at 5, 25 (Oct. 1, 2010) |
| Exhibit 12 | *Final Report to the Maryland Commission to Develop the Maryland Model for Funding Higher Education, The Panel on the Comparability on Competitiveness of Historically Black Institutions in Maryland*, (Nov. 11, 2008) |
| Exhibit 13 | Expert Report of Dr. Robert K. Toutkoushian (May 3, 2010) |
| Exhibit 14 | Supplemental Expert Report of Dr. Robert K. Toutkoushian (Oct. 1, 2010) |
| Exhibit 15 | MHEC, *2009 Maryland State Plan for Postsecondary Education* (June 2009) |
| Exhibit 16 | Transcript of Deposition of Anne Emery (Apr. 4, 2010) |
| Exhibit 17 | Transcript of Deposition of John Oliver (Mar. 19, 2010) |
| Exhibit 18 | Ltr. from Thompson to Cane (Mar. 22, 2010) |
| Exhibit 19 | Ltr. from Fox to Johnson (Sept. 20, 2001) |
| Exhibit 20 | *Report of the Commission of Higher Education of Negroes to the Governor and Legislature of Maryland* (Jan. 15, 1937) |
| Exhibit 21 | *Higher Education in Maryland: A Report of a Survey by the American Council on Education with Recommendations of the Maryland Commission on Higher Education* (1947) |
| Exhibit 22 | Second Expert Report of Dr. Clifton F. Conrad (June 15, 2010) |

| | |
|---|---|
| Exhibit 23 | First Expert Report of Dr. Clifton F. Conrad (May 3, 2010) |
| Exhibit 24 | Memo from Lyons to Finance Policy Committee (Oct. 16, 2008) |
| Exhibit 25 | Transcript of Deposition of Raymond Vollmer (Mar. 31, 2010) |
| Exhibit 26 | Transcript of Deposition of Robert Toutkoushian (May 25, 2010) |
| Exhibit 27 | *Report to the Maryland Council for Higher Education* (Aug. 9, 1974) |
| Exhibit 28 | *Final Report of The State's Commission to Develop the Maryland Model for Funding Higher Education* (2008) |
| Exhibit 29 | *Sixth Annual Report of the Maryland Council for Higher Education* (1970) |
| Exhibit 30 | MHEC, *Trends in White Graduate Students at Historically Black Institutions in Maryland* (Oct. 2009) |
| Exhibit 31 | Interim Proposal for a New Instructional Academic Program |
| Exhibit 32 | Ltr. from Richardson to Burnett (Nov. 16, 2004) |
| Exhibit 33 | Ltr. from Burnett to Bogolmony and Caret (Nov. 22, 2004) |
| Exhibit 34 | Memo from Burnett to MHEC Commissioners (Mar. 1, 2005) |
| Exhibit 35 | Ltr. from Burnett to Bogolmony and Caret (Mar. 15, 2005) |
| Exhibit 36 | Transcript of Deposition of Kevin O'Keefe (Mar. 29, 2010) |
| Exhibit 37 | MHEC Faculty Advisory Council, Minutes of the Mar.15, 2005 Meeting |
| Exhibit 38 | MHEC Faculty Advisory Council, Minutes of the Apr. 19, 2005 Meeting |
| Exhibit 39 | Ltr. from Fox to Burnett (Apr. 13, 2005) |
| Exhibit 40 | Oliver to Burnett and University Presidents (May 25, 2005) |
| Exhibit 41 | Transcript of Deposition of Sue Blanshan (Mar. 18, 2010) |

**INTRODUCTION**

Defendants' brief in support of their summary judgment motion regarding intentional discrimination and funding (the "Funding Br.") in essence argues that the State should prevail because it does not intend to discriminate and does things differently than it did in the past. They begin with a "things were bad but are getting better" preface recounting facts that are, for the most part, completely irrelevant to this case. From a historical account ranging from Spiro Agnew to Pete Rawlings, defendants apparently believe the Court should conclude that surely any vestiges of discrimination in Maryland – in higher education or otherwise – must be gone. (*See* Funding Br. at 3-4.) Defendants go on to suggest that this Court need not follow *U.S. v. Fordice*, 505 U.S. 717 (1992), because the law has since become "more demanding for plaintiffs." (Funding Br. at 7.) But the issue before the Court is whether there are *material facts in dispute* as to whether vestiges of *de jure* discrimination exist under *Fordice* at Maryland's Historically Black Institutions ("HBIs" or "HBCUs"). Plaintiffs submit that disputed facts regarding such vestiges abound, and nothing about the general atmosphere of race relations in Maryland or improvements that might have been achieved at Traditionally White Institutions ("TWIs") could eradicate those fact disputes as a matter of law.

It is telling that defendants do not set forth an explicitly worded statement of *material facts not in dispute* as one would expect in a summary judgment motion. Rather, defendants offer a "statement of facts" that is filled with contested assertions and seeks to establish the *immaterial* proposition that Maryland's higher education funding faces fiscal constraints and is done differently now than in the *de jure* era. (*See* Funding Br. at 19-20.) But *Fordice* does not excuse vestiges because practices are "different," nor does *Fordice* only require the elimination of vestiges the State contends it can "afford" to eliminate. A different methodology may still perpetuate practices traceable to *de jure* discrimination and thus run afoul of *Fordice* –

otherwise, a state could maintain the dual system cloaked in new forms. Nor is there a "recession exception" to the Constitution.

In sum, defendants' current motion fails for several reasons. *First*, contrary to defendants' arguments, plaintiffs need only show Maryland's funding policies are traceable to the *de jure* era. (*See* Part I.) *Second*, plaintiffs present overwhelming evidence that current practices are in fact traceable, and defendants cannot establish beyond dispute that current shortcomings are not vestiges of such discrimination simply because they use a funding mechanism that is "different" than the one that existed during the *de jure* era. Plaintiffs present ample evidence to demonstrate the existence of material facts showing "traceability" of current practices to *de jure* discrimination. Plaintiffs further cite substantial evidence that Maryland's HBIs have received less than their equitable share of operating funds, that they have never received enough operating or capital improvement funding to overcome Maryland's past discriminatory practices, and that the changes to Maryland's funding methodology are superficial and fail to eradicate such past practices. (*See* Part II.)

*Third*, plaintiffs' proof is consistent with the controlling and dispositive *Fordice* standard and with subsequent lower court decisions involving discrimination in higher education. (*See* Part III.) *Fourth*, even though discriminatory intent is not required for any claims based on *Fordice* vestiges, plaintiffs in fact present sufficient evidence of intentional discrimination as to current policies to defeat *any* finding that intent is lacking in this case. (*See* Part IV.) *Finally*, it is not even clear what "judgment" defendants are seeking. Their motion is simply entitled "Motion for Summary Judgment." Yet their memorandum in support renames the motion as a "Motion for Summary Judgment Regarding Intentional Discrimination and Maryland's Funding of Public Institutions of Higher Education Under *Fordice*." (*See* Funding Br. Cover Page.) Further still, the prayer for relief in defendants' conclusion seeks dismissal of some unspecified

portion of plaintiffs' Complaint "insofar as it alleges any intentional racial discrimination" and seeks dismissal of unspecified "claims that Defendants have not eradicated vestiges" so far as they concern "the State's appropriations of annual operating expenses" and "allocations for capital improvements." (Funding Br. at 42.) In sum, it is unclear what "claim" on which defendants move for summary judgment. Rather, defendants' motion seems to seek (prematurely) to preclude certain proof or ask for findings of fact. Plaintiffs submit that defendants' technical non-compliance with Rule 56 is mooted by the clear existence of material facts in dispute, but even absent such disputes, a motion for summary judgment is an inappropriate vehicle to seek such piecemeal rulings. (*See* Part V.)

## BACKGROUND

Defendants begin with a revisionist history that implies that the facts and law regarding Maryland's higher education policies have changed and that the State's discrimination and burden to remediate it are ancient history. Defendants' introduction portrays (i) the issue of discrimination in Maryland higher education as a closed case, (ii) the legal burden on the State as somehow diminished, and (iii) the vestiges of discrimination as uncontestably eradicated. None of these assertions is correct.

### A. Maryland's Case Is Not Closed.

Far from being ancient history, Maryland's failure to dismantle the vestiges of past discrimination continues today. As recently as last year, the Office for Civil Rights of the United States Department of Education (OCR) indicated that Maryland is an "open" state, *i.e.*, a state that previously operated a *de jure* system of segregation that has not been fully dismantled. *See* Andrew Ujifusa, *Changes afoot for state colleges*, Gazette.net (Nov. 25, 2010) http://www.gazette.net/stories/11252010/polinew174354_32538.php. (Ex. 1). And United States Secretary of Education Arne Duncan has announced that cases like Maryland will *remain*

open "until the vestiges of state-imposed segregation have been completely eliminated." *Changing the HBCU Narrative: From Corrective Action to Creative Investment – Remarks by Secretary Arne Duncan at the HBCU Symposium at North Carolina Central University Centennial*, Ed.gov (June 3, 2010), http://www.ed.gov/news/speeches/changing-hbcu-narrative (Ex. 2 at 2) ("We will continue to work with governors and state higher education officials to reach agreement on what must still be done to eliminate the vestiges of formerly segregated systems and enhance our HBCUs.").

In this case, plaintiffs contend that Maryland has not dismantled the vestiges of its prior *de jure* system of segregation and has not fulfilled its obligation to desegregate its HBIs. According to defendants' brief, 59% of Maryland's African American college students attend one of Maryland's four HBIs. (Funding Br. at 6.) The white student population at those schools is approximately 5%. (MHEC, *Trends in Enrollment by Race & Gender Maryland Higher Education* at 69 (July 2009) ("Trends in Enrollment") (Ex. 3).) The HBIs, according to plaintiffs' expert Dr. Clifton Conrad (who consulted with OCR with respect to its 2000 Partnership Agreement with Maryland), are part of "a dual and unequal system of higher education in Maryland between the public [H]BIs and TWIs." (Third Expert Report of Dr. Clifton F. Conrad at 18 (June 15, 2010) ("Conrad III") (Ex. 4).)[1]

Maryland's segregation vestiges were supposed to have been eliminated through the 2000 Partnership Agreement. According to Defendants' 30(b)(6) witness, Joanne Boughman, the Partnership Agreement did not spring from Maryland's "progressiveness," but from the fact that "Maryland was deemed to have the vestiges of a former segregated system." (Boughman Dep. at 40 (Ex. 5).) These findings were a part of the Partnership Agreement because, as Ms. Boughman

[1] In the Partnership Agreement, in the Attorney General Opinion Letter, and in report after report, including the 2009 State Plan, Maryland uses the phrase Traditionally White Institutions or "TWIs" to refer to what defendants now suddenly have decided to call "non-HBIs' in this litigation (the first time apparently Maryland has found the term TWI to be problematic.)

explained, "OCR felt that rather than moving in an adversarial kind of way, that a cooperative agreement would serve the public best. And Maryland agreed, the Governor Agreed." (*Id.*).

Consistent with MHEC's testimony that the Partnership Agreement was designed to remove vestiges of segregation, Maryland's Attorney General described the Partnership Agreement as an effort by Maryland and OCR "to identify policies with segregative effects and to implement appropriate remedies." Op. Ltr. from Attorney General to Burnett, 90 Md. Op. Att'y. Gen. 153, 2005 WL 3024511, at *19 (Nov. 8, 2005) ("AG Op. Ltr.") (Ex. 6). According to the Attorney General, the Partnership Commitments were "designed to enhance student choice or reduce the stigmatic racial identifiability of institutions." *Id.* Without significant, unique, high-demand academic programs to attract students regardless of race, the HBIs' academic identity starts and ends with being Historically Black Institutions, which is a vestige of the *de jure* era.

Since Maryland put in place and maintained the system of *de jure* segregation, the Partnership Agreement, consistent with *Fordice*, put on Maryland the obligation to dismantle the system. To do so, the Partnership Agreement made defendant MHEC "specifically responsible for developing a program of desegregation and equal educational opportunity, including an enhancement plan for HBCUs." (*Maryland's Report and the Partnership Agreement Between the State of Maryland, U.S. Department of Education, Office for Civil Rights* at 5 (2000) ("Partnership Agreement") (Ex. 7).) Although Maryland now disclaims responsibility for issues such as the missions at these institutions, the Partnership Agreement required that MHEC's desegregation plan include "enhancing the missions of HBCUs and their enrollment of non-African American students; strengthening the undergraduate and graduate programs at HBCUs; developing high demand academic programs at HBCUs; and avoiding unnecessary program duplication at geographically proximate HBCUs and TWIs." (*Id.* at 11.) The Partnership

Agreement recognized that "sustaining a desegregated system will require additional State investments in HBCUs" both to "improve educational opportunities for African American students who attend them and to increase their attractiveness to students of all races, especially white students." (*Id.*) Significantly, the Agreement committed Maryland to desegregating all of its institutions, "including desegregating TWIs and HBCUs." (*Id.* at 21.)

In sum, the Partnership Agreement with OCR identified certain vestiges of Maryland's *de jure* system and committed Maryland to eliminate those vestiges. Maryland has not done so, and in some instances has done the opposite, further segregating the HBIs rather than desegregating them. In one example, the Office of the Attorney General called MHEC's conduct "alarming" and warned that a court could "infer" bad faith. (Memo from McConkie to Oliver (April 20, 2005) at 3 ("McConkie Memo") (Ex. 8).) Maryland's apparent progress in desegregating its TWIs – the focus of defendants' discussion – is good news, but does not relieve it of its obligations to the HBIs, where nearly 60% of its African American college students are educated. Indeed, the Attorney General recognized this in his 2005 Opinion, noting: "it is possible for the State to have dismantled some aspects of prior segregation, and be discharged of any remedial obligations with respect to those factors, *while remaining responsible for remedial measures in other areas.*" AG Op. Ltr., 2005 WL 3024511, at *16 (Ex. 6) (emphasis added). As plaintiffs have made clear, this case is about Maryland's *HBIs*. The "improvements" of TWIs are immaterial.

**B. Maryland's Legal Obligation Continues.**

*United States v. Fordice*, 505 U.S. 717 (1992), unquestionably governs this case. *Fordice* requires no proof of current intentional discrimination, since the intentional discrimination occurred during the *de jure* era. *See Fordice*, 505 U.S. at 733 n.8 ("The private petitioners and the United States, however, need not show discriminatory intent to establish a

constitutional violation for the perpetuation of policies traceable to the prior *de jure* segregative regime which have continuing discriminatory effects.”).

Contrary to defendants’ insinuation that the less than two decade old decision in *Fordice* is outdated, or has been superseded by cases involving different issues which result in lowering Maryland’s obligations, the legal burden on Maryland remains the same. In fact, after the Partnership Agreement ended in 2005, defendant MHEC asked Maryland’s Attorney General to outline the proper legal standard by which its compliance would be measured and the Attorney General advised MHEC that *Fordice* provided the governing legal standard, along with the commitments in the Partnership Agreement and “Maryland’s decades of work with OCR, spanning multiple desegregation plans, to identify policies with segregative effects and to implement appropriate remedies”. *See* AG Op. Ltr., 2005 WL 3024511, at *19 (Ex. 6). Nowhere did the Attorney General’s opinion identify “intentional discrimination” as a part of the analysis, nor did it advise MHEC that its obligations might be diminished based on the number of African Americans in the Maryland legislature, the race of the mayor of Baltimore, or any of the other irrelevant facts cited in defendants’ brief.

Rather than argue, as defendants now do, that the State and MHEC have no obligation to provide enhanced funding to its HBIs as a part of Maryland’s affirmative obligation to dismantle its *de jure* system, the Attorney General advised just the opposite. He specifically advised MHEC that “enhanced funding has been a common element of post-*Fordice* higher educational desegregation remedies.” *Id.* at *20. Though defendants now insist the question is so straightforward that they are entitled to judgment as a matter of law, the Attorney General then acknowledged that “[t]he assessment of when enhancements are sufficient or necessary to overcome past funding deficiencies under *de jure* segregation is a ***difficult*** determination.” *Id.* at *20-21 (emphasis added). Consistent with plaintiffs’ position here, the Attorney General

advised defendant MHEC that "[t]o the extent that enhancements are necessary to cure funding inequities traceable to *de jure* segregation, then they are ***constitutionally required.***" *Id.* at *21 (emphasis added). The Attorney General's November 2005 opinion completely undercuts defendants' arguments.

So too did the prior Attorney General Opinion to MHEC dated April 20, 2005. In that Opinion, the Attorney General's Office advised MHEC with respect to "[its] obligations under federal law regarding the dismantling of its prior *de jure* segregated system of higher education, particularly with respect to the duplication of academic programs at the State's Historically Black Institutions by geographically proximate Traditionally White Institutions." (McConkie Memo at 1 (Ex. 8).) Contrary to the arguments that it now makes about how the changes in Maryland's higher education system, the passage of time, and other factors have somehow changed its obligations to desegregate its HBIs, the Attorney General's office stated clearly that "the State's obligation remains in full force and effect." (*Id.*)[2] In sum, the legal obligations have not changed. *Fordice* and the Partnership Agreement are the principal guides in this case.

**C. Maryland's Failure to Remedy Continues.**

***Maryland has admitted that it has not fully dismantled the vestiges of its prior de jure system.*** To begin with, Maryland has adopted the findings and conclusion of the HBI Study Panel Report, including its findings that tie the current inferior condition of the HBIs to past discrimination and current underfunding. Defendants' own witness, Geoffrey Newman, from whom movants submitted a declaration, has already testified that "substantial additional resources must be invested in HBIs" in order "to overcome the competitive disadvantages caused by prior discriminatory treatment." (Newman Dep. at 133-34 (Ex. 9).) More significantly, the former Secretary of the Maryland Higher Education Commission, Dr. James Lyons, a former

[2] In the Defendants' Statement of the Case, they try to distance themselves from this memo by arguing that it was written by an Assistant Attorney General, like the lawyers defending this case. But the memorandum has never been repudiated, and is entirely consistent with the Attorney General's November 2005 Opinion to MHEC.

college president, has readily admitted that Maryland has not fully dismantled the vestiges of its *de jure* system of segregation in higher education in terms of "funding the campus physical plants." (Lyons Dep. at 266 (Mar. 5, 2010) ("Lyons Dep. I") (Ex. 10).) Dr. Lyons also identified the need for "added funding to try and compensate for the dual mission" and agreed that facilities were also an area in which Maryland had not eliminated the vestiges of discrimination. (*Id.*)

Consistent with MHEC's admissions and the conclusion of Maryland's HBI Panel Report that the facilities at the HBIs "visibly lag" those at the TWIs, plaintiffs' facilities expert has also concluded that the majority of facilities at the HBIs fall below higher education standards, and are a vestige of Maryland's prior *de jure* system of segregation. (Facilities Expert Report of Dr. Harvey Kaiser at 5, 25 (Oct. 1, 2010) ("Kaiser Report") (Ex. 11).) He also explains the flaws in defendants' reliance on relative capital funding amounts as a measure of whether Maryland has dismantled its *de jure* system of segregation. (*Id.* at 11-12.)[3]

***Maryland has failed to fund the HBIs to make them comparable and competitive.***

The Partnership Agreement required Maryland to enhance the HBIs in terms of funding, facilities, and other areas to be "comparable and competitive" to the TWIs. The Attorney General's November 2005 opinion explained that "enhanced funding has been a common element of post-*Fordice* higher educational desegregation remedies." *See* AG Op. Ltr., 2005 WL 3024511, at *20 (Ex. 6). Commitment 9 of the Partnership Agreement, therefore, required Maryland to enhance the HBCUs to "ensure that the HBCUs are comparable and competitive with the TWIs in all facets of their operations and programs" as a means to "ensure that these institutions provide equal opportunity for a quality education to all students who choose to attend them and to enable them to compete for and be attractive to students regardless of race."

[3] It is telling that while seeking an extension in order to consider retaining its own facilities expert, Maryland decided not to do so, apparently unable to find a witness who would dispute the findings of its own HBI study Panel and the testimony of the former Chairman of MHEC.

(Partnership Agreement at 35 (Ex. 7).) This commitment included enhancing the operational funding, "the expanse, functionality and architectural quality of physical facilities," "the appearance, attractiveness and ambiance of the campus and surrounding public infrastructure" and "funding to support students' quality of campus life." (*Id.*) Contrary to defendants' snide observations that, so far as campuses are concerned, "beauty is in the eye of the beholder," the Partnership Agreement specifically provided that "[i]ncluded in this commitment are the enhancement of campus environments at HBCUs to ensure parity with TWIs with respect to physical characteristics of landscape, ambiance and appearance as well as the availability, quality and adequacy of facilities necessary to support the missions and programs at the institutions" in recognition of the importance of campus appearance to student choice of colleges. (*Id.*)

Maryland's own blue-ribbon commission shows that Maryland has not complied with Commitment No. 9. In 2008, Maryland's HBI Study Panel concluded that Maryland had not gotten the HBIs out of the ditch that its prior discrimination had put them in. It concluded:

> There are many indicators that suggest that substantial additional resources must be invested in HBIs to overcome the competitive disadvantages caused by prior discriminatory treatment: the lack of modern "state of the art" science and technology labs, the aging physical plants and lack of consistent funding for maintenance, the poor retention and graduation rates of students as compared to TWIs, and the large number of low income and educationally underserved students in need of financial assistance.

(*Final Report to the Maryland Commission to Develop the Maryland Model for Funding Higher Education, The Panel on the Comparability on Competitiveness of Historically Black Institutions in Maryland*, at 6 (Nov. 11, 2008) ("HBI Study Panel Rpt.") (Ex. 12).) The HBI Study Panel concluded that "the current result of these longstanding past practices is that there exists a substantial lack of comparability and capacity" between the HBIs and TWIs and "[w]hat is most important at this juncture is for the Commission to remedy both the lack of comparability among

the doctoral institutions and restructure the process that has caused the inequities and lack of competitiveness between the HBIs and the traditionally white doctoral institutions." (*Id*. at 17.)

***Maryland Continues to Underfund Its HBIs.*** Dr. Robert Toutkoushian, a well-qualified economist has concluded that the HBIs have experienced funding disparities that "are the direct consequence of Maryland's decision to assign its HBCUs less research-intensive missions during its *de jure* system of segregated higher education, missions that have not been substantially enhanced even today." (Expert Report of Dr. Robert K. Toutkoushian at 3 (May 3, 2010) ("Toutkoushian Rpt.") (Ex. 13).) Dr. Toutkoushian has quantified these funding disparities and represents that for the years 1990-2009, Maryland's HBIs experienced both a disparity in state appropriations of between $166,841,100 and $572,076,700 and a disparity in total revenues of between $1,733,704,438 and $2,138,940,038. (Supplemental Expert Report of Dr. Robert K. Toutkoushian at 24 (Oct. 1, 2010) ("Toutkoushian Supp. Rpt.") (Ex. 14).) These findings are consistent with Maryland's own HBI Panel Report, which tied the condition of the HBIs to "the continuing effects and vestiges of policies and practices supported by many decades of a dual system of public higher education in Maryland." (HBI Study Panel Rpt. at 4 (Ex. 12).)[4]

***Maryland has not avoided unnecessary program duplication.*** Maryland has also violated Commitment 8 which required Maryland to avoid unnecessary program duplication and to provide unique programs to the HBIs. As the Attorney General's April 2005 Memo makes clear, "[u]nnecessary program duplication is part and parcel of the [*de jure* system of segregation]." (McConkie Memo at 2 (Ex. 8).) Accordingly, Maryland committed to "[a]voiding [u]nnecessary [p]rogram [d]uplication and [e]xpansion of [m]ission and Program [u]niqueness and [i]nstitutional [i]dentity at the HBCUs." (Partnership Agreement at 33 (Ex. 7.) Recognizing

---

[4] Maryland's 2009 Plan for Postsecondary Education describes enhancing the HBIs to become comparable and competitive with the TWIs as "an integral part of the State's commitments in its 2000 Partnership Agreements." (MHEC, 2009 Maryland State Plan for Postsecondary Education at 27 (June 2009) ("2009 State Plan") (Ex. 15).) The Report notes that substantial additional resources are needed to, among other things, attract and graduate a "racially, culturally, and ethnically diverse student body." (*Id*. at 26-27.)

that academic programs require funding and institutional infrastructure, Maryland committed that "[t]he State [would] take appropriate steps to ensure that new unique, high demand and other programs that are approved for HBCUs, by operation of law or by MHEC, for the purpose of promoting their institutional competitiveness and ensuring that these institutions ***attract students regardless of race.***" (*Id.* at 34 (emphasis added).)

Rather than comply with this commitment, Maryland perpetuated widespread program duplication, including in at least one instance, over the advice of the Attorney General's Office that the program approval would leave Maryland "vulnerable" from a legal point of view, that a court may "infer bad faith," and that the program approval would have segregative effects. (McConkie Memo at 3 (Ex. 8).) Former MHEC Commissioner Dr. Ann Emery testified that "every time a historically Black school gets something that seem[s] to be successful somebody tries to undermine that or take it away or do something. And I watched that the whole time I was on the commission." (Emery Dep. at 26 (Ex. 16).) Likewise, MHEC's former Chairman John J. Oliver testified that the HBIs programs "have been duplicated and there seems to be a trend where such practices are continuing and, in my opinion, that's wrong." (Oliver Dep. at 74-75 (Ex. 17).) Maryland's Legislative Black Caucus also expressed concern about "systematic" unnecessary program duplication and its harmful effect on the HBIs. A 2005 Report prepared by the presidents of Maryland's HBIs for consideration by the Legislative Black Caucus concluded that the condition of the HBIs "threatens to deteriorate even further as certain TWIs are being targeted as growth institutions and any uniqueness in missions and programs between HBIs and TWIs is being systematically eroded." (Ltr. from Thompson to Cane at 2 (Mar. 22, 2010) (Ex. 18).)

This factual evidence alone is sufficient to defeat summary judgment, and raise the inference of intentional discrimination, to the extent such a showing is relevant here. Moreover,

it is further supported by plaintiffs' expert, Dr. Conrad, who has concluded that there is widespread, unnecessary program duplication in Maryland, that the HBIs have limited academic missions that are vestiges of the *de jure* era, and that contrary to the commitment in the Partnership Agreement, the HBIs have few, unique, high-demand programs. (Conrad III at 18 (Ex. 4).) In fact, the TWIs have **122** such programs, while the HBIs have only **11**. *Id.* at 10. In sum, while no showing of intentional discrimination is required under the *Fordice* traceability standard, plaintiffs' evidence also creates an inference of intentional discrimination in program duplication, especially where it was done over the objection of the Attorney General's Office, which advised that a court may infer "[bad] faith." (McConkie Memo at 3 (Ex. 8).) Simply put, plaintiffs' evidence, beginning with defendants' own admissions and documents, is more than sufficient to defeat defendants' motion for summary judgment.

## COUNTER-STATEMENT OF FUNDING FACTS

Contrary to defendants' one-sided description of supposedly equitable funding practices over recent years (*see* Funding Br. at 15-19), a review of the past decade shows otherwise. Indeed, in late 2001, OCR indicated it was "concerned that a continuation of funding at the current rate does not meet the terms of the Partnership and cannot achieve the goals of the Agreement within the time frames stipulated in our Agreement." (Ltr. from Fox to Johnson at 3 (Sept. 20, 2001) (Ex. 19).) OCR also indicated that "funding for capital improvements at TWIs has increased proportionately at a significantly higher rate than at HBCUs." (*Id.* at 2.)

Similarly, in 2008, the HBI Study Panel confirmed that the HBIs were still not adequately funded. Citing to the HBIs dual mission of carrying out regular collegiate programs as well as providing strong developmental education programs to underprivileged students, the Panel found that the HBIs "are not funded at appropriate levels to carry out both parts of this mission at

once." (HBI Study Panel Rpt. at 12 (Ex. 12).) Witnesses in this case have confirmed this underfunding. (*See*, *e.g.*, Lyons Dep. I at 215 (Ex. 10).)

Again in 2009, well after this lawsuit was filed, Maryland issued the 2009 State Plan, which acknowledged that the lack of infrastructure at Maryland's HBIs kept them from competing with the TWIs. (MHEC, *2009 Maryland State Plan for Postsecondary Education* at 27 (June 2009) ("2009 State Plan") (Ex. 15).) The 2009 State Plan made clear that substantial additional resources needed to be given to the HBIs in order to make them comparable and competitive with the TWIs. (*Id.* at 28.) The 2009 State Plan recommended that Maryland "accelerate funding for public HBI capital priorities that build institutional capacity related to comparability and competitiveness." (*Id*. at 30.)

This history is further supported by plaintiffs' expert Dr. Robert Toutkoushian, who concluded that the HBIs have experienced sustained funding deficiencies from 1990 to 2009. After adjusting for inflation, he found inequity for Maryland's HBIs in unrestricted revenues of between $1.6 and $2 billion, inequity in total revenues of between $1.7 and $2.1 billion, and inequities in state appropriations of between $166 million and $572 million. (*See* Toutkoushian Supp. Rpt. at 24 (Ex. 14).) Dr. Toutkoushian concluded that contemporary disparities between the HBIs and the TWIs are direct consequences of Maryland's decision to assign HBIs less research-intensive missions during its *de jure* system of segregated higher education and its current failure to enhance HBI missions. (*Id.* at 3.)

Over the years, Maryland's historical discrimination in favor of its TWIs fueled their tremendous growth and allowed them to outpace the HBIs and to attract substantial private funding. As a result of the large enrollment gaps that developed, Maryland's TWIs enjoy substantial economies of scale, such that the HBIs have higher per student costs. (Toutkoushian Rpt.at 17 (Ex. 13).) Maryland's present funding formula does not account for the history of

funding disparities that disfavored HBIs. (*Id*. at 16.) Nor does it take into account the dual mission the HBIs have in educating disadvantaged students. (Lyons Dep. I at 223 (Ex. 10).)

In sum, not only does it fail to remedy the pre-existing *disadvantaged* state of the HBCUs, but Maryland's current funding formula *still* works to the disadvantage of "HBCUs because: (a) the comparators used for HBCUs are less research-intensive and thus lead to lower funding recommendations, (b) no funding adjustments are made for economies of scale, (c) the formula does not provide for additional revenues for HBCUs to meet the higher cost of educating more students from disadvantaged backgrounds, and (d) per-student weights are higher at selected TWIs in the state." (*See* Toutkoushian Rpt. at 4 (Ex. 13).)

**<u>SUMMARY JUDGMENT STANDARD</u>**

Summary judgment is appropriate *only* when there is "no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). *See also Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). The Court should not grant summary judgment unless it is clear that a trial is unnecessary, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), and any doubts in this regard should be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970) . Moreover, it is a settled rule that "[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997) (citing *Anderson*, 477 U.S. at 255. "If reasonable minds could differ as to the import of the evidence . . . and if there is any evidence in the record *from any source* from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain summary judgment" *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 59 (2d Cir. 1997) (internal quotation marks and citations omitted).

## ARGUMENT

Plaintiffs submit that defendants' motion for summary judgment is meritless. *First*, the law is clear that plaintiffs meet their burden under *Fordice* if they can show that Maryland's funding policies and practices are traceable to the *de jure* era. *Second*, plaintiffs are able to show that defendants' funding policies and practices are in fact traceable and dispute any evidence to the contrary. *Third*, contrary to defendants' argument, subsequent lower court decisions confirm plaintiffs have met their burden. *Fourth*, even though discriminatory intent is not required for any claims based on *Fordice* vestiges, plaintiffs in fact present sufficient evidence regarding intentional discrimination as to current policies to defeat *any* finding that intent is lacking. *Finally*, defendants' request for dismissal of vaguely identified portions of plaintiffs' Complaint "insofar as" they relate to intentional discrimination or funding allegations is not a proper summary judgment motion, even if no material facts were in dispute, which there are here. In sum, defendants have not come close to meeting the Rule 56 standard, since at a minimum disputed facts exist as to whether Maryland's funding policies and practices are traceable to the *de jure* era, whether Maryland's HBIs have received less than their equitable share of operating funds, and whether they have received enough operating or capital improvement funding to overcome Maryland's past discriminatory practices.

### I. PLAINTIFFS MEET THE *FORDICE* STANDARD BY SHOWING THE STATE'S FUNDING POLICIES ARE TRACEABLE TO THE *DE JURE* ERA.

Plaintiffs' claims are governed by the standards set forth by the Supreme Court in addressing segregation in Mississippi's public universities and colleges in *U.S. v. Fordice,* 505 U.S. 717 (1992). Contrary to defendants' arguments, plaintiffs are not required to show a current intent to discriminate in funding, but only that Maryland's current practices are ***traceable*** to past discrimination. *Fordice* requires no proof of current intentional discrimination, since the intentional discrimination occurred during the *de jure* era. *See Fordice*, 505 U.S. 717, 733 n.8

("The private petitioners and the United States, however, need not show discriminatory intent to establish a constitutional violation for the perpetuation of policies traceable to the prior *de jure* segregative regime which have continuing discriminatory effects.").

Under *Fordice,* a State that previously maintained a *de jure* segregated education system "does not discharge its constitutional obligations until it eradicates policies and practices traceable to its prior *de jure* system that continue to foster segregation." *Id.* at 728. Present intent to discriminate is not required – rather, the inquiry is: (1) whether any policies or practices currently exist that are traceable to the former segregated system of higher education; (2) if they do exist, whether they continue to foster segregation; and (3) if they exist and are segregative, whether it is practicable or educationally sound to eliminate them. *Id*. at 729. The purpose of such a remedy is not simply to proscribe intentional discrimination or merely to improve the historically disfavored institutions, but rather to undo the segregative effects such vestiges exert, "whether by influencing student enrollment decisions or by fostering segregation in other facets of the university system." *Id.* at 731.

Plaintiffs meet their initial burden, as defendants concede, by proving "that a Maryland policy or practice is traceable to the *de jure* era." (Funding Br. at 29.) Defendants likewise concede that "[o]nce the plaintiff has made this initial showing, the burden is then shifted to the State." (*Id.*) Defendants cannot defeat plaintiffs' claim by showing no intent to discriminate – they must show that the suspect policy or practice does not have segregative effect or cannot be reformed in a manner that is practicable and consistent with sound educational practice. *Fordice*, 505 U.S. at 729; *Knight v. Alabama*, 14 F.3d 1534, 1540-42 (11th Cir. 1994). A policy or practice is "traceable" under *Fordice* if it to some degree follows and maintains the structures that were inherent to *de jure* segregation. As discussed below, *Fordice* further shows that when this standard is met, a policy or practice is traceable even if it is embedded in current policies

that themselves did not exist in the *de jure* era, was adopted after the *de jure* era, or is racially neutral and non-discriminatorily intended. *See, e.g.*, 505 U.S. at 738-41.

*Fordice* specifically held certain practices traceable because they maintained structures that were inherent to racial segregation in the *de jure* era, *regardless* of whether these practices were embedded in new policies that had no link to the *de jure* era. *Id.* *First*, in addressing program duplication, the Court stated, "[i]t can hardly be denied that such duplication was part and parcel of the prior dual system of higher education – the whole notion of 'separate but equal' required duplicative programs in two sets of schools – and that the present unnecessary duplication is a continuation of that practice." *Id.* at 738. Significantly, the Court so held despite the fact that the state's policy for program selection was a complex, six-step review process that was adopted decades after the *de jure* era, and that the process was not only facially neutral with regard to race but had actually *reduced* program duplication. *See Ayers v. Allain*, 673 F. Supp 1523, 1540 (N.D. Miss. 1987). Thus, a current practice that was "part and parcel" of the *de jure* era is traceable even if the practice is now maintained through entirely new policies that did not exist during the *de jure* era.

*Second*, *Fordice* held that the simple fact that Mississippi operated eight universities was traceable: "The existence of eight instead of some lesser number was undoubtedly occasioned by state laws forbidding the mingling of the races." *Fordice*, 505 U.S. at 741. Determining traceability did not require any examination of the formal mechanism by which these universities came into being or were sustained, or of current state laws, policies or procedures. It was enough that *de jure* segregation required a larger number of universities, and that current practice and policy maintained this larger number. *Id.*

*Third*, the *Fordice* Court held that policies regarding mission were traceable because they followed the structures of the *de jure* era in some degree, even though the policy at issue was far

different from anything that existed in the *de jure* era. *Id.* at 740-41. The Court held that Mississippi's institutional mission designations had "as their antecedents the policies enacted to perpetuate racial separation during the *de jure* segregated regime." *Id.* at 740. The Court noted that these designations did not exist in the *de jure* era, having been created and assigned in 1981, but this did not affect its analysis. *Id.* Nor did it matter that "the classification and mission assignments were made without discriminatory purpose." *Id.* at 741. What mattered was that the Court of Appeals had found the "inequalities among the institutions largely follow the mission designations, and the mission designations to some degree follow the historical racial assignments." *Id.* at 740-41 (quoting *Ayers v. Allain*, 914 F.2d 676 (5th Cir. 1990) (*en banc*)). There was not a requirement of identity or even substantial similarity with a *de jure* era policy, nor was there an explanation of a clear historical progression or evolution from the *de jure* era assignments to the missions. Rather, these designations had their "antecedents" in the *de jure* era because they "to some degree follow[ed]" patterns or structures established as part of the *de jure* era and thus preserved the inequalities of that era. *Id.*

*Fourth*, the Supreme Court found Mississippi's admissions policies traceable to discriminatory *de jure* era policies, even though the current policies represented a modification of the original policies that had been adopted in the 1970s for what the lower courts had found to be a non-discriminatory purpose. In the *de jure* era, Mississippi had required a minimum score on the ACT for admission to the TWIs, set at a level far above the average score of black students, while allowing a lower score for entry to the HBIs. The current policy continued this basic structure, although with different required score levels. The Supreme Court, in the words of a later Fifth Circuit opinion, was "unmoved by lower court determinations that the admissions standards derived from policies enacted in the 1970s to redress the problem of student

unpreparedness," *Ayers v. Fordice*, 111 F.3d 1183, 1193 (5th Cir. 1997). Rather, the *Fordice* Court called this a "mid passage justification" for perpetuating a discriminatory policy.

The above examples show that "traceability" under *Fordice* is a fact question, requiring a close examination of the substance of a policy or practice, not just its form, to identify whether the policy or practice in some degree maintains or follows key structures of the *de jure* era. *Fordice* also indicated that funding is a *critical* area of policy and practice that could require reform in order to dismantle a *de jure* segregated system. The Court specifically indicated that "upgrading" a state's HBIs might be a necessary part of the corrective process. It emphasized that "an increase in funding" to HBIs could be necessary in order "to achieve a full dismantlement" of the *de jure* system. 505 U.S. at 743. As discussed below, such an examination of Maryland's funding policies and practices clearly reveals their traceability.

## II. PLAINTIFFS HAVE DEMONSTRATED THAT THE STATE'S POLICIES ARE TRACEABLE AND HAVE DISPUTED ANY CONTRARY EVIDENCE.

### A. Defendants' Funding Policies Are Traceable Because They Follow The *De Jure* Practice Of Underfunding And Maintaining Structural Inequality.

Maryland's policies and practices regarding funding for its higher education institutions, both with regard to facilities and operations, follow and maintain structures inherent to the *de jure* era by systematically providing inadequate, inferior resources to the HBIs. Maintaining the HBIs as second-class institutions in comparison with the TWIs is a practice that was an inherent and fundamental element of *de jure* segregation. The fact that Maryland's funding policies and practices perpetuate this structural inequality makes them traceable to the *de jure* era.

Just as maintenance of multiple universities in a geographic area offering duplicative programs was "part and parcel of the prior dual system of higher education," *Fordice*, 505 U.S. at 738, 741, the drastic under-resourcing of black institutions was another keystone of the dual system. *See, e.g., Knight v. Alabama*, 787 F. Supp. 1030, 1091 (N.D. Ala. 1991). The provision

of inequitable resources for black institutions was a consistent element of the subjugation of African Americans in Maryland's segregated higher education system. A 1937 State commission stated: "The contrast between the amounts of money received by the two racial groups would show, if possible of computation, an enormous differential in favor of the white race." (*Report of the Commission of Higher Education of Negroes to the Governor and Legislature of Maryland* at 138 (Jan. 15, 1937) (Ex. 20).) Another commission similarly reflected in 1947: "The state has consistently pursued a policy of providing higher education facilities for Negroes which are inferior to those provided for whites. The meager appropriations and the inferior accreditation status of the Negro colleges attest to this fact." (*Higher Education in Maryland: A Report of a Survey by the American Council on Education with Recommendations of the Maryland Commission on Higher Education* at 90 (1947) ("1947 Rpt.") (Ex. 21).)

Plaintiffs have shown that Maryland has continued the practice of providing inferior resources to its HBIs to this day. Plaintiffs' expert Robert Toutkoushian concluded that "[t]he . . . HBCUs[] in the State of Maryland have experienced a long history of inequitable treatment by the state in comparison to the [TWIs]." (Toutkoushian Rpt. at 5 (Ex. 13).) Furthermore, he found that "the shortfall in funding available to HBCUs in Maryland increased sharply following the change in funding guidelines and the expiration in 1990 of the State's partnership agreement with OCR." (*Id.* at 8.) Specifically, Dr. Toutkoushian demonstrated that from 1990 to 2009 alone, Maryland's HBIs had access to between $1.7 billion and $2.1 billion less in total revenues than they were entitled to given their share of enrollment. (*Id.* at 4.)

Plaintiffs have also shown that Maryland's practice of providing inequitable and inadequate support for Maryland's HBIs clearly extends to campus facilities, as is evident from the inferior physical plants of the HBIs. Plaintiffs' facilities expert, Dr. Harvey Kaiser, reported

that "[t]here is overwhelming evidence, in the form of State-published reports and the deposition testimony of current and former State employees, establishing that the HBIs' facilities lag behind those at the TWIs [and] that facilities have historically been underfunded at [HBIs]." (Kaiser Report at 7 (Ex. 11).) Dr. Kaiser also concluded from his documentary and in-person study that "[t]he majority of HBI facilities fall below higher education standards." (*Id.* at 6.)

Defendants dispute plaintiffs' facts, claiming that Maryland has funded the HBIs equitably or more than equitably since the mid-1980s. (*Compare* May 17, 2010 Expert Report of Allan J. Lichtman ("Lichtman Rpt.") (Dkt. No. 207-8) with Toutkoushian Rpt. (Ex. 13) and Toutkoushian Supp. Rpt. (Ex.14); *see also* Funding Br. at 34-35, 40-41.) As shown in Section C below, plaintiffs have presented substantial evidence on this issue, creating a dispute of material fact that must defeat defendants' request for summary judgment. Furthermore, even if defendants' claims were correct, defendants would still not be absolved of liability under *Fordice*, which requires the State not merely to implement race-neutral policies, *Fordice*, 505 U.S. at 728-729, but to "take the necessary steps to ensure that [student] choice now is truly free," *id.* at 743. As discussed in greater detail below, *Knight v. Alabama* properly applied the *Fordice* rule to hold that even 25 years of favorable funding to HBIs does not suffice to dismantle the dual system if it does not yet allow the HBIs "provide an education today free from the stigma of past discrimination such as poor physical facilities and the tarnish of a reputation of lack of quality education." *Knight v. Alabama*, 900 F. Supp. 272, 308 (N.D. Ala. 1995). The case in Maryland mirrors Alabama. As the State's blue-ribbon Panel on the Comparability and Competitiveness of Historically Black Institutions in Maryland put it in 2008:

> There are many indicators that suggest that substantial additional resources must be invested in HBIs to overcome the competitive disadvantages caused by prior discriminatory treatment: the lack of modern "state of the art" science and technology labs, the aging physical plants and lack of consistent funding for maintenance, the poor retention and graduation rates of students as compared to

> TWIs, and the large number of low income and educationally underserved students in need of financial assistance.

(HBI Study Panel Rpt. at 6 (Ex. 12.) Maryland's HBIs are clearly not free of the stigma and tarnish described in *Knight;* and until they are, student choice will not be "truly free" as required under *Fordice.* In sum, through their funding systems for operations and capital at their State institutions, defendants are maintaining an essential structure of the dual system: a set of well-resourced TWIs and a set of second-class HBIs that "fall below higher education standards." This practice is thus traceable to the *de jure* era.

**B. Defendants' Funding Formula Is Traceable Because It Allocates Funds Based On Mission Classifications That Follow Historical Racial Assignments.**

Maryland's funding practices and policies are also traceable to the *de jure* era because the State allocates funds based on university mission classifications as defined by each university's Carnegie classification, and those classifications follow their historic racial assignments. As will be shown below, more funding goes to the universities with higher mission classifications, and the mission classifications to a significant degree replicate the *de jure* hierarchy that existed between TWIs and HBIs. As with the Mississippi mission designations in *Fordice,* "inequalities among the institutions largely follow the mission designations, and the mission designations to some degree follow the historical racial assignments." *Fordice,* 505 U.S. at 740-41.

**1. The actual missions of the Maryland institutions are defined by the Carnegie Classification System.**

The Carnegie Classification System provides the clearest way to identify the actual missions of Maryland institutions of higher education. While Maryland State colleges and universities have official "mission statements," which are proposed by the university presidents and subject to approval by MHEC, Md. Code Ann. Educ. § 11-302(a)), these statements do not systematically indicate what level of programs, degrees and research an institution offers. (Kaiser Rpt. at 11 (Ex. 11).) They do not employ "a consistency of terminology and definitions

that invite comparisons between institutions in a system and those in other systems." (*Id.*) In contrast to "the generalities and vagueness of typical mission statements," the Carnegie Classification System defines the real mission of each institution by objectively identifying what each institution has actually been given the resources and the authority to do. (*Id.*) The Carnegie system categorizes an institution according to what is taught, who the students are and what the setting is. (*Id.* at 49.) It is "used commonly throughout higher education and provides a fundamental set of characteristics to describe an institution." (*Id.* at 11.) Thus, "Carnegie classification is a relevant barometer of an institution's mission as it reflects the breadth of program and degree offerings at an institution." (Second Expert Report of Dr. Clifton F. Conrad at 10 (June 15, 2010) (Ex. 22).) As discussed below, the State has effectively adopted the Carnegie classifications by incorporating them into its state funding formula.

### *2.* The Carnegie classifications follow historical racial designations

During the *de jure* era the HBIs offered a lesser variety and a lower level of programs than the TWIs, and today's assignment to the HBIs of lower-level, less research-intensive missions (as measured by their Carnegie classifications) follows and maintains this hierarchy. The segregated, differentiated *de jure* era roles of the Maryland colleges and universities are the antecedents of the current mission classifications in the same way that the differentiated roles of Mississippi's higher education institutions in the *de jure* era were the antecedents of Mississippi's mission designations adopted in 1981. *See Fordice*, 505 U.S. at 740.

Significant programmatic disparities between the HBIs and the TWIs typified the *de jure* era. For example, "all of the white teachers' colleges (Frostburg, Salisbury, and Towson) had been offering junior college liberal arts programs since 1946, Frostburg and Salisbury since 1935. By comparison, neither of the two black teachers' colleges (Bowie and Coppin) had expanded beyond teacher education as of 1954." (First Expert Report of Dr. Clifton F. Conrad at

6 (May 3, 2010) ("Conrad I") (Ex. 23).) There were no graduate and professional programs at the HBIs; black students had some opportunity to attend law school at the University of Maryland through a State court decision, and beyond that the state provided some scholarships to send black students to out-of-state programs. (1947 Rpt. at 59-60 (Ex. 21).)

Just as the HBIs were given subordinate and inferior roles in the *de jure* era, they now have been consigned to subordinate and inferior positions in the Carnegie hierarchy. As Dr. Toutkoushian observed:

> The TWI institutions are more likely to be grouped with more research-intensive institutions than are the HBCU institutions. Among the four institutions described as "doctoral/research" or higher, for example, Morgan State University has the lowest classification. Similarly, Coppin State University and UM-Eastern Shore have the less prestigious groupings relative to their TWI counterparts.

(Toutkoushian Rpt. at 14 (Ex. 13).) The subordinate mission assignments of Maryland's HBIs are shown in the following table:

| **Table 2-2: Carnegie Classifications for Maryland's Four-Year Public Institutions** | | |
|---|---|---|
| **Carnegie Classification** | **TWIs** | **HBCUs** |
| Research – Very High Activity | UM-College Park<br>UM-Baltimore County[1] | None |
| Research – High Activity | UM-Baltimore County[1] | None |
| Doctoral/Research Universities | Towson University[2] | Morgan State University |
| Master's – Larger Programs | Frostburg State University<br>Salisbury State University<br>Towson University[2]<br>University of Baltimore | Bowie State University |
| Master's – Medium Programs | None | Coppin State University |
| Master's – Smaller Programs | None | UM-Eastern Shore |

*Notes*: [1]On appeal, the University of Maryland-Baltimore County was allowed to select peers from both Research-Very High Activity and Research-High Activity. [2]On appeal, Towson State University was allowed to select peers from both Doctoral/Research Universities and Master's – Large Programs although it is classified as Master's – Large Programs.

(Toutkoushian Rpt. at 14 (Ex. 13).) This ordering is similar to the ordering of State institutions under Mississippi's mission designation system:

| **Mission Designation** | **TWIs** | **HBIs** |
|---|---|---|
| Comprehensive | Univ. of Mississippi<br>Mississippi State<br>Southern Mississippi | None |
| Regional | Delta State University<br>Miss. Univ. for Women | Alcorn State University<br>Miss. Valley Univ. |
| Urban | None | Jackson State University |

*See Fordice*, 505 U.S. at 740. The Maryland hierarchy is, if anything, more extreme – Maryland has only TWIs at the two highest levels, and only HBIs at the two lowest levels. Therefore, just as the Mississippi mission designations were traceable to the *de jure* era because they followed historic racial assignments, the Maryland classifications are also traceable.

**3. Maryland's funding formula is based on the Carnegie mission classifications.**

The State has officially incorporated the mission classifications provided by the Carnegie Classification System into its system for determining university funding levels. At its core, Maryland's funding formula sets a target funding level for each institution by "objectively

identifying comparator institutions for each college or university," analyzing their funding levels, and identifying a percentile level within this group at which the Maryland institution should be funded. (*See* Newman Declaration at 7-8 (Dkt. No. 207-2); Toutkoushian Rpt. at 12 (Ex. 13); *see also* Memo from Lyons to Finance Policy Committee (Oct. 16, 2008) ("Lyons Memo") (Ex. 24).) Significantly, "[t]he selection group [of comparators] for most [Maryland] institutions was limited to public four-year colleges and universities within the same Carnegie Classification." (Lyons Memo at 2.) Thus, Maryland institutions are essentially locked into funding levels that correspond to their mission levels under the Carnegie classifications. As Dr. Toutkoushian observed, "the comparator institutions chosen for Maryland's HBCUs work to their disadvantage and lead to lower levels of recommended funding . . . [T]he comparators used for Maryland's four HBCUs are biased towards more teaching-oriented missions, and thus will tend to have less financial resources per student." (Toutkoushian Rpt. at 13-14.) This differentiation in comparison with the TWIs tracks directly back to the *de jure* era:

> Because the *de jure* system of higher education in Maryland contributed to the HBCUs being assigned less-research intensive missions than the TWIs, the comparators chosen for the HBCUs are on the whole less-research intensive and this further biases funding against the HBCUs in Maryland. This arises because it is typically the case that funding levels are positively related to the research intensity of a college or university.

(*Id.* at 14.) The Maryland funding formula thus tracks HBIs into lower funding levels according to their current missions, which tie back to their *de jure* era missions.

Accordingly, defendants' funding practices are traceable because the policies that drive funding allocations rely upon Maryland's discriminatory assignment of less research-intensive missions to the HBIs during the *de jure* era and Maryland's later failure to expand the HBIs' missions. These disputes constitute triable issues and are sufficient to defeat defendants' motion for summary judgment. As Dr. Toutkoushian explains, disparities in funding experienced by

Maryland's HBCUs "are the direct consequence of Maryland's decision to assign its HBCUs less research-intensive missions during its *de jure* system of segregated higher education, missions that have not been substantially enhanced even today." (Toutkoushian Rpt. at 3 (Ex. 13).) One can trace Maryland's current comparator-based funding policies to the *de jure* era because the comparators chosen for the HBCUs reflect the *de jure* system's assignment of "less research-intensive missions than the TWIs" and this incorporation "further biases funding against the HBCUs in Maryland." (*Id*. at 14.) Dr. Toutkoushian is not alone – Maryland has likewise admitted the damaging effects of this practice through its HBI Study Panel. (HBI Study Panel Rpt. at 16 (Ex. 12) (explaining that "the process by which a state sets university missions . . . has had the effect of substantially marginalizing the HBIs and their ability to develop and maintain comparable quality and competitiveness").

In conclusion, inherent to the *de jure* racial assignments were subordinated roles for the HBIs, backed up by inferior funding and resources. The continuation and even exacerbation of this subordination in the post *de jure* era is defined and quantified in the institutions' mission classifications via the Carnegie system. The implementation of a funding formula based on those classifications both incorporates and perpetuates this critical hierarchical structure from the *de jure* era into the future. As in Mississippi, "inequalities among the institutions largely follow the mission designations, and the mission designations to some degree follow the historical racial assignments." *Fordice*, 505 U.S. at 740-41. Thus, the funding formula that perpetuates these inequalities in Maryland is as traceable as the Mississippi mission designations were.

### C. Plaintiffs Dispute Defendants' Contention that Maryland's HBIs Have Received Adequate or Higher Levels of Funding In Comparison With The TWIs.

Defendants suggest they have no obligation to reform their funding policies and practices in part by claiming that "over the last twenty-five years Maryland has funded the four HBIs at

higher (i.e., better) levels per FTE student than the seven public non-HBIs in Maryland." (Funding Br. at 35.) Like the traceability of Maryland's funding methods, however, the adequacy of funds provided through those methods has been disputed by plaintiffs' evidence.

Defendants use their expert Allan Lichtman's analysis to support their argument that the "undisputed record of providing HBCUs more generous funding for operating expense and capital projects than has been provided for non-HBIs cannot be reconciled with any alleged intent to discriminate against African American students or the HBIs." (*Id*. at 34.) As an initial matter, plaintiffs are not required to establish intentional discrimination to prevail. In any event, defendants cannot show "undisputed facts" by relying on *their* expert, while ignoring the conflicting conclusions of plaintiffs' expert. Dr. Toutkoushian's opinions clearly *dispute* the "facts" upon which defendants rely.

Dr. Toutkoushian is a Professor of Higher Education at the University of Georgia, whose "areas of expertise include higher education finance, economics of higher education, and quantitative research methods." (Toutkoushian Rpt. at 3 (Ex. 12).) His calculations, summarized below, demonstrate that Maryland's HBCUs have experienced significant cumulative funding deficiencies since 1984. (*Id.* at 24, Table 3-2.)

**Comparison of Cumulative Deficiencies in Funding for HBCUs: 1990-09 versus 1984-09**

| **Cumulative Deficiency** | **Years Used in Calculation:** | | **Difference:** |
|---|---|---|---|
| | **1990 to 2009 (1)** | **1984 to 2009 (2)** | **(1) – (2)** |
| Unrestricted Revenues | | | |
| Enrollment share | $1,576,012,307 | $1,584,274,656 | ($8,262,349) |
| Enrollment share and mission | $1,981,247,907 | $2,060,383,856 | ($79,135,949) |
| Total Revenues | | | |
| Enrollment share | $1,733,704,438 | $1,705,673,038 | $28,031,400 |
| Enrollment share and mission | $2,138,940,038 | $2,181,782,238 | ($42,842,200) |
| Appropriations + Enhancements | | | |
| Enrollment share | $166,841,100 | $34,518,558 | $132,322,542 |
| Enrollment share and mission | $572,076,700 | $510,627,758 | $61,448,942 |

In addition, genuine disputes exist regarding the appropriate inputs for any such quantitative analysis of funding. The parties' divergent positions regarding the appropriate time period for an analysis of funding inequities, the relevant funding sources, the significance of the University of Maryland College Park, and the financial implications of the HBIs' dual mission underlie disputes about equity in operating funding that must be resolved at trial.

*First*, a genuine issue exists as to the most appropriate time period for such a quantitative analysis. Dr. Toutkoushian explains his view that a funding analysis considering 1990-2009, as opposed to one beginning in 1984, provides a better view of Maryland's funding practices, as they relate to the HBIs, as follows:

> The year 1990 was used as the starting point for the calculations because, in this year, the State departed from an enrollment-driven funding formula and the 1985-89 OCR partnership agreement with the State had expired. Furthermore, the analysis of revenue data that follows shows quite clearly that the financial situation of Maryland's four HBCUs deteriorated quickly in the beginning of the 1990s and has not yet been rectified.

(*Id.* 23.)[5] Dr. Toutkoushian further explains that a time period including the years 1990-2009 "coincides with a major change in state policy in Maryland that served to enhance one of its TWIs at the expense of its HBIs. In 1988, the State of Maryland chose to designate the University of Maryland – College Park as a 'flagship institution' and subsequently increased its funding at a much greater rate than for the HBI institutions over the same period of time." (Toutkoushian Supp. Rpt. at 23 (Ex. 13).) Dr. Lichtman begins his analysis in 1984 and maintains that Dr. Toutkoushian "shifts the chronological baseline of its analysis to produce

[5] Mr. Raymond Vollmer, Morgan's Vice President of Finance and Management, testified during his deposition that while he was "not sure if it was a coincidence or not," the aforementioned departure from a funding formula that considered enrollments worked to the detriment of Maryland's HBIs because it coincided with a period of enrollment growth at these institutions. (Vollmer Dep. 29 (Ex. 25).) Mr. Vollmer further explained that "[o]nce enrollment started to increase at the traditionally white institutions, Maryland Higher Education Commission decided, then, to go back to an enrollment-driven guideline. And we've been under that guideline since then." *Id.* at 30. The circumstances surrounding these changes to Maryland's funding formula give rise to a triable issue regarding discriminatory intent.

results that diminish the state's effort on behalf of historically black institutions." (Lichtman Rpt. at 2.)

*Second*, a material dispute exists as to whether only state appropriations or total revenues should be used to evaluate funding. Plaintiffs contend that "[w]hen drawing conclusions about equity in funding, the amount of aggregated revenues (unrestricted or total) is more important than a single source of funds within these totals." (Toutkoushian Rpt. at 20 (Ex. 13).) Defendants, however, argue that only state appropriations are relevant to the equitable funding issue. (*See* Lichtman Report at 2.)

*Third*, plaintiffs dispute the improper exclusion of College Park from Maryland's funding analysis. Dr. Lichtman concludes that Maryland's HBIs have received higher funding since 1984 by excluding the University of Maryland at College Park, a TWI and the best-funded institution in the state, from many of his calculations. (*Id.* at 7-8.) Meanwhile, Dr. Toutkoushian testified that the University of Maryland at College Park should be included, not only because it is a four-year public institution that competes with other institutions for students and funding but also because Maryland's practice of providing generous funding for this institution has exacerbated the disparities experienced by the HBIs. (*See* Toutkoushian Dep. at 116 (Ex. 26).)

*Fourth*, plaintiffs dispute the propriety of any analysis that fails to account for expenses associated with the "dual mission" of the HBIs. Maryland's HBI Study Panel described the "dual mission" of Maryland's HBIs and the related financial considerations as follows:

> HBIs need a different form and level of capacity because unlike the TWIs, the HBIs have a dual mission: (1) to carry out their regular collegiate programs and associated functions to the best of their ability and (2) to provide strong programs in developmental education to ensure access and success to students, mostly from low income families, who otherwise would not have an opportunity to pursue a bachelor's degree. The HBIs are not funded at appropriate levels to carry out both parts of this mission at once.

(HBI Study Panel Rpt. at 12 (Ex. 12).) Dr. James Lyons, Maryland's former Secretary of Higher Education admits that Maryland's HBIs have a dual mission that is not properly funded by the state. (Lyons Dep. I at 214-215 (Ex. 10).) Maryland concedes in its HBI Study Panel Report that "HBIs historically and into the future have a dual mission." (HBI Study Panel Rpt. at 7). Dr. Toutkoushian, therefore, incorporates a supplement of $1,400, the figure recommended by Maryland's 2008 Commission to Develop the Maryland Model for Funding Higher Education, into his financial disparity calculations. (Toutkoushian Rpt. at 18 (Ex. 13).)

Plaintiffs also dispute the defendants' contention that the facilities at Maryland's HBIs have received adequate funding since the 1980s. In support of their argument, defendants identify several purportedly undisputed quantitative metrics, including: (1) funding per FTE student; (2) square footage per FTE student; (3) amount of physical plant built since 1982 and (4) size of research lab deficiency, to suggest that Maryland's HBIs are actually better-resourced than the TWIs. (Funding Br. at 40-41.) Defendants further contend that plaintiffs have not disputed defendants' claims that recent capital investments have eliminated any vestiges of the *de jure* system. (*Id.* at 41.) These assertions again ignore the record regarding the questionable reliability of defendants' metrics in comparing Maryland's institutions of higher education, the disparity in the condition of the facilities at Maryland's HBIs relative to those of the TWIs, and the traceability of these disparities to Maryland's historical funding policies and practices.[6]

Furthermore, plaintiffs' expert evidence and defendants' own admissions raise triable issues regarding the condition of the facilities at the HBIs. Dr. Kaiser correctly points out that

---

[6] MHEC's own 1974 Task Force to Propose Ways of Enhancing the Role and Image of Predominantly Black Public Colleges in Maryland questioned the appropriateness of giving undue weight to funding and space per FTE student in comparisons between HBIs and TWIs because of differences in the sizes and missions of these institutions. (*See Report to the Maryland Council for Higher Education*, at Appendix 2, p. 2 (Aug. 9, 1974) (Ex. 27).) Dr. Harvey Kaiser, plaintiffs' facilities expert, considered this report, along with several other historical documents when he concluded that "extracting data for calculations of capital funding on a per-FTE basis ignores the needs and distinctive missions of the HBIs," and rejected "Dr. Lichtman's method of analysis about the amount of square feet per FTE at the HBIs and research space deficiencies as misleading." (Kaiser Rpt. at 11- 12 (Ex. 11).)

defendants' expert, Dr. Lichtman, fails to draw any conclusions about the "actual conditions" of Maryland's HBIs. (Kaiser Rpt. at 7 (Ex. 11).) As noted above, based on his extensive study, Dr. Kaiser concluded that the HBI facilities are inferior to the TWIs and have been historically underfunded, going back to the *de jure* era (*Id.* at 9.) Defendants' own witnesses also support this conclusion (Lyons Dep. at 267 (Ex. 10)) ("Maryland has eliminated vestiges in many areas, but not all areas" including "facilities"). Likewise, the HBI Study Report concluded "that substantial additional resources must be invested in HBIs to overcome the competitive disadvantages caused by prior discriminatory treatment: the lack of modern 'state of the art' science and technology labs, the aging physical plants and lack of consistent funding for maintenance." (HBI Study Panel Rpt at 6 (Ex. 12).) The Panel indicated that "the facilities at the HBIs are not comparable to those of the TWIs. . . . [T]he Panel wishes to make a special case for addressing the needs of the HBIs both as a priority and as expeditiously as possible. We recommend this not only out of our first-hand findings that the HBIs visibly lag behind the TWIs but also because addressing this deficiency is crucial to achieving the goals of capacity and competitiveness of the HBIs in both undergraduate and graduate education." (*Id*. at 28-29.)

### D. Defendants Cannot Defend Their Funding Methodologies By Arguing They Were Created After The *De jure* Era Or Delegated To Lower State Officials.

Defendants make the unpersuasive argument that their funding formula is not traceable to the *de jure* era because the formula in use today was first implemented in 1999. (Funding Br. at 30-31.) They similarly argue that their methodology for capital funding was adopted after the *de jure* era. (*Id.* at 37.) The *Fordice* Court's treatment of Mississippi's mission assignment makes clear, however, that new policies that, like Maryland's funding policies, maintain the structures or patterns of the *de jure* era are not saved by their "newness." The mission designations held to be traceable in *Fordice* had been adopted in 1981, well after the *de jure* era. *Fordice,* 505 U.S. at 740. Thus, like Maryland's funding formula, Mississippi's institutional mission designations

represented a new policy, and even a new type of policy. Those designations were nevertheless held to be traceable because they "to some degree follow[ed] the historical racial assignments." *Id.* at 740-41. As demonstrated above, the same is true of Maryland's funding formula.

The *Knight* court properly applied these principles in finding Alabama's funding formula traceable despite being adopted long after the *de jure* era, in 1973. *See Knight*, 787 F. Supp. at 1193, 1270. Furthermore, the Alabama formula was not based on any prior formula used in the *de jure* era; rather, the *Knight* court observed that Alabama's formula had been "originally derived from a Texas model," and implied that funding formulas had not been in use prior to its adoption. *Id.* Notwithstanding this history, however, the court found that this formula set funding based on a historic, discriminatory distribution of resources that had been established in the *de jure* era. *Knight*, 900 F. Supp. at 308. *See also Ayers*, 111 F.3d at 1207 (it is not required "that a challenged policy as it exists today must have been in effect during the *de jure* period in order to be constitutionally problematic.") Similarly, the fact that Maryland's funding methodologies were adopted after the *de jure* era, and that *de jure* era funding systems may have worked differently, do not mean the formula is not traceable. Maryland's funding policies and practices follow and maintain structures from the *de jure* era by continuing the systematic under-support of the HBIs and by basing funding on university mission designations. They are therefore traceable.

Defendants also make much of the fact that certain university management functions have been delegated to the university presidents, and suggest that defendants are therefore freed from their constitutional obligations. This novel argument fails for two reasons. *First*, *Fordice* defines the obligations of the State, and a decentralized management scheme does not terminate these obligations. Defendants cannot deny responsibility for adequately funding HBIs because the decision to admit disproportionately less-prepared students is "within the complete discretion

of each university." (Funding Br. at 36.) Nor can they blame university presidents for their constrained decisions about capital funding priorities, implying that the State is therefore not responsible for the physical conditions of the universities. (*Id.* at 38.)

As an initial matter, the State cannot wash its hands of its constitutional obligations through some policy of delegation or decentralized management. "Because the former *de jure* segregated system of public universities . . . impeded the free choice of prospective students, the State in dismantling that system must take the necessary steps to ensure that this choice now is truly free." *Fordice,* 505 U.S. at 743. Maryland's obligation to take "the necessary steps" is not voided by an attempt to outsource responsibility over its State system. If indeed it had ceded control of its system (which is clearly not the case, as discussed below), it would need to retake such control in order to meet any outstanding constitutional obligations.

*Second*, the individuals whom defendants would blame, the university presidents, are in fact State actors under State control who are ultimately responsible to the Governor; they are, effectively, the State itself. The University System of Maryland ("USM") is "an instrumentality of the State," as is Morgan State University. Md. Code. Ann. Educ. §§12-102(a)(2), §14-101. Presidents of the State universities at issue in this case are appointed by the Board of Regents of USM, *id.* at §12-109(a), with the exception of Morgan's president, who is appointed by the Morgan Board of Regents, *id.* at §14-104(k)(1). In either case, the Regents are appointed by the Governor, with the advice and consent of the Senate. *id.* at §§12-102(e), §14-102(b). Not only do the Governor's appointees control who the university presidents are, but the Regents in fact exercise significant direct control of those presidents. The USM Board "[i]s responsible for the management of the University System of Maryland and has all the powers, rights, and privileges that go with that responsibility, including the power to conduct or maintain any institutions, schools or departments in the University at the locations the Board determines." *Id.* at §12-

104(c)(1); *see also Id.* at §14-104(a)(1) (comparable provision for Morgan). Furthermore, "[a]ny delegation of authority [to a university president] may be modified or rescinded by the Board of Regents at any time in whole or in part." *Id.* at § 12-104(k)(2). Beyond these general powers, the higher-level State actors retain significant control over specific and critical areas of university governance. Defendant MHEC creates a "State Plan for Higher Education," *Id.* at §11-105(b)(2)(i), and then reviews proposed university mission statements for coherence with that plan, *Id.* at §11-302(d). Mission statements within USM must also be approved by the Board of Regents. *Id.* at §11-302(b)(ii). MHEC also reviews university proposals and submits recommendations to the Governor on capital projects, *Id.* at §11-105(i)(3), and the Governor is the only official in Maryland who can include an appropriation in an annual budget bill. Md. Const. Art. 3, §52. In short, defendants' remarkable claim that they are somehow no longer responsible for taking the necessary steps to fully dismantle the vestiges of *de jure* segregation must be rejected.

## III. SUBSEQUENT LOWER COURT OPINIONS CONFIRM THAT PLAINTIFFS HERE MEET THE SUPREME COURT'S *FORDICE* STANDARD.

Contrary to defendants' suggestion that "more demanding" post-*Fordice* decisions have reduced the State's obligations (Funding Br. at 7), subsequent higher education cases in fact confirm plaintiffs have presented triable issues here.

### A. *Knight v. Alabama*

The district court in *Knight v. Alabama*, 787 F. Supp. 1030 (N.D. Ala. 1991) and 900 F. Supp. 272 (N.D. Ala. 1995), provides an example of the proper application of *Fordice* to the factual record and confirms that funding policies and practices such as Maryland's are traceable. In *Knight*, Alabama's funding systems bore remarkable similarities to Maryland's. The court's conclusion that Alabama's funding policies and practices were traceable makes clear the traceability of Maryland's funding policies and practices.

**1. *Knight* shows that operations and capital funding methodologies such as Maryland's are traceable because they maintain the two-tier *de jure* era hierarchy between HBIs and TWIs.**

The *Knight* court found that Alabama's formula, like Maryland's, effectively based current funding on the unequal distribution of resources established in the *de jure* era and thus maintained the *de jure* era hierarchy between TWIs and HBIs – and was, therefore, traceable. As the court stated, "all formulas are ultimately driven from some historic distribution of past resources. . . . If the past has been noted for inequitable allocations to institutions, so will the future – unless the formula is changed to ignore the inequities of the past." *Knight*, 787 F. Supp. at 1207. Furthermore, like Maryland's formula, the Alabama formula was traceable because it continued the *de jure* era practice of disadvantaging the HBIs by failing to address economies of scale and failing to address the increased costs of educating less-prepared students.

The Alabama formula provided funding largely according to the type of program and the level of study at each university: it "allocate[d] different amounts on the basis of academic discipline and level of instruction. Irrespective of the institution, similar amounts [were] allocated for each weighted student credit hour by academic discipline and level of instruction." *Id.* at 1194. The result was a funding system that, although newly adopted in 1973, followed and maintained the patterns of the *de jure* era that favored large, complex TWIs. *Knight*, 900 F. Supp. at 308 ("The traditionally white universities possess far more of the high expenditure curricula and graduate programs. An institution with programs that have spent more money in the past will receive more money in the future."). Naturally, the maintenance of the Alabama HBIs as second-class institutions in terms of resources had a segregative effect and did not allow the HBIS to "overcome the effect of past discriminatory under funding." *Id.* Maryland's formula similarly embeds and sustains the hierarchies and inequalities of the *de jure* era in a new system; like Alabama's formula, Maryland's formula favors large, complex TWIs. By setting

funding according to "comparators" based on the Carnegie classifications, Maryland's formula favors the TWIs, which have historically been granted larger, more complex programs.

The *Knight* court identified two other elements of the Alabama funding formula (also present in Maryland) that perpetuated the inequalities of the *de jure* era. *First*, the Alabama formula did not address economies of scale, through which "in general a large school can educate students more economically than can be done at a small school." *Id.* at 311. The Maryland formula likewise perpetuates the subordinate status of the HBIs by not addressing economies of scale. (*See* Toutkoushian Rpt. 16-17 (Ex. 13) ("formula does not take into account the effect of economies of scale on the per-student cost of providing education services.").)

*Second*, the Alabama formula did not cover the greater cost of educating less prepared and poorer students. *Knight,* 787 F. Supp. at 1200. In contrast, the court described funding formulas from six other states that "recognize costs of desegregation and recognize costs of educating less-prepared students." *Id.*. The court's remedy was forceful, requiring the state to essentially triple its allocation for delivering a remedial course in the standard undergraduate program. *See id.* at 1379. Similarly, the Maryland HBIs educate a disproportionate share of disadvantaged students, and Maryland does not provide necessary additional funding to allow the schools to do so. (*See* Toutkoushian Rpt. at 18 ("The formula does not provide additional funding for HBCUs to meet the needs of serving a large share of disadvantaged students.").) As Maryland's HBI Study Panel recognized in 2008, in addition to their general goals of providing quality higher education, "HBIs in the State of Maryland also have as their mission to address the educational needs of students who come from families with traditionally less education and income and who are often under prepared as a result of their circumstances – not their abilities – for college level work." (HBI Study Panel Rpt. at 7 (Ex.12).) The Panel concluded that "[t]he HBIs are not funded at appropriate levels to carry out both parts of this mission at once," noting

that "HBIs must expend larger portions of their budgets toward developmental education and academic support than TWIs." (*Id.* at 12-13.) Another State commission recommended a supplement of $1400 per undergraduate FTE be given to each HBI to address the costs of serving this dual mission. (*Final Report of The State's Commission to Develop the Maryland Model for Funding Higher Education* at ix (2008) (Ex. 28).) Because this element of its funding formula systematically disfavors the HBIs, this is another way in which Maryland's formula sustains the discriminatory patterns of the *de jure* era and hence is traceable.

*Knight* also found that Alabama's provision of capital support for its HBIs was inequitable and traceable to the *de jure* past for reasons that apply to Maryland as well. The court stated, "there continues to exist in Alabama vestiges of segregation with regard to the condition of the facilities on the HBUs. These vestiges are a direct result of the failure of the state in the past to fund the capital development of its predominately black schools." *Knight*, 787 F. Supp. at 1370. In reaching its conclusions, the court made findings that bear a striking similarity to this case. *First*, relying substantially on the expert testimony of Harvey Kaiser, who is also plaintiffs' facilities expert, the court found the conditions of the TWI campuses to be superior to those of the HBIs, both functionally and aesthetically, in ways that would discourage students from freely choosing the HBIs, just as plaintiffs have shown to be the case with Maryland's facilities. *Id.* at 1278-79.

*Second*, the court found that to address substantial enrollment growth from the late 1960s to the early 1980s, rather than to build up HBIs located in the Montgomery and Hunstville area, the State had both created a new TWI and expanded an existing TWI. *Id.* at 1280. The result was a new era of TWIs leaving the HBIs behind, cementing the HBIs' second class status. *Id.* The similarity of Maryland's capital funding practices to what is described in *Knight* is uncanny. During the same period, Maryland ignored the offer of Morgan State University to become the

State's first truly multiracial university to accommodate the growing demand in the Baltimore region for higher education. (*Sixth Annual Report of the Maryland Council for Higher Education* at 4-1 (1970) (Ex. 29).) Rather, Maryland created the University of Maryland – Baltimore County, and spent $46 million for new facilities there from 1964 to 1973. (Conrad I at 7 (Ex. 23).) Maryland also developed Towson State University dramatically, so that it went from having a third of Morgan's enrollment in 1953 to nearly double Morgan's enrollment in 1973; the State invested $49 million in Towson's facilities from 1964 to 1973, as compared with $19 million at Morgan. (*Id.*) As in Alabama, Maryland built new and existing TWIs into far larger and better-resourced institutions, equipping them for the modern era, and consigning nearby HBIs to continue to languish in second-class status.

**2. *Knight* demonstrates the State's constitutional obligation to make its HBIs comparable and competitive so they can desegregate, not merely to improve their funding for a period of time.**

A final, striking similarity between Alabama and Maryland appears if one credits, for the sake of argument, defendants' claim that they have recently provided more than equitable support for the HBIs in operations and capital support. (Funding Br. at 34-35, 40.) The *Knight* court found in fact that Alabama had been giving its HBIs significantly favorable support for 25 years with respect to operations funding and for eight years with respect to capital. Nevertheless, the court held that, as is the case with Maryland, the State had not satisfied its constitutional obligations because its HBIs had not been raised to a level of quality from which they could compete with TWIs for students and desegregate; thus, despite improvements, the State was maintaining the *de jure* era hierarchy of the dual system.

Regarding operations funding, the *Knight* court found that "the State has funded [the HBIs] better than the other state institutions for at least the last twenty-five years." *Knight*, 900 F. Supp. at 307. However, the test was not whether during some period funding had improved

for the HBIs, but whether such funding had undone the vestige of *de jure* segregation, which was the maintenance of the second-class status of the HBIs and the attendant segregative effects. The court found that this was *not* the case:

> [S]uch funding has not yet put those institutions in the place they would have been but for their black heritage and the *de jure* system. Formula funding, like Alabama's system, is the effect of cumulative past history. . . . In particular, the lack of funding and, the concomitant dearth of high quality and/or differentiated programs prevents white students who would otherwise attend an HBI, from choosing to do so.

*Id.* (citations omitted). The court further explained: "Inequality in funding over a number of years cannot be made up overnight. The funding level over a period of years affects a school's mission, program, facilities, and reputation, all of which can then change only very slowly." *Id.* at 311 (citations omitted). In other words, the *de jure* era practice of maintaining a set of black institutions with inferior resources had effectively continued, because the HBIs had never been brought to a comparable level with TWIs. However one analyzes the year-to-year funding of Maryland's higher education system with regard to the post-*de jure* era, an examination of the mission, programs, facilities and reputation of Maryland's HBIs clearly shows that, as the *Knight* court stated, those schools have been kept at a level that "prevents white students who would otherwise attend an HBI, from choosing to do so." *Id.* at 307.

Similarly, the *Knight* court found that after the period of massive investment in its TWIs described above, Alabama began to provide better capital funding with its HBIs, but not to such a degree as to overcome the disadvantage it had created among its TWIs. In fact, the *Knight* court held that "since at least 1983, the state has fulfilled its obligation to fund capital development in a nondiscriminatory manner." *Knight*, 787 F. Supp. at 1370. However, that did not eliminate the reality that capital funding practices had not yet been changed in such a way as to bring the HBIs out of their second-class status. The court stated: "The conclusion that there is

no ongoing violation of the funding procedures does not vitiate the fact that the condition of the facilities on the HBUs continues to be a vestige of segregation which must be eliminated by the state if its actions are to comport with the Constitution." *Id.* The long-term effect of the underdevelopment of the HBIs created a pervasive segregative effect that could not be undone even with a number of years of more favorable funding, so that additional capital funding was required at the two universities to remedy this effect. *See id.* at 1283.

As in Alabama, Maryland has claimed that in the last 25 years, it has "generously constructed and renovated the HBI facilities compared to non-HBIs." (Funding Br. at 40.) And, as in Alabama, plaintiffs have shown that, whatever these funding levels may have been, facilities at the HBIs still "visibly lag behind the TWIs", as the State's own panel put it. (HBI Study Panel Rpt. Table A-2, 29 (Ex. 12); *see also* Kaiser Rpt. at 2-7 (Ex. 11).) Thus, like Alabama's HBIs, Maryland's HBIs "have not been in the position to improve their facilities to the level necessary to attract other race students particularly in the face of strong competition for capital funding from the predominately white universities located in close geographic proximity." *See Knight*, 787 F. Supp. at 1281.

**B. *Ayers v. Fordice***

Defendants' attempt to defend their funding policies and practices with reference to the *Ayers* cases (Funding Br. at 31-32) is misplaced. Under the rationale articulated by Court of Appeals in *Ayers v. Fordice*, 111 F.3d 1183, 1221-25 (5th Cir. 1997), Maryland's formula would still have been found traceable because it allocates funds according to mission assignments. In ruling on Mississippi's funding formula, the Fifth Circuit *distinguished* the then-current formula from its prior mission-based formula. *Id.* at 1223-24. This distinction was essential to upholding the formula because the mission designations had been found "to some degree [to] follow the historical racial assignments" and therefore were themselves traceable to the *de jure* era,

according to the Supreme Court. *Fordice*, 505 U.S. at 740-41. A funding formula based on those mission designations would itself have been traceable. Under this rationale, Maryland's formula is traceable. Plaintiffs submit that the *Ayers* courts did not execute the searching analysis of policies and practices for traceable elements as mandated by *Fordice*, although those failures do not alter the conclusion here.

That said, the Circuit and District courts in *Ayers* do not provide a good model for analyzing traceability because they did not analyze policies and practices that continued the structures of the *de jure* era as rigorously as the Supreme Court instructed in *Fordice*. The Fifth Circuit seems to have been more tolerant than was the Supreme Court in *Fordice* of "old wine in new bottles" – that is, patterns and structures of the *de jure* era repackaged in new forms. For example, in finding the funding formula to be non-traceable, the Fifth Circuit stated that "[w]hile the formula responds to conditions that to a significant degree have resulted from the mission designations (and consequently results in the HWIs receiving a greater proportion of funds), the manner in which the formula does so is guided by valid educational concerns and is not linked to any prior discriminatory practice." *Ayers*, 111 F.3d at 1224. This conclusion, however, is at odds with the Supreme Court's holding in *Fordice* that a new policy achieving the old result, where the old result was maintenance of an essential structure of the *de jure* era, was traceable. As discussed above, the Court held Mississippi's program duplication to be traceable to the *de jure* era, even though the program duplication was occurring through an entirely new system of program approval. *Fordice*, 505 U.S. at 738.

Similarly, the Fifth Circuit's acceptance of the funding formula's lack of adjustment for the higher cost of remedial education is at odds with the *Fordice* approach. As with program duplication, the details by which Mississippi was perpetuating the under-resourcing of HBIs had changed as well. What had not changed, however, was that the State was continuing the *de jure*

era subordination of the HBIs through inequitable funding into the present, and it was doing so in part through continuing to deny to HBIs adequate resources to educate the students they served. In contrast, the *Knight* court properly paid attention to Alabama's failure to fund HBIs to serve their needy student population. 787 F. Supp. at 1227-28. The *Knight* court's approach is thus far more consonant with the Supreme Court's approach to traceability under *Fordice* than that of *Ayers.* The Court should follow *Fordice* and *Knight* in evaluating Maryland's continued denial of adequate and equitable funds to the HBIs to educate their students and condemn the failure to allocate additional funds needed to properly serve more educationally needy students.

## IV. THERE ARE MATERIAL FACT DISPUTES AS TO WHETHER DEFENDANTS HAVE INTENTIONALLY DISCRIMINATED AGAINST AFRICAN AMERICAN STUDENTS AT THE HBIS.

While the scope of their motion on the issue is unclear, defendants appear to seek a broader dismissal of claims because "this Court could not reasonably conclude that Maryland has any [alleged] intent to discriminate against African American students or the HBIs." (Funding Br. at 26.) As to any areas that constitute "vestiges" under *Fordice,* intentional discrimination is not required, as discussed above. Moreover, there are admissible facts sufficient to show that Maryland's decisions regarding program duplication have been motivated in part by intentional discrimination against African American students who predominantly attend the HBIs.

The Supreme Court in *Fordice*, 505 U.S. 717, 732 n.6, made clear that a claim for "traditional" intentional discrimination ***is distinct from*** a *Fordice* claim based on traceability. *See* 505 U.S. 717, 732 n.6; *see also Knight*, 900 F. Supp. at 343. The elements of a traditional intentional discrimination claim were laid out in *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265-266 (1977). Discriminatory purpose must be a motivating factor, but not necessarily the "sole," "dominant," or "primary" factor. *Arlington Heights*, 429 U.S. at 265. Intent may turn on whether the action "bears more heavily on one race

than another." *Id.* at 266 (internal quotation marks and citations omitted). Other nonexclusive factors used to determine intent may include: (1) the historical background of the decision; (2) the specific sequence of events leading up to the decision; (3) procedural and substantive departures from the norm in decision making process; and (4) the legislative or administrative history of the decision or action. *Id.* at 266-268.

Plaintiffs have presented evidence regarding Maryland's history of program duplication as an example of intentional discrimination here. Program duplication can have a segregative effect because "disproportionate numbers of whites *can* satisfy their curricular desires at HWIs, and *cannot* satisfy them at HBIs, thereby discouraging them from choosing to attend HBIs." *Knight*, 900 F. Supp. at 281 (emphasis added). MHEC's former chairman, John Oliver, stated that duplication has had the same segregative effect in Maryland. (Oliver Dep. at 75-76 (Ex. 17).) Expert testimony is consistent with Mr. Oliver's experience. As Dr. Conrad finds, currently more than 50% of the HBI programs in Maryland are unnecessarily duplicated by programs at TWIs, assessed statewide or in the Baltimore/College Park area. (Conrad III at 12 (Ex. 4).) Moreover, Dr. Conrad determined that as a result, the percentage of white students at HBIs has steadily declined since 1991. *Id.* For example, in 2008 the median White enrollment at the HBIs was only 4.8% White. (Trends in Enrollment at 69 (Ex. 3).) When comparing the number of unique, high-demand, non-core programs essential to desegregating the HBIs under *Fordice,* Dr. Conrad found that Maryland's HBIs have only *11* such programs, as compared with *122* at TWIs. (Conrad III at 12-13.)

In recognition of the integral role that unique, high-quality programs play in desegregating higher education, Maryland committed to "developing high-demand academic programs at HBCUs and ensuring that they are not unnecessarily duplicated at nearby institutions" as part of its 2000 Partnership Agreement with OCR. (Partnership Agreement 33

(Ex. 7).) Yet in spite of this commitment, and with full knowledge that duplicative programming prevents the HBIs from becoming comparable and competitive with geographically proximate TWIs, MHEC continued to approve duplicative programs.

Perhaps the most dramatic example – and one that touches on many of the *Arlington Heights* factors – was the approval of the joint MBA program at the University of Baltimore and Towson University that duplicated Morgan State University's pre-existing MBA program. Certain events related to defendant MHEC's consideration of the joint MBA program gives rise to an inference of discriminatory intent.

In the early 1970s, Morgan State had a thriving MBA program that enrolled as many as 250 students, including 54 white students. (MHEC, *Trends in White Graduate Students at Historically Black Institutions in Maryland* at 9 (Oct. 2009) (Ex. 30).) In 2004, the University of Baltimore and Towson University submitted a proposal to MHEC seeking approval of a Joint MBA Program to be offered jointly by the two institutions. (*See* Interim Proposal for a New Instructional Academic Program (Ex. 31).) On November 16, 2004, the president of Morgan State University wrote Maryland's Secretary of Higher Education to object to the proposed duplicative Joint MBA Program. (*See* Ltr. from Richardson to Burnett (Nov. 16, 2004) (Ex. 32).) Dr. Richardson noted that (1) several institutions in the Baltimore area, including Morgan, already offered MBA programs; (2) enrollments in MBA programs were currently declining; and (3) Morgan could absorb any projected future need for MBA capacity. *See id.*

Initially, Dr. Burnett objected to the approval of the Joint MBA Program because of MHEC's conclusion that it "unnecessarily duplicated of the MBA programs at Bowie State University and Morgan State University." (Ltr. from Burnett to Bogolmony and Caret (Nov. 22, 2004) (Ex. 33).) But Dr. Richardson's letter was not among the fourteen documents, including letters from other institutions, provided to the full group of Commissioners for their

consideration in the deliberations that eventually led to the approval of the Joint MBA Program and the reversal of MHEC's original objection. (*See* Memo from Burnett to MHEC Commissioners (Mar. 1, 2005) (Ex. 34); Ltr. from Burnett to Bogolmony and Caret (Mar. 15, 2005) (Ex. 35); O'Keefe Dep. at 50 (Ex. 36).)[7]

OCR agreed with Morgan's analysis and informed defendants that approving the program did not meet the requirement to avoid unnecessary program duplication under the Agreement, Title VI, and *Fordice*. (Ltr. from Fox to Burnett (Apr. 13, 2005) (Ex. 39).) In addition, the Maryland Attorney General's office submitted a memorandum to MHEC dated April 20, 2005. In it, the Attorney General advised the Secretary that the decision to approve the joint MBA program was made "contrary to the advice and counsel rendered him by the Office of the Attorney General." (McConkie Memo at 2 (Ex. 8).) Specifically, the memo warned that approval of this academic program would leave the State in a "vulnerable position, legally, with respect to the law governing the unnecessary duplication of academic programs." (*Id.*) Even so, the Secretary did not change his decision and MHEC subsequently reaffirmed its approval of the joint MBA program at Towson/UB by vote. (Memo from Oliver to Burnett and University Presidents (May 25, 2005) (Ex. 40).)

MHEC's decision to approve the joint MBA program contains many factors indicative of the discriminatory intent:

- Discriminatory effect – the Maryland Attorney General's Office specifically warned MHEC of the adverse racial impact of approving the program;
- Historical context – the history of segregation and the state's failure to dismantle the vestiges of discrimination, including duplicative programming such as the MBA programs at Morgan, Towson and UB;

---

[7] The MHEC Faculty Advisory Council met on March 15, 2005, the same day the Joint MBA program was approved. According to the minutes of the meeting, MHEC staffer Genny Segura reported "The joint Towson University/University of Baltimore MBA had been approved today, largely because the Historically Black Institutions did not oppose it." (MHEC Faculty Advisory Council, Minutes of the March 15, 2005 Meeting (Ex. 37).) But the minutes from the next meeting on April 19, 2005 revealed that Morgan State had, in fact, registered an objection. (MHEC Faculty Advisory Council, Minutes of the April 19, 2005 Meeting (Ex. 38).)

- Procedural irregularities – the Secretary changed its position from opposing the program to approving it and failed to circulate Morgan State's opposition;

- Substantive irregularities – MHEC ignored the advice of counsel and approved the program after admitting the program was unnecessarily duplicative;

- Contemporary statements – MHEC staff falsely claimed at the time that none of the TBIs opposed the joint MBA program when Morgan State had done so.

Also probative on the issue of discriminatory intent is the testimony of the individuals present at MHEC when the joint MBA program was approved. The former Chair of MHEC, Mr. John J. Oliver, who refused approval of the program during his tenure, testified that MHEC's approval of the joint MBA Program after his tenure was a violation of the Agreement and *Fordice*. (Oliver Dep. at 104-105 (Ex. 17).) Mr. Oliver also observed a present-day trend of program duplication by defendants – "they have been duplicated and there seems to be a trend where such practices are continuing and, in my opinion, that's wrong." (*Id.* at 74-75.) In addition, according to Dr. Sue Blanshan, MHEC has never considered whether proposed academic programs *unnecessarily* duplicate programs at existing Maryland public colleges and universities. Instead, MHEC has always used "unreasonable program duplication," even during the term of the Agreement, when MHEC and Maryland had expressly committed to avoid *unnecessary* program duplication. (Blanshan Dep. at 62 (Ex. 41).)

The testimony of Dr. Oliver and Dr. Blanshan reveal a significant departure from a normal decision making process and the advice defendants received from both their own counsel and OCR about the potential adverse impact of such an approval illustrates that the approval of the joint MBA program was partially motivated by discriminatory intent as defined by *Arlington Heights*. The historical context and significant deviations by MHEC illustrate defendants' discriminatory intent in approving unnecessarily duplicative programs. The evidence above is sufficient under *Arlington Heights* and establishes a genuine issue of material fact on

discriminatory intent. The continued approval of unnecessary duplicative programs has resulted in a stark pattern of adverse impact on minority students at HBIs. As a result, the size and prestige of TWIs has grown, while the inferior and duplicated programs at the HBIs have prevented them from attracting other race students. Because plaintiffs have demonstrated a genuine issue of material fact with regards to discriminatory intent behind the program duplication at Maryland's TWIs, defendants' motion should be denied.

## V. RULE 56 IS NOT THE PROPER VEHICLE FOR DEFENDANTS TO SEEK PRELIMINARY FACTUAL RULINGS AS THEY DO HERE.

Although the issue is moot given the overwhelming evidence establishing material facts in dispute with respect to all issues raised in defendants' motion, plaintiffs submit that Rule 56 is not even the appropriate vehicle to address piecemeal requests for rulings as defendants request. While titled a motion for summary judgment, it is not clear defendants' motion is even an appropriate *partial* summary judgment motion. While Rule 56 permits a court to grant summary judgment "on all or part of the claim" asserted, a motion for summary judgment may not properly seek to dispose of only a factual allegation or element of a single indivisible claim for relief. *See, e.g.*, *Franklin-Mason v. Penn*, 259 F.R.D. 9, 11 (D.D.C. 2009). Defendants' motion is in essence an attempt to strike certain allegations rather than to establish as "undisputed" a claim or element thereof. Rule 56 is not the appropriate vehicle for such an attempt.

## CONCLUSION

For all the foregoing reasons, Defendants' motion should be denied.

Dated: March 25, 2011

Respectfully submitted,

________/s/___

Michael D. Jones, Esq. (Bar No. 08634)
Karen N. Walker (Bar No.14181)
Henry Thompson (*pro hac vice*)
Savaria B. Harris (*pro hac vice*)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200
Email: henry.thompson@kirkland.com

Aderson B. Francois, Esq. (Bar No. 17449)
Howard University School of Law
Civil Rights Clinic
2900 Van Ness Street, N.W.
Washington, D.C. 20008
Telephone: (202) 806-8065
Facsimile: (202) 806-8436
Email: afrancois@law.howard.edu

John C. Brittain (*pro hac vice*)
Attorney At Law
2513 Gadsby Place
Alexandria, VA 22311
Telephone: (832) 687-3007
Email: jbrittatty@comcast.net

Jon Greenbaum (*pro hac vice*)
Lawyers' Committee for Civil Rights Under Law
1401 New York Avenue, N.W., Suite 400
Washington, DC 20005
Telephone: (202) 662-8600
Facsimile: (877) 303-5039
Email: jgreenbaum@lawyerscommittee.org