**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **THE COALITION FOR EQUITY AND EXCELLENCE IN MARYLAND HIGHER EDUCATION, INC., et al.,** | ) | Trial Date: June 27, 2011 |
| **Plaintiffs,** | ) | |
| **v.** | ) | Civil No. 06-2773- CCB |
| **MARYLAND HIGHER EDUCATION COMMISSION, et al.,** | ) | |
| **Defendants.** | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON RECRUITMENT, ADMISSION, GRADUATION AND RETENTION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ....................1

COUNTER-STATEMENT OF FACTS ....................3

A. Recruitment and Admission: White Enrollment At The HBIs ....................3

1. White Enrollment at Historically Black Institutions Declines....................4

2. Lack of State Funding Stymies Progress on Commitments Three and Five....................5

3. Program Duplication Impedes HBI Recruitment of White Students....................6

4. The HBIs' Limited Missions Hamper White Student Recruitment....................8

5. HBI Recruiting Has Suffered Due To Maryland's Policies and Practices. ....................8

B. Retention And Graduation Rates: Funding Inequities At The HBIs ....................10

1. Funding Disparities Led To Enrollment And Graduation Disparities in the *De Jure* Era....................11

2. Maryland Recognized HBI Retention And Graduation Rates As Vestiges of the *De Jure* Era. ....................12

3. No Funding Was Given To Raise Retention And Graduation Rates....................13

4. Despite the Partnership Agreement, Maryland Did Not Address Retention and Graduation Disparities....................14

SUMMARY JUDGMENT STANDARD....................15

ARGUMENT ....................16

I. CURRENT RECRUITING AND ADMISSIONS DISPARITIES ARE THE SEGREGATIVE EFFECTS OF TRACEABLE POLICIES AND PRACTICES....................17

A. Lack of Other-Race Enrollment at the HBIs Demonstrates the Segregative Effects of Maryland's Policies and Practices....................19

B. Maryland's Traceable Policies and Practices Have Led To Recruiting and Admissions Disparities. ....................21

1. Funding Practices....................21

**Page**

2. Program Duplication ....................................................................22

3. Limited Missions ....................................................................24

II. LOWER HBI RETENTION AND GRADUATION RATES ALSO RESULT FROM TRACEABLE POLICIES AND PRACTICES. ....................................................................25

A. Low Retention and Graduation Rates Demonstrate the Segregative Effects of Maryland's Policies and Practices. ....................................................................26

B. Maryland's Traceable Policies and Practices Caused These Disparities. ..............28

1. No Remedial Actions Taken ....................................................................29

2. Inadequate Funding and Support ....................................................................31

III. WHILE UNNECESSARY TO TRACEABILITY CLAIMS UNDER *FORDICE*, EVIDENCE OF INTENTIONAL DISCRIMINATION EXISTS. ....................................33

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adickes v. S.H. Kress & Co.*,
398 U.S. 144 (1970) ..... 16

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986); ..... 15, 16

*Ayers v. Fordice*,
111 F.3d 1183 (5th Cir. 1997) ..... 24, 25

*Ayers v. Fordice*,
879 F. Supp. 1419 (N.D. Miss. 1995) ..... 19

*Brown v. Bd. of Education*,
347 U.S. 483 (1954) ..... 3

*Fischl v. Armitage*,
128 F.3d 50 (2d Cir. 1997) ..... 16

*Knight v. Alabama*,
14 F.3d 1534 (11th Cir. 1994) ..... 17, 18, 23

*Knight v. Alabama*,
787 F. Supp. 1030 (N.D. Ala. 1991) ..... 31

*Knight v. Alabama*,
900 F. Supp. 272 N.D. Ala. 1991) ..... 18, 19, 32

*Pulliam Inv. Co. v. Cameo Props.*,
810 F.2d 1282 (4th Cir. 1987) ..... 16

*United States v. Fordice*,
505 U.S. 717 (1992) ..... passim

## Rules

Fed. R. Civ. P. 56(a) ..... 15

Fed. R. Civ. P. 56(c) ..... 16

**INDEX OF EXHIBITS TO**
**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON RECRUITMENT, ADMISSION, GRADUATION AND RETENTION**



| | |
|---|---|
| Exhibit 1 | Op. Ltr. from Att'y Gen. to Burnett, 90 Md. Op. Gen. 153, 2005 WL 3024511 (Nov. 8, 2005) |
| Exhibit 2 | 2008 Panel on the Comparability and Competitiveness of Historically Black Institutions in Maryland |
| Exhibit 3 | Maryland's Report and the Partnership Agreement Between the State of Maryland, U.S. Department of Education, Office for Civil Rights |
| Exhibit 4 | MHEC, *Retention and Graduation Rates at Maryland Public Four-Year Institutions* (June 2006) |
| Exhibit 5 | Earl Richardson Deposition |
| Exhibit 6 | Maryland State Board for Higher Education, *A Plan to Assure Equal Postsecondary Educational Opportunity 1980-198* |
| Exhibit 7 | *Trends in White Graduate Students at Historically Black Institutions in Maryland* (Oct. 2009) |
| Exhibit 8 | John Sabatini Deposition |
| Exhibit 9 | Joseph Popovich Deposition |
| Exhibit 10 | Joann Boughman Deposition |
| Exhibit 11 | Maurice Taylor Deposition |
| Exhibit 12 | David Hossler Deposition |
| Exhibit 13 | James E. Lyons, Sr. Deposition, Volume II |
| Exhibit 14 | Barbara Vobeja, *Desegregating Maryland's Public Colleges*, The Washington Post, May 19, 1985 |
| Exhibit 15 | George Reid Deposition |
| Exhibit 16 | First Expert Report of Dr. Clifton F. Conrad (May 3, 2010) |
| Exhibit 17 | John Oliver Deposition |

| | |
|---|---|
| Exhibit 18 | Anne Emery Deposition |
| Exhibit 19 | Franklyn Jenifer Deposition |
| Exhibit 20 | Second Expert Report of Dr. Clifton F. Conrad (June 15, 2010) |
| Exhibit 21 | American Council on Education, *Higher Education in Maryland: A Report of a Survey by the American Council on Education with Recommendations of the Maryland Commission on Higher Education* (1947) |
| Exhibit 22 | Carrol L. Miller, *The Relative Educational Attainment of the Negro Population in the United States* (1953) |
| Exhibit 23 | *Report of the Commission on Higher Education of Negroes to the Governor and Legislature of Maryland* (Jan. 15, 1937) |
| Exhibit 24 | *The Needs of Higher Education in Maryland* (1955) |
| Exhibit 25 | *Report and Recommendations to the Commission to Study the Question of Negro Higher Education* (June 30, 1950) |
| Exhibit 26 | Raymond Vollmer Deposition |
| Exhibit 27 | Report by Committee II: Final Review of the Partnership Agreement between Maryland and the United States Department of Education Office for Civil Rights |
| Exhibit 28 | Geoffrey Newman Deposition |
| Exhibit 29 | MHEC, *2009 Maryland State Plan for Postsecondary Education* (June 2009) |
| Exhibit 30 | Third Expert Report of Dr. Clifton F. Conrad (June 15, 2010) |
| Exhibit 31 | Sue Blanshan Deposition |
| Exhibit 32 | MHEC, 2010 Data Book |
| Exhibit 33 | James E. Lyons, Sr. Deposition ,Volume I |
| Exhibit 34 | Expert Report of Dr. Robert K. Toutkoushian (May 3, 2010) |

## INTRODUCTION AND SUMMARY OF ARGUMENT

Defendants' brief in support of their summary judgment motion regarding recruiting, admissions, graduation and retention (the "Recruiting Brief") completely misses the mark. Defendants focus *entirely* on the State's treatment of minority students at Maryland's Traditionally White Institutions ("TWIs"). Not once in defendants' brief does the State address the core problem raised by plaintiffs: other-race enrollment and disparities at Maryland's Historically Black Institutions ("HBIs"). Like the State's brief, Maryland's effort to desegregate its public colleges and universities has focused primarily on increasing African American (and other-race) enrollment at the TWIs while ignoring diversity at its HBIs.

Let us be clear. Plaintiffs' case is about Maryland's obligations and progress *with respect to its HBIs* and the 95% minority population they serve. The State's obligations and progress with respect to TWIs are legally and factually irrelevant. Lest there be any doubt, plaintiffs will *stipulate* that they are not challenging the treatment of minority students *at the TWIs*. However, that does not end the inquiry. As a legal matter, stated by Maryland's Attorney General, it is "possible for the State to have dismantled some aspects of prior segregation, and be discharged of any remedial obligations with respect to those factors, *while remaining responsible for remedial measures in other areas*." Op. Ltr. from Att'y Gen. to Burnett, 90 Md. Op. Gen. 153, 2005 WL 3024511, at *16 (Nov. 8, 2005) ("Op. Ltr.") (Ex. 1) (emphasis added). As a factual matter, the bulk of the State's African American post-secondary student population attends a Maryland HBI. (Funding Br. at 6.) Maryland's tunnel-vision assessment of its progress with the recruitment and admission of other-race students at the State's TWIs ignores that the majority of its African American students are educated at HBIs, where efforts to diversify student bodies are non-existent. For the reasons set forth in detail below, a material dispute exists between the parties as to whether the recruiting and admissions disparities represent the segregative effects of

ongoing policies and practices traceable to the *de jure* era. Since these disparities show Maryland has not met its obligation to dismantle the vestiges of *de jure* segregation, defendants' summary judgment motion on recruiting and admissions should be denied.

Plaintiffs have also presented evidence regarding the State's failure to take actions at the HBIs to address the lower retention and graduation rates of African Americans at the HBIs. Contrary to the State's position now, the State's own 2008 Panel on the Comparability and Competitiveness of Historically Black Institutions in Maryland ("HBI Study Panel") (Ex. 2) attributed poor retention and graduation rates at HBIs—the primary educator of the state's African American higher education population—to the State's prior discriminatory treatment of HBIs, especially in the area of funding. Moreover, Maryland's former chairman of the Maryland Higher Education Commission (MHEC) and signatory to Maryland's Report and the Partnership Agreement Between the State of Maryland, U.S. Department of Education, Office for Civil Rights ("Partnership Agreement"), testified that in 1999 Maryland recognized that differential retention and graduation rates between African American and white students were a vestige of the *de jure* era and committed to address them in the Partnership Agreement's Commitment Four. (Partnership Agreement at 29 (Ex. 3)) ("significantly narrow or eliminate the difference in rates at which African Americans and white freshman are successful in obtaining college degrees"). Despite Maryland's commitment, witnesses and official reports conclude that Maryland did not take such steps and did not provide the HBIs with sufficient resources to improve their graduation and retention rates during the period of the Partnership Agreement. The evidence shows that the disparity in graduation and retention rates has worsened: Maryland is moving backward to the rates of over twenty years ago. By claiming a general "achievement gap" between African American and white students is to blame, defendants *again* fail to focus,

as plaintiffs do, on the *HBIs*. The evidence shows that disparities exist even between HBI students and *African American students at TWIs*. (MHEC, *Retention and Graduation Rates at Maryland Public Four-Year Institutions* at 24-25, 27-32 (June 2006) ("2006 Retention Graduation Rates") (Ex. 4).

Plaintiffs present evidence attributing persistent and growing differences in graduation and retention rates between HBI and TWI students to State inaction as well as to State policies and practices traceable to the *de jure* era. For these reasons, a material dispute also exists as to whether the lower graduation and retention rates *at the HBIs* are a vestige of the prior *de jure* system that the State has failed to rectify. As defendants concede, plaintiffs meet their burden by showing that recruitment, admission, retention and graduation rate disparities "are the result of policies or practices traceable to decisions made in higher education . . . in its segregated past." (Recruiting Br. at 3.) Plaintiffs have clearly presented facts showing such disparities and that their segregative effects are the result of policies and practices traceable to the *de jure* era. Having presented material facts supporting their claim, plaintiffs have established a triable issue here. Defendants' motion therefore should be denied.

## COUNTER-STATEMENT OF FACTS

Defendants' statement of facts is for the most part irrelevant, since the focus of this lawsuit is on the HBIs (rather than the TWIs). Accordingly, rather than a rebuttal of defendants' facts, the discussion below presents facts in the record regarding *the HBIs* and their African American students, with respect to: (a) recruiting and admissions disparities and (b) retention and graduation disparities.

### A. Recruitment and Admission: White Enrollment At The HBIs

In the first two decades after *Brown v. Bd. of Education*, 347 U.S. 483 (1954). Maryland showed early promise in the recruitment and admission of white students at its HBIs. During

that time, the State's HBIs offered some unique programs that enabled them to attract white students and begin to desegregate their student bodies. Former Morgan State University President Dr. Earl Richardson explained that "black institutions had, at the graduate level in particular, significant enrollments of white students. In many instances they had the only programs in some of the liberal arts, for example. . . . With [Morgan] being the primary institution for the master's programs in the private—in the public sector in Baltimore—that is, Morgan—then many nonblack students came to Morgan." (Richardson Dep. at 36 (Ex. 5).) Yet this early era of recruitment and admission of white students at the HBIs was short-lived.

**1. White Enrollment at Historically Black Institutions Declines.**

In the 1980s, Maryland struggled to develop an effective desegregation plan that could build upon the gains made after *Brown* and bring the State fully in compliance with Title VI of the Civil Rights Act.[1] As detailed by plaintiffs' program duplication expert, Dr. Clifton F. Conrad, Maryland proposed numerous plans during this period that the United States Department of Education Office of Civil Rights ("OCR") determined were insufficient. Nearly twenty years after *Brown*, and in the absence of a developed statewide approach to desegregation, early gains in white enrollment at Maryland's HBIs began to decline. (Richardson Dep. at 36-37; *see also Trends in White Graduate Students at Historically Black Institutions in Maryland* (Oct. 2009) ("2009 Trends") (Ex. 7).) Because Maryland recognized that its prior inaction caused substantial declines in white enrollment at HBIs, it entered the Partnership Agreement with OCR in an effort to halt the re-segregation of the student body at Maryland's HBIs. (Sabatini Dep. at 53-54 (Ex. 8)*;* Popovich Dep. at 240- 241 (Ex. 9); and Boughman Dep. at 55 (Ex. 10).) The State

[1] In 1969, OCR formally notified Maryland that it was one of ten states operating a racially segregated system of higher education in violation of Title VI of the Civil Rights Act. (Partnership Agreement at 3 (Ex. 3).) Thus, Maryland submitted the *State of Maryland Plan for Achieving a More Representative Racial Balance Among the Four-Year Public Institutions of Higher Learning*. (Maryland State Board for Higher Education, *A Plan to Assure Equal Postsecondary Educational Opportunity 1980-1985* at 11 (1980) (the "1980 Plan") (Ex. 6).)

committed to halt declines in other-race enrollment at all institutions of higher education and to adopt "appropriate recruitment, marketing and advertising activities attracting . . . *white students to HBCUs*." (Partnership Agreement at 28, (Commitment 3), 30 (Commitment 5) (Ex. 3).)

### 2. Lack of State Funding Stymies Progress on Commitments Three and Five.

Despite the optimism created for the future of Maryland's HBIs by the Partnership Agreement, the second decline in white enrollment at the HBIs occurred shortly after the agreement was executed. Earl Richardson testified: "Ironically, the second major decline in white enrollments at HBIs took place very recently, during the period of its 2000 through 2005 desegregation plan." (Richardson Dep. at 36 (Ex. 5).) The former Dean of Morgan State University's graduate school, Dr. Maurice Taylor, attributes the second decline to underfunding and cites as an example that Morgan State "never received any money from the State . . . for recruitment" and the funds "for other race grants [at Morgan] kept getting smaller and smaller until they became insignificant." (Taylor Dep. at 69, 102-103 (Ex. 11).) Defendants' own school choice expert, Dr. David Hossler, has acknowledged the critical role of funding in the recruitment and admission of other-race students at institutions, stating that "enrollment management 101 is, if a president says, I want to change our image dramatically and I want to do it in the next three or four years, the only sure way to do it is to buy students; is to literally buy students." (Hossler Dep. at 65-66 (Ex. 12).) Defendant Secretary of Higher Education, James Lyons, Sr., readily admits that a lack of funding prevented Maryland's HBIs from implementing financial incentive plans aimed at increasing other-race enrollments, which were recommended by the State as recently as 2009, leaving the HBIs with little more than an unfunded mandate to

increase white enrollment. (Lyons Dep. at 460, Mar. 26, 2010 ("Lyons Dep. II" (Ex. 13).)[2] Maryland's Assistant Secretary for Planning and Academic Affairs similarly testified that as of last year, "substantial additional resources are needed to ensure that the [S]tate's HBIs are comparable to the [S]tate's TWIs on the point of *recruitment*. . . ." (Reid Dep. at 130-131 (Ex. 15) (emphasis added).) As a result of the absence of these additional resources, the recruitment and admission of white students at Maryland's HBIs has not improved since the Partnership Agreement was signed and, indeed, has gotten worse.

### 3. Program Duplication Impedes HBI Recruitment of White Students.

Maryland also has undermined the recruitment and admission of white students at its HBIs by actively pursuing program approval policies that have been detrimental to the HBIs. Dr. Conrad attributes the lower percentage of white students at Maryland's HBIs today than in the 1970s to declining program uniqueness at the HBIs. (First Expert Report of Dr. Clifton F. Conrad at 80-81 (May 3, 2010) ("Conrad I") (Ex. 16); *see also* Richardson Dep. at 31.)[3] As Dr. Conrad explained: "When Maryland's TBIs began offering graduate programs in the 1960s and 1970s, they were able to attract fairly substantial numbers of white graduate students to enroll in their institutions, demonstrating progress in desegregation of the TBI campuses. Notably, this trend has not been sustained over the past three decades. Although total enrollment of white

2 Defendant Lyons has repeatedly acknowledged the importance of state funding in other race enrollment. In a 1985 Washington Post article, Dr. Lyons, who was then President of Bowie, is quoted as saying "We've got to offer a little bit more to attract first-time full-time freshmen White students. . . .To achieve that goal, the state is going to have to put far more scholarship money . . . into the school." Barbara Vobeja, *Desegregating Maryland's Public Colleges*, The Washington Post, May 19, 1985, at F11 (Ex. 14).)

3 "[I]n 1972 we were more integrated, had more white students in the graduate program at Morgan State University than we do today; that we are less desegregated today in graduate education at Morgan than we were 40 years ago. And we believe that that is owing to the duplication of mission and programs combined with the lack of resources to develop the programs and make the HBI, Morgan State in this case, more attractive for attracting—for competing for students regardless of race." (Richardson Dep. at 31 (Ex. 5).)

graduate students at the TBIs expanded to a high of 1,254 in 1973, this number declined significantly thereafter and has never regained its 1973 level." (Conrad I at 18 (Ex. 16).)

Various stakeholders in Maryland higher education, including the State's former employees, have attributed declines in white enrollment at HBIs to program duplication. John Oliver, Maryland's signatory to the Partnership Agreement and former MHEC Chairman, testified that program duplication generally results in racially-segregated systems of higher education. (Oliver Dep. at 76-77 (Ex. 17).) John Sabatini, a negotiator of the Partnership Agreement on behalf of Maryland, similarly testified that when an HBI and TWI offer the same program, white students generally choose the program at the TWI over the program at the HBI. (Sabatini Dep. at 93 (Ex. 8).) Ann Emery, an MHEC Commissioner for nearly twenty years, testified that program duplication impedes the HBIs' ability to recruit a diverse student body. (Emery Dep. at 56 (Ex. 18).)

Unnecessary program duplication has resulted in sharp and discernible declines in white enrollment at HBIs. For example, Bowie State University offered a Master of Special Education which enrolled 25 white students in 1992. In 2002, Maryland approved the same program at Towson University. By 2008, Towson's program enrolled 67 white students in that program, while Bowie enrolled only 8. Similarly, Bowie's Master of Teaching which enrolled 23 white students in 1997, but after approval of the same program at the University of Maryland Baltimore County, by 2008, UMBC enrolled 58 white students in its program while Bowie only enrolled 11. A similar shift took place when the Joint MBA Program at Towson and University of Baltimore duplicated Morgan State's MBA program. (*See* Funding Opposition at IV.) As an HBI Study Panel member and former HBI president has testified, the only way to achieve integration at Maryland's HBIs is to avoid program duplication. (Jenifer Dep. at 71-73 (Ex. 19).)

**4. The HBIs' Limited Missions Hamper White Student Recruitment.**

Maryland's failure to ensure expanded missions for its HBIs has hampered their ability to recruit a more diverse student body. Indeed, the Supreme Court in *Fordice* recognized that limited institutional missions militate against desegregation. *United States v. Fordice*, 505 U.S. 717, 738-40 (1992). Plaintiffs' expert, Dr. Conrad, determined that since 2000 Maryland has not expanded the missions of its HBIs so as to enable them to break out of their Carnegie Classification levels. (Second Expert Report of Dr. Clifton F. Conrad (June 15, 2010) ("Conrad II") at 10-11 (Ex. 20); *see also* Funding Opp. at II.B.) Maryland's discriminatory assignment of less research-intensive missions to the HBIs during the *de jure* era and later failure to expand the HBIs' missions have led to marked recruitment and admissions disparities at the HBIs. (*See* HBI Study Panel Rpt. at 16 (Ex. 2) ("[T]he process by which a state sets university missions . . . has had the effect of substantially marginalizing the HBIs and their ability to develop and maintain comparable quality and competitiveness").**)**

**5. HBI Recruiting Has Suffered Due To Maryland's Policies and Practices.**

As a result of Maryland's policies and practices, HBI recruiting and admissions have been harmed. For example, between 2000 and 2008, white enrollment at graduate programs at Bowie declined from 25 percent to 11 percent and at Coppin from 29 percent to 8 percent. (*See* 2009 *Trends* (Ex. 7).) These statistics reveal that pre-Partnership Agreement declines in white enrollment have proceeded interrupted. Between 1995 and 2004, white student enrollment decreased by 58.5 percent at Bowie State University ("Bowie") and 22.2 percent at Coppin State University ("Coppin"), Morgan State University ("Morgan"), and the University of Maryland Eastern Shore ("UMES"). (Taylor Dep. at 90 (Ex. 11).) In addition, as depicted below, the

percentage of white undergraduate students attending all four of Maryland's HBIs has declined from 13.5 percent in 1991 to only 5.1 percent in 2008. (Conrad I at 80 (Ex. 16).)

**White Student Enrollment as a Percentage of Total Enrollment at Maryland's TBIs, 1991 - 2008**




Dr. Conrad also reported that by 2008 the level of white graduate students at all four HBIs had declined below 1970 levels, as depicted below. (Conrad I at Ex. 9.)

**Enrollment of White Graduate Students at Maryland TBIs, 1970 - 2008**




**B. Retention And Graduation Rates: Funding Inequities At The HBIs**

Maryland's current practice of under-funding the HBIs—the State's primary educational institutions for African Americans—originated during the *de jure* era and hindered the quality of the education and the amount of financial support that the students attending those schools received. (American Council on Education, *Higher Education in Maryland: A Report of a Survey by the American Council on Education with Recommendations of the Maryland Commission on Higher Education* at 136-137 (1947) (Ex. 21).) As a result, the retention and graduation rates for the majority of Maryland's African Americans were negatively impacted thereby creating a difference between their rates and those of their TWI white counterparts, who attended schools with superior funding. (Carrol L. Miller, *The Relative Educational Attainment of the Negro Population in the United States* at Table I (1953) (Ex. 22).) Plaintiffs are prepared to present State documents and testimony that attribute the differences in the graduation and

retention rates between African Americans at the HBIs and students at the TWIs to the inequitable funding policies and practices, traceable to the *de jure* era, with respect to these institutions.[4] Indeed, the Partnership Agreement and the testimony of Dr. Lyons acknowledged that the State can remedy these differences by adequately funding the HBIs.

### 1. Funding Disparities Led To Enrollment And Graduation Disparities in the *De Jure* Era.

Defendants do not dispute that during the *de jure* era, there were disparities in funding provided by the State to the HBIs and TWIs. (Defs. Answers to Plfs. First Req. for Admiss. (Feb. 12, 2010).) Defendant Secretary of Higher Education admitted in his 30(b)(6) deposition on behalf of MHEC that these disparities meant greater capital and operating budgets for the TWIs than for the HBIs. (Lyons Dep. II at 349-351 (Ex. 13).) The State's contemporaneous reports from the era support these conclusions. One such document concluded that by 1937 funding inequities between HBIs and TWIs had created, "an enormous differential in favor of the white race." (1937 Rpt. at 138 (Ex. 23).) Indeed, in 1955 (one year after *Brown*), the State quantified this disparity at north of 30 million dollars. (*The Needs of Higher Education in Maryland* at 22, Table 5 (1955) (Ex. 24).) These differences were more than financial figures on the State's balance sheet; they meant material differences in the quality and amount of education white and African American students received, the quality of facilities in which they were taught, and the amount of financial support they were able to receive to pursue their education. In all of

---

4 The State's history of underfunding HBIs is well-documented. For example, the State did not provide financial support for the education of black students until 150 years after it first provided financial support for the education of white students. (*Report of the Commission on Higher Education of Negroes to the Governor and Legislature of Maryland* at 138 (Jan. 15, 1937) ("1937 Rpt.") (Ex. 23).) Even after such support was provided, a Maryland Commission found that "the contrast between the amounts of money received by the two racial groups would show, if possible of computation, an enormous differential in favor of the white race." (*Id.*) Additional discussion is provided in Dr. Toutkoushian's expert report and plaintiffs' opposition to defendants' motion for summary judgment on funding. For the sake of brevity, plaintiffs do not restate the facts identified in those documents here, but incorporate them by reference.

these areas, white students were at an advantage and, not surprisingly, surpassed their African American counterparts in the retention and graduation rates during the State's *de jure* era, as revealed by the State's own reports. (1937 Report at 45 (Ex. 23) (by 1930, nearly 15,000 whites and only approximately 900 African Americans were students in Maryland's system of higher education); *see also Report and Recommendations to the Commission to Study the Question of Negro Higher Education* at 5-6, Tables I-II (June 30, 1950) (Ex. 25) (In 1945, 370 African American students entered college in Maryland but in 1949, only 231 graduated from college in Maryland, thereby resulting in a 62.4% four-year graduation rate for African American students in Maryland).)

**2. Maryland Recognized HBI Retention And Graduation Rates As Vestiges of the *De Jure* Era.**

Maryland recognized its responsibility to address vestiges relating to retention and graduation when it entered into the Partnership Agreement with OCR. Former MHEC Chairman and signatory to the Partnership Agreement John Oliver testified that Maryland understood that the commitments in the Partnership Agreement represented areas where vestiges of Maryland's former *de jure* system remained. (Oliver Dep. at 24 - 25 (Ex. 17)) ("We signed an agreement recognizing that there was a need reflected in these commitments to address the vestiges, which were in essence generally articulated in those [9] commitments."). Notably, Commitment Four of the Partnership Agreement committed Maryland to remedying the vestige of low retention and graduation rates for the State's black students. (Partnership Agreement at 29 (Ex. 3).)[5] At that time, the difference in graduation and retention rates for African Americans and whites was the

[5] At the time Maryland entered the Partnership Agreement, "the 4th year graduation rate for African American first-time full-time freshm[e]n who matriculated in 1995 was 17%, while the rate for white students in the cohort was 38%. The 6th year graduation rate for African American freshmen [and] for white students was 40% and 65%, respectively." (*Id.*)

same as it was twenty years prior. (*Id.*) In addition, HBIs were experiencing a ten-year decline in their retention and graduation rates. (2006 Retention and Graduation Rates at 14-15, 21-22 (Ex. 4).) As a result of these alarming statistics, Maryland endeavored to "significantly narrow or eliminate the difference in the rates at which African American and white freshmen are successful in obtaining college degrees." (Partnership Agreement at 29 (Ex. 3).)

**3. No Funding Was Given To Raise Retention And Graduation Rates.**

Despite its commitment, in the five years after signing the Partnership Agreement, Maryland did not provide necessary funding for the HBIs to improve their retention and graduation rates. (Taylor Dep. at 71 (Ex. 11).) ("Let's take Commitment 4, improving retention and graduation rates. There really was little money put to HBIs to meet this particular commitment.").) Morgan State University's Vice President for Finance and Management Raymond Vollmer has testified that lack of adequate funding perpetuated the low retention and graduation rates at the HBIs. (Vollmer Dep. at 31- 33 (Ex. 26).) Vice President of University Operations at Morgan State University, Dr. Maurice Taylor, similarly explained that "[u]nder Commitment 4, in terms of retention and graduation, again, the amount of funding that was provided first in the form of grants over from 1999, in the form of grants until 2006, was so small that it wasn't enough to even support the number of African American students enrolling. . . ." (Taylor Dep. at 105.) Dr. Taylor further testified that the State went so far as to withhold those funds from the HBIs until they had conducted a "best practices" review because the State was displeased that retention and graduation rates at the HBIs had not improved in only three years. (*Id.*) Dr. Taylor likened the utility of the State's approach to "the man starving his horse and then beating it because it's too thin." (*Id.*)

### 4. Despite the Partnership Agreement, Maryland Did Not Address Retention and Graduation Disparities.

Not surprisingly, no sooner than the Partnership Agreement expired in 2005 did the State's Report by Committee II: Final Review of the Partnership Agreement between Maryland and the United States Department of Education Office for Civil Rights ("Committee II Report") reveal that the retention and graduation for African American students remained unresolved. In particular, the Committee II Report concluded that the six-year graduation rate at *all of Maryland's HBIs* was below the average level of comparable TWIs. (Committee II Report at Table 10 (2006) (Ex. 27).) John Oliver, signatory to the Partnership Agreement and Former MHEC Chairman, testified that because of these findings, it was inaccurate for Maryland to tell OCR that it had fulfilled the obligations of the Partnership Agreement or that it had removed the vestiges of its *de jure* segregated system. (Oliver Dep. at 51-52 (Ex. 17).)

Two years later, the State's blue ribbon HBI Study Panel convened by the Maryland Commission to Develop the Maryland Model for Funding Higher Education echoed the findings of the Committee II Report and went a step further to expressly link their findings to the prior *de jure* era. Specifically, the HBI Study Panel report concluded that there were "many indicators that suggest that additional resources must be invested in HBIs to overcome the competitive disadvantages *caused by prior discriminatory treatment* . . . [such as] *the poor retention and graduation rates* of students as compared to TWIs." (HBI Study Panel Rpt. at 6 (Ex. 2).) The Maryland Higher Education Commission has since fully endorsed this recommendation in the depositions of Director of Finance Policy and Facilities, Geoffrey Newman, and Assistant Secretary for Planning and Academic Affairs, Dr. George Reid. (Newman Dep. at 133-134 (Ex. 28) (explaining that substantial additional resources must be invested in the HBIs to overcome the competitive disadvantage caused by prior discriminatory treatment); Reid Dep. at

181 (Ex. 15).) Despite the State's awareness of the un-rectified differences in African American and white student graduation and retention rates, the State did not take action and, one year later, Maryland's 2009 State Plan reported that the retention and graduation rate gap between HBIs and TWIs had not narrowed in *two decades*. (MHEC, *2009 Maryland State Plan for Postsecondary Education* at 25-26 (June 2009) ("2009 State Plan") (Ex. 29).)

In light of these disparities, Maryland advised rectifying the continual retention and graduation rate gap between African American and white students. In particular, the 2009 State Plan advised the State to recognize the "importance of closing the persistent retention and graduation rate gaps that exist between African American [ ] students . . . and their white [ ] peers." (2009 State Plan at 3.) The report also recommended increases in the year-to-year retention and graduation rates for all students at HBIs. Despite this report, as with the others, Maryland made no meaningful efforts in the following year to improve these rates. Indeed, MHEC's 30(b)(6) witness on the 2009 State Plan, Dr. George Reid, could not report if the State had made any improvement in those areas and admitted that Maryland was still working to remove vestiges of the *de jure* era. (Reid Dep. at 143 (Ex. 15); 2009 State Plan at 25-26.) Today, low retention and graduation rates at the State's HBIs remain. As a result of these continued graduation and retention rate gaps, Maryland's work eliminating the vestiges of its *de jure* past is not finished. (Oliver Dep. at 66 (Ex. 17).)

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate *only* if there is "no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also Pulliam*

*Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). The moving party bears the burden of showing that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(c); *Pulliam*. Defendants have failed to sustain this burden. The Court should not grant summary judgment unless it is clear that a trial is unnecessary, *Anderson*, and any doubts in this regard should be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970). Moreover, it is a settled rule that "[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997) (citing *Anderson*, 477 U.S. at 255).

## ARGUMENT

Defendants concede that the relevant standard is whether there is evidence that recruiting, admissions, retention and graduation rate disparities "are the result of policies or practices traceable to decisions made in higher education . . . in its segregated past." (Recruiting Br. at 3.) Plaintiffs present substantial evidence that these disparities are segregative effects resulting from policies and practices traceable to the *de jure* era.[6] *First*, in the areas of recruiting and admissions, defendants completely avoid the core issue by focusing on recruiting and admissions *at the TWIs* rather than the HBIs. Plaintiffs submit that there is *overwhelming* evidence that the State has done nothing to recruit and admit white students to the HBIs and has in fact hindered such efforts by pursuing policies and practices that are traceable to the *de jure* era. (*See* Part I.) *Second*, in the areas of retention and graduation, plaintiffs similarly present evidence that retention and graduation disparities exist and are the result of traceable policies and practices,

[6] Defendants concede that they, not plaintiffs, bear the burden of proving that "there are no lingering segregative effects" of policies or practices shown to be traceable to the *de jure* era. (Funding Br. at 29.)

such as the State's failure to fund the HBIs' dual mission in order to support disadvantaged students. (*See* Part II.)

## I. CURRENT RECRUITING AND ADMISSIONS DISPARITIES ARE THE SEGREGATIVE EFFECTS OF TRACEABLE POLICIES AND PRACTICES.

There is substantial evidence in the record that Maryland's recruiting and admissions disparities at the HBIs are segregative effects attributable to policies and practices that are traceable to Maryland's former *de jure* era (the test conceded by defendants at page 19 of their brief). In *U.S. v. Fordice,* the Supreme Court addressed the circumstances under which a state's failure to desegregate its higher education system violates the Fourteenth Amendment. *United States v. Fordice*, 505 U.S. 717 (1992). *Fordice* outlines a three-part analysis to determine whether a challenged policy or practice is unconstitutional. *First*, plaintiffs have the burden of identifying one or more current policies or practices traceable to the prior system of segregation. *See id.* at 729; *see also Knight v. Alabama*, 14 F.3d 1534, 1540-41 (11th Cir. 1994). *Second*, if policies traceable to the *de jure* system are still in force, the burden shifts to defendants to demonstrate there are no ongoing segregative effects. *See Fordice*, 505 U.S. at 744 (O'Connor, J., concurring); *see also Knight*, 14 F.3d at 1541. *Third*, if there is a traceable policy or practice that continues to produce discriminatory effects, the defendants must demonstrate that the challenged policy or practice cannot be eliminated or reformed in a practicable and educationally sound manner and that no alternative exists that would reduce segregation. *Fordice*, 505 U.S. at 744 (O'Connor, J., concurring).

The Supreme Court in *Fordice* recognized that policies which "influenc[e] student enrollment decisions" can have segregative effects. *Fordice*, 505 U.S. at 731; *Knight*, 14 F.3d at 1541. These policies include those that "discourage whites from seeking to attend HBIs, examples of which include: duplication of programs at HBIs and HWIs in the same geographic

area; the assignment to HBIs of institutional missions that restrict them to programs of instruction that cannot effectively attract whites; and the failure to fund HBIs comparably to HWIs or to locate high-prestige programs at HBIs." *Knight*, 14 F.3d at 1541 (citing *Fordice*, 505 U.S. at 737-42). "As a result of such policies, disproportionate numbers of whites *can* satisfy their curricular desires at HWIs, and *cannot* satisfy them at HBIs, thereby discouraging them from choosing to attend HBIs." *Knight*, 14 F.3d at 1541 (emphasis in original). The policies at issue in *Fordice* and *Knight* that created an obligation for the states to desegregate their HBIs also exist in Maryland: (i) the failure to adequately fund the HBIs; (ii) program duplication and the lack of unique programs at the HBIs; and (iii) the limited missions of the HBIs. All are traceable to the era of *de jure* segregation and continue to have segregative effects, with the white population constituting only 5% of the students at the HBIs.

Where such segregative effects exist, courts have found that remedies such as additional funding may be necessary to desegregate a state's higher education system. As a neutral special master in *Knight* observed, "student choice is influenced by race and institutional reputation." *Knight v. Alabama,* 900 F. Supp. 272, 287 N.D. Ala. 1991). The history of underfunding associated with HBIs creates the impression that the quality of education offered there is inferior. *Id.* at 320. The court in *Knight* thus identified a number of educationally sound and practicable means by which a state could fulfill its constitutional obligations to desegregate its system of higher education. *See id.* at 318-19. It is significant, for instance, that in *Knight,* the remedial order contemplated not just financial aid to enable more African Americans to attend TWIs, it allocated funds for scholarships to encourage white students to attend the HBIs. *Id.* at 318. "Financial aid is a powerful magnet in attracting white students to HBIs." *Id.* Other-race scholarships have been found to be essential to the elimination of negative perceptions about the

education offered at HBIs. *Id.* at 318-19. Similarly, in *Ayers v. Fordice* (the district court remand of *U.S. v. Fordice*), the court included among the remedies funding to an HBI for "educational enhancement and racial diversity, including recruitment of white students and scholarships." *Ayers v. Fordice*, 879 F. Supp. 1419, 1495 (N.D. Miss. 1995). Tellingly, Maryland likewise committed to adopt remedies that would halt declines in other-race enrollment at all institutions of higher education including adopting "appropriate recruitment, marketing and advertising activities attracting . . . *white students to HBCUs*" in the 2000 Partnership Agreement. (Partnership Agreement at 26 (Commitment 3), 30 (Commitment 5) (Ex. 3).) Maryland has failed to adopt any such remedies.

### A. Lack of Other-Race Enrollment at the HBIs Demonstrates the Segregative Effects of Maryland's Policies and Practices.

The lack of other-race enrollment at Maryland's HBIs is clear evidence of ongoing segregative effects within the system of higher education. Although defendants announce that "[a]ll Maryland public [and non-profit higher education institutions] actively seek a diverse student body," defendants do not identify a single State program aimed at recruiting white students to Maryland's HBIs—or even a single HBI. (Recruiting Br. at 5.) Defendants' omission is a telling indicator of the State's failure to desegregate its HBIs, as it committed to do under the Partnership Agreement. Maryland is obligated under Title VI, the Equal Protection Clause, and *Fordice* to desegregate all—not merely certain—of its public colleges and universities; a fact that Maryland's Attorney General readily admitted in 2005. (Op. Ltr. Att'y Gen., 2005 WL 3024511, at *16 (Ex. 1).) ("It is possible for the State to have dismantled some aspects of prior segregation, and be discharged of any remedial obligations with respect to those factors, while remaining responsible for remedial measures in other areas.") (emphasis added).

Yet, defendants focus exclusively on their assessment of the State's recruitment and admissions efforts *at Maryland's TWIs*. Again, plaintiffs do not allege discrimination with respect to State recruiting and admissions policies and practices at TWIs. Plaintiffs' lawsuit concerns State action—or lack thereof—concerning disparities in recruiting and admissions (due to traceable policies and practices) at *Maryland's HBIs* and the 95% minority population they serve. Plaintiffs assert that Maryland does not actively seek to recruit and admit white students at its HBIs, despite its commitment in the Partnership Agreement to do so in order to remedy *de jure* segregation. Plaintiffs also provide evidence showing that Maryland has actively pursued policies and practices that have undermined the ability of HBIs to recruit and admit white students, thereby perpetuating the vestige of all-black student bodies at Maryland's HBIs.

By defendants' own admission, the majority of African American students continue to attend a majority-minority college or university. (Funding Br. at 6.) More significantly, only 5.1% of white students attend an HBI in Maryland. This is segregated education. As summarized in the chart below, the 2008 enrollment data from Maryland's 2010 Student Data Book shows that almost 60% of African American students in Maryland attend an HBI, where only 5% of the students are white:

| HBI | Total enrollment Fall 2008 | African American enrollment 2008 | % African American | White Enrollment Fall 2008 | % White |
|---|---|---|---|---|---|
| **Bowie** | 5,483 | 4,835 | 88.2% | 266 | 4.9% |
| **Morgan** | 7,005 | 6,291 | 89.8% | 202 | 2.9% |
| **UMES** | 4,370 | 3,314 | 75.8% | 502 | 11.5% |
| **Coppin** | 4,051 | 3,473 | 85.7% | 90 | 2.2% |
| **Total** | 20,909 | 17,913 | 85.7% | 1,060 | 5.1% |

MHEC, 2010 Data Book at 10 (2010) ("2010 Data Book") (Ex. 32).) According to MHEC's former Chairman and signatory to the Partnership Agreement, Maryland recognized that the low numbers of other-race enrollment at TWIs and HBIs were a vestige of the *de jure* era that Maryland committed to correct in the Partnership Agreement. (Oliver Dep. at 25 (Ex. 17).) As the data above indicates, Maryland has failed to do so. For these reasons, there are material facts in dispute relevant to assessing whether Maryland's recruitment and admissions disparities are vestiges of the *de jure* era.

### B. Maryland's Traceable Policies and Practices Have Led To Recruiting and Admissions Disparities.

Plaintiffs have presented substantial evidence that the disparities in recruiting and admissions are due to various policies and practices traceable to the *de jure* era, *e.g.*, funding, program duplication, and limited missions. (*See* also Pls.' Funding Opp'n.)

#### 1. Funding Practices

Despite Maryland's tandem commitments to halt trends of declining other-race enrollments (Commitment Three) and to increase the number of other-race students at TWIs and HBIs (Commitment Five), defendants and other stakeholders in the Maryland higher education community have since testified that Maryland did not provide HBIs with sufficient funding to meet these commitments. Defendant Secretary of Higher Education, James Lyons, Sr., has even admitted that a lack of funding has *prevented* Maryland's HBIs from implementing incentive plans aimed at increasing other-race enrollments. (Lyons. Dep. II at 459-460 (Ex. 13).) Similarly, Maryland's Assistant Secretary for Planning and Academic Affairs testified that Maryland's HBIs do not have funding sufficient to be comparable to TWIs with respect to recruitment and that substantial additional resources will be needed for the HBIs to become comparable in this area. (Reid Dep. at 130-131(Ex. 15).) Indeed, the importance of additional

funding in changing the demographic of a university's student body has been corroborated by defendants' own school choice expert, Dr. David Hossler, who repeatedly described the need to "buy" students if a university seeks to change its student body demographic. (Hossler Dep. at 65, 130 (Ex. 12).) Despite these facts, the State has not provided funding to HBIs sufficient to allow them to recruit white students, as detailed by the former Dean of Morgan State University's Graduate School and participant on the State's Committee I, Dr. Maurice Taylor:

> Q. Could you give me an idea of what initiative the state failed to support that the institution would have been able to do as far as attracting white students?
>
> A. Well, yes. One, I believe—because all of it has to do with, to some extent, supporting these initiatives. One is to ensure that there was sufficient funding to support students at the University. Even if, Ms. Bainbridge, even if other race grants, identifying other race grants as problematic under certain cases, *had the State provided funding to support*, in this instance, graduate education —I am talking about it only because that is was the role I occupied —*there would have been more funding to support the White students coming to the University*, the tuition and the like. The State failed to provide funding for anybody, for any of these programs, for any of these students.

(Taylor Dep. at 104-105 (Ex. 11) (emphasis added).)

### 2. Program Duplication

Plaintiffs further contend that Maryland's policies and practices with respect to high-demand programs and program duplication have undermined the ability of HBIs to recruit white students. In *Fordice*, the Supreme Court held that the "widespread duplication of programs" between TWIs and HBIs and the *limited missions* of HBIs clearly militate against desegregation. *See Fordice*, 505 U.S. at 738-740. Despite this directive, over the past 11 years Maryland has approved unnecessarily duplicative programs at its HBIs and TWIs and has not collaborated with the presidents of HBIs to ensure sufficiently attractive and unique programs to attract white students.

Unnecessary program duplication discourages other-race students from enrolling in an HBI. Program duplication refers to those instances where two or more geographically-proximate institutions offer the same nonessential or noncore program. Current program duplication is "part and parcel" of the prior dual system of higher education. *Fordice,* 505 U.S. at 738; *see also Knight*, 14 F.3d at 1543-44. The very notion of "separate but equal" drove the creation of duplicative programs, and any "current unnecessary program duplication is a continuation of that practice." *Id.* To the extent Maryland continues to approve programs at geographically proximate TWIs, those policies and practices are directly traceable to the *de jure* era.

One of the central disputes in this matter is the amount of unnecessary program duplication in Maryland's higher education system. Plaintiffs contend that defendants have engaged in a practice of unnecessary program duplication that is traceable to the *de jure* era. Plaintiffs' program duplication expert, Dr. Conrad, concluded that more than one-half of the programs at the State's HBIs are duplicated at TWIs—a percentage higher than the program duplication present in the Mississippi higher education system that was the subject of the *Fordice* decision. (Third Expert Report of Dr. Clifton F. Conrad at 18 (June 15, 2010) ("Conrad III") (Ex. 30).) Plaintiffs contend that one of the results of this unnecessary program duplication has been the decline in white student enrollment at the HBIs, often on a duplicated program-by-program basis, such as the Masters of Special Education and the Masters of Teaching at Bowie. Former Maryland higher education employees and consultants, including Maryland's negotiator of the Partnership Agreement (John Sabatini), Maryland's former Chairman of MHEC and signatory to the Partnership Agreement (John Oliver), Maryland's former MHEC Commissioner (Ann Emery), and Maryland's appointed member of the HBI Study Panel (Franklyn Jennifer) have all verified that the low numbers of white students at HBIs are attributable to Maryland's

practice of unnecessary program duplication. (Oliver Dep. at 76-77 (Ex. 17); Sabatini Dep. at 93 (Ex. 8); Emery Dep. at 56 (Ex. 18); Jenifer Dep. at 71-73 (Ex. 19).)

Maryland's HBIs must offer unique, high-demand programs in order to attract other-race students. (Conrad III at 8 (Ex. 30).) The HBI Panel specifically found that having a unique mix of academic programs not duplicated at neighboring TWIs is key to attracting other-race students (HBI Study Panel Rpt. at 3.) Well-planned programs that respond to the particular needs and interests of local populations may promote student choice and desegregate HBIs. *See Ayer v. Fordice*, 111 F.3d 1183, 1213-14. Maryland's current policies and practices with respect to program approval and limited institutional mission hamper the ability of its HBIs to offer unique, high-demand programs which might attract white students and talented African American students who are instead drawn to more competitive and geographically-proximate TWIs. (Conrad III at Ex. 13; *see also* Sabatini Dep. at 93.) Given the parties' disagreement as to the existence and impact of unnecessary program duplication and the absence of unique programs on the HBIs' ability to recruit white students, there are disputes of material fact on recruitment and admissions sufficient to defeat defendants' motion for summary judgment.

**3. Limited Missions**

Another of the parties' disputes is whether the missions of Maryland's HBIs' are limited so as to militate against the desegregation of HBIs in violation of *Fordice*. Plaintiffs contend that HBI missions are limited as compared to their TWI counterparts and cite in support the HBI Carnegie classification rankings demonstrating more TWIs than HBIs at the research level, and that these limitations follow the racial designations of the *de jure* era. (Conrad II at 10-11 (Ex. 20); *see also Fordice*, 505 U.S. at 739-41.) In addition, MHEC's 30(b)(6) witness on program duplication, Dr. Sue Blanshan, testified that the only distinctive aspect of HBI missions are that they are historically black. (Blanshan Dep. at 117-118 (Ex. 31).) Plaintiffs contend that the

State's limitation of HBI missions to their racial identifiability, without more, has undermined the ability of HBIs to recruit and be attractive to white students.

Institutional mission tends to drive the ability of an institution to pursue advanced and specialized programs, develop the widest range of curricular functions, and in turn may constrict the competitiveness of the historically black universities. *Fordice*, 505 U.S. at 741. Mission designations, even when adopted after the era of *de jure* segregation, may effectively fix the scope of programmatic offerings available at each university to those in place during that era. *See Ayers v. Fordice*, 111 F.3d 1183, 1210 (5th Cir. 1997). More importantly, when combined with unnecessary program duplication, limited institutional mission often interferes with student choice and perpetuates segregation. *Fordice*, 505 U.S. at 741. Well-planned programs that respond to the particular needs and interests of local populations may promote student choice and desegregate HBIs. *See Ayers*, 111 F.3d at 1213-14.

Maryland's current policies and practices with respect to program approval and limited institutional mission hamper the ability of its HBIs to offer comparable and competitive programming which might attract white students and talented African American students who are instead drawn to more competitive and geographically proximate TWIs. (Sabatini Dep. at 93 (Ex. 8).) Accordingly, a triable issue of fact exists as to whether the HBI missions are limited and, if so, the impact of their limitations on recruitment of white students at HBIs. Thus, defendants' motion for summary judgment on recruitment and admissions should be denied.

## II. LOWER HBI RETENTION AND GRADUATION RATES ALSO RESULT FROM TRACEABLE POLICIES AND PRACTICES.

Defendants acknowledge that there are differences in the retention and graduation rates between African American students and their white peers at Maryland's colleges and universities. (Recruiting Br. at 10.) They insist any such differences, however, are not due to

Maryland's policies and practices but instead to a general "achievement gap" explained by societal factors outside Maryland's control. (*Id.* at 10-14.)

Defendants' motion must be denied because plaintiffs have presented evidence of clear segregative effects caused by traceable policies and practices. *First*, these segregative effects cannot be explained away by defendants' proffer of a general "achievement gap." Statistics in state reports show that the starkest retention and graduation rate gaps exist not between African American students and white students, but between HBIs and TWIs as a whole, with HBIs educating 59% of the African American students and only 5.1% of the white students. (2010 Data Book at 14 (Ex. 32).) For example, using statistics from the State's 2010 Data Book, African American students at Towson University, a TWI, have second-year retention rates that are higher than the overall student rate (84.3% to 80.8%) and six-year graduation rates that are close to equal to the overall student rate (69.9% to 70.4%); whereas, these rates are superior to that of Coppin State, a HBI (58% retention rate and 18% graduation rate). *Second*, the evidence shows that such disparities are caused by policies and practices traceable to the *de jure* era. For instance, although the HBIs have the dual mission of educating African American students who require additional support, Maryland has adopted none of the remedies outlined in the Partnership Agreement, the types of policies outlined in *Knight*, nor has Maryland provided HBIs with the resources and funding to fulfill this mission—resulting in the retention and graduation gaps described above.

### A. Low Retention and Graduation Rates Demonstrate the Segregative Effects of Maryland's Policies and Practices.

Retention and graduation rates are indicators of the lack of comparability and competitiveness of Maryland's HBIs. The low retention and graduation rates at the HBIs are relevant and admissible evidence of ongoing segregative effects of the racially identifiable *and*

inferior education at the HBIs. Defendants' brief focuses elsewhere, even discussing graduation and retention rates in other states for other races, rather than focusing on graduation and retention rates in Maryland at the HBIs for the minority students they serve. Plaintiffs submit that defendants' discussion of "achievement gaps" in other states is irrelevant to analyzing whether graduation and retention rate disparities are traceable to the *de jure* era *in Maryland*. Rather, the State's own documents, particularly the 2008 HBI Study Panel Report, admits the connection between differences in graduation and retention rates and the State's prior discriminatory treatment of HBIs. (HBI Study Panel at 6 (Ex. 2).) In that report, the State wrote, "many indicators [ ] suggest that additional resources must be invested in HBIs to overcome the competitive disadvantages *caused by prior discriminatory treatment* . . . [such as] *the poor retention and graduation rates* of students as compared to TWIs." (*Id.*) MHEC has fully endorsed this finding in the depositions of both its Director of Finance Policy and Facilities, Geoffrey Newman and Assistant Secretary for Planning and Academic Affairs, Dr. George Reid. (Newman Dep. at 133-134 (Ex. 28); Reid Dep. at 181 (Ex. 15).) Plaintiffs rely on the testimony of Former MHEC Chairman and signatory to the Partnership Agreement John Oliver that the commitments of the Partnership Agreement, including African American graduation and retention rates, were areas where Maryland recognized that vestiges of the *de jure* system existed. (Oliver Dep. at 24 - 25 (Ex. 17).)

A segregative effect occurs when a policy or practice continues to foster segregation, or influences student enrollment decisions by substantially restricting, in a discriminatory manner, a person's choice of which institution to enter. *Fordice,* 505 U.S. at 731. Defendants focus on the achievement gap between African American and white students within the different colleges and universities in the Maryland system. In doing so, Maryland dismisses differences in student

achievement as an unfortunate societal ill for which it is not responsible, and which is hardly unique to Maryland. But plaintiffs submit evidence of the obvious gaps between students at the HBIs and both African American and white students at Maryland's TWIs. Such evidence shows clear disparities between the TWIs and the four HBIs responsible for educating over half of the African Americans in Maryland. Low student achievement at Maryland's HBIs is admissible evidence showing that the majority of Maryland's black students continue to be educated by schools which continue to suffer vestiges of discrimination.

**B. Maryland's Traceable Policies and Practices Caused These Disparities.**

Defendants imply that retention and graduation rates do not, in and of themselves, demonstrate the existence of a discriminatory policy or practice. However, college retention and graduation rates are two objective outcome measures of the quality of educational services which students receive once they are there. (HBI Study Panel Rpt. at 13 (Ex. 2) (explaining that graduation rates are important because they are often viewed as the most significant indicator of undergraduate program outcome and competitiveness).) Plaintiffs have presented evidence that the disparities between the retention and graduation rates at the HBIs and TWIs are ongoing segregative effects of defendants' pattern of underfunding and undercutting the ability of HBIs to become comparable and competitive with the TWIs.

Defendants assert that no court has been willing to address retention or graduation in terms of desegregating higher education, and also argue that several courts have commented on race-correlated achievement disparities in the K-12 context by refusing to find such disparities a vestige of discrimination. (Recruiting Br. at 23.) These observations are irrelevant because, as discussed above, plaintiffs present specific proof of Maryland's policies and practices which continue to have segregative effects. (*See also* Pls.' Funding Opp'n.)

Clearly there is a material dispute as to whether graduation and retention rates for African American and white students are a vestige of the *de jure* era, created by disparities in State funding provided to HBIs and TWIs, program duplication, and limited missions that the State has failed to rectify. Plaintiffs submit that there is substantial evidence that, *in Maryland*, differences in graduation and retention rates for African American at HBIs: (1) are vestiges of the *de jure* era that defendants committed to correct; and (2) have been exacerbated by ongoing State policies and practices traceable to the *de jure* era. These material disputed facts preclude summary judgment.

**1. No Remedial Actions Taken**

Maryland has taken no steps to rectify its retention and graduation disparities in any of the ways the court in *Knight* recommended, that Maryland committed to do in the Partnership Agreement, or that the HBI Study Panel prescribed. Maryland agreed to rectify graduation and retention rate disparities in Commitment Four of the Partnership Agreement, but (as discussed below and in plaintiffs' Funding Opposition) did not allocate sufficient funding to the HBIs to enable them to meet their goals. (Vollmer Dep. at 31-33 (Ex. 26); Taylor Dep. at 105 (Ex. 11).) The testimony of Maryland HBI employees as well as the State's own documents chronicle the State's lack of progress in rectifying these rates and include, but are not limited to, the 2006 Committee II Report, which concluded that the six-year graduation rate at *all of Maryland's HBIs* was below the average level of comparable TWIs; the 2008 HBI Study Panel Report; and the 2009 State Plan, which reported that the retention and graduation rate gap between HBIs and TWIs had not narrowed in *two decades*.

Contrary to the specific recommendations of its own HBI Study Panel to devote "substantial additional resources" to rectify "poor graduation and retention rates" at the HBIs, Maryland has not committed to any strategy to raise graduation levels at the HBIs to those at the

TWIs. (HBI Study Panel Rpt. at 6 (Ex. 2).) This is in spite of the fact that Maryland's HBIs bear a disproportionate burden of educating the State's students in need of financial support. (*Id.* at 14.) The Panel found that research confirmed at least 80% of the students at HBIs required remedial effort in order to succeed in college. (*Id.* at 15.) In addition, the HBIs have higher percentages of students who are lower income and minority. Affordability is a critical factor in both retention and graduation. (*Id.* at 16.) As a result, outcome indicators reveal large gaps in performance between students at Maryland's HBIs and TWIs, including lower retention and graduation rates. (*Id.* at 11.)

A comparison between HBIs and TWIs confirms that African American students at the HBIs continue to lag behind their peers, as shown by the comparison on the next page of HBI second-year retention and six-year graduation rates:

| Second year Retention Rates for HBIs and TWIs | | |
|---|---|---|
| **School** | **2nd year retention rate** | **2nd year retention rate - AA** |
| **UMCP** | 93.7% | 95.2% |
| **St. Mary's** | 89.2% | 90.7% |
| **UMBC** | 86.8% | 90.5% |
| **Towson** | 80.8% | 84.3% |
| **Frostburg** | 74.3% | 77.9% |
| **Salisbury** | 82.7% | 76.0% |
| **Bowie*** | 69.5% | 69.7% |
| **Morgan*** | 67.7% | 67.4% |
| **UMES*** | 65.9% | 65.7% |
| **Coppin*** | 58.4% | 58.6% |

| Six-year Graduation Rates for HBIs and TWIs | | |
|---|---|---|
| **School** | **6-year graduation rate** | **6-year graduation rate - AA** |
| **Towson** | 70.4% | 69.9% |
| **UMCP** | 82.1% | 68.3% |
| **Salisbury** | 74.9% | 64.3% |
| **UMBC** | 66.3% | 62.2% |
| **St. Mary's** | 80.9% | 57.6% |
| **Frostburg** | 57.2% | 51.6% |
| **UMES*** | 45.6% | 45.8% |
| **Bowie*** | 45.0% | 45.0% |
| **Morgan*** | 34.1% | 34.6% |
| **Coppin*** | 18.3% | 18.5% |

Note: * = HBI and AA = African American

**2. Inadequate Funding and Support**

The disparities in retention and graduation are also the result of Maryland's policies of under-funding the HBIs (also discussed in plaintiffs' opposition to defendants' funding motion). Maryland has failed to provide the HBIs with sufficient funding to account for expenses associated with the "dual mission" of the HBIs. Like all schools, HBIs are committed to the traditional mission of providing a quality education experience that allows students to attain their degree. (HBI Study Panel Rpt. at 7 (Ex. 2).) But HBIs also offer students from disadvantaged backgrounds an opportunity to pursue higher education. (*Id.*) Students from families with less education and income may be less prepared for—although capable of—college level work. (*Id.*)

Maryland's HBI Study Panel thus indicated that HBIs have greater funding needs due to (i) higher revenues needed for financial aid; (ii) lower tuition and fees; and (iii) larger expenditures for developmental education and academic support. (HBI Panel Study Report at 12-13.) The Panel described the "dual mission" of Maryland's HBCUs and the related financial considerations as follows:

> HBIs need a different form and level of capacity because unlike the TWIs, the HBIs have a dual mission: (1) to carry out their regular collegiate programs and associated functions to the best of their abilit[ies] and (2) to provide strong programs in developmental education to ensure access and success to students, mostly from low-income families, who otherwise would not have an opportunity to pursue a bachelor's degree. The HBIs are not funded at appropriate levels to carry out both parts of this mission at once.

(HBI Study Panel Rpt. at 12) In the Alabama higher education desegregation case, the court made similar findings. *Knight v. Alabama*, 787 F. Supp. 1030, 1227-28 (N.D. Ala. 1991) ("The HBU's have a disproportionate number of the less well prepared students, and thus they have

additional costs per student that must be absorbed by their budgets. The HBU's also have a disproportionate share of poorer students, who also impose additional costs on the institution.")[7]

Maryland's Secretary of Higher Education, Dr. Lyons, admits that Maryland's HBIs have a dual-mission that is not properly funded by the state. (Lyons Dep. I at 214-215 (Ex. 33).) Maryland concedes in its HBI Study Panel Report that "HBIs historically and into the future have a dual mission." (HBI Study Panel Rpt at 7 (Ex. 2).). Dr. Toutkoushian, therefore, incorporates a supplement of $1,400, the figure recommended by Maryland's 2008 Commission to Develop the Maryland Model for Funding Higher Education, into his financial disparity calculations. (Expert Report of Dr. Robert K. Toutkoushian at 18 (May 3, 2010) (Ex. 34).) In sum, as the Study Panel found, "HBIs are not funded at appropriate levels to carry out both parts of [their] mission at once." (HBI Study Panel Rpt. at 12.)

As indicated by the arguments in defendants' memorandum, defendants now disavow that differences in the graduation and retention rates of Maryland's African American and white students are traceable to its *de jure* history and that the State has any legal responsibility to rectify them. The parties' accordingly dispute whether the graduation and retention rate disparities between Maryland's African Americans and whites represent in some degree segregative effects of policies and practices traceable to the prior *de jure* system. This dispute is material to a determination of whether Maryland has eradicated graduation and retention vestiges of the prior *de jure* era and accordingly, defendants' motion for summary judgment on graduation and retention rates should be denied.

---

7 Indeed, as part of the remedy, the *Knight* court adjusted the funding formula in favor of the HBIs to account for the extra expense for remedial education and the lower tuition at the HBIs. *Knight v. Alabama*, 900 F. Supp. 272, 309 n.20 (N.D. Ala. 1991).

## III. WHILE UNNECESSARY TO TRACEABILITY CLAIMS UNDER *FORDICE*, EVIDENCE OF INTENTIONAL DISCRIMINATION EXISTS.

Just as defendants have incorporated by reference their discussion of "intentional discrimination" in their Funding Brief, plaintiffs direct the Court to plaintiffs' legal and factual discussion as to funding as well. (*See* Funding Opposition Part IV.) There, plaintiffs presented overwhelming evidence that MHEC's conduct illustrated defendants' discriminatory intent in approving unnecessarily duplicative programs and thereby harming the predominantly black student populations at the HBIs. That evidence is sufficient to establish a genuine issue of material fact on discriminatory intent with regard to program duplication at Maryland's TWIs. As such, defendants' motion should be denied.

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that Defendants' Motion for Summary Judgment on Recruitment, Admissions, Retention, and Graduation Rates be denied.

Dated: March 25, 2011

Respectfully submitted,

________/s/___________________________

Michael D. Jones, Esq. (Bar No. 08634)
Karen N. Walker (Bar No.14181)
Savaria B. Harris (*pro hac vice*)
Henry Thompson (*pro hac vice*)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200
Email: savaria.harris@kirkland.com

Aderson B. Francois, Esq. (Bar No. 17449)
Howard University School of Law
Civil Rights Clinic
2900 Van Ness Street, N.W.
Washington, D.C. 20008
Telephone: (202) 806-8065
Facsimile: (202) 806-8436
Email: afrancois@law.howard.edu

John C. Brittain (*pro hac vice*)
Attorney At Law
2513 Gadsby Place
Alexandria, VA 22311
Telephone: (832) 687-3007
Email: jbrittatty@comcast.net

Jon Greenbaum (*pro hac vice*)
Lawyers' Committee for Civil Rights Under Law
1401 New York Avenue, N.W., Suite 400
Washington, DC 20005
Telephone: (202) 662-8600
Facsimile: (877) 303-5039
Email: jgreenbaum@lawyerscommittee.org