IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| THE COALITION FOR EQUITY AND EXCELLENCE IN MARYLAND HIGHER EDUCATION, et al., | * | Trial Date: June 27, 2011 |
| Plaintiffs, | * | |
| v. | * | Case No. CCB-06-CV-2773 |
| MARYLAND HIGHER EDUCATION COMMISSION, et al., | * | |
| Defendants. | | |

*    *    *    *    *    *    *    *    *

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT REGARDING INTENTIONAL DISCRIMINATION AND MARYLAND'S FUNDING OF PUBLIC INSTITUTIONS OF HIGHER EDUCATION UNDER *FORDICE***

DOUGLAS F. GANSLER
Attorney General of Maryland

STEVEN M. SULLIVAN
Assistant Attorney General
Federal Bar No. 24930
CAMPBELL KILLEFER
Assistant Attorney General
Federal Bar No. 05707
ANNE L. DONAHUE
Assistant Attorney General
Federal Bar No. 07661
CAROLYN W. SKOLNIK
Assistant Attorney General
Federal Bar No. 23484

Office of the Attorney General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202-2021
Tel: (410) 576-7644

CATHERINE M. SHULTZ
Assistant Attorney General
Federal Bar No. 15635
DENISHA A. WATSON
Assistant Attorney General
Federal Bar No. 29214

Maryland Higher Education Commission
839 Bestgate Road, Suite 400
Annapolis, MD 21401-3013
Tel: (410) 260-4505

Counsel for Defendants

April 8, 2011

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........................................................................................ ii

INDEX OF REPLY EXHIBITS ................................................................................ vi

INTRODUCTION AND SUMMARY OF REPLY ARGUMENTS ................................ 1

ARGUMENT ............................................................................................................ 6

I. PLAINTIFFS HAVE NOT AND CANNOT SHOW ANY INTENTIONAL DISCRIMINATION AGAINST AFRICAN AMERICAN STUDENTS BY THE STATE ................................................................................................ 6

II. PLAINTIFFS HAVE NOT SATISFIED AND CANNOT SATISFY THE *FORDICE* STANDARD RELATING TO ALLEGED VESTIGES OF *DE JURE* SEGREGATION CONCERNING FUNDING ........................................ 14

A. Plaintiffs Mischaracterize The Legal Standard Under *Fordice* And Other Relevant Cases ........................................................................ 14

B. Plaintiffs Have Invented Their Own Unconvincing Connections Between Maryland's Existing Policies And Practices Concerning Appropriations For Annual Operating Expenses And Alleged Vestiges at HBIs ................. 17

C. Plaintiffs Also Cannot Meet Their Burden Under *Fordice* Concerning Maryland's Allocations For Capital Improvements At HBIs ............................................................................................ 22

CONCLUSION ......................................................................................................... 25

## TABLE OF AUTHORITIES

### Cases

**Page**

*Adams v. Bd. Of Pub. Educ.*, 2007 WL 841945, No. 5:63-CV-1926 (M.D. Ga. March 20, 2007) ........ 15

*Alexander v. Sandoval*, 532 U.S. 275 (2001) ........ 3, 8

*Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ........ 9

*Ayers v. Fordice*, 111 F.3d 1183 (5th Cir. 1997) ........ 4, 16, 18, 23

*Belk v. Charlotte-Mecklenburg Bd. Of Educ.*, 269 F.3d 305 (4th Cir. 2001) ........ 15

*Brown v. Bd. of Educ.*, 347 U.S. 483 (1954) ........ 17, 20

*Freeman v. Pitts*, 503 U.S. 467 (1992) ........ 12, 15

*Gratz v. Bollinger*, 539 U.S. 244 (2003) ........ 3

*Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667 (1st Cir. 1995) ........ 6

*Grutter v. Bollinger*, 539 U.S. 306 (2003) ........ 2, 5

*Guardians Assn. v. Civil Serv. Comm'n of New York City*, 463 U.S. 582 (1983) ........ 8

*Holton v. City of Thomasville Sch. Dist.*, 490 F.3d 1257 (11th Cir. 2007) ........ 9, 15

*Kairgadam v. Bell Atl. Corp.*, 46 Fed. Appx. 194 (4th Cir. 2002) ........ 6

*Knight v. Alabama*, 476 F.3d 1219 (11th Cir. 2007) ........ 15

*Knight v. Alabama*, 14 F.3d 1534 (11th Cir. 1994) ........ 15, 16

*Knight v. Alabama*, 900 F. Supp. 272 (N.D. Ala. 1995) ........ 13, 16

*Knight v. Alabama*, 787 F. Supp. 1030 (N.D. Ala. 1991) .............................................16

*Mandel v. HEW*, 411 F. Supp. 542 (D. Md. 1976)......................................................... 7

*Md. Minority Contractor's Ass'n v. Md. Stadium Auth.*, 70 F. Supp. 2d 580
(D. Md. 1998) (Blake, J.)..................................................................................................9

*Milliken v. Bradley*, 418 U.S. 771 (1974).........................................................................12

*Missouri v. Jenkins*, 515 U.S. 70 (1995) ..........................................................................15

*Morrison v. Garraghty*, 239 F.3d 648 (4th Cir. 2001) .......................................................9

*Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256 (1979) ........................................9

*Peters v. Jenney*, 327 F.3d 307 (4th Cir. 2003)...........................................................3, 8

*Podberesky v. Kirwan*, 38 F.3d 147 (4th Cir. 1994) ........................................................8

*Price v. Louisiana Dep't. of Educ.*, 29 Fed. Appx. 559 (5th Cir. 2009) ............................9

*Pryor v. NCAA*, 288 F.3d 548 (3d Cir. 2002)....................................................................9

*Swann v. Charlotte-Mecklenburg Bd. of Educ.* 402 U.S. 1 (1971) .................................12

*Sweatt v. Painter*, 339 U.S. 629 (1950) ............................................................................9

*Thompson v. U.S. Dep't. of Hous. and Urban Dev.*, 348 F. Supp. 2d 398
(D. Md. 2005) ............................................................................................................3, 15

*United States v. Fordice*, 505 U.S. 717 (1992) ............................1, 3, 4, 11, 12, 14, 15, 22

*Victors v. Kronmiller*, 553 F. Supp. 2d 533 (D. Md. 2008) (Blake J.)............................. 9

**Constitutional and Statutory Provisions**

U.S. Const. Amend. XIV ...........................................................................................8, 14

United States Codes

42 U.S.C. §2000d (2006) .........................................................................................8, 14

Federal Rules of Civil Procedure

Fed. R. Civ. P. 56 ........................................................................................................ 1

## Miscellaneous

Declaration of Geoffrey Newman with attached two-page Exhibit A on "University System of Maryland: Capital Budget Development Process" ............5, 17, 20, 22, 23, 24

Expert Report of Allan J. Lichtman dated May 17, 2010 ..............5, 11, 14, 19, 20, 24, 25

Historical Summary of the Carnegie Classifications of Maryland's Four-Year Public Institutions ..........................................................................................................20, 21

Institutional Profiles of Maryland's Four Historically Black Institutions........................12

Maryland Opinion of the Attorney General, 90 Md. Op. Atty. Gen. 153 (2005) ..7, 11, 24

Maryland's Final Report on the 2000-2005 Plan Under The Partnership Agreement With The Office For Civil Rights ....................................................................7

MHEC 2011 Data Book ....................................................................................8, 11, 13

Mission Statements of Maryland's Four Historically Black Institutions, 2006...............12

Office of the Attorney General Policies and Procedures – Opinions and Advice, Maryland.........................................................................................................................10

Plaintiffs' Expert Report of Robert K. Toutkoushian dated May 3, 2010 (excerpts) .......................................................................................................17, 18

Reply Expert Report of Allan J. Lichtman: Response to the Supplemental Report of Robert K. Toutkoushian dated October 28, 2010.....................................................5, 19

Reply Expert Report of Allan J. Lichtman: Response to the Report of Harvey Kaiser dated December 10, 2010...................................................................5, 25

Report of Committee 2, Final Review of the Partnership Agreement Between Maryland in the U.S. Department of Education Office for Civil Rights, Commitment 9 (Feb. 2006) ........................................................................................ 24

Saulny, Susan, "Race Remixed: Black? White? Asian? More Young Americans Choose All Of The Above," New York Times, January 29, 2011 ................................................ 13

*Seventh Annual Report and Recommendations of The Maryland Council For Higher Education*, 1971 ........................................................................................ 17

Transcript of the Deposition of Dr. Harvey Kaiser on November 19, 2010 (excerpts) ........................................................................................ 19, 24

INDEX OF REPLY EXHIBITS IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
ON INTENTIONAL DISCRIMINATION AND FUNDING

The exhibits accompanying MHEC's initial memorandum in support of the motion for summary judgment were numbered 2-11. The Reply exhibits follow in sequence.

12. Reply Expert Report of Allan J. Lichtman: Response to the Supplemental Report of Robert K. Toutkoushian dated October 28, 2010

13. Reply Expert Report of Allan J. Lichtman: Response to the Report of Harvey Kaiser dated December 10, 2010

14. Office of the Attorney General Policies and Procedures – Opinions and Advice, Maryland

15. MHEC 2011 Data Book

16. Mission Statements of Maryland's Four Historically Black Institutions, 2006

17. Institutional Profiles of Maryland's Four Historically Black Institutions

18. Saulny, Susan, "Race Remixed: Black? White? Asian? More Young Americans Choose All Of The Above," New York Times, January 29, 2011

19. Historical Summary of the Carnegie Classifications of Maryland's Four-Year Public Institutions

**INTRODUCTION AND SUMMARY OF REPLY ARGUMENTS**

Defendants Maryland Higher Education Commission, *et al.* ("MHEC" or "Maryland"), respectfully submit this Reply in support of their motion for summary judgment pursuant to Fed. R. Civ. P. 56. Plaintiffs, the Coalition for Equity and Excellence in Maryland Higher Education, *et al*., ("Plaintiffs" or "the Coalition"), have filed an Opposition to MHEC's motion ("Coalition Opp.") that seeks, selectively and in multiple ways, to insulate the resolution of this case from the realities of its legal, factual, and historical context.

Plaintiffs insist, for example, that the following aspects should *not* be taken into consideration because they are "for the most part, completely irrelevant," Coalition Opp. at 1: developments in the law after *United States v. Fordice,* 505 U.S. 717 (1992), including the ultimate disposition of that case in the lower courts and more recent Supreme Court and federal appellate case law that Plaintiffs decline to acknowledge, *see id*. at 1; the status of "race relations in Maryland," including the dramatic and undisputed increase in the participation of African Americans at the highest levels of all three branches of Maryland State government since the late 1960s, *id*.; Maryland's undisputed success in "desegregating its TWIs [Traditionally White Institutions]," *id.* at 6, where barriers to minority attendance had been the defining characteristic of the dual system that existed during the *de jure* era, *id*.; and even the fact that Maryland voluntarily has participated in a series of remedial agreements with the U.S. Department of Education's Office for Civil Rights ("OCR"), the last of which ended in 2005 without OCR

requesting an extension or taking any other action to indicate that further remedial measures were necessary to satisfy Maryland's obligation to dismantle its former dual system of higher education, *id*. at 4-6.

Rather than meaningfully address their burden of *proving*, and not merely presuming, that present policies and practices in Maryland constitute vestiges of the former *de jure* discrimination, Plaintiffs would prefer to have the case adjudicated without reference to either the most up-to-date and comprehensive body of pertinent case law or the actual, present-day undisputed evidence showing that Maryland does *not* intentionally discriminate against African American students and does *not* maintain policies or practices that are vestiges of the segregation era. Supreme Court precedent precludes this Court from adopting the mode of analysis urged by the Coalition, which is selectively blinkered and removed from the actual context in which Maryland's system of higher education operates today. Instead, as the Supreme Court emphasized in one of its more recent cases involving issues of race in higher education: "*Context matters*. . . ." *Grutter v. Bollinger*, 539 U.S. 306, 327 (2003) (emphasis added).

In this regard, the Coalition's Opposition to MHEC's motion suffers from at least four sets of significant flaws. First, though the Coalition claims to be confused by MHEC's assertion of arguments with respect to intentional discrimination and denies that any such showing is required, the need to address intentional discrimination arises from both the Coalition's own complaint and the case law applicable to its claims. *See* Fourth Amended Complaint ("Complaint") ¶136 ("Defendants have engaged in a pattern and

practice of *intentional discrimination* with respect to Maryland's HBCUs in violation of Title VI . . . ."), ¶ 141 ("Defendants have engaged in a pattern and practice of *intentional discrimination* with respect to Maryland's HBCUs in violation of the Equal Protection Clause of the Fourteenth Amendment and under *Fordice*.") (emphasis added). Thus, Plaintiffs have alleged "intentional discrimination" in violation of Title VI and the Equal Protection Clause.

In explaining the relevant legal standard for such a claim in the context of higher education, the Supreme Court in *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003), cited three of its decisions, the first two of which were *Alexander v. Sandoval*, 532 U.S. 275, 281 (2001), and *U.S. v. Fordice*, 505 U.S. 717, 732 n.7 (1992) – in that order. This exposition of the law by the Supreme Court forecloses Plaintiffs' view that the development of pertinent authority ceased with the Supreme Court's decision in *U.S. v. Fordice*, 505 U.S. 717 (1992).[1] Instead, *Fordice*, like other Supreme Court decisions, must be read and applied in light of subsequent precedent. In contrast to the example set by the Supreme Court in *Gratz*, Plaintiffs cannot bring themselves to cite or discuss MHEC's more recent and controlling cases requiring that Plaintiffs carry the burden of proving intentional discrimination, including *Sandoval* and *Peters v. Jenney*, 327 F.3d 307 (4th Cir. 2003) (following *Sandoval* and clarifying the need to prove intentional discrimination); and this Court's decision in *Thompson v. U.S. Dep't. of Hous. and Urban*

[1] Remarkably, Plaintiffs' 50-page Opposition cites only 13 cases, 5 of which address the uncontroversial standard on summary judgment. Plaintiffs do not address at all over 15 important cases cited in MHEC's initial memorandum.

*Dev.*, 348 F. Supp. 2d 398 (D. Md. 2005). Nor do Plaintiffs acknowledge that in the *U.S. v. Fordice* case itself, on remand from the Supreme Court, the district court found and the Fifth Circuit affirmed that, under the standards set forth by the Supreme Court, Mississippi's funding of its public institutions of higher education was *not* a vestige of *de jure* segregation. *Ayers v. Fordice*, 111 F.3d 1183, 1221-22 (5th Cir. 1997).

Second, the Coalition does not accurately describe the *Fordice* test in terms of the indicia of policies or practices that constitute vestiges traceable to the segregation era. Instead, throughout their Opposition, Plaintiffs repeat variations on the argument that was expressly rejected in *Fordice*; that is, they describe the alleged discriminatory *effects* of the segregation era compared to the present, without clearly identifying actual policies or practices that are traceable to the long ago era of *de jure* segregation. *See U.S. v. Fordice*, 505 U.S. at 730 n.4 ("To the extent [plaintiffs] urge us to focus on the present discriminatory effects without addressing whether such consequences flow from policies rooted in the prior system, we reject this position."). Under *Fordice*, the Coalition must show existing policies or practices with segregative effects and then tie them to the era of *de jure* segregation, but Plaintiffs fail to do so.

Third, as MHEC will show in this Reply, undisputed evidence establishes both that current Maryland policies in higher education are not traceable to the era of *de jure* segregation and that such policies benefit rather than disadvantage HBIs. This undisputed evidence includes both admissions by experts for plaintiffs and the important facts set forth in the Declaration of Geoffrey Newman regarding the State's existing

policies and practices and the facts that prevent them from being traced to the *de jure* era. Exhibit 2, Newman Declaration ("Newman Dec."), attached to MHEC's Initial Memorandum. The undisputed evidence also includes many of the factual findings and resulting opinions of MHEC's funding expert, Professor Allan Lichtman. *See* Exhibit 8, Expert Report of Allan J. Lichtman ("Lichtman Initial Report"), attached to MHEC's Initial Memorandum; Reply Expert Reports of Professor Allan Lichtman, attached hereto as Exhibits 12 and 13.[2]

Fourth, the Coalition ignores the effect of decisions made by the presidents and other decision makers at Maryland's HBIs, which were made under the substantial authority delegated to the HBI presidents and boards of regents and carried out, in their professional views, in the best interests of the HBIs. Maryland should not be faulted for honoring the decisions made by the HBIs and their administrators, in light of the Supreme Court's "tradition of giving a degree of deference to a university's academic decisions," particularly those involving "complex educational judgments. . . ." *Grutter v. Bollinger*, 539 U.S. at 328 (citations omitted). Maryland's ability to dictate or override such decisions is also constrained by Supreme Court "cases recognizing a constitutional dimension, grounded in the First Amendment, of educational autonomy." *Id.* at 329.

Plaintiffs cannot prevail on their claims as a matter of law. Maryland has met its legal obligation to dismantle its dual system of higher education because all policies and

[2] Plaintiffs complain that MHEC did not prepare a separate statement of material facts not in dispute. As this Court knows, such a separate statement is not required under the Local Rules.

practices that were a part of that former system have been either purposefully eliminated or severed from any connection to the *de jure* era due to the passage of time and structural change within the system of higher education. The Coalition cannot show any evidence of intentional discrimination against African American students under the *Sandoval* test. Even if the Court were to decide not to apply the *Sandoval* test, MHEC shows below that Maryland satisfies the *Fordice* test because there are no existing policies or practices traceable to the *de jure* segregation era that have continuing segregative effects. Because the Coalition cannot show any Equal Protection or Title VI violation by the State, this Court should grant MHEC's motion for summary judgment and dismiss the Coalition's complaint.

## ARGUMENT

### I. PLAINTIFFS HAVE NOT AND CANNOT SHOW ANY INTENTIONAL DISCRIMINATION AGAINST AFRICAN AMERICAN STUDENTS BY THE STATE.

By failing to address the substance of MHEC's argument with respect to intentional discrimination – or even to acknowledge the case law cited by MHEC – Plaintiffs have effectively conceded that they are unable to prove intentional discrimination within the meaning of applicable precedent. Plaintiffs' failure to address MHEC's undisputed facts and legal authority forecloses the Coalition's claim of intentional discrimination and summary judgment should be granted. *Kairgadam v. Bell Atl. Corp.*, 46 Fed. Appx. 194, 195 (4th Cir. 2002) (on appeal from Blake, J.); *Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 668 (1st Cir. 1995).

Rather than rekindle an unnecessary fight with OCR – Maryland had earlier prevailed on administrative issues in *Mandel v. HEW*, 411 F.Supp. 542 (D. Md. 1976) – Maryland cooperatively entered into an agreement with OCR in 2000. The 2000-2005 Plan, known as the Partnership Agreement, was a joint, collaborative effort between the State and OCR. *See* Exhibit 3, Maryland's Final Report on the 2000-2005 Plan, attached to MHEC's Initial Memorandum. As background in a formal opinion of the Maryland Attorney General addressing the issue of unnecessary program duplication, the OCR Partnership's Agreement was discussed:

> It is significant that Maryland is not, and has never been, subject to court-ordered higher education desegregation remedies. On the only occasion when the courts have intervened, they did so in 1976 to bar OCR from instituting enforcement proceedings against the State, *Mandel*, 411 F.Supp. at 542. Since then, during decades of voluntary desegregation plans, OCR has never determined that the State's efforts were inadequate. Moreover, Maryland's participation in the 2000 Agreement was voluntary, and the Agreement's terms were developed through negotiations between Maryland higher education officials, other State leaders, and OCR representatives. In some instances, the provisions of the 2000 Agreement may *exceed* constitutional requirements. *However, the State's efforts to comply with the terms of the Agreement may provide evidence that the State has acted in good faith to meet its constitutional obligations*.

90 Md. Op. Atty. Gen. 153 (2005) (emphasis added). Actually, even in the early 1990s, the University of Maryland, College Park had attempted to convince the federal courts that College Park still retained some vestiges of the segregated system, primarily related to admissions, retention, and campus climate. The University was hoping to continue a challenged race-based scholarship program for African American students. The Fourth Circuit held that College Park was unable to show that the conditions it identified were

actually vestiges of *de jure* segregation, and the scholarship program was eliminated. *Podberesky v. Kirwan*, 38 F.3d 147, 153-54 (4th Cir. 1994).

African American students now are welcomed at and attend all of Maryland's public four-year institutions of higher education – at HBIs and all of the non-HBIs alike.[3] There has never been a finding that Maryland is in violation of the Partnership Agreement or that the State continues any policies or practices with segregative effects traceable to the era of *de jure* segregation. Without such a finding, Maryland must be presumed to be operating its institutions of higher education consistent with the United States Constitution. In this case, the Coalition bears the burden to show intentional discrimination by Maryland, which the Coalition has not done.

The Coalition cannot dispute that, absent a finding of recent continuing discrimination, the broader test articulated by the Supreme Court after its decision in *Fordice* is that Plaintiffs must show intentional discrimination to prove an Equal Protection Clause or Title VI violation. *Sandoval*, 532 at 280-81 (2001); *Guardians Assn. v. Civil Serv. Comm'n of New York City*, 463 U.S. 582, 610-11 (1983); *Peters*, 327 F.3d at 320 (4th Cir. 2003). To satisfy this standard, in this case, Plaintiffs must show

---

[3] In the latest year for which data is available, 2009, 59% of all African American students attending Maryland's public four-year institutions attended non-HBIs (26,263 students) compared to HBIs (18,313 students). *See* MHEC 2011 Data Book at 10, attached hereto as Exhibit 15. African American students have exercised their freedom to choose the kind of institution they wish to attend and its location. Plaintiffs' experts have not disputed the finding of Dr. Lichtman that Maryland provides more state appropriations and capital funding per full-time equivalent African American students than for non-African American students, regardless of the four-year public institutions they attend. Exhibit 8, Lichtman Initial Report at 38-40.

deliberate, intentional actions by Maryland to discriminate against African American students. Institutions have no civil rights themselves, of course; only individuals are guaranteed civil rights. *Sweatt v. Painter*, 339 U.S. 629, 635 (1950).[4]

"Facially neutral" policies such as Maryland's methodology of annual appropriations of operating expenses and allocations for capital improvements at the public four-year institutions do not violate Title VI or the Fourteenth Amendment solely due to any disproportionate effects (although as shown below no such effects exist in Maryland). *Victors*, 553 F. Supp. at 541 (internal quotes omitted). In order "[t]o prove intentional discrimination by a facially neutral policy, a plaintiff must show that the relevant decision maker ... adopted the policy at issue 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* (*quoting Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979)).[5]

---

[4] Similarly, a violation of the Equal Protection Clause can occur only if it results from a discriminatory intent or purpose. *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977); *Md. Minority Contractor's Ass'n. v. Md. Stadium Auth.*, 70 F. Supp. 2d 580, 593 (D. Md. 1998) (Blake, J.) (holding that a State agency's prequalification requirement used in selection of contractors was not the result of intentional discrimination, and thus did not violate equal protection rights of minority contractors). "To succeed on an equal protection claim, a plaintiff must . . . demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Victors v. Kronmiller*, 553 F. Supp. 2d 533, 541 (D. Md. 2008) (Blake J.) (*quoting Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)).

[5] The plaintiffs' mere conclusory allegations of intent are wholly insufficient to satisfy their heavy burden to prove discriminatory purpose or intent. *See Price v. Louisiana Dep't of Educ.*, 29 Fed. Appx. 559, 560 (5th Cir. 2009); *Holton v. City of Thomasville Sch. Dist.*, 490 F.3d 1257, 1263 (11th Cir. 2007); *Pryor v. NCAA*, 288 F.3d 548, 563 (3d Cir. 2002).

The Plaintiffs here have failed to put forth any material evidence that Maryland has purposefully and intentionally pursued any form of discriminatory treatment toward African American students at whatever public four-year school they may attend or at Maryland's HBIs in particular. In their Opposition memorandum, Plaintiffs offer only a single example of alleged program duplication as a supposed instance of "inferred" intentional discrimination (Coalition Opp. at 44-49). But it is indisputable that in the past ten years MHEC has approved *only one* proposed program at a public non-HBI over the objections of an HBI.[6] Morgan State University objected to the proposed expansion of the University of Baltimore's existing Master's in Business Administration program into a joint program with Towson University in 2005.[7] However, the expansion of that MBA

---

[6] Although MHEC recently approved University of Maryland, University College's on-line Community College Leadership Program over Morgan State University's objections, it was approved only as offered to non-Maryland students; UMUC's request to offer it to Maryland students was denied.

[7] Plaintiffs attempt to support their only intentional discrimination allegation by arguing that a former Maryland Assistant Attorney General, who at that time represented MHEC, wrote an advice of counsel memorandum stating that approval of the Towson/UB MBA program would amount to unnecessary program duplication. That memorandum, however, was short (i.e., three pages) and conclusory, devoid of detailed analysis, and was *not* an official statement of a legal position by the Attorney General. Under the Office of the Attorney General policy, such advice is considered to express no more than the view of the specific attorney who drafted it; such a memorandum does not constitute and may not be equated with an opinion of the Attorney General. *See* Office of the Attorney General Policies and Procedures – Opinions and Advice, Maryland, attached hereto as Exhibit 14. In contrast, several months after the advice memorandum cited by Plaintiffs, the Maryland Attorney General did issue an actual formal opinion analyzing program duplication. That opinion states, among other things:

> [T]he State may legitimately assert a range of educational justifications for duplicate programs. If the justification is consistent with the State Plan for

program had no segregative effects. Enrollment data show that Morgan State University's MBA program had *no* white students in the years preceding MHEC's approval of the expanded program at UB/Towson, but managed to attract a small number of white students following such approval. *See* Exhibit 3 of Defendant's Reply in Support of Their Motion for Summary Judgment on Recruitment, Admission, Retention and Graduation Rates.

The fact that "an institution is predominantly white or black does not in itself make out a constitutional violation." *See Fordice,* 505 U.S. at 743. No one could argue that Maryland's HBIs are not open to students of all races, but the history of these institutions as HBIs renders them more attractive to African Americans than to students of other races. As Justice Thomas recognized in his concurring opinion in *Fordice*, historically black colleges:

> have succeeded in part because of their distinctive histories and traditions; for many, historically black colleges have become a "symbol of the highest attainments of black culture." Obviously, a State cannot maintain such traditions by closing particular institutions, historically white or historically black, to particular racial groups. Nonetheless, it hardly follows that a State cannot operate a diverse assortment of institutions—including historically black institutions—open to all on a race-neutral basis, but with established traditions and programs that might disproportionately appeal to one race or another. No one, I imagine, would argue that such institutional *diversity* is without "sound educational justification," or that it is even remotely akin to

---

> Higher Education or the current OCR agreement and supported by sound reasoning and empirical evidence, we believe that it has satisfied the criterion of educational soundness. The question then is whether those legitimate educational objectives can be met without the same segregative effect. 90 Op. Md. Att'y Gen. 153,177-783 (2005).

> program *duplication*, which is designed to separate the races for the sake of separating the races.

*Fordice*, 505 U.S. at 748-749 (citation omitted).

*Fordice* is only one of several cases in which the Supreme Court has acknowledged that "racial balance is not to be achieved for its own sake." *Freeman v. Pitts*, 503 U.S. 467, 494 (1992). *See also Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 24 (1971) ("If we were to read the holding of the District Court to require, as a matter of substantive constitutional right, any particular degree of racial balance or mixing, that approach would be disapproved and we would be obliged to reverse."); *Milliken v. Bradley*, 418 U.S. 771, 740-41 (1974) (stating that desegregation does not require any particular racial balance).

Plaintiffs complain that the four HBIs in Maryland have great difficulty attracting white undergraduates, but at the same time those HBIs understandably market themselves and proudly embrace their history as "historically black" schools. The four Maryland HBIs' websites highlight their historical roots as institutions for African Americans and predominantly display African American students in their website photographs. True copies of the four Maryland HBIs' website descriptions of their institutional profiles or history as accessed online on March 28, 2011, are attached collectively as Exhibit 16. In addition, the four HBIs' self-created and formally adopted "Mission Statements" highlighted their continuing commitment to operate as HBIs. True copies of the Mission Statements of Bowie State University, Coppin State University, Morgan State University, and University of Maryland Eastern Shore are attached collectively as Exhibit 17. Those

HBIs' websites and Mission Statements are factual, accurate and a source of strength and pride, but they may well come at a cost. As was found in *Knight v. Alabama*, on which Plaintiffs rely, "the desire of an HBI to maintain its racial identifiability extracts an intangible, but very real, cost in the desegregation process. It makes it more difficult to recruit white students to the college." *Id.*, 900 F. Supp. 272, 314 (N.D. Ala. 1995).[8]

The State's evidence regarding the pattern of funding increases to the HBIs and the written report of MHEC's expert witness, Professor Allan Lichtman, show that over the last twenty-five years Maryland has funded the four HBIs at higher (i.e., better) levels per full-time equivalent ("FTE") student than the seven public non-HBIs in Maryland. Professor Lichtman concluded that Maryland had more than equally or equitably funded the HBIs by the standard measurement of FTE students:

> An appropriate analysis using full-time equivalent students as a benchmark measure of comparison shows that since 1984 the state of *Maryland has provided substantially more support through annual appropriations and capital allocations to historically black than to non-historically black public four-year institutions of higher education.* In each of these two state-supported categories, this additional support amounts to *several hundred millions of dollars during the past quarter century.*

---

[8] In fact, the HBIs' historical identities may discourage enrollment of even some of the increasing numbers of undergraduates who identify themselves as multiracial or biracial. The racially polyglot nature of many college campuses, including the University of Maryland at College Park, is highlighted in the recent New York Times article "Race Remixed: Black? White? Asian? More Young Americans Choose All of the Above" by Susan Saulny, January 29, 2011, attached hereto as Exhibit 18. Maryland's most recent statistics show that 42,337 students (12%) identify themselves as "other" when asked to designate race. Exhibit 15, 2011 Data Book at 11. These trends are positive, on balance, but those institutions wedded to using "historically black" in their marketing may be adversely affected in their enrollment. That result, however, does not represent any <u>intentional</u> discrimination by the State of Maryland.

***

> Both annual appropriations and capital funding to historically black four-year institutions have risen at a faster rate than to non-historically black schools in recent years. *Present-day support is substantially higher for the historically black institutions.*

Exhibit 8, Lichtman Initial Report at 1 (Summary of Opinions 1 and 2) (emphasis added). Maryland's generous funding of the HBIs over the last 25 years, and particularly during the last five years, shows there is no intentional discrimination toward African American students.

## II. PLAINTIFFS HAVE NOT SATISFIED AND CANNOT SATISFY THE *FORDICE* STANDARD RELATING TO ALLEGED VESTIGES OF *DE JURE* SEGREGATION CONCERNING FUNDING.

### A. Plaintiffs Mischaracterize The Legal Standard Under *Fordice* and Other Relevant Cases.

In *United States v. Fordice*, 505 U.S. 717, 727 (1992), the United States Supreme Court reiterated that states have an affirmative obligation to rid themselves of any remaining vestiges of segregation in their systems of public higher education. Failure to meet this obligation constitutes a violation of the Fourteenth Amendment to the United States Constitution and Title VI of the Civil Rights Act of 1964. *Id.* at 743.[9]

---

[9] In *Fordice*, the Court prescribed a three-part analysis to determine whether a state had fully met this obligation. *Fordice*, 505 U.S. at 751. First, the challenged policy or practice should be examined to determine whether it is "traceable" to a state's former practices originating in an era of *de jure* segregation. *Id*. Second, the policy should be studied to determine whether it continues to promote segregative effects. *Id.* Third, even if a policy originated in a *de jure* era and continues to have segregative effects, it may still be permissible if there is an educationally sound rationale for its continued existence or if it is a practice that cannot be practicably eliminated. *Id.*

Even a school system characterized by racial imbalances will *not* violate the Equal Protection Clause if the disparities that exist within the system are not vestiges of *de jure* segregation. *Freeman v. Pitts*, 503 U.S. 467, 485 (1992); *Holton v. City of Thomasville Sch. Dist.*, 490 F. 3d 1257, 1262 (11th Cir. 2007) (per curiam); *Belk v. Charlotte-Mecklenburg Bd. Of Educ.*, 269 F. 3d 305, 318 (4th Cir. 2001); *Adams v. Bd. Of Pub. Educ.*, 2007 WL 841945, No. 5:63-CV-1926 (M.D. Ga. March 20, 2007). Racial disparity resulting from other societal conditions, rather than the prior State-sponsored *de jure* regime, cannot give rise to an equal protection claim. *See Fordice*, 505 U.S. at 730; *Missouri v. Jenkins*, 515 U.S. 70, 96, 100-01 (1995). Thus, this Court has rejected equal protection claims where plaintiffs had not proved "that the conditions that Baltimore's poor African Americans face [derive] principally from state-sponsored, modern-era *racial* discrimination, rather than from their poverty and society's inadequate efforts to address this poverty." *Thompson v. U.S. Dept. of Hous. and Urban Dev.*, 348 F. Supp. 2d 398, 450-51 (D. Md. 2005).

Under *Fordice*, the Coalition carries the initial burden of proving that a Maryland policy or practice is traceable to the *de jure* era. *Knight v. Alabama*, 476 F. 3d 1219, 1221 (11th Cir. 2007); *Knight v. Alabama*, 14 F.3d 1534, 1540-41 (11th Cir. 1994). This is where Plaintiffs' argument falls short. They conjure up racial disparities – the *effects* of alleged discrimination – but cannot tie segregative effects to any <u>policy</u> or <u>practice</u> that is traceable back to the pre-1954 era of *de jure* segregation.

To satisfy their burden under *Fordice* with respect to claims alleging funding disparities between HBIs and non-HBIs, the Plaintiffs must be able to trace particular policies or practices that *result* in funding disparities to the *de jure* era, rather than just tracing the disparities themselves. *Ayers v. Fordice*, 111 F. 3d 1183, 1223-25 (5th Cir. 1997). The Fifth Circuit's decision in *Ayers* provided the resolution of this issue in the *Fordice* case after it was remanded from the Supreme Court. The Fifth Circuit held that the funding formula used in Mississippi was "*not* traceable to *de jure* segregation" and was "*not* linked to any prior discriminatory practice," *id*. at 1223-24 (emphasis added), even though it was tied to the long-term effects of the system's prior mission statements, which were traceable to the *de jure* era. *Id.* Plaintiffs' failure to show such policies or practices is fatal to their claims in this case.

Plaintiffs' favorite case appears to be *Knight v. Alabama*, 787 F. Supp. 1030 (N.D. Ala. 1991), its subsequent history on appeal to the 11th Circuit, *Knight v. Alabama*, 14 F.3d 1534 (11th Cir. 1994), and on remand back to the district court, *Knight v. Alabama*, 900 F. Supp. 272 (N.D. Ala. 1995). Despite Plaintiffs' hyperbole that "Maryland mirrors Alabama" (Coalition Opp. 22), the *Knight* decisions are readily distinguished on their facts.

At the time the plaintiffs filed the lawsuit in *Knight* in the late 1980s, there was no doubt that Alabama was underfunding its two HBIs compared to the State's many non-HBIs, notwithstanding an increase in funding that occurred after the *Knight* lawsuit was

filed. In Maryland, as shown in section B below, both pre- and post-filing of this lawsuit, the State has been funding its four HBIs at a significantly *higher* level compared to the non-HBIs, even with the "flagship" College Park included and particularly when compared to the non-HBIs with College Park properly excluded.

In addition, Alabama had not included any enhancement funding for HBIs, whereas Maryland has included such funding for many years. In *Knight*, Alabama had been allocating capital budgets to HBIs on par or slightly better than to its non-HBIs. *Knight*, 787 F.Supp. at 1270. As shown in section C below, Maryland has been providing significantly more to HBIs' capital improvements compared to non-HBIs for the last 37 years, amounting to a $652 million benefit to Maryland's HBIs. Despite the Coalition's hyperbole, Maryland certainly does *not* "mirror Alabama."

### B. Plaintiffs Have Invented Their Own Unconvincing Connections Between Maryland's Existing Policies And Practices Concerning Appropriations For Annual Operating Expenses And Alleged Vestiges At HBIs.

As a matter of undisputed historical fact, Maryland's existing use of its funding guidelines cannot be traced back to Maryland's *de jure* era.[10] As Plaintiffs' expert concedes, "the current funding formula used in Maryland can be traced back to 1999."

---

[10] The concept of using a funding formula to make appropriation recommendations to the legislature began no earlier than 1968, which was fourteen years after *Brown v. Bd. of Educ.* 347 U.S. 483 (1954), and four years after the Civil Rights Act of 1964. Newman Dec. ¶ 10. Those facts are conceded in the written report of Plaintiffs' funding expert, Professor Robert Toutkoushian. Exhibit 9, Expert Report of Dr. Robert Toutkoushian ("Toutkoushian Report") at 10, relevant excerpts attached to MHEC's Initial Memorandum); *Seventh Annual Report and Recommendations of The Maryland Council For Higher Education, 1971.*

Toutkoushian Report at 11. Maryland's current funding methodology, in its reliance on FTE student adjustments, is similar to the funding approach upheld in *Ayers v. Fordice*, 111 F.3d 1183, 1223-25 (5th Cir. 1997), and most certainly is not traceable to the era of *de jure* segregation.

The Coalition erroneously attempts to establish traceability by alleging that any funding *disparities* today (i.e., effects, but not policies) are themselves traceable to the *de jure* era. Toutkoushian Report at 5. That showing cannot satisfy the *Fordice* standard, as a matter of law. *See Ayers*, 111 F.3d at 1223-24. Without establishing traceability of specific current policies or practices, plaintiffs may not maintain a claim against Maryland under the Equal Protection Clause or Title VI unless they can establish that Maryland acted with a discriminatory purpose or intent. As shown above, Plaintiffs cannot make any such showing of intent.

In 1988, the Maryland General Assembly passed legislation to elevate the University of Maryland at College Park as the State's "flagship" university. This legislation cannot be considered a vestige of the era of *de jure* segregation that ended more than 30 years before its enactment in 1988, at which time African American students were already attending College Park, as well as all of the other non-HBIs in Maryland. College Park's status as the "flagship" university led to enhanced funding of operating expenses and allocations for capital improvements, which enabled the university to compete more effectively with the large "flagship" universities in other states. Where Dr. Toutkoushian goes astray is his unsupported assertion that these

"flagship" decisions disadvantaged all historically black institutions relative to all non-historically black institutions. In fact, as Dr. Lichtman's analysis shows, Maryland's four HBIs have received far more appropriations for both operating budgets and capital projects per FTE student than the comparable six non-HBIs, not including College Park. Dr. Toutkoushian conducted no funding analyses that compared the historically black institutions only to the six non-flagship, non-historically black institutions. Exhibit 8, Lichtman Initial Report, at 15, Table 3 & at 28, Table 6.[11]

Based on current funding practices, Maryland's four HBIs fare much better in state annual appropriations than the non-HBIs. With College Park properly excluded, the four Maryland HBIs rank as follows: 1st (Coppin), 2nd (Morgan), 5th (UMES) and 6th (Bowie) in funding per FTE student for FY 2010. The four lowest (i.e., worst) funded universities in Maryland measured by FTE students are all *non*-HBIs: Towson University, Salisbury University, the University of Baltimore, and Frostburg State University. On average, HBIs received $9,948 per FTE in 2010, 55 percent higher than

[11] Dr. Harvey Kaiser, Plaintiffs' facilities expert, also agrees that College Park is an "outlier" and should not be included in comparisons with the HBIs and other non-HBIs. Dr. Kaiser conceded during this deposition that the University of Maryland at College Park was an "outlier" due to its large size, research focus and special designation as Maryland "flagship" university. Exhibit 11, Transcript of the Deposition of Harvey Kaiser ("Kaiser Dep.") at 194-95, 199-200, attached to MHEC's Initial Memorandum. Moreover, an analysis of annual appropriations by Dr. Lichtman that extends from FY 1984 to FY 2010 shows that even with College Park included, historically black institutions have received more than their fair share of funding, based on full-time equivalent students. Lichtman Reply Report to Toutkoushian, at 14, Table 2, attached hereto as Exhibit 12. Dr. Toutkoushian has conducted no analysis that extends from 1984 to 2010.

the average of $6,431 for the six non-HBIs, not including College Park. Exhibit 8, Lichtman Initial Report at 75.

The Coalition and Dr. Toutkoushian rely on a combination of the HBIs' own mission statements and their relative placement in the Carnegie classification system for four-year colleges and universities to argue that Maryland's HBIs are "locked into" inferior funding compared to the non-HBIs. There are many flaws in the Coalition's argument, the first of which is that no such inferior funding has taken place, as indicated above.

In addition, as set forth in the Declaration of Geoffrey Newman, each of Maryland's public four-year institutions of higher education, HBIs and non-HBIs alike, determines its own written mission subject to limited review and comment by MHEC. Exhibit 2, Newman Dec. ¶ 5. The four HBI presidents have the authority and autonomy by statute to create their own institution's mission with minimal oversight. *Id.* The four Maryland HBIs revised their written missions in 2000 in connection with the State's Partnership Agreement with OCR, and revised the mission statements again in 2006.

Plaintiffs' reliance on the Carnegie classifications (see chart in Coalition Opp. at 26) is both flawed and misleading. It is flawed because the Carnegie classification system was not even created until 1973, almost 20 years *after* the end of *de jure* segregation by *Brown v. Bd. of Educ.*, 347 U.S. 483 (1954). The Carnegie classification system, as its name implies, is administered and updated by an independent organization, is widely used throughout the United States in higher education, and is on its face racially

neutral, not tied to individual institutions' history or mission statement. Even more tellingly, the Maryland HBIs' positions on the Carnegie classification chart have no relationship whatsoever to their comparative funding levels on a FTE student basis, as shown in the expert report of Professor Allan Lichtman

Plaintiffs' use of the Carnegie classification chart on page 26 of their Opposition is also misleading. The chart does not show how Maryland's HBIs have moved up tiers in the system. For example, in 2005 Morgan State University moved up a tier from "Masters – Larger Programs" to "Doctoral/Research University." *See* the Historical Summary of the Carnegie Classifications of Maryland's Four-Year Public Institutions, attached hereto as Exhibit 19. Plaintiffs' chart failed to show that Bowie State University also moved up a tier to "Doctoral/Research University" in 2010. *Id.* In addition, Plaintiffs' chart is affirmatively misleading in showing UMES on the supposed lowest tier of Masters-Smaller Programs. The Coalition's chart totally omits St. Mary's College in an even lower tier – "Baccalaureate Colleges – Arts & Sciences" – below the tiers of Coppin and UMES. *Id.* Surely Plaintiffs do not argue that St. Mary's College – Maryland's "Public Honors College" – is less prestigious than all the universities "above it" in the Carnegie classification. In sum, Plaintiffs' reliance on their inaccurate and misleading chart does not undercut the facts that Maryland's HBIs are more generously funded compared to the non-HBIs on a FTE student basis.[12]

---

[12] One of the arguments Plaintiffs use to support their claim that the HBIs are entitled to more funding is that they serve a costly "dual mission" to educate not only high-achieving students but also those with remedial education needs and financial

As MHEC has demonstrated, if there is a funding disparity, it favors HBIs over non-HBIs. But even if the reverse were true, the Coalition's attempts to prove their case through (factually erroneous) funding disparities fail as a matter of law. The *Fordice* Court specifically rejected the idea of using a *Fordice*-type claim as a vehicle for addressing any funding disparities between HBIs and non-HBIs for their own sake. As the Supreme Court made clear, an HBI is not entitled to be a "separate but 'more equal'" school. *Fordice*, 505 U.S. at 743.

### C. Plaintiffs Also Cannot Meet Their Burden Under *Fordice* Concerning Maryland's Allocations for Capital Improvements At HBIs.

The Declaration of Geoffrey Newman describes the complex processes by which Maryland currently allocates funds for capital improvements at the public four-year schools. Exhibit 2, Newman Dec. ¶¶ 14-21. Plaintiffs' Opposition does not address at all the important facts in the Newman Declaration. The detailed Capital Improvement Program and the System-Funded Construction Program are new Maryland approaches:

> The capital budget processes that have been in use for over a decade do not resemble the funding processes from the State's era of racial segregation of college campuses. The budgeting process, the sources of funding and the financial sophistication employed throughout the budgeting process in 2011 bear no relationship to capital budgeting and funding of the past.

Exhibit 2, Newman Dec. ¶ 22. Dr. Kaiser conceded at his deposition that he could *not* identify any current Maryland policy or practice relating to the public four-year schools,

---

disadvantages. This argument is not viable under the *Fordice* standard, as shown in MHEC's Reply in Support of Defendants' Motion for Summary Judgment on Recruitment, Admission, Retention and Graduation Rates.

and specifically the HBIs, that are allegedly tied to the prior era of *de jure* segregation. Exhibit 11, Kaiser Dep. at 208-209, 250, 251-52.

Plaintiffs also failed to address the facts in the Newman Declaration that the presidents of Maryland's HBIs can set their own institutions' capital improvement priorities. All of Maryland's campuses at public four-year institutions have their own tired, old buildings. The president and other officials at HBIs and non-HBIs alike have considerable authority whether to renovate old buildings or to construct new facilities instead:

> [In Maryland] capital allocations focus on individual capital projects identified by the institution's president and other leaders as high priorities. Each institution has broad authority to designate new construction (e.g., a science center or humanities building facility) as higher priority than a renovation project (e.g., modernizing an academic building or campus signs or landscaping). Presidents can also rank renovations as higher priority than new buildings. Because the State's finances are very limited, MHEC and DBM look to the individual institutions of higher education to set relative priorities on their capital projects.

Exhibit 2, Newman Dec. ¶ 14. Plaintiffs' failure to address those material facts makes them undisputed.

On remand from the Supreme Court in *Fordice*, the Fifth Circuit upheld the district court's decision validating the State's construction funding. The district court had noted that, although the State provided new construction funds disproportionately to the non-HBIs during the late 1960s, figures from 1970 through 1994 showed that HBIs received a percentage of capital improvement funds that *exceeded* their percentage of system-wide enrollment. *Ayers v. Fordice,* 111 F.3d at 1222; *see also* 90 Md. Op. Atty.

Gen. 153 (2005). The same is true of Maryland's generous allocations for capital improvements at the HBIs, not only over the past 25 years, but over the past 37 years.[13]

Professor Lichtman found that:

- Since 1984 the State has devoted well over two billion dollars to capital projects for historically black and non-historically black four-year public institutions. During that period, Maryland has provided the four historically black institutions more than $400 million above the capital allocations proportional to their share of FTE students.

- Maryland's historically black institutions have more square feet per FTE student than non-historically black institutions.

- Maryland's historically black institutions have more of their physical plant built since 1982 and 1992 than the non-historically black institutions.

- Historically black institutions have less deficiency in research laboratory space than non-historically black institutions. Although most institutions have some deficiency, the deficiency for the historically black institutions is relatively small compared to the non-historically black institutions.

Exhibit 8, Lichtman Initial Report at ¶ 15 on page 25 and ¶ 18 on page 33.[14] Dr. Kaiser's report did not include any independent calculations on capital improvements, but said

---

[13] It bears emphasis that neither Dr. Toutkoushian nor Dr. Kaiser analyzed or compared at all the capital appropriations for Maryland's four HBIs compared to the seven non-HBIs, with University of Maryland, College Park included or excluded. Professor Lichtman criticized Dr. Toutkoushian for not evaluating a large category of State financing – capital improvements – in comparing the State's overall treatment of HBIs to non-HBIs. Dr. Kaiser conceded that he does "not contest the [capital improvement] calculations in Dr. Lichtman's report." Facilities Expert Report of Dr. Harvey Kaiser (Doc. 172-3), at p. 9. Therefore, Professor Lichtman's calculations and analyses are undisputed.

[14] In addition, *The Report of Committee 2, Final Review of the Partnership Agreement Between Maryland in U.S. Department of Education Office for Civil Rights, Commitment 9,* (Feb. 2006), systematically compares each of the four HBIs with averages for non-HBIs on four measures on the adequacy of facilities (16 comparisons). The results show that Maryland's HBIs lead and are better off than the non-HBIs on 11 of 16 objective measures (*Report of Committee 2,* Tables 11-14).

only that Dr. Lichtman should have extended his analysis further back in time and adjusted for inflation. When Dr. Lichtman then did extend the analysis back to 1975 and adjusted for inflation, the results showed an even larger advantage for the HBIs of more than $650 million in terms of a substantial increase in the amount of excess capital appropriations compared to non-HBIs. Reply Expert Report of Allan Lichtman: Response to the Report of Harvey Kaiser, Doc. 186, at ¶ 29 page 23, attached hereto as Exhibit 13.

**CONCLUSION**

For the reasons stated above and in MHEC's initial memorandum filed on February 11, 2011 (Doc. 207), the Court should grant MHEC's motion for summary judgment and (1) dismiss Plaintiffs' latest Complaint in its entirety because Plaintiffs cannot show any intentional racial discrimination by the Defendants or, (2) alternatively, if the Court is inclined not to dismiss the entire Complaint, then dismiss Plaintiffs' claims that Defendants have not eradicated vestiges from the era of *de jure* segregation concerning (a) the State's appropriations of annual operating expenses and (b) allocations for capital improvements at the campuses of Maryland's four historically black institutions.

April 8, 2011

Respectfully submitted,

DOUGLAS F. GANSLER
Attorney General of Maryland

__________/S________________________
STEVEN M. SULLIVAN
Assistant Attorney General
Federal Bar No. 24930
CAMPBELL KILLEFER
Assistant Attorney General
Federal Bar No. 05707
ANNE L. DONAHUE
Assistant Attorney General
Federal Bar No. 07611
CAROLYN W. SKOLNIK
Assistant Attorney General
Federal Bar No. 23484

Office of the Attorney General
of Maryland
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202-2021
Telephone: 410-576-7644

___________/S________________________
CATHERINE M. SHULTZ
Assistant Attorney General
Federal Bar No. 15635
DENISHA A. WATSON
Assistant Attorney General
Federal Bar No. 29214

Maryland Higher Education Commission
830 Bestgate Road, Suite 400
Annapolis, MD 21401-3013
Telephone: 410-260-4505

Counsel for Defendants