IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| THE COALITION FOR EQUITY AND EXCELLENCE IN MARYLAND HIGHER EDUCATION, INC., *et al.* | : : : : | |
| v. | : : | Civil Action No. CCB-06-2773 |
| MARYLAND HIGHER EDUCATION COMMISSION, *et al.* | : : : | |

...o0o...

**MEMORANDUM**

Plaintiff The Coalition for Equity and Excellence in Maryland Higher Education, Inc. ("the Coalition") sued the Maryland Higher Education Commission and the State of Maryland (collectively "the State") in 2006 alleging violations of Title VI of the Civil Rights Act of 1964[1] and the Equal Protection Clause of the Fourteenth Amendment.[2] Despite the progress made since 1954, the plaintiff claims the State has still failed to dismantle certain aspects of its prior *de jure* segregated system of public four-year colleges and universities. The State disputes these claims and, after extensive discovery, has filed motions for summary judgment which were argued May 11, 2011. A bench trial is set to begin within the month. In resolving these motions, the court will set forth the legal framework applicable to these claims and briefly state its rulings without, at this time, attempting an exhaustive review of the factual record, which is thoroughly discussed in the parties' memoranda.

In 1954, the Supreme Court held in *Brown v. Board of Education* that "the doctrine of

---

[1] Section 601 of Title VI provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

[2] The plaintiffs' rights under Title VI are coextensive with but no greater than their rights under the Equal Protection Amendment. *See Alexander v. Sandoval*, 532 U.S. 275, 280-81 (2001) (explaining that 42 U.S.C. § 2000d proscribes "only those racial classifications that would violate the Equal Protection Clause [of] the Fifth Amendment") (quoting *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 287 (1978) (opinion of Powell, J.)).

1

'separate but equal' has no place" in the field of public education. 347 U.S. 483, 495 (1954). The following year, the Court ordered the states to end segregation in public education "with all deliberate speed," *Brown v. Board of Education*, 349 U.S. 294, 301 (1955) ("*Brown II*"), imposing on states an "affirmative obligation to dismantle [their] prior *de jure* segregated system[s] in elementary and secondary schools." *United States v. Fordice*, 515 U.S. 717, 721 (1992). The obligation to "completely abandon[]" segregated systems of public education extends to public systems of higher education. *Id.* at 729. A state university system, however, "is quite different in very relevant respects from primary and secondary schools." *Id.* at 728-29. While states typically assign primary and secondary school students to particular schools, "a student's decision to seek higher education has been a matter of choice." *Id.* at 729. Therefore, the precise contours of states' obligations under *Brown II* in the university context necessarily diverge from their obligations in the primary and secondary school context. In light of these differences, *Fordice* instructs that to satisfy *Brown II*, public university systems must do more than simply adopt and implement "race-neutral policies." *Id*. They must ensure that there are no current state policies that are "traceable to the State's prior *de jure* segregation and that continue[] to foster segregation." *Id.* "If the State perpetuates policies and practices traceable to its prior system [of *de jure* segregation] that continue to have segregative effects—whether by influencing student enrollment decisions or by fostering segregation in other facets of the university system—and such policies are without sound educational justification and can be practicably eliminated, the State has not satisfied its burden of proving that it has dismantled its prior system." *Id.* at 731.

*Fordice* thus adopted a three-step analysis for determining whether a state has discharged its duty to dismantle former systems of *de jure* segregated higher education. *Knight v. Alabama*,

14 F.3d 1534, 1540 (11th Cir. 1994). First, the plaintiff must show that a "particular policy that has been challenged as segregative is 'traceable' to decisions that were made or practices that were instituted in the past for segregative reasons, thus rendering it a vestige of segregation." *Id.* at 1540. The *Fordice* Court alternatively described such policies as those that are "derived from," 505 U.S. at 734, "a continuation of," *id.* at 738, "rooted in," *id.* at 743, or that "have as their antecedents," *id.* at 740, prior *de jure* segregation.

Second, if the plaintiff succeeds in showing that a policy or practice is traceable to prior *de jure* segregation, the burden of proof shifts to the state "to establish that it has dismantled its prior de jure segregated system." *Fordice*, 515 U.S. at 739. The state must show that the challenged policies, when considered in combination, *id.* at 739, do not currently have continuing "segregative effects." *See id.* at 731; *Knight*, 13 F.3d at 1541. Policies with segregative effects are those that "discourage[e] or prevent[] blacks from attending HWIs" and those that "discourage whites from seeking to attend HBIs." *Knight*, 13 F.3d at 1541.[3]

Third, if the state fails to show that policies traceable to prior *de jure* segregation do not have current segregative effects (or if the state chooses to bypass the segregative-effects analysis), it must show that those policies have a "sound educational justification" and cannot be "practicably eliminated." *Fordice*, 515 U.S. at 731. To show that a policy cannot be "practicably eliminated," the state must show that its "legitimate educational objectives" could not be accomplished through "less segregative means." 505 U.S. at 744 (O'Connor, J., concurring); *see also Knight*, 14 F.3d at 1546 ("Under *Fordice,* a state can be required to change even educationally sound practices where they have been found to be vestiges of segregation with continuing segregative effects. Only where there are no alternative remedies that are

---

[3] In *Fordice*, the Court alternatively described the second step of the analysis as determining whether a policy has "discriminatory effects," rather than "segregative effects." *Id.* at 729. The Court did not seem to place any significance on the variation in terminology; therefore neither will this court.

practicable and educationally sound is the state defendant relieved of its obligation to remedy the vestiges' effects.")[4]

Despite the State's argument to the contrary, *Grutter v. Bollinger*, 539 U.S. 306 (2003) neither rendered this framework "obsolete" nor switched the burden of proof on segregative effects from the State to the Coalition.[5] In *Grutter*, the Court upheld the University of Michigan Law School's admissions policies, because the school's use of race as a factor was narrowly tailored to serve the compelling state interest in student body diversity. *Id.* at 325, 328. In reaching that conclusion, the court discussed the deference that courts should grant to the educational judgment of university administrators:

> We have long recognized that, given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition. . . . In announcing the principle of student body diversity as a compelling state interest, Justice Powell [in his opinion in *Bakke*] invoked our cases recognizing a constitutional dimension, grounded in the First Amendment, of educational autonomy: "The freedom of a university to make its own judgments as to education includes the selection of its student body." *Bakke*, 438 U.S. at 312. From this premise, Justice Powell reasoned that by claiming "the right to select those students who will contribute the most to the 'robust exchange of ideas,'" a university "seek[s] to achieve a goal that is of paramount importance in the fulfillment of its mission." 438 U.S. at 313. . . . Our conclusion that the Law School has a compelling interest in a diverse student body is informed by our view that attaining a diverse student body is at the heart of the Law School's proper institutional mission, and that *"good faith" on the part of a university is "presumed" absent "a showing to the contrary."* 438 U.S. at 318-319.

*Grutter*, 539 U.S. at 329 (emphasis added).

In *Fordice*, the Court emphasized that "the burden of proof falls on the *State,* and not the

---

[4] At oral argument, the State sought to distinguish *Fordice* and *Knight* entirely by arguing that, unlike here, the federal government was a plaintiff in those cases, in *Fordice* as an intervenor and in *Knight* as the original plaintiff. The holdings and reasoning in those cases were not, however, contingent on the federal government's participation. *Fordice* mandates that states eliminate impermissible policies regardless of whether the federal government decides to sue.

[5] Although at oral argument the State argued that the *Fordice* framework was amended by both *Grutter* and its companion case, *Gratz v. Bollinger*, 539 U.S. 244 (2003), the discussion that is arguably relevant to the State's position appears in *Grutter*, not in *Gratz*.

4

aggrieved plaintiffs, to establish that it has dismantled its prior *de jure* segregated system." 505 U.S. at 739. The *Knight* court interpreted this aspect of *Fordice*, as does this court, as imposing upon the State the burden to prove that a policy traceable to prior *de jure* segregation does not currently have segregative effects. 14 F.3d at 1541. The State seems to argue that by saying "'good faith' on the part of a university is 'presumed' absent 'a showing to the contrary,'" *Grutter* switched the burden of proof on the "segregative effects" prong of the *Fordice* analysis from the State to the plaintiffs. It did not. *Fordice* addressed how to determine whether a state has fulfilled its affirmative obligation to dismantle *de jure* segregation—to eliminate as much as possible the vestigial effects of segregation in the past. *Grutter*, on the other hand, along with *Gratz*, addressed whether a different obligation—the obligation not to discriminate intentionally in the present—prohibits a university from using race as a factor in student admissions. These two obligations are closely related, but nonetheless distinct. Whether a current state policy constitutes intentional discrimination is an "entirely separate question" from whether a current policy is a vestige of prior intentional segregation that has continuing segregative effects. *Knight*, 14 F.3d at 1545.[6] When understood in context, therefore, the presumption of good faith in *Grutter* does not relieve the State of its burden under *Fordice* to show that a policy traceable to prior *de jure* segregation does not have continuing segregative effects.

This is not the end of the *Grutter/Gratz* story, however. While those cases did not switch any burdens of proof under *Fordice*, as the State contends, neither are they completely irrelevant,

---

[6] This also explains why the State is mistaken in arguing that the *Fordice* framework was altered by *Alexander v. Sandoval*, 532 U.S. at 275. In *Sandoval*, the Court considered whether a private right of action exists to enforce disparate-impact regulations promulgated under Title VI of the Civil Rights Act of 1964. In holding that it does not, the Court explained that section 601 of Title VI prohibits only intentional discrimination. *Id.* at 280. The State seems to argue that *Alexander* altered *Fordice* to require the plaintiffs to show not only that a current policy is traceable to prior *de* jure segregation, but also that the State is currently engaged in intentional discrimination. But the question whether the private right of action under Title VI includes the right to enforce disparate impact regulations is an entirely different question from whether a state has satisfied its obligation to dismantle prior *de jure* segregation.

5

as the Coalition contends. Rather, they provide three lessons relevant to the State's obligations under *Fordice*. First, "[c]ontext matters when reviewing race-based governmental action under the Equal Protection clause." *Grutter*, 539 U.S. at 327. This is not news, of course; context was crucial in *Fordice*. But *Grutter* reminds us that, "in dealing with claims under broad provisions of the Constitution, which derive content by an interpretive process of inclusion and exclusion, it is imperative that generalizations, based on and qualified by the concrete situations that gave rise to them, must not be applied out of context in disregard of variant controlling facts." *Id.* (quoting *Gomillion v. Lightfoot*, 364 U.S. 339, 343-344 (1960)).

Second, *Grutter* instructs that a university's "educational judgment" is entitled to judicial deference, because "given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition." 539 U.S. at 329. In *Grutter*, the Court's deference to the Law School's "educational judgment that . . . diversity is essential to its educational mission" informed its decision to recognize student body diversity as a compelling state interest. *Id*. at 328-29. That deference also informs the third prong of *Fordice*. But informing the analysis is a far cry from relieving the State of its burden under that prong. If the court reaches that prong, the State retains the heavy burden of proving that a segregative policy traceable to prior *de jure* segregation has a "sound educational justification" and cannot be "practicably eliminated." *Fordice*, 515 U.S. at 731.

Third, in discussing whether the Law School's admissions policies are sufficiently tailored to its interest in promoting student body diversity, the *Grutter* Court explained: "Narrow tailoring . . . requires that a race-conscious admissions program not unduly harm members of any racial group. Even remedial race-based governmental action generally 'remains subject to

continuing oversight to assure that it will work the least harm possible to other innocent persons competing for the benefit.'" 539 U.S. at 341 (quoting *Bakke*, 438 U.S. at 308 (opinion of Powell, J.)). Although the *Fordice* analysis differs in various ways from strict scrutiny, this aspect of *Grutter* arguably could inform the third prong of *Fordice* if reaching that analysis becomes necessary. It does not, however, render the overall *Fordice* framework obsolete.

On the other hand, it is not enough for plaintiffs to focus on present discriminatory effects without demonstrating that such consequences "flow from policies rooted in the prior system." *Fordice*, 505 U.S. at 730 n.4. While it is not sufficient for the State simply to show that current policies are race-neutral, neither is it sufficient for the plaintiffs to show, for example, a present imbalance in resources without identifying a current policy or practice rooted in *de jure* segregation that allegedly causes that imbalance. *See also Ayers v. Fordice*, 111 F.3d 1183, 1223 (5th Cir. 1997) ("The district court correctly focused on the traceability of policies and practices that result in funding disparities rather than the traceability of the disparities themselves.").

Finally, it is important to understand that the Coalition is not pressing any claims relating to minority students at the "traditionally white institutions" ("TWI's") also referred to as "non-Historically Black Institutions" ("non-HBIs").[7] Minority students attend those institutions in significant numbers today.[8] The Coalition focuses instead on the State's obligation to minority students at the four HBIs, where white enrollment is very low.[9]

In its response to the State's two motions for summary judgment, the Coalition identified

---

[7] The non-HBI's include: Frostburg State University; Salisbury University; St. Mary's College of Maryland; Towson University; University of Baltimore; University of Maryland, Baltimore County; and University of Maryland, College Park. (Initial Expert Report of Allan J. Lichtman, Pl.'s Opp'n to Defs.' Mot. for Summ. J. Regarding Intentional Discrimination and Funding, ECF no 207-8, at 5-6.)

[8] Approximately 59% of African-Americans attending public four-year institutions are enrolled at non-HBI's. (Def.'s Reply, Ex. 15.)

[9] The four HBI's are: Bowie State University; Coppin State University; Morgan State University; and the University of Maryland Eastern Shore.

as policies and practices traceable to the *de jure* era "funding, program duplication, and limited missions." (*See* Opp'n to Defs.' Mot. for Summ. J. Regarding Recruitment, Admission, Graduation and Retention, at 21.) Those issues will be addressed in turn.[10]

First, the present policy applicable to determine operational funding differs from the method of determining capital funding. (Declaration of Geoffrey Newman ("Newman Decl."), Def.'s Mot. for Summ. J. Regarding Intentional Discrimination and Funding, Ex. 2.) As to operational funding, the Coalition has presented genuine disputes of material fact through its expert Dr. Robert Toutkoushian. (*See* Expert Report of Dr. Robert K. Toutkoushian, Pl.'s Opp'n to Defs.' Mot. for Summ. J. Regarding Intentional Discrimination and Funding, ECF No. 207, Ex. 13.)[11] In particular, there are issues concerning the extent to which the funding formula is based on institutional missions traceable to the era of *de jure* segregation, as well as disputes concerning appropriate treatment of the State's "flagship" campus at College Park and whether the HBIs' "dual mission" should be taken into account.[12] As to capital budget funding, however,

---

[10] In its brief, the Coalition seems to cite these three policies or practices as a nonexclusive list, implying that there are other policies or practices traceable to prior *de jure* segregation. (*See* Opp'n to Defs.' Mot. for Summ. J. Regarding Recruitment, Admission, Graduation and Retention, at 21 ("Plaintiffs have presented substantial evidence that the disparities in recruiting and admissions are due to various policies and practices traceable to the de jure era, *e.g.*, funding, program duplication, and limited missions.").) Nowhere in either of its opposition briefs, however, does the Coalition point to other specific alleged policies or practices. Although it refers to low rates of recruitment, admission and retention of students at HBIs, for example, those are alleged continuing segregative effects, not alleged policies or practices traceable to prior *de jure* segregation

[11] The fact that the current formula was not adopted until 1999 does not in itself show it is not "traceable." "[A] challenged policy as it exists today [need not] have been in effect during the *de jure* period in order to be constitutionally problematic." *Ayers*, 111 F.3d at 1207. In *Fordice*, for example, the Court held that Mississippi's institutional mission designations could be traceable to *de jure* segregation even though they were not adopted until 1981, because the designations "have as their antecedents the policies enacted to perpetuate racial separation during the *de jure* segregated regime." 505 U.S. at 740.

[12] Because the parties dispute the extent to which prior mission designations affect Maryland's current formula for funding higher education, the Fifth Circuit's holding in *Ayers* concerning Mississippi's funding formula is distinguishable, at least at this stage. In *Ayers*, the Fifth Circuit affirmed the district court's finding that Mississippi's formula was not traceable to *de jure* segregation because "[u]nlike the previous formula, which allocated funds based on mission designations," the new formula "allocates funds as a function of the size of each institution's enrollment, faculty, and physical plant." 111 F.3d at 1224. Although the new formula "responds to conditions that to a significant degree have resulted from the mission designations (and consequently results in the HWIs receiving a greater proportion of funds), the manner in which the formula does so . . . is not linked to any

the Coalition has not presented a genuine dispute of material fact. Dr. Toutkoushian did not address capital improvements in his funding analysis nor did he dispute defense expert Dr. Allan Lichtman's calculations. Dr. Harvey Kaiser, the Coalition's recently-designated facilities expert, does not challenge Dr. Lichtman's capital budget calculations (*see* Facilities Expert Report of Dr. Harvey Kaiser, ECF No. 172-3, at 9) nor does he identify a current "traceable" policy or practice related to capital funding. (*See* Deposition of Harvey H. Kaiser excerpts, ECF No. 207-11, at 207-09, 250-52.) Accordingly, there is not sufficient evidence to go forward on a claim that current capital budget funding is a "traceable" policy or practice.

Second, "unnecessary program duplication" has been identified in both *Fordice* and *Knight* as a policy or practice that may be traceable to the era of *de jure* segregation. *See Fordice*, 505 U.S. at 738-39; *Knight v. Alabama*, 900 F. Supp. 272, 298-99, 306, 317-18, 371-72 (N.D. Ala. 1995). On this issue, the Coalition has presented sufficient evidence to go forward through the testimony of their expert Dr. Clifton Conrad and, in particular, as to the dispute concerning the approval of an expanded MBA program at Towson University and the University of Baltimore in 2005 over the objection of Morgan State University. There is not, however, sufficient evidence of intentional discrimination in the process followed to obtain that approval to permit a claim of present-day intentional discrimination to proceed.[13] *See Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 270 (1977) (affirming the district court's finding that the city's decision to deny a rezoning request was not a product of intentional discrimination).

Third is "limited institutional mission." This seems to the court to be an issue that

---

prior discriminatory practice." *Id.* Here, there is a genuine dispute about whether (and if so, to what extent) the present funding formula in Maryland is based on mission designations traceable to *de jure* segregation.

[13] The approval of the MBA program is the only example of current intentional discrimination identified by the Coalition.

overlaps with operational funding and unnecessary program duplication and must be considered more fully at trial, despite the State's position that HBIs, like non-HBIs, have substantial control over determining their own missions.

Finally, the court notes that although *Podberesky v. Kirwan*, 38 F.3d 147 (4th Cir. 1994), provides some support for the State's position, it does not stand for the proposition that, as a matter of law, there are no current policies or practices traceable to prior *de jure* segregation. In *Podberesky*, the Fourth Circuit considered the constitutionality of a scholarship program at the University of Maryland, College Park ("UMCP") that was open only to African-American students. *Id*. at 161-62. Because the program was a race-conscious remedial measure, to maintain the program the University had to prove that it was "narrowly tailored" to redressing present effects of past discrimination and that any such present effects were "caused by the past discrimination" and were "of sufficient magnitude to justify the program." *Id.* at 153. The University pointed to four "present effects" as justifying the program: (1) the poor reputation of UMCP in the African-American community; (2) underrepresentation of African Americans in UMCP's student population; (3) low retention and graduation rates among African-American students at UMCP; and (4) a campus atmosphere perceived as hostile to African-American students. *Id.* at 152. The Fourth Circuit held that none of these present effects justified the program. The poor reputation in the African-American community and the perceived hostility of the campus climate were insufficient because the only link between these effects and past discrimination was "knowledge of the University's [prior] discrimination"; "mere knowledge of historical fact is not the kind of present effect that can justify a race-exclusive remedy." *Id.* at 154. With respect to underrepresentation and low retention/graduation rates, the court held that even assuming those effects exist, the scholarship program was not narrowly tailored to those

effects, for various reasons. *See id.* at 158-61.

The court's mode of analysis in *Podberesky* certainly informs the *Fordice* analysis, particularly on the questions of traceability and segregative effects. The case would not, however, justify granting the State judgment as a matter of law. Most crucially, *Podberesky*, like *Grutter* and *Gratz*, addressed the state's obligation not to discriminate intentionally; current intentional discrimination is justified only as a means to remediate past discrimination, and even then only if the measure is "narrowly tailored to meet the remedial goal." *Id.* at 153. Further, the Coalition is not challenging conditions at UMCP, but rather only at the HBIs.

For these reasons, the bench trial scheduled to begin later this month will proceed, although the issues to be addressed will be limited in accordance with this opinion and as will be further discussed at the pre-trial conference. Finally, counsel should consult whether beginning trial on July 5, 2011 would pose a serious disruption, as the court has a conflicting criminal case scheduled for trial on June 27, 2011.

<u>June 6, 2011</u>  /s/
Date  Catherine C. Blake
  United States District Judge