**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **THE COALITION FOR EQUITY AND EXCELLENCE IN MARYLAND HIGHER EDUCATION, INC., et al.,** | ) | **Trial Date: July 11, 2011** |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Civil No. 06-2773-CCB** |
| **MARYLAND HIGHER EDUCATION COMMISSION, et al.,** | ) | |
| **Defendants.** | ) | |

# PLAINTIFFS' MOTION TO CLARIFY AND RECONSIDER AND MEMORANDUM IN SUPPORT

# INDEX OF EXHIBITS

| | |
|---|---|
| Exhibit 1 | Dr. Sue Blanshan Deposition Transcript |
| Exhibit 2 | Dr. John Sabatini Deposition Transcript |
| Exhibit 3 | MD. CODE ANN., EDUC. § 10-203 |
| Exhibit 4 | 2008 Report by the Panel on the Comparability and Competitiveness of Historically Black Institutions in Maryland to the Maryland Commission to Develop the Maryland Mode |
| Exhibit 5 | 2009 Maryland State Plan for Postsecondary Education |
| Exhibit 6 | Dr. Joseph Popovich Deposition Transcript |
| Exhibit 7 | Dr. John Oliver Deposition Transcript |

## I. INTRODUCTION

Plaintiffs, by and through undersigned counsel, respectfully request that this Court clarify that its June 6, 2011 Order (Order) does not preclude: (i) plaintiffs' presentation of evidence at trial regarding facilities or capital funding as they relate to program quality and missions at Maryland's Historically Black Institutions (HBIs); or (ii) any future order of relief from including facilities or capital funding to the HBIs. Plaintiffs also respectfully request that this Court reconsider its June 6th ruling granting summary judgment as to capital funding.

On June 6, this Honorable Court entered an Order denying in part, and granting in part, the Defendants' Motions for Summary Judgment. (Dkt. #243.) The Court correctly found that the plaintiffs had established sufficient evidence to go forward at trial on unnecessary program duplication and missions. (*Id.* 9-10.) The Court also correctly found that plaintiffs had established a triable issue of fact that the operational funding formula is based on policies traceable to the era of *de jure* segregation, including that the formula is based at least in part on institutional mission. (*Id.* 8.) Conversely, the Court held that "there is not sufficient evidence to go forward on a claim that current capital budget funding is a 'traceable' policy or practice," and granted summary judgment on that issue. (*Id.* 9.)[1]

## II. ARGUMENT

### A. BASIS FOR CLARIFICATION

Plaintiffs respectfully submit that the issues in this case, as this Court rightly noted of defendants' summary judgment briefs, are "merged together in some important ways." (Sum. Judg. Tr. 7-8.) Inferior program quality and limited missions at HBIs are inextricably linked to their facilities. Quite simply, no university — HBI or Traditionally White Institution (TWI) —

---

[1] The Court also found that plaintiffs failed to set forth a triable issue of fact regarding discriminatory intent under the standard of *Village of Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). Plaintiffs do not seek reconsideration of that decision.

can simply decide for itself to pursue a research-intensive mission if it lacks the programming and facilities necessary to do so. Indeed, when the Maryland Higher Education Commission (MHEC) considers whether to approve a proposed program, it assesses whether the program is consistent with the institution's mission and *supported by the institution's facilities*. (Blanshan Dep. 198, 211, 213-214 Ex. 1.) Similarly, when MHEC considers whether to approve a change to the institution's mission, it considers the programs offered and *the facilities that the school provides in support*. (Sabatini Dep. 83, Ex. 2.) Even when MHEC is assessing for program quality at an institution, it counts facilities among the factors for its review. (Blanshan Dep. 197, Ex. 1.) Accordingly, plaintiffs' presentation at trial on the reasons for limited programming and missions at the HBIs will necessarily require a discussion of the bricks and mortar (or lack thereof) available at these institutions.

Nonetheless, plaintiffs recognize the potential for ambiguity at trial on the extent to which evidence of facilities or capital funding may be presented with respect to programs and missions or included as part of any relief due to the Order that there is not sufficient evidence that capital funding *itself* is a traceable policy or practice. Accordingly, plaintiffs request the Court's clarification that its ruling on summary judgment does not preclude either: (i) the presentation of evidence on facilities or capital funding as they relate to programs or missions; or (ii) any order of relief from including facilities or capital funding.

Prior to this action, courts adjudicating higher-education desegregation cases have recognized the role of facilities in determining the quality of education that HBIs provide to their students. In *Ayers v. Allain*, 674 F. Supp. 1523, 1549 (N.D. Miss. 1987), *rev'd in part on other grounds*, 914 F.2d 676 (5th Cir. 1990) (*en banc*), the district court recognized the "close relationship" between facilities and academic programs at an institution:

> *There is a close relationship between facilities and the development or expansion of academic programs*. A recent publication by the Carnegie Foundation reported

> that 62% of the students surveyed stated that facilities were the most important factor in their interest in an institution. *The particular mix of facilities found at a given institution defines its "character."* Objectively, one might include such factors as the age and construction type and design of campus buildings, their condition, ease of access, extent of land holdings, ability to expand, and visual images in defining institutional character.

*Id.* at 1549 (emphasis added).[2]

Similarly, in *Knight v. Alabama*, 900 F. Supp. 272 (N.D. Al. 1995), on remand, the Northern District of Alabama discussed the impact of inadequate facilities on the overall spectrum of program offerings at Alabama A & M University (AAMU), an HBI, as compared to the University of Alabama at Huntsville (UAH), a nearby TWI that offered a broader array of programs:

> In the absence of segregation *resulting in inadequate facilities and programs* at AAMU, *there is little doubt* that UAH would not exist, or, more likely, *that AAMU would offer a wider spectrum of engineering and technical programs than currently found there*.

*Id*. at 316 (emphasis added).

The Court also recognized the role of facilities in contributing to the overall educational opportunities a university provides to its students:

> Comparisons are made among schools, not because schools have rights or are entitled to funds as such, but because schools are the instruments through which students are reached, which *means that the overall resources of a school, whether in funds, facilities, or programs, determine what is received by the school's students*.

*Id*. at 312.

[2] Although, on appeal before the 5th Circuit, plaintiffs lost on their argument for "general funds to enhance facilities," the settlement agreement reached provided up to $75 million for capital improvements at the historically black universities. *Ayers v. Thompson*, 358 F.3d 356, 371 (5th Cir. 2004).

Maryland's own documents provide the best evidence of the close relationship in Maryland higher education between facilities, programs, and missions. Maryland's Education Code expressly ties capital funding to an institution's mission by directing that such funding be provided "to support construction, operation, and maintenance of a physical plant *that is consistent with each institution's mission*." MD. CODE ANN., EDUC. § 10-203 (EX. 3.) In addition, Maryland reports repeatedly articulate that quality academic programs must be supported by quality program facilities. For example, the 2008 Report by the Panel on the Comparability and Competitiveness of Historically Black Institutions in Maryland to the Maryland Commission to Develop the Maryland Model (HBI Study Panel Report) specifically identifies how the lack of libraries, infrastructure, and technology resources have impacted the ability of Morgan State University (MSU) and University of Maryland Eastern Shore (UMES) — both HBIs — to offer quality doctoral programs:

> *Quality doctoral universities require advanced library and information resources specific to the doctoral programs*. To recruit and support top doctoral faculty and students in their programs and research, the overall university infrastructure needs to be modern, attractive and conducive to research and scholarship. *The latest in university-wide technology and administrative support systems are critical*. UMBC and UMCP have the institutional platform and foundation to support these qualities. *MSU and UMES do not*.

(HBI Study Panel Report 23, Ex. 4) (emphasis added).

Similarly, the 2009 Maryland State Plan for Postsecondary Education echoes the HBI Study Panel's call for an institutional platform consisting, in part, of facilities at HBIs, in order to "enhanc[e] targeted doctoral programs at the public HBIs so that they achieve a very high level of excellence." (2009 Maryland State Plan p. 27, Ex. 5.) Maryland's report findings have been corroborated by the testimony of Maryland's current and former employees in its higher education community. MHEC's witness on program duplication, Dr. Sue Blanshan, explained the direct relationship between facilities and program approval:

> Q: If a school does not have sufficient facilities or sufficient funding for a new program, can the program still be approved?
>
> A: If the school doesn't have sufficient facilities or sufficient funding? *It should not be approved*. The sequencing that the institution should pursue is establishing the sufficient facilities so that when they come forward with their proposal, a statement of the adequacy of facilities is a true and factual statement.

(Blanshan Dep. 214, Ex. 1) (emphasis added).

Pursuant to Maryland state policy, then, facilities are critical to an HBI's ability to obtain new programs. In turn, new programs are critical to an HBI's ability to enhance its mission. This reality was described by Maryland's former Secretary of Higher Education, Dr. John Sabatini, with respect to Coppin State University, an HBI:

> Q: What were some of the specific goals that were set for Coppin?
>
> A: New programs, a revitalized mission. I would have to go back into that report itself and try to recall exactly what we recommended. But I know capital projects was a significant component, because there was a lot of concern about the physical appearance of the institution. And as a result of that, the institution did have difficulty attracting students to the campus. *So new facilities and then academic programs that would support the mission of the institution and make it more competitive.*

(Sabatini Dep. 56, Ex. 2.)

Even setting aside the relationship between facilities and expanded missions, Maryland's failure to ensure sufficient facilities at HBIs has impacted their ability to even sustain their existing missions. Morgan State University's Vice President for Planning and Information Technology, Dr. Joseph Popovich, explained in deposition the difficulty of maintaining MSU's mission as a doctoral granting university without addressing the problems with its facilities:

> Q: Broadly, do you agree with [the HBI Study Panel's recommendations]?
> MS. TRESTMAN: Objection.
>
> THE WITNESS: Yes. The idea at least, that -- I think it's important, the recognition that HBIs have two missions. One is the standard mission of providing a liberal arts education, but the secondary mission of taking first

> generation and under-prepared students and moving them up and really being a vehicle for middle class mobility. And what goes with that is the recognition that it is a more expensive proposition than the typical campus has to deal with. *The other thing that I found myself in agreement with was the fact that if Morgan is going to be a successful graduate research University, it does have to change its infrastructure and look more like a campus in terms of resources, because we have gotten to where we are not with the same kind of the resources that the typical doctoral campus has. I think that's a concern here, whether or not we can sustain what we have got.*

(Popovich Dep. 256, Ex. 6) (emphasis added).

Similarly, Dr. John Oliver, the former Chairman of MHEC, observed that facilities at all Maryland HBIs are insufficient to continue to support HBIs' long-standing dual-missions:

> Q: If you look at the second full paragraph, it's the HBI study panel found that "HBIs need a different form and level of capacity because unlike the TWIs, the HBIs have a dual mission." Do you agree with that statement?
>
> A: I agree.
>
> Q: What is your basis for agreeing with that statement?
>
> A: It recognizes the necessity of the historically Black institutions have to address special needs that reflect the population of the students that they accept and have got to educate. That's well beyond what exists at the historically White institutions; the remedial process, *the special facilities that will probably be needed to expedite that process because these students are not as well prepared as reflected by the SAT. You probably need some additional specific facilities because these are very poor students that require special needs as well because of their low-income level, economic level.* It's just not — I think it's absolutely wrong, indeed unfair, just simply to put a — take a model of a TWI and try to superimpose it on an HBI and then measure the HBI as if in fact it's doing the job that the HBI is expected to do. These HBI students, a large segment of them, can't get educated in the TWI right now, given the standards and the level of preparedness that these students today do not have.

(Oliver Dep. 67-68, Ex. 7) (emphasis added).

Maryland policies regarding the approval of programs and missions make the insufficiency of facilities at Maryland's HBIs a critical piece of evidence on those topics. Any discussion of missions or programs, either as they currently exist or as part of a remedy, necessarily requires a discussion of facilities. Plaintiffs respectfully request the Court's

clarification that its Order does not foreclose such a discussion during either the liability or any remedial phase in this litigation.

**B. BASIS FOR RECONSIDERATION**

In support of this motion for reconsideration of the Court's ruling on summary judgment as to capital facilities, plaintiffs respectfully refer the Court to the Maryland Education Code, which specifies that both the operational and capital funding for Maryland's higher education institutions is based on institutional mission:

> (c) Funding proposals - In general. - Funding proposals for public senior higher education institutions shall include:
>
> (1) Base funding in accordance with the role and mission of the institution, as approved by the Maryland Higher Education Commission . . . . ;
>
> (3) Capital funding to support construction, operation, and maintenance of a physical plant that is consistent with each institution's mission.

MD. CODE ANN., EDUC. § 10-203 (Ex. 7).

In light of the unequivocal statement in Maryland's Code that Maryland's current policy on capital funding is based on institutional mission, and the Court's determination that plaintiffs have set forth an issue of material fact regarding whether the current institutional missions are traceable to the era of *de jure* segregation, plaintiffs respectfully request that the Court reconsider its interlocutory ruling under the Federal Rule of Civil Procedure 54(b) that "there is not sufficient evidence to go forward on a claim that current capital budget funding is a 'traceable' policy or practice." (Dkt. # 243.)

The Fourth Circuit has held that a partial motion for summary judgment is interlocutory in nature and subject to reconsideration at any time prior to final judgment pursuant to the Federal Rule of Civil Procedure 54(b). *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514-515 (4th Cir. 2003); *see also* 11 Moore's Federal Practice – Civil ¶¶ 56.122[1], 56.130[2][a]. As such, courts have full discretion to reconsider interlocutory orders, and are not

required to review motions for reconsideration of interlocutory orders under the strict standards applicable to final judgments under the Federal Rules of Civil Procedure 59(e) and 60(b). *Am. Canoe Ass'n*, 326 F.3d at 514-515; *see also Fayetteville Investors v. Commercial Builders*, 936 F.2d 1462, 1472 (4th Cir. 1991).

While motions for reconsideration of an interlocutory order are not strictly governed by the precise standards of final judgments, those standards instruct the court's reconsideration. *Superior Bank v. Tandem Nat'l Mortgage, Inc.*, 197 F. Supp. 2d 298, 331-332 (D. Md. 2000). Factors indicating that reconsideration is warranted include: (1) evidence not previously available becomes available; (2) an intervening change in the controlling law; (3) a clear error of law or manifest injustice; (4) party or court mistake, inadvertence, surprise or excusable neglect; or (5) any other reason justifying relief from the operation of the judgment. *Robinson v. Fountainhead Title Group Corp.*, No. 03-3106, 2009 WL 539882, at *1 (D. Md. March 3, 2009), citing *Superior Bank*, 197 F. Supp. 2d at 331-332. In reference to the Federal Rule of Civil Procedure 60(b) factors for reconsideration included above, the Fourth Circuit has stated that "these grounds for relief often overlap and it is difficult, if not inappropriate, in many cases to specify or restrict the claim for relief to a particular itemized ground." *Compton v. Alton S.S. Co.*, 608 F.2d 96, 102 (4th Cir. 1979).

Plaintiffs simply were not aware of the above-cited section of the Maryland Education Code at the time of the briefing and argument. Nonetheless, plaintiffs submit that reconsideration is necessary to prevent a manifest injustice, given the public interest nature of this case. The alleged harms of unconstitutional and discriminatory capital funding practices are felt not just by the plaintiffs, but the many thousands of people attending, working at, or living near Maryland's HBI campuses and using their facilities. Hence, in light of the significance of the issue at hand, the public harms associated with the capital funding practices, and the clear

statement of the policy in the Maryland Education Code, plaintiffs respectfully request that the Court reconsider the granting of its interlocutory ruling under the Federal Rule of Civil Procedure 54(b) that "there is not sufficient evidence to go forward on a claim that current capital budget funding is a 'traceable' policy or practice."

## III. CONCLUSION

For the foregoing reasons, plaintiffs request that the Court grant their Motion to Clarify and Reconsider.

Date: June 15, 2011

Respectfully submitted,

/s/ Michael D. Jones
Michael D. Jones, Esq. (Bar No. 08634)
Karen N. Walker (Bar No.14181)
Henry Thompson (*pro hac* vice)
Savaria B. Harris (*pro hac* vice)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200
Email: michael.jones@kirkland.com

Aderson B. Francois, Esq. (Bar No. 17449)
Howard University School of Law
Civil Rights Clinic
2900 Van Ness Street, N.W.
Washington, D.C. 20008
Telephone: (202) 806-8065
Facsimile: (202) 806-8436
Email: afrancois@law.howard.edu

John C. Brittain (*pro hac* vice)
Attorney At Law
2513 Gadsby Place
Alexandria, VA 22311
Telephone: (832) 687-3007
Email: jbrittatty@comcast.net

Jon Greenbaum (pro hac vice)
Lawyers' Committee for Civil Rights Under Law
1401 New York Avenue, N.W., Suite 400
Washington, DC 20005
Telephone: (202) 662-8600
Facsimile: (877) 303-5039
Email: jgreenbaum@lawyerscommittee.org