**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| THE COALITION FOR EQUITY AND EXCELLENCE IN MARYLAND HIGHER EDUCATION, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>MARYLAND HIGHER EDUCATION COMMISSION, et al.,<br><br>Defendants. | ) | Civil No. 06-2773-CCB |

# PLAINTIFFS' REBUTTAL TO MARYLAND'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

*Privileged and Confidential*
*Attorney Work Product*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ....................................................................................................1

I. MARYLAND'S NEW STANDING ARGUMENT HAS PREVIOUSLY BEEN ABANDONED BY THE DEFENDANTS BECAUSE IT LACKS MERIT. ....................2

II. MARYLAND'S NEW ARGUMENT THAT THE HBIS ARE ALREADY DESEGREGATED RELIES UPON UNRELIABLE DATA AND IGNORES THE ACKNOWLEDGED LACK OF DIVERSITY ON HBI CAMPUSES. ....................4

III. MARYLAND'S NEW ARGUMENT THAT DESEGREGATION AT THE TWIS RENDERS MOOT ANY UNNECESSARY PROGRAM DUPLICATION ANALYSIS IS FRIVOLOUS. ....................7

IV. MARYLAND'S ARGUMENTS REGARDING MISSIONS AND FUNDING LACK CANDOR AND ARE CONTRADICTED BY MARYLAND'S NON-LITIGATION POSITIONS. ....................10

A. Mission Statements Do Not Fully Account For the Roles of Maryland's HBIs and Must Follow Strict Guidance From Maryland. ....................10

B. Defendants' Arguments Regarding Operating Funding and Facilities are Misleading and Rely Upon a Legal Framework That is Inconsistent With *Fordice* and the Facts in Maryland. ....................16

REBUTTAL FINDINGS AND CONCLUSIONS ....................20

I. PLAINTIFFS HAVE STANDING. ....................20

A. Defendants Have Conceded That Plaintiffs' Standing is Self-Evident. ....................20

B. The Individual Student Plaintiffs Have Standing. ....................26

1. Individual Plaintiffs' injuries are concrete, particularized and actual. ....................26

2. Plaintiffs claims are fairly traceable to Maryland's action and susceptible of remediation by judicial action. ....................30

3. Plaintiffs' claims are not moot. ....................31

4. The individual Plaintiffs have prudential standing. ....................33

C. The Alumni Plaintiffs Have Standing. ....................35

*Privileged and Confidential*
*Attorney Work Product*

**TABLE OF CONTENTS**
**(cont'd)**

**Page**

D. The Coalition Has Standing. .....36

1. The Coalition has associational standing. .....36

2. The Coalition itself has organizational standing. .....39

II. DEFENDANTS' ARGUMENTS THAT THE SYSTEM IS DESEGREGATED BASED ON STUDENT DEMOGRAPHICS ARE LEGALLY AND FACTUALLY INSUFFICIENT .....42

III. DEFENDANTS' ARGUMENTS DO NOT REBUT PLAINTIFFS' PREVIOUS SHOWING THAT THE DUAL AND LIMITED MISSIONS OF THE HBIS ARE TRACEABLE TO THE ERA OF *DE JURE* SEGREGATION .....48

IV. MARYLAND'S POLICIES AND PRACTICES REGARDING OPERATING FUNDING ARE TRACEABLE TO THE *DE JURE* ERA AND RECENT FUNDING TRENDS, VIEWED IN THE PROPER CONTEXT, ESTABLISH THAT THE HBIS ARE STILL INADEQUATELY FUNDED. .....57

A. Though Maryland Contends That Maryland's TWIs Could Potentially Be Improved With Increased Funding, Maryland Has Acknowledged That the Needs Are Greater at the HBIs .....58

B. Maryland's HBIs Allocate Their Operating Funding Based on Their Institutional Missions and the Constraints Imposed by Budgets That Are Insufficient to Fund Every Aspect of Their Operations at Appropriate Levels. .....59

1. Maryland admits that it has failed to provide the HBIs with the "substantial additional resources" necessary for them to properly support their operations and attract diverse student bodies. .....59

2. While HBI administrators willingly attempt to fund the dual mission, often to the detriment of other aspects of their operations, they could not choose to do otherwise because Maryland assigned it to them. .....60

3. Maryland does not adequately fund UMES' land grant functions, which forces the institution to reallocate resources from other aspects of its operations. .....63

*Privileged and Confidential*
*Attorney Work Product*

**TABLE OF CONTENTS**
**(cont'd)**

**Page**

C. Maryland's Policies and Practices Regarding Funding Are Traceable to the *De Jure* Era Through Their Perpetuation of Current Service Levels and Reliance On Institutional Mission. ....64

1. The funding analysis in *Knight* better accounts for the Supreme Court's guidance than the *Fordice* remand proceedings. ....64

2. Maryland's current policies and practices regarding operating funding are traceable to the *de jure* era because they perpetuate historically deficient service levels at the HBIs and the related perceptions of institutional inferiority. ....68

D. Dr. Lichtman's Analyses Amount to Mere Number Crunching That Suffers From Methodological Flaws and Does Not Address the Adequacy of HBI Funding Levels, Given Their Histories, Missions, and Challenges Attracting Students of Other Races....71

1. A comprehensive and legally-sufficient analysis of the relative funding of higher education in Maryland must include UMCP. ....74

2. Dr. Lichtman's analyses regarding the quality of HBI facilities and libraries relies upon incomplete metrics and does not account for the actual conditions on HBI campuses and their effect on student choice. ....77

V. MARYLAND'S CODE OF REGULATIONS PERPETUATES PROGRAM INEQUALITY. ....80

A. Maryland's Practice of Fewer and Inferior Programs at the HBIs than the TWIs is Traceable to the *DeJure* Era....80

1. Limited missions prevent the HBIs from developing academic programs that would exceed their institutional role of providing modest educational opportunities for blacks and those that cannot attend TWIs....82

2. Underfunding prevents the HBIs from demonstrating adequate resources for new program approval under COMAR....85

3. As results of the State's underfunding of HBIs and COMAR requirements, program development at the HBIs trails the TWIs. ....87

*Privileged and Confidential*
*Attorney Work Product*

**TABLE OF CONTENTS**
**(cont'd)**

**Page**

B. Unnecessary Program Duplication is Not Rectified by the Desegregation of the TWIs or by Maryland's Program Approval Process. ....90

1. The desegregated status of the TWIs does not extinguish Plaintiffs' unnecessary program duplication claims. ....91

2. Maryland's program approval regulations do not address unnecessary program duplication. ....95

3. MHEC's reasonableness of program duplication standard differs from that of the program duplication standard in *Fordice*. ....97

4. The State's equal opportunity obligations have not prevented unnecessary program duplication. ....101

5. *Fordice* does not provide an exception for *de minimis* instances of unnecessary program duplication. ....103

6. Defendants' critiques of Dr. Conrad's analysis lack merit. ....104

a. Dr. Conrad did not rely solely on CIP codes to assess program duplication in Maryland. ....104

7. Dr. Blanshan did not provide sound educational justifications for Maryland's unnecessary program duplication. ....106

a. Programs first approved at TWIs are not exempt from being unnecessarily duplicative. ....108

b. Programs approved prior to 2001 are not exempt from being unnecessarily duplicative. ....109

c. Programs approved in different geographic regions of the State are not exempt from being unnecessarily duplicative....110

d. A program's status as high-need or high-demand does not exempt it from being unnecessarily duplicative. ....111

C. Carefully Considered Policies Do Not Break Traceability....114

VI. DEFENDANTS MISCONSTRUE BOTH THE PLAINTIFFS' BURDEN AND EVIDENCE WITH RESPECT TO STUDENT CHOICE....116

*Privileged and Confidential*
*Attorney Work Product*

**TABLE OF CONTENTS**
**(cont'd)**

**Page**

A. Defendants Bear the Burden of Showing That Maryland's Traceable Policies and Practices Do Not Have Ongoing Segregative Effects. ....................117

B. Defendants Also Misrepresent the Evidence Related to Student Choice ............120

1. The policies and practices Plaintiffs challenge are recognized as affecting student choice. ..........................................................................120

2. Defendants' own expert agrees that programs and funding influence student choice..............................................................................121

3. Plaintiffs presented evidence which demonstrates that inequalities in institutional mission at Maryland's HBIs have influenced student choice.............................................................................................122

4. Plaintiffs presented significant evidence that Maryland's traceable policies and practices with respect to programs continue to restrict student choice.............................................................................................125

5. Plaintiffs presented substantial evidence that Maryland's traceable funding policies have limited student choice..........................................131

VII. DEFENDANTS ERRONEOUSLY ASSERT THAT PLAINTIFFS FOCUS ON REMEDY TO THE EXCLUSION OF LIABILITY. .....................................................136

CONCLUSION..................................................................................................................139

*Privileged and Confidential*
*Attorney Work Product*

**TABLE OF AUTHORITIES**
**(cont'd)**

**Page(s)**

**Cases**

*Allen v. Wright*,
468 U.S. 737 (1984) ........ 35, 37

*Am. Library Ass'n v. F.C.C.*,
401 F.3d 489 (D.C. Cir. 2005) ........ 22

*Ass'n for Disabled Am. v. Claypool Holdings, LLC*,
No. IP00–0344–C, 2001 WL 1112109 (S.D. Fla. Sept 21, 2001) ........ 42

*Ayers v. Allain*,
674 F. Supp. 1523 (N.D. Miss. 1987) ........ 78, 120

*Ayers v. Fordice*,
111 F.3d 1183 (5th Cir. 1997) ........ passim

*Ayers v. Musgrove*,
2001 U.S. Dist. LEXIS 9306 (N.D. Miss. 2001) ........ 47

*Ayers v. Thompson*,
358 F.3d 356 (5th Cir. 2004) ........ 10

*Bazemore v. Friday*,
478 U.S. 385 (1986) ........ 46

*Biotechnology Indus. Org. v. District of Columbia*,
496 F.3d 1362 (D.C. Cir. 2007) ........ 39

*Brown v. Board of Educ.*,
347 U.S. 483 (1954) ........ 88

*DeRolph v. Ohio*,
712 N.E.2d 125 (Ohio 1999) ........ 78

*Equal Rights Ctr. v. Equity Residential*,
798 F. Supp. 2d 707 (D. Md. 2011) ........ 45

*Equity In Athletics, Inc. v. Dep't of Educ.*,
639 F.3d 91 (4th Cir. 2011) ........ 39

*Fialka-Feldman v. Oakland Univ. Bd. of Trs.*,
639 F. 3d 711 (6th. Cir. 2011) ........ 33

*Privileged and Confidential*
*Attorney Work Product*

**TABLE OF AUTHORITIES**
**(cont'd)**

**Page(s)**

*Filardi v. Loyola University*,
No. 97 C 1814, 1998 WL 111683 (N.D. Ill., Mar. 12, 1998) .......... 37, 38

*Fox v. Bd. of Trs. of State Univ. of New York*,
764 F. Supp. 747 (N.D.N.Y 1991) .......... 33

*Frank Krasner Enter., Ltd. v. Montgomery Cnty., Md.*,
60 Fed.Appx. 471 (4th Cir. 2003) .......... 26

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*,
204 F.3d 149 (4th Cir. 2000) .......... 26, 28

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*,
629 F.3d 387 (4th Cir. 2011) .......... 26

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167 (2000) .......... 27

*Goldstein v. Costco Wholesale Corp.*,
278 F. Supp. 2d 766 (E.D. Va. 2003) .......... 42

*Graves v. Walton County Bd. of Educ.*,
686 F.2d 1135 (5th Cir. 1982) .......... 34

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) .......... 42

*Honig v. Doe*,
484 U.S. 305 (1988) .......... 32

*Hughes v. Bedsole*,
48 F.3d. 1376, 1383 (4th Cir.), *cert denied*, 516 U.S. 870 (1995) .......... 4

*Hunt v. Washington State Apple Adver. Comm'n*,
432 U.S. 333 (1977) .......... 26, 39, 40, 41

*Knight v. Alabama*,
14 F.3d 1534 (11th Cir. 1994) .......... passim

*Knight v. Alabama*,
787 F. Supp. 1030 (N.D. Ala. 1991) .......... passim

*Knight v. Alabama*,
900 F. Supp. 272 (N.D. Ala. 1995) .......... passim

*Privileged and Confidential*
*Attorney Work Product*

**TABLE OF AUTHORITIES**
**(cont'd)**

**Page(s)**

*Log Cabin Republicans v. United States*,
716 F. Supp. 2d 884 (C.D. Cal. 2010)........................................................................ 40

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ........................................................................................ 28

*Md. Highways Contractors Ass'n v. Maryland*,
933 F.2d 1246 (4th Cir. 1991)........................................................................ 42

*Murphy v. Hunt*,
455 U.S. 478 (1982) ........................................................................................ 32

*NAACP Anne Arundel Cnty. Branch v. City of Annapolis*,
133 F. Supp. 2d 795 (D. Md. 2001) ........................................................................ 27

*Osage Tribe of Indians of Okla. v. United States*,
96 Fed. Cl. 390 (Fed. Cl. 2010)........................................................................ 78

*Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty., Md.*,
268 F.3d 255 (4th Cir. 2001)........................................................................ 39

*Retail Indus. Leaders Ass'n v. Fielder*,
475 F.3d 180 (4th Cir. 2007)........................................................................ 26, 41, 45

*Rogers v. Paul*,
382 U.S. 198 (1965) ........................................................................................ 34

*Sierra Club v. EPA*,
292 F.3d 895 (D.C. Cir. 2005) ........................................................................ 22

*United Food & Commercial Worker's Union Local 751 v. Brown Group, Inc.*,
517 U.S. 544 (1996) ........................................................................................ 39, 40

*United States v. Fordice*, 505 U.S. 717 (1992)........................................................ passim

*Vaughns v. Bd. of Educ. of Prince's Cnty.*,
574 F. Supp. 1280 (D. Md. 1983) ........................................................................ 34

*Vill. of Bellwood v. Dwivedi*,
895 F.2d 1521 (7th Cir. 1990)........................................................................ 45

*Warth v. Seldin*,
422 U.S. 490 (1975) ........................................................................................ passim

*Privileged and Confidential*
*Attorney Work Product*

**TABLE OF AUTHORITIES**
**(cont'd)**

**Page(s)**

**Statutes**


COMAR 13B.02.03.04 .......... 82

COMAR 13B.02.03.09 .......... 9, 99, 100

COMAR 13B.02.03.26 .......... 101

Md. Code Ann., Educ. § 10-203 .......... 69

Md. Code Ann., Educ. § 10-203(c) .......... 49

Md. Code Ann., Educ. § 10-207(5) .......... 17

Md. Code Ann., Educ. § 10-209(f)(1) .......... 51

Md. Code Ann., Educ. § 10-209(f)(4) .......... 51

Md. Code Ann., Educ. § 10-209(g) .......... 51

Md. Code Ann., Educ. § 11-105(b)(2) .......... 51

Md. Code Ann., Educ. § 11-105(b)(2)(iii) .......... 51

Md. Code Ann., Educ. § 11-105(b)(5)(i) .......... 51

Md. Code Ann., Educ. § 11-105(b)(5)(ii) .......... 51

Md. Code Ann., Educ. § 11-105(b)(5)(iii) .......... 51

Md. Code Ann., Educ. § 11-105(u) .......... 81

Md. Code Ann., Educ. § 11-302 .......... 50

Md. Code Ann., Educ. § 11-302(d) .......... 50

Md. Code Ann., Educ. § 12-106(a)(1)(iii)(1) .......... 51

Md. Code Ann., Educ. § 12-106(a)(1)(iii)(2) .......... 51

Md. Code Ann., Educ. § 12-106(a)(1)(iii)(4) .......... 51

Md. Code Ann., Educ. § 12-106(a)(1)(iii)(5) .......... 51

Md. Code Ann., Educ. § 12-106(d)(2)(i) .......... 49

*Privileged and Confidential*
*Attorney Work Product*

**TABLE OF AUTHORITIES**
**(cont'd)**

**Page(s)**

**Other Authorities**

43 Fed. Reg. 6658 (Notice Feb. 15, 1978) .......... 137

Alfreda A. Sellers-Diamond, *Black, White. Brown, Green, and Fordice: The Flavor of Higher Education in Louisiana and Mississippi*, 5 HASTINGS RACE & POVERTY L.J. 57 (2008) .......... 44

David J. Armor & Christine H. Rossell, Desegregation and Resegregation in the Public Schools, BEYOND THE COLOR LINE: NEW PERSPECTIVES ON RACE AND ETHNICITY (Abigail Thernstrom & Stephen Thernstrom eds., 2002) .......... 45

## INTRODUCTION

1. Plaintiffs have met their burden under *Fordice* of identifying traceable policies and practices. *United States v. Fordice*, 505 U.S. 717, 729 (1992). Maryland, however, has not met its burden of proving that these policies and practices have sound educational justification, cannot practicably be eliminated, or lack segregative effects. *Id.* at 731. As Plaintiffs pointed out in opening statement and in their Corrected Findings of Fact and Conclusions of Law, the positions that Maryland took in the Partnership Agreement and the 2009 State Plan make these defenses unavailable. (*See* 1/3/12 AM Trial Tr. 31, 38-39; Plaintiffs' Corrected Findings of Fact and Conclusions of Law ("Pls.' FOF") ¶¶ 274, 737 (Dkt. #355).)

2. As a result, Maryland devotes most if its Findings of Fact and Conclusions of Law to attempting to persuade the Court to avoid reaching the merits with its standing argument (*see* Defendants' Findings of Fact and Conclusions of Law ("Defs.' FOF") ¶¶ 42-115 (Dkt. #353)) or to avoid applying the *Fordice* analysis because the TWIs are desegregated (*see* Defs.' FOF ¶¶ 116-131).

3. When Maryland finally turns to the traceable policies and practices, its arguments run into and are knocked down by its pre-trial positions. For example, its argument that the HBIs are responsible for their own missions is contrary to the position Maryland took in the Partnership Agreement (PTX 4 at 36-37), contrary to the analysis in the Attorney General's 2005 Opinion (PTX 698 at 24-25), and contrary to the 2009 State Plan, which commits Maryland to providing substantial additional resources to expand the HBI's programmatic missions, apparently in response to criticism from the HBI Panel that Maryland does not provide funding for programs at the HBIs (PTX 1 at 31-32; PTX 2 at 129-30). The HBI Panel concluded that

Maryland establishes the missions of its institutions. (PTX 2 at 129 (referring to the process by which Maryland "sets university missions.").)

4. As for whether the HBIs' missions are more limited than those of the TWIs, Maryland largely relies on exhibits that it initially introduced into evidence through Dr. Sue Blanshan. (DTX 406-409.) The Court subsequently struck these exhibits after cross-examination exposed that Dr. Blanshan could not vouch for their accuracy or even testify as to who prepared them. (2/7/12 AM Trial Tr. 47-48 (Blake, J.).)

5. Similarly, Maryland relies on demographic data that its own witness testified was unreliable to support its new argument that the HBIs are already desegregated. (*See* 1/25/12 AM Trial Tr. 37-38 (Passmore).) And for the first time in the litigation, Maryland is counting as non-African Americans foreign students and students who failed to indicate a racial category. (*See* Defs.' FOF ¶ 129.)

6. Maryland also plays fast and loose with the facts with respect to all of its new arguments, including its new argument that Plaintiffs lack standing.

## I. MARYLAND'S NEW STANDING ARGUMENT HAS PREVIOUSLY BEEN ABANDONED BY THE DEFENDANTS BECAUSE IT LACKS MERIT.

7. This new procedural argument takes up as much space as any of Maryland's substantive arguments. (*See* Defs.' FOF at ¶¶ 42-115.) But Maryland does not even devote a footnote to explaining why it is just now challenging standing. It offers the Court no explanation as to why it did not identify standing as an issue in its Statement of the Case and Issues to be Considered at Trial ("Defs.' Trial Statement") (Dkt. #178), filed in October 2010 pursuant to the Court's request, in the Joint Pretrial Order (Dkt. #272), or in its summary judgment briefing, the resolution of which its current submission rightly points out, "established a legal framework for trial." (Defs.' FOF at ¶ 2.) That legal framework did not include standing.

8. A duty of candor should have required that Maryland acknowledge that, in 2006, it raised standing as an issue in a Motion to Dismiss and/or for Summary Judgment but thereafter abandoned it. (*see* Defs.' Mot. to Dismiss and/or for Summ. J. at 2-5 (Dkt. #15).) In fact, in 2008, Maryland moved for partial summary judgment on Plaintiffs' breach of contract claim partly on the basis of standing to enforce the Partnership Agreement as a contract. (Defs.' Mot. for Partial Summ. J. at 11 (Dkt. #40-1).) It did not, however, challenge Plaintiffs' standing to bring the constitutional claims. (*See generally* Defs.' *Mot. for Partial Summ. J.*) Indeed, when Judge Garbis granted Defendants' motion, he specifically indicated that the case would continue as to the constitutional claims. (Mem. & Order Re: Contract Claim at 17 (Dkt. #57).) As a part his ruling, Judge Garbis described the Plaintiffs as consisting of current and former students, and the Coalition as consisting of current and former students. (Mem. & Order Re: Contract Claim at 1-2.)

9. In the past four years, standing has not been an issue in the case. Moreover, contrary to its current arguments, Maryland learned during the deposition of David Burton that the Coalition has current members who are students and never challenged this fact. (3/12/10 Burton Dep. at 39-40, attached as Ex. 1.) Further, Muriel Thompson has not graduated from Morgan, and Plaintiff Rahsaan Simon is also continuing his studies at an HBI.

10. Disingenuously, Maryland's Findings of Fact and Conclusions of Law pretend that standing was properly identified as an issue at trial and that Plaintiffs tried but failed to carry their burden of proof. (*See* Defs.' FOF at ¶¶ 42-115.) But nothing could be further from the truth.

11. If Maryland had indicated in the Pretrial Order (or even in its opening statement) that it considered standing to be an issue in this case, it would have been a simple enough matter

for Plaintiffs to more explicitly elicit at trial some of the facts that Maryland knows are in the pre-trial record. As it is, it would have made no sense to waste the Court's time establishing facts that were not at issue, particularly given the Court's expressed interest in narrowing the issues for trial. (5/11/11 Hr'g Tr. 59-60 (Blake, J.).) There is no real question that the Plaintiffs, including the Coalition, have standing. *See infra* at ¶¶ 60-132; (*see also* D. Burton Aff. ¶¶ 3-6, attached as Ex. 2; R. Simon Aff. ¶¶ 2-7, attached as Ex. 3; M. Thompson Aff. ¶¶ 5-9, attached as Ex. 4.)[1]

## II. MARYLAND'S NEW ARGUMENT THAT THE HBIS ARE ALREADY DESEGREGATED RELIES UPON UNRELIABLE DATA AND IGNORES THE ACKNOWLEDGED LACK OF DIVERSITY ON HBI CAMPUSES.

12. As is discussed more fully at paragraphs 140-45, and for the first time in this litigation, Maryland is now counting as "non-African Americans" an assortment of students including, (1) students (of whatever race) who did not designate a racial category, (2) foreign students (whether from the Netherlands or Nigeria), and (3) white, Asian, Hispanic, and "other race." (*See* Defs.' FOF ¶ 129.) No Court has ever accepted this kind of argument as proving desegregation. *See infra* at ¶¶ 141-42.

---

[1] Defendants' argument that plaintiffs have failed to state a claim upon which relief can be granted because the complaint does not specifically refer to 42 U.S.C. § 1983 should similarly fail for lack of support in fact or law. (*See* Defs.' FOF ¶ 14 n.4.) As an initial matter, Defendants failed to raise this issue either when they sought to have this case removed to federal court and conceded that "[t]he United States District Court has jurisdiction under 28 U.S.C. §§ 1331 and 1441 because this case involves claims or rights arising under the Constitution and laws of the United States," (Not. of Removal at 2 (Dkt. #1)), or in their pre-trial dispositive briefing. While it is true that the complaint does not cite § 1983, its contents have put Defendants on notice of a claim under this statutory section. (*See* Fourth Amended Complaint ¶ 5 (Dkt. #165) (alleging that pursuant to other civil rights statutes, "the Plaintiffs seek declaratory and injunctive relief for deprivations under color of state law of their federal civil rights."). Fourth Amended Complaint 30 (alleging "Violations of the Equal Protection Clause," a substantive right protected by § 1983.) In any event, Defendants have not identified any authority that supports dismissal under these circumstances. In *Hughes v. Bedsole*, the case cited by Defendants, the plaintiff's sexual discrimination claim failed not because she attempted to assert it directly under the Fourteenth Amendment, as opposed to under § 1983, but rather because of the court's view that plaintiff should have sued under Title VII instead. 48 F.3d. 1376, 1383 (4th Cir.), *cert denied*, 516 U.S. 870 (1995).

13. More importantly, Maryland knows full well that this new argument is misleading and contrary to the facts as shown by the demographic data. (*See* 1/25/12 AM Trial Tr. 37-38 (Passmore).) In fact, until now, its non-litigation position had been to acknowledge the lack of diversity at the HBIs and to commit to remedying it with expanded missions and funding. (*See* PTX 1 at 31 (noting that Maryland's HBIs need substantial additional resources for "[r]ecruiting, retaining, and graduating an academically, racially, culturally, and ethnically diverse student body."); PTX 4 at 37-38 (committing to enhance the HBIs "to ensure that these institutions provide an equal opportunity for a quality education to all students who choose to attend them and to enable them to compete for and be attractive to students regardless of race.").) Indeed, Maryland's litigation position until now has been to blame the HBIs, as the Attorney General's office did at the hearing on its motion for summary judgment:

> We said we've got to tell you that part of the problem in your attracting white students is that if you go to the web sites of your universities, or you read your mission statements, it is very apparent that you are proud of the fact that you are an historically black institution, and you should be proud of it. You have a real advantage in attracting a certain segment of students because of that marketing approach, but it comes at a cost, and the cost is that white and other non-African American students may be deterred in considering one of these HBIs if, in the public way in which they market themselves, they are so intent on focusing on that attribute as opposed to others.

(5/11/11 Hr'g Tr. at 25.)

14. To accentuate its litigation position that racial identifiability at the HBIs is of their own making, Maryland argued that no amount of enhancement would bring substantial numbers of non-black students to the HBIs:

> Ms. Walker said something provocative I thought, this speculative, and I underlined speculative, this speculative notion that if you build it, they will come. The State is supposed to allocate its scarce resources on some sort of field of dream ideas, that if we

> build a ballpark in a cornfield, old baseball players will come back and life will be great? Come on. That's ridiculous.

(5/11/11 Hr'g Tr. at 98.)[2]

15. Maryland now dramatically pivots from its "that's ridiculous" position to its current position that this "field of dreams" is already a reality. The HBIs, it now argues, already have substantial numbers of non-African-American students. (*See* Defs.' FOF ¶ 129.)

16. However expedient this argument may be, it is contrary to the facts, as acknowledged by Dr. William Kirwan, the Chancellor of the University System of Maryland:

> Q. And have you looked at the data for the racial makeup of the [HBIs] in the state?
> A. I have.
> Q. And you know that they are not particularly diverse?
> A. I do.
> Q. And they have not been successful at attracting non-African Americans. You're aware of that?
> A. The data would suggest that, yes.

(1/24/12 PM Trial Tr. 30 (Kirwan).)

17. In fact, the data for Maryland's four-year residential campuses show that the non-black students are concentrated in the TWIs and that very few attend the HBIs. In 2008, for example, the same year that Maryland discusses, the data show the following:

- White Students: 98% attended TWIs; 2% attended HBIs.
- Hispanic Students: 93% attended TWIs; 7% attended HBIs.
- Asian Students: 98% attended TWIs; 2% attended HBIs.
- Native American Students: 89% attended TWIs; 11% attended HBIs.

[2] During its opening statement, Maryland offered a more urbane version of this same argument. (1/3/2012 AM Trial Tr. 83) ("Dr. Conrad seems to simply suggest that if you offer programs at HBIs, that that in of itself would draw students of all races. Well, Your Honor, it's more comprehensive than that, and you will hear from the experts for the State in that regard.")

- Other Race Students: 92% attended TWIs; 8% attended HBIs.
- African American Students: 41% attended TWIs; 59% attended HBIs.

(PTX 448 at 47-60, 63-66, 69-71; *see also* Enrollment at 4-year Residential Institutions by Race: 2008, attached as Ex. 15).

18. In sum, as Dr. Kirwan testified, whether the racial category is white, Asian, Hispanic, or other race, the HBIs are not able to attract non African American students in material number. (*See* 1/24/12 AM Trial Tr. 30 (Kirwan).) Indeed, in a 2006 submission to OCR, Maryland acknowledged that the concentration of Maryland's black students at non-diverse HBIs will continue as the increasing selectivity at the TWIs means fewer and fewer African Americans can attend. (PTX 8 at 55 ("The lower academic credentials of low-income students in terms of standardized test scores (SATs) and high school preparedness (e.g. the lower percentage of low incomes students taking college preparatory curriculum in high school) have been factors in the decline in African American admissions to the TWIs.").)

## III. MARYLAND'S NEW ARGUMENT THAT DESEGREGATION AT THE TWIS RENDERS MOOT ANY UNNECESSARY PROGRAM DUPLICATION ANALYSIS IS FRIVOLOUS.

19. Here too, Maryland is creating a new argument with no factual or legal support. In both *Knight* and *Ayers*, the courts found unnecessary program duplication to be a traceable policy even though the TWIs had the percentages of other-race students that Defendants erroneously claim establish desegregation. *See U.S. v. Fordice*, 505 U.S. 717, 724 (1992); *Knight v. Alabama*, 787 F. Supp. 1030, 1063 (N.D. Ala. 1991); (Defs.' FOF ¶¶ 128-29 nn.23-24). Moreover, a large part of Maryland's defense was predicated on its claim to have in place an elaborate (albeit ineffective) mechanism for avoiding unnecessary program duplication between the HBIs and TWIs. (*See* 2/7/12 AM Trial Tr. 54-60 (Blanshan).) Maryland recognized in the

Partnership Agreement, however, that it was obligated to actually avoid unnecessary program duplication. (PTX 4 at 36.)

20. Desegregation at the TWIs does not excuse Maryland's obligations to the HBIs. Indeed, the Attorney General's 2005 Published Opinion concluded that "it is possible for the State to have dismantled some aspects of prior segregation, and be discharged of any remedial obligation with respect to those factors, while remaining responsible for remedial measures in other areas." (PTX 698 at 22.) The Attorney General made clear that *Fordice's* unnecessary program duplication analysis applies in Maryland with full force:

> The State's maintenance of geographically proximate [HBIs] and TWIs with overlapping programs is, as the *Fordice* Court observed, "part and parcel of the prior dual system of higher education." 505 U.S. at 738. As noted above, the Court particularly focused on "unnecessary" program duplication, defined as "duplication at the bachelor's level of non basic liberal arts and sciences course work and all duplication at the master's level and above." Thus, many policies that produce "unnecessary" program duplication 11 are traceable to *de jure* segregation, and the State has the burden of proving that such duplication otherwise meets *Fordice* standard.

(PTX 698 at 23.)

21. Moreover, the AG Opinion cites as relevant to whether Maryland has dismantled its *de jure* system of segregation, the 2000 Partnership Agreement and Maryland's various desegregation plans. (PTX 698 at 4.) The Partnership Agreement itself makes clear that desegregation is two pronged, focused on (1) continued integration of TWIs and (2) desegregation of the HBIs through enhancements to be competitive with the TWIS.[3]

---

[3] It states: "In 1985, OCR and Maryland agreed on another statewide desegregation plan, entitled *A Plan to Assure Equal Postsecondary Educational Opportunity* (Appendix A) designed to foster equal educational opportunity in Maryland's public institutions of higher education. The Plan was accepted by OCR as one which could meet the requirements of Title VI. Its principal objectives were (1) the continued integration of Maryland's TWIs through a portfolio of enrollment goals, recruitment measures, retention efforts and affirmative action plans, and (2) the enhancement of Maryland's [HBIs] to ensure that they are comparable and competitive with TWIs with respect to capital facilities, operating budgets and new academic programs. The Plan provided for a wide range of measures and activities to meet these objectives, including enhancement of the [HBIs], desegregating student enrollments through increased recruitment and improved retention programs for African American students, and desegregating faculties, staffs and governing boards, all of which were

22. The Attorney General's Opinion is consistent with the specific advice from the Attorney General's office warning that Maryland's approval of the joint Towson, U of B MBA Program violated the Constitution. (PTX 14 at 2.) The Assistant Attorney General advised MHEC that in so far as unnecessary program duplication was concerned, "the State's legal obligations remain in full force and effect." (PTX 14 at 1.)

23. Similarly, in 2005, the Office for Civil Rights notified Maryland of its concerns about the questionable constitutionality of Maryland's recent approval of the joint MBA program. (PTX 36 at 1 (observing that OCR was "concerned that MHEC has misinterpreted the requirements of Title VI of the Civil Rights Act of 1964 and the U.S. Supreme Court's *Fordice* decision, as they relate to unnecessary program duplication during the desegregation of a formerly *de jure* system of higher education.").)

24. In addition, in its October 2010 Statement of The Case and Issues to Be Considered at Trial Maryland noted that "[t]he standards set forth in the *Fordice* analysis govern the program duplication analysis." (Defs.' Trial Statement at 13.)

25. Finally, although Maryland inexplicably failed to notify the Court of this fact, *after trial*, Maryland amended its regulations to require that MHEC analyze the "[e]ducational justification for the dual operation of programs broadly similar to unique or high-demand programs at HBIs." COMAR 13B.02.03.09. This analysis was lacking under previous iterations of Maryland's program approval process. (PTX 694; DTX 400 at 15.)

designed to meet the mandates of Title VI in the state-supported institutions of higher education in Maryland." (PTX 4 at 6.)

## IV. MARYLAND'S ARGUMENTS REGARDING MISSIONS AND FUNDING LACK CANDOR AND ARE CONTRADICTED BY MARYLAND'S NON-LITIGATION POSITIONS.

### A. Mission Statements Do Not Fully Account For the Roles of Maryland's HBIs and Must Follow Strict Guidance From Maryland.

26. To begin with, both the court in *Ayers* and the court in *Knight* found the HBIs' missions traceable to the *de jure* era. *Ayers v. Fordice*, 111 F.3d 1183, 1211 (5th Cir. 1997) (citing *Ayers v. Fordice*, 879 F. Supp. 1419, 1477 (N.D. Miss. 1995)); *Knight v. Alabama*, 14 F.3d 1534, 1544-46 (11th Cir. 1994). As a part of a court approved settlement in *Fordice*, Mississippi agreed to pay a total of $500 million dollars to settle the litigation, with approximately $245 million dollars dedicated to creating new academic programs at the HBIs. *Ayers v. Thompson*, 358 F.3d 356, 359, 364, 366 (5th Cir. 2004).

27. Maryland tries to distinguish itself from those cases by pointing out that in Maryland the HBIs write their own mission statements. Defs.' FOF ¶ 254. As the *Knight* court pointed out, however, institutions in Alabama also had a role in the development of their institutional missions. *See Knight v. Alabama*, 900 F. Supp. 272, 290 (N.D. Ala. 1995). More importantly, this argument fails to distinguish between the written mission statement and an institution's role and operative mission. (*See* Pls.' FOF ¶ 421.)

28. In *Knight*, the court concluded that the "'limited missions because of prior state-sponsored discrimination' discussed in the Eleventh Circuit's opinion must refer to the mission, or more precisely, the role" of Alabama's HBIs." *See Knight*, 900 F. Supp. at 289. It explained further that "[r]ole essentially is what an institution does, and generally, with respect to three major functions, instruction, research and public service. Also involved with role would be the clientele that an institution serves." *Id*. at 290.

29. With respect to Maryland's HBIs, the State Plan makes clear that their principal role is fulfilling the *de jure* era goal of educating largely first generation minority students:

> One of our state's great strengths is its diversity, and one reflection of that diversity is our Historically Black Institutions (HBIs), which boast a proud history and a continuing mission of providing quality education, including educating low-income students and students who are the first generation in their families to attend college

(PTX 1 at 4.)

> Because Historically Black Institutions (HBIs) award a high percentage (45 percent) of the degrees earned by Maryland minority students and a relatively high percentage of their graduates are first-generation college students, one important aspect of ensuring equal opportunity for a diverse Maryland student population is to provide enhancement funding to HBIs. As part of their dual missions, HBIs are charged with providing access to academically well-qualified students and also a significant percentage of under-prepared students

(PTX 1 at 56.)

> The growing population of "historically underserved" students such as African Americans requires enhancement of HBIs 'to ensure equal educational opportunity for all students.

(PTX 1 at 57.)

30. Since Maryland pledged in the Partnership Agreement to expand the HBIs' missions (PTX 4 at 36-37), it is hard to believe that Maryland would have made this commitment to OCR if Maryland did not, in fact, determine the HBIs' missions.

31. While Maryland currently argues that traceability of the missions turns upon the fact that the HBIs write their own mission statements (Defs.' FOF ¶ 254), the Attorney General's 2005 Opinion, consistent with Plaintiffs' position and the *Knight* decision, opined that the question turns on whether the current missions are traceable to those of the past. (PTX 698 at 1-3, 9.)

32. Besides, writing the mission statement is largely a ministerial act as the contents are dictated by Maryland statute and are required to be consistent with the State Plan for Higher Education. *See infra* at ¶¶ 153-54. As Maryland points out in Paragraph 255 of its indings of Fact, before an institution writes a mission statement, MHEC must first "formulate a statewide plan for higher education, to coordinate the role played by each of Maryland's institutions, and ultimately, to approve the mission articulated by any given institution of light of that statewide plan." (Defs.' FOF ¶ 255 .)

33. The purpose of Maryland's State Plan for Higher Education "is to articulate State priorities that will give direction to both the State and to institutions offering postsecondary education programs." (PTX 1 at 5.) The State Plan divides Maryland's four year institutions into two groups—"HBIs" and "TWIs" (PTX 1 at 12), and notes "MHEC is responsible for assessing the extent to which progress is being made toward achieving the goals of the *State Plan*. Progress will not be tracked at the institutional level, but rather at the level of groups of institutions (e.g., segments of postsecondary education, Historically Black Institutions)." (PTX 1 at 5.)

34. Maryland's mission statement review process is governed by statute and requires institutions to provide in their mission statements their "institutional identify" and indicate how their institutional priorities fit into the State Plan.

> **INSTITUTIONAL IDENTITY**
>
> Provide a brief description of the institution as a distinct entity, including those unique strengths which contribute to the State's diversity of programs. Institutional priorities for instructional program emphasis and aspirational degree levels should be included. Identify specifically how each priority addresses initiatives outlined in the State Plan.

(PTX 104 at 9.)

35. Consistent with this provision and the State Plan, the mission statements of all four HBIs include references to their status as HBIs. (*See* PTX 763 at 5 (explaining that Bowie "embraces diversity which includes its African American heritage); PTX 763 at 14 (noting that Coppin "as a Historically Black Institution, fulfills a particularly important mission for the State of Maryland."); PTX 763 at 66 (describing UMES as "the State's Historically Black 1890 Land-Grant institution."); PTX 763 at 98 (acknowledging Morgan as "one of the Nation's premier historically black institutions of higher education").)

36. The UMES written mission statement, for example, restates the State Plans "access" mission for Maryland's HBIs, stating "UMES engages in numerous collaborative efforts to (a) increases access and opportunity for a broad spectrum of students including: the economically and educational disadvantaged, low income adult learners, and first generation college students; and (b) to meet other state needs." (PTX 763 at 68.)

37. By contrast, UMBC, to whom the HBI Panel compared UMES (PTX 2 at 135), has an institutional identity centered around being a highly selective research institution:

> The University of Maryland, Baltimore County (UMBC), established in 1966, is an historically-diverse, highly-selective, public research university. The graduate schools of UMBC and the University of Maryland, Baltimore (UMB), combined in 1985, comprise the University of Maryland Graduate School, Baltimore (UMGSB) as one of the University System of Maryland's (USM) two principal centers for research and doctoral level training.
>
> As an honors university, UMBC aspires to be one of the finest of the new American research universities that effectively blends high-quality teaching, advanced research, and social responsibility. UMBC is a research institution with a profound commitment to liberal education and its relevance to contemporary life. A strong liberal arts and sciences core and disciplinary base provides the foundation for the undergraduate educational experience. UMBC offers a complement of disciplinary and interdisciplinary masters and doctoral programs with an emphasis on selected areas of the sciences, engineering, information technology, human services, and public policy. These programs are closely linked to

> undergraduate programs in the liberal arts and sciences and engineering. The University has developed particular strength in interdisciplinary instruction and research by building bridges among the cultures of the sciences, engineering, humanities, visual and performing arts, and the social sciences.

(PTX 763 at 55.)

38. Maryland's mission statement review process then requires that the mission statements include a specific description of "institutional capabilities" and "unique strengths" that ties back into the institutional identify and State Plan. (PTX 104 at 9.)

39. Predictably, the mission statements of the HBIs refers to their access missions. (*See* PTX 763 at 8 (noting Bowie's "historical, present, and future role in providing access and success to individuals with limited fiscal means"); PTX 763 at 13 (observing that "Coppin State University provides educational access and diverse opportunities for students with a high potential for success and for students whose promise may have been hindered by a lack of social, personal or financial opportunity"); PTX 763 at 66 (reporting that "UMES is committed to providing access to high quality values-based educational experience, especially to individuals who are first-generation college students"); PTX 763 at 99 (acknowledging that "Morgan enrolls a relatively broad segment of the young population, from those who have outstanding pre-college preparation to those who require support to realize their potential in college and complete a degree.").)

40. Finally, written mission statements must articulate how an institution's goals fit into the state plan as warranting additional investment of state resources. (PTX 104 at 9.) As for the HBIs, the State Plan notes the need to provide "substantial additional resources" to fund both components of the HBIs' dual mission. (PTX 1 at 32 ("In summary, the investment of substantial additional resources by the State needed to ensure that its public HBIs are comparable

and competitive with its public TWIs refers to the sum total of resources needed to deliver on the HBIs' dual missions of educating high achieving students as well as others who may require supplemental support, i.e., students from low-income households and underrepresented minorities.").)

41. Mr. Vivona, the Chief Operating Officer of the University System of Maryland, conceded that Maryland articulates the mission of each university:

> The state articulates that mission. If that mission includes research, by definition, that will be a more costly institution. It is not - you work with, you work within that mission, and that ultimately determines what your need will be.

(1/31/12 AM Trial Tr. 43 (Vivona).)

42. Since the State Plan sets the HBIs roles and missions and state law largely dictates the content of the mission statement, it is little wonder that HBI Presidents testified that Maryland sets their missions, including their dual missions (*See, e.g.*, 1/4/12 AM Trial Tr. 37-38 (Wilson) (explaining that Morgan's designation as an "urban" institution represented a mandate to support the dual mission); 1/4/12 PM Trial Tr. 34 (T. Thompson) (confirming that HBIs historically and into the future have a dual mission)), and little wonder that the Attorney General's Opinion posed the mission as turning in the first instance on traceability (PTX 698 at 1-3, 9.). Indeed, the Attorney General's Opinion makes clear "[i]f that link is found [traceability to the *de jure* era] then institutional missions must also be scrutinized to determine if they have segregative effects." (PTX 698 at 25.)

43. As for segregative effects, Maryland previously argued that the HBIs written mission statements had a segregative effect. (5/11/11 Hr'g Tr. at 25.) And except for its attempt

to manipulate the demographic data, *see infra* at ¶¶ 133-46, it presents no evidence that the HBIs' limited roles and missions do not have a segregative effect.

### B. Defendants' Arguments Regarding Operating Funding and Facilities are Misleading and Rely Upon a Legal Framework That is Inconsistent With *Fordice* and the Facts in Maryland.

44. Maryland seeks to avoid a finding that its current policies and practices regarding operating funding are traceable to the *de jure* era by arguing that it does not really follow its funding guideline or fund its institutions based on their institutional missions. (*See* Defs.' FOF ¶¶ 139-59.)

45. As described by the Chief Operating Officer of the University System of Maryland, Mr. Vivona, the funding guideline "was created and initially was used in many ways to determine allocations" (1/31/12 AM Trial Tr. 14-15 (Vivona).) For approximately the past ten years, however, Maryland has funded its institutions of higher education by providing funds to maintain the same level of service from the prior year with some program enhancements "to achieve the goals of the strategic plan and goals of the university specifically within its mission" (1/31/12 AM Trial Tr. 6 (Vivona).)

46. Maryland's "current services" approach to funding was criticized by the HBI Panel because it perpetuates the *de jure* era disadvantages faced by the HBIs. (*See* PTX 2 at 128-30.) The HBI Panel called upon Maryland to "restructure the process that has caused the inequities and lack of competitiveness between [the two sets of] institutions." (PTX 2 at 130.)

47. Outside of the context of this litigation, Maryland has acknowledged that the current levels of state support leaves the HBIs unable to improve their low retention and graduation rates (1/18/12 PM Trial Tr. 77 (Reid)), make progress in "[r]ecruiting, retaining, and graduating an academically, racially, culturally, and ethnically diverse student body" (PTX 1 at

31), and "overcome the competitive disadvantages caused by prior discriminatory treatment" (PTX 2 at 119; 2/1/12 AM Trial Tr. 48 (Newman)).

48. The legal question is whether Maryland's current funding policies and practices, which maintain the historical imbalance between the two sets of institutions are traceable to the *de jure* era, when Maryland's stated policy was to "consistently pursue[] a policy of providing higher education facilities for Negroes which are inferior to those provided for whites." (PTX 18 at 108.)

49. As Plaintiffs noted in their opening statement, traceability is not a "hyper-technical" term. (1/3/12 AM Trial Tr. 8.) It simply refers to remnants of the *de jure* system. *Fordice*, 505 U.S. at 733. Moreover, Justice Thomas described traceability as not involving a heavy burden but turning on the question whether the challenged policy or practice "began during the *de jure* era, produces adverse impacts, and persists without sound educational justification." *Id*. at 746.

50. Here, Maryland's policies and practices fund institutions in a way that: (1) excludes adequate funding for the HBIs' dual mission (*see* PTX 2 at 124); (2) excludes consideration of economies of scale (*see* PTX 324 at 4); and (3) excludes consideration of the "substantial lack of comparability" exhibited by the "institutional platform[s]" at the HBIs. (PTX 2 at 129.).

51. Moreover, the policy or practice upon which the "current services" model sits, the funding guidelines, is traceable, in particular, because, as indicated by Maryland statute, the guidelines are driven by institutional mission. Md. Code Ann., Educ. § 10-207(5).

52. For factual reasons explained by Maryland's HBI Panel, and for legal reasons outlined by Judge Murphy in *Knight*, it is not a defense to point out that the HBIs receive higher

funding per FTE. (*See* PTX 2 at 124 (explaining that "[t]he very different and greater challenges faced by HBIs in terms of student preparation and affordability should determine the specific capacity require by the HBIs, not a strict comparison to that of TWIs")); *see also Knight*, 900 F. Supp. at 308 (observing that higher levels of FTE funding had not empowered Alabama's HBIs to overcome the stigma associated with historical underfunding.) Indeed, the Attorney General's 2005 Opinion did not even cite this fact as a relevant factor when discussing enhanced funding for the HBIs. (*See generally* PTX 698.)

53. As with many of its other arguments, Maryland's arguments regarding operating funding and facilities are misleading. As an initial matter, Dr. Lichtman, a presidential historian, offers no opinions regarding the adequacy of the funding and facilities of Maryland's HBIs in the context of their missions or whether Maryland's funding policies and practices are traceable to the *de jure* era. Instead, he focuses on resources per FTE student, a metric that has been rejected by Maryland state reports and fails to account for the actual conditions at the institutions. For additional discussion of the limitations of analyses based on per-FTE calculations see Plaintiffs' Corrected Findings of Fact and Conclusions of Law paragraphs 850-870.

54. Dr. Lichtman's approach is contrary to the HBI Panel's conclusion that "[t]he very different and greater challenges faced by HBIs in terms of student preparation and affordability should determine the specific capacity required by the HBIs, not a strict comparison to the TWIs." (PTX 2 at 124 (emphasis added).) Dr. Lichtman also acknowledges that at the time the Bohanan Commission recommended enhanced funding for the HBIs, the HBIs were receiving more funding per FTE than the TWIs. (2/2/12 AM Trial Tr. 46-47 (Lichtman).)

55. In spite of these levels of FTE funding, Maryland has never represented outside of litigation that its HBIs are over-funded or even adequately-funded. Instead, it has repeatedly

called for "[s]ubstantial additional resources" to address the lack of comparability at the HBIs. (PTX 1 at 31; PTX 2 at 119.) And rather than attributing shortcomings in HBI operations to decisions made by administrators or claiming that every institution could benefit from increased funding, Maryland has acknowledged that HBIs are charged with a dual mission and identifies providing the resources necessary to accomplish this mission as a state-wide priority. (PTX 1 at 30, 56.)

56. Similarly, except for in this litigation, Maryland has never excluded UMCP from its comparisons of TWIs and HBIS because of its status as a flagship institution. Dr. Lichtman fails to provide a standard deviation analysis to support his conclusion that UMCP is a statistical outlier. In fact, UMCP's funding levels for FY 2010 were more similar to the institutions that both Dr. Toutkoushian and Dr. Lichtman included in their analysis than UM-B's and UMUC's, the agreed-upon outliers. (see PTX 1020 at 80, 92; PTX 1021 at 11, 24, 34, 45, 55, 66, 77, 87, 96, 116.)

57. Indeed, Maryland appears to recognize the fatal flaws in its outlier analysis and attempts to argue in the alternative that even if one includes UMCP, Maryland's HBIs have received excess funding since 1984. (Defs.' FOF ¶ 188.) This analysis, however, relies upon Dr. Toutkoushian's initial calculations of FTE enrollments that were based on headcounts, as opposed to credit hours, because of limitations in the data available to him. (PTX 325 at 4.)

58. Drs. Toutkoushian and Lichtman agree that FTE calculations based on annual credit hours are preferable to headcount-based measures. (PTX 325 at 4.) And the analyses presented at trial were based on enrollments calculated from annual credit hours. (DTX 65v at 5-6; 1/17/2012 PM Trial Tr. 58 (Toutkoushian) (discussing use of enrollment data based on annual credit hours); 2/1/12 PM Trial Tr. 54-55 (Lichtman) (discussing Dr. Toutkoushian's initial use of

enrollment data based on headcounts and subsequent use of enrollment data based on the state's methodology).) Calculating FTE enrollments based on headcounts tended to understate the enrollment shares of the HBIs, and, as a result, understated their proportional funding shares. (PTX 325 at 5.) Even if one only considers state appropriations and enhancements, the HBIs have experienced cumulative funding deficiencies of $17,822,046 from 1984-2010. (PTX 1029 at 20.) Maryland's reliance on analysis that has been subsequently revised to account for their own criticisms is both misleading and disingenuous.

59. Defendants' arguments regarding facilities and infrastructure fare no better. Instead of actually visiting the HBI campuses to assess their competitiveness, Dr. Lichtman selectively relies on purportedly "objective" metrics, including space deficits and library holdings per FTE student, while failing to account for statistics and other evidence that more accurately represent the conditions on HBI campuses. (DTX 405 at 61-65.) This approach ignores Maryland's own observations regarding the limited value of examining space deficits in the abstract and the effects of economies of scale on an assessment of physical volumes per student. For additional discussion of facilities and infrastructure see Plaintiffs' Corrected Findings of Fact paragraphs 344-96.

## REBUTTAL FINDINGS AND CONCLUSIONS

## I. PLAINTIFFS HAVE STANDING.

### A. Defendants Have Conceded That Plaintiffs' Standing is Self-Evident.

60. In a desperate bid to have the Court avoid reaching the merits, Defendants now choose to challenge—after nearly ***six years of litigation***— Plaintiffs' ability to even bring the present lawsuit at all. (Defs.' FOF ¶¶ 42-115.) But if Defendants genuinely believed that Plaintiffs do not have standing, it is unconscionable that they would squander judicial resources

by engaging in six years of litigation before even raising this issue with this Court, despite having repeated opportunities to do so in motions to dismiss, summary judgment briefings, pre-trial briefing, and a ***six week*** bench trial.

61. Indeed, Defendants abandoned this constitutional standing argument long ago. While Defendants originally challenged Plaintiffs' standing in their December 11, 2006 motion to dismiss, prior to the case's administrative closure, they completely abandoned this argument once the case was re-opened in 2008. To be sure, the sole standing argument raised by Defendants since this litigation was re-opened solely related to Plaintiffs' standing to bring a breach of contract claim under the Partnership Agreement. (*See generally* Defs.' Mot. for Partial Summ. J. (Dkt. #40-1).) Defendants made no mention of Plaintiffs' constitutional standing in their Summary Judgment brief, nor did Defendants challenge Plaintiffs' standing to bring this case in their later motion for summary judgment, Statement of Issues to be tried, or the Pretrial Order. Accordingly, Defendants' suggestion that Plaintiffs' standing was ever an issue at trial is disingenuous.

62. As set forth below, Plaintiffs' standing in this case is self-evident, as Plaintiffs include individuals who are unquestionably injured as a result of the State's practices. *See Am. Library Ass'n v. F.C.C.*, 401 F.3d 489, 491 (D.C. Cir. 2005) (explaining that *Sierra Club v. EPA*, 292 F.3d 895, 899-901 (D.C. Cir. 2005) stands for the proposition that Plaintiffs "should explain the basis for their standing at the earliest appropriate stage in the litigation" only "*when they have good reason to know that their standing is not self-evident*"). Moreover, as a result of Defendants' complete failure to contest Plaintiffs' standing before now, Plaintiffs proceeded in this litigation as if the validity of their standing was not only self-evident, but also uncontested.

63. Defendants now attempt to argue—at the eleventh hour—that Plaintiffs lack standing in what can only be described as a transparent effort to sandbag Plaintiffs after the close of evidence. The Court should see such gamesmanship for what it is and reject Defendants' efforts. To the contrary, as the D.C. Circuit made clear in *American Library Association*, nothing in standing doctrine nor the *Sierra Club* decision which the State has invoked for the first time, "suggests that it is intended to create a 'gotcha' trap whereby parties who reasonably think their standing is self-evident nonetheless may have their cases summarily dismissed if they fail to document fully their standing at the earliest possible stage in the litigation." 401 F.3d at 493.

64. Indeed, Defendants have, in effect, conceded that Plaintiffs' standing is self-evident by acknowledging in their Findings of Fact and Conclusions of Law that current students of Maryland's HBIs should properly have standing to bring this lawsuit. (Defs.' FOF at ¶¶ 51-54, 71, 88, 110.) Defendants' argument that Plaintiffs lack standing turns entirely on the misguided--and demonstrably false--notion that no current students are Plaintiffs and that no current students are members of the Coalition.

65. Yet, Defendants fail to acknowledge that they have long been aware that the named Plaintiffs in this lawsuit include current students of Maryland's HBIs. (Fourth Am. Compl. (Dkt. #165).) Defendants have also learned through years of litigation that the membership of the Coalition includes current students at Maryland's HBIs. (3/12/10 Burton Dep. at 39-40.) Defendants' contrary representations to this Court are disingenuous.

66. Two years before trial, Defendants were aware of the concrete injuries alleged by the Plaintiffs in this case who were students of Maryland's HBIs. For instance, Plaintiff Muriel

Thompson, who remains an actively enrolled graduate student at Morgan State University, stated in her Interrogatory Responses, filed in January of 2010:

> Plaintiff M. Thompson has suffered damages in that unnecessary program duplication and lack of adequate funding has undermined the institutional reputation of Morgan State. The reputations of schools are fostered and supported through curricular offerings. When a program is unnecessarily duplicated at proximate TWIs, students, funding, recruitment, faculty and research opportunities are diverted to TWIs and away from HBIs, like Morgan State. As a result of this, the value of her degree has diminished, thus decreasing her earning potential."[4]

(M. Thompson Irog. Resp. at 8, attached as Ex. 5.)

67. Ms. Thompson further stated:

> The facilities and resources provided were not comparable to white institutions; they were inferior. For example, the roof of the building in which Plaintiff attended classes regularly leaked when it rained. She and other students would have to wade through standing water on the first floor in order to reach their classrooms. In addition, there was inadequate classroom space. Classrooms often had to double as conference and presentation rooms. When classrooms were in use for one of these other purposes, Plaintiff and other students had to search out other space to hold class. Further, Plaintiff's program had only one tenured professor and relied on adjunct professors to carry most of the teaching workload.

(M. Thompson Irog. Resp. at 6.)

68. Ms. Thompson also provided extensive testimony regarding her injuries at trial. Ms. Thompson testified that while taking classes at Morgan State, her program lacked any dedicated classroom space, and that there were times when she had to attend class in a lounge or shared space because other academic spaces were unavailable. (1/3/12 PM Trial Tr. 18 (M. Thompson).) Ms. Thompson further testified that due to the inadequate resources to support her academic research at Morgan State, she was required to conduct most of her academic research

[4] Although Defendants' Findings of Fact assume that Muriel Thompson has completed her doctoral studies (*see* Defs.' FOF ¶ 82), she remains a current graduate student at Morgan State University. (*See* M. Thompson Aff. ¶ 5 (establishing that Muriel Thompson is still a student at Morgan). *But see* Pls.' FOF ¶ 131 (erroneously identifying Muriel Thompson as a "[f]ormer graduate student").)

at Towson University or the University of Maryland College Park. (1/3/12 PM Trial Tr. 25-27 (M. Thompson).)

69. Similarly, Plaintiff Chris Heidelberg, a student of Morgan State University at the time this lawsuit was initiated, stated in his Interrogatory Responses:

> Most notably, the facilities that were provided at Morgan State University ("MSU") were not comparable to that of Maryland's Traditionally White Institutions ("TWIs"); they were inferior. In one of the most egregious examples of this, Plaintiff Heidelberg had to routinely wade through standing water in the Jenkins Building of Morgan State's campus due to an unrepaired ceiling leak.[5]

(C. Heidelberg Irog Resp. at 6, attached as Ex. 6.)

70. Mr. Heidelberg further informed Defendants:

> Plaintiff Heidelberg has suffered damages in that program duplication has undermined the institutional reputation of Morgan State University. The reputations of schools are fostered and supported through curricular offerings. When a program is duplicated at proximate TWIs, students, funding, recruitment, faculty and research opportunities are diverted to the TWIs and away from HBIs such as MSU. As a result of this, the value of his degree has diminished, thus decreasing his earning potential.

(C. Heidelberg Irog Resp. at 6.)

71. Mr. Heidelberg also provided significant details of his injuries at trial. In particular, he testified that Morgan State University lacked the minimum resources necessary for his education, including chalk, erasers, chairs, and desks. (1/9/12 PM Trial Tr. 68-69 (Heidelberg).) Mr. Heidelberg further testified that the he was "severely handicapped" by the fact that Morgan State's telecommunications graduate program lacked the minimum equipment necessary to prepare its students for the workforce. (1/9/12 PM Trial Tr. 71-72 (Heidelberg).)

---

[5] As discussed below, Defendants cannot run out the clock on current students' claims through lengthy litigation and then argue that the case has become moot. This case presents a classic example of a scenario "capable of repetition, yet evading review," and Article III jurisdiction remains.

72. Defendants have had an opportunity to assess plaintiffs' averments in depositions and through cross-examination at trial.

73. Despite this extensive record showing Plaintiffs' standing in this case, Plaintiffs now submit affidavits related to standing since this is the first time the issue has been contested, and the parties' closing arguments have yet to take place. Courts have repeatedly rejected the sort of *fait de accompli* Defendants now seek. *See, e.g.*, *Warth v. Seldin*, 422 U.S. 490, 501 (1975) ("[I]t is within the trial court's power to allow or to require the Plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of Plaintiff's standing."); *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 387, 390 (4th Cir. 2011) (ordering "limited remand" to district court for factual inquiry regarding whether Plaintiff had standing); *Frank Krasner Enter., Ltd. v. Montgomery Cnty., Md.*, 60 F. App'x 471, 472 (4th Cir. 2003) (citation omitted) (remanding case to district court to further develop factual record to determine whether Appellees had standing).

74. As set forth below, each of the Plaintiffs have standing. Regardless, it is axiomatic that only one Plaintiff need have standing for the Court to adjudicate the merits and grant declaratory and injunctive relief. *See, e.g.*, *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 186 (4th Cir. 2007) (citing *Warth* , 422 U.S. at 511 ("Associational standing may exist even when ***just one*** of the association's members would have standing.") (emphasis added)); *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 155 (4th Cir. 2000) (citing *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)) (explaining an organization has associational standing when "at least one of its members would have standing to sue in his own right"). Plaintiffs readily meet that low threshold.

**B. The Individual Student Plaintiffs Have Standing.**

75. The standing of current students at Maryland's HBIs is self-evident, as Defendants have in effect conceded. (Defs.' FOF at ¶¶ 51-54, 71, 88, 110.) Given that Plaintiffs include current students, as well as individuals who were students at the time they became Plaintiffs, it follows that, at a minimum, those Plaintiffs have standing.

76. At every phase of this lawsuit, there has been a Plaintiff who is a current student.[6] Muriel Thompson is a current student of Morgan State University. (*See* M. Thompson Aff. ¶ 1, attached as Ex. 7.)

77. In any event, a brief review of the record demonstrates that each of the individual student Plaintiffs satisfy the requirements for Article III standing. An individual has standing where she demonstrates that she has "suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the Defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000); *NAACP Anne Arundel Cnty. Branch v. City of Annapolis*, 133 F. Supp. 2d 795, 799 (D. Md. 2001) (Blake, J.) (individual Plaintiffs and Plaintiff NAACP had standing to challenge city ordinance).

1. <u>Individual Plaintiffs' injuries are concrete, particularized and actual.</u>

78. In order for an injury to be "concrete and particularized," a Plaintiff must show that the injury affects her "in a personal and individual way." *Friends of the Earth, Inc.*, 204 F.3d 149, 156 (4th Cir. 2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 575 (1992)).

---

[6] For example, Rahsaan Simon, Damien Montgomery and Muriel Thompson were each students at the time they were named a plaintiff.

79. Muriel Thompson, a current graduate student, provided verified interrogatory responses and testified at trial about how her injury was concrete and particularized, and how it affected her in a personal and individual way by limiting her ability to complete her doctoral studies in a timely manner. *See supra* ¶ 69. Ms. Thompson has submitted an affidavit confirming the personal and immediate nature of the injuries she has suffered. (*See* M. Thompson Aff. ¶¶ 2-9.) Because of the inadequacy of the resources currently available to her, Ms. Thompson believes that her education would have been superior at a TWI. (M. Thompson Aff. ¶ 8.)

80. Similarly, Plaintiff Kelly Thompson, who was a student at Coppin State University at the time this lawsuit was filed, affirmed:

> Plaintiff K. Thompson states that she has suffered in the past from racial discrimination in educational opportunities in a number of ways. Most notably, the facilities and resources provided at Coppin State University were not comparable to Maryland's Traditionally White Institutions ("TWIs"); they were inferior. For example, the library at Coppin State lacked necessary books and subscriptions to pertinent newspapers and journals. Moreover, Coppin State had limited study areas available for students. Plaintiff K. Thompson's professors often encouraged students to utilize facilities and services at other University System of Maryland Institutions. Furthermore, Coppin State's level of technology paled in comparison to what is available to similarly situated students at Maryland's TWIs. Plaintiff K. Thompson frequently encountered problems accessing Coppin State's limited number of computers and printers. This lack of resources hindered Plaintiff K. Thompson's ability to complete research assignments.
>
> . . .
>
> Plaintiff K. Thompson states that she has suffered harm in several ways. First, Maryland violated her Equal Protection rights by racially segregating the public system of higher education. Second, Plaintiff K. Thompson has suffered damages in that program duplication has undermined the institutional reputation of Coppin State University. The reputations of schools are fostered and supported through curricular offerings. When a program is duplicated at proximate TWIs, students, funding, recruitment, faculty and research opportunities are diverted to TWIs and away from HBIs like Coppin State. ***Plaintiff K. Thompson has***

> ***encountered individuals that judge Coppin State as an inferior University. For example, Plaintiff K. Thompson's former supervisor indicated that she did not expect Plaintiff K. Thompson's work product to be so exceptional because Plaintiff K. Thompson had attended Coppin State. As a result of Coppin State's diminished reputation, Plaintiff K. Thompson felt pressure to attend a TWI to complete her graduate education.*** Plaintiff K. Thompson has experienced firsthand how generations of neglect have impaired Coppin State University's reputation, prestige, recruitment of graduates, and access to cutting edge research and faculty.

(K. Thompson Irog. Resp. at 7-8, attached as Ex. 7 (emphasis added).)

81. Plaintiff Kelly Thompson has submitted an affidavit in which she affirms that she chose to attend a TWI for graduate school to attempt to improve her professional reputation, which was harmed by attending Coppin State University. (*See* K. Thompson Aff. ¶ 3-4, attached as Ex. 8.)

82. Plaintiff Damien Montgomery, then a student at Bowie State University, affirmed in response to Defendants' interrogatories:

> Plaintiff Montgomery states that he has suffered in the past and continues to suffer from racial discrimination in educational opportunities in a number of ways. Most notably, the facilities that are provided at Bowie State University ("BSU") are not comparable to those at Traditionally White Institutions ("TWIs") . . . Plaintiff Montgomery has found BSU's facilities to be in a general state of disrepair; for example, chipped paint and missing ceiling and floor tiles are a common sight. BSU's library facilities do not provide adequate study space, and the spaces that are available close at 10 pm which significantly limits their usefulness to Plaintiff Montgomery. The BSU campus does not offer students a 24-hour study space as TWI campuses, such as College Park, do.
>
> Moreover, research opportunities, and academic options at BSU pale in comparison to programs available to similarly situated students at TWIs. Finally, Maryland has engaged in a practice of unnecessarily duplicative course offerings. As a result, MHEC's decisions to duplicate program offerings at TWIs in conjunction with the disparate funding of Historically Black Institutions ("HBIs") and the longstanding history of maintenance of a dual higher education system, create a state endorsed system of competition that demonstrates a bias and preference for the vitality of TWIs at the expense of state HBIs. Plaintiff Montgomery is harmed

> because Maryland consistently provides the best resources to TWIs and because program duplication creates the perception that top course offerings, faculty, and academic opportunities are more available at TWIs than at HBIs like BSU.
>
> . . .
>
> Plaintiff Montgomery experienced first hand how generations of neglect have impaired BSU's reputation, prestige, access to cutting edge research and faculty, and recruitment of its graduates.

(D. Montgomery Irog. Resp. at 5-7, attached as Ex. 9.)

83. Plaintiff Rahsaan Simon, an undergraduate student at Morgan State University at the time he joined the case as a Plaintiff, and now a graduate student at Morgan State, affirmed:

> Program duplication. . . harms Plaintiff Simon because it creates the assumption that top course offerings, faculty and opportunities are more often found at TWIs than at HBIs, like Morgan State.
>
> Plaintiff Simon has suffered harm in several ways. First, Maryland violated his Equal Protection rights by racially segregating the public system of higher education. Second, Plaintiff Simon has suffered damages in that program duplication has undermined the institutional reputation of Morgan State. The reputations of schools are fostered and supported through curricular offerings. When a program is duplicated at proximate TWIs, students, funding, recruitment, faculty and research opportunities are diverted to the TWIs and away from the HBIs, like Morgan State. ***As a result of this, the value of his degree has diminished.*** Additionally, Plaintiff Simon experienced first-hand how generations of neglect have impaired the intangibles of higher education such as his alma mater's reputation, prestige, student recruitment, and access to cutting-edge research and faculty.

(R. Simon Irog. Resp. at 6, attached as Ex. 10.)

84. Plaintiff Simon has submitted an affidavit in which he affirms that the limited resources in Morgan's libraries have harmed his ability to complete research for his Master's thesis. The materials are so outdated and insufficient that he cannot meet the requirements of assignments such as a literature review undertaken in preparation for his thesis using materials

on-campus. Like Muriel Thompson, Plaintiff Simon has resorted to relying on libraries at other institutions. (*See* R. Simon Aff. ¶¶ 3-5.)

2. Plaintiffs claims are fairly traceable to Maryland's action and susceptible of remediation by judicial action.

85. Each Plaintiff explained their interrogatory responses how their injuries were directly traceable to Maryland's policies and practices including underfunding and program duplication. *See supra at* ¶ 81 (Maryland's practice of "program duplication has undermined the institutional reputation of Coppin State University")*; Supra* ¶ 70 ("the facilities that were provided at Morgan State University ("MSU") [by Maryland] were not comparable to that of Maryland's Traditionally White Institutions ("TWIs")").

86. The injuries caused by Maryland's segregative policies and practices are redressable by a favorable decision. The injuries suffered by Plaintiffs here are directly analogous to the injuries of Plaintiffs in the *Fordice* and *Knight* cases, which both challenged vestiges of segregated higher education systems such as underfunding and program duplication. These injuries, like those, will be redressed by a favorable decision that puts an end to Maryland's segregative practices.

87. Plaintiffs have offered testimony showing that, as in earlier desegregation cases, a favorable ruling will remedy the injuries of which they complained.

88. For example, placement of non-duplicated high-demand programs at HBIs will support greater diversity at HBIs. Dr. Walter Allen wrote, "white students, [and] for that matter any and all students, will enroll in high demand programs wherever these are available." (PTX 661 at 8.) Dr. Allen further testified that additional funding would assist HBIs in attracting qualified students of all races. (1/18/12 PM Trial Tr. 39 (Allen).)

89. Attracting qualified students of all races, through strategies such as placing high-demand programs at HBIs, would help to remove the "stigma" attached to HBIs that Maryland has created by enforcing its policies and practices traceable to the *de jure* era, that "underdevelop" Maryland's HBIs. (1/18/12 PM Trial Tr. 4-8 (Allen).)

3. Plaintiffs' claims are not moot.

90. Muriel Thompson is a current student, currently impacted by Maryland's policies and practices traceable to segregation. Her claims are not moot.

91. Even if Ms. Thompson were to graduate before the conclusion of this suit, her claims will not be moot, because they fall under the mootness exception for claims capable of repetition but evading review.

92. In *Honig v. Doe*, in which a disabled student challenging the policies of his school district, the Supreme Court articulated an expectation to the mootness doctrine for claims "capable of repetition yet evading review" because the challenged action was too short in duration to be fully litigated prior to its cessation, and there was a reasonable expectation that the controversy will recur. *Honig v. Doe*, 484 U.S. 305, 318 (1988) (quoting *Murphy v. Hunt*, 455 U.S. 478, 482 (1982)).

93. Some courts have optimistically predicted that the constitutional claims of university students would not be capable of repetition yet evading review, because cases "would no doubt be swiftly resolved, an in any event certainly before the passage of . . . four years." *Fox v. Bd. of Trs. of State Univ. of New York*, 764 F. Supp. 747, 753 (N.D.N.Y 1991). The Sixth Circuit relied on similar reasoning in declining to apply the "capable of repetition, yet evading review" doctrine -- "University programs. . . tend to last longer than the time it takes to obtain a trial court ruling and an appeal." *Fialka-Feldman v. Oakland Univ. Bd. of Trs.*, 639 F.3d 711, 714 (6th. Cir. 2011).

94. Such optimism is misplaced, as demonstrated by the history of this case. This litigation has extended for six years, far longer than the four years typically required to obtain a bachelor's degree. Indeed, this litigation appears likely to extend longer than the time required to obtain a doctorate. Further, the fact that a student completes college does not mean that the injury to them is unlikely to recur: as shown by the Plaintiffs in this case, college students often return to a Maryland HBI for graduate study.[7]

95. The unsubstantiated hope that "swift resolution" would apply to any future claim should not render the present claims moot because the course of desegregation litigation has shown that cases of this nature are heavily contested and slow to resolve. The *Fordice* case spanned seventeen years. The *Knight* case continued for twenty-six years.[8] Indeed, a child born at the beginning of the *Knight* litigation would be a college graduate by its conclusion.

96. The history of the litigation of claims of this nature shows that the litigation will typically take longer than four years to obtain a district court ruling, much less exhaustion of appeals. Therefore, Plaintiffs' claims are by definition capable of repetition yet evading review.

97. Without specifically invoking the doctrine of claims capable of repetition yet evading review, courts in K-12 desegregation cases have allowed the substitution of new student Plaintiffs—even on appeal—to avoid the rendering of a case moot after the original student Plaintiffs graduate while the litigation is pending. *See Graves v. Walton County Bd. of Educ.*, 686 F.2d 1135, 1138 (5th Cir. 1982); *Rogers v. Paul*, 382 U.S. 198, 198-99 (1965) (granting motion to add new Plaintiffs because one of the original student Plaintiffs graduating pending the

[7] Rahsaan Simon returned to Morgan State for his Masters degree after graduating from Morgan with his Bachelors. (*See* R. Simon Aff. ¶ 2.)

[8] Defendants discussed the exceptional duration of this case during the Summary Judgment hearing. (*See* 5/11/2011 Hr. Tr. at 14.)

Supreme Court's review); *Vaughns v. Bd. of Educ. of Prince's Cnty.*, 574 F. Supp. 1280 (D. Md. 1983) (granting motion to add new parties). This line of precedent also recognizes that education desegregation cases may stretch beyond the time required to complete the educational program itself. To the extent the Court deems it necessary, Plaintiffs would seek add Plaintiffs who are current students of a Maryland HBI.

4. The individual Plaintiffs have prudential standing.

98. In addition to satisfying the constitutional minima for standing, the student Plaintiffs plainly meet the standards for prudential standing. Prudential standing requires that Plaintiffs assert claims that fall within the zone of interest protected by the constitutional provision or regulation at issue, are specific and not generalized in nature, experienced by the Plaintiff herself and not derivatively. *Allen v. Wright*, 468 U.S. 737, 751 (1984).

99. The student Plaintiffs' interests fall within the zone of interests protected under Title VI as interpreted by the Supreme Court in *Fordice.* In *Fordice*, the court recognized that aspects of Mississippi's university system were "race neutral on their face," but "contribute to the racial identifiability of the . . . public universities" and were therefore "constitutionally suspect." *U.S. v. Fordice*, 505 U.S. 717, 733 (1992). Plaintiffs challenge the aspects of Maryland's system that have contributed to the racial identifiability of the universities they attend or were attended when they became Plaintiffs. *See, e.g., supra* at ¶¶ 67-71; 81-84 (Interrogatory responses of C. Heidelberg, M. Thompson, K. Thompson, R. Simon and D. Montgomery describing harm from practices of underfunding and program duplication).

100. Plaintiffs' choice- to attend an HBI does not remove them from the zone of interests protected by *Fordice.* As Justice O'Connor recognized in *Fordice* despite Defendants' suggestion that obtaining resources at HBIs might be no different than being able to obtain a

resource at a TWI, "universities are not fungible." *Fordice*, 505 U.S. at 749 (O'Connor, J., concurring)(internal quotation marks omitted)*;* (Defs.' FOF ¶ 93.")[9]

101. Plaintiff's testimony further shows that Maryland's higher education institutions are not fungible: Muriel Thompson's degree program was only available at Morgan State University when she matriculated. 1/13/12 PM Trial Tr. 29 (M. Thompson). Further, in Plaintiff Heidelberg's deposition, he stated that he attended Morgan in part because other Maryland public universities were not open to him due to the timing of his recent discharge from the Army. (3/8/10 Heidelberg Dep. at 7-8, attached as Ex. 11). [10]

102. The injury articulated by Plaintiffs is not "generalized." Plaintiff Muriel Thompson stated that she was denied access to adequate library resources by virtue of attending an HBI. *See supra*, ¶¶ 68-69. Plaintiff Kelly Thompson affirmed that her reputation in the workplace was damaged by attending Coppin State University. *See supra*, ¶¶ 81-82. These statements--and dozens others like them available in the record--demonstrate legally cognizable injuries caused by Maryland's failure eradicate its policies and practices traceable to the segregated era such as underfunding and program duplication, in violation of the Fourteenth Amendment and Title VII.

103. Defendants argue that Plaintiffs' claims are barred because they "raise the concerns of hypothetical students." (Defs.' FOF ¶ 95.) That assertion is nonsense. As set forth above, the student Plaintiffs assert injury based on their *own* educational experience arising from the ongoing vestiges of *de jure* segregation that the State has failed to remedy.

---

[9] Indeed, it almost suggests the "ironic" result Justice Thomas warned against: "[i]t would be ironic to say the least, if the institutions that sustained blacks during segregation were themselves destroyed in an effort to combat its vestiges." *U.S. v. Fordice*, 505 U.S. at 749 (Thomas, J., concurring).

[10] Defendants state that Plaintiff Heidelberg chose to attend an HBI because of its "unique qualities"-- this is true. He attended an HBI because it was uniquely available to him, when other universities were not. This restricted choice does not exclude him from the zone of interests protected under *Fordice*.

**C. The Alumni Plaintiffs Have Standing.**

104. Defendants cite extensively to cases regarding the standing of an association made up solely of Alumni to bring a claim against the alma mater of its members. Since no such association is a Plaintiff in this case, these citations are at best irrelevant, and at worst misleading. (*See* Defs.' FOF at 19, n. 12.)

105. Defendants acknowledge that an alumnus may have standing where the "stigmatizing injury" of racial discrimination accords standing to those personally denied equal treatment by the challenged conduct. (Defs.' FOF ¶ 64, citing *Allen v. Wright*, 468 U.S. 737, 755.) Plaintiff Kelly Thompson, now an alumna of Coppin State University, swore in her affidavit that her "former supervisor indicated that she did not expect Plaintiff K. Thompson's work product to be so exceptional because Plaintiff K. Thompson had attended Coppin State."[11]

106. Plaintiff K. Thompson continues to be injured by Maryland's practices because she continues to be judged unfavorably for having attended Coppin State. For this reason, she has enrolled in a TWI for graduate school in order to attempt to counteract the negative professional consequences of having attended a Maryland HBI, Coppin State. (*See* K. Thompson Aff. ¶ 2-4.)

107. Defendants rely in part on *Filardi v. Loyola University*, No. 97 C 1814, 1998 WL 111683 (N.D. Ill. Mar. 12, 1998). But unlike the Plaintiff in *Filardi,* Ms. Thompson alleged "some facts that establish a continuing injury to her" in her interrogatory responses, her deposition testimony, and in her affidavit. (Defs.' FOF ¶ 55; K Thompson Aff. ¶ 2-4.). While the Plaintiff in *Filardi* complained of conduct (failure to provide access to the disabled) that

---

[11] This testimony is consistent with her interrogatory responses and deposition testimony.

would not affect a former student, Plaintiffs here challenge conduct by Maryland that has far-reaching detrimental effects even to former students like Ms. Thompson.

108. Alumni Plaintiffs have standing because they are likely to experience the harm of stigma from their education during the rest of her career. Plaintiff Kelly Thompson's testimony demonstrates this. Similarly, Plaintiff Heidlberg has stated that he continues to experience the negative impact on his earning capacity caused by Maryland's neglect of the HBIs. *See* Heidelberg Irog. Resp. at 7 ("the value of his degree has diminished, thus decreasing his earning potential").

109. Defendants attempt to characterize the interests of student-Plaintiffs who have graduated as "no more than a vehicle for the vindication of the value interests of concerned bystanders." Maryland's history of *de jure* segregation, and ongoing policies and practices that have failed to remedy the vestiges of that history, have branded Coppin State University as an inferior, under-resourced institution with the effect that Kelly Thompson experienced negative treatment in her workplace and had to seek additional education to attempt to improve her professional standing. Kelly Thompson is not a "bystander," but has personally experienced this professional harm and Defendants' argument based on lack of personal injury to alumni must fail.

**D. The Coalition Has Standing.**

110. Defendants' transparent attempt to cherry-pick trial testimony to argue that the Coalition lacks standing must fail.

1. <u>The Coalition has associational standing.</u>

111. The Coalition properly has standing to bring the present lawsuit "as the representative of its members" who have been harmed. *Warth*, 422 U.S. at 511. An association has standing to file suit as a representative of its members when: "(a) its members would

otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977); *see also Equity In Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 99 (4th Cir. 2011); *Retail Indus.*, 475 F.3d at 186; *Biotechnology Indus. Org. v. District of Columbia*, 496 F.3d 1362, 1369 (D.C. Cir. 2007). The Coalition satisfies each of the three associational standing requirements.

112. The first prong of associational standing simply requires that the Coalition "include at least one member with standing to present, in his or her own right, the claim (or the type of claim) pleaded by the association." *United Food & Commercial Worker's Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 555 (1996); *see also Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty., Md.*, 268 F.3d 255, 264 (4th Cir. 2001) (finding associational standing where ***one*** of association's members had standing in her own right).

113. Contrary to Defendant's assertion, the Coalition satisfies the first prong of associational standing because it has "at least one member" who is a current HBI student with standing to sue. (3/12/10 Burton Dep. at 39-40.)

114. In further support of the fact that members of the Coalition include current students of Maryland HBIs with standing, Plaintiffs attach affidavits of Joshua Harris (Ex. 12), Chinedu Nwokeafor (Ex. 13), Marlon Garner, II (Ex. 14), and David Burton (Ex. 2).

115. Although many student members of the Coalition have graduated from Maryland's HBIs during the six years of this litigation, membership of the Coalition has continued to grow throughout this litigation to include new, current students of Maryland's HBIs. (*See* D. Burton Aff. ¶¶ 3-4..) As such, the Coalition has maintained associational

standing to bring this lawsuit despite any changes in its membership. *See Log Cabin Republicans v. United States*, 716 F. Supp. 2d 884, 894 (C.D. Cal. 2010) (holding that organization that maintained standing through one member maintained standing even after original member left the organization because another individual with standing joined the organization during the course of the litigation).

116. While uncontested by Defendants, the Coalition also meets the second prong of associational standing because the interests that the Coalition seeks to protect are germane to its purpose. *See Hunt*, 432 U.S. at 343; *United Food*, 517 U.S. at 555-56 (explaining that the second prong serves to ensure that "the association's litigators will themselves have a stake in the resolution of the dispute, and thus be in a position to serve as the Defendant's natural adversary").

117. As an advocacy group dedicated to vindicating the civil rights of its members and ensuring the equality of Maryland's HBIs, the Coalition's attempt to remedy its members' injuries as a result of Defendants' civil rights violations is central to the Coalition's purpose. *See Hunt*, 432 U.S. 333 at 344.

118. The Coalition satisfies the third, and final, prong of associational standing because "the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensible to proper resolution of the cause." *See Warth*, 422 U.S. at 511; *see also Hunt*, 432 U.S. at 342-43.

119. Plaintiffs do not seek damages in this action that require the participation of each individual member of the Coalition in the lawsuit. (Fourth Am. Compl. at 31-33 (Dkt. #165).) Rather, Plaintiffs seek declaratory and injunctive relief, which is precisely "the type of relief for which associational standing was originally recognized." *Retail Indus. Leaders Ass'n v. Fielder*,

475 F.3d 180, 187 (4th Cir. 2007). Such relief does not "require[] individualized proof and [] are thus properly resolved in a group context." *See Hunt*, 432 U.S. at 344; *Warth*, 422 U.S. at 515 ("If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured.").

120. Nor do the Coalition and its members have conflicting interests in the outcome of this lawsuit which would require the individual members to come into the lawsuit to assert their interests. *See Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1253 (4th Cir. 1991).

2. The Coalition itself has organizational standing.

121. Even assuming, *arguendo*, that the Coalition did not have associational standing, it has standing to sue in its own right. "There is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Warth*, 422 U.S. at 511. Defendants acknowledge as much, recognizing that an association has an independent right to bring claims where the association itself suffers an injury. (Defs.' FOF ¶ 99.)

122. An organization has standing to sue in its own right where Defendants' wrongful conduct caused the association to divert resources from its normal operations in order to address the injury. *See Goldstein v. Costco Wholesale Corp.*, 278 F. Supp. 2d 766, 770 (E.D. Va. 2003) (citing *Ass'n for Disabled Am. v. Claypool Holdings, LLC*, No. IP00–0344–C–T/G, 2001 WL 1112109 at *14 (S.D. Fla., Sept 21, 2001) ("[U]nder *Havens Realty*, an organization suffers a concrete and demonstrable injury if it diverts resources such as time and money from its primary activities to legal efforts to fight alleged discrimination by the Defendant.")); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (explaining that "there can be no question that the

organization has suffered injury in fact" where the Defendants' practices "have perceptibly impaired" the organization's activities).

123. Defendants argue that the Coalition cannot have standing in its own right because Defendants' misconduct has not caused it to divert resources from its ongoing activities because the Coalition's "***only*** activities involve the pursuit of claims in this litigation." (Def. FOF ¶ 105 (emphasis added).) Not so.

124. Contrary to Defendants' claims, the Coalition is an organization engaged in advocacy on behalf of Maryland's HBIs and the current and former students of Maryland's HBIs. Mr. Burton, the founding member of the Coalition, testified at trial that "[t]he Coalition is an organization that was founded in 2006 to promote and support equity and comparability between Maryland HBIs and TWIs." (1/17/12 AM Trial Tr. 100 (Burton).)

125. Mr. Burton further testified that this lawsuit is only ***one of the purposes*** of the Coalition, "to the extent that is specifically addresses the issue of program duplication, mission duplication, as it affects the [HBIs] in the State of Maryland. So this is a premier initiative of the Coalition towards its ***broad objective*** of supporting its mission of, you know, precluding mission duplication, program duplication, and then the like." (1/17/12 PM Trial Tr. 3 (Burton) (emphasis added).)

126. Defendants also ignore Mr. Burton's deposition testimony, in which he flatly rejected the contention that this litigation is the primary purpose of the Coalition. (3/12/10 Burton Dep. at 182 ("Q: Is the primary purpose of the Coalition to advance this litigation? A: The primary purpose, no. No.").) Rather, Mr. Burton testified that the Coalition was formed "[t]o educate [HBIs] on broad issues pertaining to diversity and fairness and equity and to network with organizations around the country." (3/12/10 Burton Dep. at 37.)

127. In pursuit of its broader purpose of advocating for the civil rights of its members and the equality of Maryland's HBIs, that the Coalition participates in a variety of activities, including "[m]eetings, numerous strategy sessions, phone calls, outreach through each of the four [HBI] alumnae." (1/17/12 PM Trial Tr. 2 (Burton).) The Coalition also participates in investigative actions and has testified before the Maryland House of Representatives and Senate. (1/17/12 PM Trial Tr. 2-3, 6-7 (Burton).)

128. In his deposition, Mr. Burton informed Defendants of the many activities in which the Coalition participates aside from the maintenance of the present lawsuit. Specifically, Mr. Burton testified that the Coalition "ha[s] supported legislation that have introduced by the Maryland Black Caucus." (3/12/10 Burton Dep. at 46.) Mr. Burton further testified that the Coalition "coordinated Annapolis Day to bring awareness to general issues by inviting all the [HBIs] in Maryland [to] collaborate with the Morgan alumni association and alumni associations at other [HBIs]," (3/12/10 Burton Dep. at 48), and has engaged in fact-gathering meetings with HBI representatives. (3/12/10 Burton Dep. at 49.) Accordingly, the present lawsuit is simply one of the Coalition's activities.

129. Simply put, the Coalition has been forced to divert resources from seeking funding and enhancements to HBIs over and beyond what is required to eliminate the vestiges of Maryland's history of *de jure* segregation, to pursuing this litigation and related efforts to obtain the minimum that the Constitution itself requires.

130. Indeed, Defendants ignore Mr. Burton's deposition testimony, in which he stated that Defendants' violations of Title VI and *Fordice* have caused the Coalition to divert resources from its activities and have frustrated the Coalition's broader mission. (3/12/10 Burton Dep. at 182.)

131. Specifically, the Coalition's support of this lawsuit has caused it to divert time and resources to investigating and developing a clear foundation for this lawsuit as opposed to devoting time and resources to its primary activities aimed at "promot[ing] and support[ing] equity and comparability between Maryland HBIs and TWIs" beyond what the Constitution requires to eliminate the vestiges of segregation. (1/17/12 AM Trial Tr. 100 (Burton)); *see also Vill. of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990) ("[T]he only injury which need be shown to confer standing . . . is [a] deflection of the agency's time and money from counseling to legal efforts directed against discrimination."); *Equal Rights Ctr. v. Equity Residential*, 798 F. supp. 2d 707, 722 (D. Md. 2011) (Blake, J.) (finding Plaintiff organization had standing in its own right because, "[b]y expending [ ] resources to identify and counteract [Defendant's] alleged violations . . . , the [organization's] ability to advance its mission . . . was perceptibly impaired.").

132. For the foregoing reasons, Plaintiffs clearly have standing. Student Plaintiffs, alumnae Plaintiffs, and the Coalition itself--both in its representational capacity and in its own right--all have standing, and this Court may adjudicate the merits of Plaintiffs' claims. In any event, even if only one Plaintiff had standing, that would be sufficient, and there is no serious question that there is at least one Plaintiff with standing. *See, e.g., Retail Indus.*, 475 F.3d at 186.

## II. DEFENDANTS' ARGUMENTS THAT THE SYSTEM IS DESEGREGATED BASED ON STUDENT DEMOGRAPHICS ARE LEGALLY AND FACTUALLY INSUFFICIENT

133. Separate and apart from their arguments regarding specific policies and practices, Defendants claim that Maryland has desegregated its higher education system. (Defs.' FOF ¶¶ 116-132.) First, they argue that because Plaintiffs do not contend that the TWIs are segregated, Plaintiffs cannot bring a *Fordice*-type claim because, according to them, the system as a whole is not segregated: "By itself, the fact that Maryland's nine public non-HBIs are desegregated

extinguishes Plaintiffs' claims." Defs.' FOF ¶ 125, *see generally* Defs.' FOF ¶¶ 122-27. Second, they claim that the individual schools are desegregated because they contend that "[v]arious authorities have identified 10% other-race enrollment as the threshold that characterizes a desegregated system or institution," Defs.' FOF ¶ 128 n.23, and they claim that each of the HBIs has a greater than 10% other-race enrollment, Defs.' FOF ¶¶ 128-130.[12]

134. Both of Defendants' arguments fail. First, the case law makes clear that regardless of whether the TWIs are desegregated, the Fourteenth Amendment can be violated for failure to desegregate the HBIs:

> *Fordice* recognized as having segregative effects policies that "influenc[e] student enrollment decisions.". In its discussion of several of the *Fordice* Plaintiffs' specific challenges to Mississippi higher education policy, the Court offered examples of two broad categories of practices that can inhibit "free choice" by students as to university attendance. The first category comprises policies that have the effect of discouraging or preventing blacks from attending HWIs, examples of which include the maintenance of more stringent admissions requirements for HWIs than for HBIs. The second category consists of policies that discourage whites from seeking to attend HBIs, examples of which include: duplication of programs at HBIs and HWIs in the same geographic area; the assignment to HBIs of institutional missions that restrict them to programs of instruction that cannot effectively attract whites; and the failure to fund HBIs comparably to HWIs or to locate high-prestige programs at HBIs. As a result of such policies, disproportionate numbers of whites *can* satisfy their curricular desires at HWIs, and *cannot* satisfy them at HBIs, thereby discouraging them from choosing to attend HBIs.

*Knight v. Alabama*, 14 F.3d 1534, 1541 (internal citations omitted).

---

[12] Defendants also make the point that "racial identifiability" must be attributable to state action,(Defs.' FOF ¶ 120) and they cite to *Bazemore v. Friday*, 478 U.S. 385 (1986), where, among other things, the Supreme Court found that a university extension service was not required to dismantle segregation in private clubs for which it provided services. *Id.* at 408 (White, J. concurring). *Bazemore* is not applicable here given that the Maryland public higher education system is a public system, not a private system. Indeed, Justice White's opinion distinguishes the circumstances in *Bazemore* from the "voluntary choice" programs in formerly *de jure* segregated public schools where the school officials are constitutionally required to "take affirmative action to integrate their student bodies." *Id.* at 408 (White, J. concurring)

135. In regard to the Defendants' second argument, none of the three authorities Defendants cite stand for the proposition that 10% other-race enrollment means that an institution is desegregated. The *Ayers* settlement agreement contained a provision that control of an endowment designed to enrich the HBIs would be transferred from a state board to an HBI if the HBI had 10% of other race students for three years. The district court never stated that 10% of other race students met a legal threshold for desegregation. To the contrary, the district court stated that the ten percent threshold did not constitute desegregation:

> Contrary to the Court's plan, the Parties' plan contains a racial quota. The quota requires historically black universities to reach a ten per cent "other-race" student body over a period of seventeen years to be eligible for control of certain funds in a seventy million dollar ($70,000,000.00) endowment created by the Parties' plan. The term "other-race" in the Settlement Agreement is defined as "non African-American." By this definition, the ten percent quota could be reached with students from Asia, South America, or other such nationalities, with few or no white students attending the institution. Even foreign students from Nigeria would be considered "other race" at the historically black universities under the Parties' plan. Such is not desegregation within the context of this case.
>
> The most recent information shows that the average percentage of white students at public historically black four year universities in the South is 15.1 per cent. The historically white universities in Mississippi average 26 percent black students in their student bodies, without counting Asians, and other such nationalities. The Court has a serious reservation about that part of the Parties' plan which allows Asians, Indians, and even some black students to be counted toward desegregation at historically black universities.

*Ayers v. Musgrove*, No. 4:75cv9-B-D 2001 U.S. Dist. LEXIS 9306 at * 7-8 (N.D. Miss. 2001).

136. The Diamond article cited by Defendants, Alfreda A. Sellers-Diamond, *Black, White. Brown, Green, and Fordice: The Flavor of Higher Education in Louisiana and Mississippi*, 5 HASTINGS RACE & POVERTY L.J. 57 (2008), recounts the settlement agreement in *Ayers* and states that the Mississippi agreement did not have an other-race numerical goal threshold:

> The 1994 ***Louisiana*** Settlement Agreement differed from its 1981 predecessor in that the 1994 Agreement contained no numerical goals for proportional enrollment of other-race enrollment in the historically black and the historically white institutions. Similarly, the 2001 ***Mississippi*** Settlement Agreement contained no numerical goals but focused on institutional enhancements and incentives for attracting other-race students to historically black campuses. The attainment of specific enrollment numbers was eschewed in both Agreements because the parties saw them as a hindrance to the successful implementation of a plan.

*Id.* at 115 (emphasis added) (internal footnotes omitted).

Moreover, nowhere in the document does the author state that the standard for desegregation is, or should be, 10% other race students.

137. The other source cited by Defendants, David J. Armor & Christine H. Rossell, Desegregation and Resegregation in the Public Schools, BEYOND THE COLOR LINE: NEW PERSPECTIVES ON RACE AND ETHNICITY (Abigail Thernstrom & Stephen Thernstrom eds., 2002), similarly undermines Defendants' argument. The Armor and Rossell article, which focuses on K-12 education, states that a school that is 90 percent black and 10 percent white is not desegregated but racially isolated: "A school system that is 90 percent black and 10 percent white would be perfectly balanced if every school had 10 percent white enrollment. Yet such a school system would not be considered desegregated by most interested parties. Many courts have defined a 90 percent black school as racially isolated, regardless of the system wide composition." *Id.* at 232-33.

138. If the 10 percent other-race threshold were the legal standard for desegregation, there would have been no reason for Maryland to enter the Partnership Agreement with OCR in 2000 because, of the HBIs, only Morgan was 90% black in 2000, and barely so. (DTX 398 at 4, 6, 22; PTX 579 at 33-34.)

139. Thus, Defendants have failed to demonstrate that if an HBI, or if HBIs as a whole, have a 10% or greater "other race" student population, the HBI or HBIs are desegregated.

140. Moreover, Maryland's facts regarding the other race data are misleading and do not add up to a legal defense. Maryland includes all non-African American students in the other race category, including foreign students, students of unknown race, students of other race, Indian students, Asian students, and Hispanic students. (*Compare* Defs.' FOF ¶ 129 *with* DTX 398 at 4, 6, and 22).

141. As set forth in Plaintiffs' FOF ¶ 937, whites comprise only 5.1% of the students at the HBIs. Bowie (4.2%), Morgan (2.3%), Coppin (1.3%) are all below 5%. Even excluding UMB and UMUC, fewer than 2% (1,077/57,476) of whites attending Maryland public senior institutions of higher education attend HBIs. (Pls.' FOF ¶ 937.) No higher education segregation case has found demographics like this to constitute that of a desegregated system.

142. In addition, none of the higher education desegregation cases suggest that HBIs in a public university system can be desegregated by an influx of non-African American, non-white students, especially those falling in the foreign, unknown, and other category. Nonetheless, in Maryland, as detailed in Plaintiffs' Corrected Findings of Fact and Conclusions of Law, (*see* Plfs.' FOF ¶ 937), few Asian and Hispanic students are attending HBIs (1.1% of each). Indeed, only 7.3% of the students at the HBIs are white, Asian, and Hispanic (Plfs.' FOF ¶ 937), and the USM data shows that the combined percentage of white, Asian, and Hispanic students at the three HBIs within USM has decreased since 2000 (Coppin 7.6% to 1.9%; Bowie 19.5% to 7.6%; and UMES 18.5% to 16.2%). (DTX 398 at 4, 6, 22; *infra* ¶143).

143. Many of the students Maryland counts as "other-race" students at the HBIs in their Findings are in fact foreign students and students of "other" or "unknown" race as the following table shows:

| Enrollment of Non-African American students at Maryland [HBIs], Fall 2009 | | | | | |
|---|---|---|---|---|---|
| [HBIs] | White, Hispanic, Asian | | Unknown, Foreign and "Other" Non-African American | | Total Enrollment |
| | # | % of Total | # | % of Total | # |
| **Bowie** | 425 | 7.6% | 224 | 4.0% | 5617 |
| **Coppin** | 76 | 2.0% | 372 | 9.8% | 3801 |
| **UMES** | 717 | 16.2% | 227 | 5.1% | 4433 |
| **Morgan** | 339 | 4.7% | 334 | 4.6% | 7226 |
| **Total** | 1557 | 7.4% | 1157 | 5.5% | 21077 |

(PTX 755 at 16; *see also* DTX 398 at 3-4, 5-6, and 21-22 for USM schools).[13]

144. Defendants' witness, Dr. Ben Passmore, who performs demographic studies for USM and introduced an exhibit that included demographics at each USM school since 1980, testified that he treats the "unknown" and "other" categories as unknown. (1/25/12 AM Trial Tr. 37-38 (Passmore).) He also stated that in making racial percentage comparisons since 1980, the data after 2006 is skewed because of the increase in the other and unknown categories and so the data from 1980-2006 provides a "truer" picture. (1/25/12 AM Trial Tr. 38 (Passmore).)

145. Because Defendants rely on data from 2007-09 in making their argument regarding the other race demographics (Defs.' FOF ¶ 129) they rely on data their own demographer has found to be unreliable.

[13] The "other" category also includes Native American students. Native American students make up such a small share of the student population at the HBIs that they do not make an appreciable difference in the numbers. For example, there were 42 Native American students at the HBIs in 2008, which is about .2% of the student population. (DTX 398 at 3, 5, 21; PTX 448 at 6-9, 24-25, 28-29.)

146. None of Defendants' witnesses made the claim that the demographics demonstrate that the HBIs are desegregated. To the contrary, on cross-examination, Dr. Kirwan admitted just the opposite:

> Q. And have you looked at the data for the racial makeup of the [HBIs] in the state?
> A. I have.
> Q. And you know that they are not particularly diverse?
> A. I do.
> Q. And they have not been successful at attracting non-African Americans. You're aware of that?
> A. The data would suggest that, yes.

(1/24/12 PM Trial Tr. 30 (Kirwan).) Chancellor Kirwan further admitted that the facts on the ground show that the HBIs' role continues to be as it was during the *de jure* era, educating black students. (Pls.' FOF ¶¶ 165-66, 428.)

## III. DEFENDANTS' ARGUMENTS DO NOT REBUT PLAINTIFFS' PREVIOUS SHOWING THAT THE DUAL AND LIMITED MISSIONS OF THE HBIs ARE TRACEABLE TO THE ERA OF *DE JURE* SEGREGATION

147. Defendants' Findings of Fact and Conclusions of Law scarcely addresses Maryland's traceable policy of assigning the HBIs a dual mission and a more limited mission than the TWIs. Defendants devote seven paragraphs and about two pages to the issue. (Defs.' FOF ¶¶ 253-259 at 94-95.) Not only are Defendants' core contentions regarding mission incorrect, but they never address the substantial evidence regarding the dual and more limited mission of the HBIs that is contained in the documents and/or testimony at trial and set forth in Plaintiffs' Corrected Findings of Fact and Conclusions of Law.

148. Defendants contend that "[the] court has previously noted that institutional missions are relevant to the inquiry in this case insofar as they affect the other two issues highlighted by Plaintiffs." (Defs.' FOF ¶ 253.) But what the court actually said was substantially different—that mission "overlaps with operational funding and unnecessary

program duplication." (6/6/11 Op. re Summ. J. at 9-10 (Dkt. #242).) The Court's statement regarding viewing mission in combination with other policies is consistent with Supreme Court's finding in *Fordice* that "when combined with the differential admission practices and unnecessary program duplication, it is likely that the mission designations interfere with student choice and tend to perpetuate the segregated system." *Fordice*, 505 U.S. at 719. The overlap does not mean mission is somehow subordinate to the other policies and practices; in fact, mission may drive another policy or practice. Indeed, the Maryland Education Code specifically provides that operational funding and capital funding are based on the mission of the institution, Md. Code Ann., Educ. § 10-203(c), and that MHEC (and USM for USM schools) will only approve a new program if it is consistent with the institution's mission statement, Md. Code Ann., Educ. § 12-106(d)(2)(i). So far from being the afterthought Defendants suggest, the issue of mission is central. (*See* Defs.' Trial Statement at 12 ("The kind of mission a university develops influences many aspects of its operations. It affects the kinds of programs it offers, the funding it receives, the buildings it constructs, and the students it attracts.").)

149. Defendants claim that appropriations decisions rely on factors independent of mission. (Defs.' FOF ¶ 253.) As discussed in the previous paragraph, this is directly contrary to what the Maryland Education Code states as well as the testimony of Maryland officials who are engaged in the Maryland higher education budget process as discussed below.

150. Defendants next contend that, with respect to mission statements, "[e]ach of Maryland's public institutions of higher education is responsible for developing its own mission statement;" MHEC's role in the mission statement process is merely to ensure that an institution's mission statement is consistent with the State Plan; and "[t]here is no evidence in the

record that MHEC has failed to approve a proposed mission statement." (Defs.' FOF ¶ 254-256.)

151. The first two of these contentions are technically correct but leave out material information and the third is incorrect. Defendants appear to equate "mission statement" with mission. Mission has a broader definition than a mission statement. As stated by Plaintiffs' expert, Walter Allen, the mission of a university is "what [the university] actually does . . . in terms of the major kind of activities associated with institutions, academic, the public service, their teaching, functions." (2/8/12 PM Trial Tr. 3 (Allen).) It bears "some relationship to the mission statement" of the institution but goes beyond that to encompass "what happens on that campus on a day-to-day basis." (2/8/12 PM Trial Tr. 3 (Allen).) Like Plaintiffs, the district court in *Knight* stated that a mission analysis in a higher education desegregation case involves the role and scope of the institution. *Knight v. Alabama*, 900 F. Supp. 272, 290 (N.D. Ala. 1995) ('Tthe current limited mission assignments of [the HBIs] that are the present focus of this litigation are the role and scope of the institutions.") Indeed, the mission statement process began in Maryland in 1988 but because every university has a mission from its beginning, universities in Maryland had missions for decades before a formal mission statement process existed.

152. In addition, while the mission statement process originates with a university president, the statement is subject to a number of approvals and restraints. *(See* Pls.' FOF ¶¶ 482-485); Md. Code Ann., Educ. § 11-302.

153. For example, MHEC's responsibility of ensuring that the mission statement is consistent with the State Plan, Md. Code Ann., Educ. § 11-302(d), has the effect of significantly constraining the university presidents. MHEC has the statutory responsibility of developing and

updating the State Plan. Md. Code Ann., Educ. § 11-105(b)(2). Among other things, the State Plan must incorporate the statutory goals and priorities for higher education contained in the Maryland Education Code, including those set forth at §§ 10-209 and 12-106 of the Maryland Education Code. Md. Code Ann., Educ. § 11-105(b)(2)(iii). To the extent these goals and priorities mention specific institutions, they favor the TWIs, and to the extent HBIs are mentioned, their missions are racially identifiable for the most part:

- Enhancing the mission of UMCP as the flagship campus and providing it operating funding and facilities to place it in the upper echelon of peer institutions. Md. Code Ann., Educ. §§ 10-209(f)(1), (4); *see also id.* §§ 11-105(b)(5)(i), 12-106(a)(1)(iii)(1).

- Maintaining and enhancing a coordinated Higher Education Center for Research and Graduate Study at UMB and UMBC with a focus on science and technology. Md. Code Ann., Educ. §§ 12-106(a)(1)(iii)(2)); *see also id.* §§ 10-209(g), 11-105(b)(5)(ii).

- Supporting Towson as the largest comprehensive institution. Md. Code Ann., Educ. § 12-106(a)(1)(iii)(4).

- Enhancing Morgan as the state's "public urban university." Md. Code Ann., Educ. § 11-105(b)(5)(iii).

- "Recogniz[ing] the role of University of Maryland Eastern Shore as the State's 1890 land grant institution." Md. Code Ann., Educ. §§ 12-106(a)(1)(iii)(5).

154. The current State Plan largely confines the mission of the HBIs as that of being HBIs. In the introduction, the State Plan notes that progress will not be tracked at the institutional level, but rather at the level of groups of institutions. It identifies "Historically Black Institutions" as one of those groups. (PTX 1 at 5.)

155. With respect to the HBIs, the State Plan makes clear that their principal mission, as it was in the *de jure* era, is fulfilling the role of educating largely first generation minority students :

> "One of our state's great strengths is its diversity, and one reflection of that diversity is our Historically Black Institutions (HBIs), which boast a proud history and a continuing mission of providing quality education, including educating low-income students and students who are the first generation in their families to attend college." (PTX 1 at 4.)

> "Because Historically Black Institutions (HBIs) award a high percentage (45 percent) of the degrees earned by Maryland minority students and a relatively high percentage of their graduates are first-generation college students, one important aspect of ensuring equal opportunity for a diverse Maryland student population is to provide enhancement funding to HBIs. As part of their dual missions, HBIs are charged with providing access to academically well-qualified students and also a significant percentage of under-prepared students." (PTX 1 at 56.)

> "The growing population of 'historically underserved students' such as African Americans requires enhancement of HBIs 'to ensure equal educational opportunity for all students.'" (PTX 1 at 57.)

156. As part of its January 2002 Mission Statement Review, MHEC created a proposed format for mission statements. In introducing the format, MHEC made clear that a university's mission statement must follow the statutes and the State Plan: "Mission statements should be consistent with prevailing statute, and be developed in clear, precise, and succinct language, specifically demonstrating the congruence of the institution's mission with the State Plan for Higher Education, and incorporating the applicable mandates and priorities established by the General Assembly." (PTX 104 at 9.) In the three sections included in the proposed format, the State Plan played a prominent role in each. The mission statement had to (1) "[i]dentify specifically how each priority addresses initiatives outlined in the State Plan" (INSTITUTIONAL IDENTITY); (2) "[d]escribe the institution's teaching, research, and public service functions as they relate to the goals and objectives of the State Plan," ("INSTITUTIONAL CAPABILITIES"), and (3) "[l]ist short and long-term goals and objectives" and "[a]ddress to what extent these objectives will meet the State's present and future

needs as outlined in the State Plan for Higher Education" (INSTITUTIONAL OBJECTIVES AND OUTCOMES). (PTX 104 at 9.)

157. In addition, for USM schools, prior to submission to MHEC, the mission statement must be shared with the USM Chancellor, who may make recommendations. Thereafter, the statement is shared with the USM Board of Regents, who may approve the statement, approve it as amended, or return it to the university with revisions. The USM Board of Regents must ensure that each mission statement is consistent with USM's plan. The mission statements of the USM schools are consolidated into a system-wide statement.

158. Consistent with the State Plan, the mission statements of the HBIs contain several references to their dual mission. For example:

> "Coppin State University provides educational access and diverse opportunities for students with a high potential for success and for students whose promise may have been hindered by a lack of social, personal or financial opportunity." (PTX 763 at 13.)

> "University of Maryland Eastern Shore (UMES), the State's Historically Black 1890 Land-Grant institution, emphasizes baccalaureate and graduate programs in the liberal arts, health professions, sciences, and teacher education. . . . UMES is committed to providing access to high quality values-based educational experience, especially to individuals who are first-generation college students of all races . . . ." (PTX 763 at 66.)

> "UMES engages in numerous collaborative efforts to (a) increase access and opportunity for a broad range of students including: the economically and educationally disadvantaged, low income adult learners, and first-generation college students; and (b) to meet other state needs." (PTX 763 at 68.)

> "Morgan enrolls a relatively broad segment of the young population, from those who have outstanding pre-college preparation to those who require support to realize their potential in college and complete a degree. As part of this commitment, it has and will continue to reserve up to 20% of places in its freshman class for students who do not meet all of its freshman admissions criteria but who exhibit potential for success in college. While this positions Morgan to serve students from a wide variety of backgrounds, this orientation is particularly important in serving the rapidly growing African-American population, which is considerably

less likely to obtain a college degree than majority students." (PTX 763 at 99.)

159. Moreover, as discussed in Plaintiffs' Proposed Corrected Findings of Fact and Conclusions of Law, several HBI Presidents testified about the dual mission of their schools. (Pls.' FOF ¶¶ 485-87.)

160. By contrast, UMBC, to whom the HBI Panel compared UMES and Morgan, identifies itself as an "honors university" and has an institutional identity centered around being a highly selective, public research institution. (PTX 763 at 55.)

161. Because the mission statement process is largely dictated by the Maryland Education Code and the MHEC-created State Plan, and the mission statement must be approved by MHEC (and the USM Board of Regents for the USM schools), the fact that university presidents begin the process of developing the mission statement means little to nothing. It is the state that sets missions and the HBIs have been marginalized in that process. The HBI Panel concluded as much: "We refer to the process by which a state sets university missions, approves new programs, funds them through some model or process, and then holds universities accountable for results. Whether intentional or not, the past treatment of the historically black institutions in this process in contrast to the treatment of other public institutions in the state has had the effect of substantially marginalizing the HBIs and their ability to develop and maintain comparable quality and competitiveness in the state's system of higher education." (PTX 3 at 17.)

162. Moreover, contrary to Defendants' contention, MHEC has rejected a proposed mission statement. In 1999, UMES proposed amending its mission statement to expand its PhD offerings in 5-7 disciplines. UMES's president contended that this expansion was consistent with UMES's mission and constituent needs and would benefit UMES by attracting quality

faculty and through enhanced funding. MHEC denied approval. (PTX 254 at 108-09.) This serves as an example that HBIs are "not independently empowered to make determinations about their missions." (02/08/12 PM Trial Tr. 6 (Allen).)

163. Most of Defendants' remaining arguments in the remaining three paragraphs about mission involve their position that mission is not tied to funding. Defendants' devote two paragraphs to discussing the Carnegie classifications and the funding guidelines in which they largely dismiss the significance of the Carnegie classifications and the funding guidelines in the appropriations process.[14] This position is somewhat contrary to that of their own witness Geoffrey Newman, MHEC's Director of Finance and Facilities, whose direct testimony largely focused on the process of setting the funding guidelines and the relevance of the guidelines in the budget process. Mr. Newman also testified about the use of Carnegie classifications in setting the guidelines: "Under the funding guideline method, the first starting point for choosing peers is that they be public institutions, but that they also be within the same Carnegie classification." (01/31/12 PM Trial Tr. 98 (Newman).)

164. Nonetheless, the testimony of Defendants' witness, Joseph Vivona, USM's Chief Operating Officer and Vice Chancellor for Administration and Finance for the last decade, establishes the critical role mission plays in funding. Mr. Vivona testified that, for at least the last decade, Maryland has funded its public higher education institutions based on a cost model which looks at how to fund the institution based on what it is currently doing and what its needs are. (01/31/12 AM Trial Tr. 37-38 (Vivona).) Mr. Vivona further testified that the state articulates the mission of the university and the mission determines a lot about need:

[14] In another section of their brief, Defendants are more even explicit about their view regarding the relevance of the Guidelines: "[t]he guidelines embody the State's goal for funding higher education, but they play a minimal role in the actual funding process." Defs.' FOF ¶ 149.

> The state articulates that mission. If that mission includes research, by definition, that will be a more costly institution. It is not—you work with, you work within that mission, and that ultimately determines what your need will be. . . . The mission determines a lot about need, but within the appropriate Carnegie classification, just to be clear about that, because any funding model considers the true differences between those missions. The comprehensive institution has a certain mission and a research institution has a different mission.

(01/31/12 AM Trial Tr. 43-44 (Vivona).) So, both according to the Education Code and in practice, state funding is based in significant part on mission.

165. Defendants' final argument is to analogize this case to the Mississippi higher education desegregation case where they claim that the Fifth Circuit concluded on remand in *Ayers v. Fordice* that "institutional missions did not play a role in maintaining a segregated system." (Defs.' FOF ¶ 259.) To the contrary, the Fifth Circuit stated that the district court in *Ayers* found that the limited missions of the HBIs were a policy traceable to the era of *de jure* segregation: "The district court indeed found that 'policies and practices governing the missions of the institutions of higher learning are traceable to *de jure* segregation and continue to foster separation of the races.'" *Ayers*, 111 F.3d, 1183 at 1211 (quoting *Ayers*, 879 F. Supp. 1419 at 1477. The district court remedied the violation by making programmatic enhancements. It did not alter any mission designations. *Ayers*, 111 F.3d at 1211 (citing 879 F. Supp. at 1483).

166. In *Ayers*, the Fifth Circuit rejected the Plaintiffs argument regarding the operational funding formula because the state had moved from a mission-based funding formula to one based on the size of the institution's enrollment, faculty, and physical plant even though the results were largely the same. 111 F.3d at 1223 & nn.73. 74.. The Fifth Circuit in *Ayers* remanded the issue of equipment funding to the district court because the district court had determined that policies and practices for equipment funding had followed the mission assignments but found no violation. *Id.* at 1225.

167. As discussed in more detail in the Funding Section below, Plaintiffs believe that the Fifth Circuit's decision regarding funding is inconsistent with the Supreme Court's standard. Regardless, the Mississippi case is factually distinguishable from the situation in Maryland. Unlike Mississippi, operational funding in Maryland is currently based on mission as set forth in the Education Code and discussed by the Defendants' witnesses.

168. In making the relatively discrete points detailed above, Defendants never confront the overwhelming evidence that the current dual and limited missions of the HBIs are a policy and practice traceable to the *de jure* era. Much of this evidence was set forth over almost fifty pages of Plaintiffs' Corrected Findings of Fact and Conclusions of Law and was largely based on statements in Maryland's own documents. (*See* Pls.' FOF at 420-517.) Moreover, other than their general argument that demographics demonstrate that the system is desegregated, Defendants do not make any arguments on the issues where they have the burden of proof: (1) that the dual and limited missions do not have a segregative effect and (2) that the dual and limited missions result from a sound educational practice and there is no less segregative alternative. Defendants would have been hard pressed to make such arguments given that there is a dearth in the evidentiary record to establish either of those points.[15]

## IV. MARYLAND'S POLICIES AND PRACTICES REGARDING OPERATING FUNDING ARE TRACEABLE TO THE *DE JURE* ERA AND RECENT FUNDING TRENDS, VIEWED IN THE PROPER CONTEXT, ESTABLISH THAT THE HBIs ARE STILL INADEQUATELY FUNDED.

169. As detailed in Plaintiffs' Corrected Findings of Fact and Conclusions of Law, Maryland's current policies and practices of underfunding the HBIs generally, underfunding the

[15] In their section on discussing the issue of unnecessary program duplication, Defendants make the argument that the programs at the HBIs have expanded over the last 30 years. (Defs.' FOF ¶ 227.) As detailed below in the discussion of program duplication, Defendants' argument fails because it is largely based on data from exhibits that the court struck at trial and it does not reflect the fact that TWI program offerings have expanded at a greater rate which have put the HBIs at a competitive disadvantage.

dual mission, not adequately accounting for the lower tuitions HBIs charge because of the dual mission, and not adequately accounting for economies of scale are traceable to the *de jure* era. Moreover, Maryland's recent and current funding practice is to fund based on institutional mission, and as discussed in Section III above, the missions of the HBIs are traceable to the era of *de jure* segregation. Maryland's rebuttal, which largely focuses on the argument that the HBIs received roughly equal funding per FTE, fails to account for actual conditions and has been rejected by Maryland's own reports as well as the federal court in *Knight*.

### A. Though Maryland Contends That Maryland's TWIs Could Potentially Be Improved With Increased Funding, Maryland Has Acknowledged That the Needs Are Greater at the HBIs

170. In its Findings of Fact, Maryland states that "[t]he testimony left little doubt that HBIs could benefit from more funding, as could other Maryland public institutions." (Defs.' FOF ¶ 118.) The suggestion that the TWIs face the same challenges as the HBIs, however, is not supported by the facts in the record.

171. William Kirwan, the Chancellor of the University System of Maryland acknowledges that "[t]here is no question that we have not done right over time by Historically Black Institutions and they deserve special scrutiny and attention in terms of adequacy of funding." (1/24/12 PM Trial Tr. 68 (Kirwan).)

172. According to Maryland's 2009 State Plan for Higher Education, "[t]he State of Maryland has identified as a ***priority*** for higher education the goal of providing the funding necessary to ensure that its four public HBIs– Bowie State University, Coppin State University, Morgan State University, and the University of Maryland Eastern Shore - are c***omparable and competitive*** with the State's public TWIs." (PTX 1 at 30 (emphasis added).)

173. The Bohanan Commission observed that "[t]he magnitude of the challenges faced by these institutions is particularly great, especially at the undergraduate level and will require

special attention and consideration if they are to be satisfactorily overcome." (PTX 2 at 30.) Therefore, "**[t]he commission strongly endorses the HBI Panel's finding that undergraduate education should be the first funding priority and that graduation rate should be the primary indicator of performance.**" (PTX 2 at 15 (emphasis in original).) If, as Maryland now suggests, the HBIs were already adequately funded, (*see* Defs.'FOF ¶¶ 179-193), there would be no need to set this as a state priority.

**B. Maryland's HBIs Allocate Their Operating Funding Based on Their Institutional Missions and the Constraints Imposed by Budgets That Are Insufficient to Fund Every Aspect of Their Operations at Appropriate Levels.**

1. <u>Maryland admits that it has failed to provide the HBIs with the "substantial additional resources" necessary for them to properly support their operations and attract diverse student bodies.</u>

174. According to the 2008 HBI Panel Report,

> There are many indicators that suggest that substantial additional resources must be invested in HBIs to overcome the competitive disadvantages caused by prior discriminatory treatment: the lack of modern 'state of the art' science and technology labs, the aging physical plants and lack of consistent funding for maintenance, the poor retention and graduation rates of students as compared to TWIs, and the large number of low income and educationally underserved students in need of financial assistance.

(PTX 2 at 119.) Geoffrey Newman, MHEC's Director of Finance Policy and 30(b)(6) representative, agrees that there are many indicators that suggest that substantial additional resources must be invested in the HBIs to overcome the competitive disadvantages caused by prior discriminatory treatment. (2/1/12 AM Trial Tr. 48 (Newman).)

175. In its 2009 State Plan for Higher Education, Maryland acknowledges that [s]ubstantial additional resources are needed to ensure the State's public HBIs with their dual missions are comparable to Maryland's TWIs in their capacity to be competitive with respect to the following areas:

- Recruiting, retaining, and graduating an academically, racially, culturally, and ethnically diverse student body;
- Attracting and retaining quality faculty able to teach, conduct scholarly activities, and perform services consistent with each institution's mission;
- Generate external revenue by securing contracts and grants from Federal and State agencies that support instructional services and enhance institutional infrastructure and facilities; and
- Form partnerships with businesses and foundations that expand educational opportunities for students and that promote development in the communities proximate to the institutions.

(PTX 1 at 31.)

2. <u>While HBI administrators willingly attempt to fund the dual mission, often to the detriment of other aspects of their operations, they could not choose to do otherwise because Maryland assigned it to them.</u>

176. The HBI Panel observed that "HBIs historically and into the future have a dual mission." (PTX 2 at 120.) The 2009 Maryland State Plan further explains that "[a]s part of their dual missions, HBIs are ***charged*** with providing access to academically well-qualified students and also a significant percentage of under-prepared students. Responding to the needs of poor and under-prepared students, requires academic and support services tailored to their needs." (PTX 1 at 56 (emphasis added).)

177. Maryland's 2008 HBI Panel concluded that

> HBIs need a different form and level of capacity because unlike the TWIs, the HBIs have a dual mission: (1) to carry out their regular collegiate programs and associated functions to the best of their abilities and (2) to provide strong programs in developmental education to ensure access and success to students, mostly from low-income families, who otherwise would not have an opportunity to pursue a bachelor's degree. ***The HBIs are not funded at appropriate levels to carry out both parts of this mission at once.***"

(PTX 2 at 124 (emphasis added).)

178. According to the 2009 State Plan for Higher Education, Maryland's HBIs not only need additional resources to support the access component of their dual mission, but they also need additional support for their regular academic programs:

> The majority of instructional resources at HBIs are used to educate students who meet the regular admissions criteria established by the institutions, and who are educated consistent with their respective missions. Therefore, funding for HBIs must include resources necessary to enhance instructional services for regularly admitted, academically prepared students regardless of race and/or socioeconomic status. This fact notwithstanding, HBIs also enroll a disproportionate share of low-income students who are not academically prepared to successfully matriculate in college, and adequate funding is also required to enhance the access and success rates of these students.

(PTX 1 at 32.)

179. The presidents of Maryland's HBIs decide how to allocate their limited funds within the context of this dual mission. For example, Dr. Wilson observed that

> Morgan has been designated as Maryland's urban university. So as such, when I see that, and I read that, counsel, I take that seriously, that the State is expecting Morgan to embrace the intractable challenges in the City of Baltimore, and the metropolitan area. So I come away with that saying that the State certainly has embraced that. Then on the access side, that certainly has been a part of our mission. It is to provide opportunity for students who may have educational challenges, but who are not short on potential.

(1/4/12 AM Trial Tr. 37 (Wilson).) Dr. Wilson added that "the more money you have to take out of the operating budget to support the access mission on the part of [the] institution, the fewer dollars you have then to do the other work to advance the other part of the institution's mission." (1/03/12 PM Trial Tr. 68-69 (Wilson).)

180. In 2005, the presidents of Maryland's HBIs observed that

> In addition to basic operations, HBIs have special funding needs that need to be reflected in their operating budgets if they are to close the gap with their counterparts. For example, they require more favorable student-faculty ratios and additional staff to provide for the extra academic and

> student support services they need to provide. They need additional funds for student financial aid. They require adequate funds to equip and support the operation and maintenance of new or renovated buildings. They also need to be able to add functions that broaden their appeal such as research parks, business incubators, technology transfer centers, etc.. ***To the extent that these additional needs are not funded adequately, they will not be carried out or they will have to be supported through re-allocation from basic operations, which has the effect of undermining other enhancement efforts.***

(PTX 13 at 10 (emphasis added).)

181. According to the HBI Panel,

> The consequences of serving a higher percentage of students from low-income families include the following:
>
> 1. HBIs must expend a higher percentage of revenue toward student financial aid;
> 2. HBIs must charge lower tuition and fees because students cannot afford higher costs. Consequently, in FY 2007, the revenue from tuition and fees for HBIs is on the average $1,500/FTE student less than that of TWIs (this analysis excludes UMUC and St. Mary's College because of their unique status);
> 3. The HBIs' graduation rates are less than that of the TWIs because of the challenges associated with graduating students from low-income families at the same rate as that of students from higher income families; and
> 4. HBIs must expend larger portions of their budgets toward developmental education and academic support than TWIs.

(PTX 2 at 125.) MHEC acknowledges that Maryland's HBIs expend a higher percentage of their revenue towards financial aid and developmental education than the TWIs. (2/1/12 AM Trial Tr. 50 (Newman).)

182. MHEC's Assistant Secretary for Planning and Academic Affairs and 30(b)(6) witness, Dr. George Reid, confirms that the low graduation and retention rates at the HBIs are attributable to financial issues: "Q. I'm asking: Does MHEC stand by the statement that substantial additional resources are needed to ensure the state's HBIs are comparable to the

state's TWIs on the point of recruitment, retention and graduation? A. Yes. Probably, yes, that's correct." (1/18/12 PM Trial Tr. 77 (Reid).)

3. Maryland does not adequately fund UMES' land grant functions, which forces the institution to reallocate resources from other aspects of its operations.

183. Maryland provides UMES with less than 30% of the funds that it needs to match its federal land grant funding. (1/5/2012 PM Trial Tr. 10-11 (Neufville); 1/04/2012 PM Trial Tr. 42-43 (T. Thompson).) Maryland, however, gives UMCP, its TWI land grant institution, at least a 5:1 match of federal funds, meaning that the state provides approximately five dollars in matching funds for every dollar of federal land grant funding received by UMCP. (1/5/2012 PM Trial Tr. 11 (Neufville) (testifying that UMCP receives seven state dollars for every federal dollar of land grant funding); PTX 875 at 3, Fig. 2 (showing that 78% of UMCP land grant funding comes from the state compared to 15% from the federal government).

184. In 2011, the Education Policy Committee of the USM Board of Regents acknowledged the strain that this disparity placed on UMES' operations by noting that

> The distribution of formula funds is subject to a 1:1 match of non-federal funds. **Any amount unmatched with non-federal funds will be deducted from the annual federal allocation to the university.** UMES struggles with this required match and while the UMES-AES is presently utilizing general funds that support the academic land grant programs for this purpose, the current 1:1 match will be nearly impossible to maintain unless additional state funding is realized.

(PTX 875 at 4 (emphasis in original).) And the state has not rebutted this disparity in land-grant funding.

### C. Maryland's Policies and Practices Regarding Funding Are Traceable to the *De Jure* Era Through Their Perpetuation of Current Service Levels and Reliance On Institutional Mission.

1. The funding analysis in *Knight* better accounts for the Supreme Court's guidance than the *Fordice* remand proceedings.

185. A policy or practice is "traceable" if to some degree it follows and maintains the structures that were inherent to *de jure* segregation. *Fordice* referred to such policies as "remnants" and specifically held certain practices traceable because they maintained structures that were inherent to racial segregation in the *de jure* era, regardless of whether these practices were embedded in new policies that did not exist in that form in the *de jure* era. *Fordice,* 505 U.S. at 733. In particular, the *Fordice* court held that Mississippi's institutional mission designations had "as their antecedents the policies enacted to perpetuate racial separation during the *de jure* segregated regime." *Id*. at 740. The Court further observed that "inequalities among the institutions largely follow the mission designations, and the mission designations to some degree follow the historical racial assignments." *Id*. at 740-41.

186. Contrary to Maryland's argument in paragraph 162 of its Findings of Fact, Plaintiffs do not "advocate enhancement of the HBIs in order to rectify the detrimental effects of past *de jure* segregation, without regard to present policies and practices." *Ayers*, 111 F.3d at 1224. Instead, they seek redress for, among other things, Maryland's continuing practice of failing to provide the substantial additional resources identified by the 2009 State Plan as necessary for the HBIs to compete with the TWIs with respect to "[r]ecruiting, retaining, and graduating an academically, racially, culturally, and ethnically diverse student body." (PTX 1 at 31.) Maryland also admittedly continues its practice of underfunding the dual mission that it assigned to the HBIs during the *de jure* era. (*See* PTX 2 at 120, 124.)

187. Defendants cannot reconcile their reliance on a certain analysis from the *Fordice* remand proceedings with Maryland's admissions regarding the role of enhanced HBI funding in its desegregation efforts. Judge Biggers concluded that in Mississippi "[a]ttainment of funding 'equity' between the HBIs and HWIs is impractical and educationally unsound," *Ayers* 879 F. Supp. 1419 at 1453. Maryland has, however, embraced the opposite view in non-litigation contexts. For example, the Partnership Agreement obligated Maryland to make its HBIs comparable and competitive with the TWIs in the following aspects of their operations and infrastructures, among others:

> Operational funding consistent with the mix and degree level of academic programs, support for the development of research infrastructure, and support consistent with the academic profile of students. . . . The expanse, functionality and architectural quality of physical facilities; . . . Funding to support students' quality of campus life.

(PTX 2 at 116.) John Oliver, who served as Chairman of MHEC and signatory to the agreement on behalf of Maryland, describes these commitments as practical. (1/11/12 AM Trial Tr. at 37 (Oliver).) Maryland's 2009 State Plan, the principal policy document for higher education, establishes the educational soundness of enhanced funding by identifying "as a priority for higher education the goal of providing the funding necessary to ensure that its four public HBIs--Bowie State University, Coppin State University, Morgan State University, and the University of Maryland Eastern Shore--are comparable and competitive with the State's public TWIs." (PTX 1 at 30.)

188. Maryland is correct that on remand, Judge Biggers noted that Mississippi's new funding formula, which funded institutions based primarily on their enrollments, "causes practically the same result as under the previous funding formula that funded by institutional mission designations." *Ayers*, 879 F. Supp. at 1449. But even though he acknowledged that

"[t]he funding formula does not operate on a 'clean slate,' however, and the historical disparity in funding between the HWIs and HBIs once practiced by law persists through perpetuation of the status quo as it existed then," he held that that Mississippi's superficially-revised formula was not traceable to the *de jure* era. *Id*. at 1452-53. This decision was affirmed by the Fifth Circuit. *Ayers,* 111 F.3d at 1223-24.

189. The determination that Mississippi's decision to create a race-neutral funding formula that maintained the same results as the *de jure* funding formula insulated Mississippi from liability is inconsistent with the Supreme Court's decision in *United States v. Fordice.* The Supreme Court found that Mississippi could not maintain a policy or practice that was originally adopted in the *de jure* era but now was based on race-neutral reasons. 505 U.S. at 734-35. For example, the admissions standards for the Mississippi schools were originally adopted for discriminatory reasons, but because they "derived from policies enacted in the 1970's to redress the problem of student unpreparedness" the district court and Fifth Circuit had held that the change in justification had removed the discriminatory taint. *Id*. at 734, The Supreme Court held that the lower courts had erred: "Obviously, this midpassage justification for perpetuating a policy enacted originally to discriminate against black students does not make the present admissions standards any less constitutionally suspect." *Id*.

190. In any event, the facts in Mississippi regarding the funding practices are factually distinguishable from those here. The District Court and Fifth Circuit in *Ayers* found that Mississippi's funding formula was not based on institutional mission. *See* 111 F.3d at 1224; 879 F. Supp. at 1449. In contrast, as discussed above in the mission section, Maryland's funding formula is driven by institutional mission. This distinction is critical because, as discussed above in the mission section, the courts in *Ayers* identified the limited missions of the HBIs as

traceable, and the Fifth Circuit in *Ayers* remanded the issue of equipment funding to the district court because it appeared that the district court had found equipment funding was based on mission but had not found a violation on the practice for equipment funding. 111 F.3d at 1224-25. *Ayers* is also factually distinguishable regarding the failure to adequately fund remedial education in that the district court had found that the Plaintiffs had failed to demonstrate a traceable policy from the *de jure* era with respect to funding of remedial education, 111 F.3d at 1223-24, whereas Plaintiffs in this case have done so. *See* Pls.' FOF ¶¶ 810-813.

191. In *Knight v. Alabama*, however, the District court was sensitive to sophisticated modes of discrimination and held that Alabama's funding formula was traceable to the *de jure* era, even though it was adopted in 1973. *See Knight*, 900 F. Supp. at 308-12 (discussing the traceable aspects of Alabama's funding formula); *Knight*, 787 F. Supp. at 1193 (funding formula adopted in 1973). Central to this holding was its conclusion that, even though Alabama's HBIs were comparable per FTE to the TWIs, they still had not received the funding necessary to "provide an education to its students in a manner which has overcome the effect of past discriminatory underfunding for the operations of [HBIs] and to provide an education today free from the stigma of past discrimination such as poor physical facilities and the tarnish of a reputation of lack of quality education." *Knight*, 900 F. Supp. at 308 (quoting *Knight*, 787 F. Supp. at 1271).

192. *Knight* also identified these two problematic aspects of Alabama's funding formula. *First*, Alabama's funding formula failed to fully account for economies of scale, which in general permits larger schools to educate students more efficiently and economically and which has the effect of systematically disadvantaging the state's smaller HBIs. *Knight v. Alabama*, 900 F. Supp. at 311. *Second*, the Alabama funding formula failed to account for the

greater costs associated with providing remedial education to less prepared and economically disadvantaged students. *Knight*, 787 F. Supp. at 1200. Both of these constitutionally suspect characteristics of Alabama's funding formula are shared by Maryland's current funding practices. For additional discussion of the failure of the funding formula to account for the dual mission both in the *de jure* era and today see Plaintiffs' Corrected Findings of Fact paragraphs 810-13. For additional discussion of economies of scale see Plaintiffs' Corrected Findings of Fact paragraphs 871-91.

2. Maryland's current policies and practices regarding operating funding are traceable to the *de jure* era because they perpetuate historically deficient service levels at the HBIs and the related perceptions of institutional inferiority.

193. In *Knight v. Alabama*, the District Court concluded that "[w]hite students' perceptions of the inferiority of black institutions are traceable to the *de jure* history of Alabama." *Knight v. Alabama*, 900 F. Supp. at 320. It further explained that "White students perceptions flow from the fact of the HBIs academic inferiority resulting from historical underfunding." *Id*. The *Knight* court observed that inequitable funding over a number of years "cannot be made up overnight." The cumulative effect of such deficiencies over a period of time affects a school's mission programs, facilities and reputation, "all of which can then change only very slowly." *Knight*, 900 F. Supp. at 311. Discrepancies tend to "grow and become embedded" over time. *Id.* "Of the major considerations that can affect raw financial comparisons – such as economy of scale, enrollment trends, and historical patterns – the historical patterns are the most important. This is because historical deficits tend to continue over a period of time, and become cumulative, which, of course, means they cannot be erased overnight." *Id.*

194. With respect to funding, Maryland's statute currently states that "[f]unding proposals for public senior higher education institutions shall include: (1) Base funding in

accordance with the role and mission of the institution, as approved by the Maryland Higher Education Commission." Md. Code Ann., Educ. § 10-203. Dr. Toutkoushian explains that "[t]he mission is where you would get the connection between what's going on now at the HBIs in terms of funding and what's happened historically, because the mission will influence the amount of revenues that they receive and also their competitiveness for other types of revenues from donations, research grants, and other things." (1/17/12 PM Trial Tr. 77-78 (Toutkoushian).)

195. During the *de jure* era, Maryland's policies and practices involved the provision of inadequate funding to support limited missions at the HBIs. Maryland's 1937 Soper Commission concluded that "[t]he policy of State aid to education has benefitted the white schools on all levels very much more than the Negro schools." (PTX 17 at 145.) And as Maryland explained in its 1947 Marbury Commission Report, "[t]he State has consistently pursued a policy of providing higher education facilities for Negroes which are inferior to those provided for whites. The meager appropriations and the inferior accreditation status of the Negro colleges attest to this fact." (PTX 18 at 108.) For additional discussion of Maryland's *de jure* era underfunding of the HBIs see Pls.' FOF ¶¶ 743-757.

196. Dr. Allen explains that "[i]t is important to recognize that this pattern of underfunding goes back to the very inception of those campuses, and has been continued, and has cumulative effects over a century relative to the TWIs." (1/18/12 PM Trial Tr. 69 (Allen).) Dr. Allen further observes that "fiscal inequities ultimately disadvantage HBIs in the competition which is a key element of academe. HBIs are placed at extreme disadvantage in the competition for students, faculty, research grants, institutional reputation, even additional state funding." (PTX 661 at 11.)

197. The current funding guideline "was created and initially was used in many ways to determine allocations." (1/31/12 AM Trial Tr. 14-15 (Vivona).) In recent years, the funding guidelines have, at minimum, been a factor that is considered by the Department of Budget and Management, the Governor, and the legislature in the appropriations process. (2/1/12 AM Trial Tr. 22 (Newman); 1/30/12 PM Trial Tr. 73-74 (Treasure).)

198. For about the last decade, Maryland has worked off of an incremental budget system that looks to maintaining the same level of service from the year prior with some program enhancements "to achieve the goals of the strategic plan and goals of the university specifically within its mission." (1/31/12 AM Trial Tr. 6 (Vivona).) Maryland's 2008 HBI Panel describes the contemporary levels of service at HBIs, the baseline under this approach, by referring to

> the process by which a state sets university missions, approves new programs, funds them through some model or process, and then holds universities accountable for results. Whether intentional or not, the past treatment of the historically black institutions in this process in contrast to the treatment of other public institutions in the state has had the effect of substantially marginalizing the HBIs and their ability to develop and maintain comparable quality and competitiveness in the state's system of higher education.

(PTX 2 at 129.)

199. Rather than endorsing the modest enhancement to the current levels of service at HBIs, the HBI Panel observed

> [t]hat the Commission's charge to the Panel portends its intent to pursue a more strategic approach to the enhancement of HBI programs and facilities to eliminate any vestiges and effects of prior discrimination and the disadvantages created by the cumulative shortfall of funding over many decades. The charge also portends an intent to adopt a strategic funding plan to acknowledge that shortfall and appropriate funds over time that will build the capacity of HBIs and make them comparable in terms of quality and resources to the state's public TWIs. Comparability once achieved will place HBIs in the position they would have been, absent the perpetuation of discriminatory policies and practices, to compete efficiently with other public institutions in the state.

(PTX 2 at 118-19.)

200. Outside of the context of this litigation, Maryland has recognized that its funding policies and practices (1) "have not done right over time by Historically Black Institutions" (1/24/12 PM Trial Tr. (Kirwan)); (2) do not adequately fund the HBIs' dual mission (PTX 1 at 32; PTX 2 at 124); and (3) do not fund the HBIs sufficiently to allow them to attract a diverse student body (PTX 1 at 31; PTX 4 at 38.)

### D. Dr. Lichtman's Analyses Amount to Mere Number Crunching That Suffers From Methodological Flaws and Does Not Address the Adequacy of HBI Funding Levels, Given Their Histories, Missions, and Challenges Attracting Students of Other Races.

201. Dr. Lichtman's approach is consistent with Maryland's arguments during the *de jure* era (PTX 773 at 41-42) but contrary to the HBI Panel's conclusion that "[t]he very different and greater challenges faced by HBIs in terms of student preparation and affordability should determine the specific capacity required by the HBIs, not a strict comparison to the TWIs." (PTX 2 at 124 (emphasis added).)

202. The relative levels of funding provided to Maryland's HBIs and TWIs in recent years must also be considered in the context of historical funding levels, generally, and during the 1990s, in particular. Between 1988 and 2000, Maryland's HBIs had smaller growth in state funding per FTE student than the TWIs, and for UMES the funding decreased over that period. (PTX 1010.)

203. Notwithstanding the aforementioned limitations of a per-FTE funding analysis in assessing funding adequacy, from 1984-2010, Maryland's HBIs experienced substantial cumulative deficiencies in several revenue categories.

PTX 1029 - Page 20 of 29

## Summary of Revenue Deficiencies for HBIs

| Cumulative Deficiency | Years Used in Calculation: | |
|---|---|---|
| | 1984 to 2010 | 1990 to 2010 |
| Appropriations + Enhancements | | |
| Enrollment share | -$17,822,046 | -$182,636,119 |
| (Table 9) Enrollment share and mission | -$136,046,241 | -$278,792,942 |
| Appropriations + Enhancements + Tuition/Fee Revenue | | |
| Enrollment share | -$792,769,359 | -$890,006,189 |
| (Table 10) Enrollment share and mission | -$910,993,554 | -$986,163,012 |
| Unrestricted Revenues | | |
| Enrollment share | -$1,872,414,458 | -$1,862,229,146 |
| (Table 11) Enrollment share and mission | -$1,990,638,653 | -$1,958,385,969 |
| Total Revenues | | |
| Enrollment share | -$2,018,019,124 | -$2,053,559,109 |
| (Table 12) Enrollment share and mission | -$2,136,243,319 | -$2,149,715,932 |

- Revenue deficiencies are still substantial through FY2010
- Remediation mission adjustment increases deficiencies in all four revenue categories by $118 million (FY1984 to FY2010) or $96 million (FY1990 to FY2010)
- Revenue deficiencies persist in periods 1984-2010 and 1990-2010

Coalition, et al. v. MHEC, et al.
Civil No. CCB-06-2773

20

(PTX 1029 at 20.)

204. In particular if one considers state appropriations, enhancements, and tuition/fee revenue, Maryland's HBIs experienced a cumulative deficiency of $792,769,359 from 1984-2010. (PTX 1029 at 20.) If one accounts for Dr. Toutkoushian's partial quantification of expenses associated with the remedial component of the dual mission, then this deficiency grows to $910,993,554. (PTX 1029 at 20.) This analysis is consistent with the HBI Panel's conclusion that "HBIs must charge lower tuition and fees because students cannot afford higher costs." (PTX 2 at 125.) In fact, if one excludes UMUC, then Maryland's HBIs all have lower in-state tuitions than all of Maryland's TWIs. (PTX 755 at 38; 1/11/12 AM Trial Tr. 83 (Vollmer).)

1. A comprehensive and legally-sufficient analysis of the relative funding of higher education in Maryland must include UMCP.

205. UMCP should not be excluded as a substantive outlier because "the state designation as a flagship institution is not tied to a specific, unique attribute of College Park. The label could be applied to other institutions as well if the state had chosen to do so." (2/8/12 AM Trial Tr. 5-6 (Toutkoushian).) Moreover, neither the Partnership Agreement nor the HBI Panel excluded UMCP from comparisons with the HBIs. (PTX 4 at 5 (identifying UMCP as a TWI); PTX 2 at 133-35 (including UMCP in comparisons with UMBC, Morgan, and UMES regarding quality of doctoral programs).) And neither the court in *Ayeres* nor the Court in *Knight* excluded the flagships from their analyses. *See Ayers*, 879 F. Supp. at 1447 (citing *Ayers v. Allain*, 674 F. Supp. 1523, 1546-48 (N.D. Miss. 1987)) (analyzing the funding of all eight public four-year institutions in Mississippi); *Knight v. Alabama*, 14 F.3d 1534, 1544 (11th Cir. 1994); *Knight*, 900 F. Supp. at 307. It is noteworthy that this litigation is the first time that Maryland has suggested that UMCP should be excluded from a study of higher education finance because of its flagship status.

206. UMCP should not be excluded from the funding analysis as a statistical outlier because Dr. Lichtman failed to provide a standard deviation analysis to support his contention that UMCP is a statistical outlier.[16] In fact, UMCP's funding levels for FY 2010 were more similar to the institutions that both experts included in their analysis than the UMB and UMUC, the agreed-upon outliers.

---

[16] When experts have excluded data points as outliers without providing a formal statistical justification, courts have found that their analyses lack foundation. *See Osage Tribe of Indians of Okla. v. United States*, 96 Fed. Cl. 390, 419 (Fed. Cl. 2010) (court found that expert's analysis lacked foundation where expert failed to conduct a formal statistical analysis and expert's outlier analysis was directed at undermining data points that supported larger recovery for plaintiffs); *DeRolph v. Ohio*, 712 N.E.2d 125, 186 (Ohio 1999) (court determined that expert analysis regarding base cost of adequate education was arbitrary because expert "did not select outliers per se," but instead excluded only "unusual" districts) (citation omitted).




(PTX 1020 at 80, 92; PTX 1021 at 11, 24, 34, 45, 55, 66, 77, 87, 96, 116.)

207. Dr. Lichtman's analysis that suggests that Maryland's HBIs have received excess state appropriations and enhancements from 1984-2010, even if one includes UMCP, is misleading because its is based on enrollment data from Dr. Toutkoushian's initial, superseded report, which was based on total headcounts. (PTX 324 at 20.) Dr. Toutkoushian acknowledged that "[t]he reason that I calculated FTES based on Fall headcounts in my first report was that I did not have data on the FTEs for all of the years 1984 through 2009 that I needed for my analysis." (PTX 325 at 4.) Drs. Toutkoushian and Lichtman agree that FTE calculations based on annual credit hours are preferable to headcount-based measures. (PTX 325 at 4.)

208. Moreover, as Maryland knows, the analyses presented at trial were based on enrollments calculated from annual credit hours. (DTX 65v at 5-6.) Calculating FTE enrollments based on headcounts tended to understate the enrollment shares of the HBIs, and, as a result, understated their expected funding shares. (PTX 325 at 5.) Maryland's reliance on these outdated calculations is, therefore, both misleading and inconsistent with his general approach.

209. Dr. Lichtman's analysis of tuition and fees improperly excludes UMCP. Dr. Toutkoushian's analysis, which included this institution, established that Maryland's HBIs received less revenue per FTE student than the TWIs in terms of both state appropriations and gross tuition and state appropriations and net tuition.




(PTX 855 at 24.)

2. Dr. Lichtman's analyses regarding the quality of HBI facilities and libraries relies upon incomplete metrics and does not account for the actual conditions on HBI campuses and their effect on student choice.

210. Dr. Lichtman does not offer any opinions about whether the facilities, libraries, and infrastructure at Maryland's HBIs allow them to accomplish their existing institutional missions, or to expand these missions. He also failed to offer any analysis regarding the effect of the actual conditions of the respective campuses on school choice decisions. Inexplicably, he did not visit the campuses at all to make comparisons. (2/2/12 PM Trial Tr. 25 (Lichtman).) Instead, he relied on purportedly "objective" metrics, altogether foreign to students, such as space deficits and library holdings per FTE student. (DTX 405 at 61-65.)

211. Certain statistical measures, however, which Dr. Lichtman chose to ignore, more accurately represent the condition of the facilities at Maryland's HBIs. For example, in a 2006 report to the Office for Civil Rights, Maryland admits that while an average of 17 buildings had been renovated on each TWI campus since 1970, there were only 8 renovations on Bowie's campus during this period, 5 on the Coppin campus, and 13 at UMES. (PTX 9 at 14-16.) Even though 19 buildings were renovated on the Morgan campus during this time period, "[t]he average building age at Morgan is 44 years, while buildings at the TWIs have an average age of 40 years, and UMBC's average building age is 25 years." (PTX 9 at 17.)

212. The age and renovation status of HBI buildings is particularly important in light of documents that note that Maryland paid little attention to the quality of buildings on the HBI campuses during the *de jure* era. (PTX 40 at 38 (explaining that during the *de jure* era "there was little concern demonstrated for providing more than minimal accommodations for Black students.").) Dr. Kaiser, who, unlike Dr. Lichtman, conducted campus visits and reviewed Maryland state reports prepared by others who had done the same, concluded:

> that the current generally inferior conditions of the Maryland's HBI limit the implementation of mission and program development at the HBIs. That's categorically. The inferior conditions are limiting. That the HBIs spend a disproportionate amount of their operating funds on operations and maintenance, and even with those high expenditures, they really cannot satisfactorily maintain their physical plants. Then third, that the condition of the HBI facilities have a negative impact on the student choice and retention.

(1/17/2012 AM Trial Tr. 27 (Kaiser).)

213. Consistent with Dr. Kaiser's conclusions, the HBI Panel recognized that "[a]ll institutions have unmet capital needs. However, the Panel wishes to make a special case for addressing the needs of HBIs both as a priority and as expeditiously as possible. We recommend this not only out of our first-hand findings that ***the HBIs visibly lag behind the TWIs*** but also

because addressing this deficiency is crucial to achieving the goals of capacity and competitiveness of the HBIs in both undergraduate and graduate education." (PTX 2 at 140 (emphasis added).)

214. Space deficit calculations, on which Dr. Lichtman relied (DTX 405 at 61-65), often present an incomplete picture of the amount of quality space available to students. Maryland's Bohanan Commission described the limitations of this kind of analysis as follows:

> Although space deficits are an important aspect of capital needs, an analysis of the quality of existing space is necessary for a full understanding of the issue. While some institutions might have small deficits or even surpluses of certain types of space, this does not reflect the quality of existing space. For instance, an institution may have a surplus of space, but the quality of that space may render it unusable.

(PTX 2 at 61.)

215. Maryland's HBIs have insufficient quality space for their academic programs. For example, Morgan graduate student Muriel Thompson described not having dedicated space for her doctoral program in community college leadership, requiring the class to roam from location to location. If there was no place to meet, the class could not be held. (1/3/12 PM Trial Tr. 18 (M. Thompson).) And Bowie's ability to expand its high-demand nursing program is limited by space constraints. (1/5/12 PM Trial Tr. 54 (Burnim).)

216. According to Dr. Walter Allen, "the HBI libraries are greatly under-resourced and inadequate compared to the TWI libraries, and just compared to a general standard of what one needs in order to execute highest quality instruction and research." (2/8/12 PM Trial Tr. 21 (Allen).) Therefore, to conclude that HBI libraries are superior to those of TWIs because they have more physical volumes per student "would be just flat out wrong. It would be flat out incorrect. Because, in fact, what we're seeing is a function of the economies of scale . . . ." (2/8/12 PM Trial Tr. 23 (Allen).) In spite of their physical holdings per FTE student, Dr. Conrad

observed that the library holdings at the HBIs "are some of the smallest numbers I have ever seen." (1/10/12 AM Trial Tr. 89 (Conrad).)

217. In any event, an analysis that focuses exclusively on physical volumes is rendered obsolete by the increasing reliance on electronic databases in higher education. (2/8/12 PM Trial Tr. 18-20 (Allen).) Maryland's HBIs can not provide their students with access to these databases to the same extent as the TWIs because of resource constraints. (*See, e.g.*, 1/4/12 AM Trial Tr. 28-29 (Wilson).)

## V. MARYLAND'S CODE OF REGULATIONS PERPETUATES PROGRAM INEQUALITY.

### A. Maryland's Practice of Fewer and Inferior Programs at the HBIs than the TWIs is Traceable to the *DeJure* Era.

218. As Plaintiffs have set out in detail in the Corrected Propsed Findings of Fact and Conclusions of Law, Maryland has an ongoing policy and practice of unequal program development and quality as between their HBIs and TWIs that is rooted in the *de jure* era. (*See* Pls.' FOF ¶¶ 527-590, 641-666.) Defendants attempt to oppose Plaintiffs' claims by shifting responsibility for academic program development from MHEC to the institutions and asserting the robust nature of the Code of Maryland Regulations (COMAR) with respect to the program approval process. (*See* Defs.' FOF ¶¶ 201, 206.)

219. Defendants' portrait of academic program development at the HBIs is misleading in two ways. First, program development is not merely a matter of institutional initiative, but more importantly, a matter of institutional resources and State approval. (DTX 400 at 12-13; 1/5/12 PM Trial Tr. 14 (Neufville).) Second, contrary to the stricken evidence that Defendants cite in their Findings of Fact and Conclusions of Law, program growth at the HBIs has not blossomed under Maryland's statutory program approval process, but has been clearly and

indisputably out-paced by the development at the better-resourced TWIs. (Conrad Demonstratives 67.)

220. As a threshold matter, the State has general approval and oversight responsibility for any new programs that are allowed to be offered at institutions. As Defendants admit, "[b]efore any public higher education institution in Maryland can offer a new academic program or substantially modify an existing program, it must submit the program proposal to MHEC" for approval. (Defs.' FOF ¶ 207.)

221. As part of this responsibility, "MHEC, which has broad responsibility for coordinating postsecondary activities across the various segments of higher education in Maryland, is responsible for reviewing and approving new academic programs." (Defs.' FOF ¶ 203; DTX 400 at 10-11.)

222. The regulations concerning the review and approval of academic programs are found in COMAR, which MHEC has adopted. Md. Code Ann., Educ. § 11-105(u).

223. MHEC utilizes the COMAR Criteria for Program Review to evaluate a new program proposal for approval. These criteria are set forth below:

> (1) ***Centrality to mission*** and planning priorities, relationship to the instructional program emphasis as outlined in the mission statements, and a campus priority for academic program development;
> (2) Critical and compelling regional or Statewide need as identified in the State Plan;
> (3) Quantifiable and reliable evidence and documentation of market supply and demand in the region and service area;
> (4) Reasonableness of program duplication, if any;
> (5) Adequacy of curriculum design and related learning outcomes;
> (6) Adequacy of articulation;
> ***(7) Adequacy of faculty resources;***
> ***(8) Adequacy of library resources;***
> ***(9) Adequacy of physical facilities and instructional equipment;***
> ***(10) Adequacy of financial resources with documentation;***
> (11) Adequacy of provisions for evaluation of program;
> (12) Consistency with the Commission's minority student achievement

> goals; and
> (13) Relationship to low productivity programs identified by the Commission.

(DTX 400 at 12-13) (emphasis added).

224. Although MHEC evaluates program proposals and makes recommendations regarding whether they should be approved, MHEC has delegated its final decision-making authority for approval to the Secretary of Higher Education. COMAR 13B.02.03.04.

225. For a proposing institution to establish the adequacy of resources as required under subparts (7)-(10) for program approval, the institution is "required to include [in the proposal] the tables indicating the resources needed to adequately fund the program, and the projected revenues." (2/7/12 AM Trial Tr. 54 (Blanshan).)

226. If, on review of the proposal, MHEC determines that the institution does not have sufficient funding for the proposed program, then MHEC's position is that the program should not be approved for implementation. (2/7/12 AM Trial Tr. 56 (Blanshan).)

227. Moreover, if an institution does not have adequate faculty, library, physical facilities, and instructional equipment, then there is an increased necessity for the proposal to be very, very strong on the remaining criteria in order to receive State approval. (2/7/12 AM Trial Tr. 60 (Blanshan).)

1. Limited missions prevent the HBIs from developing academic programs that would exceed their institutional role of providing modest educational opportunities for blacks and those that cannot attend TWIs.

228. The first criteria identified for the assessment of new program proposals is "[c]entrality to mission." (DTX 400 at 12.) Yet, the State's mission for its HBIs has been and continues to be more circumscribed than the one for its TWIs as a result of the HBIs' originating purpose "to provide modest, and honestly, it might even be more acceptable to say substandard educational, higher educational opportunities for blacks." (1/1/12 AM Trial. Tr. 65 (Allen).)

229. Plaintiffs have set forth in detail the history of the circumscribed missions of the HBIs from the *de jure* era through the present in their Corrected Findings of Fact and incorporate it here by reference. (Plfs'. FOF ¶¶ 420-507; *see also* 1/10/2012 AM Trial Tr. 19 - 24 (Conrad) (testifying regarding the history of the limited missions at the HBIs during the *de jure* era and immediately following *Brown v. Board of Educ.*, 347 U.S. 483 (1954)).)

230. The connection between HBIs' limited missions today and the *de jure* past was explained by Dr. Allen on rebuttal:

> Q. And the related question I now want to ask you about is the issue of the HBI's dual mission, which the Court has heard a lot about, the contingent is that this is not imposed upon the HBI's, but it's something they voluntarily undertake.
>
> A. I have trouble accepting that kind of framing for the simple fact, first and foremost, those institutions are part of a system that is hierarchical. So in that sense, the institutions are not independent entities. They really have to seek and gain approval from the system of which they're a part. ***And then keeping in mind as well that in a sizable extent, some of the possibilities for those institutions many of the possibilities for those institutions were historically set***. That is, that dual mission was one that grew out of a set of historical relationships, and that that precedent then was further elaborated and perpetuated by just the decisions that came from the system with respect to funds, because one can only implement missions within the bounds the available funds and resources, for example ***So it's a combination of a historical set of obligations side to the fact that the founding purpose of those institutions was to educate black people***. ***And then with that set of realities being compounded and perpetuated by decisions in terms of funding and in terms of program approvals, in terms of the subsequent decisions that flowed out of that original historical reality.***

(2/8/12 PM Trial Tr. 4-5 (Allen) (emphasis added).)

231. Due to HBIs' limited missions, and the statutory connection between an institution's mission and its programs, HBIs cannot simply decide for themselves to launch a new series of academic programs that extend well beyond their role within the university system. As this Court aptly recognized at the summary judgment hearing:

> THE COURT: Right. I think maybe we need to distinguish between a mission statement as something that is expressed on a web site as sort of this is who we are here, kind of an explanation of what's important to that particular place, and what I think is important in terms of a mission statement, a mission designation, a mission classification under the case law. ***I think the point is that a school that does not have a doctoral program let's say today can't say all right, we're going to redefine ourselves and next year we want to be a medical school. The mission statement, in terms of are we are a research-intensive institution, are we a doctoral degree granting institution, what kinds of degree, do we offer that, is not something, I assume, that each college or university is allowed to just decide for itself.***

(5/11/11 Hr'g Tr. 99 - 100 (J. Blake) (emphasis added).)

232. Indeed, Dr. Conrad specifically attributes the limited number and inferior quality of academic programs at the HBIs as compared with the TWIs to their continuing limited missions and the State's failure to rectify this disparity:

> Q. Now moving on to your second opinion, which I believe you described as an analysis for the period 2001 to 2009, please describe for the Court what your findings were.
>
> A On the following page, accenting that this is over the period from 2001 to 2009, Maryland did not avoid the policy and practice of unnecessary program duplication between 2001 and 2009. Secondly, that the newly introduced programs at the TBIs fell short of the commitment to the state to expand program uniqueness, the identity, if you will, the programmatic identity of the TBIs, by establishing some unique, a meaningful number of unique, high-demand programs. ***Further, and along with that, Maryland did not significantly change its policy of limited admissions -- limited missions, I'm sorry, at the TBIs. Put very simply, the TBIs do not have, not only comprehensive, but distinctive missions, and along with that, the program offerings that go along with comprehensiveness and distinctiveness in missions that the TWIs have.*** So in turn, Maryland simply did not take action sufficient to remove those policies and practices, those vestiges that are anchored in the dual, and unequal system of higher education.

(1/10/12 AM Trial Tr. 40 - 41 (Conrad) (emphasis added).)

233. Accordingly, without a meaningful expansion of the missions of the HBIs, the ability of the HBIs to persuasively propose new academic programs that go beyond their role

will be hamstrung by Maryland's program approval regulations. (1/18/12 AM Trial Tr. 65-66 (Allen).)

2. Underfunding prevents the HBIs from demonstrating adequate resources for new program approval under COMAR.

234. Due to a lack of adequate funding from the State, HBIs also under-perform in COMAR's areas for demonstrated program resources including funding, libraries, faculty, facility, and equipment resources. Chiefly, as recently as 2008, Maryland's HBI Study Panel wrote that the State had not adequately funded the HBIs (either historically or in contemporary periods), such that the HBIs lack proper libraries, science labs, equipment, teacher salaries and facilities, and consistent funds for maintenance. (PTX 2 at 119-120, 124.)

235. The Panel's library findings were corroborated by the research and testimony of Dr. Conrad, who independently investigated library conditions at HBIs and TWIs as part of his assessment of program equality between those institutions. Dr. Conrad determined that TWIs have an average collection size of ***930,759***; whereas, HBIs have an average collection size of ***238,532***. (PTX 71 at 117.) By way of context, Dr. Conrad described the library collection sizes at Maryland's HBIs as "some of the smallest numbers I have ever seen." (1/10/12 AM Trial Tr. 89 (Conrad); *see also* Pls.' FOF ¶¶ 110-149, 655-666.)

236. COMAR's emphasis on demonstrated institutional resources for program approval disadvantages the under-resourced HBIs in their ability to develop new programs. Indeed, as the witnesses from the HBIs testified at trial, far more than desire or ingenuity, the availability of resources is their overriding consideration for program development at HBIs. This relationship was eloquently explained by President Neufville of UMES and Dr. Taylor of Morgan State:

> Q. When you were trying to decide whether or not to pursue a—what defines the number of programs that UMES might be able to try to apply for?
>
> . . .
>
> THE WITNESS: It's a resource issue. Do you have the resources, the financial resources? Do you have the faculty? Do you have the space availability? Do you have the equipment or whatever? It's a resource issue.

(1/5/12 PM Trial Tr. 15-16 (Neufville).)

237. As explained by Dr. Taylor, successfully launching new programs requires faculty, funding and facilities:

> Q. And in your experience adding programs, what, if anything, did you find to be involved in the successful implementation of a new program?
>
> A. Well, you know, sometimes we make this a lot harder than what it is. Really, program development at the graduate level, at the undergraduate level, really rests on a stool of three F's: Faculty, facilities, and funding. And if you're not talking about faculty, facilities or funding, funding in terms of student support, funding in terms of operations, funding in terms of infrastructure, if you're not talking about that in the context of whatever program development, then really it's just an idea. ***It's platitudes . . . unless there's faculty associated with it, unless there's facilities associated with it, unless there's funding associated with it.***

(1/10/12 PM Trial Tr. 48-49 (Taylor) (emphasis added).)

238. Yet, the HBI Panel criticized Maryland for not funding the HBIs sufficient to ensure that those institutions are competitive with the State's TWIs in attracting and retaining quality faculty. And MHEC has agreed with these findings. (1/18/12 PM Trial Tr. 77 - 78 (Reid).)

239. Indeed, in light of COMAR's requirement that institutions demonstrate that they have the resources for new program proposals and the State's practice of underfunding the HBIs, the HBIs are not in a position to seek new programs in good faith. As Dr. Allen explained:

> The point is that when that money is not available, it translates into an underfunding of programs. It just hamstrings the ability of the university to mount new programs. Because as I was going through the rules and regulations for the creation of programs, it's a tough standard that schools face in the creation of a new program because initially, you have to say to the state that you have the resources in house to fund that program, to launch it. If you are in a situation where you don't have those resources, then you are absolutely hamstrung in terms of staying competitive, and adding new programs, and expanding programs, and what have you.

(1/18/12 AM Trial Tr. 74 (Allen).)

3. As results of the State's underfunding of HBIs and COMAR requirements, program development at the HBIs trails the TWIs.

240. Despite the obvious disadvantages to HBIs presented by COMAR's demonstrated resources criteria for new programs, Defendants make the bold assertion, "[m]oreover, far from being limited by the program approval process, all of the HBIs have expanded their program offerings significantly in the last 30 years." (Defs.' FOF ¶ 227.)

241. In support of this proposition, Defendants cite to demonstrative exhibits DTX 406-409, which purport to show programmatic growth at the HBIs, and the corresponding testimony of Dr. Sue Blanshan. (Defs.' FOF ¶ 227.)

242. Defendants initially attempted to offer these demonstratives at trial for the same purpose during the direct examination of Dr. Blanshan. (2/6/12 AM Trial Tr. (Blanshan) 95-97.) Yet, on cross-examination, Dr. Blanshan's admitted that she could neither testify to the accuracy of the documents nor identify their author:

> Q. I would like to turn your attention to DTX 408.
> A. Okay.
> Q. Now for this document, it states under Morgan State College, the first column, programs from catalog for academic year 1966-1967. I have a book that I left on your tabletop. Is this the book that you used?
> A. I did not create this table.
> Q. You did not? Okay. Who created this table?
> A. I'm not sure.
> Q. Are you aware of the source of the information in this table?
> A. Well, the left-hand column indicates the Enoch Pratt Library, and the

> right-hand column indicates the website program listing for the institution, which is located directly from the program inventory.
> Q. Do you know if the information in this demonstrative is accurate, Dr. Blanshan?
> A. I know that the right-hand column is accurate.
> Q. Ok. Do you know -- the right-hand column, but you don't know if the left-hand column is accurate?
> A. I did not create the table, so you know, I couldn't verify.

(2/7/12 AM Trial Tr. 46-47 (J. Blake).)

243. This exchange prompted the Court to subsequently convene a bench conference:

> THE COURT: Could I see the counsel at the bench?
> MS. HARRIS: Certainly.
>
> (Counsel approached the bench and the following ensued.)
>
> THE COURT: This seems a bit odd. I had assumed, perhaps it now appears incorrectly, that Dr. Blanshan was taking ownership of this table, and that Dr. Blanshan had looked in the catalogs and had come up with this chart.
>
> . . .
>
> THE COURT: Your motion to strike is granted.
> MS. HARRIS: Thank you.
> THE COURT: Those four charts are out.

(2/7/12 AM Trial Tr. 47-48 (J. Blake).)

244. In violation of the Court's ruling, Maryland cites to these stricken exhibits. (Defs.' FOF ¶ 227.)

245. Maryland also anecdotally cites to more than 40 programs at the HBIs to support its argument that program development at the HBIs has not been hamstrung by COMAR over the past 30 years. (Defs.' FOF ¶¶ 228-233) Yet, this discussion lacks context regarding when these programs were approved, how they fare in comparison to program development at the TWIs, or whether they are duplicated -- such as the engineering program at UMES and the architecture program at Morgan that Defendants include among their examples. (PTX 70 at 81-97.)

246. Indeed, the HBI Panel drew a distinction between the number of programs at an institution and program quality between institutions, noting that many of the programs at HBIs lag in quality compared to programs at the TWIs. (PTX 3 at 18-24.)

247. By contrast, Dr. Conrad performed a comprehensive assessment of program growth at *HBIs and TWIs* during the same period. (Conrad Demonstratives 67.)

248. Dr. Conrad focused on the inception of the Partnership Agreement for his analysis due to Maryland's commitments in the agreement to expand the programs at the HBIs. (PTX 4 at 36-37.)

249. John Oliver, former MHEC Chairman and signatory to the Partnership Agreement on behalf of Maryland, testified that per the agreement, the development of new programs was to occur at the HBIs, irrespective of the efforts by those institutions. (1/11/12 AM Trial Tr. 38 (Oliver).)

250. Despite these commitments, Maryland did not change its policies to make program approval easier for HBIs. Consequently, the TWIs developed far more programs than the HBIs. And a higher percentage of these programs were high-demand programs as compared with the programs at the HBIs. (1/12/12 PM Trial Tr. 8 (Richardson); Conrad Demonstratives 67.)

251. Specifically, Dr. Conrad determined that between 2001 and 2009, Maryland approved ***137*** new programs at its TWIs and only ***57*** new programs at the HBIs. (Conrad Demonstratives 67.) Moreover, ***approximately 77%*** of the programs the TWIs received were unique (non-duplicated); whereas, only ***approximately 43%*** of the new programs at the HBIs were unique. (Conrad Demonstratives 67.) In addition, ***approximately 23%*** of the new unique

programs at the TWIs were high-demand, whereas, only ***16%*** of the new unique programs at the HBIs were high demand.

252. Based on those numbers, which Defendants have not refuted except through stricken evidence, Dr. Conrad concluded that the newly introduced programs at the HBIs fell short of Maryland's commitment to expand program uniqueness at the HBIs and that Maryland did not take sufficient actions to remove the program inequality vestige of *de jure* segregation from its system of higher education. (Conrad Demonstratives 41.)

253. Accordingly, contrary to Defendants' assertion, Maryland's regulations have not effectively addressed program inequality between the HBIs and TWIs and program development at the HBIs continues to trail that at the TWIs. (1/18/12 AM Trial Tr. 74-75 (Allen).)

**B. Unnecessary Program Duplication is Not Rectified by the Desegregation of the TWIs or by Maryland's Program Approval Process.**

254. Defendants' argument with respect to unnecessary program duplication takes a winding and contradictory course. First, Defendants argue that there *can be no unnecessary program duplication in Maryland* because the TWIs are desegregated. (Defs.' FOF ¶ 126.) Yet, the desegregated status of the TWIs has never precluded a finding of unnecessary program duplication in *Fordice* or *Knight*, where the institutions had reached the 10% figure for other-race enrollment that Defendants purpose represents desegregation. (Defs,' FOF ¶ 201-202). Then, Defendants claim that COMAR provides an elaborate framework for addressing unnecessary program duplication (presumably, needlessly so), such that any instances of unnecessary program duplication are so few as to not render the system inadequate. (Defs.' FOF ¶ 248.) Finally, in a single paragraph, Defendants address Dr. Conrad's three expert reports on unnecessary program duplication by claiming that all of this unnecessary program duplication was justified, not by contemporaneous documents or studies, but by the *post hac* rationalizations

expressed in Dr. Blanshan's direct examination -- rationalizations that are insufficient under *Fordice*. (Defs.' FOF ¶ 251.)

1. <u>The desegregated status of the TWIs does not extinguish Plaintiffs' unnecessary program duplication claims.</u>

255. Defendants begin their rebuttal on unnecessary program duplication by making the disingenuous claim that "it makes no sense to speak of program duplication having a segregative effect because there is no racially identifiable [white] institution to duplicate the programs." (Defs.' FOF ¶ 126.)

256. This argument, which neither Defendants nor their witnesses ever previously raised, is purportedly based on the November 2011 joint pre-trial stipulation, in which Plaintiffs agreed that they do not contend the TWIs have failed to be desegregated. (Defs.' FOF ¶ 122-123). Specifically, Defendants state:

> By acknowledging that Maryland's non-HBIs are desegregated, Plaintiffs concede that the non-HBIs are not 'racially-identifiable' as formerly white-only institutions. In the current context, therefore, it makes no sense to speak of program duplication having a segregative effect, because there is no racially identifiable institution to duplicate the programs offered at the HBIs.

(Defs.' FOF ¶ 126).

257. Setting aside the timing and sincerity of Defendants' argument, it is nonetheless readily dispatched by a review of civil rights precedent. Contrary to Defendants' claim, as the rulings in *Fordice* and *Knight* make clear, simply because a TWI has been desegregated does not exempt it from being considered racially identifiable or a part of the unnecessary program duplication analysis. In *Fordice*, the Supreme Court identified the widespread duplication as necessitating further inquiry about whether the State had met its duty to dismantle its prior *de jure* segregated system, despite the desegregation of the TWIs at the time of the Court's decision. *See U.S. v. Fordice*, 505 U.S. at 725, 738 (1992) (describing the TWIs as "predominantly white,"

not exclusively so). Similarly, in *Knight*, the District Court found unnecessary program duplication, despite the desegregation of the TWIs. *See Knight v. Alabama*, 787 F. Supp. 1030, 1063 (N.D. Ala. 1991) (referring to Alabama's non-historically black institutions as "majority-white"), *aff'd* in part, *vacated* in part, *rev'd* in part on other grounds, *Knight v. Alabama*, 14 F.3d 1534 (11th Cir. 1994); (*see also* 1/23/12 Trial Tr. AM 60 (Howard) (referring to Maryland's TWIs as "predominately white.").)

258. In *Fordice*, the TWIs in Mississippi had an average of 9-20% other-race enrollment and thus had reached the 10% other-race enrollment figure that Defendants purport characterizes a desegregated institution. *See* 505 U.S. at 725. In addition, "more than 99 percent of Mississippi's white students were enrolled" at the subject TWIs. 505 U.S. at 725. This is a percentage comparable to the percent of white enrollment (98%) at Maryland's TWIs out of the total white enrollment for public, four-year institutions in the State. (*See* PTX 934 at 18.)

259. Despite the desegregated status of the TWIs in *Fordice*, the Supreme Court concluded that "[i]t can hardly be denied that such duplication was part and parcel of the prior dual system of higher education— the whole notion of 'separate but equal' required duplicative programs in two sets of schools—*and that the present unnecessary duplication is a continuation of that practice*." 505 U.S. at 738 (emphasis added).

260. Moreover, contrary to Defendants' urging, the Supreme Court's finding of unnecessary program duplication was not *dependent upon* its existence in conjunction with other vestiges. (*See* Defs' FOF ¶ 250 ("It was only because the 'duplication issue . . . does not stand alone, but instead operated 'in conjunction' with 'the element of differential admissions standards', that the *Ayers/Fordice* court found similar institutional offerings between

Mississippi's HBIs and geographically proximate, racially identifiable TWIs raised an inference that duplication continued to promote segregation.")

261. Rather, the Supreme Court was admonishing the District Court for not considering the effects of unnecessary program duplication in combination with other State policies in evaluating the State's constitutional duty. 505 U.S. at 739. This is made clear by the following excerpt, which places the Court's discussion of unnecessary program duplication in its proper context:

> "The District Court's treatment of [program duplication] is problematic from several different perspectives. . . . Finally, by treating this issue in isolation, the court failed to consider the combined effects of unnecessary program duplication with other policies, such as differential admissions standards, in evaluating whether the State had met its duty to dismantle its prior de jure segregated system."

U.S. 505 at 738-739 (emphasis added).

262. As in *Fordice*, the practice of unnecessary program duplication in Maryland is itself traceable to the prior *de jure* era, but it does not stand alone. Rather, Maryland's policies and practices of limited missions, underfunding, unequal program development at the HBIs and differential admissions standards likewise independently perpetuate and work in concert with unnecessary program duplication to perpetuate a segregated system. (*See* Pls.' FOF ¶¶ 228 - 411.)

263. In *Knight*, the District Court similarly found unnecessary program duplication, despite the desegregated condition of the TWIs. Specifically, the TWIs had an average of 12.6% black enrollment and thereby had also reached the 10% other-race enrollment figure that Defendants claim represents desegregation. Moreover, as in Maryland, the substantial majority of blacks (59%) in Alabama attended TWIs rather than HBIs. 787 F. Supp. at 1063. These findings were not disturbed by the Eleventh Circuit on appeal.

264. Just as the TWIs' desegregated status was not sufficient to extinguish the Plaintiffs' claims in *Fordice* and *Knight*, nor is it dispositive here. Moreover, Maryland's own documents reflect that the desegregation of the TWIs does not terminate the program duplication analysis. For example, although Maryland's TWIs admitted other-race students as early as the 1960s, forty years later with the signing of Partnership Agreement, the State recognized the ongoing vestige of unnecessary program duplication as an area that needed to be rectified. (1/11/12 AM Trial Tr. 34-35 (Oliver); PTX 833.)

265. Specifically, the Partnership Agreement makes clear that desegregation is a two-fold obligation for the State that must occur at the TWIs as well as the HBIs. (PTX 4 at 30 ("All public colleges and universities commit to continuing and expanding their recruitment and admissions activities, including ongoing self-evaluation of their effectiveness, to assure that African Americans have equal access to public higher education in Maryland at the undergraduate, graduate and professional levels in desegregated institutions, including *desegregated TWIs and [HBIs]*.") (emphasis added).)

266. Indeed, OCR continued to notify Maryland that it believed Maryland to be engaging in the practice of unnecessary program duplication as late as 2005 with the approval of the Towson and UB joint-MBA program, despite the desegregated status of the TWIs at that time. (PTX 36.)

267. Specifically OCR notified Maryland that it had questions about whether approval of the joint MBA program at the TWIs Towson and UB was consistent with Maryland's obligation to avoid unnecessary program. Wendella Fox, who negotiated the Partnership Agreement on behalf of OCR, wrote MHEC:

> [W]e have serious questions about whether approval of the program is consistent with Maryland's commitments and its Agreement with the

> Office of Civil Rights, specifically, those included in Commitment #8, *Avoiding Unnecessary Duplication and Expansion of the Mission and Program Uniqueness and Institutional Identity of the [HBIs]*.

(PTX 36.)

268. OCR's letter was sent at a time when UB and Towson each had 1,288 black students of 4,895 total enrolled (26.3%) and 2,031 black students of 18,011 total enrolled (11.3%), respectively. (PTX 448 at 14-17.)

269. OCR's concerns were echoed by Maryland's Attorney General's Office when analyzing the legality of Maryland's approval of the joint Towson/UB-MBA program. Specifically, counsel to MHEC from the Office of the Attorney General advised: "There is little question that the proposed MBA program, if approved, would constitute 'unnecessary program duplication' as that term of art is defined and articulated in federal law." (PTX 14 at 2) This memorandum attached no relevance to the well-known fact that Maryland's TWIs were desegregated and had been for decades. (1/5/12 PM Trial Tr. 86 (Popovich).)

270. As discussed above, Defendants' claim that the desegregated condition of the TWIs contravenes a finding of unnecessary program duplication is undermined by case law and the advice of OCR and the Office of the State's Attorney General. Tellingly, Defendants offer no cite for their assertion.

2. <u>Maryland's program approval regulations do not address unnecessary program duplication.</u>

271. After arguing that unnecessary program duplication cannot exist in Maryland, Defendants then spend numerous pages making the contradictory argument that the regulations issued by MHEC are an "elaborate system designed to avoid specifically the types of program duplication about which Plaintiffs complain." (Defs.' FOF ¶ 201.)

272. To be clear, Plaintiffs are complaining about only one type of program duplication: unnecessary program duplication.

273. As defined by Dr. Conrad, unnecessary program duplication exists when broadly similar academic programs, which are "not essential for the provision of general and specialized education in the core liberal arts and sciences at the undergraduate level", "are offered by a[n] [H]BI and a TWI with overlapping service areas." (PTX 70 ¶¶ 25-26.)

274. The Supreme Court in *Fordice* cited and applied Dr. Conrad's definition of unnecessary program duplication in its opinion. 505 U.S. at 738; *see also Knight v. Alabama*, 14 F.3d 1534, 1541 (11th Cir. 1994) (citing the duplication of programs at historically black institutions and historically white institutions in the same geographic area as a policy recognized in *Fordice* as having a segregative effect.)

275. Maryland and OCR likewise adopted Dr. Conrad's definition of unnecessary program duplication in the Partnership Agreement's Commitment 8 ("**Avoiding Unnecessary Program Duplication and the Expansion of Mission and Program Uniqueness and Institutional Identity at the HBIs**"). (1/10/12 AM Trial Tr. 36-37 (Conrad); PTX 4 at 36.)

276. Maryland also relied on this definition in 2004, when it retained Dr. Conrad as a consultant to perform an independent assessment of whether proposed academic programs at TWIs would unnecessarily duplicate programs at HBIs. (1/10/12 AM Trial Tr. 9 (Conrad).)

277. In 2005, Maryland's Attorney General advised MHEC utilizing the definition of unnecessary program duplication from *Fordic*e as part of his opinion regarding the Towson/UB MBA program. (PTX 698 at 23.)

278. Despite Maryland's well-documented awareness of and specific commitment to avoid *unnecessary program duplication*, nowhere in COMAR is this standard addressed. Rather,

the only standard expressly mentioning duplication in COMAR's Criteria for Program Review is "Reasonableness of program duplication, if any," which until recently has focused on efficient use of State resources as opposed to the *Fordice* standard. (*See* DTX 400 at 12-13.)

3. MHEC's reasonableness of program duplication standard differs from that of the program duplication standard in *Fordice.*

279. "Reasonableness of program duplication" is not identified in *Fordice*, *Knight*, or the Partnership Agreement. Indeed, despite Dr. Conrad's considerable experience as an expert witness in *Fordice* and *Knight* and work as a program duplication consultant to Maryland, OCR, and the United States Department of Justice, he testified that he has never come across the term. (1/10/12 AM Trial Tr. 8-10, 57 (Conrad).)

280. Former President of Morgan State Earl Richardson, who was president from 1984 until 2010, distinguished between unnecessary and unreasonable program duplication, stating:

> Q. Well, let me ask you, Dr. Richardson. What is the difference between unnecessary program duplication and unreasonable program duplication?
> A. Well, as had been interpreted in my dealings with MHEC, the unnecessary was really language that came out of *Fordice* and was directly related to the responsibility of the State in terms of diversity, in terms of equal educational opportunity, and desegregation. Associated with dismantling the dual system. So those considerations related to that. Then carried with it the concept of unnecessary duplication, when you were talking about establishing more than one program in a given area. If it's unreasonable, then I think it was more general in its application. And it was, from the State standpoint of view, it had been always interpreted, is it efficient, is this the most efficient way of doing things, or would it be better for us to build out the existing program at an existing institution? And so one is an efficiency measure. The other one is the desegregation issue, the *Fordice* standard.
> Q. Which one is the efficiency measure?
> A. The unreasonable, as has been interpreted by the State. And then the unnecessary is the desegregation-related issue.

(1/12/12 PM Trial Tr. 21-22 (Richardson); *see also* 1/11/12 PM Trial Tr. 58-59 (Sabatini) (describing unreasonable program duplication as "dealing with the state's obligations to be cost effective and cost efficient.")

281. By focusing on cost effectiveness of duplicative programming alone, the unreasonable program duplication analysis fails under *Fordice* because it does not assess whether there is a sound educational justification for the program that cannot be met under less segregative means. *See* 505 U.S. at 744 ("Where the State can accomplish legitimate educational objectives through less segregative means, the courts may infer lack of good faith; 'at the least it places a heavy burden upon the [State] to explain its preference for an apparently less effective method.'")

282. Indeed, this was the very critique made by Pace McKonkie, counsel to MHEC from the Maryland Attorney General's Office, regarding the Secretary of Higher Education's analysis of the UB/Towson MBA proposal. Jake Oliver, the former Chairmen of MHEC, agreed with this critique, as set forth below:

> Q. Can you please turn your attention to Page Three? . . . It states here, ["]It's a matter of concern, however, that the Secretary's analysis does not adequately address sound educational justification.["] And then it goes on to state, ["]The analysis may be considered lacking by virtue of its very limited effort to address the impact upon geographically proximate HBIs.["] And then it further states, ["]Perhaps most alarming is the complete lack of an analysis regarding the possibility of accomplishing legitimate educational objectives through less segregative means.["] Did you agree that the Secretary's analysis did not adequately address sound educational justification, in your role as Chair ?
> A. Yes.
> Q. And did you agree that there had been a complete lack of analysis regarding accomplishing whatever the objectives were of the proposed program through less segregative means, in your role as Chair?
> A. I agreed.
> Q. Was there any discussion by MHEC regarding expanding the MBA program offered by Morgan in response to the Towson MBA program proposal?
> A. No.

(1/11/2012 AM Trial Tr. 50-51 (Oliver).)

283. Until a few months ago, the unreasonable program duplication standard *never* included an analysis of whether there was an educational justification for duplication of an existing program at an HBI, as required under *Fordice*.

284. No doubt because the unreasonable program duplication standard is neither synonymous with nor equally vigilant in ensuring against violations of Title VI of the Civil Rights Act of 1964, Maryland changed the law (without notifying the parties or this Court) on April 2, 2012 to include an assessment of educational justification as part of this standard. COMAR 13B.02.03.09.

285. *Before this trial*, the COMAR factors MHEC considered to determine unreasonable program duplication were limited to the following:

> C. Determination of Duplication.
> (1) In determining whether a program or course of study is unreasonably duplicative, the Secretary shall consider:
> (a) The degree to be awarded;
> (b) The area of specialization;
> (c) The purpose or objectives of the program or course of study to be offered;
> (d) The specific academic content of the program or course of study;
> (e) Evidence of the quality of the proposed program in comparison to existing programs; and
> (f) An analysis of the market demand for the program.
> (2) The Commission staff analysis shall include an examination of factors, including:
> (a) Role and mission;
> (b) Accessibility;
> (c) Alternative means of educational delivery;
> (d) Analysis of enrollment characteristics; and
> (e) Residency requirements.

(PTX 694; DTX 400 at 15-16.)

286. *After trial*, Maryland amended these criteria to require that MHEC analyze the "[e]ducational justification for the dual operation of programs broadly similar to unique or high-

demand programs at HBIs." A review of the legislation on the current State website now lists the criteria as set forth below. The newest factor is bolded below.

> C. Determination of Duplication.
> (1) In determining whether a program is unreasonably duplicative, the Secretary shall consider:
> (a) The degree to be awarded;
> (b) The area of specialization;
> (c) The purpose or objectives of the program to be offered;
> (d) The specific academic content of the program;
> (e) Evidence of the equivalent competencies of the proposed program in comparison to existing programs; and
> (f) An analysis of the market demand for the program.
> (2) The analysis shall include an examination of factors, including:
> (a) Role and mission;"
> (b) Accessibility;
> (c) Alternative means of educational delivery including distance education;
> (d) Analysis of enrollment characteristics;
> (e) Residency requirements.
> (f) Admission requirements; and
> **(g) Educational justification for the dual operation of programs broadly similar to unique or high-demand programs at HBIs.**

COMAR 13B.02.03.09 (emphasis added).

287. The "unmodified" unreasonable program duplication standard that Maryland employed before April 2012 did not prevent unnecessary program duplication as revealed, at a minimum, by the two instances where OCR notified Maryland that it was perpetuating unnecessary program duplication while this standard was in place. These instances were: (i) in 1998, when OCR informed Maryland that its approval of the Towson doctoral educational leadership program unnecessarily duplicated Morgan's educational leadership program; and (ii) in 2005, when MHEC wrote MHEC regarding the UB/Towson MBA program. (1/11/12 AM Trial Tr. 23-24 & 41-42 (Oliver).)

288. Moreover, former President of Morgan State, Dr. Richardson, testified that as a result of the watered-down nature of the unreasonable program duplication standard, the State

was able to approve the joint MBA program at UB/Towson. (1/12/12 PM Trial Tr. 20-21 (Richardson).)

289. Even higher numbers of unnecessary program duplication were found by Dr. Conrad as having taken place between 2000 and 2009, which covered the period of the Partnership Agreement when Maryland was utilizing the "unmodified" unreasonable program duplication standard. Pursuant to Dr. Conrad's analysis, detailed in Plaintiffs' Corrected Findings of Fact and Conclusions of Law, paragraphs 603-10, the State approved ***18 new programs*** at TWIs that unnecessarily duplicated programs at HBIs. (Conrad Demonstratives 60.)

290. Moreover, when Dr. Conrad investigated unnecessary program duplication in Maryland as of 2010, when MHEC was still utilizing the "unmodified" unreasonable program duplication standard, ***65 of the 109 non-core programs*** at HBIs were unnecessarily duplicated at a TWI. (Conrad Demonstrative 78; *see also* Pls.' FOF ¶ 611.)

4. The State's equal opportunity obligations have not prevented unnecessary program duplication.

291. Defendants admit that the State does not consider unnecessary program duplication as part of its program review criteria. (2/7/12 AM Trial Tr. 89-90.) Yet, Defendants claimed for the first time at trial that Maryland considers unnecessary program duplication as an available basis for objection pursuant to the statutory criteria of "failure to meet the state's equal opportunity obligations." (2/6/2012 AM Trial Tr. 25 (Blanshan).)

> Under COMAR 13B.02.03.26: [w]ithin 30 days of receipt of a notice of an institution's intent to establish a new program under this regulation, *the Commission may fil*e, or the institutions of higher education in the State may file with the Commission, an objection to the implementation of a proposed program if the objection is based on: (1) Inconsistency of a proposed program with the institution's approved mission; (2) Unreasonable program duplication which would cause demonstrable harm

> to another institution; or (3) Violation of the State's equal educational opportunity obligations under State and federal law.

(DTX 400 at 29-30) (emphasis added).

292. Despite MHEC's *ability* to object to proposed programs on the above basis, MHEC *has never actually* objected on the basis of *unnecessary program duplication* on its own accord. In fact, the evidence shows that it was only *after OCR or an HBI* raised *their* concerns with MHEC regarding a proposal's potential to result in program duplication that MHEC ever considered the issue. (*See, e.g.* PTX 14, PTX 955)

293. Specifically, with respect to the UB/Towson MBA program, MHEC only solicited an opinion from the Office of the Maryland Attorney General regarding unnecessary program duplication following the receipt of a letter *from OCR* that the program's approval constituted a violation of *Fordice*. (PTX 14; 1/11/212 AM Trial Tr. 43-44 (Oliver).)

294. Additionally, with respect to the Doctorate of Management degree in Community College Leadership at UMUC, it was only after *Morgan's objection* on the grounds of unreasonable program duplication that MHEC addressed the issue. There, MHEC's analysis focused primarily on unreasonable duplication with only a line reference to unnecessary program duplication in a discussion of Commitment 8 of the Partnership Agreement. (PTX 955 at 5.)

295. Indeed, even Dr. Blanshan's remarks to the Maryland General Assembly regarding the program at UMUC did not address unnecessary program duplication either in her discussion of unreasonable program duplication or the State's equal opportunity obligations. (DTX 329b.)

296. Thus, even if unnecessary program duplication *can be* prevented under the State's equal opportunity obligations, it is clear from the record that MHEC *has never* taken the initiative in making objections on this basis. Instead, and despite having broad coordinating

responsibilities under COMAR, MHEC has only *reactively* addressed unnecessary program duplication when raised by OCR or the HBIs.

5. *Fordice* does not provide an exception for *de minimis* instances of unnecessary program duplication.

297. Finally, Defendants make the claim that even if there are "one or even a few instances" of unnecessary program duplication that it does not mean that Maryland's system is inadequate or that Maryland has a policy or practice of unnecessary program duplication. (Defs.' FOF ¶ 248) Tellingly, Defendants offer no cite for this claim.

298. *Fordice* contains no exception for "one or even a few instances" of unnecessary program duplication. The opinion of the Court was clear that "[i]f policies traceable to the *de jure* system are still in force and have discriminatory effects, those policies too must be reformed to the extent practicable and consistent with sound educational practices." U.S. 505 at 729.

299. Defendants offer no reason nor any proof to support that there are only a few instances of unnecessary program duplication in Maryland or that they should be permitted. Indeed, Defendants do not even cite the permitted exception that it would not be practical and consistent with sound educational practices to reduce these instances further.

300. Should this Court find that there are instances of unnecessary program duplication that do not fall within *Fordice's* permitted exception, then Maryland's system for preventing such duplication *is inadequate* and the policy and practice of unnecessary program duplication persists. *See* 505 U.S. at 743 ("But surely the State may not leave in place policies rooted in its prior officially segregated system that serve to maintain the racial identifiability of its universities if those policies can practicably be eliminated without eroding sound educational policies.")

6. Defendants' critiques of Dr. Conrad's analysis lack merit.

301. Defendants attempt to cabin the Court's finding of unnecessary program duplication, if any, to the few instances discussed above at paragraphs 294-95 by: first, attempting to discredit Dr. Conrad's analysis by citing critiques, which are inapplicable here, made by the trial court in *Fordice*; and second, by providing demand-based justifications for program duplication, without addressing whether that demand could have been met at the HBIs. (Defs.' FOF ¶¶ 249, 251.)

a. Dr. Conrad did not rely solely on CIP codes to assess program duplication in Maryland.

302. Defendants point to the *Fordic*e trial court's critique of Dr. Conrad's use of CIP codes to criticize his program duplication analysis here. (Defs.' FOF ¶ 249)

303. Notably, the trial court in *Fordice* was itself criticized at length by the United States Supreme Court for not applying the correct legal standard. 505 U.S. at 738. With respect to unnecessary program duplication, the Supreme Court specifically stated of the trial court's analysis:

> ***The District Court's treatment of this issue is problematic from several different perspectives.*** First, the court appeared to impose the burden of proof on the plaintiffs to meet a legal standard the court itself acknowledged was not yet formulated. It can hardly be denied that such duplication was part and parcel of the prior dual system of higher education-the whole notion of "separate but equal" required duplicative programs in two sets of schools-and that the present unnecessary duplication is a continuation of that practice. *Brown* and its progeny, however, established that the burden of proof falls on the *State,* and not the aggrieved plaintiffs, to establish that it has dismantled its prior *de jure* segregated system. *Brown II, 349 U.S., at 300, 75 S.Ct., at 756.* The court's holding that petitioners could not establish the constitutional defect of unnecessary duplication, therefore, improperly shifted the burden away from the State. Second, implicit in the District Court's finding of "unnecessary" duplication is the absence of any educational justification and the fact that some, if not all, duplication may be practicably eliminated. Indeed, the District Court observed that such duplication "cannot be justified economically or in terms of providing quality

> education." 674 F. Supp., at 1541. Yet by stating that "there is no proof" that elimination of unnecessary duplication would decrease institutional racial identifiability, affect student choice, and promote educationally sound policies, the court did not make clear whether it had directed the parties to develop evidence on these points, and if so, what that evidence revealed. See *id.*, at 1561. ***Finally, by treating this issue in isolation, the court failed to consider the combined effects of unnecessary program duplication with other policies, such as differential admissions standards, in evaluating whether the State had met its duty to dismantle its prior de jure segregated system.***

U.S. 505 at 738 (emphasis added).

304. Moreover, the Supreme Court did not adopt any critiques of Dr. Conrad's program duplication analysis, though it did apply his definition of unnecessary program duplication (as did the trial court). 505 U.S. at 738.

305. Notwithstanding the above, the trial court did level the following critique regarding the use of CIP codes to identify instances of unnecessary program duplication:

> As the United States' expert is first to acknowledge, analysis of duplication by CIP codes tells little of the internal makeup of programs such as program emphasis, quality and/or the relative academic rigor of the program. Similarly, duplicative CIP programs at two universities may lead to an altogether different degree at each university. As such, it is difficult to accept the proposition that Conrad's analysis actually yields an answer to the threshold question he himself poses: "[h]as this formally *de jure* curriculum system been dismantled?"

*Ayers v. Fordice*, 879 F. Supp. at 1445.

306. However, the critiques raised by the trial court are not relevant here. As reflected by Dr. Conrad's October 1, 2010 expert report, he *also* performed an assessment of unnecessary program duplication in Maryland as of 2010 utilizing the criteria of program title, purpose, and curriculum. (PTX 72 at 2.) His analysis was performed with the specific purpose of determining "the extent to which use of the CIP program inventory may have led to underestimation or overestimation of unnecessary program duplication between Maryland's TWIs and [HBIs] in my Third Expert Report, dated June 15, 2010." (PTX 72 at 2.)

307. Utilizing the additional criteria, Dr. Conrad identified ***12 programs*** that were unnecessarily duplicated that he had not previously identified using the CIP methodology and ***9 programs*** that, upon closer examination, he determined were not unnecessarily duplicated. (PTX 72 at 2.) As a result of his findings, he determined that had actually *under-counted* by 3 those instances of unnecessary program duplication utilizing the CIP methodology and that "the CIP typology provides a sound overall classification for identifying program offerings." (PTX 72 at 2.)

308. Accordingly, because Dr. Conrad's program duplication analysis in *this case* does not rely solely on CIP codes, the *Fordice* trial court's critique of his CIP code analysis is irrelevant here.

7. Dr. Blanshan did not provide sound educational justifications for Maryland's unnecessary program duplication.

309. Not until paragraph 251 of Defendants' Findings of Fact do they squarely address the merits of Dr. Conrad's findings with respect to unnecessary program duplication. There, Defendants provide a cursory justification for the approval of duplicative programming and cite to the testimony of Dr. Blanshan in support. (Defs.' FOF ¶ 251.)

310. As a threshold matter, Dr. Blanshan's generalized testimony regarding need does not provide sufficient justification for the instances of unnecessary program duplication identified by Dr. Conrad. The November 8, 2005 Maryland Attorney General Opinion undermines Maryland's suggestion that unnecessary program duplication can be justified by general testimony unsupported by contemporaneous documents. The Attorney General's Opinion makes clear that Maryland's justifications must be scrutinized and supported by objective data.

> First, as Justice O'Connor stressed, an educational justification must be scrutinized to ensure that it does not "merely mask" the perpetuation of

> segregative practices, *Fordice,* 505 U.S. at 744 (O'Connor, concurring). Thus, the proffered justification should be supported by sound reasoning and, where available, empirical evidence. Moreover, such justifications may not violate the terms of any applicable OCR agreement.

(PTX 698 at 21.)

311. The Attorney General's Opinion rightly points out that the Court must analyze Maryland's justifications to determine whether they are consistent with the State Plan, and if not, it will not be deemed a sound educational justification.

> Second, the justification should be assessed in light of the State's expressed goals and priorities. The General Assembly has established by statute a systematic basis for analyzing, planning, and setting priorities in higher education policy. The Maryland Higher Education Commission must periodically produce a State Plan for Higher Education, developed in consultation with post-secondary education officials across the State. Annotated Code of Maryland, Education Article ("ED"), §11-105. That plan is to identify higher education needs present capabilities, and future objectives and priorities. ED §11-105(b)(2). If the educational justification for a proposal is inconsistent with the statewide objectives and priorities, it is unlikely to be deemed "sound educational policy."

(PTX 698 at 21.)

312. In this case, as Dr. Allen pointed out, Maryland made no such showing. And in any case, as the Attorney General's Opinion makes clear, Maryland must prove that it could not have met the State demand through less segregative means -- such as placing the programs as one of the HBI -- something that it never seriously considered because of its view of the role of the HBIs in Maryland's system of higher education as being largely limited to educating African Americans, and increasingly those who cannot obtain admission to the TWIs.

313. Dr. Blanshan's testimony is also unavailing because the reasons that she proffered for duplication were rejected under *Fordice*, based on a mistaken understanding of Dr. Conrad's analysis, or non-responsive.

a. Programs first approved at TWIs are not exempt from being unnecessarily duplicative.

314. The most glaring problem with Defendants' proffered set of justifications is their position that any instance of program duplication, where the program was first begun at a TWI, is *per se not unnecessary program duplication.* (Defs.' FOF ¶ 251; 2/7/12 AM Trial Tr. 19 (Blanshan).)

315. At trial, Dr. Blanshan testified that it is MHEC's position that whenever a program is first begun at a TWI, it cannot be considered unnecessarily duplicated if it is later approved at an HBI. (2/7/12 AM Trial Tr. 19-20 (Blanshan).)

316. As Dr. Conrad's three reports make clear, instances of unnecessary program duplication may occur at HBIs and TWIs with overlapping service areas if the institutions offer broadly similar programs, irrespective of where the program was first begun. (2/7/12 AM Trial Tr. 16 - 17 (Blanshan).)

317. A program first begun at a TWI that is later duplicated at an HBI is no less pernicious in perpetuating a segregated system because it fosters a "separate, but equal" system of higher education, in which students can meet their non-core educational desires at institutions that have traditionally served their race. As Dr. Allen, Plaintiffs' student choice expert, explained on rebuttal:

> Q. Doctor, I believe that Miss Blanshan, Dr. Blanshan testified in terms of program duplication. It matters in their analysis who had the program first, whether the TWI had it first or an HBI had it first. In terms of your assessment, does it matter who had the program first?
> A. Ultimately not. And for me, that's a problematic framing of the question by virtue of the fact that there is a history that restricted and limited the ability of HBI's to have programs first. I mean, it was a *de jure* system that removed that implied competition and removed that implied possibility and opportunity for black schools to have those programs first. But that aside, the fact of the matter is that the research, the historical record, the testimony that I read in this case, and in other cases, makes very clear that when you have the sort of duplication between TWI's and

> HBI's, the result tends to be creation and continuation of segregation by race.

(2/8/12 PM Trial Tr. 23-24 (Allen).)

318. Moreover, if, as Defendants purport, unnecessary program duplication could *only* occur where the HBI first had the program, then a State could simply circumvent an unnecessary program duplication finding by granting all of the programs first to the TWIs and then later duplicating them at the HBIs. Not even the trial court in *Fordice* attempted to create such a loop-hole in the unnecessary program duplication analysis. Nor, was such an exception recognized by the Supreme Court in *Fordice* or the Eleventh Circuit in *Knight*. This Court should not credit such a justification here.

319. Defendants admit that ***approximately one-third of the instances of unnecessary program duplication*** identified by Dr. Conrad were for programs first begun at a TWI. (2/7/12 AM Trial Tr. 16-17 (Blanshan).) Accordingly, Defendants' justification for at least this amount of unnecessary program duplication (approximately 20 programs) lacks merit.

b. Programs approved prior to 2001 are not exempt from being unnecessarily duplicative.

320. Defendants also proffer the justification that "a number of programs [identified as unnecessarily duplicated] were established before the time period identified as relevant by Dr. Conrad." (Defs.' FOF ¶ 251).

321. Yet Dr. Blanshan admitted on cross-examination that she had misspoken when she testified that Dr. Conrad's relevant timeframe was limited to 2000 forward. (2/7/12 AM Trial Tr. 12 (Blanshan).).

322. Actually, Dr. Conrad performed two separate analyses of unnecessary program duplication. First, as reflected in his second expert report, he investigated from 2001 through 2009 Maryland's actions in avoiding unnecessary program duplication. (Conrad Demonstratives

60; PTX 70 at 101.) In addition, as reflected in his third expert report, he performed a snapshot in 2010 of unnecessary program duplication in Maryland -- irrespective of when the programs were initially approved -- to demonstrate the amount of unnecessary program duplication in the State at that time. (Conrad Demonstratives 78; PTX 71 at 2, 85-86).

323. ***Forty-nine of the fifty-six instances of unnecessary program duplication*** identified by Dr. Conrad in his third report were for programs begun prior to 2000. (2/7/12 AM Trial Tr. 19 (Blanshan).) As a percentage of the non-core programs at Maryland's HBIs, this figure is higher than the percentage of unnecessary program duplication in Mississippi in the *Fordice* case. *See Ayers*, 111 F.3d at 1218.

324. Thus, these instances alone constitute a finding of unnecessary program duplication traceable to the *de jure* era given the unsupported nature of Defendants' justification for them.

c. Programs approved in different geographic regions of the State are not exempt from being unnecessarily duplicative.

325. Defendants also proffer the justification that "a number [of programs] were in different geographic regions of the State." (Defs.' FOF ¶ 251.)

326. As a threshold matter, Dr. Conrad did not merely perform a statewide analysis of program duplication, but also two regional analyses based on the TWIs and HBIs in Baltimore/College Park and Eastern Shore, respectively. (PTX 71 at 85.)

327. Pursuant to the Baltimore/ College Park analysis, ***51 of the 86 non-core programs*** at the HBIs in Baltimore/College Park were unnecessarily duplicated, which was ***59%*** of the HBIs' non-core programs -- a percentage still higher than the amount of unnecessary program

duplication in *Fordice*.[17] (PTX 71 at 85, Conrad Demonstratives 82, *Ayers*, 111 F.3d at 1218.) Accordingly, even if limited to the Baltimore/College Park findings alone, this Court has ample evidence of a policy and practice of unnecessary program duplication in the State.

328. Moreover, unnecessary program duplication is based on overlapping service areas. (PTX 70 ¶ 25.) And all of Maryland's HBIs and TWIs have overlapping service areas as evidenced by the fact that they all have a statewide draw and their largest student enrollments come from the same Maryland counties. (PTX 934 at 24; *see also* Pls.' FOF ¶¶ 615-619.)

329. The institutions overlapping service areas is evidenced by the fact that these institutions are within 49 miles one another and, as Defendants' expert Dr. David Hossler testified, most college students attend an institution within 80 miles of where they live. (Pls.' FOF ¶ 615; 2/6/12 PM Trial Tr. 72 (Hossler).) It is also evidenced by the State's increased reliance on distance learning initiatives, such as on-line programs, which have the effect of expanding service areas. (1/29/12 Ltr. to Court re C. Conrad analysis (DTX #298) at Exhibit C (PTX 703 at 2).)

330. Accordingly, Defendants' justification for unnecessary program duplication on the basis that the program is offered in a different part of the State is undermined by the realities of the proximity of these institutions and their statewide draw.

d. A program's status as high-need or high-demand does not exempt it from being unnecessarily duplicative.

331. Finally, Defendants attempt to justify unnecessary program duplication on the basis that "a number involved high need or high demand programs." (Defs.' FOF ¶ 251.) There are two problems with Defendants' justification.

---

[17] Dr. Conrad explained that the amount of unnecessary program duplication on the Eastern Shore was lower due to the fewer course-offerings (and thereby, fewer non-core course offerings) that could be duplicated as compared with schools in the Baltimore/College Park area. (1/10/12 AM Trial Tr. 83 (Conrad).)

332. First, Dr. Blanshan's assessment of need was since 2000 -- not as of the time the program was approved. Only ***18 of the 145 programs*** counted among Dr. Conrad's 65 instances of unnecessary program duplication were approved after 2000. (*See* Conrad Demonstrative 60 & 78.) Thus, for the vast majority of programs identified by Dr. Conrad as unnecessarily duplicative, Dr. Blanshan admitted that she had not gone back to determine the need for program when he was actually approved:

> Q. Okay. Now, with respect to need, Dr. Blanshan, were you discussing the need as we sit here to date, or the need at the time the programs were approved backs in the 1970s, or prior to the 1970s, as the case may be?
> A. By and large, I was talking about the need as defined in the 2000-2010 decade.
> Q. Did you perform an analysis of need prior to 1976?
> A. I did not.
> Q. Did you perform an analysis of need prior to 2000?
> A. I did not.

(2/7/2012 AM Trial Tr. 37-38 (Blanshan).)

333. Accordingly, there is no evidence that the market need that Dr. Blanshan identified in her testimony existed when the program was approved or was the basis for the State's approval of the program.

334. Given the State's inability to tie the need that Dr. Blanshan discussed to the actual reason the program was approved, such testimony does not surpass the sound educational justification hurdle that Justice O'Connor prescribed when she wrote that "the courts below must carefully examine Mississippi's proffered justifications for maintaining a remnant of *de jure* segregation to ensure that such rationales do not merely mask the perpetuation of discriminatory practices." *Fordice*, 505 U.S. at 744.

335. Second, the assessment that a program is in a high-need or high-demand area does not, in and of itself, provide a justification for the program to be duplicated. As this Court recognized:

> I agree that simply saying that something is a high demand area, I see two problems. First of all, she testified to that. She just went year to year what's high demand and what isn't. Number two, yes, depending on how you are offering this, it's not going to tell me as to any individual program whether that was justified because it may be a high demand area, but it doesn't mean that you can start putting in every single institution that wants it. There are other factors to consider.

(2/6/2012 AM Trial Tr. 45 (J. Blake).)

336. As demonstrated by Dr. Blanshan's testimony and explained in the 2005 opinion from the Office of the Maryland Attorney General regarding the UB/Towson MBA program, woefully lacking from Maryland's practice of justifying program duplication on the basis of need is whether the need can be met at an existing HBI:

> It is a matter of concern, however, that the Secretary's analysis does not adequately address "sound educational justification" in the specific context of a desegregating system of higher education with very specific and continuing legal obligations. The analysis may also be considered lacking by virtue of its very limited effort to address the impact upon geographically proximate HBIs. ***Perhaps most alarming is a complete lack of an analysis regarding the possibility of accomplishing legitimate educational objectives through less segregative means, particularly in light of existing programs at HBIs that are not at capacity.***

(PTX 14 at 3) (emphasis added).

337. Indeed, even Maryland's Chancellor Kirwan, agreed that one way to satisfy high need for a program would be to enhance the programs at the HBI:

> Q. Do you agree that it would be one good way to meet educational demand in Maryland, in a way to kill two birds with one stone, would be to build out programs, enhance programs at the Historically Black Institutions?
> A. I think that is, that is a strategy that can be employed, yes. Obviously depends upon the size of the demand and what it would take to meet that demand. But that would be a strategy that in some circumstances would be appropriate.

(1/24/12 PM Trial Tr. 49 (Kirwan).)

338. Without evidence as to the need for duplicative programs at the time the programs were approved or, at a minimum, the inability of the HBIs to meet the need for those programs (or, to be enhanced sufficient to meet the need of the high-demand programs), the mere fact that a program is high-demand or high need is not responsive to the claim of unnecessary program duplication. Accordingly, Defendants' justification should be disregarded as deficient.

**C. Carefully Considered Policies Do Not Break Traceability**

339. Finally, in Defendants' last paragraph addressing unnecessary program duplication, they state of COMAR that "Maryland has put in place elaborate and carefully considered policies and practices designed to eliminate any vestiges of a dual system. Even if plaintiffs had shown that a current policy has a segregative effect, they did not trace that policy to the *de jure* era." (Defs.' FOF ¶ 252.)

340. At bottom, Defendants' argument is an attempt to persuade this Court that adopting new, race-neutral and good-faith policies are sufficient to discharge their constitutional obligations. Such a strategy is not novel. Indeed, Defendants' argument is not unlike that of the trial court in *Fordice*, which likewise concluded:

> While student enrollment and faculty and staff hiring patterns are to be examined, ***greater emphasis should be placed on current higher education policies and practices to insure [sic] that such policies and practices are racially neutral, developed and implemented in good faith,*** and do not substantially contribute to the racial identifiability of individual institutions.

505 U.S. at 726-27 (emphasis added).

341. The Court of Appeals in *Fordice* articulated a similar point with respect to the change in admissions' policies from race conscious to race-neutral as sufficient for the State to fulfill its affirmative obligations under the Constitution:

> The Court of Appeals concluded that the State had fulfilled its affirmative obligation to disestablish its prior *de jure* segregated system ***by adopting***

> ***and implementing race-neutral policies governing its college and university system.*** Because students seeking higher education had "real freedom" to choose the institution of their choice, the State need do no more.

505 U.S. at 728 (quoting *Ayers v. Allain*, 674 F. Supp. at 1527) (emphasis added).

342. Ultimately, both of these courts' reasoning was overturned by the Supreme Court. Specifically, the Court held:

> ***We do not agree with the Court of Appeals or the District Court, however, that the adoption and implementation of race neutral policies alone suffice to demonstrate that the State has completely abandoned its prior dual system***. That college attendance is by choice and not by assignment does not mean that a race-neutral admissions policy cures the constitutional violation of a dual-system. In a system based on choice, student attendance is determined not simply by admissions policies, but also by many other factors. Although some of these factors cannot be attributed to state policies, many can be. ***Thus, even after a State dismantles its segregative admissions policy, there may still be state action that is traceable to the State's prior de jure segregation that continues to foster segregation. The Equal Protection Clause is offended by "sophisticated as well as simple-minded modes of discrimination."***

505 U.S. at 729 (emphasis added).

343. As with the admissions policies in *Fordice*, the fact that Maryland has "carefully considered policies and practices" is not alone sufficient to break the chain of traceability, particularly when Maryland had these same policies in place when OCR notified Maryland in 2000 that vestiges of its *de jure* system remained. (Defs.' FOF ¶ 252; *see also* 1/12/12 PM Trial Tr. 8 (Richardson); 1/11/12 AM Trial Tr. 33 (Oliver); 1/11/12 PM Trial Tr. 79 (Sabatini).)

344. As discussed above, regardless of Maryland's intentions and considerations, the fact remains that Maryland's regulations, in conjunction with the State's underfunding of HBIs, perpetuate program inequality among HBIs and TWIs through the demonstrated resource requirements. *Supra* at ¶¶ 228-53. Moreover, the regulations have not effectively prevented against unnecessary program duplicate-on because: (i) they do not expressly address unnecessary

program duplication as a standard; (ii) the equal opportunity basis for objecting to duplicative programs has not been utilized by MHEC unless concerns were voiced by OCR or the HBIs; and (iii) until very recently after trial, they did not require Maryland to assess for educational justifications for duplicative programs. *Supra* at ¶¶ 254-97.

345. Accordingly, irrespective of Maryland's "consideration," quite clearly the policy and practice of program inequality and unnecessary program duplication remain.

## VI. DEFENDANTS MISCONSTRUE BOTH THE PLAINTIFFS' BURDEN AND EVIDENCE WITH RESPECT TO STUDENT CHOICE

346. Defendants make the following four arguments with respect to student choice. First, Defendants claim that Plaintiffs failed to meet their burden of showing some policy or practice that affects student choice and perpetuates a segregated higher education system. Second, Defendants argue that Plaintiffs' only evidence on student choice came in the form of testimony from Dr. Conrad, who relied on flawed methodology. Third, Defendants note that their expert on student choice, Dr. Hossler, testified that demography rather than programs influences student choice. Finally, Defendants assert that Plaintiffs request the HBIs receive additional funding and unique, high-demand programs to attract white students in greater numbers without first establishing liability. (Defs.' FOF ¶¶ 261-264.)

347. In fact, Defendants misconstrue both the Plaintiffs' burden and evidence with respect to student choice. First, Defendants bear the burden of countering evidence that Maryland's policies and practices related to institutional mission, programs, and funding produce ongoing segregative effects by limiting student choice. Second, Plaintiffs presented overwhelming and convincing evidence that Maryland's traceable policies and practices continue to produce segregative effects by impeding student choice. Third, even Defendants' own expert, Dr. Hossler, concedes that institutional attributes, programs and funding may influence student

choice. And finally, Plaintiffs demonstrate that because Maryland maintains traceable policies and practices, enhancement of Maryland's HBIs is necessary to make them comparable and competitive.

### A. Defendants Bear the Burden of Showing That Maryland's Traceable Policies and Practices Do Not Have Ongoing Segregative Effects.

348. The Defendants mischaracterize the relationship between traceable policies and practices and student choice. By doing so, Defendants attempt to shift to Plaintiffs what is properly their affirmative burden to show that Maryland's traceable policies and practices do not have ongoing segregative effects. *Fordice,* 505 U.S. at 731

349. In their Findings of Facts, Defendants commit less than four pages to the issue of student choice. (Defs.' FOF at 96-99.) In those pages, Defendants identify virtually no evidence relevant to the relationship between student choice and segregative effects, an issue for which they bear the affirmative burden. Instead, Defendants fundamentally misinterpret the Plaintiffs' burden as it relates to student choice by arguing that Plaintiffs failed to demonstrate a state policy or practice affects student choice and perpetuates a segregated system of higher education. (Defs.' FOF ¶ 264 (citing *Fordice,* 505 U.S. at 742).)

350. Defendants cite *Fordice* to imply that the Plaintiffs bear – and failed to meet – the burden of showing a policy or practice of the State "affects student choice and perpetuates a segregated higher education system." (Defs.' FOF ¶ 264 (citing *Fordice,* 505 U.S. at 742).) However, this language is taken completely out of context and does not stand for the proposition Defendants suggest – read in its entirety, it is clear that this language relates to remedy, *not* the burden for determining segregative effects or student choice. *Fordice,* 505 U.S. at 742.

351. In determining whether elimination of program duplication and revision of admissions criteria might require the closure or merger of universities, the Supreme Court

observed, "this issue should be carefully explored by inquiring and determining whether retention of all eight institutions itself *affects student choice and perpetuates the segregated higher education system*, whether maintenance of each of the universities is educationally justifiable, and whether one or more of them can be practicably closed or merged with other existing institutions." *Fordice*, 505 U.S. at 742. This statement in no way supports Defendants' proposition that Plaintiffs have a burden to produce evidence that Maryland's policies influence choice and foster ongoing segregation in its colleges and universities.

352. In fact, *Fordice* clearly places the burden of proving that traceable policies and procedures do not create ongoing segregative effects by restricting student choice squarely on Defendants – *not* the Plaintiffs. *Fordice*, 505 U.S. at 731 ("If the State perpetuates policies and practices traceable to its prior system that continue to have segregative effects – *whether by influencing student enrollment decisions* or in other facets of the university – and such policies are without sound educational justification and can be practicably eliminated, the *State has not satisfied its burden* of proving that it has dismantled its prior system." (emphasis added).)

353. Student choice is therefore more appropriately viewed as a function of segregative effects – not traceable policies and practices. Choice does relate to traceable policies and practices in that a state's policies and practices may have segregative effects on student choice if they prevent that choice from being "truly free." However, student choice is an aspect of segregative effects which flows from Maryland's burden to demonstrate its policies do not produce discriminatory effects. This relationship between segregative effects and choice is illustrated by the Eleventh Circuit's discussion of whether limited institutional missions influence student choice in *Knight*: "It appears to us that the district court never actually addressed the substance of *Fordice*'s second inquiry: whether the HBIs current mission

assignments have continuing segregative effects on student choice." *Knight*, 14 F.3d at 1544. While the Plaintiffs bear the burden of showing mission assignments are traceable, Defendants bear the burden of demonstrating no segregative effect on student choice.

354. While Defendants bear the burden of showing no segregative effects, Plaintiffs produced substantial and convincing evidence that Maryland's HBIs continue to be racially identifiable, such that student choice is not yet "truly free." This is outlined in great detail in paragraphs 133-46 above, which addresses ongoing segregative effects and will not be repeated here.

355. It is worth reiterating, however, that the HBIs remain racially identifiable institutions. Maryland's four HBIs continue to have a low actual number and percentage of white students, especially as compared to the TWIs. As of fall of 2009, the white student enrollment at Bowie was 4.2% of total campus enrollment, 1.3% at Coppin, 13.3% at UMES and 2.8% at Morgan. Enrollment of Hispanic and Asian students accounted for less than 2% of total student enrollment at all four of Maryland's HBIs. (*See* PTX 755 at 16.) Equally persuasive is that Defendants acknowledge that even today, Maryland's HBIs are neither diverse nor successful at attracting other race students. (1/24/12 PM Trial Tr. 30 (Kirwan).)

356. As a result, Plaintiffs argue that the educational opportunities afforded those students continues to be influenced by the more limited institutional roles and missions assigned to the HBIs, the failure to avoid duplicative programs at geographically proximate TWIs, and the failure to adequately fund and support the HBIs.

357. What is perhaps more significant is what is noticeably *absent* from Defendants' Findings of Fact and Conclusions of Law with respect to student choice. As addressed above, Defendants bear the burden of demonstrating that Maryland's traceable policies related to

mission, programs and funding do not produce ongoing segregative effects. Moreover, Defendants agree that "*Fordice* teaches that student choice is the key to determining whether a post-secondary-school system retains unconstitutional vestiges of segregation." (Defs.' FOF ¶ 260.) Even so, in the six paragraphs Defendants commit to this issue, they offer virtually no substantive evidence to counter the substantive evidence in the record related to the ongoing discriminatory effects perpetuated by Maryland's traceable policies and practices. (*See* Defs.' FOF ¶¶ 260-265.)

**B. Defendants Also Misrepresent the Evidence Related to Student Choice**

358. In addition to misconstruing the burden of proof, Defendants mischaracterize the Plaintiffs' evidence on traceable policies and practices and how theose policies and practices continue to impair student choice. Contrary to Defendants' assertions that Plaintiffs' only evidence on student choice was the flawed testimony of Dr. Conrad, Plaintiffs in fact presented substantial testimonial and documentary evidence that Maryland's traceable policies and practices with respect to institutional mission, programs and funding continue to influence student enrollment in a manner inconsistent with the state's affirmative obligation to eliminate the vestiges of discrimination in higher education. The record is replete with evidence to support Plaintiffs' assertions that Maryland's traceable policies and practices with respect to institutional role and mission, programs, and funding continue to restrict student choice.

1. <u>The policies and practices Plaintiffs challenge are recognized as affecting student choice.</u>

359. As this Court is aware, *Fordice* outlines a three-part analysis to determine whether the state has fully met its remedial obligation to dismantle policies and practices that perpetuate the vestiges of discrimination by inhibiting student choice. *Fordice*, 505 U.S. 729-31; *Knight*, 14 F.3d at 1540-42. Once Plaintiffs identify traceable policies and practices with

ongoing "discriminatory taint," *Fordice*, 505 U.S. at 734, the burden shifts to Defendants to demonstrate that there are no ongoing segregative effects as a result. Policies or practices with segregative effects are those which "influence student enrollment," and may include those that discourage or prevent blacks from attending traditionally white institutions, or those which discourage other race students from seeking to attend historically black institutions. *Knight*, 14 F.3d at 1541. Thus, segregated or racially identifiable institutions are indicative that student choice is not free.

360. The Supreme Court clearly recognized that there are two broad categories of practices that can impede free choice by students. Most significant to this case, it has been held that the assignment of limited institutional roles and missions, the duplication of programs at HBIs and TWIs within the same geographic proximity, the failure to locate unique, high-demand programs at HBIs, and the failure to provide comparable funding are all policies and practices that restrict student choice. *See Fordice*, 505 U.S. at 733; *Knight*, 14 F.3d at 1541. Thus, each of the traceable policies and practices challenged by Plaintiffs fall squarely within what the Supreme Court has agreed may perpetuate segregated institutions by influencing student choice. Indeed, outside of the context of this litigation, Maryland's Attorney General has recognized that the Partnership commitments related to mission, funding, and unnecessary program duplication were "designed to enhance student choice or reduce the stigmatic identifiability of institutions. PTX 698 at 27. To now argue that these policies and practices are irrelevant to student choice is yet another example of Maryland asserting whatever argument seems expedient.

2. <u>Defendants' own expert agrees that programs and funding influence student choice</u>.

361. While Dr. Hossler testified that demography, rather than programs, influences student choice and the characteristics of the student population at a school, (2/6/12 PM Trial Tr.

48-50, 59-63 (Hossler)), he conceded that programs and funding may influence student choice. His own research recognizes that a number of studies conclude that institutional attributes may influence student choice, such as special academic programs, tuition, availability of financial aid, academic reputation, location, size and the social atmosphere at a school. (PTX 129 at 271.)

362. Dr. Hossler also testified that "some unique programs can attract other race students." (2/6/12 PM Trial Tr. 58 (Hossler).) He clarified that "programs that are not found at every place in the country" – unique programs – "may make a difference in who enrolls." (2/6/12 PM Trial Tr. 59 (Hossler).) Where an institution offers a program that is the "only game in town," it will attract more students. (2/6/12 PM Trial Tr. 63 (Hossler).) As an expert in *Knight*, he agreed that "locally situated high demand programs would help the HBI's." (2/6/12 PM Trial Tr. 60 (Hossler).)

363. Dr. Hossler even acknowledged that it would take "a lot of money to attract other race students" to historically black institutions. (2/6/12 PM Trial Tr. 60 (Hossler).) He acknowledged that students would be attracted to new facilities and programs. (2/6/12 PM Trial Tr. 64 (Hossler).) That would obviously require additional funding. Dr. Hossler further testified that "the biggest thing the state can do to impact student choice between HBI's and TWI's is financial aid." (2/6/12 PM Trial Tr. 66 (Hossler).) This contemplates both need-based aid and merit aid, which Dr. Hossler testified may "eliminate barriers and remedy segregation." (2/6/12 PM Trial Tr. 67 (Hossler).)

3. Plaintiffs presented evidence which demonstrates that inequalities in institutional mission at Maryland's HBIs have influenced student choice.

364. As in *Fordice*, "[t]hat different missions are assigned to the universities surely limits to some extent an entering student's choice as to which university to seek admittance." *Fordice*, 505 U.S. at 741. An institution's mission is essential to attracting other race students

because it drives the school's ability to pursue advanced and specialized programs, as well as develop a varied portfolio of curricular offerings. *See Fordice*, 505 U.S. at 741. On the other hand, limited institutional missions may constrain the overall competitiveness of historically black institutions. *Fordice*, 505 U.S. at 741.

365. Here, Plaintiffs produced evidence that an institution's mission is an important element of student choice. As Dr. Conrad testified, "mission matters" in terms of the programs offered, the degree level they are offered at, the number of programs available, and range of programs, and that all of these factors affect student choice. (1/10/12 AM Trial Tr. 44-45 (Conrad).) Even so, Maryland "did not significantly change its policy of limited missions at the traditionally black institutions." (1/10/12 AM Trial Tr. 75-76 (Conrad).) A more limited mission, on the other hand, restricts a school's ability to attract a diverse student body as well as their competitiveness for funding. (PTX 13 at 3, 8-9.) For example, the *Baltimore Sun Times* noted in a lengthy opinion piece that Morgan was stigmatized as "Negro only," creating a significant disadvantage in the effort to compete for students. (PTX 268 at 17.)

366. Dr. Allen testified that Maryland's policies and practices with respect to mission have a segregative effect on student enrollment. (1/18/12 AM Trial Tr. 66 (Allen) ("The fact of the matter is that those policies and practices of the State creating and maintaining proximate [HBIs] and TWIs has had, and continues to have segregative effects. It just creates a situation where absent academic missions . . . explicit[ly] being assigned to HBIs . . . then [HBIs] are just . . . perceived as . . . black schools.").) The issue is whether a school is in a position to project "an academic rationale for choosing it" or whether it remains in a "restrictive position" of being racially identifiable. (1/18/12 AM Trial Tr. 68 (Allen).)

367. Dr. Allen elaborated that Maryland's policy and practice of not providing a mission supported by meaningful program uniqueness as HBIs means the defining characteristic of those schools is their "historic racial identity and their mission to serve black students." As a consequence, "white students choosing between an HBI and a TWI with similar programs is [sic] almost inevitably going to choose to attend the institution that does not have an explicit racial focus on students of a racial group different than their own." (1/18/12 PM Trial Tr. 88-89 (Allen).)

368. Plaintiffs presented extensive evidence that Maryland itself acknowledges the critical role that mission plays in desegregation. In its 1980 desegregation plan with OCR, Maryland specifically recognized that the HBIs "should be developed to their fullest potential in keeping with their roles and missions," and that the HBIs have been "unique" in their contribution to diversity of educational opportunity and "freedom of choice in Maryland." (PTX 263 at 14-15.)

369. Pursuant to the 2000 Partnership Agreement, each institution's mission was to be revised in a way which would support expansion of programs at the HBIs and promote desegregation at both the TWIs and HBIs. (PTX 4 at 38.) "The revised missions [were to] support future establishment of high demand programs at the [HBIs] that [would] enhance their respective institutional identities. The missions [were to] ensure that they [did] not promote racial identifiability at any of the State's public institutions of higher education or otherwise foster segregation and discrimination by race." (PTX 4 at 36.)

370. The HBI Presidents believed their limited missions affected student choice. In 2005, they observed that the institutional missions and role of the HBIs restricted their ability to offer education in a diverse environment. "Historically, HBIs have had relatively narrow

missions and substantially fewer academic program [offerings] than majority campuses. This has limited their attractiveness to students of all races." (PTX 13 at 9.) For their part, TWIs have had little reason to view HBIs as recruitment peers when competing for students. (1/25/12 PM Trial Tr. 54 (Dudley-Eschbach) (noting that she, as the President of Salisbury does, not consider HBIs to be recruiting peers).)

4. Plaintiffs presented significant evidence that Maryland's traceable policies and practices with respect to programs continue to restrict student choice.

371. In order for racial desegregation to occur at Maryland's HBIs and for them to attract, recruit and retain white students, they must be able to offer programs not available at the TWIs. The placement of "unduplicated high demand programs has a definite impact on the enrollment of other race individuals at an otherwise racially identifiable institution," materially assisting in desegregation. *Knight*, 787 F. Supp. at 1331. Continued placement of high demand programs at TWIs in close proximity to HBIs has the contrary effect of "restricting influence on the latter's ability to attract white students" undermining the state's constitutional duty to desegregate. *Knight*, 787 F. Supp. at 1331. Where policies allow white students to satisfy their curricular desires at TWIs, whereas they cannot satisfy them at TWIs, they discourage them from choosing to attend HBIs. *Knight*, 14 F.3d at 1541.

372. Defendants argue that Dr. Hossler testified that it would be a "very, very rare student" for whom academic major or program offerings played a role in the first stage of making a college choice. (2/6/12 PM Trial Tr. 18 (Hossler).) Defendants observe that Dr. Hossler instead emphasizes that the "vast majority" of students think about the "institution." (2/6/12 PM Trial Tr. 59 (Hossler).) Yet Dr. Hossler also testified that "some unique programs can attract other race students." (2/6/12 PM Trial Tr. 58 (Hossler).) He clarified that "programs that are not found at every place in the country" – unique programs – "may make a difference in

who enrolls." (2/6/12 PM Trial Tr. 59 (Hossler).) Where an institution offers a program that is the "only game in town," it will attract more students. (2/6/12 PM Trial Tr. 63 (Hossler).) In fact, Dr. Hossler conceded that as an expert in *Knight*, he agreed that "locally situated high demand programs would help the HBI's." (2/6/12 PM Trial Tr. 60 (Hossler).)

373. In addition, an institution's prestige or reputation for quality may influence student choice. "Another major factor attracting White students concerns the [HBIs] reputation: [HBIs] with good reputations are much more likely to attract White students." (PTX 73 at 6.) Indeed, Dr. Hossler acknowledges there is a tendency for institutions is to try to "trade up" in an effort to influence student behavior and student choice. (*See* 2/6/12 PM Trial Tr. 22-23 (Hossler).) Dr. Howard also acknowledged that overall selectivity rankings such as U.S. News & World Report may have some influence over student choice. (1/23/12 AM Trial Tr. 78 (Howard).) As noted by Dr. Conrad, the HBIs trail the TWIs in U.S. News and World Report rankings. (Conrad Demonstratives 85.)

374. Dr. Allen agreed that "convenience is one factor" which influences student choice, including where a school is located relative to where a student lives. (1/18/12 AM Trial Tr. 112 (Allen).) However, Dr. Allen elaborated that the research also shows "a sizaeble impact from the kinds of programming and majors that are offered at the institution." (1/18/12 AM Trial Tr. 112 (Allen).) In both Alabama and Mississippi, Dr. Allen was part of a panel of experts which recommended that HBIs receive "high-demand programs that are in many cases exclusive programs, and those programs then translated into changing the identity or helping to change the identity of the institutions . . . bringing more white students in." (1/18/12 PM Trial Tr. 53 (Allen).) When asked whether Dr. Allen had determined whether those recommendations had been successful, he testified, "[y]es." (1/18/12 PM Trial Tr. 53 (Allen).)

375. Without unique, high-demand programs, HBIs are circumscribed in their ability to attract a racially diverse population of prospective students, as evidenced by a 1997 study on the reasons why white students select HBIs. (*See* PTX 73 at 4-6.) Dr. Conrad, who served as the lead author of the study, attributes declining enrollment at Maryland's HBIs to unnecessary program duplication and the absence of unique, high-demand programs at those schools. (1/10/12 AM Trial Tr. 59-61 (Conrad).) While Dr. Hossler criticized that study, he still agrees with the fundamental conclusion that the number of non-duplicated programs is relevant to an institution's ability to attract more students. (*See* 2/6/12 PM Trial Tr. 63 (Hossler).)

376. Dr. Allen also testified that program duplication impedes desegregation efforts irrespective of whether the original program was placed at a TWI or an HBI. This is attributed both to "a history that restricted and limited the ability of HBIs to have programs first," as well as the fact that program duplication reinforces and maintains a dual system of education, which allows for racial bias to influence student choice. (2/8/12 PM Trial. Tr. 23 (Allen); 1/18/12 AM Trial Tr. 64-66 (Allen).) Without meaningful academic differentiation, "white students choosing between an [HBI] and a TWI with similar programs [are] almost inevitably going to choose to attend the institution that does not have an explicit racial focus on students of a racial group different than their own." (1/18/12 AM Trial Tr. 89 (Allen); PTX 661 at 8.)

377. Plaintiffs presented evidence that program offerings influence both academic identity, as well as the diversity of an institution. While some factors that drive student choice may be convenience or geographic proximity to a student's home, "[there is] a sizeable impact from the kinds of programming and majors that are offered at the institution." (1/18/12 AM Trial Tr. 112 (Allen).) Dr. Allen elaborated that the remedy is to refine the institution identity to create "academic foci and specialties for [the HBIs]." (1/18/12 AM Trial Tr. 89 (Allen).)

378. Rejecting arguments that demographic change may account for decreasing other race enrollment at Maryland's [HBIs] between 2002 to 2009, Dr. Allen explained that the inability to mount unique, high-demand programs is the "true explanation . . . driving those changes." (2/8/12 PM Trial Tr. 25 (Allen).) Indeed, Dr. Allen views demographic changes as one reason why Maryland should implement policies and practices to increase the attractiveness and ability of HBIs to serve students of all races, not merely rely on black student enrollment to drive growth, which would have the "ultimate effect of expanding higher education opportunities in the State of Maryland and ensuring that the groups of students who have aspirations to earn degrees would have a broader set of choices and be able to earn those degrees in institutional settings that were excellent to the greatest extent possible." (1/18/12 PM Trial Tr. 64 (Allen).)

379. Maryland acknowledges the role that programs have in influencing student choice. The Cox Report recognized that each HBI should develop its own "specialty areas or programs within the total state system of higher education that will broaden the appeal of the institution to a more diverse student body." (PTX 22 at 20-21.) It was further recommended that the HBIs be presented as "models" for how to successfully educate black and disadvantaged students. (PTX 22 at 22.)

380. In 1985, Maryland entered a desegregation agreement with OCR in which it made a "strong commitment" to make its HBIs attractive to students of all races. (PTX 305 at 15.) In order to do so, Maryland committed to improving academic programs at its HBIs, recognizing that "a reputation for high quality [programmatic] offerings will contribute significantly to the long-term attractiveness of these campuses." (PTX 305 at 22-23.)

381. In the 2000 Partnership Agreement, Maryland again agreed to increase the attractiveness of its HBIs to all students, especially other race students, and committed to doing

so by eliminating unnecessary academic program duplication among the HBIs and geographically proximate TWIs. (PTX 4 at 24.) Declines in other race enrollment at any level of study were to require "immediate corrective action." (PTX 4 at 31.)

382. As referenced above, in their 2005 letter to the Maryland black Caucus, the four Presidents of the HBIs noted that "[t]he position of these four institutions . . . and any uniqueness in missions and programs between the HBIs and TWIs is being systematically eroded." (PTX 13 at 3.) Observing that this programmatic gap between the HBIs and TWIs had in fact widened during the period of the 2000 Partnership Agreement, they recognized that fewer academic program offerings at the HBIs "limited their attractiveness to students of all races." (PTX 13 at 9.) The HBI Presidents ultimately concluded that "HBIs need to offer students the same quality and range of educational experiences as students attending other campuses," and that those campuses "need to be competitive for students of all races and students who can afford to attend without substantial financial assistance." (PTX 13 at 13.)

383. Dr. Thompson further clarified that "a good indicator of the extent to which HBIs are competitive with their peers will be the extent to which they . . . attract students of other races based on program equality." (1/4/12 PM Trial Tr. 28 (T. Thompson).) Had Maryland given priority to achieving parity between the HBIs and the majority campuses, the HBIs would be in position to attract students who want good programs regardless of race. (1/4/12 PM Trial Tr. 21-22 (T. Thompson).)

384. According to Dr. Popovich, when the Maryland Council of Higher Education approved duplicative programs, white students began moving to TWIs. (PTX 184 at 8-11.) As the state began to desegregate its campuses, overall enrollment slowed down and "white schools kept their white students and added black students," but "black schools did not add white

students." (1/5/12 AM Trial Tr. 109 (Popovich); *see also id* at 82 ("It's a competitive environment. Anybody can fare poorly in the competition and need not be an [HBI]. But I think we know from history that [HBIs] were less well-equipped for the competition that ensued when development started taking place than the white schools were.").)

385. The record reveals that while Maryland later approved new and attractive programs at its HBIs following that period, competition with geographically proximate institutions and lack of funding to support those programs diluted and undermined the results of those efforts. (PTX 268 at 18.) By 2008, UMBC and Towson both exceeded Morgan in terms of program offerings, and while UMES experienced a relative increase in the overall number of degree offerings it still offers fewer programs than Salisbury, its geographically proximate peer institution. (PTX 39 at 60.)

386. The evidence further shows that more limited duplication of programs on the Eastern Shore have allowed for more unique programs and greater diversity at UMES. (PTX 856 at 51.) Dr. Thompson testified that UMES has been able to enroll higher numbers of white students in those programs which are not duplicated at Salisbury, the neighboring TWI. For example, its aeronautics program is "quite heavily patronized by white students," as is the accelerated pharmacy program that is a unique to UMES. (1/4/12 PM Trial Tr. 80 (T. Thompson).) Even so, as of 2010 UMES has been experiencing a "steady decline" in the percentage of non-African American students since 2004, which UMES attributes – at least in part – to the budget cuts which prevented it from implementing a marketing strategy with a non-African American recruiter. (PTX 892 at 90.)

5. Plaintiffs presented substantial evidence that Maryland's traceable funding policies have limited student choice.

387. It is indisputable that severe under-resourcing of Maryland's HBIs is an integral aspect of the formerly dual system of higher education, and that such underfunding has a strong influence on student enrollment. *See Fordice*, 505 U.S. at 739-40; *Knight*, 787 F. Supp. at 1271-72. For example, *Knight* specifically recognized that the facilities at Alabama's TWIs were far superior to those at its HBIs both functionally and aesthetically in ways likely to influence student choice. *Knight*, 787 F. Supp. at 1278-79.

388. Likewise, Maryland's practice of providing inadequate and inequitable support for its HBIs extends to infrastructure and facilities, as is evident by the inferior physical plants on those campuses. However one analyzes Maryland's funding formula over time, the missions, programs, facilities and reputations of Maryland's HBIs confirm that they continue to be delegated an inferior status, "prevent[ing] white students who would otherwise attend an HBI from choosing to do so." *Knight*, 900 F. Supp. at 307.

389. Dr. Allen testified that Maryland's "misguided and unequal funding priorities" left HBIs under-resourced and "unable to compete in the educational marketplace." (1/18/12 AM Trial Tr. 69 (Allen).) He emphasized that "this pattern of underfunding goes back to the very inception of those campuses, and has been continued, and has cumulative effectives over a century relative to the TWIs." (1/18/12 AM Trial Tr. 69 (Allen).) "As the field of higher education, and as strategies for competing for students have shifted in this contemporary moment, schools have been emphasizing, trying to present the kinds of features that would allow them, and help [them] to win the competition for students." (1/18/12 AM Trial Tr. 70 (Allen).) Dr. Allen also observed that "in that kind of a competition, in that kind of a reality, the [HBIs] are severely disadvantaged." (1/18/12 AM Trial Tr. 71 (Allen).)

390. As a consequence of funding policies and practices traceable to the *de jure* era, Maryland's HBIs experienced smaller growth as measured by state funding per FTE. During the 1990s, the record demonstrates that Maryland's failure to provide adequate appropriations to the HBIs had an "enormous" detrimental impact on their ability to attract other race students. (1/12/12 AM Trial Tr. 91-92 (Richardson).) Even the Defendants' own expert agreed that it would take "a lot of money to attract other race students" to historically black institutions. (2/6/12 PM Trial Tr. 60 (Hossler).)

391. Plaintiffs presented substantial evidence that infrastructure and facilities impact student enrollment. Institutional infrastructure and facilities are essential not just to a school's ability to offer programs, but must be of such a nature and quality that students and faculty would choose to be there. (1/10/12 PM Trial Tr. 51 (Taylor).) Dr. Richardson also testified that among other things, "[s]tudents are attracted to what they believe are modern facilities." (2/8/12 AM Trial Tr. 92 (Richardson).)

392. Dr. Kaiser testified that he understood facilities to play a key role in student choice. (1/17/12 AM Trial Tr. 12 (Kaiser).) He understood that student choice is affected by facilities, and referenced the comments of Ernest Boyer, former Chancellor of State University of New York, who opined that because facilities are so important in terms of campus characteristics, the director of buildings and grounds may actually be more important than the academic dean. (1/17/12 PM Trial Tr. 68 (Kaiser).) Dr. Kaiser also referenced other studies (the 1986 Carnegie Foundation of the Advancement of Teaching and another approximately twenty years later by Dr. Craig and Gary Reynolds) which reiterate that for up to two-thirds of students, the quality of facilities is "very important" in terms of where they choose to attend college, and that "the way an image is established of a campus is perpetuated for generations." (1/17/12 PM

Trial Tr. 69 (Kaiser).) "[I]t is quite clear that student choice is affected by the attractiveness and functionality of facilities. How you support your programs, how you implement programs, attract and retain students is affected by the quality and condition of the facilities." (1/17/12 PM Trial Tr. 76-77 (Kaiser).)

393. This opinion was echoed by Dr. Thompson, who testified that research shows that "campus visits constitute a major factor as students choose where they will get their degrees," and that "they would choose a campus that has facilities that are state-of-the-art and modern." (1/4/12 PM Trial Tr. 18 (T. Thompson).) Dr. Allen also observed that after visiting the facilities and making comparisons between Maryland's campuses, "it was just glaringly apparent that [HBIs] were lagging behind TWIs in terms of just the kinds of facilities, and the richness of those facilities, and the age of those facilities," leading him to conclude that "when you compare those campuses, it is quite apparent that the [HBIs] lag behind the TWIs in terms of attractiveness." (1/18/12 AM Trial Tr. 70 (Allen).) Indeed, even Dr. Hossler acknowledged that students would be attracted to new facilities and programs. (2/6/12 PM Trial Tr. 64 (Hossler).)

394. Maryland recognized the importance of adequate facilities in attracting students to campus. For example, Maryland's 1981 Consultant's Report to the Desegregation Task Force noted that students who visited the "neat, trim, well-kept, well-supplied, clean freshly painted, well-lit classrooms, halls, studios and seminar rooms at UMBC or Towson and then compared them with Morgan would immediately choose the former regardless of the quality of the program." (PTX 40 at 150.)

395. The HBI Panel visited each of the campuses in an effort to assess the comparability of facilities and HBIs. (PTX 2 at 122.) It concluded that the facilities at the HBIs "visibly lag" behind those at the TWIs in spite of recent capital investments, noting that

addressing those facilities was essential to achieving the "capacity and competitiveness of the HBIs in both undergraduate and graduate education." (PTX 2 at 140.) The Panel further noted that campuses must be attractive and safe as a means of attracting well-prepared students, implicitly recognizing the relationship between facilities and student choice. (PTX 2 at 141.)

396. In addition to facilities, Maryland's 2009 State Plan noted that "[t]he lack of comparable IT services restricts the capacity of HBIs to compete in certain markets for students and to be competitive in the delivery of effective and efficient administrative services. (PTX 1 at 31.) This directly affects the ability of the HBIs to fulfill their academic missions, and to compete for what Chancellor Kirwan described as the "wired generation." (1/23/12 PM Trial Tr. 65-66 (Kirwan).)

397. Inadequate libraries, science labs, facilities and infrastructure identified by the HBI Panel and the 2009 Maryland State Plan impact the academic experience of students at all four of the HBIs in a way likely to influence student choice. "The physical environment of a campus, including its facilities and infrastructure such as landscaping, utilities, and data/telecommunications systems, contributes substantially to quality graduate education. To recruit and support top doctoral faculty and students in their programs and research activities, the overall university infrastructure needs to be modern, attractive, safe and conducive to research and scholarship." (PTX 2 at 141.)

398. With respect to Morgan, Dr. Wilson testified that Morgan's technology infrastructure is "shocking" and "very, very poor," making it difficult to compete with TWIs. (1/4/12 AM Trial Tr. 33-35 (Wilson).) In spite of a new library building, students must resort to conducting research at TWIs like Johns Hopkins, Towson or UMBC given the inadequacy of Morgan's holdings. (1/4/12 AM Trial Tr. 27-28 (Wilson).) The science labs lack basic

equipment such as working microscopes. (1/3/12 PM Trial Tr. 62-63 (Wilson).) The science facility is a "hodgepodge" or a "make-do" facility that bears little resemblance to the standard of a world-class university. (1/4/12 AM Trial Tr. 22 (Wilson).) Lack of state of the art equipment has compromised the ability of Morgan to prepare students for careers in communication technology, as Morgan's students are not adequately prepared for positions in their profession. (1/4/12 AM Trial Tr. 71-72 (Wilson).) Dr. Heidelberg described the situation with respect to technology, equipment, library and facilities at Morgan as "egregious." (1/9/12 PM Trial Tr. 94 (Heidelberg).) Dr. Kaiser confirmed that at Morgan, "research facilities for a research university really don't exist." (1/17/12 AM Trial Tr. 52 (Kaiser).) Morgan's attractiveness to talented faculty is diminished because it lacks funding for graduate assistants and laboratory start-up funds, which makes it less competitive for students who want to study with those professors. (1/4/12 AM Trial Tr. 14-16 (Wilson).)

399. Financial aid and tuition are also related to student choice, and the HBIs inability to offer adequate financial aid, coupled with the need to keep tuition low, impacts student choice.

400. Dr. Hossler testified that "the biggest thing the state can do to impact student choice between HBI's and TWI's is financial aid." (2/6/12 PM Trial Tr. 66 (Hossler).) This contemplates both need-based aid and merit aid, which Dr. Hossler testified may "eliminate barriers and remedy segregation." (2/6/12 PM Trial Tr. 67 (Hossler).)

401. Dr. Richardson agreed that "the absence of funding for financial aid at our historically black colleges has an adverse impact on your ability to recruit those students." (2/8/12 AM Trial Tr. 92 (Richardson).)

402. In addition to convenience and programs, Dr. Allen testified that cost is also a factor cited by students as influencing their selection of a college or university. (1/18/12 AM

Trial Tr. 112 (Allen).) He concluded, among other things, that Maryland's "misguided funding priorities have left the [HBIs] under-resourced, unable to compete on equal footing in the educational marketplace, and therefore neither comparable, nor competitive." (1/18/12 AM Trial Tr. 116 (Allen).) This led to Dr. Allen's recommendation that additional funding at the HBIs – along with expanded missions and unique, high-demand programs – would better equip HBIs to attract students of all races. (1/18/12 AM Trial Tr. 112 (Allen).)

## VII. DEFENDANTS ERRONEOUSLY ASSERT THAT PLAINTIFFS FOCUS ON REMEDY TO THE EXCLUSION OF LIABILITY.

403. Ignoring the substantial record on traceable policies and practices, Defendants claim that Plaintiffs demand a remedy before demonstrating liability. Defendants further assert that Plaintiffs seek the remedy of additional funding for the HBIs without first demonstrating a traceable policy or practice. "Even assuming that what plaintiffs seek would result in greater white student enrollment, what they request is a remedy; remedies need not be considered unless and until a plaintiff establishes liability." (Defs.' FOF ¶ 265).

404. However, Defendants ignore the fact that the record includes extensive testimony and documentary evidence that enhancement and additional funding for the HBIs is necessary to redress the ongoing segregative effects produced by Maryland's traceable policies with respect to mission, programs and funding. Plaintiffs clearly demonstrated that as a result of Maryland's traceable policies related to mission, programs and funding, enhancement of its HBIs is necessary to make them comparable and competitive to their TWI counterparts.

405. As described above, and as outlined in great detail in Plaintiffs' Corrected Findings of Fact and Conclusions of Law, Plaintiffs presented overwhelming evidence that Maryland's traceable policies and practices related to mission, programs and funding continue to produce segregative effects on student choice. Comparability and competitiveness is about

student choice, and Plaintiffs have demonstrated that enhancement efforts are essential to ensuring that student choice is free from racial considerations.

406. As previously mentioned, student choice drives desegregation efforts in the context of higher education. Comparability and competitiveness is a function of student choice, requiring enhancement of mission, programs, funding, facilities and infrastructure at the HBIs to render them realistic options for students interested in pursuing higher education at one of Maryland's public colleges or universities. It is important to note that Defendants' own expert agreed that whether the HBIs are comparable and competitiveness with the TWIs is relevant to the issue of student choice. (2/6/12 PM Trial Tr. 53 (Hossler).)

407. According to the U.S. Department of Health and Human Services[18], the criteria issued to assist states in the preparation of desegregation plans pursuant to Title VI should enable HBIs to "overcome the effects of past discrimination" by assuring that "students will be attracted to each institution on the basis of educational programs and opportunities uninhibited by past practices of segregation." Revised Criteria Specifying the Ingredients of Acceptable Plans to Desegregate State Systems of Public Higher Education, 43 Fed. Reg. 6658, 6661 (Notice Feb. 15, 1978). This anticipated defining institutional missions on a basis "other than race," and the introduction of both resource and programmatic improvements to HBIs to permit them to be "at least comparable" to TWIs with similar missions. 43 Fed. Reg. at 6661.

408. Several state documents acknowledge the need to improve comparability and competiveness by enhancing the HBIs, thereby increasing meaningful student choice. For example, the 1981 Consultant's Report recommended that Maryland's HBIs be enhanced by strengthening their role and missions and providing regular and special fiscal resources at levels

---

[18] Formerly known as the U.S. Department of Health, Education and Welfare.

consistent with those provided to white institutions of similar missions. (PTX 40 at 9.) Implementing these recommendations would make the HBIs comparable and competitive with comparable institutions, assuring their capacity "to serve all citizens of the State, *regardless of creed or color*." (PTX 40 at 246 (emphasis added).)

409. Similarly, among the principal objectives of Maryland's 1985 desegregation plan was the "enhancement of Maryland's [HBIs] *to ensure that they are comparable and competitive with TWIs with respect to capital facilities, operating budgets and new academic programs*. The Plan provided for a wide range of measures and activities to meet these objectives, including enhancement of the [HBIs], *desegregating student enrollments through increased recruitment and improved retention programs for African American students, and desegregating faculties, staffs and governing boards, all of which were designed to meet the mandates of Title VI* in the state-supported institutions of higher education in Maryland." (PTX 4 at 6 (emphasis added).)

410. In 1999, OCR informed Maryland that based on its analysis of the extent to which Maryland had successfully eradicated the vestiges of discrimination from its higher education system, it would focus its review on enhancing the HBIs to improve educational opportunities for the African American students who attend them and to "increase their attractiveness to students of all races." (PTX 4 at 24.)

411. Furthermore, Dr. Allen testified that institutional enhancement is tied to desegregation. (1/18/12 AM Trial Tr. 73 (Allen).) "Students are attract[ed] to campuses that are more inviting, that have more resources, that have richer programs, academic programming, and more distinguished faculty . . . ." (1/18/12 AM Trial Tr. 73 (Allen).) As a result, the HBIs are effectively "penalized" by underfunding, which impedes their ability to create programs and campus environments "that are competitive and that will be appealing to students who are

making shoppers' choices about where they will go to school." (1/18/12 AM Trial Tr. 73-74 (Allen).)

## CONCLUSION

412. During Maryland's de jure era, a number of Maryland commissions and panels documented that Maryland assigned its HBIs more limited missions than its TWIs and underfunded their missions, including their dual missions, and infrastructures to ensure that they were inferior to those of the TWIs. (*See e.g.*, PTX 18 at 108 (expressing Maryland's view as of 1947 that during the de jure era, Maryland had "consistently pursued a policy of providing higher education facilities for Negroes which are inferior to those provided for whites. The meager appropriations status and the inferior accreditation status of the Negro colleges attest to this fact.").)

413. In the Partnership Agreement, Maryland agreed to restructure the policies and practices that led to the inferiority of the HBIs by committing to (1) expand the HBIs' missions by establishing and funding unique, high-demand programs, (*see* PTX 4 at 36-37); (2) avoid unnecessary program duplication, (PTX 4 at 36),; and (3) fund the HBIs sufficiently to allow them to compete with the TWIs, (*see* PTX 4 at 37-38).

414. But Maryland's blue ribbon HBI Panel concluded that Maryland's current practice of setting institutional missions and funding its institutions accordingly perpetuates de jure era inequality and substantially marginalizes its HBIs, such that they are not in a position to compete with the TWIs for students regardless of race, fulfill their dual mission, or provide equal educational opportunities for their current students. (*See* PTX 2 at 102, 129.) As explained in the foregoing submission, this inequality is due to policies and practices that are traceable to the de jure era.

415. As for unnecessary program duplication, both OCR and the Assistant Attorney General responsible for advising MHEC warned that MHEC had misconstrued its obligations under Fordice. (*See* PTX 36 at 1; PTX 14 at 2-3.) The result is widespread unnecessary program duplication in Maryland, (see Conrad Demonstrative 60), and a belated post-trial attempt by Maryland to articulate the proper standard by amending its regulations, (*see* COMAR 13B.02.03.09), even as it argues that Fordice's unnecessary program duplication analysis no longer applies, (*see* Defs.' FOF ¶ 128 n.20).

416. The bottom line is that Maryland has not dismantled the vestiges of its de jure system and its litigation defense strategy is to make whatever argument at the moment seems expedient, no matter how at odds with its previous positions. Maryland has fallen far short of meeting its burden of proving that these traceable policies have sound educational justifications and lack segregative effects.

Dated: August 13, 2012

Respectfully submitted,
/s/

Michael D. Jones, Esq. (Bar No. 08634)
Karen N. Walker (Bar No.14181)
Henry Thompson (*pro hac vice*)
Savaria B. Harris (*pro hac vice*)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200
Email: savaria.harris@kirkland.com

Jon Greenbaum (*pro hac vice*)
Brenda Shum (*pro hac vice*)
Lawyers' Committee for Civil Rights Under Law
1401 New York Avenue, N.W., Suite 400
Washington, DC 20005
Telephone: (202) 662-8600
Facsimile: (877) 303-5039
Email: jgreenbaum@lawyerscommittee.org

Aderson B. Francois, Esq. (Bar No. 17449)
Howard University School of Law
Civil Rights Clinic
2900 Van Ness Street, N.W.
Washington, D.C. 20008
Telephone: (202) 806-8065
Facsimile: (202) 806-8436
Email: afrancois@law.howard.edu

John C. Brittain (*pro hac vice*)
2513 Gadsby Place
Alexandria, VA 22311
Telephone: (832) 687-3007
Email: jbrittatty@comcast.net