# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

THE COALITION FOR EQUITY AND    :
EXCELLENCE IN MARYLAND    :
HIGHER EDUCATION, *et al.*    :
    :
    :
       v.    :    Civil No. CCB-06-2773
    :
    :
MARYLAND HIGHER EDUCATION    :
COMMISSION, *et al.*    :

## MEMORANDUM

This action arises under Title VI of the Civil Rights Act of 1964 and the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs The Coalition for Equity and Excellence in Maryland Higher Education and named individuals associated with the organization (collectively, "the Coalition") allege that defendants State of Maryland, the Maryland Higher Education Commission ("MHEC"), and its officers in their official capacities (collectively, "the State") have failed to desegregate Maryland's system of higher education as required by federal law under the framework articulated in *United States v. Fordice*, 505 U.S. 717 (1992). The parties presented evidence during a six-week bench trial in January 2012 and subsequently submitted proposed findings and conclusions. The court held oral argument in October 2012. Under Fed. R. Civ. P. 52(a), the court makes the following findings of fact and conclusions of law.

## TABLE OF CONTENTS

I.     INTRODUCTION……………………………………………………………….3

II.    PARTIES………………………………………………………………………...4

III.   BACKGROUND…………………………………………………………………...5

    A.  Maryland's Higher Education System………………………………………...5

    B.  *De Jure* Era Segregation in Maryland Higher Education……………………..6

    C.  OCR Notification and Initial Plans (1969-2000)……………………………10

    D.  The 2000 OCR Partnership Agreement………………………………………...14

    E.  The 2009 Maryland State Plan………………………………………………15

    F.  The Coalition's Suit…………………………………………………………16

IV.    JUSTICIABILITY………………………………………………………………...16

V.    MARYLAND'S HBIs ARE RACIALLY IDENTIFIABLE………………………...20

VI.    MARYLAND HAS ELIMINATED SOME BUT NOT ALL TRACEABLE *DE JURE* ERA POLICIES AND PRACTICES AS REQUIRED BY *FORDICE*………22

    A.  Mission Setting………………………………………………………………24

        1.  Formal Mission Statements or Designations……………………………26

        2.  "Mission" as Program……………………………………………………27

        3.  TWI "Mission" Expansion………………………………………………29

        4.  The "Dual Mission" of the HBIs………………………………………..31

    B.  Operational Funding………………………………………………………...33

        1.  Maryland's Funding Formula……………………………………………34

        2.  HBI Funding Today………………………………………………………38

        3.  Other Allegedly Traceable Funding Policies and Practices……………...41

    C.  Unnecessary Program Duplication…………………………………………44

        1.  Current Unnecessary Duplication………………………………………45

        2.  Traceability of Unnecessary Duplication………………………………...47

        3.  The State's Purported Efforts to Eliminate this Practice Have Failed…...50

    D.  Segregative Effects…………………………………………………………52

E.  Purported Educational Justifications…………………………………………56

VII.    REMEDIES……………………………………………………………………..59

VIII.   CONCLUSION…………………………………………………………………60

## I.      INTRODUCTION

As the parties involved in this long-running litigation agree, Maryland had a shameful history of *de jure* segregation throughout much of the past century. Public higher education opportunities for African Americans were either non-existent or decidedly inferior to the opportunities afforded to white citizens. Most of that history, briefly summarized below, is neither disputed nor excused by the State in this case.

It should also not be disputed that the State has made great progress in recognizing and attempting to rectify those wrongs. Whether that progress is sufficient to satisfy constitutional requirements, that is, whether there exist current policies or practices attributable to the State which are traceable to the *de jure* era and have continuing segregative effects, has been the subject not only of this litigation but of much debate among the academic and governmental communities, the general public, and the media. There are sincerely held beliefs on all aspects of this very difficult debate, which cannot be satisfactorily resolved by one lawsuit, and one judicial opinion. I have considered the testimony, arguments, and evidence presented by the excellent and well-prepared counsel who appeared before me, and applied the law established by the Supreme Court in *Fordice*. I find the plaintiffs have prevailed in establishing current policies and practices of unnecessary program duplication that continue to have segregative effects as to which the State has not established sound educational justification. Remedies will be required. The plaintiffs have not, however, made that showing as to the current operational funding policies and practices put in place by the State.

3

## II.    PARTIES

Plaintiff The Coalition for Equity and Excellence in Maryland Higher Education, Inc., is an organization that was founded in 2006 to support Maryland's historically black institutions of higher education ("HBIs") and promote equity between the HBIs and Maryland's traditionally white institutions ("TWIs"). (1/17/12 AM Trial Tr. 100 (Burton).) Members of the Coalition include current and former students of Maryland's HBIs. (1/17/12 PM Trial Tr. 3 (Burton).) Plaintiff Muriel Thompson is currently a doctoral candidate at Morgan State University, a Maryland HBI. (1/3/12 PM Trial Tr. 5 (M. Thompson).) Plaintiff David Burton is an alumnus of Morgan State and founder of the Coalition. (1/17/12 AM Trial Tr. 94, 100 (Burton).) Plaintiffs Chris Heidelberg and Anthony Robinson are also alumni of Morgan State. (1/9/12 PM Trial Tr. 59 (Heidelberg); 1/12/12 AM Trial Tr. 28 (Robinson).) Plaintiff Kelly Thompson is an alumna of Coppin State University, a Maryland HBI. Plaintiff Damien Montgomery was a student at Bowie State University, a Maryland HBI, when this lawsuit was filed. Plaintiff Rahsaan Simon was a student at Morgan State when this lawsuit was filed. Plaintiff Jomari Smith is Muriel Thompson's son and was a prospective candidate for a Maryland HBI. (1/3/12 PM Trial Tr. 33 (M. Thompson).) Defendant State of Maryland was added by court order on September 25, 2010. (ECF No. 164.) Defendant MHEC is an agency of the State of Maryland. MHEC's responsibilities include (a) "ensur[ing] that the State Plan for Higher Education complies with the State's equal educational opportunity obligations under State and federal law, including Title VI of the Civil Rights Act," Md. Code Ann., Educ. § 11-105(b)(2)(ii); (b) "assur[ing] that courses and programs offered are within the scope of the approved missions of the regional higher education centers," § 11-105(d)(2)(iv); and (c) developing a program for "desegregation and equal educational opportunities," § 11-105(f). Defendant Danette Gerald Howard is

4

Secretary of MHEC and is sued in her official capacity. Defendant Kevin M. O'Keefe was the

Chairman of MHEC when this action was filed.

## III.  BACKGROUND

### A.  Maryland's Higher Education System

The Maryland Charter for Higher Education is the "statement of policy for higher

education in Maryland." Md. Code Ann., Educ. § 10-201. MHEC's duties, under the Charter,

include "[a]dvis[ing] the Governor and General Assembly on statewide higher education policy;

. . . [c]oordinat[ing] and arbitrat[ing] among different segments of higher education in the state; .

. . grant[ing] final approval of mission statements for each public institution of higher education .

. . [and] [a]ssess[ing] the adequacy of operating and capital funding for public higher education

and establish[ing] operating funding guidelines based on comparison with peer institutions and

other relevant criteria[.]" Md. Code Ann., Educ. § 10-207. The Maryland Education Code

defines the "public senior higher education institution[s]" as Morgan State University

("Morgan"); St. Mary's College of Maryland ("St. Mary's"); and the constituent universities of

the University System of Maryland ("USM"), which includes: University of Maryland,

Baltimore ("UMB"); University of Maryland Baltimore County ("UMBC"); University of

Maryland, College Park ("UMCP" or "College Park"); University of Maryland Eastern Shore

("UMES," formerly "Princess Anne"); University of Maryland University College ("UMUC");

Bowie State University ("Bowie"); Coppin State University ("Coppin"); Frostburg State

University ("Frostburg"); Salisbury University ("Salisbury"); Towson University ("Towson");

and the University of Baltimore ("UB"). Md. Code Ann., Educ. §§ 10-101, 12-101(b)(6).

Bowie, Coppin, Morgan, and UMES are Maryland's HBIs; UMCP, UMUC, UMB, UB,

Frostburg, Salisbury, Towson, and St. Mary's are its TWIs. (OCR Partnership Agreement, PTX

4, at 5.) Morgan State University has a Board of Regents and St. Mary's has a Board of Trustees. Md. Code Ann.,  Educ. §§ 14-102(a), 14-402(a). The University System of Maryland is governed by a single Board of Regents. § 12-102(b). The duties of each governing board are governed by § 10-208 and include "policy[;]" "mission statements;" "goals that are consistent with the roles and missions approved for the institutions;" and "institutional budget submissions."

### B.  *De Jure* Era Segregation in Maryland Higher Education

By the turn of the 20th century, "[o]perating under statutory direction . . . [Maryland] ha[d] established a dual system of public education, one administered for its white and one administered for its colored citizens." *(*Appellant's Brief, *Pierson v. Murray* (Md. Ct. App. 1935), PTX 773, at 9.) Prior to 1920, no public higher education opportunities existed for African Americans in Maryland. (Trial Tr. 1/5/12 AM Trial Tr. 27 (Popovich).) The state had contracted with Morgan, which was a private institution at the time, to operate UMES (at the time, it was called Princess Anne) in order to fulfill its federal 1890 land grant mandate so the state could continue to receive funding for its white land grant institution, College Park. UMES was operated merely as a college prep school, not a college campus, for black students. (*Id.* at 28-29.) Finally, by 1935, the state purchased UMES from Morgan, but UMES did not become a full-fledged college campus until the 1970s. (*Id.* at 29.)

Throughout the last century, the Governor and the General Assembly commissioned a series of reports to examine Maryland's provision of higher education to its black citizens. These provide detailed, contemporaneous accounts of the development of Maryland's dual higher education system throughout the *de jure* era. (*See id.* at 30-32.) The first such report, conducted by the 1937 Soper Commission, found that "[a] crisis has arisen in the field of higher education

for Negroes in Maryland . . . The cause is that the State has failed to make adequate provision for

Negroes in this branch of education." (Soper Commission Report, PTX 17, at 10.)

The Commission found:

> In the field of higher education, while the State has fostered white colleges for
> one hundred and fifty years it made its first grant to a Negro college in 1914 . . .
> The State organized and supported a white teacher training institution in 1866,
> seventy years ago. It has aided a Negro Normal School only since 1911 – twenty
> five years. The State of Maryland came into actual ownership of a State
> University for white students in 1918, since which time it has formally adopted a
> policy of state provision for white under-graduate, graduate, and professional
> education. It was not until 1935 that provision was made for Negro graduate and
> professional education . . . In the same year the State provided its own college for
> Negroes by the purchase of Princess Anne Academy from Morgan College
> seventeen years after the acquisition of the corresponding white institution.

(*Id.* at 146.)

The Soper Commission summarized: "It is thus clear that the white population has had

the advantage of generous state support for its higher education many years in advance of the

Negro population. The contrast between the amounts of money received by the two racial groups

would show, if possible of computation, an enormous differential in favor of the white race."

(*Id.*) The Soper report was commissioned in the wake of a lawsuit filed by an African American

who successfully petitioned to be admitted to the University of Maryland Law School in 1935.

(1/5/12 AM Trial Tr. 34 (Popovich).) By this time, "Maryland . . . was starting to feel the

pressure of providing for some choice because the courts seemed to be ruling against the kind of

situation that existed in Maryland." (*Id.*)

Following a recommendation of the Soper Commission, Maryland purchased Morgan in

1939 to provide a college education to African Americans in the state. (*Id.* at 34-35.) The report

also recommended shuttering UMES because of "how badly [it] . . . had been supported," but

this recommendation was not followed. (*Id.*)

In addition to UMES and Morgan, by this time the state also had two public teachers colleges for African Americans: Coppin and Bowie. (*Id.* at 42.) (Coppin was, at this time, run by the City of Baltimore, not the state. *Id.*) Both Coppin and Bowie were sub-standard institutions, inferior to the public white teachers colleges in Maryland, and in need of substantial improvements. (Soper Commission Report, PTX 17, at 22-24.)

By 1947, when the Marbury Commission completed a comprehensive review of higher education in Maryland (including a review of "The Problem of Separate Institutions for Negroes"), all four of the current HBIs in Maryland were under public control. (Marbury Commission Report, PTX 18, at 77.) Morgan was defined as an "undergraduate liberal arts college;" UMES was "nominally a branch of the University of Maryland and [was] designated as the land-grant college for Negroes;" Bowie and Coppin were teachers colleges for Prince George's County and Baltimore City schools, respectively. (*Id.* at 77-78.) The commission found that "[n]one of these schools [was] equal in quality to the corresponding institution maintained for the white population." (*Id.* at 78.) The commission also noted that "[a]lthough the state maintain[ed] extensive facilities for the graduate and professional education of white persons, there [was] no provision for the equivalent training of Negroes in the state." (*Id.*)

In a follow up report to the Marbury Commission that specifically examined the state's public HBIs, the 1950 Weglein Commission found: "It would hardly be feasible to attempt a complete separation of Negro higher education in Maryland from the higher education of white students in the state. The development of colleges for white students in the state has directly influenced the manner of establishment and growth of Negro institutions. The continuous uphill struggle on the part of the Negro colleges to secure facilities on a par with white institutions is a factor which cannot be overlooked in a survey of this kind." (Weglein Commission Report, PTX

826, at 15.) The Weglein Commission made a variety of recommendations, some of which were

eventually followed (such as increasing the master's degree offerings at Morgan, moving Coppin

to state control, and establishing a permanent state commission on higher education). (*See id.* at

7-9.)

In 1954, the Supreme Court decided *Brown v. Board of Education*, 347 U.S. 483 (1954),

declaring that "separate but equal" was inherently unconstitutional, but Maryland continued to

operate a segregated system of higher education for more than a decade after. (*See* 1/5/12 AM

Trial Tr. 62-64 (Popovich); Overview of Morgan State University (Popovich Demonstrative),

PTX 39, at 21, 38.) During this time, Maryland operated the University of Maryland as a

comprehensive university for white students and two four-year liberal arts colleges (Morgan and

UMES) for black students. (Conrad Expert Rep. I, PTX 69, at 6.) Notably, the Pullen

Commission report, a comprehensive study of higher education in Maryland released after

*Brown*, delineated between "white colleges" and "Negro colleges," noting that while "there

[were] Negroes in graduate schools in Maryland, there are no Negro graduate schools." (Pullen

Commission Report, PTX 19, at 39-40.)

On the heels of the Pullen Commission, two "dueling" commissions, the Warfield and

Frampton Commissions, issued reports recommending ways to expand and improve the system.

(1/5/12 AM Trial Tr. 70-73 (Popovich).) The Frampton report criticized the Warfield

Commission for failing to consider the "appropriate utilization" of the state's four HBIs. The

Frampton Commission recommended, for example, that Morgan would "serve as a branch of the

University of Maryland in the Baltimore area far more logically than . . . Towson[,]" as the

Warfield report had recommended. (Frampton Commission Report, PTX 20, at 21.) The state

ignored the Frampton Commission's recommendation, and instead of turning Morgan into the

University of Maryland's Baltimore campus—to which it was well-suited—the state opted to create a new campus entirely, the University of Maryland at Baltimore County ("UMBC"). (Popovich, "Higher Education Development in the Absence of Statewide Planning" (Feb. 2010), PTX 268, at 4.) The state later acquired the University of Baltimore ("UB") in 1973. (Popovich, Historical Context (June 1, 2005), PTX 267, at 6.) The Baltimore Sun referred to the large number of public schools in Baltimore as the "mess in Baltimore." (1/5/12 AM Trial Tr. 93-94 (Popovich).) The problem of duplicative institutions in Baltimore has never been addressed. In fact, in 2007, MHEC approved the admission of freshmen at UB, which had been limited to third and fourth year undergraduates, adding an *additional* four-year institution to the region, and UB continues to seek an expansion of its four-year offerings. (1/30/12 AM Trial Tr. 17, 60-62 (Bogomolny).)

In 1968, Maryland created the Maryland Council of Higher Education ("MCHE") which authored the state's first plan for higher education. (Popovich, Historical Context (June 1, 2005), PTX 267, at 4.) The first state plan recognized the system's segregation and the need to place unique programs at HBIs. (*Id.*) Morgan proposed becoming the state's first multi-racial institution in 1969, but the state ultimately rejected this proposal. (*Id.*)

### C.  OCR Notification and Initial Plans (1969-2000)

In March of 1969, what is now the Office for Civil Rights (OCR) at the Department of Education formally notified Maryland "that it was one of ten states operating a racially-segregated system of education in violation of Title VI of the Civil Rights Act." (Conrad Expert Rep. I, PTX 69, at 12.) Maryland submitted a "State Plan" for desegregation, and OCR "requested revisions." (*Id.*) In 1970, Maryland resubmitted the plan but OCR did not respond. (*Id.*)

In 1973, OCR informed Maryland that it was still not in compliance with Title VI and set a deadline of June 1973 for a new desegregation plan. (*Id.*) In February 1974, Maryland submitted a new plan to OCR, which was amended in May 1974 at the request of OCR. (Maryland Desegregation Plan (February 1974), PTX 381; Conrad Expert Rep. I, PTX 69, at 12.) The plan called for MCHE, which had no formal enforcement authority to review mission designations or academic programs, to implement the plan. (*Id.*)

MCHE created a task force (the "Cox Task Force") to "propose ways of enhancing the role and image of predominantly black public colleges in Maryland." (Cox Task Force Report, PTX 22, at 1.) The task force determined that Maryland's HBIs "had to develop the ability to compete despite disparities." (*Id.* at 8.) It recommended, among other changes, that HBIs be given enhanced funding and that "each historically black public college should develop its own specialty areas or programs within the total state system that will broaden the appeal of the institution to a more diverse student body." (*Id.* at 20-21.) The Cox Task Force also warned that establishing the University of Baltimore as a public college would have a negative effect on Morgan and Coppin, and it recommended that, at most, UB operate only as a "third and fourth year and postgraduate" institution. (*Id.* at 24-25.)

Maryland's plan was accepted by OCR in June 1974. ("A Plan to Assure Equal Postsecondary Educational Opportunity 1985-1989" (June 1985), PTX 305, at 13). But, shortly thereafter, in response to a "mid-year desegregation status report," OCR informed Maryland that it had failed to execute its plan "promptly and vigorously" and that, unless remedial actions were taken, enforcement proceedings would be initiated. (*Id.*) In December 1975, OCR informed Maryland that it was referring the matter to the now Department of Education's Office of General Counsel and requesting "administrative fund termination proceedings." (*Id.*) In January

1976, before such proceedings began, Maryland filed suit against OCR seeking an injunction restraining OCR from initiating any administrative fund termination. (*Id.*) In *Mandel v. U.S. Dep't of Health, Education, and Welfare*, 417 F. Supp. 57 (D. Md. 1976), the court granted an injunction requiring OCR to take certain steps before any further enforcement proceedings could commence. (*Id.*)

Concerned about the eventual approval of OCR's enforcement authority, however, Maryland began desegregating its TWIs "very quickly" in order to prevent its higher education funding from being cut off. (1/5/12 AM Trial Tr. 86 (Popovich).) This desegregation was largely one-directional, with a substantial number of black students entering TWIs but not the other way around. (*Id.* at 89; *see* "Second Annual Desegregation Status Report" (Vol. III, Feb. 1976), PTX 455, at 9; "A Plan to Assure Equal Postsecondary Educational Opportunity 1980-1985" (December 1980), PTX 263, at 56.) In fact, the percentage of white students attending HBIs was at its highest in the mid-1970s, and, with some exceptions, declined thereafter. (*See* "Trends in White Graduate Students at Historically Black Institutions in Maryland" (October 2009), PTX 184, at 1). "In 1972, white students attending [HBIs] accounted for over 8% of the total white graduate/professional students attending public campuses statewide. Currently, only 2% of white students pursuing advanced degrees are enrolled at an HBI." (*Id.*) In 1976, the HBIs reported 18.2% white undergraduate enrollment. ("Second Annual Desegregation Status Report" (Vol. III, Feb. 1976), PTX 455, at 7, 11). By 2008, the enrollment of white undergraduates at HBIs was 3.35%. (Conrad Demonstrative Exhibits, at 32 (citing HBI Enrollment Data, PTX 740).)

In 1975, the Maryland General Assembly also passed legislation designating Morgan the state's "urban university" and giving the school doctoral granting authority. (Overview of Morgan State University (Popovich Demonstrative), PTX 39, at 40; *see also* Md. Code Ann.,

Educ. § 14-101(b).) However, by 1981, representatives of Morgan testified at a special legislative session that the school's ability to develop programs had been hampered by Maryland's focus on having Morgan's programs be "urban oriented." (Popovich, Historical Context (June 1, 2005), PTX 267, at 8.) Until 1994, only one doctoral program was approved at Morgan. (*Id.* at 7-9; Overview of Morgan State University (Popovich Demonstrative), PTX 39, at 40.)

By 1985, Maryland and OCR settled their ongoing litigation and jointly approved a new desegregation plan that stated it "fully conform[ed] with Title VI of the Civil Rights Act." ("A Plan to Assure Equal Postsecondary Educational Opportunity 1985-1989" (June 1985), PTX 305, at 14.) Following the expiration of the 1985 desegregation plan, Maryland submitted a final report in 1991 on the state's performance in meeting its goals. ("Plan to Assure Equal Postsecondary Educational Opportunity 1985-1989 Final Report" (May 1991), PTX 44.) The state did not meet its desegregation goals in terms of the percentage of other race enrollment at the HBIs. (*Id.* at 58.) The state also had set a goal of implementing 25 new programs at the HBIs, but had only implemented 13 new programs. (*Id.* at 14.) OCR issued no findings and had no correspondence with Maryland regarding desegregation of the HBIs between the end of the 1985 plan and 1999. (1/9/12 AM Trial Tr. 27-28 (Popovich.).) In 1994, however, Maryland did issue a "Notice of Application of Supreme Court Decision" following the *Fordice* opinion and indicated that it would apply *Fordice* "to all pending Title VI evaluations of statewide higher education systems with OCR-accepted desegregation plans that have expired, including Maryland." (OCR Partnership Agreement, PTX 4, at 7; Conrad Expert Rep. I, PTX 69, at 16.)

During this time, beginning in 1988, Maryland also reorganized its public higher education system. (Overview of Morgan State University (Popovich Demonstrative), PTX 39, at

48.) MHEC became, and continues to be, the authority charged with reviewing and approving campus missions and proposals for new academic programs. (Conrad Expert Rep. I, PTX 69, at 14.) MHEC also creates and implements operational funding guidelines. *See* Md. Code Ann., Educ. §§ 10-203, 11-302, 11-105, 11-206. MHEC is also charged with implementing desegregation. § 11-105(f). The University System of Maryland ("USM") became the governing body for all public institutions besides Morgan and St. Mary's. §§ 10-101(e)-(f), 12-101(b)(6). This reorganization, for the most part, reflects the current makeup of Maryland's public higher education institutions.

The 1999 Larson Task Force determined that MHEC and USM had not completely met their obligations under the 1988 reorganization act to develop a desegregation plan for the HBIs. (Larson Task Force Report, PTX 563, at 60-61.)

### D. The 2000 OCR Partnership Agreement

In December 2000, Maryland and OCR entered into a Partnership Agreement which "set[] forth commitments that the State and OCR anticipate will result in agreement that Maryland is in full compliance under federal law, particularly Title VI . . . and the standards set forth in *United States v. Fordice* . . . regarding Maryland's system of higher education." (OCR Partnership Agreement, PTX 4, at 4.) OCR noted that "[t]he breadth and number of efforts devoted to participation and success of African American students in Maryland higher education attest to the State's unflagging commitment to providing equal educational opportunities to all of its citizens. At all levels, the State and its public education institutions have developed and implemented far-ranging initiatives designed to maximize higher education access and success for African Americans." (*Id.* at 7.) The Agreement lists such efforts, including "special grants to

[HBIs] for development of recruitment and retention initiatives" and "strategic plans in which goals and objectives associated with African American achievement figure prominently." (*Id.*)

The "commitments" made by Maryland in the Agreement included "Avoiding Unnecessary Program Duplication and Expansion of Mission and Program Uniqueness and Institutional Identity at the [HBIs]" and "Enhancing Maryland's [HBIs]" including "assess[ing] and incorporat[ing] into its established budget and program review procedures the operating (including academic programs) and capital enhancement funding proposals for each [HBI]." (*Id.* at 36-39.) Under the Agreement, Maryland and OCR were to assess whether the commitments had been fully implemented by May 2006. (*Id.* at 45.) If so, OCR stated it would "acknowledge formally in writing that Maryland has eliminated all vestiges of segregation in its public system of higher education." (*Id.*)

In June 2006, Maryland wrote to OCR seeking such an acknowledgement and stating that it believed it had fully implemented its commitments, but OCR never responded to this letter and has taken no further action on the 2000 Partnership Agreement. (Conrad Expert Rep. I, PTX 69, at 17-18.)

### E.  The 2009 Maryland State Plan

In 2008, the Bohanan Commission to Develop the Maryland Model for Funding Higher Education appointed a panel to examine the HBIs which concluded:

> HBIs historically and into the future have a dual mission. They are committed to the traditional mission of any institution of higher education to provide a quality educational experience . . . [They] also have as their mission to address the educational needs of students who come from families with traditionally less education and income and who are often underprepared as a result of their circumstances . . . This function for the HBIs is disproportionately more important than in the TWIs. Simply comparing the traditional indicators of capacity (funding levels, student-faculty ratios, etc.) poses the question: What kind of capacity is truly needed to carry out such a challenging mission?

(Bohanan Commission Report, PTX 2, at 120.) The 2009 State Plan adopted many of the

Commission's findings and concluded that "substantial additional resources" are needed for the

HBIs to be "comparable" and "competitive" with the TWIs. (2009 Maryland State Plan, PTX 1,

at 30-31.)

### F.  The Coalition's Suit

Alleging that the State never met its commitments under the OCR partnership agreement,

and citing "OCR's failure to effectively and aggressively enforce relevant desegregation[,]" the

Coalition filed suit in state court in 2006 seeking "to prevent the State of Maryland from

continuing to . . . maint[ain] . . . a dual system of education based on race." (*See* Complaint, ECF

No. 2.) The Coalition sought a mandate that the State take steps to ensure that its HBIs are

"attractive to and provide a quality education" to students "regardless of race." (*Id.*) The

Coalition's suit was removed to this court on October 23, 2006. The Coalition amended its

complaint four times. (*See* Fourth Amended Complaint, ECF No. 165.) After substantial

discovery and a narrowing of the issues to be addressed, the parties presented evidence at a six-

week bench trial in January-February 2012, culminating with closing oral arguments in October

2012.[1]

## IV.    JUSTICIABILITY

After six years of litigation and a six-week bench trial, the State asserted, in its Proposed

Findings of Fact and Conclusions of Law, that the Coalition and the named plaintiffs all lacked

standing to bring this case. Indeed, nearly *half* of the State's Proposed Findings are preoccupied

---

[1] This case was originally assigned to Judge Marvin J. Garbis and was transferred to the
undersigned judge on June 25, 2010.

with showing why this suit is non-justiciable. Before reaching the merits of the Coalition's case, the court will briefly address the State's arguments.[2]

While standing is an important jurisdictional requirement under the Constitution, it exists where "any one" member of an association would have standing to sue individually. *See Warth v. Seldin*, 422 U.S. 490, 511-12 (1975); *Retail Industry Leaders Assoc. v. Fielder*, 475 F.3d 180, 186 (4th Cir. 2007) ("Associational standing may exist even when just one of the association's members would have standing."). Thus, so long as one member of the Coalition would have had standing to sue, the Coalition has standing in this case.[3] Consistent with desegregation jurisprudence, *see, e.g.*, *Rogers v. Paul*, 382 U.S. 198, 199 (1965), the State all but directly admits that any one current student at an HBI would have standing to challenge allegedly segregative policies. (*See* Defs.' Findings ¶¶ 51-54, 71,110.) The founding member of the Coalition has stated, by affidavit, that "students enrolled at Maryland's HBIs have been members of the Coalition throughout the entire duration of this case." (Affidavit of David Burton, ECF No. 367-2, ¶ 3; *see also* Current Student Affidavits, ECF Nos. 367-12, -13, & -14, ¶ 2.)[4] The State has not presented any evidence to rebut this assertion and the court accepts it as fact. Therefore, because any HBI student member of the Coalition would have had standing in this case, the Coalition has standing and the court may proceed to an adjudication on the merits. Furthermore, named plaintiff Muriel Thompson was a current student at Morgan when the case was filed, and the suit could proceed on that basis as well.

---

[2] It is surprising and disappointing that the State waited until after trial to raise, in any substantial way, its challenge to the plaintiffs' standing.

[3] The court is not deciding whether the Coalition itself would have organizational standing as well.

[4] Had the State raised this issue at trial, presumably Burton and current student members of the Coalition could have testified to this directly.

The State suggests, however, that even current students at HBIs have not shown a sufficient injury in fact for standing purposes. This argument is entirely without merit. *See, e.g.*, *Allen v. Wright*, 468 U.S. 737, 756 (1984) ("[The] diminished ability to receive an education in a racially integrated school—is, beyond any doubt, not only judicially cognizable but, . . . one of the most serious injuries recognized in our legal system."). The plaintiffs have alleged that, as current and former students of Maryland's public HBIs, they were subjected to ongoing segregative policies traceable to the *de jure* era. Their claim directly mirrors the claims in *Fordice* and is obviously justiciable. *See Fordice*, 505 U.S. at 727-28 (holding that the state has an "affirmative duty to dismantle its prior dual university system"). Attendance at an educational institution affected by segregative policies traceable to a prior *de jure* system may constitute an injury, regardless of the institution's resources or quality. *See Brown v. Board of Ed. of Topeka*, 347 U.S. 483, 495 (1954) ("[I]n the field of public education the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal. Therefore . . . the plaintiffs and others similarly situated for whom the actions have been brought are, *by reason of the segregation complained of*, deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment.") (emphasis added); *see also Plessy v. Ferguson*, 163 U.S. 537, 562 (1896) (Harlan, J., dissenting) ("The arbitrary separation of citizens, on the basis of race, . . . is a badge of servitude wholly inconsistent with the civil freedom and the equality before the law established by the constitution."). Thus, if the Coalition demonstrated that any one of its members is subject to ongoing segregative policies traceable to the *de jure* era and attributable to the state, *see Allen*, 468 U.S. at 757, whether they perpetrate segregation "ingeniously or ingenuously[,]" then the Coalition has shown a justiciable injury. *See Cooper v. Aaron*, 358 U.S. 1, 17 (1958) (quotation omitted).

The State's suggestion that the court must look to the "individual circumstances" of the plaintiffs to find an injury in fact is overbroad. (*See* Defs.' Proposed Findings & Conclusions ("Defs.' Findings"), ECF No. 353, ¶ 50.) It is settled law that any traceable vestige of *de jure* segregation must be addressed at every level of public education. *Fordice*, 505 U.S. at 727-28; *see also Fisher v. University of Texas at Austin*, 133 S. Ct. 2411, 2421 (2013) (noting that "[t]he higher education dynamic" does not afford a state more deference where race-based policies are implicated). So long as a student is subject to traceable segregative policies attributable to the state, no court since *Brown* has decided that, notwithstanding such policies, a student's voluntary attendance at a segregated school discharges a state's affirmative duty to dismantle the vestiges of *de jure* segregation affecting that school. *See, e.g., Green v. County Sch. Bd. of New Kent*, 391 U.S. 430, 440-42 (1968) (rejecting "freedom of choice" as a sufficient desegregation plan); *see also Fordice*, 505 U.S. at 729 ("That college attendance is by choice and not by assignment does not mean that a race-neutral admissions policy cures the constitutional violation of a dual system. In a system based on choice, student attendance is determined not simply by admissions policies, but also by many other factors. Although some of these factors clearly cannot be attributed to state policies, many can be."). A state's obligation is to dismantle the "sophisticated as well as simple minded modes of discrimination" that are traceable to *de jure* segregation. *See id.* at 729, 733. To the extent the State challenges the Coalition's assertions regarding whether Maryland's HBIs are racially identifiable or whether such identifiability is the effect of state policies traceable to the *de jure* era, those are legal and factual disputes to be decided on the merits. Such questions do not deprive the court of jurisdiction.

Finally, the defendants' mootness claims are without merit. The defendants argue that any plaintiff who was a student at a Maryland HBI has likely graduated, and is no longer subject

to ongoing injury at segregated HBIs, mooting any entitlement to injunctive relief. As explained

above, the plaintiffs have demonstrated that both named plaintiff Muriel Thompson and

members of the Coalition are *current* students at Maryland HBIs. So long as the Coalition

continues to add new members who are current students, this case will not be moot. Because it is

not a class action, however, there is a danger that the case will become moot if all the named

plaintiffs and members of the Coalition graduate. *See Pasadena City Bd. of Ed. v. Spangler*, 427

U.S. 424, 430 (1976).[5]

## V.    MARYLAND'S HBIs ARE RACIALLY IDENTIFIABLE

The parties agree that Maryland operated a *de jure* system of segregated public higher

education. The schools identified in this case as HBIs were founded as schools exclusively for

black students. Under *Fordice,* a state has not satisfied the requirements of the Civil Rights Act

or the Constitution in eradicating the vestiges of *de jure* segregation if "existing racial

identifiability is attributable to the State." 505 U.S. at 728 ("Our decisions establish that a State

does not discharge its constitutional obligations until it eradicates policies and practices traceable

to its prior *de jure* dual system that continue to foster segregation."). Today, Maryland's HBIs

remain racially identifiable institutions. White students made up only 5% of the population of

Maryland's HBIs in Fall 2009. (2011 MHEC Data Book, PTX 755, at 16.) Black students were

91% of the population. (*Id.*) At Bowie, black students were 88.4% of the population, while white

students were 4.2%. (MHEC Enrollment Information System Data, DTX 398, at 398.4.) At

Coppin, black students were 88.2% of the population and white students made up only 1.3%. (*Id.*

at 398.6) At UMES, white students were a more significant 13.3% of the population, but black

students still made up 77.6% of the student body. (*Id* at 398.22.) At Morgan, black students were

---

[5] The court does not decide now whether and how this case may become moot. The Coalition
argues that the issues in this case are "capable of repetition, yet evading review."

90.7% of the population, while white students were 2.8%. (2011 MHEC Data Book, PTX 755, at 16.) Furthermore, as noted above, the percentage of white students attending HBIs peaked in the mid-1970s. (*See* "Trends in White Graduate Students at Historically Black Institutions in Maryland" (October 2009), PTX 184, at 1). "In 1972, white students attending [HBIs] accounted for over 8% of the total white graduate/professional students attending public campuses statewide. Currently, only 2% of white students pursuing advanced degrees are enrolled at an HBI." (*Id.*) In 1976, the HBIs reported 18.2% white undergraduate and graduate enrollment. ("Second Annual Desegregation Status Report" (Vol. III, Feb. 1976), PTX 455, at 7). By 2008, the enrollment of white undergraduates at HBIs was 3.35%. (Conrad Demonstrative Exhibits, at 32 (citing HBI Enrollment Data, PTX 740).) The State's demographer, Dr. Ben Passmore, recognized the precipitous drop in white enrollment at HBIs over the past thirty years. (1/25/12 AM Trial Tr. 12-15 (Passmore).) William Kirwan, chancellor of the University System of Maryland, recognizes that the state's HBIs "have not been successful at attracting non-African Americans." (1/24/12 PM Trial Tr. 30 (Kirwan).)

The State argues that the court should adopt a 10% "other race enrollment" threshold for determining whether an institution is racially identifiable, but even if such a threshold were appropriate (an unconvincing proposition given the data show Maryland's HBIs are, for the most part, overwhelmingly attended by black students), the State has not adduced reliable data suggesting it has met this "desegregation" threshold at its HBIs. Overall, only 7.4% of the students at the HBIs are white, Asian, and Hispanic. (2011 MHEC Data Book, PTX 755, at 16.) Factoring in unknown, foreign, and other race students, the non-black enrollment at the HBIs appears to rise to 13.1%. (*Id.*) However, the State cannot rely on this number because the "unknown" and "other" numbers include students who refused to report their race or wished to

report multiple race groups, according to the State's demographer. (*See* 1/25/12 AM Trial Tr. 38 (Passmore).) The propriety of including "foreign" students into this analysis is also doubtful, because the federal government "only looks at U.S. citizens when it calculates . . . racial percentages[.]" (1/9/12 AM Trial Tr. 89 (Popovich).)

More importantly, the State's strict numerical arguments misinterpret its obligations under Title VI and the Constitution. The controlling question is not whether the state has done "enough" to integrate its institutions of higher learning; rather, it is whether the state has "le[ft] in place policies rooted in its prior officially segregated system that serve to maintain the racial identifiability of its universities." *Fordice*, 505 U.S. at 743. Because the Coalition has demonstrated that Maryland's HBIs are "racially identifiable," to the extent the Coalition has proven that this racial identifiability continues to be perpetrated by State policies traceable to the *de jure* era, the State is liable for the continued segregative effects of those policies.

## VI. MARYLAND HAS ELIMINATED SOME BUT NOT ALL TRACEABLE *DE JURE* ERA POLICIES AND PRACTICES AS REQUIRED BY *FORDICE*

The court makes no finding in this opinion as to whether the State has met all of its commitments in the 2000 OCR Partnership Agreement, nor is the court suggesting that the State should not continue efforts to better fund Maryland's HBIs and support their dual mission, regardless of any obligation to do so under Title VI. As already noted, the issues in this case are difficult, and both sides hold sincere beliefs about the State's successes and failures in supporting the HBIs.

The court can hold the State liable, however, only under the framework articulated in *Fordice*. There, the Supreme Court established a three-step analysis for determining whether a state has discharged its duty to dismantle former systems of *de jure* segregated higher education. *Knight v. Alabama*, 14 F.3d 1534, 1540 (11th Cir. 1994). First, the plaintiff must show that a

"particular policy that has been challenged as segregative is 'traceable' to decisions that were made or practices that were instituted in the past for segregative reasons, thus rendering it a vestige of segregation." *Id.* The *Fordice* Court alternatively described such policies as those that are "derived from," 505 U.S. at 734, "a continuation of," *id.* at 738, "rooted in," *id.* at 743, or that "have as their antecedents," *id.* at 740, prior *de jure* segregation. While it is not sufficient for the defendants simply to show that current policies are race-neutral, neither is it sufficient for the plaintiffs to show, for example, a present imbalance in resources without identifying a current policy or practice rooted in *de jure* segregation that allegedly causes that imbalance. *See Ayers v. Fordice*, 111 F.3d 1183, 1223 (5th Cir. 1997) ("The district court correctly focused on the traceability of policies and practices that result in funding disparities rather than the traceability of the disparities themselves.").

Second, if the plaintiff succeeds in showing that a policy or practice is traceable to prior *de jure* segregation, the burden of proof shifts to the state "to establish that it has dismantled its prior de jure segregated system." *Fordice*, 505 U.S. at 739. The state must show that the challenged policies, when considered in combination, *id.*, do not currently have continuing "segregative effects." *See id.* at 731; *Knight*, 13 F.3d at 1541. Policies with segregative effects are those that "discourage[] or prevent[] blacks from attending HWIs" and those that "discourage whites from seeking to attend HBIs." *Knight*, 13 F.3d at 1541.

Third, if the state fails to show that policies traceable to prior *de jure* segregation do not have current segregative effects (or if the state chooses to bypass the segregative-effects analysis), it must show that those policies have a "sound educational justification" and cannot be "practicably eliminated." *Fordice*, 505 U.S. at 731. To show that a policy cannot be "practicably eliminated," the State must show that its "legitimate educational objectives" could not be

accomplished through "less segregative means." 505 U.S. at 744 (O'Connor, J., concurring); *see also Knight*, 14 F.3d at 1546 ("Under *Fordice,* a state can be required to change even educationally sound practices where they have been found to be vestiges of segregation with continuing segregative effects. Only where there are no alternative remedies that are practicable and educationally sound is the state defendant relieved of its obligation to remedy the vestiges' effects.")

Three allegedly traceable policies of the Maryland system of higher education are at issue in this case: (1) limited institutional missions; (2) operational funding deficiencies; and (3) unnecessary program duplication. As explained below, the Coalition has proven that the State has failed to eliminate the traceable *de jure* era policy of unnecessary program duplication for Maryland's HBIs. The State has not proven that the current unnecessary program duplication that exists in Maryland at its HBIs does not continue to have segregative effects on Maryland's system of higher education, nor has it shown that there are sound educational justifications preventing the elimination of this duplication. The Coalition has not proven that any current operational funding or mission related policy or practice, however, is traceable to the *de jure* era, even if Maryland's HBIs do not have resources or missions equal to Maryland's TWIs.

### A.  Mission Setting

If the State continues to impose more "limited" missions on public HBIs than their TWI counterparts, such mission designations may be traceable policies. *See Fordice*, 505 U.S. at 739-41; *Ayers*, 111 F.3d at 1210-11 ("[T]he mission designations adopted by the [state] . . . effectively fixed the scope of programmatic offerings that were in place at each university during the *de jure* period . . . [p]olicies and practices governing the missions of the institutions of higher learning are traceable to de jure segregation and continue to foster separation of the races."

(quotation omitted)); *Knight*, 14 F.3d at 1544-46 (affirming district court's finding that the limited missions of Alabama's HBIs are traceable policies and remanding on issue of segregative effects). As explained below, while the mission statements of Maryland's HBIs are in some ways historically linked to their *de jure* era analogs, the Coalition has not demonstrated that the State continues to "effectively fix" the scope of HBI offerings based on their *de jure* era missions, nor does it continue to impose missions on the HBIs, which have independence and flexibility in crafting mission statements.

The Coalition makes three arguments to support its allegation that the current missions of Maryland's HBIs are "limited" by the state as they were during the *de jure* era, and, as a result, that the mission designation of each Maryland HBI is a traceable policy. First, even though Maryland has a current policy granting schools themselves the power to craft their mission statements, and to propose programs to complement those mission statements, MHEC must approve changes. The Coalition argues that the HBIs have been limited by the State in their attempts to expand their historical missions, fixing them to their *de jure* era counterparts. Second, the Coalition argues that mission is "what a university actually does," not simply its formal mission statement or designation, and, thus, that an examination of the actual offerings at the HBIs conclusively demonstrates they are limited relative to their TWI peers. Finally, the Coalition points to examples of TWI mission expansions as evidence that the HBIs are comparatively weaker within the system and continuing to be encroached upon in mission. As explained below, none of these arguments demonstrate that the State's current policies and practices regarding HBI missions are traceable to the *de jure* era.

### 1. Formal Mission Statements or Designations

First, the Coalition does not dispute that it is the institution itself that develops its own

mission statement. *See* Md. Code Ann., Educ. § 11-302(a). Instead, the Coalition alleges that

MHEC's power to object to mission statements if it determines the proposed statement is

inconsistent with the State Plan, § 11-302(d), has perpetuated traceably limited formal mission

statements or designations at each HBI. Certainly, MHEC works to coordinate Maryland's

institutions through the statewide planning process and to approve mission statements. (1/23/12

AM Trial Tr. 26-27 (Howard); 2/2/12 PM Trial Tr. 54-55 (Blanshan).) MHEC may also make

suggestions on ways to improve an institution's mission proposals. (1/4/12 PM Trial Tr. 2-4 (T.

Thompson).) Despite this authority, the State currently plays an overall minor role in setting the

mission of each institution. (2/6/12 AM Trial Tr. 91 (Blanshan).) The Coalition has identified

only one example of a time in which an HBI was refused a mission statement change. A

proposed revised mission statement for UMES, which would have expanded its Ph.D. offerings

in 5-7 disciplines, was denied in 1999. (Joint MBA Proposal Workgroup, PTX 254, at 108-11.)

While MHEC did recommend delaying the UMES expanded mission at that time, it also

simultaneously approved an expanded mission statement for Bowie to develop two new applied

doctoral offerings. (*Id.*) MHEC also emphasized that UMES's proposed mission change was

being delayed due to a failure to document the "need for a separate engineering program or for

general authority to offer research doctorates" apart from a collaborative program already

underway between UMES and College Park. (*Id.* at 109.) This single example does not

demonstrate that the State's mission statement policies and practices are rooted in or a

continuation of the mission planning process that limited HBIs during the *de jure* era.

To the contrary, there is ample evidence in the record demonstrating that the State has actively worked to expand the roles of the HBIs since the *de jure* era and to place them on equal mission footing with Maryland's TWIs. The 2009 State Plan repeatedly emphasizes enhancement of Maryland's HBIs as a primary goal for MHEC. (*See, e.g.*, 2009 Maryland State Plan, PTX 1, at 12-13, 30-34.) The 2008 HBI Panel, which was convened in the state planning process to examine ways to make HBIs comparable and competitive with the TWIs, noted that it

> should not be lost and is highly significant that the state of Maryland has initiated on its own examination of the specific meaning of the terms comparable and competitive. . . . In doing so, Maryland, on its own, has reached for not only a more specific standard – but a higher and more exacting one, which demonstrates its commitment to strengthening the HBIs and the Maryland system of higher education as a whole.

(Bohanan Commission Report, PTX 2, at 118.) While it may be true that the "past treatment of the [HBIs]" in setting missions, approving programs, funding them, and assessing results, "has had the effect of substantially marginalizing the HBIs[,]" (*id.* at 128), Maryland has maintained a policy of enhancing HBI mission and programming at least since the 1970s in an effort to mitigate the effects of *de jure* discrimination. (*See* 1/9/13 AM Trial Tr. 76-77 (Popovich) (stating that, beginning in the 1970s, the State instituted a strategy (albeit not completely effective) of "enhanc[ing] the historically black schools through program development").) In short, Maryland's continued efforts to ensure its HBIs are comparable and competitive in terms of mission are commendable in light of past discrimination, and the Coalition has not demonstrated that the State's mixed success in these efforts constitutes a traceable policy or practice perpetuating "limited" missions at the HBIs.

### 2. "Mission" as Program

Second, beyond formal mission statements or designations, the Coalition argues that the HBIs are functionally limited in mission, based on their actual offerings and capacity. This

argument relies on one of the Coalition's expert's, Dr. Walter Allen's, broader view that the

"mission" of a university is not just its formal designation in the system but also what it "actually

does . . . in terms of the major kind of activities associated with institutions, academic, the public

service, their teaching, functions." (2/8/12 PM Trial Tr. 3 (Allen).) While a broader definition of

"mission" may be useful in other contexts, it is not helpful for the purpose of assessing the

Coalition's traceability allegations, because it conflates policies associated with the State's

formal mission planning process with each individual programmatic decision made by the State

or the institutions themselves. Nevertheless, even under this broad definition of "mission," Dr.

Allen did not suggest that the alleged mission limitations imposed on the HBIs are a product of

any direct State policy or practice regarding mission; rather, he argued that the HBIs' mission

limitations have been caused "by historical factors and also factors of the kinds of resources that

are in place to allow implementation of that set of mission statements." (*Id.*) Thus, the Coalition

identified no traceable policy or practice specifically controlling HBI "missions" that the State

must eliminate, even if the HBIs "do" less than their TWI peers.

The Coalition's broad mission arguments are not entirely irrelevant, however. They relate

to relative program uniqueness and competitiveness, and to that extent some of the evidence the

Coalition introduced related to "mission" illustrates, as detailed in Part VI.C *infra*, the need for

the State to eliminate unnecessary program duplication. For example, the 2000 OCR Partnership

Agreement suggests that expansion of HBI "missions" is a necessary step towards desegregation.

(OCR Partnership Agreement, PTX 4, at 36-37.) The agreement demonstrates not that any

current statewide mission assignment process must be changed, but that mission expansion may

be one effective remedy for unnecessary program duplication that increases the racial

identifiability of the HBIs by making them less competitive in attracting other race students.

Similarly, in a 2005 document assessing the Partnership Agreement, the four HBI presidents

noted the need to "expand HBI missions[,]" but they characterized this need as a way to reverse

the systematic erosion of the "uniqueness in missions and programs between HBIs and TWIs."

(Report on the OCR Partnership Agreement (March 28, 2005), PTX 13, at 3, 8.) The letter

emphasized the need for HBIs to "offer attractive academic programs without undue duplication

at nearby campuses." (*Id.* at 9.)

Indeed, MHEC itself has recognized that "[m]ission creep" is a problem across the state's

institutions of higher learning, undermining the competitiveness and uniqueness of each

institution, not because the state's mission-assignment policies need to be reformed, but because

the state is accepting "program proposals exceed[ing] the boundaries of [institutional] missions."

(MHEC "Review of Mission Statements" (January 11, 2012), PTX 866, at 19.) As explained

below, because the HBIs are already disproportionately affected by excessive duplication of their

offerings, this mission creep harms the HBIs significantly more than the TWIs. Thus, the court

recognizes the struggles of the HBIs to compete with the TWIs in program offerings, but finds

that no current mission-related policy or practice is traceable to the *de jure* era. Rather, it is

because the state has allowed its "institutions of higher education to be reactive to [the] pursuit of

prestige[,]" (1/23/12 AM Trial Tr. 73 (Howard)), that the state has failed to adequately recognize

and support the mission potential of its HBIs. Accordingly, evidence of HBI/TWI programmatic

imbalance is better assessed in the context of unnecessary program duplication, not separately as

a traceable "mission" related policy or practice.

### 3. TWI "Mission" Expansion

Finally, and relatedly, the Coalition points to "mission" expansions at regionally

proximate TWIs as evidence that the State continues to undermine HBI competitiveness, but

such arguments are again better assessed in the context of unnecessary program duplication and a

lack of unique, high-demand programs at HBIs, *not* as State policies concerning HBI missions

themselves. For example, Morgan is identified as "the State's public urban university," Md.

Code Ann., Educ. § 14-101(b), but Towson's mission statement identifies it as "the State's

metropolitan university." ("Towson at a Glance" (2010), PTX 100, at 1.) MHEC approved

Towson's new mission statement in 2005-2006, touting itself as the state's "metropolitan"

university, over the objection of Morgan, which argued that "urban" and "metropolitan" are too

similar. (*See* Letter from Morgan President Richardson to MHEC (December 9, 2005), PTX 287,

at 1; MHEC "Mission Statement Review" (February 2006), PTX 763, at 34; 1/12/12 AM Trial

Tr. 96-98 (Richardson).) While this potential overlap in mission is confusing, it is *not* evidence

that Morgan's mission statement is "limited" by a traceable state policy. To the contrary, Morgan

is benefited by its mission designation. (*See* 1/9/12 AM Trial Tr. 77-78 (Popovich) (recognizing

some of the programmatic offerings at Morgan related to its "urban" mission). The Coalition's

proven concern is not that any state policy "limits" Morgan in mission, but rather that Towson's

new mission statement may perpetuate unnecessary duplication of programs always available at

Morgan through expanding thematically similar program offerings.

Similarly, the Coalition argues that the approval of an expanded master plan for the

University of Baltimore, turning it into a fast growing institution, has harmed the

competitiveness of the HBIs. UB began as primarily a graduate and upper division institution,

(*see* 1/30/12 AM Trial Tr. 53-54 (Bogomolny)), but since the 1990s the state has allowed UB to

increasingly expand its offerings to four-year undergraduates. (*See* Joint MBA Proposal

Workgroup, PTX 254, at 108; 1/24/12 AM Trial Tr. 63-66 (Kirwan); UB Strategic Plan (2008-

2012), PTX 917, at 4; 1/30/12 AM Trial Tr. 61-62 (Bogomolny).) The "mess in Baltimore,"

(Overview of Morgan State University (Popovich Demonstrative), PTX 39, at 31; 1/5/12 AM

Trial Tr. 94-95 (Popovich)), that has resulted from the State's expansion of UB and other

Baltimore regional TWIs is again a problem of duplication, however, not any identified policy

that "limits" HBI missions.

Thus, the Coalition's "mission" argument, as it relates to the relative strength of the

program offerings at the HBIs and TWIs, in terms of demand and uniqueness, is better addressed

in the analysis of unnecessary program duplication as a traceable policy. Otherwise, the

Coalition has not proven the State must eliminate any traceable policy or practice related to the

HBI missions themselves.

### 4. The "Dual Mission" of the HBIs

Similarly, the Coalition has suggested that the HBIs' so-called "dual mission" of

educating both adequately prepared and underprepared college students persists as a traceable

policy of the *de jure* era imposed on the HBIs by the state. The 2008 HBI Panel described this

"dual mission" in detail as follows, and the court adopts the Panel's description as the definition

of the term "dual mission":

> [T]he mission of the HBIs in providing an undergraduate degree is substantially
> different and more challenging than that of the TWIs. HBIs historically and into
> the future have a dual mission. They are committed to the traditional mission of
> any institution of higher education to provide a quality educational experience and
> guide students to the attainment of an undergraduate degree. HBIs in the State of
> Maryland also have their mission to address the educational needs of students
> who come from families with traditionally less education and income and who are
> often under prepared as a result of their circumstances—not their abilities—for
> college level work. Helping these under prepared students earn a bachelor's
> degree is central to the HBI mission. This function for the HBIs is
> disproportionately more important than in the TWIs.

("Report to the Maryland Commission to Develop the Maryland Model for Funding Higher

Education" (November 11, 2008), PTX 3, at 8.)

While this "dual mission" certainly has roots in the *de jure* era origins of Maryland's

HBIs, which were historically tasked with educating students underprivileged by virtue of racial

discrimination and economic oppression, the HBIs themselves have embraced this ongoing

mission of providing educational opportunities for students of all abilities and backgrounds in

Maryland. (*See, e.g.*, 1/30/12 PM Trial Tr. 53-54 (Treasure); 1/3/12 PM Trial Tr. 65-66

(Wilson); 1/4/12 AM Trial Tr. 36-39 (Wilson); 1/4/12 AM Trial Tr. 86-90, 99-100 (Thompson).)

Dr. David Wilson, the president of Morgan, spoke most eloquently on this topic in response to

the question of whether Morgan could "reject" the "dual mission":

> I guess I would respond to that . . . with a question, and the question would be
> why would our university want to move away from addressing critical problems
> in the City of Baltimore that stand in the way of the State's competitiveness? It
> just seems to me that there is opportunity for the State at Morgan to grow this
> institution in a way that will help this city and help this region to prosper. So I
> would find it troubling if then the State said we know that there are K through 12
> challenges in the city, we know that there are underperforming businesses in the
> city, we know that there is a high crime rate in the city, we know that the
> incidence of diseases, public health issues is very high, and we have an institution
> here that has been missioned appropriately to address that, but we do not want it
> addressed. I would find that to be very, very troubling.

(1/4/12 AM Trial Tr. 39 (Wilson).) The Coalition did not adduce evidence that the State imposes

the duty of educating less prepared students solely on the HBIs or that the HBIs' sustained

commitment to this part of their history constitutes a continuation of a *de jure* era State policy or

practice mandating as much. (*See* 2/1/12 AM Trial Tr. 51 (Newman).)[6]

Thus, the HBIs' "dual mission" of educating students with more financial or academic

needs, even if it is a "continuation" of the role the HBIs played during the *de jure* era, cannot be

---

[6] In fact, because Coppin has an unfortunately low graduation rate, a recent report, conducted by
a committee of Coppin alumni and State officials, recommended that the school take steps to
change its "open-door" admissions policy and to focus on admitting more transfer students. *See
Tough love for Coppin*, Baltimore Sun, May 19, 2013,
http://www.baltimoresun.com/news/opinion/editorial/bs-ed-coppin-20130519,0,5666052.story.

said to be a "traceable" policy or practice of *de jure* segregation attributable to the State or

somehow in need of elimination. As Justice Thomas's concurrence in *Fordice* emphasizes, it is

not a state's constitutional obligation—nor should it be—to erase a school's history or actively

take steps to undermine an institution's own commitment to maintaining its legacy within the

community. *See Fordice*, 505 U.S. at 747-49 (Thomas, J., concurring). Taken to its logical

extreme, the Coalition's arguments regarding the "dual mission" could require fundamentally

altering the HBIs' self-determined identity and purpose, and such a result would be neither

preferable nor constitutionally sanctioned.

### B.  Operational Funding

During remand proceedings after *Fordice*, the Fifth Circuit reiterated that, although the

"private plaintiffs appear[ed] to advocate enhancement of the HBIs in order to rectify the

detrimental effects of past de jure segregation, without regard to present policies and practices. . .

. The Supreme Court expressly rejected the proposition that the State's duty to dismantle its prior

de jure system requires elimination of all continuing discriminatory effects." *Ayers v. Fordice*,

111 F.3d at 1210 (citing *Fordice*, 505 U.S. at 730 n.4 ("To the extent we understand private

petitioners to urge us to focus on present discriminatory effects without addressing whether such

consequences flow from policies rooted in the prior system, we reject this position.")).

Emphasizing this distinction between traceable policies and effects, the Fifth Circuit affirmed the

lower court's holding that, despite a resource disparity that flowed from the *de jure* era,

Mississippi's funding formula was not itself a traceable policy. *Id.* at 1221-24. The court found

that the funding formula was not traceable because it was sufficiently disconnected from

Mississippi's prior mission-based funding policies:

> Unlike the previous formula, which allocated funds based on mission
> designations, the present formula allocates funds as a function of the size of each

institution's enrollment, faculty, and physical plant. While the formula responds
to conditions that to a significant degree have resulted from the mission
designations (and consequently results in the [T]WIs receiving a greater
proportion of funds), the manner in which the formula does so is guided by valid
educational concerns and is not linked to any prior discriminatory practice.

*Id.* at 1224.

Conversely, the district court in *Knight* determined that Alabama's funding formula was
an extension of its past funding practices, and concluded that "although [Alabama] ha[d] funded
[its HBIs] better than the other state institutions for at least the last twenty-five years, such
funding ha[d] not yet put those institutions in the place they would have been but for their black
heritage and the de jure system." 900 F. Supp. at 307-09. The court emphasized (quoting its
earlier findings) that "[t]he advantage of [Alabama's] formula to those . . . institutions having the
more complex curricula [was] extraordinary" and that the same elements of the funding formula
that harmed HBIs during the *de jure* era had never been addressed. *Id.* at 309.[7] Thus, a state's
funding formula is a traceable policy only if it is rooted in or a continuation of the funding
practices that disadvantaged HBIs during the *de jure* era.

### 1. Maryland's Funding Formula

Prior to 1990, the Maryland State Board of Education used a rote funding formula with a
number of factors, including attendance, program offerings, and research, including library
volumes and gross square feet of facilities, to set the funding levels of each state institution.

---

[7] The district court's opinion in *Knight* is sometimes difficult to parse, given it combines findings
that were originally rendered prior to *Fordice* with those reached after the opinion was vacated
and remanded by the Eleventh Circuit. Though the court pointed to the structural problems with
Alabama's funding formula that perpetuated segregation, the *Knight* opinion may also be read to
suggest that the effects of past funding inequities must be remedied even if the state has since
fixed its funding practices and they are no longer traceable to the *de jure* era policies that caused
the inequities. To the extent that *Knight* held as much, this court concludes that such a holding
is inconsistent with *Fordice*, which expressly states that a state is only liable for inequities that flow
from current "policies rooted in the prior system[.]" *Fordice*, 505 U.S. at 730 n.4.

(1/31/12 PM Trial Tr. 82-83 (Newman).) After the state's major restructuring of higher

education in 1988, the old funding formula was discontinued by 1990, and institutions were

funded on a school-by-school basis, primarily based on full-time equivalents ("FTE"), until 1998

state legislation was passed directing MHEC to develop formal funding guidelines. (*Id.* at 86-

87.) "Consistent with the goal that Maryland . . . attain national eminence for its system of higher

education[,]" the Larson Commission, which was charged with recommending reforms for the

USM in 1998, recommended a "peer-based funding guideline method" that would use

comparator institutions to set funding goals for each institution. (*Id.* at 87.) A work group was

assembled to create peer-based guidelines, and the resulting process the group developed,

(Funding Guidelines Interim Report (August 1999), DTX 88, at 88.31), was subsequently

adopted. (1/31/12 PM Trial Tr. 85-86 (Newman).) This process continues to govern MHEC's

budget analysis and appropriations recommendations for the funding of Maryland's institutions

of higher learning. (2/1/12 AM Trial Tr. 22 (Newman).)

  In their current form, the guidelines use groups of "peer" institutions as benchmarks for

setting institutional funding goals. (Funding Guidelines Interim Report (August 1999), DTX 88,

at 88.39.) The process begins with the Carnegie Foundation for the Advancement of Teaching's

classification for each institution. (1/31/12 PM Trial Tr. 88 (Newman).) In general, the Carnegie

classification for each school is used to find 50 to 60 peer institutions. (*Id.* at 88-89.) Maryland's

HBI peer selection process is subject to a variation (originally "Variation Six," currently,

"Variation 4-A") that was designed to ensure "an HBI's peer group wouldn't be too heavily

weighted with HBIs as peers." (*Id.* at 92-93; *see also* Funding Guidelines Interim Report (August

1999), DTX 88, at 88.37; Memorandum on 2008 Funding Guideline Peer Reselection (October

16, 2008), PTX 244, at 1-2.) Then, the funding for each peer institution is assessed and a target

funding level at the 75th percentile of those peer groups is calculated for each Maryland institution. (1/31/12 PM Trial Tr. 89 (Newman); *see also* Toutkoushian Expert Rep., PTX 324, at 12.) The state then sets appropriations based on the difference between expected tuition revenue and the overall funding target. (Toutkoushian Expert Rep., PTX 324, at 12.)

Not unexpectedly, the selection of peer comparator institutions has, at times, been controversial. Because of its designation as Maryland's "flagship" campus in 1988, (2/8/12 AM Trial Tr. 5-6 (Toutkoushian)), UMCP was "allowed to look at five aspirational peers" which were institutions that UMCP "want[ed] to emulate in performance and funding and resources" that "may perform and receive more funds and perform in certain indicators at a higher level than the Maryland institution." (1/31/12 PM Trial Tr. 91-92 (Newman).) A 2001 "Revitalization Study" of Coppin recommended Coppin also be allowed to use an aspirational peer group, rather than its current funding group, but that recommendation has not been implemented. (Final Report on the 2001 Coppin Revitalization Study (August 22, 2011), PTX 810, at 63 (also recognizing that Coppin's funding "increased by 98%" from 2001-2011, three times the average USM institution, and that Coppin is "now funded at 101% of the USM funding guidelines").)

At the time the guidelines were adopted, Morgan argued that its unique characteristics as an HBI and an urban research institution made peer selection difficult. (1/31/12 PM Trial Tr. 94 (Newman).) MHEC agreed and allowed Morgan to extend the deadline to determine a peer group. (*Id.*) Ultimately, Morgan was not satisfied with its initial peer group when it was set for fiscal year 2002. (*Id.* at 95.) UMES was also not satisfied with its peer group in light of its history as an 1890 land grant institution, and UMES was allowed a variation related to its research functions that led to the selection of a new peer group, in 2003 or 2004, that satisfied the school's concerns. (*Id.* at 95-96.)

Following 2005 changes to the Carnegie classification system, in 2008 MHEC conducted a re-selection of peers. (Memorandum on 2008 Funding Guideline Peer Reselection (October 16, 2008), PTX 244, at 1.) Three TWIs—UMBC, Towson, and UB—submitted revised peer group proposals that MHEC accepted. (*See id.* at 2-5; 1/31/12 PM Trial Tr. 98-104 (Newman); 2/1/12 AM Trial Tr. 5-7 (Newman).) Morgan also submitted a proposal that included ten institutions as a peer group, with no persuasive rationale, and MHEC rejected that proposal. (Memorandum on 2008 Funding Guideline Peer Reselection (October 16, 2008), PTX 244, at 6.) However, MHEC entered into discussions with Morgan and accounted for the school's concerns regarding funding in selecting a new group of 18 peers. (*See* 2/1/12 AM Trial Tr.at 8-19 (Newman).) Morgan did not agree with the peer group MHEC ultimately adopted for the institution, (*id.* at 19), but the new peer group resulted in an increase in the funding guidelines (nearly $10 million in additional recommended appropriations for FY2010 over FY 2009). (Memorandum on 2008 Funding Guideline Peer Reselection (October 16, 2008), PTX 244, at 7.)

Importantly, the funding guidelines are not determinative of the actual funding that institutions will receive. The guidelines function as a "benchmark for reference for the Governor and the General Assembly to consider as they are moving forward with their budget recommendations, their budget decisions." (2/1/12 AM Trial Tr. 22 (Newman).) The actual appropriations process begins at the institutions themselves, which are tasked with developing a budget request, with direction from the State Department of Budget and Management, that is then submitted to the Department and to MHEC. (*Id.* at 20; *see also* 1/31/12 AM Trial Tr. 6-7 (Vivona).) MHEC analyzes the budget requests and ensures they are meeting all of the State's overall priorities, and it uses the funding guidelines "in [its] analysis of the budgets, the state appropriations levels . . . , and comments on where the attainment is coming in, how the state is

doing in reaching that aspirational funding level[.]" (2/1/12 AM Trial Tr. 21-22 (Newman).)

Thus, current operational funding levels at Maryland public universities are derived from

collaboration among the Governor, the General Assembly, the institutions themselves, the State

Department of Budget and Management, and MHEC, and no single set of guidelines is

determinative of institutional funding levels.

### 2. HBI Funding Today

In light of the recent history of Maryland's higher education funding process, while it

may be true that the HBIs are at a "competitive disadvantage" with TWIs because of past

discriminatory treatment, (*see* Bohanan Commission Report, PTX 2, at 119), the Coalition has

not demonstrated that Maryland's current funding practices or policies are traceable to the *de

jure* era. Structurally, the current funding formula is entirely different from any of Maryland's

prior funding policies or practices; functionally, the current formula has not disadvantaged the

HBIs or provided them any less state-controlled funding than the TWIs.

First, and most importantly, under the current funding formula, Maryland's HBIs are not

"underfunded" by the State, relative to the TWIs. (*See* 2/1/12 PM Trial Tr. 59 (Lichtman)

("[F]rom 2001 through 2010 . . . [t]here's virtually no difference in the mean State appropriation

plus enhancements per FTE for this 10-year period for all the HBIs compared to all the non-

HBIs, even with the driver of College Park[.]").) Including College Park, which has received a

tremendous amount of funding since it was christened Maryland's flagship university, between

1984-2010, Maryland's HBIs received $84,621,000 in state appropriations and enhancement

funds above what they would have received if these funds had been distributed to all Maryland

institutions in proportion to their student enrollment. (*Id.* at 52-54.) Today, Maryland

appropriates nearly an equal amount of funding per full-time student at HBIs and TWIs (with

38

slightly more funding per-FTE going to the HBIs). (*Id.* at 45-46; Lichtman Demonstrative Exhibits, DTX 405, at 17.)[8]

The Coalition suggests that because of their relatively low enrollments, (*see* MHEC Enrollment Figures, DTX 65q, at 6-7), per-FTE funding comparisons do not adequately take into account the "economies of scale" that benefit larger institutions. (*See* MHEC "Consolidated Budget & Fact Book" (1990), PTX 437, at 11; 1/17/12 PM Trial Tr. 67-68, 73-74 (Toutkoushian); 1/25/12 PM Trial Tr. 50 (Dudley-Eshbach).) While there may be no academic consensus on whether economies of scale exist in higher education, (2/2/12 PM Trial Tr. 10 (Lichtman)), it is likely that some efficiency is gained by increasing enrollment, such that per-FTE funding does not wholly represent the adequacy of an institution's funding. Nevertheless, Maryland's funding formula partially takes account of economies of scale because it sets funding targets for the HBIs by selecting peers based on, among other factors, head count and degrees awarded. (Funding Guidelines Interim Report (August 1999), DTX 88, at 37.) Thus, because the HBIs are funded at or above their peer-based funding targets, (*see* Toutkoushian Demonstrative Exhibits, PTX 855, at 46), they are funded adequately compared to similar institutions. In other words, if there are economies of scale in higher education, Maryland is failing to take account of them only as much as the HBIs' peer institutions do, not because of any policy or practice traceable to the *de jure* era.

---

[8] In its rebuttal to the State's findings of fact, the Coalition appears to challenge the data (headcount versus credit hour FTEs) upon which Dr. Lichtman relied for some of his calculations, acknowledging that Dr. Lichtman used the data on which its own expert, Dr. Toutkoushian, initially relied. Dr. Lichtman pointed out the problems with this data during his testimony, however, (*see* 2/1/12 PM Trial Tr. 54-55 (Lichtman)), and the court finds that his calculations were reasonably reliable, even if he had to rely on some less persuasive data in rebutting Dr. Toutkoushian's analysis.

Second, even though Maryland's funding formula arguably takes mission and programs, which are linked to an institution's history, into account through the Carnegie peer selection process, the funding formula is neither based in nor derived from Maryland's *de jure* era funding practices. As described above, Maryland's current funding formula involves a recently developed target-setting process, and it expressly accounts for the unique characteristics of Maryland's HBIs to ensure that peer groups for the HBIs are not limited to other HBIs. MHEC has also worked, when necessary, to ensure HBI peer groups accurately reflect specific institutional funding concerns. (*See* 1/31/12 PM Trial Tr. 94-96 (Newman); 2/1/12 AM Trial Tr. 8-19 (Newman).) The Coalition adduced no evidence linking the current funding formula to *de jure* era policies and practices. Even if past iterations of Maryland's funding formula resulted in discriminatory appropriations for Maryland's HBIs, there is no evidence that the *current* process employed by the State is in any way traceable to any such *de jure* era funding practice or policy. The Coalition's expert, Dr. Toutkoushian, focused on an elaborate calculation of alleged "cumulative deficiencies" present in the HBIs because of past funding discrimination, (*see* Toutkoushian Expert Rep., PTX 324; Toutkoushian Supp. Expert Rep., PTX 325; Toutkoushian Rebuttal Demonstrative Exhibits, PTX 1029, at 20), but even if such resource deficiencies can be quantified, they are a remnant of past discrimination, not the result of any ongoing traceable policy or practice as required under *Fordice*.[9] The Coalition also presented substantial evidence about alleged deficiencies in the HBIs' physical plants, but, as the court previously determined at

---

[9] In the past few years, Maryland's HBIs have not stagnated in resources. For example, Coppin recently announced it was developing a state-funded $80 million science center. Steve Kilar, *Science center may help Coppin close the gap*, Baltimore Sun, May 3, 2013, at 1. UMES has also announced the acquisition of an agricultural research farm, through a $1.55 million federal grant. *UMES acquires farm for agricultural research*, The Star Democrat, April 26, 2013, http://www.stardem.com/news/state_news/article_724cd612-ae93-11e2-a6d4-0019bb2963f4.html.

summary judgment that no traceable policy for capital funding exists, such deficiencies would be relevant only if they were linked to traceable policies related to operational funding, which has not been shown. Accordingly, the State is under no legal obligation to change its current funding formula or appropriations practices.

### 3. Other Allegedly Traceable Funding Policies and Practices

The Coalition makes a variety of other arguments related to funding, but none specifically identify any policy or practice that is traceable to the *de jure* era. Overall, the Coalition adduced a substantial amount of evidence showing that Maryland's HBIs struggle financially more than its TWIs because of many factors outside of State control, such as lower tuition revenue, (*see, e.g.*, 2/8/12 AM Trial Tr. 66-67 (Toutkoushian)), insufficient fundraising capacity, (*see* 1/17/12 PM Trial Tr. 42-43 (Kaiser)), and difficulty in attaining external grants, (1/12/12 AM Trial Tr. 36-37 (Robinson).) While these characteristics may have a serious effect on the fiscal health of the HBIs, they are, at most, effects of past discrimination, not current policies or practices attributable to the State. In fact, the state has put policies in place to address these disparities. For example, the State's funding practices recognize and compensate for lower tuition revenue, and the state has also taken steps to avoid reducing HBI budgets where other budget cuts have been required due to the state's overall fiscal health. (1/31/12 AM Trial Tr. 17-21, 35, 48-53 (Vivona).) Even facing the economic downturn, state financial support for the HBIs grew by 82.5%, compared to only 43.3% for TWIs, between 2000-2012 (excluding outlier TWIs). (1/30/12 PM Trial Tr. 66-67 (Treasure).)

Furthermore, the HBIs' "dual mission" does not require additional funding beyond what the HBIs already have received in enhancement funding from the state. As explained above, the "dual mission" of Maryland's HBIs is important and laudatory, but it does not follow that the

State's alleged failure to devote specific resources towards funding for the dual mission is traceable to the *de jure* era. While it may be wise or prudent for the State to devote additional resources to funding remediation at the HBIs, (*see* Bohanan Commission Report, PTX 2, at 11), because the dual mission is not imposed on the HBIs by the State and is not otherwise a traceable policy or practice, *see supra* Part VI.A.4, the State has no obligation under *Fordice* to directly fund remedial education.

Similarly, the Coalition has failed to prove that the State's failure to provide mandatory state funding of UMES's land-grant programs, (*see* 1/5/12 PM Trial Tr. 10-11 (Neufville); 1/4/12 PM Trial Tr. 42-43 (T. Thompson)), is a traceable policy or practice. In order to receive federal funding for such programs, an institution must provide 1:1 matching dollars. ("Triennial Report on Status of Agricultural Programs at UMCP and UMES" (June 1, 2011), PTX 875, at 3.) The State provides College Park with an excess of funding to meet this match, (*see* 1/5/12 PM Trial Tr. 10-11 (Neufville)), but UMES must use general fund dollars to support such programs and receive the federal funding, (*see* ("Triennial Report on Status of Agricultural Programs at UMCP and UMES" (June 1, 2011), PTX 875, at 3.) Nevertheless, at present, UMES is able to receive its full federal match, (*id.*), and the disparity in state funding for the specific agricultural research and extension land-grant programs between UMES and College Park is a function of College Park's designation as the state's "flagship" and UMES's need to allocate state funding to other programs.

Finally, the Coalition suggests that the designation of College Park as a "flagship" was improper, because that policy created an unaddressed funding imbalance between College Park, a TWI, and the HBIs. (*See* 2/8/12 AM Trial Tr. 5-6 (Toutkoushian).) Preliminarily, the State demonstrated that there are compelling educational justifications for creating a "flagship." Not

only does a flagship serve as the state's educational representative on the national and international stage and as an anchor for the rest of the USM in terms of research output, faculty, and competitiveness with other public and private universities, but a flagship also allows Maryland to more efficiently leverage resources among all of its institutions by offering a diverse array of graduate degrees independently and through institutional partnerships. (1/23/12 PM Trial Tr. 41-45 (Kirwan).) Such partnerships exist across the system and benefit TWI and HBI students alike. (*Id.*) Even if it were somehow improper for the State to have designated a TWI as a "flagship," the State demonstrated that no funding imbalance actually exists: the HBIs are still funded comparably to the State's TWIs, even including College Park. (2/1/12 PM Trial Tr. 58-60 (Lichtman); Lichtman Demonstrative Exhibits, DTX 405, at 19; *see also* Lichtman Reply Expert Rep., DTX 64B, at 13-14; 2/1/12 PM Trial Tr. 48 (Lichtman) (noting that, not including College Park, the HBIs have been funded considerably more generously over the past decade than the TWIs).)

In short, while the Coalition adduced an abundance of evidence demonstrating that Maryland's HBIs face challenges that stem from direct and indirect historic discrimination, economic stratification, and pre-K-12th grade educational inequity, the Coalition has not proven that the State continues to employ any funding policy or practice that is traceable to the *de jure* era that must be eliminated. The court applauds Maryland's acknowledgment in the 2009 State Plan that "[s]ubstantial additional resources are needed to ensure the State's public HBIs with their dual missions are comparable to Maryland's TWIs[,]" (2009 Maryland State Plan, PTX 1, at 32), but there is no basis to hold Maryland legally liable for any failure to provide such additional funding to the HBIs.

### C.  Unnecessary Program Duplication

On the other hand, unnecessary duplication of academic programs at HBIs and non-HBIs

"was part and parcel of the prior dual system of higher education—the whole notion of 'separate

but equal' required duplicative programs in two sets of schools—and . . . present unnecessary

duplication is a continuation of that practice." *Fordice*, 505 U.S. at 738. Given the multitude of

regionally proximate institutions in Maryland, convincing expert analysis of the state of program

duplication throughout Maryland, and the recognition of several State officials of the historic

problem of program duplication, the Coalition has proven that unnecessary program duplication

continues in Maryland, to the detriment of its HBIs, and is traceable to the *de jure* era. (*See, e.g.*,

Assistant Attorney General's Memorandum on the UB/Towson University Joint MBA Proposal,

PTX 14, at 3 ("[B]ecause the unnecessary duplication of programs was a means by which

Maryland operated a segregated system of higher education, the law will presume that the

continuation of this practice will perpetuate conditions indicative of the former dual system and

foster segregation . . . Any proffered justifications for maintaining a remnant of the prior dual

system will be carefully scrutinized . . ."); 1/11/12 AM Trial Tr. 50 (Former MHEC Chairman

Oliver) ("**Q:** Did you also agree that approval of the MBA program would be a continuation of

Maryland's policy or practice of program duplication? **A:** Yes."); 90 Opinions of the Maryland

Attorney General 153 (2005), PTX 698, at 19 ("There is no doubt that Maryland operated *de jure*

segregated public higher education programs before 1969 when OCR found the State in violation

of Title VI, and that some policies, such as program duplication at geographically proximate

schools, are traceable to that era.").)

### 1. Current Unnecessary Duplication

Dr. Clifton Conrad, the Coalition's expert on unnecessary program duplication, is the nation's preeminent scholar on this issue, having served as a testifying expert and conducted similar duplication analyses for OCR in *Fordice* and its progeny. As adopted by the Supreme Court in *Fordice*, Dr. Conrad's definition of "unnecessary duplication" is "those instances where two or more institutions offer the same nonessential or noncore program. Under this definition, all duplication at the bachelor's level of nonbasic liberal arts and sciences course work and all duplication at the master's level and above are considered to be unnecessary." 505 U.S. at 738; (*see also* 1/10/12 AM Trial Tr. 54 (Conrad).) Dr. Conrad explained that, in conducting his analysis of program duplication in Maryland, he relied primarily on the "CIP method," which involves classifying higher education programs uniformly and then comparing the program offerings at Maryland's various institutions, (1/10/12 AM Trial Tr. 55 (Conrad)), but that he confirmed the results of his CIP analysis with an independent evaluation of each school's program offerings, (*see* Conrad. Supp. Expert Rep., PTX 72.)

Based on Dr. Conrad's analysis, the court finds that, statewide, 60% of the noncore programs at Maryland's HBIs are unnecessarily duplicated, compared with only 18% of Maryland's TWIs' noncore programs. (Conrad Expert Rep. III, PTX 71, at 84-85.) Regionally, 38% of Baltimore area HBI programs are unnecessarily duplicated, but unnecessary program duplication is not a problem on the Eastern Shore, where only 9% of UMES' programs are regionally duplicated. (*Id.*, as modified by correspondence on Jan. 29, 2012 (ECF No. 298), Table 5.)[10] Today, Maryland's TWIs have a total of 296 unique, non-core programs, for an

---

[10] The 38% figure represents a more conservative determination of the scope of program duplication in the Baltimore region than Dr. Conrad initially found (59%) because it excludes UMCP and UMUC (Maryland's online university). The Coalition vigorously argues that UMCP

average of 42 programs per institution. (Conrad Expert Rep. III, PTX 71, at 114.) On the other

hand, Maryland's HBIs only have 44 unique programs, in total, for an average of only 11 per

institution. (*Id.*) Duplication also varies somewhat depending on degree level: for example, the

TWIs have six times as many unique masters programs as the HBIs, but over thirteen times as

many unique doctoral programs, in part because of UMCP's central role as Maryland's flagship

research university. (*Id.*) More importantly, Maryland's HBIs offer only 11 non-duplicated, high-

demand, noncore programs, compared with 122 such programs at TWIs, for an average of 17 per

TWI and only 3 per HBI. (*Id.*) Unique, high-demand programs are a key reason white students

attend HBIs in other states, and, without them, HBIs "are identified by their racial history as

opposed to [their] programs." (Conrad Expert Rep. II, PTX 70, at 5 ("[I]n order for

desegregation to occur at [H]BIs . . . [H]BIs must offer programs not offered at TWIs."); *see also*

1/18/12 AM Trial Tr. 88-89 (Allen).) Dr. Conrad's duplication findings are comparable to, and in

some cases more pronounced than, the duplication found in Mississippi during the *Fordice*

remand proceedings that held the state liable for failing in its desegregation efforts. *See Ayers*,

111 F.3d at 1218; (Conrad Demonstrative Exhibits, at 82 (noting that Mississippi was found to

have 40% undergraduate unnecessary program duplication and 25% at the graduate level).) The

court agrees with Dr. Conrad's conclusion, in light of this data, that Maryland continues to have

---

and UMUC should be included in this analysis because 2011 student enrollment data shows that
these institutions draw their largest student enrollments from the same four counties as the other
Baltimore schools, (*see* University System of Maryland Data Journal (2010-2011), PTX 934, at
25-26 (for example, nearly the same number of undergraduates from Baltimore County went to
UMCP as to UMBC)), and MHEC's own demographer testified at trial that UMUC and UMCP
have a statewide draw, (1/25/12 AM Trial Tr. 67 (Passmore) (**Q:** What other schools in the
public system draw from Baltimore and the surrounding areas heavily? **A:** Coppin, Towson, UB,
UMBC, UMB – College Park draws from everywhere or anywhere – and UMUC . . . .).)
Nevertheless, because, as the Coalition has proven, the 38% duplication, combined with the lack
of unique, high demand programs at the HBIs, is traceable and has segregative effects, the court
will recognize the 38% figure as the minimum, proven amount of proximate duplication in the
Baltimore region.

a "dual structure of higher education" which is "a structure in which there is a substantial amount of unnecessary or non-essential program duplication between TWIs and [H]BIs, and there is not meaningful program uniqueness at both sets of institutions." (1/10/12 AM Trial Tr. 49, 73-75 (Conrad) ("So the [TWIs] on balance have a far greater institutional identity. No wonder they have been desegregated. . . . While, again, on the other hand, there is nothing that really distinguishes [the HBIs] . . . programmatically.").) As explained below, this dual system is traceable to the *de jure* era and it prevents the HBIs from attracting non-black students, perpetuating the racial identifiability of the HBIs.

### 2. Traceability of Unnecessary Duplication

The State argues that Dr. Conrad's analysis should be disregarded because there is also duplication between TWI institutions. According to the State, the duplication that Dr. Conrad found "is not the result of a policy or practice traceable to *de jure* segregation but must be attributable to something else." (Defs.' Opp. to Pls.' Findings, ECF No. 366, at 26.) This argument is unconvincing. First, as demonstrated above, when the data is parsed as between TWIs and HBIs, it is apparent that duplication in the State far more significantly affects the HBIs, even if duplication is also a problem for other institutions. (*See, e.g.*, Conrad Expert Rep. II, PTX 70, at 98 (showing that the three HBIs aside from Morgan were 8th, 9th, and 10th out of 11 institutions in terms of new programming developed between 2001 and 2009); Conrad Demonstrative Exhibits at 67 (showing that six times as many unique, high demand new programs were developed at TWIs as were at HBIs between 2001 and 2009).) This disparity is highly suspect in light of the history of Maryland's system of higher education.

Second, significant evidence supports the Coalition's claim that the duplication Dr. Conrad found is a direct result of a continuing failure of the State to address the *de jure* era

policy of duplicating programs to maintain a dual, segregated system. Program duplication was part and parcel of the prior segregated system in Maryland. (*See, e.g.*, Soper Commission Report, PTX 17, at 56-57, 88). Furthermore, "it [is] clear that the originating justification" of locating HBIs and TWIs "a stone's throw from one another . . . had to do with trying to create separate educational streams and sites for Maryland's black and white populations." (1/18/12 AM Trial Tr. 43-44 (Allen).) The 1937 Soper Commission, in assessing higher education in Maryland, noted that "several institutions of both the white and Negro groups are undertaking to perform the same cluster of functions." (Soper Commission Report, PTX 17, at 56.) In 2005, a Maryland Attorney General Opinion recognized that "Maryland operated *de jure* segregated public higher education programs before 1969 . . . and that some policies, such as program duplication at geographically proximate schools, are traceable to that era." (90 Opinions of the Maryland Attorney General 153 (2005), PTX 698, at 19.)

During the 1960s and 1970s, in the wake of *Brown*, Maryland's HBIs began offering unique, high-demand programs and began attracting significant numbers of white graduates. (*See* "Second Annual Desegregation Status Report" (Vol. III, Feb. 1976), PTX 455, at 235-546; 1/10/12 AM Trial Tr. 30-31 (Conrad).) Rather than building on that progress, however, Maryland made very large investments in TWIs, particularly newly created Towson and UMBC, that undermined preliminary gains in desegregation. (*See* 1/10/12 AM Trial Tr. 26-33 (Conrad).) These investments included further duplication of programs at already existing TWIs and creating new public institutions in geographic proximity to existing HBIs, including UB, Towson, and UMBC. (*See* "Trends in White Graduate Students at Historically Black Institutions in Maryland" (October 2009), PTX 184, at 8-9; "Final Report of the Governor's Commission on Education" (1975), PTX 380, at 16-17; 1/10/12 AM Trial Tr. 26-33 (Conrad).) In the 1980s,

"white enrollment began to decline very markedly," and that trend continues today. (1/10/12 AM

Trial Tr. 34-35 (Conrad).) The early gains that had been made in integration at Maryland's HBIs

halted almost as soon as they began, and the State has continued to duplicate HBI programs at

TWIs, failing to address the dual system it created in the *de jure* era. (*See* Conrad Expert Rep. I,

PTX 69, at 19.)

In Maryland's 2000 Partnership Agreement with the Office of Civil Rights, Maryland

committed to developing unique, high-demand academic programs at the HBIs and to avoid

further unnecessary program duplication. (1/11/12 AM Trial Tr. 35-38 (Oliver); OCR

Partnership Agreement, PTX 4, at 36-37.) Unfortunately, the State did not follow through on this

commitment, and white enrollment at HBIs only continued to decline following the Partnership

Agreement, such that HBI racial identifiability has continued to increase. (Conrad Demonstrative

Exhibits, at 32 (citing HBI Enrollment Data, PTX 740); "Trends in White Graduate Students at

Historically Black Institutions in Maryland" (October 2009), PTX 184, at 5; Conrad Expert Rep.

I, PTX 69, at 81-82.) Coppin experienced a 73% decline in white graduate student enrollment

after the partnership agreement; Bowie experienced a similar 67% decrease. ("Trends in White

Graduate Students at Historically Black Institutions in Maryland" (October 2009), PTX 184, at

5.) At the same time, graduate enrollments have grown rapidly at TWIs while stagnating at HBIs.

("Trends in White Graduate Students at Historically Black Institutions in Maryland" (October

2009), PTX 184, at 3.) In fact, the State has not only failed to take steps to eradicate existing

unnecessary duplication, it has continued to duplicate high-demand programs, to the further

detriment of the HBIs. Dr. Conrad found that, on a statewide comparison, between 2001 and

2009, 18 *new* programs at TWIs unnecessarily duplicated programs at HBIs, 13 of which were

"high-demand." (Conrad Expert Rep. II, PTX 70, at 102.)[11] Thus, the State has never dismantled

the *de jure* era duplication of programs that facilitated segregation—and it has maintained

policies and practices that have even exacerbated this problem.

### 3. The State's Purported Efforts to Eliminate this Practice Have Failed

Despite this significant evidence demonstrating the traceability of the continued

unnecessary program duplication among HBIs and TWIs in Maryland, the State argues that it has

established safeguards to mitigate unnecessary program duplication. When a state institution

seeks to propose a new program, MHEC plays an active role in evaluating the program if the

program requires new resources, Md. Code Ann.,  Educ. § 11-206, but, in any event, MHEC

must notify all institutions of higher education of the proposed program, § 11-206.1(b)(3), (5).

Another institution or MHEC may then file an objection to the proposed program if, among other

criteria, the program constitutes "[u]nreasonable program duplication which would cause

demonstrable harm to another institution" or a "[v]iolation of the State's equal educational

opportunity obligations under State and federal law." § 11-206.1(e). The Commission also has

the authority to eliminate a program that unreasonably duplicates a program at another

institution. Md. Code Ann.,  Educ. § 11-206(e)(5)(iv). As demonstrated by the court's above

findings, however, MHEC has not effectively addressed unnecessary program duplication. First,

these purported safeguards are only forward facing—they do not address the substantial

duplication that existed since, essentially, the beginning of Maryland's system of public higher

education. The State offered no evidence that it has made any serious effort to address continuing

---

[11] Regionally, 12 new programs unnecessarily duplicated HBI programs in the "Baltimore-College Park" region, 9 of which were high demand, but there was no further duplication of high-demand programs on the Eastern Shore. (Conrad Expert Rep. II, PTX 70, at 102.)

historic duplication. Second, and even more troublingly, the State has failed to prevent *additional* unnecessary duplication, to the detriment of the HBIs.

For example, the development of the joint UB/Towson MBA in 2005, over Morgan's objection, demonstrates the inefficacy of the State's current policy regarding duplication. It was the consensus of OCR staff, HBI leaders, and even MHEC, initially, that the creation of the program would constitute unnecessary program duplication. (*See* 1/11/12 AM Trial Tr. 43-48 (Oliver); OCR Letter to MHEC (April 13, 2005), PTX 36; Assistant Attorney General's Memorandum on the UB/Towson University Joint MBA Proposal, PTX 14, at 2-3; Joint MBA Proposal Workgroup, PTX 254, at 28-29; MHEC Memorandum (May 25, 2005), PTX 330, at 3.) Yet, the Secretary of MHEC reversed course and approved the program on March 15, 2005. The Maryland Office of the Attorney General wrote, in response to this reversal:

> Please be advised that the Secretary's decision [to approve the Towson MBA program], while within his discretion to act, was made contrary to advice and counsel rendered him by the Office of the Attorney General. Specifically, the Secretary was advised that approval of this academic program would leave the State in a vulnerable position, legally, with respect to the law governing the unnecessary duplication of academic programs. . . . There is little question that the proposed MBA program, if approved, would constitute "unnecessary program duplication" as that term of art is defined and articulated in federal law. The Secretary accepts this and makes no attempt to refute it.

(Assistant Attorney General's Memorandum on the UB/Towson University Joint MBA Proposal, PTX 14, at 2.) MHEC Chairman John Oliver initially agreed with the Attorney General's office and attempted to collaborate with stakeholders to develop an alternative. (1/11/12 AM Trial Tr. 51-54 (Oliver).) Nevertheless, MHEC ultimately approved the program. (*Id.*) Furthermore, as previously discussed, the crowding of Baltimore with four year undergraduate institutions, including the recent and ongoing expansion of UB as yet another such college, (*see* Joint MBA Proposal Workgroup, PTX 254, at 108; 1/24/12 AM Trial Tr. 63-66 (Kirwan); UB Strategic Plan

(2008-2012), PTX 917, at 4; 1/30/12 AM Trial Tr. 61-62 (Bogomolny)), has worsened the

regional unnecessary duplication that has been a problem since the 1960s and 70s. MHEC did

address the potential duplicative effects of a proposed Doctorate of Management degree in

Community College Leadership at UMUC, but only after Morgan objected to it. (*See*

Memorandum to Sue Blanshan (February 2, 2009), PTX 955, at 1; MHEC Letter to UMUC

(February 13, 2009), PTX 179.)

As these series of events demonstrate, despite what the State characterizes as "an

elaborate system designed to avoid" unnecessary program duplication, the State has failed to

eliminate this vestige of the *de jure* era. And, even if "avoidance" of further duplication were

enough, the State has in fact continued to fail to avoid further unnecessary duplication, even in

the face of open objections by state officials.[12]

### D.  Segregative Effects

The State has failed to meet its burden of demonstrating there are no ongoing segregative

effects that are a result of the traceable unnecessary program duplication proven by the Coalition.

The State has recognized that its HBIs are not successful at attracting other-race students.

(1/24/12 PM Trial Tr. 30 (Kirwan).) The State argues, however, that even if unnecessary

program duplication exists in Maryland, it was only found segregative in *Fordice* because

Mississippi *also* had segregative admissions criteria in place. This argument fails to appreciate,

as demonstrated by the Coalition, the independent segregative effects that unnecessary program

duplication has had in Maryland because, "in order for racial desegregation to occur at [H]BIs[,]

---

[12] Notably, in 2012, Maryland amended its program approval regulations to specifically require
an analysis of the "[e]ducational justification for the dual operation of programs broadly similar
to unique or high-demand programs at HBIs," COMAR 13B.02.03.09. (*See* Correspondence re:
Information Concerning Regulatory Revision Cited by Plaintiff in their Rebuttal, ECF No. 368.)
Certainly, this is a much clearer statement of the standard applicable under *Fordice.*

. . . [H]BIs must offer programs not offered at TWIs." (Conrad Expert Rep. II, PTX 70, at 5.) As demonstrated above, there has been an intensification of the HBIs' racial identifiability over the past twenty years. (*See* Conrad Expert Rep. I, PTX 69, at 19; Conrad Demonstrative Exhibits, at 32-33; "Trends in White Graduate Students at Historically Black Institutions in Maryland" (October 2009), PTX 184, at 1; 1/10/12 AM Trial Tr. 38-39 (Conrad) (recognizing that Maryland's HBIs are more racially identifiable today than they were in 1970, the year after *de jure* segregation formally ended in Maryland.) Coalition experts Dr. Conrad and Dr. Allen convincingly explained that this intensification is a result of, in part, the unnecessary program duplication that pervades Maryland's system of higher education because, in the absence of a competitive academic advantage, non-black students have less of an incentive to enroll in what is otherwise perceived as a school for black students. (*See, e.g.*, Conrad Expert Rep. II, PTX 70, at 5; 1/18/12 AM Trial Tr. 88-89 (Allen).) "The fact of the matter is that . . . creating and maintaining proximate [HBIs] and TWIs has had, and continues to have segregative effects. It . . . creates a situation where, absent academic missions that are explicit[ly] being assigned to HBIs . . . those are just schools that are labeled as, and perceived as, the black schools. So the decision of where you go if you are a white student is strained[.]" (1/18/12 AM Trial Tr. 66 (Allen).). This effect is reflected in the decreasing enrollment of white students at the HBIs. When asked about this trend, Dr. Mickey Burnim, president of Bowie State, testified, "[T]here is increased competition for the degree programs that enroll a lot of our white students. So I think that is one significant factor." (1/5/12 PM Trial Tr. 61-62 (Burnim).)

In fact, the duplication of a unique HBI program at a TWI can have an effect on the overall enrollment at the HBI because of this perception. For example, Bowie offered an MS in Computer Science before Towson introduced the program; yet, once Towson offered the MS,

enrollment in Bowie's program dropped precipitously, from 119 in 1994 to 29 in 2008, while enrollment went from 23 in 1994 to 101 in 2008 at Towson. (1/10/12 AM Trial Tr. 59-61 (Conrad); Conrad Demonstrative Exhibits at 59.) Similarly, enrollment in Bowie, Coppin, and Morgan's MA in Teaching programs all dropped substantially between 2002 and 2008 after UMBC began offering the program. (*Id.*) When UB entered the public system offering an MBA, the MBA program that Morgan had been operating by itself suffered. (*See* 1/9/12 AM Trial Tr. 59 (Popovich) (testifying that the impact of UB's MBA on Morgan's program "illustrates the type of effect you may get when you have duplicative programs nearby").)

Where HBIs possess unique programs, however, they will be more empowered to attract a diverse student body. (1/18/12 AM Trial Tr. 91, 112 (Allen); Allen Expert Rep., PTX 661, at 8-9); *see also Knight*, 14 F.3d at 1541 (finding a need for unique programming at HBIs where a "disproportionate numbers of white *can* satisfy their curricular desires at [T]WIs, and *cannot* satisfy them at HBIs, thereby discouraging them from choosing to attend HBIs.") (citing *Fordice*, 505 U.S. at 736-43). The current demographics of the two Eastern Shore institutions, UMES and Salisbury, are telling. As of 2009, UMES had a student population that was 77.6% black and 13.3% white, making it significantly more desegregated than its three HBI counterparts, which had white populations between roughly 1 and 4%. *See* Part V *supra* at 20-21. In light of these figures, it is unsurprising that Dr. Conrad found that only 9% of the programs at UMES were unnecessarily duplicated, "eliminating the dual system . . . to a large extent" on the Eastern Shore. (1/10/12 AM Trial Tr. 83 (Conrad); *see also* Conrad Expert Rep. III, PTX 71, at 114 (showing that Salisbury has 26 unique non-core programs, while UMES has 25).) This lack of duplication is not an accident; it is the result of a strong collaborative partnership between UMES and Salisbury and it demonstrates that unnecessary duplication can be eliminated. (*See*

1/25/12 PM Trial Tr. 34-39 (Dudley-Eshbach) (noting that UMES and Salisbury share a significant number of students because "[a]ny UMES student can take any class at Salisbury" and vice-versa).) The court finds that, at a minimum, it is more likely than not that the lack of unnecessary duplication at UMES and Salisbury has led to UMES's substantial success in attracting white students, as well as other race students. Conversely, the court finds that the pervasive duplication of Coppin, Bowie, and Morgan's programs, and their corollary lack of unique programming, contributes to their continued pronounced racial identifiability. Accordingly, the State has not demonstrated that its traceable policy of unnecessary program duplication does not have segregative effects.

The State suggests, through its expert, Dr. Don Hossler, that program offerings have very little to do with a student's selection of an institution—and that demographics usually control, (*see* 2/6/12 PM Trial Tr. 18-19, 48-49, 69-71 (Hossler)), but this argument is not persuasive. While it may be true that other factors are more important than program offerings, for many students, in choosing a university, the State's burden is to prove that the traceable *de jure* vestige of program duplication does not continue to have any segregative effects. *See Fordice*, 505 U.S. at 731, 739; *Knight*, 13 F.3d at 1541. Thus, even if program duplication plays a less significant role than other factors in maintaining the racial identifiability of the HBIs, because the Coalition convincingly demonstrated that duplication does have a palpable effect on student choice, the State is under an obligation to eliminate it. Dr. Hossler acknowledged that program duplication does have some effect on student choice. (2/6/12 PM Trial Tr. 62-63, 68-69, 71-72 (Hossler).)[13]

---

[13] The court does not address whether any *de minimis* effect would violate *Fordice*—the effect of unnecessary duplication on enrollment demographics at Maryland's HBIs has been proven by the Coalition to be more than *de minimis*.

Moreover, Dr. Hossler's criticism of Dr. Conrad's more marked conclusions regarding the effect of duplication on student choice, (*see* 2/6/12 PM Trial Tr. 36-39 (Hossler)), does not undermine the consensus of Dr. Allen and Dr. Conrad that duplication has such an effect, nor does it undermine the data itself. For example, despite Morgan's overwhelmingly black enrollment, because it is one of only two public universities in Maryland to offer such programs, (*see* 1/9/12 AM Trial Tr. 13 (Popovich)), 83% of the Landscape Architecture degrees it awarded in 2010 were to white students, as were 33% of the Architecture degrees it awarded. (2010 Program Completion Rates at Maryland Schools by Race, PTX 741.) The court finds that unnecessary duplication influences student demographics at the HBIs, and that Maryland's HBIs will not be able to increase their non-black enrollment if their offerings continue to be unnecessarily duplicated.

### E.  Purported Educational Justifications

Finally, the State did not, for the most part, present evidence that unnecessary program duplication could not be eliminated consistent with sound educational practices, relying instead on the argument that no traceable policy or practice existed to begin with. The State is in a tenuous position on this issue, because eliminating unnecessary program duplication has been a centerpiece of most prior higher education desegregation efforts. To the extent the State offered any sound educational justification for existing duplication, it consistently focused on "good" reasons for approving a particular duplicative program rather than a thorough analysis of whether there were less segregative means of obtaining the same goal as required by *Fordice*. 505 U.S. at 729 ("If policies traceable to the de jure system are still in force and have discriminatory effects, those policies too must be reformed to the extent practicable and consistent with sound educational practices.").

For example, in response to the Secretary's approval of the Towson MBA program, the

Office of the Attorney General wrote:

> On its face, the Secretary's March 15th determination appears to be deficient in that his analysis primarily addresses sound educational justification in the context of Towson University's capacity to adequately offer the MBA program jointly with the University of Baltimore in the face of an apparent need for the program. It is a matter of concern, however, that the Secretary's analysis does not adequately address "sound educational justification" in the specific context of a desegregating system of higher education with very specific and continuing legal objections. The analysis may also be considered lacking by virtue of its very limited effort to address the impact upon geographically proximate HBIs. Perhaps most alarming is a complete lack of an analysis regarding the possibility of accomplishing the legitimate educational objectives through less segregative means, particularly in light of existing programs at HBIs that are not at capacity.

(Assistant Attorney General's Memorandum on the UB/Towson University Joint MBA Proposal,

PTX 14, at 3.) As the State acknowledges in this document, "sound educational justification" is

not an open-ended invitation to justify otherwise segregative policies or practices; rather, it is a

requirement that the State seriously consider whether a traceable policy cannot possibly be

eliminated in light of legitimate educational concerns. Nonetheless, as Kevin O'Keefe, a former

MHEC commissioner who voted to approve the MBA program testified, the commission was

focused on "one issue, and one issue only. Are there grounds for educational justification for this

program?" (1/30/12 AM Trial Tr. 108 (O'Keefe).) O'Keefe testified that he based his vote on "a

clear need for additional capacity in a public MBA program and [the fact] that Morgan was, for

perfectly good reasons, not willing to direct its resources, apparently, to developing that

program." (1/30/12 PM Trial Tr. 4-5 (O'Keefe).) This articulated justification is insufficient

under *Fordice*. If MBA capacity was a state need, and even if Morgan opposed building its

capacity, the State offered no evidence that it seriously considered alternative, non-segregative

means to accomplishing the capacity building it sought, such as offering Morgan additional

funding for such programming or considering another HBI to fill this need.

The Supreme Court recently reaffirmed in *Fisher v. University of Texas at Austin* that even a "serious, good faith consideration of workable race-neutral alternatives" in the higher education context does not supplant the strict scrutiny analysis that is warranted where race-based policies are implicated. *See* 133 S. Ct. 2411, 2421 (2013) (quoting *Grutter v. Bollinger*, 539 U.S. 306, 339 (2003)). Here, the State has not offered any compelling evidence that any sound educational need is an unavoidable driver of the ongoing unnecessary duplication of HBI programs throughout Maryland's system of higher education.

On the contrary, the State's maintenance and exacerbation of this proximate program duplication, as described above, "does not comport with best practices in higher education." (1/18/12 AM Trial Tr. 62-64 (Allen).) Dr. Allen conducted an analysis of the State's purported educational justifications for duplicative program approvals over the past decade, relying on MHEC Secretary James Lyon's deposition statement that "academic program files" would be the "best resources for determining the basis for program approval." (*Id.* at 47.) Dr. Allen found that the justifications in these files for duplicated programs are "[m]inimal" and "superficial[.]" (*Id.* at 47-48.) As to Towson's joint MBA, Dr. Allen noted that the file had "more" material, given the controversy surrounding its approval, but that "[t]he justification provided in the file . . . wasn't persuasive." (*Id.* at 49.) Tellingly, the State's proposed findings of fact and conclusions of law include only a few references to the issue of "sound educational justification," and only then in reference to the Towson MBA approval. (*See* Defs.' Findings, ECF No. 353, ¶¶ 241, 245, 246 n.44.) Furthermore, as noted above, UMES and Salisbury have developed a unique, collaborative partnership, that has both virtually eliminated unnecessary program duplication on their campuses and resulted in UMES having "more white students on its campus than any other HBI in the state[.]" (1/4/12 PM Trial Tr. 65-66 (T. Thompson); 1/25/12 PM Trial Tr. 37-39 (Dudley-

Eshbach).) It was evident from the testimony of the presidents of both UMES and Salisbury that their collaborative efforts are a source of pride for both institutions and contribute to the overall quality of higher education program offerings on the Eastern Shore. (*See, e.g.*, *id.*) Accordingly, it is the court's conclusion that the extensive program duplication in Maryland is a traceable vestige of the *de jure* era, that it continues to exacerbate the racial identifiability of Maryland's HBIs by limiting their competitiveness in program offerings, and that there is no sound educational justification preventing the mitigation of this duplication.

## VII.    REMEDIES

In light of the State's liability on the issue of program duplication, the court strongly suggests that the parties enter mediation to attempt to generate a suitable plan to address this problem. As embodied in the OCR Partnership Agreement, a remedy for unnecessary program duplication likely includes both avoidance of such duplication and "expansion of mission and program uniqueness and institutional identity at the HBIs." (Final Report on the OCR Partnership Agreement (February 15, 2006), PTX 8, at 73.) Dr. Allen was tasked by the Coalition with developing remedies, and his recommendation that "[e]ach HBI should develop programmatic niches of areas or areas of excellence in at least two high-demand clusters within the next three to four years" appears to be a promising starting point. (*See* 1/18/12 AM Trial Tr. 90 (Allen).)[14] These niche suggestions include, among others, Green Sustainability Studies; Computer Sciences; Aging Studies; and Health Care Facilities Management. (*See* Allen Demonstrative Exhibits, PTX 856, at 52-65.) It is also likely that the transfer or merger of select high-demand programs from TWIs to HBIs will be necessary. (*See* 1/18/12 AM Trial Tr. 103 (Allen).) Former MHEC Secretary James Lyons has stated that Maryland has the capacity and

---

[14] The Coalition has not suggested the extreme remedy of closing any institutions.

capability to implement program transfers and mergers. (*Id.* at 107.) Similarly, the creation of collaborative programs through the wide use of resources to enhance the quality of current and newly developed programs at the HBIs may be an additional effective and creative method of enhancing the HBIs' programs. (*See id.* at 102.) If mediation is not successful, further proceedings will be scheduled so that the court may evaluate any competing proposals.

## VIII.   CONCLUSION

In light of the above findings of fact and conclusions of law, the court proposes to defer entry of judgment pending mediation or further proceedings if necessary to establish an appropriate remedy. A conference call will be scheduled with counsel.


October 7, 2013                                    _____/S/_____
Date                                                       Catherine C. Blake
                                                                United States District Judge