**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| COALITION FOR EQUITY AND EXCELLENCE IN MARYLAND HIGHER EDUCATION, *et al.*, | * | |
| | * | |
| Plaintiffs, | * | |
| v. | * | |
| MARYLAND HIGHER EDUCATION COMMISSION, *et al.*, | * | Case No.: CCB-06-cv-2773 |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \*

**MOTION TO CERTIFY INTERLOCUTORY APPEAL
OF THE COURT'S OCTOBER 7, 2013 ORDER**

At the conclusion of its October 7, 2013 findings of fact and conclusions of law, the Court suggested that the parties enter mediation. Doc. 382 at 59. Just as the State had requested and pursued mediation prior to trial, the State's representatives have followed the Court's suggestion and pursued further mediation since the fall of 2013, in the hope of resolving this case in a way that best serves the interests of all those who benefit from Maryland's public institutions of higher education, including those students who attend Maryland's historically black institutions ("HBIs"). Despite the efforts of the parties and the able assistance of the Court-appointed mediator, Judge Paul Grimm, regrettably the parties have been unable to reach agreement.

In the absence of a settlement, the case is presently slated for a complex and time-consuming remedies litigation phase. A remedies phase, more so than a trial on liability issues, threatens to harm Maryland public higher education as a whole. The parties will argue and present evidence about particular programs at various universities and the

proceedings will draw into question their continued existence.  *See* Doc. 382 (predicting that "the transfer or merger of select high-demand programs from TWIs to HBIs will be necessary").  There are students of all races enrolled in those programs, and prospective students of all races applying to those programs, and faculty and staff of all races teaching and administering those programs.  Past cases of this type have involved difficult, protracted remedies litigation, followed by appeals and, ultimately, remands that required issues to be relitigated a second time in the district court.

In light of this history, before the Court and the parties proceed to a remedies litigation phase, the State submits that it is in the interest of all concerned to seek the guidance of the appellate court to determine the applicable legal standard—and then, if after appeal the case remains unresolved, to apply that standard once, in a single remedies proceeding.  An appeal prior to litigating remedies is especially appropriate in the context of this case.  Since the Supreme Court decided *United States v. Fordice*, 505 U.S. 717 (1992), no district court's findings and conclusions of law in a higher education desegregation case have survived an appeal without being reversed or modified at least in part.  *See*, *e.g.*, *Ayers v. Fordice*, 111 F.3d 1183, 1190, 1228-29 (5th Cir. 1997) (reversing in part and remanding for further proceedings); *Knight v. Alabama*, 14 F.3d 1534, 1556-57 (11th Cir. 1994) (reversing in part, vacating in part, and remanding for further proceedings); *United States v. Louisiana*, 9 F.3d 1159, 1171 (5th Cir. 1993) (reversing adjudication of liability, vacating remedial order, and remanding for further proceedings).

The appropriateness of an interlocutory appeal at this juncture of a case challenging a state's higher education policies was demonstrated in a decision previously cited by this

Court, *Gratz v. Bollinger*, 539 U.S. 244 (2003) (*see* Doc. 242 at 4 n.5, 5, 11), in which the Supreme Court decided an appeal that was certified by a district court after a ruling on liability but prior to litigation of remedies. *See* 539 U.S. at 259 (noting that the district court "certified two questions for interlocutory appeal to the Sixth Circuit pursuant to 28 U.S.C. § 1292(b)"); *Gratz v. Bollinger*, 122 F. Supp. 2d 811, 814 (E.D. Mich. 2000) (stating that the district court's ruling addressed "the 'liability' phase only, which has been previously defined as 'whether [D]efendants' use of race as a factor in admissions decisions" at a public university "violates the Equal Protection Clause of the Fourteenth Amendment" (brackets in original)).

### Summary of the Court's Rulings

In a series of rulings prior to the trial of this matter, the Court acknowledged that there is no valid claim of intentional discrimination on the part of Maryland public higher education, Doc. 242 at 9, 9 n.13, and that Maryland had successfully desegregated all of its so-called "traditionally white institutions" ("TWIs") or "non-historically black institutions" ("non-HBIs"), *id.* at 7 (noting that "the Coalition is not pressing any claims relating to minority students at the 'traditionally white institutions'").[1] The Court found that "[m]inority students attend [Maryland's TWIs and non-HBIs] in significant numbers

---

[1] *See* Doc. 272, Joint Proposed Pre-Trial Order at 33, ¶¶ 29, 30 ("Plaintiffs do not claim the existence of vestiges of the *de jure* segregated system at non-HBIs in Maryland," and "Plaintiffs do not contend that Maryland has failed to desegregate its non-HBIs."); Doc. 311, Jan. 10, 2012 Trial Tr. vol. 1, testimony of plaintiffs' expert, Dr. Clifton Conrad at 100 ("[T]he dual structure has been eliminated with the public TWIs. . . ."); *id.* at 115 ("Q: Are the traditionally white institutions in Maryland desegregated? A: They are, yes, indisputably.").

today," and "[a]pproximately 59% of African-Americans attending public four-year institutions [in Maryland] are enrolled at non-HBIs." *Id.* at 7, 7 n.8.[2]

The Court further confirmed that Maryland had previously eliminated other policies affecting HBIs that were traceable to the former *de jure* system, including policies that had been found to persist in the systems of other states, as documented in *Fordice*, *Knight v. Alabama*, and *United States v. Louisiana*. The Court found no basis to conclude that Maryland has any traceable policies pertaining to

(1)     recruitment practices;

(2)     admissions practices;

(3)     retention rates at HBIs;

(4)     graduation rates at HBIs; or

(5)     capital funding.

*See* Doc. No. 242 at 8, n.10; *id*. at 8-9; *see also* Doc. 382 at 40-41.

In its October 7, 2013 findings and conclusions of law, the Court ruled in favor of the State on two of the three remaining claims by finding that the State's policies on operational funding and missions for HBIs were not vestiges of *de jure* segregation. *See* Doc. 382 at 38-43; 27-28, 32-33. The Court found that "Maryland has maintained a policy of enhancing HBI mission and programming at least since the 1970s in an effort to mitigate the effects of *de jure* discrimination." *Id.* at 27. The Court further quoted the acknowledgment by the federal Office for Civil Rights ("OCR") that "[a]t all levels, the

---

[2] Prior to the reassignment of this case to Judge Blake, the Court ruled in favor of the State on the plaintiffs' claim that the State had breached its 2000 Partnership Agreement with the U.S. Department of Education's Office for Civil Rights. Doc. 57.

State and its public education institutions have developed and implemented far-ranging initiatives designed to maximize higher education access and success for African-Americans." *Id.* at 14; *see id.* (quoting OCR's recognition of "the State's unflagging commitment to providing equal educational opportunities to all of its citizens"). The Court determined that "Maryland's HBIs are not 'underfunded' by the State, relative to the TWIs," and Maryland's "current formula has not disadvantaged the HBIs or provided them any less state-controlled funding than the TWIs." *Id.* at 38. Far from being deprived of financial resources, "between 1984-2010, Maryland's HBIs received $84,621,000 in state appropriations and enhancement funds above what they would have received if these funds had been distributed to all Maryland institutions in proportion to their student enrollment." *Id.* The Court also found that in recent years "Maryland's HBIs have not stagnated in resources." *Id.* at 40.

The Court further found that the State has been attentive to the special needs and challenges facing the HBIs. "In fact, the state has put policies in place to address . . . disparities" affecting the HBIs' financial condition arising from "many factors outside of State control, such as lower tuition revenue, . . . insufficient fundraising capacity, . . . and difficulty in attaining external grants. . . ." *Id.* at 41. "For example, the State's funding practices recognize and compensate for lower tuition revenue, and the state has also taken steps to avoid reducing HBI budgets where other budget cuts have been required due to the state's overall fiscal health." *Id.* The Court found that even during the "economic downturn" experienced in the years 2000 to 2012, "state financial support for the HBIs grew by 82.5%, compared to only 43.2% for TWIs. . . ." *Id.* at 41.

The Court then decided the lone remaining claim by finding that the State continues to maintain a policy of unnecessary program duplication that is traceable to *de jure* segregation and has segregative effects. *Id.* at 44-50, 52-55. However, the Court found that "unnecessary program duplication is not a problem on the Eastern Shore. . . ," *id.* at 45, and specifically noted a "lack of unnecessary duplication at UMES and Salisbury. . . ," *id.* at 55. The Court determined there was no educational justification for the unnecessary duplication it found elsewhere, *id.* at 56-59, and further found that even if there had been educational justification, the State did not offer "compelling evidence that any sound educational need is an unavoidable driver of the ongoing unnecessary duplication of HBI programs throughout Maryland's system of higher education," *id.* at 58.

## ARGUMENT

### THE COURT SHOULD CERTIFY AN APPEAL OF THE OCTOBER 7, 2013 FINDINGS OF FACT AND CONCLUSIONS OF LAW.

By statute, Congress has authorized an interlocutory appeal of an order upon certification by a district court where the following three criteria are satisfied: the decision (1) "involves a controlling question of law" (2) "as to which there is substantial ground for difference of opinion" and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). As shown below, all three of these criteria are met with respect to this Court's October 7, 2013 memorandum of findings and conclusions of law resolving questions of liability (Doc. 382).

Where these criteria are satisfied, Rule 5(a)(3) of the Federal Rules of Appellate Procedure permits the Court to "amend its order, either on its own or in response to a party's

motion, to include the required permission or statement" certifying an interlocutory appeal. Neither § 1292 nor Rule 5(a)(3) places any time limitation on a motion requesting certification or a district court's ability to amend a prior order to certify an appeal. *See Aparicio v. Swan Lake*, 643 F.2d 1109, 1112 (5th Cir. 1981) ("Because the interlocutory order can be amended at any time in order to incorporate the certification language, the lapse of an extended period of time between the entry of the interlocutory order and the appeal pursuant to 28 U.S.C. § 1292(b) is countenanced by Rule 5(a)."). The only time requirement applies *after* an order is certified for appeal by the district court: § 1292(b) provides that the appellate court may "in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order [certifying the appeal]."[3] *See Safety-Kleen, Inc. v. Wyche*, 274 F.3d 846, 866 (4th Cir. 2001) ("When a district court certifies a question for interlocutory review, the appellant must, within ten days, file with the court of appeals an application for permission to appeal."); *id.* at 866-67

---

[3] Some courts, most notably the Seventh Circuit in *Weir v. Propst*, 915 F.2d 283 (7th Cir. 1990), have suggested there is some implicit limitation on the time within which a district court may amend its order to certify an appeal. *See id.* at 287 ("Although the district judge has by virtue of Rule 5(a) the power to amend his interlocutory ruling at any time, . . . [t]he grant of a power is not a license to abuse it."); *but see Aparicio*, 643 F.2d at 1112 (allowing interlocutory appeal under § 1292(b) where order certifying appeal was entered more than a year after the district court originally issued its order that was the subject of the appeal). In the period since *Weir* was decided, both § 1292 and Rule 5 have been amended, but no such time requirement for certification has been added to the text of either the statute or the rule. In any case, even in *Weir*, the court recognized that extending the time for seeking certification is proper "if there is a reason for the delay. . . ." 915 F.2d at 287. Here, the Court deferred scheduling further proceedings pending mediation, *see* Doc. 382 at 60, and the defendants have deferred requesting certification of an appeal while engaging in mediation, in an effort to achieve an agreed resolution that would potentially obviate the need for an appeal. Now that the mediation has proved unsuccessful, the defendants are seeking certification to permit an interlocutory appeal.

(recognizing district court's "power to recertify a question for review" if "the appellant fails to file the required application for permission to appeal" within the 10 days provided in § 1292(b)).

### A. This Is an Exceptional Case Warranting Interlocutory Appeal.

Certification of an appeal under § 1292(b) is reserved for "exceptional circumstances [that] justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." *Cooper & Lybrand v. Livesay*, 437 U.S. 463, 475 (1978) (citation omitted). This case involves circumstances that are unquestionably exceptional.

The October 7, 2013 findings and conclusions of law constitute the first time since the early 1990s that any district court in the United States has had occasion to issue a ruling on liability in a case involving issues of desegregation in public higher education. In the more than two decades since the Supreme Court decided *Fordice*, higher education in Maryland and throughout the nation has undergone a series of significant changes that the Supreme Court could not have accurately foreseen in 1992. These changes have profoundly transformed a feature of higher education at the very core of the Court's analysis in *Fordice*, namely, student choice. *See id.* at 734 (condemning policies that "restrict the range of choices of entering students as to which institution they may attend in a way that perpetuates segregation"); *id.* at 733 (same); *id.* at 742 ("Unquestionably, a larger rather than a smaller number of institutions from which to choose in itself makes for different choices. . . ."). Thanks to the advent of online education, universities with nationwide and even global operations, and other innovations that were unknown in 1992,

"the range of choices" available to students in higher education is exponentially greater in 2015, if not unlimited.[4]

In addition to the lapse of two decades that renders the Court's application of *Fordice* "exceptional," the October 7, 2013 ruling represents the first time any court applying *Fordice* has found a state liable where the facts show that the state already had fully desegregated its formerly white institutions *and* had adequately funded its HBIs, while "maintain[ing] a policy of enhancing HBI mission and programming at least since the 1970s in an effort to mitigate the effects of *de jure* discrimination." Doc. 382 at 27. This case also presents the first instance where a state has been found to have eliminated all policies traceable to its former *de jure* system of segregated higher education, with the sole exception of what the Court found to be unnecessary program duplication. *See Ayers v. Fordice*, 111 F.3d at 1228 (identifying 8 traceable policies still maintained in Mississippi); *Knight v. Alabama*, 14 F.3d at 1539, 1545, 1550 (letting stand the district

_____

[4] In addition to Maryland's 13 four-year State universities and 16 community colleges, prospective students in Maryland may choose from any of 22 in-state independent four-year private colleges and universities, as well as 95 approved out-of-state institutions with campuses, internship sites, or practica sites in Maryland. *See* Md. Code Ann., Education § 11-202 (requiring certificate of approval from MHEC before a postsecondary institution may operate in Maryland). Maryland students may also access programs via the Internet from sources around the world, including any of the 310 colleges and universities that are registered to offer online programs in Maryland. *See* 2012 Md. Laws, chs. 595, 596, effective July 1, 2012, codified at Md. Code Ann., Education § 11.202.2 (requiring registration with MHEC by each institution of higher education that enrolls Maryland students). The effects of these developments upon Maryland higher education are multiplied due to geography: the great majority of Marylanders live within relatively short driving distance from the bordering states of Pennsylvania, Delaware, Virginia and the District of Columbia, each of which has its own universities and colleges that market themselves to Maryland residents.

court's finding of 6 traceable policies in effect in Alabama and adding at least one other traceable policy that the district court had not found). The case law reveals no prior example of a court finding a state's formerly white institutions to be fully desegregated and yet holding the state liable based solely on a finding of unnecessary program duplication and no other traceable policies. *See Ayers v. Fordice*, 879 F. Supp. 1419, 1445 (N.D. Miss. 1995) ("The duplication issue, however, does not stand alone. . . .").

Finally, "exceptional circumstances" warrant an interlocutory appeal of the October 7, 2013 ruling because the issues of law addressed in the decision, concerning the application of *Fordice*, have never before been addressed by any court in the Fourth Circuit, including the Court of Appeals itself. The appellate Court has yet to have any opportunity to provide guidance on the appropriate legal standard to apply to determine whether Maryland has a policy of unnecessary program duplication that is traceable to the *de jure* era, nor has the Court of Appeals addressed any of the multiple issues subsumed within that question, which include but are not limited to the following:

1.     Whether a state that has fully desegregated its TWIs, has no racially identifiable non-HBIs, and has an HBI that is no longer racially identifiable,[5] can be deemed to have a "dual system" and held liable for a traceable policy of unnecessary program duplication, when the courts in *Fordice* concluded that "*only* program duplication

_____

[5] *See* Doc. 382 at 54, 55 (finding that UMES's student population is 13.3% white and noting "UMES's substantial success in attracting white students, as well as other race students"); *see also* MHEC, 2011 Data Book, Defendants' Trial Exhibit 146, at 10 (showing that non-African American students accounted for more than 32% of UMES's Fall 2009 enrollment).

*between* proximate, *racially identifiable* institutions was traceable to *de jure* segregation and had segregative effects," *Ayers*, 111 F.3d at 1218 (emphasis added), meaning that both institutions involved at either end of unnecessary program duplication must be racially identifiable, *see Ayers*, 879 F. Supp. at 1470 (finding "continuing racial identifiability" at both HBIs and HWIs in Mississippi, with "sizable underrepresentation of black students at most of the HWIs in the state");

2. Whether the State can be deemed to have a "policy" of unnecessary program duplication traceable to *de jure* segregation, as this Court found, when the Maryland Higher Education Commission ("MHEC") has a detailed process for reviewing all program proposals for compliance with requirements that include the principles set forth in *Fordice*, including its instructions with respect to unnecessary program duplication and educational necessity; there is no evidence the Commission has ever rejected a program proposal from an HBI; and the plaintiffs were able to identify only one instance when the Commission approved a non-HBI's program proposal over the objection of an HBI, and in that instance the program request involved an institution where minority students outnumber white students[6];

---

[6] The one instance the Court has cited of MHEC approving a program request over the objection of an HBI, Doc. 382 at 51, involved the joint MBA program between the University of Baltimore (Fall 2009 university enrollment: 41% white) and Towson University (Fall 2009 university enrollment: 67% white). *See* MHEC, 2011 Data Book, Defendants' Trial Exhibit 146, at 10. The only other MHEC program review decision highlighted in the Court's findings, Doc. 382 at 52, was the *denial* of approval of a doctorate program proposed by University of Maryland University College (Fall 2009 university enrollment: 38% white). *See* Defendants' Trial Exhibit 146, at 10. The Court found that MHEC's denial of the request "did address the potential duplicative effects. . . ." Doc. 382 at 52.

11

3. Whether the State can be deemed to have a "policy" that is the cause of any perceived unnecessary program duplication when MHEC applies the same program approval regulations and standards to institutions statewide and the Court has found that "unnecessary program duplication is not a problem on the Eastern Shore. . . ," Doc. 382 at 45; *see id.* at 50 ("there was no further duplication of high-demand programs on the Eastern Shore"); *id.* 55 (referring to "the lack of unnecessary duplication at UMES and Salisbury");

4. Whether MHEC's policies and procedures of program approval, which expressly incorporate the principles set forth in *Fordice* and had no analog in the *de jure* era, can nonetheless be deemed a policy of unnecessary program duplication traceable to *de jure* segregation because, in the Court's view, the current "safeguards are only forward facing" and have not acted retrospectively to eliminate accumulated duplication "that existed since, essentially, the beginning of Maryland's system of public higher education," Doc. 382 at 50; *see Fordice*, 505 U.S. at 728 (a state's "constitutional obligations" are discharged when "it eradicates *policies* and *practices* traceable to its prior *de jure* dual system that continues to foster segregation" (emphasis added)); *id.* at 729 (requiring reform of "policies traceable to the *de jure* system" that are "*still in force* and have discriminatory effects" (emphasis added)); *id.* at 730 n.4 (rejecting claim for relief based on "present discriminatory effects" without consideration of "whether such consequences flow from [present] policies rooted in the prior system");

5. Whether given the Court's finding that during the 1960s and 1970s, Maryland's HBIs "began attracting significant numbers of white graduates," Doc. 382 at 48, and given the dramatic changes in the demographic makeup of Baltimore City and

Prince George's County that have occurred since 1970,[7] the plaintiffs should have been required to prove that any post 1970s decrease in white enrollment at HBIs was the result of intentional discrimination on the part of the State rather than other causes. *See Fordice*, at 732 n.6 ("If challenged policies are not rooted in the prior dual system, the question becomes whether the fact of racial separation establishes a new violation of the Fourteenth Amendment under traditional principles."); *id.* at 733 n.8 ("As for present policies" that are not traceable, "a claim of violation of the Fourteenth Amendment cannot be made out without a showing of discriminatory purpose."); *Freeman v. Pitts*, 503 U.S. 467, 495 (1992) ("Where resegregation is a product not of state action but of private choices, it does not have constitutional implications.");

6.     Whether, in addition to meeting *Fordice*'s test that a state has "satisfied its burden of proving that it has dismantled its prior system" if it no longer has traceable policies that "are without sound educational justification and can be practicably eliminated," 505 U.S. at 728, the state must also prove, as this Court ruled, that the state "seriously considered alternative, non-segregative means" to fulfilling the educational need, Doc. 382 at 57, a requirement that is not found in *Fordice*'s 8-1 majority opinion and was not applied by the lower courts on remand from *Fordice*, *see Ayers*, 111 F.3d at 1192

---

[7] *See* Doc. 322, Trial Tr. Feb. 6, 2012, testimony of Dr. Donald R. Hossler at 50 ("[T]he demographic makeup of the area" where each school is located will "heavily influence the characteristics of who enrolls" and "makes a huge difference in what's going on.")  Doc. 311, Trial Tr. Jan. 10, 2012, testimony of Dr. Clifton F. Conrad at 131 (agreeing that changes in demographics of neighborhoods where institutions are located "[m]ost certainly" play an important role in enrollment rates); *id.* at 131-32 (acknowledging that Dr. Conrad's analysis and opinions with regard to enrollment at TWIs and HBIs "did not" take into account any changes in demographics of areas where the institutions are located).

("We have read *Fordice* to require that 'each suspect state policy or practice be analyzed to determine whether it is traceable to the prior de jure system, whether it continues to foster segregation, whether it lacks sound educational justification, and whether its elimination is practicable.'" (quoting *United States v. Louisiana*, 9 F.3d 1159, 1164 (5th Cir. 1993)); *but see Fordice*, 505 U.S. at 744 (O'Connor, J., concurring) ("In my [Justice O'Connor's] view, . . . if the State shows that maintenance of certain remnants of its prior system is essential to accomplish its legitimate goals, then it still must prove that it has counteracted and minimized the segregative impact of such policies to the extent possible."); *Knight*, 14 F.3d at 1541-42 (adopting the additional test proposed in Justice O'Connor's concurrence); *Maryland v. Wilson*, 519 U.S. 408, 412-13 (1997) (likening "dictum" to a statement "contained in a concurrence" and explaining that "neither constitutes binding precedent").

## B. The Findings and Conclusions of Law Involve a Controlling Question of Law.

The correct legal analysis for determining whether, despite having fully desegregated its TWIs, the State can be held liable based on a finding of unnecessary program duplication, constitutes a "controlling question of law" for purposes of § 1292(b). The issue is "plainly a 'question of law' within the meaning of § 1292(b), insofar as it is 'a question of the meaning of a statutory or constitutional provision, regulation or common law doctrine. . . .'" *Price v. Atlantic Ro-Ro Carriers, Inc.*, No. CCB-11-1735, 2014 WL 7358729, *1 (D. Md., Dec. 22, 2014) (quoting *Lynn v. Monarch Recovery Mgmt., Inc.*, 953 F. Supp. 2d 612, 623 (D. Md. 2013) (other citation omitted)). It is just as plainly a

"controlling question of law" under § 1292(b), which has been interpreted to include a legal issue "that would require reversal if decided incorrectly or that could materially affect the course of litigation with resulting savings of the court's or the parties' resources." *APCC Serv., Inc. v. Sprint Commc'ns Co., LP*, 297 F. Supp. 2d 90, 95-96 (D.D.C. 2003) (quoting *Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group*, 233 F. Supp. 2d 16, 19 (D.D.C. 2002)).

The Supreme Court in *Fordice* held that a district court's "problematic" analysis of unnecessary duplication was a ground for reversal. 505 U.S. at 738; *see id.* at 739. Though the "resolution of an issue need not necessarily terminate an action in order to be 'controlling'" for § 1292(b) purposes, *APCC Serv., Inc.*, 297 F. Supp. 2d at 96 (citing *Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 24 (2d Cir. 1990)), in this case, the resolution of this question of law in favor of the defendants could end the litigation by reversing the disposition of the only claim on which the plaintiffs have prevailed.

As Judge Motz has pointed out, where an order involves a controlling question of law, "the significance and importance of the ruling" becomes "relevant," and the district court's decision whether to certify an interlocutory appeal "may depend in part upon the *significance* and *importance* of the ruling" sought to be appealed. *Jacobson v. Comcast Corp.*, No. JFM-09-562, 2010 WL 5463084, *2 (D. Md. Dec. 29, 2010) (emphasis in original). The exceptional "significance" and "importance" of this Court's October 7, 2013 findings and conclusions of law cannot be overstated.

**C. There Is Substantial Ground for Difference of Opinion.**

The second criterion is also met because "substantial ground for difference of opinion" arises from the applicable case law on unnecessary duplication, a body of law in which no comparable district court ruling to date has emerged fully intact from appellate review. Other pertinent considerations also suggest a difference of opinion.

"A substantial ground for difference of opinion is often established by a dearth of precedent within the controlling jurisdiction," such as the complete absence of Fourth Circuit precedent here, and may also be shown by "conflicting decisions" elsewhere. *APCC Serv., Inc.*, 297 F. Supp. 2d at 97. The conflict between decisions need not be stark and irreconcilable, however; even another decision that is distinguishable because it involved "substantively different facts" may suffice to create "substantial ground for difference of opinion" where the prior decision "cuts close to the bone on a basic issue" bearing on the controlling question of law. *Brooks v. Circuit City Stores, Inc.*, DKC-95-3296, 1997 WL 679899, *1 (D. Md. Sept. 16, 1997). Although a lack of precedent for a court's treatment of an issue does not necessarily establish a substantial ground for difference of opinion, "when a matter of first impression also had other grounds for difference of opinion–and met the other two criteria–district courts in this circuit have certified the issue for interlocutory appeal." *Kennedy v. Villa St. Catherine, Inc.*, No. PWG-09-3021, 2010 WL 9009364, *2 (D. Md. June 16, 2010) (citations omitted). The nature of the "other grounds for difference of opinion," *id.*, may vary from case to case. *See*, *e.g.*, *Hanley v. Hand 'N Heart, L.L.C.*, Nos. 06cv71, 06cv143, 2007 WL 201088, *13 (E.D. Va. Jan. 22, 2007) (substantial ground for difference of opinion arose from decisions

of another circuit and the variance between an administrative agency's original proposals and the resulting regulation as adopted); *In re Travelstead*, 250 B.R. 862, 865, 866 (D. Md. 2000) (in bankruptcy case, applying by analogy "the standards set forth in 29 U.S.C. § 1292(b)" and finding "substantial ground for difference of opinion" "based on the interplay" of "various provisions" of debtor's reorganization plan and the confirmation order and "contemporaneous representations of Debtor's counsel").

In this case, the Supreme Court's decision in *Fordice* and the *Ayers* decisions implementing it on remand themselves present "substantial ground for difference of opinion," because the analyses in those decisions differ materially from this Court's. These "differences of opinion" are illustrated by the following:

1. Whereas this Court found unnecessary program duplication to be a traceable policy despite Maryland's lack of any racially identifiable TWIs, *Ayers* clearly and repeatedly insists that "*only* program duplication *between* proximate, *racially identifiable* institutions was traceable to *de jure* segregation and had segregative effects." *Ayers*, 111 F.3d at 1218 (emphasis added); *id.* at 1218 (repeating three times the formula for traceable unnecessary duplication with segregative effects: "program duplication between proximate, racially identifiable institutions"); *id.* at 1219 (repeating same formula twice); *id.* at 1221 (repeating same formula); *accord Knight v. Alabama*, 787 F. Supp. 1030, 1319 (N.D. Ala. 1991)("Throughout the country . . . high demand non-core programs are duplicated by state institutions whether geographically proximate or not. What makes the situation in Alabama problematic is the fact that the proximate institutions are racially identifiable *and* the allegation that this racial identifiability, rather than sound educational

policy, is the impetus for non-core high demand program duplication between the proximate HBCUs and HWUs [historically white universities]" (emphasis in original)).

2.      *Fordice* instructs district courts not to consider unnecessary program duplication "in isolation" from other traceable policies, 505 U.S. at 739, since "[t]he duplication issue . . . does not stand alone. . . ," *Ayers*, 879 F. Supp. at 1445, but here "isolation" of the finding of unnecessary program duplication has been rendered unavoidable because the Court has found no other traceable policies.

3.      This Court's imposition of what is, in effect, a least segregative alternative requirement, in addition to *Fordice*'s standards of educational soundness and practicability, *see* Doc. 382 at 57-58, represents a substantial ground for difference of opinion, one that is apparent from the case law.  That is, the majority opinion in *Fordice* lacks such a requirement, though the additional test is advocated by Justice O'Connor's concurrence, 505 U.S. at 744; the Fifth Circuit in *Ayers* did not interpret *Fordice* to impose the requirement, *Ayers*, 111 F.3d at 1192, but the Eleventh Circuit in *Knight* chose to adopt Justice O'Connor's proposal, 14 F.3d at 1541-42.

4.      This Court's finding that during the 1960s and 1970s, Maryland's HBIs "began attracting significant numbers of white graduates," Doc. 382 at 48, has no precedent or analog in *Fordice* or any of the decisions applying it, but as was suggested in a case the Supreme Court decided the same term as *Fordice*, "past discrimination is no longer playing a proximate role" where, as here, "the racial imbalance had been temporarily corrected after the abandonment of *de jure* segregation."  *Freeman*, 503 U.S. at 503 (Scalia, J., concurring).

18

In addition to these and other grounds for difference of opinion that emerge from the case law, the circumstances of this case necessarily involve substantial grounds for difference of opinion because this Court's decision takes issue with the policies, procedures, and considered determinations of MHEC, the body empowered by State law to review institutions' program proposals and to evaluate them based on multiple criteria that include compliance with *Fordice*. *See Caudill v. Blue Cross & Blue Shield of North Carolina*, 999 F.2d 74, 80 (4th Cir. 1993) ("[E]ven if the court would have come to a different conclusion, it must not substitute its judgment for that of the administrative agency with a decision under review."), *abrogated on other grounds by Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677 (2006). The Court's determination also differs from the "complex educational judgments" of those who administer Maryland's universities and develop and maintain their programs, "an area that lies primarily within the expertise of the university," to which the Supreme Court has accorded a "degree of deference . . ., within constitutionally prescribed limits." *Grutter v. Bollinger*, 539 U.S. 306, 328 (2003).

### D. An Interlocutory Appeal May Materially Advance the Ultimate Termination of the Litigation.

The third criterion under § 1292(b) is also satisfied because an interlocutory appeal may "materially advance the ultimate termination of the litigation," if it results in the dismissal of the only remaining claim that has not already been rejected by this Court. To evaluate this criterion, "a district court should consider whether an immediate appeal would '(1) eliminate the need for trial, (2) eliminate complex issues so as to simplify the trial, or

(3) eliminate issues to make discovery easier and less costly.'" *Lynn v. Monarch Recovery Mgmt., Inc.*, 953 F. Supp.2d 612, 626 (D. Md. 2013). This Court has found that where, as here, reversal of an order "would result in dismissal of the entire action," then "the third requirement is met." *In re Travelstead*, 250 B.R. at 866; *accord Kennedy*, PWG-09-3021, 2010 WL 9009364, *4 (finding the third criterion met where, if the appellate court were to conclude that "summary judgment should have been granted on all counts," then "litigation would end"). "It is immaterial that other possible outcomes exist"; to satisfy the third criterion of § 1292(b), "it is enough that appeal may lead to a possible terminus for the case." *Kennedy*, No. PWG-09-3021, 2010 WL 9009364, *4.

In this case, the outcome of an interlocutory appeal may eliminate entirely the "complex issues" involved in litigating remedies, the complexity of which has previously been acknowledged by this Court and by the plaintiffs. *See* Doc. 379, Transcript Oct.19, 2012 Closing Argument at p. 8, lines 4-5 (the Court acknowledging that "if we get to that [question of remedies], they are very complex issues"); *id.* at p. 7, lines 17-19 (plaintiffs' counsel noting that "in the *Knight* and *Fordice* cases, the remedies phase . . . was pretty elongated"). Even if the appeal does not conclude the case, it is likely to provide guidance that will help clarify the issues, and thereby streamline the determination of remedies while possibly averting the need for a future appeal.

# CONCLUSION

For the reasons stated, the Court should certify an interlocutory appeal of the October 7, 2013 findings of fact and conclusions of law by amending the order to add the statement that the Court finds it "involves a controlling question of law as to which there is substantial ground for difference of opinion" and "an immediate appeal from the order may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b).

Respectfully submitted,

_____/s/_____
STEVEN M. SULLIVAN
Federal Bar No. 24930
KATHERINE D. BAINBRIDGE
Federal Bar No. 29591
KATHLEEN E. WHERTHEY
Federal Bar No. 23900
BEATRICE NUÑEZ-BELLAMY
Federal Bar No. 29582
Assistant Attorneys General
Office of the Attorney General
200 Saint Paul Place
Baltimore, Maryland  21202-2021
Tel: (410) 576-6325

Attorneys for Defendants