**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

THE COALITION FOR EQUITY AND EXCELLENCE IN MARYLAND HIGHER EDUCATION, INC., et al.,

Plaintiffs,

Civil No. 06-2773-CCB

v.

MARYLAND HIGHER EDUCATION COMMISSION, et al.,

Defendants.

# PLAINTIFFS' MEMORANDUM IN SUPPORT OF PLAINTIFFS' REMEDIAL PROPOSAL

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

THE LEGAL REQUIREMENTS OF A REMEDY .............................................................. 9

I. The Court's Decision: Unnecessary duplication in Maryland is widespread and traceable to the *de jure* era, undermines desegregation of the HBIs, and must be remediated. ........................................................................................................ 9

II. General remedial principle: Traceable policies which perpetuate a segregated system of higher education are unconstitutional and must be remedied. ......................... 15

III. In higher education, desegregation requires a significant increase in other-race enrollment and an overall reduction in the racial identifiability of the HBIs. .................. 18

IV. The remedial plans implemented in most of the other higher education desegregation cases largely failed to desegregate the HBIs. ........................................... 23

A. Alabama ...........................................................................................25

B. Mississippi .......................................................................................29

C. Louisiana..........................................................................................34

V. In a unitary system, the HBIs have a distinctive institutional identity created by a meaningful number of unique, high-demand programs organized around programmatic niches. ................................................................................... 37

A. Unique, high-demand programs are the most effective way to ensure that HBIs can attract students of all races. ...................................................38

B. The creation of programmatic niches composed of a meaningful number of unique, high-demand programs may require new, enhanced, or transferred programs at the HBIs. .............................................................44

C. Unique but low-demand programs will not make a significant contribution to the desegregation of an institution. ..................................................53

D. Placing duplicative programs at the HBIs is unlikely to lead to meaningful desegregation. .........................................................................................55

E. In rare circumstances, extremely high-demand and competitive professional programs offer strong desegregative potential for the HBIs – even when duplicated. ...........................................................................59

F. Joint programs can reinforce the desegregative effects achieved through other remedies, but on their own may not desegregate an institution. ..................62

G. Institutional mergers may have transformative desegregative potential and should be given serious consideration. ....64

VI. Eliminating unnecessary duplication is practicable and sound educational policy. .......... 70

VII. In addition to remedying the effects of past duplication, Plaintiffs seek revision of the program approval process to prevent unnecessary duplication moving forward and a process to enforce compliance with the remedial plan.......... 72

CONCLUSION.......... 80

Appendix 1.......... A-1
Appendix 2.......... A-2
Appendix 3.......... A-3
Appendix 4.......... A-4
Appendix 5.......... A-5
Appendix 6.......... A-6
Appendix 7.......... A-7
Appendix 8.......... A-8
Appendix 9.......... A-9
Appendix 10.......... A-10
Appendix 11.......... A-11
Appendix 12.......... A-12
Appendix 13.......... A-13
Appendix 14.......... A-14
Appendix 15.......... A-15
Appendix 16.......... A-16
Appendix 17.......... A-17
Appendix 18.......... A-18
Appendix 19.......... A-19
Appendix 20.......... A-20
Appendix 21.......... A-21
Appendix 22.......... A-22
Appendix 23.......... A-23
Appendix 24.......... A-24
Appendix 25.......... A-25
Appendix 26.......... A-26

Appendix 27 .......... A-27
Appendix 28 .......... A-28
Appendix 29 .......... A-29

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Ayers v. Allain*,
674 F. Supp. 1523 (N.D. Miss. 1987) ........................................ 7, 18, 23, 29

*Ayers v. Fordice*,
111 F.3d 1183 (5th Cir. 1997)........................................ 17, 29

*Ayers v. Fordice*,
40 F. Supp. 2d 382 (N.D. Miss. 1999) ........................................ 20

*Ayers v. Musgrove*,
No. 4:75CV009-B-D,
2002 WL 91895 (N.D. Miss. Jan. 2, 2002) ........................................ 23, 29, 30

*Ayers v. Thompson*,
358 F.3d 356 (5th Cir. 2004)........................................ 33

Code of Maryland Regulations 13B.02.03.09(C)(2)(a) ........................................ 76

*Geier v. Alexander*,
593 F. Supp. 1263 (M.D. Tenn. 1984),
*aff'd*, 801 F.2d 799 (6th Cir. 1986) ........................................ 20, 23, 24, 66

*Geier v. Blanton*,
427 F. Supp. 644 (M.D. Tenn. 1977) ........................................ passim

*Geier v. Dunn*,
337 F. Supp. 573 (M.D. Tenn. 1972) ........................................ 21

*Geier v. Sundquist*,
128 F. Supp. 2d 519 (M.D. Tenn. 2001) ........................................ 24, 76, 77

*Geier v. Univ. of Tennessee*,
597 F.2d 1056 (6th Cir. 1979)........................................ 7, 21, 24

*Knight v. Alabama*,
787 F. Supp. 1030 (N.D. Ala. 1991) ........................................ passim

*Knight v. Alabama*,
469 F. Supp. 2d 1016 (N.D. Ala. 2006),
*aff'd*, *United States v. Alabama*, 271 F. App'x. 896 (11th Cir. 2008) ........................................ 23

*Knight v. Alabama*,
900 F. Supp. 272 (N.D. Ala. 1995) ........................................................................ passim

*Milliken v. Bradley*,
418 U.S. 717 (1974) ......................................................................................................... 18

*Milliken v. Bradley*,
433 U.S. 267 (1977) ........................................................................................... 5, 17, 18

*Sanders v. Ellington*,
288 F. Supp. 937 (M.D. Tenn.1968) ............................................................... 7, 23, 65

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*,
402 U.S. 1 (1971) ............................................................................................................. 72

*United States v. Fordice*,
112 S. Ct. 2727 (1992) ......................................................................... 16, 17, 26, 71

*United States v. Fordice*,
505 U.S. 717 (1992) ................................................................................................ passim

*United States v. Louisiana*,
527 F. Supp. 509 (E.D. La. 1981) ............................................................... 8, 23, 34

*United States v. Louisiana*,
811 F. Supp. 1151 (E.D. La. 1992) ........................................................................ 8, 23

*United States v. Louisiana*,
No. 80-CV-3300 (E.D. La. Nov. 14, 1994)............................................................... 8, 34

*United States v. Louisiana.*,
692 F. Supp. 642 (E.D. La. 1988) ......................................................................... 23, 34

*United States. v. Louisiana.*,
9 F.3d 1159 (5th Cir. 1993)..................................................................... 8, 23, 34, 70

**Statutes and Regulations**

Code of Maryland Regulations 13B.02.02.09(C)(2)(g).................................................... 75

Code of Maryland Regulations 13B.02.03.09 ....................................................... 72, 73

COMAR 13B.02.03.09(C)................................................................................... 74, 75

Md. Code Ann., Educ. § 11-206 ........................................................................................ 72

Md. Code Ann., Educ. § 11-206.1 ..................................................................................... 72

Md. Code Ann., Educ. §11-206(5)(iv)............................................................................... 73

Md. Code Ann., Educ. §11-206(e)(4) ........ 73

Md. Code Ann., Educ. 11-206(5)(i) ........ 73

**Other Sources**

2013 Undergraduate and Graduate Enrollment by Institution by Degree Program provided by Maryland Higher Education Commission. ........ 46, 47, 50, 52, 60

Alabama Comm'n on Higher Educ., Alabama Statewide Student Database (2013) ........ 25

ALABAMA STUDENT DATABASE ........ 25, 26, 63

ALCORN STATE UNIVERSITY FACT BOOK (2012-2013) ........ 41

BALTIMORE SUN, Oct. 8, 2013 ........ 1

*Board Approves Merger of Georgia State, Georgia Perimeter Colleges,* DIVERSE ISSUES IN HIGHER EDUCATION, Jan. 6, 2015 ........ 67, 68, 69

Final Report of the Governor's Commission on Education (1975) ........ 11

GEORGIA BOARD OF REGENTS, RECOMMENDED CONSOLIDATIONS ........ 67, 68, 69

GEORGIA BOARD OF REGENTS, USG CONSOLIDATIONS: PHASE III ........ 67, 68, 69

JACKSON STATE ENROLLMENT FACT BOOK (FALL 2013) ........ 41

MARYLAND HIGHER EDUC. COMM'N, 2015 DATA BOOK 4-9 (2015) ........ 11

MISSISSIPPI PUBLIC UNIVERSITIES, AY 2010 – AY 2013 DEGREES AWARDED AND TOP-TEN DEGREES & MAY 2013 ACADEMIC PROGRAM INVENTORY (2013) ........ passim

Mississippi Public Universities, Enrollment Fact Book & A Ten-year Enrollment Comparison & Selected Information on Diversity (2013) ........ 25, 29

National Center on Education Statistics ........ 25, 41

NCES IPEDS Data Center, COMPLETION DATA (2011-2012) ........ passim

NCES IPEDS Data Center, COMPLETION DATA (2012-2013) ........ 62

*Plans to Merge Georgia State U. With a Community College,* INSIDE HIGHER ED., Jan. 6, 2015 ........ 67, 68

*Regents Approve Principles for Consolidation of Institutions*, UNIVERSITY SYSTEM OF GEORGIA NEWSROOM, Nov. 8, 2011 ........ 67, 69

Review of Mission Statements (Jan. 11, 2012) ........ 76

Second Annual Desegregation Status Report (Vol. III, Feb. 1976)............................................ 10

Statewide Student Profiling System – Student Headcount Enrollment by Student Major (Fall 2014-2015)...................................................................................................................... 34

Tennessee Higher Educ. Comm'n, Tennessee Higher Education Fact Book (2014)............. 25, 66

TENNESSEE HIGHER EDUCATION FACT BOOK (2013-2014).......................................................... 7

Trends in White Graduate Students at Historically Black Institutions in Maryland (Oct. 2009)...................................................................................................................................... 11

## INTRODUCTION

After a six-week trial, and hundreds of pages of proposed findings of fact and conclusions of law, the Court concluded in its 2013 Memorandum Opinion that Maryland still operates a dual system of higher education in which the State's Historically Black Institutions ("HBIs") lack institutional identifiability beyond race and have only 11 unique, high-demand academic programs compared to 122 at the Traditionally White Institutions ("TWIs").[1] The Court concluded that Maryland "has never dismantled the *de jure* era of duplication of programs that facilitated segregation—and it has maintained policies and practices that have even exacerbated this problem."[2] The Court further concluded: "The State offered no evidence that it has made any serious effort to address continuing historic duplication. Second, and even more troublingly, the State has failed to prevent *additional* unnecessary program duplication, to the detriment of the HBIs."[3]

More troubling still is the fact that even after the Court's decision, Maryland still does not take seriously its constitutional obligation to prevent unnecessary program duplication. For example, Chancellor Kirwan said the following to the *Baltimore Sun*: "In my opinion, I think the system has been very supportive of creating unique programs at the HBCUs whenever possible and has been very careful to avoid duplication. . . . There are obviously some programs that are in high demand in the economy. In such instances there is some duplication, but that is in the best interest of the state's economy."[4]

---

[1] *See* Memorandum Opinion, D.E. 382 at 44, 46 (Oct. 7, 2013), [hereinafter Memorandum Opinion] (citing *United States v. Fordice*, 505 U.S. 717, 738 (1992)).

[2] *Id.* at 49-50.

[3] *Id.* at 50.

[4] Carrie Wells, *Maryland universities unnecessarily duplicated the programs of black colleges, court rules*, BALTIMORE SUN, Oct. 8, 2013, *available at* http://articles.baltimoresun.com/2013-10-08/news/bs-md-black-colleges-rulling-20131007_1_black-institutions-black-colleges-hbcus.

Maryland is simply not prepared to abandon this unconstitutional practice. Indeed, through a combination of aggressive litigation tactics and vaporous promises, the State has delayed for a full generation dismantling its unconstitutional system.

Over forty years ago, Maryland's Cox Commission recommended that the State allow each HBI to "develop its own specialty areas or programs within the total state system that will broaden the appeal of the institution to a more diverse student body."[5] But the State did not do so.

Thirty years ago, Maryland settled ongoing litigation with the U.S. Department Office for Civil Rights ("OCR") by agreeing, among other things, to create 25 new programs at the HBIs. But as the Court noted, it did not do this either.[6]

Fifteen years ago, to avoid being sued by the U.S. Department of Justice, Maryland agreed to discontinue the practice of unnecessary program duplication. But it did not do so.[7] Moreover, as a part of the State's 2000 Partnership Agreement ("Partnership Agreement") with OCR, Maryland agreed to create at the HBIs a number of unique, high-demand programs sufficient to create the kind of specialties called for by the 1973 Cox Commission. But it did not do that either.[8] Instead, such programs were disproportionately placed at the TWIs.

Ten years ago, in a confidential memorandum, the Office of Maryland's Attorney General warned the State that its legal obligations to avoid unnecessary program duplication

---

[5] Memorandum Opinion at 11.

[6] *Id.* at 13.

[7] *See id.* at 49.

[8] *Id.* at 49-50.

remained "in full force and effect"[9]; it advised the State to reconsider its approval of what it called the "alarming" duplication of Morgan State University's MBA program.[10] But the State did not do that either.

Six years ago, in Maryland's 2009 State Plan for Higher Education, the State committed to implementing plans that would enable the HBIs to compete with the TWIs with academic programs that would attract a diverse student body.[11] But Maryland did not do so.

Four years ago, on the eve of trial in this case, Maryland suddenly declared an interest in mediation; in moving to delay the trial date, it represented to the Court that "the State has already committed orally and in writing to discuss and propose remedies on essentially all of Plaintiffs' topics."[12] But six months of mediation led nowhere, and the State emerged from those discussions with a new trial team.

Almost a year ago, after the Court's decision and contrary to Plaintiffs' status report, Maryland represented to the Court that a mediated agreement was achievable because the parties' proposals "already have significant areas of overlap" and so far as the State was concerned, the remedial issues discussed in the Court's Memorandum Opinion (academic niches and targeted transfers) could be meaningfully discussed, as no issue was "non-negotiable."[13] But these discussions, predictably, led nowhere.

---

[9] *See* PTX 14 at 1.

[10] *See* PTX 14 at 3.

[11] *See* 2009 State Plan for Higher Education, PTX 1 at 26-30.

[12] *See* Defendants' Request for Status Conference to Discuss Possible Mediation, D.E. 244.

[13] *See* Joint Status Report, D.E. 394 at 3.

Meanwhile, the State's violation of the Equal Protection Clause continues. Though Maryland has always attempted to minimize the significance of unnecessary program duplication as a traceable vestige, of all the *de jure* era practices, it is the most inextricably linked to the policy of "separate but equal."

Not surprisingly, then, the Court concluded that this policy has "independent segregative effects."[14] That is to say that acting alone, without another vestige, it acts to steer white students away from Maryland's HBIs. In fact, the evidence at trial showed that because of the State's policy, the HBIs have fewer white students enrolled now than they had in the 1970s.[15]

The Court's 2013 Memorandum Opinion identifies some of the direct evidence showing that Maryland's deliberate policy of unnecessary program duplication undercut integration at the HBIs.[16] Notwithstanding its litigation position, Maryland has recognized that unnecessary program duplication has the effect of segregating the HBIs, which is why it agreed to discontinue the practice as a part of its Partnership Agreement with OCR and why it agreed to establish unique, high demand academic programs at the HBIs. But as the Court concluded, "[u]nfortunately, the State did not follow through on this commitment."[17]

---

[14] Memorandum Opinion at 52.

[15] *See id.* at 12.

[16] *See id.* at 49-60.

[17] *Id.* at 49. Maryland has a pattern of ignoring its obligations when it comes to academic programs at the HBIs. In its 1985 Desegregation Agreement, for example, the State promised the HBIs 25 new academic programs, but only provided 13. *See* Plaintiffs' Proposed Findings of Fact and Conclusions of Law, D.E. 355 at 31.

The Court also concluded that Maryland made no serious attempt to justify its policy of unnecessary program duplication.[18] As the Court noted, this policy is also inconsistent with best practices in higher education.[19]

Since the parties have not been able to agree on a remedy, Plaintiffs submit their proposal ("Remedial Proposal") designed to dismantle the State's dual system.[20] It generally follows the outline of Dr. Walter Allen's trial testimony[21] and calls upon Dr. Clifton Conrad's experience in other higher education desegregation cases. Driven by the common sense proposition that a constitutional remedy should address the constitutional violation, Plaintiffs' remedy focuses on unnecessary program duplication. *Milliken v. Bradley*, 433 U.S. 267, 280 (1977) (remedy must be related to the condition alleged to offend the constitution). It is consistent with Maryland's non-litigation position, reflected in its 2000 Partnership Agreement. It establishes, after considerable input from the HBI presidents and their faculty and staffs,[22] programmatic niches of unique, high demand programs that would be attractive to students regardless of race. The centerpiece is unique programs, especially high-demand programs that are unique (not unnecessarily duplicated by geographically proximate TWIs) and mostly in the STEM[23] fields that are expected to meet workforce needs.

---

[18] *See* Memorandum Opinion at 56 (noting the State did not, for the most part, present evidence that unnecessary program duplication could not be eliminated consistent with sound educational practices).

[19] *See id.* at 54.

[20] *See* Pls.' App. 1.

[21] *See* Memorandum Opinion at 59-60 (citing 1/18/12 AM Trial Tr. 90-107 (Allen)).

[22] During the course of the mediation process, each HBI submitted a document setting forth program creation and enhancement measures that would serve to desegregate its institution. These documents, as well as the mediation discussions that involved the HBI presidents and their staff, helped inform Plaintiffs' proposed remedial plan.

[23] STEM fields refer to programs in Science, Technology, Engineering and Mathematics.

Plaintiffs' plan is consistent with the 2006 Committee I Report that Maryland submitted to OCR ("Committee I Report"), which rightly noted that unique, high-demand programs at HBIs attract white students.[24] It states: "The last time Morgan [State University] had a number of unique programs at the graduate level was in the late 1960s and early 1970s. During that period a *minority* of enrollments at the graduate level were African-American. The recent development of unique graduate programs, primarily at the doctoral level, has once again enabled the [*sic*] Morgan to attract significant non-black enrollments."[25] Maryland continued, "In architecture and planning, which are master's levels [*sic*] programs and are not duplicated in the Baltimore area, enrollments are 60% non-black."[26]

Accordingly, Plaintiffs' Remedial Proposal places major emphasis on creating unique, high-demand programs within programmatic niches that will enhance the institutional identities of Maryland's HBIs based on their academic program offerings. Plaintiffs believe that this approach is most likely to desegregate HBIs in the manner that Maryland's 2009 State Plan for Higher Education identified as a top priority.[27]

In terms of its focus, Plaintiffs' Remedial Proposal differs from the remedies in other cases involving *de jure* era vestiges in higher education. For the most part, remedies in Louisiana, Mississippi, and Alabama ultimately were not aimed at eliminating the segregative

---

[24] *See* Committee I Report, PTX 8 at 28 (stating that Maryland will take appropriate steps to ensure that new unique, high-demand and other programs are approved for the HBIs for the purpose of promoting their institutional competitiveness and ability to attract students regardless of race).

[25] *Id.* at 60 (emphasis in original).

[26] *Id.* at 60, 77.

[27] *See* PTX 1 at 27 (referring to the need to ensure that HBIs succeed in "[r]ecruiting, retaining, and graduating an academically, racially, culturally, and ethnically diverse student body."). As the Court may recall, then Chancellor William Kirwan testified that diversity at HBIs is just as important to the state as diversity at TWIs. *See* Plaintiffs' Proposed Findings of Fact and Conclusions of Law, D.E. 355 at 12.

practice of unnecessary program duplication, and thus did not focus on creating niches of unique, high-demand programs. These remedies instead largely focused on other traceable policies, such as funding, mission, and facilities. To the extent that new programs were created, there was limited emphasis placed on uniqueness. It may well be that by focusing on these other vestiges, the courts underestimated the segregative effect of unnecessary program duplication, since the HBIs in those states are still segregated. This case shows that, at least in Maryland, unnecessary program duplication standing alone has a strong segregative effect.

As for remedies in other states, Tennessee was different than Alabama, Louisiana, and Mississippi in that it involved an institutional merger.[28] That HBI, Tennessee State University ("TSU"), is one of the most diverse HBIs in the country, with a level of white enrollment which far exceeds any Maryland HBI. As of the fall of 2013, TSU has a white student enrollment of 24.5%.[29]

While reviewing the remedies in other jurisdictions is instructive as to what works and does not work in terms of desegregating an institution, insofar as unnecessary program duplication is concerned, Maryland is unique in several ways. It is the only state that had in place an agreement with the OCR to cease unnecessary program duplication but then systematically violated that Agreement.[30] It is the only state that duplicated an HBI program (the controversial

---

[28] *See Geier v. Blanton*, 427 F. Supp. 644, 660-61 (M.D. Tenn. 1977) (mandating a merger between the proximately located HBI and TWI when progress towards desegregating the racially identifiable HBI was insufficient), *aff'd Geier v. Univ. of Tennessee*, 597 F.2d 1056 (6th Cir. 1979).

[29] TENNESSEE HIGHER EDUCATION FACT BOOK (2013-2014) [hereinafter Tennessee Fact Book], *available at* https://www.tn.gov/thec/Legislative/Reports/2014/2013-2014%20FACTBOOK.pdf

[30] Mississippi, Alabama, and Tennessee did not have a partnership agreement with OCR prior to the litigation. *See Ayers v. Allain*, 674 F. Supp. 1523, 1530 (N.D. Miss. 1987) [hereinafter *Ayers I*], *vacated sub nom. Fordice*, 505 U.S. 717 (1992); *Knight v. Alabama*. 787 F. Supp. 1030, 1047-49 (N.D. Ala. 1991) [hereinafter *Knight I*], *vacated on other grounds*, 14 F.3d 1534 (11th Cir. 1994); *see generally Sanders v. Ellington*, 288 F. Supp. 937 (M.D. Tenn.1968). Louisiana never entered a partnership agreement with OCR prior to the commencement desegregation litigation; however, Louisiana entered a consent decree with the Department of Justice in 1981, which outlined a

joint Masters of Business Administration ("MBA") program) over the objection of its Attorney General's Office. And, so far as Plaintiffs can discern, this is the only case where Plaintiffs actually presented specific examples of how unnecessary program duplication drained the HBIs of white students. The segregative effect of unnecessary program duplication is demonstrable.

Unlike in other jurisdictions, where the remedies did not achieve desegregation, Plaintiffs' proposal meets the constitutional violation head-on. Both the HBIs and TWIs would be put in the same positions they would have been in absent the State's illegal conduct. Plaintiffs' proposal also proposes reform of the program approval process, as it is abundantly clear that the State cannot be trusted to meet its constitutional obligations.

The first section of this document discusses the legal requirements of a remedy. After summarizing the Court's finding of a violation, it analyzes the general remedial principles and the lessons learned from other states where a remedy was implemented. Attached to the brief, there are a series of appendices. Appendix 1 is the Plaintiffs' remedial proposal authored by Plaintiffs' experts Drs. Walter Allen and Clifton Conrad. Appendices 2-5 contain summaries of the procedural history and remedies in the Alabama, Louisiana, Mississippi, and Tennessee cases, respectively. Appendices 6-29 provide selected enrollment and degree completion data from Maryland, Alabama, Louisiana, Mississippi, and Tennessee.

---

plan for desegregation. *See United States v. Louisiana*, 527 F. Supp. 509 (E.D. La. 1981), *reconsidered and overridden to reassert jurisdiction*, to resolve claims, 811 F. Supp. 1151 (E.D. La. 1992), *vacated and remanded*, 9 F.3d 1159 (5th Cir. 1993); Agreement, *United States v. Louisiana*, No.-CV-3300 (E.D. La. Nov. 14, 1994) (settlement agreement).

## THE LEGAL REQUIREMENTS OF A REMEDY

### I. The Court's Decision: Unnecessary duplication in Maryland is widespread and traceable to the *de jure* era, undermines desegregation of the HBIs, and must be remediated.

As the Court noted, the unnecessary duplication of academic programs at HBIs and TWIs is "part and parcel of the prior dual system of higher education—the whole notion of 'separate but equal' required duplicative programs in two sets of schools—and . . . present unnecessary duplication is a continuation of that practice."[31] "Given the multitude of regionally proximate institutions in Maryland, convincing expert analysis of the state of program duplication throughout Maryland, and the recognition of several State officials of the historic problem of program duplication, the Coalition has proven that unnecessary program duplication continues in Maryland, to the detriment of its HBIs, and is traceable to the *de jure* era."[32]

Relying upon the testimony of Dr. Clifton Conrad, the Court found that "Maryland continues to have a 'dual structure of higher education' which is 'a structure in which there is a substantial amount of unnecessary or non-essential program duplication between the TWIs and [H]BIs, and there is not meaningful program uniqueness at both sets of institutions."[33] Dr. Conrad found that on balance the TWIs in Maryland still enjoy greater institutional identity than the HBIs, which continue to be perceived primarily as "a school for black students."[34]

In fact, the Court noted, based on Dr. Conrad's findings, the level of duplication in Maryland is "comparable to, and in some cases more pronounced than, the duplication found in

---

[31] Memorandum Opinion at 44 (citing *Fordice*, 505 U.S. at 738).

[32] *Id.* (referencing Assistant Attorney General's Memorandum on the UB/Towson University Joint MBA Proposal, PTX 14, at 3; 1/11/12 AM Trial Tr. 50 (Former MHEC Chairman Oliver); 90 Opinions of the Maryland Attorney General 153 (2005), PTX 698, at 19.

[33] *Id.* at 46-47 (citing 1/10/12 AM Trial Tr. 49, 73-75 (Conrad)).

[34] *Id.* at 53 (citing 1/18/12 AM Trial Tr. 88-89 (Allen)).

Mississippi during the *Fordice* remand proceedings that held the state liable for failing in its desegregation efforts."[35] Statewide, approximately 60% of the non-core programs at Maryland's HBIs are unnecessarily duplicated compared with only 18% of such programs being duplicated at Maryland's TWIs. In the Baltimore region alone, the percentage of unnecessary program duplication is at least 38%.[36] At the time of trial, the Court found that "Maryland's HBIs only have 44 unique programs, in total, for an average of only 11 per institution."[37] While duplication varies by degree level, Maryland's HBIs offer an average of 3 non-duplicated, high-demand, non-core programs, compared with an average of 17 per TWI.[38]

Yet Maryland has never dismantled the practices that facilitate segregation at its HBIs.[39] The Court recognized that "[u]nique, high-demand programs are a key reason white students attend HBIs in other states, and, without them, HBIs 'are identified by their racial history as opposed to [their] programs.'"[40] "During the 1960s and 1970s, in the wake of *Brown*, Maryland's HBIs began offering unique, high-demand programs and began attracting significant numbers of white graduates."[41] But rather than building upon that progress, "Maryland made very large investments in TWIs, particularly newly created Towson and UMBC, that undermined

---

[35] *Id.* at 46 (noting that the rate of statewide program duplication in Mississippi was 40% at the undergraduate level and 25% at the graduate level).

[36] *See id.* at 45 (noting that that the scope of duplication in the Baltimore region might be as high as 59% if UMUC and UMCP are included in the calculation as argued by Plaintiffs).

[37] *Id.* at 46 (citing Conrad Expert Rep. III, PTX 71, at 114).

[38] *See id.*

[39] *See id.* at 50.

[40] *Id.* at 46-47.

[41] *Id.* at 48 (citing "Second Annual Desegregation Status Report (Vol. III, Feb. 1976), PTX 455, at 235-246; 1/10/12 Trial Tr. 30-31 (Conrad)).

preliminary gains in desegregation."[42] As a result, "early gains that had been made in integration at Maryland's HBIs halted almost as soon as they began, and the State has continued to duplicate HBI programs at TWIs, failing to address the dual system it created in the *de jure* era."[43] Maryland therefore continues to maintain a "dual structure of higher education" in which there is substantial unnecessary (non-essential) duplication between HBIs and non-HBIs.[44]

As a result, Maryland's HBIs remain racially identifiable.[45] In the fall of 2009, white students made up only 5% of the overall student population at Maryland's HBIs, and only 2% of the white students pursuing graduate degrees in Maryland were attending its HBIs.[46] The fall 2013 enrollment data reported by the Maryland Higher Education Commission in its "2015 Data Book"[47] shows that things have not changed since the trial:

| **Institution** | **Total Enrollment** | **White Enrollment** | **% White** |
|---|---|---|---|
| **Bowie State University** | 5,561 | 201 | 3.6% |
| **Coppin State University** | 3,383 | 51 | 1.5% |
| **Morgan State University** | 7,546 | 256 | 3.4% |
| **University of Maryland Eastern Shore** | 4,220 | 634 | 15.0% |

---

[42] *Id.* (referring to "Trends in White Graduate Students at Historically Black Institutions in Maryland" (Oct. 2009), PTX 184, at 8-9; "Final Report of the Governor's Commission on Education (1975), PTX 380, at 16-17; 1/10/12 AM Trial Tr. 26-33 (Conrad)).

[43] *Id.* at 49 (citing Conrad Expert Rep. I, PTX 69, at 19).

[44] *Id.* at 46-47.

[45] *Id.* at 53 (citing 1/10/12 AM Trial Tr. 38-39 (Conrad)).

[46] *Id.* at 20 - 21 (citing 2011 MHEC Data Book, PTX 755, at 16).

[47] MARYLAND HIGHER EDUC. COMM'N, 2015 DATA BOOK 4-9 (2015), *available at* http://www.mhec.state.md.us/Publications/research/AnnualPublications/2015DataBook.pdf.

| | | | |
|---|---|---|---|
| **Total HBIs** | 20,710 | 1,142 | 5.5%[48] |

Significant evidence supports the conclusion that unnecessary duplication and its concomitant harm to Maryland's HBIs is a direct result of the "continuing failure of the State to address the *de jure* era policy of duplicating programs to maintain a dual, segregated system."[49] Maryland has not only failed to take steps to eradicate existing unnecessary duplication, it has continued to duplicate high-demand programs to the further detriment of the HBIs.[50] During 2001 to 2009, Maryland approved 18 new programs at the TWIs which unnecessarily duplicated existing programs at the HBIs, 13 of which were also high-demand.[51] Six times as many new unique, high-demand programs were developed at the TWIs than the HBIs during that same time period.[52]

In other words, state policies and practices actually worsened rather than corrected this problem.[53] For example, in Maryland's 2000 Partnership Agreement with the OCR, the State committed to developing unique, high-demand academic programs at the HBIs and to avoid further unnecessary program duplication.[54] Unfortunately, the State failed to follow through with this commitment, and white graduate student enrollment at Coppin State University and Bowie

[48] *See id.* Indeed, it is noteworthy that there are nearly as many foreign students (1,065) as white students at the HBIs and only UMES has fewer foreign students than white students.

[49] Memorandum Opinion at 47-48 (citing the Soper Commission Report, PTX 17, at 56-57, 88 and 1/18/12 AM Trial Tr. 43-44 (Allen)).

[50] *See id.* at 49.

[51] *Id.* at 49-50 (citing Conrad Expert Rep. II, PTX 70, at 102).

[52] *See id.* at 47 (citing Conrad Demonstrative Exhibits at 67).

[53] *See id.* at 50-52.

[54] *See id.* at 49 (citing 1/11/12 AM Trial Tr. 35-38 (Oliver); 2000 Partnership Agreement, PTX 4, at 36-37).

State University ("Bowie") declined following the implementation of that Partnership Agreement even as graduate enrollment at the TWIs grew rapidly, leading to the increased racial identifiability of those institutions.[55]

As the Court observed, the keystone question is not whether the State has done enough to integrate its institutions of higher learning, but whether the State has left in place policies rooted in its prior segregated system.[56] Maryland has not addressed its tolerance for unnecessary program duplication.[57] The purported safeguards adopted by the Maryland Higher Education Commission ("MHEC") are only "forward facing" – they do not address the substantial duplication that has existed since the beginning of Maryland's system of public higher education.[58] In addition, "even more troublingly, the State has failed to prevent *additional* unnecessary duplication, to the detriment of the HBIs."[59] Despite what the State characterizes as "an elaborate system" to avoid unnecessary duplication, Maryland has failed to eliminate this vestige.[60]

While traceable policies and practices may work in concert to perpetuate segregation in higher education, unnecessary program duplication may also function independently to create segregative effects. In fact, the Court specifically held that unnecessary program duplication has

---

[55] *See id.* at 49 (noting a 73% decline in white graduate student enrollment at Coppin and 67% decline in white graduate enrollment at Bowie following implementation of the 2000 Partnership Agreement).

[56] *See id.* at 22 (citing *Fordice*, 505 U.S. at 743).

[57] *See id.* at 50-51 (noting Maryland offered "no evidence that it has made any serious effort to address continuing historic duplication").

[58] *Id.* at 50.

[59] *Id.* at 51.

[60] *See id.* 51-52 (referencing the 2005 development of the joint UB/Towson MBA program over the objections of Morgan and concerns of OCR, HBI leaders, and MHEC and ongoing expansion of UB).

had its own segregative effect in Maryland[61] and contributed to an intensification of the racial identifiability of the HBIs over the past twenty years.[62] In the absence of a competitive academic advantage, non-black students have less incentive to enroll in what is otherwise perceived as a school for black students.[63]

Maryland did not, for the most part, present evidence that it was unable to eliminate unnecessary duplication consistent with sound educational practices.[64] Indeed, the Court observed that the strategy of "eliminating unnecessary program duplication has been a centerpiece of most prior higher education desegregation efforts."[65] Duplicative programs and institutions are inefficient, expensive, and undesirable. Yet Maryland offered no compelling evidence that any sound educational need is an "unavoidable driver of the ongoing unnecessary duplication of HBI programs throughout Maryland's system of higher education."[66] As a result, the Court held that the maintenance and exacerbation of proximate program duplication "does not comport with best practices in higher education."[67]

The Court indicated that "[r]emedies will be required"[68] to dismantle the extensive unnecessary program duplication in Maryland. The Court specifically contemplated that a remedy is likely to include revised policies and practices to ensure both the "avoidance of such duplication" in the future and the "expansion of mission and program uniqueness and

---

[61] *See id.* at 52.

[62] *See id.* at 53 (citing Conrad Expert Rep. I, PTX 69, at 19; Conrad Demonstrative Exhibits, at 32-33; "Trends in White Graduate Students" (Oct. 2009), PTX 184, at 1); 1/10/12 AM Trial Tr.38-39 (Conrad)).

[63] *See id.* (citing to Conrad Expert Rep. II, PTX 70, at 5; 1/18/12 AM Trial Tr. 88-89 (Allen)).

[64] *See id.* at 56.

[65] *Id.* at 56.

[66] *Id.* at 58.

[67] *Id.* (citing to 1/18/12 AM Trial Tr. 62-64 (Allen)).

[68] *Id.* at 3.

institutional identity at the HBIs."[69] The Court also found that "[i]t is also likely that the transfer or merger of select high-demand programs from TWIs to HBIs will be necessary."[70] "Similarly, the creation of collaborative programs through the wide use of resources to enhance the quality of current and newly developed programs at the HBIs may be an additional effective and creative method of enhancing the HBIs' programs."[71] It should also be presumed that an effective remedy requires adequate long-term funding to ensure the meaningful implementation of that remedy.[72]

## II. General remedial principle: Traceable policies which perpetuate a segregated system of higher education are unconstitutional and must be remedied.

The analytical framework which informs the remedies required here is outlined in *United States v. Fordice,* 505 U.S. 717 (1992). The primary issue in higher education desegregation cases is whether the state has met its affirmative duty to dismantle its prior dual system. *Id.* Once a violation has been found, a state does not discharge its constitutional obligation until it eradicates policies and practices traceable to its prior *de jure* dual system that continue to foster segregation. *Id*. at 728. If traceable policies or practices perpetuate the vestiges of discrimination by influencing student enrollment decisions or fostering segregation in other facets of the higher education system, and such policies are without educational justification and can be practicably eliminated, the state has not satisfied its burden of dismantling its dual system. *Id.* at 731.

A state has not dismantled its dual system or eradicated the vestiges of segregation from its schools if "existing racial identifiability is attributable to the State," *id*. at 728, although

[69] *Id.* at 59 (citing to Final Report on the OCR Partnership Agreement (February 15, 2006), PTX 8, at 73).

[70] *Id.* (citing to 1/18/12 AM Trial Tr. 103 (Allen).

[71] *Id.* at 60 (citing to 1/18/12 AM Trial Tr. 102 (Allen).

[72] *See* Pls.' Apps. 2-5 (briefly summarizing the remedial orders and/or settlement agreements reached in other higher education desegregation cases, and demonstrating that funding was provided to implement the terms of the court order or negotiated settlements).

racially identifiable institutions alone do not establish a constitutional violation. *Id.* at 743. Segregated institutions are a function of student choice, which is influenced by many factors. *Id.* at 729. The court must determine whether the state is responsible for the current racial identifiability of its institutions. *Id.* at 728. If so, a "State may not leave in place policies rooted in its prior officially segregated system that serve to maintain the racial identifiability of its universities if those policies can practicably be eliminated without eroding sound educational policies." *Id.* at 743.

*Fordice* recognized that traceable policies and practices may influence student enrollment decisions, including program duplication which may discourage whites from seeking to attend the HBIs. *Knight v. Alabama,* 14 F.3d 1534, 1541 (11th Cir. 1995) (citing *United States v. Fordice,* 112 S. Ct. 2727, 2740-42 (1992)). As a result of traceable policies such as program duplication, "disproportionate numbers of whites *can* satisfy their curricular desires at HWIs, and *cannot* satisfy them at HBIs, thereby discouraging them from choosing to attend HBIs." *Id.* (emphasis in original).

The circumstances in which a state may maintain a segregative policy or practice are narrow. *Fordice,* 505 U.S. at 744 (O'Connor, J., concurring). The court must "carefully examine [the State's] proffered justifications . . . to ensure that such rationales do not merely mask the perpetuation of discriminatory practices." *Id.* If the state can accomplish its legitimate educational objectives through less segregative means, the court may infer lack of good faith or place a "heavy burden" upon the state to justify its preference for an apparently less effective method, and when doing so the state must still prove that it has counteracted and minimized the segregative impact of such policies "to the extent possible." *Id.*

The State bears the burden of adopting, from among the full range of practicable and educationally sound alternatives to the challenged policy, the one that would achieve the greatest possible reduction in the identified segregative effects. *See Knight*, 14 F.3d at 1541 (citing to *Fordice,* 112 S. Ct. at 2744 (O'Connor, J. concurring)). The court in *Knight* noted that "the state's burden of proving that such alternatives are impracticable or educationally unsound is a heavy one and the circumstances in which a State may maintain a policy or practice traceable to *de jure* segregation that has segregative effects are narrow.'" *Id*. (internal quotation marks omitted). "Moreover, because the obligation to remedy the segregative effects of vestiges of segregation is an affirmative duty borne by the state, the onus is not on the plaintiffs to propose the remedy options to be considered." *Id.* Accordingly, to the extent that "the State could practicably take steps to desegregate that do not run afoul of sound educational practices, the State has a duty to do so and the remedial decree should so reflect." *Ayers v. Fordice,* 111 F.3d 1183, 1213 (5th Cir. 1997).

In remedying discrimination, a court must be guided by general equitable principles. The scope of those powers is broad, for "breadth and flexibility are inherent in equitable remedies." *Knight v. Alabama*, 787 F. Supp. 1030, 1377 (N.D. Ala. 1991) [hereinafter *Knight I*] (quoting *Milliken v. Bradley,* 433 U.S. 267, 280-81 (1977)), *vacated and rev'd in part on other grounds,* 14 F.3d 1534 (11th Cir. 1994). The specific remedy required will be determined by the nature and scope of the violation, but must be remedial in nature in that the remedy seeks to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct. *Id*. While the remedy must relate to the condition alleged to offend the constitution, once a constitutional violation has been shown a remedy does not exceed the

violation if the remedy is tailored to cure the condition that offends the Constitution. *Milliken,* 433 U.S. at 282 (citing *Milliken v. Bradley*, 418 U.S. 717, 738 (1974)).

### III. In higher education, desegregation requires a significant increase in other-race enrollment and an overall reduction in the racial identifiability of the HBIs.

Successful desegregation of a higher education system requires a state to take "the necessary steps to ensure that [student] choice now is truly free." *Fordice,* 505 U.S. at 742-43. The strategies adopted must not only reduce segregation, but should eliminate or minimize practices responsible for that segregation to the extent possible. *Id.* at 744-45 (O'Connor, J., concurring) (stating that only by eliminating a remnant that unnecessarily continues to foster segregation, or by negating insofar as possible its segregative impact, can the State satisfy its constitutional obligation to dismantle its discriminatory system). The Supreme Court therefore mandated that policies which substantially restrict the choice of which institution to attend and contribute to the racial identifiability of an institution must be justified or eliminated. *Id.* at 733.

Unfortunately, the courts offer little guidance in terms of how to measure whether system of higher education has been successfully desegregated.[73] The Supreme Court's majority opinion in *Fordice* did not specifically address the question of whether some level of integration is required in order to successfully desegregate a higher education system. Instead, the focus there

[73] Pre-*Fordice,* the District Court in Mississippi did address whether "some level of racial mixture at previously segregated institutions of higher learning is not only desirable but necessary to 'effectively' desegregate the system." *Ayers v. Allain,* 674 F. Supp. 1523, 1552 (N.D. Miss. 1987) [hereinafter *Ayers I*], *vacated on other grounds, Ayers v. Fordice,* 970 F.2d 1378 (5th Cir. 1992). In answering that question, *Ayers I* held that the duty to desegregate "does not contemplate either restricting choice or the achievement of any degree of racial balance." *Ayers I,* 674 F. Supp. at 1553. That decision was later upheld by the Fifth Circuit, which agreed that the duty to dismantle a *de jure* system of higher education is satisfied by "discontinuing prior discriminatory practices and adopting and implementing good-faith, race-neutral policies and procedures." *Ayers v. Allain*, 914 F.2d 676, 687 (5th Cir. 1990), *vacated, Fordice,* 505 U.S. 717 (1992). The Supreme Court ultimately overturned and revised that conclusion in *Fordice* without revisiting the specific question of whether successful desegregation required some level of racially integrated student enrollment. *See Fordice,* 505 U.S. 717 (1992).

was on the elimination of "the specific *policies* alleged to produce racial imbalance, rather than on the *imbalance* itself." *Id.* at 746 (Thomas, J., concurring) (emphasis in original). Rather than identifying a specific level of other-race enrollment that indicates successful desegregation, *Fordice* recognized that racial disparities in enrollment may reveal a traceable policy or practice which perpetuates the vestiges of discrimination. *Id.* at 742-43. Even so, where the goal is desegregation, an effective remedy should seek to ensure a significant increase in other-race enrollment.

After *Fordice,* for example, the district court on remand specifically analyzed the continuing racial identifiability of institutions as one factor when assessing whether Mississippi's system of higher education fostered a racially hostile climate on its college campuses. *Ayers v. Fordice,* 879 F. Supp. 1419, 1467-72 (N.D. Miss. 1995) [hereinafter *Ayers II*], *aff'd in part, rev'd in part on other grounds* 111 F.3d 1183 (5th Cir. 1997). In doing so, the court observed that "black students in Mississippi are moving to the HWIs, but little change has been seen in the racial percentages of the HBIs." *Id.* at 1470. The court acknowledged that one of the main challenges in desegregation in higher education has not been in attracting blacks to the TWIs, but "the paucity of whites who choose to go to the HBIs." *Id.* The Court recognized that while "[d]irecting or impacting student choice in and of itself . . . is not an end to be shaped by this court," understanding why students choose a particular institution is "helpful in determining whether a particular vestige of the past shapes or impacts student choice and determines the result." *Id.* at 1471.

Consequently, the remedial decree ordered measures that were expected to increase other-race enrollment. *Id.* at 1495-96. The district court in Mississippi emphasized that the "real purpose of the enhancements ordered by the court is to desegregate the HBIs, i.e., to attract more

white students to attend them." *Ayers v. Fordice*, 40 F. Supp. 2d 382, 384 (N.D. Miss. 1999). For example, the court ordered an institutional study of Jackson State University ("JSU") which was to assess the "nature and extent of duplication with other institutions in the system" in order to determine "*whether meaningful programmatic uniqueness may be gained which would bring about significant white enrollment* through elimination and/or transfer of existing programs at other institutions and the feasibility/educationally soundness of such elimination and/or transfer." *Ayers II*, 879 F. Supp. at 1495 (emphasis added). This strategy was upheld and extended to include a similar analysis of Alcorn State University ("Alcorn") and Mississippi Valley State University ("MVSU") by the Fifth Circuit, which directed the State to study and report on programs that "have a reasonable chance of increasing other-race presence" at MVSU and Alcorn. *Ayers*, 111 F.3d at 1214, 1228.

Tennessee's desegregation decisions in the *Geier* line of cases may also prove instructive on this point.[74] When discussing the residual effects of *de jure* segregation which previous remedial measures had not yet removed, the district court approved a settlement agreement – upheld on appeal – after observing that the court was "empowered, if not compelled, to implement a remedy formulated to reverse the effects of such [discriminatory] treatment." *Geier v. Alexander*, 593 F. Supp. 1263, 1266 (M.D. Tenn. 1984), *aff'd*, 801 F.2d 799 (6th Cir. 1986). In doing so, it presumed that the court may analyze changes in other-race enrollment at the institutional level when assessing the effectiveness of a desegregation plan, and numerical

[74] The procedural history and the remedial framework and settlement terms in the Tennessee line of desegregation cases are summarized in Appendix 5. While the district court's remedial decrees predate *Fordice*, the Tennessee decisions and subsequent settlements offer some of the most extensive discussion specific to the question of how a court should assess whether the level of other-race enrollment satisfies the state's obligation to dismantle its dual system. More importantly, the constitutional violation there was based on the racial identifiability of University of Tennessee Nashville and Tennessee State University produced by the programmatic structure and duplicative offerings of those institutions. *Geier*, 427 F. Supp. at 660-61. Thus, the basis of liability is most similar to the case here, where liability is limited to unnecessary program duplication.

objectives may serve as "[g]uideposts" to measure and incentivize progress. *Id.* at 1267. The ultimate goal is "*not* any ideal ratio or mix of black and white students," but a system of higher education in which "race is irrelevant" and in which equal protection is a reality. *Id.* (emphasis in original).

For example, in 1971 the overall black enrollment at TSU[75] exceeded 99%. *See Geier v. Blanton*, 427 F. Supp. at 647, *aff'd* 597 F.2d 1056 (6th Cir. 1979). By 1975, white enrollment had increased to 7% and reached 12% when off-campus students were included in this calculation. *Id.* at 52. Still, these increased levels of white enrollment were insufficient to demonstrate that the State had successfully desegregated the HBI. *Id.* The district court expressed some concern that the phenomenon of a "black Tennessee State, so long as it exists, negates both the contention that defendants have dismantled the dual system of public higher education in Tennessee" or were likely to do so. *Geier v. Dunn*, 337 F. Supp. 573, 576 (M.D. Tenn. 1972).

The level of white student enrollment within specific programs at an HBI may also be relevant to this inquiry. At the program level, for example, the Tennessee district court found that adding three exclusive programs at TSU had failed to integrate that institution.[76] *Geier*, 427 F. Supp. at 655-56. Two of those programs remained predominantly black, as reflected by 95% black enrollment in the criminal justice program and 80% black enrollment in allied health. *Id.* at 655. Given the student demographics in these exclusive programs, the court did not view them as

[75] Prior to the institutional merger of the University of Tennessee Nashville ("UT-N") under Tennessee State University ("TSU"), UT-N was the TWI in operating in the Nashville area. *See* Appendix 5.

[76] There were also programs "exclusively" assigned to TSU during the day, with UT-N having the opportunity to offer those same programs after 4:00 pm. *See Geier*, 427 F. Supp. at 655. Of those, the programs exclusive to TSU during part of the day were also "overwhelmingly black at TSU (ranging from 97.6% black in the Arts and Science program to 87.1% black in the engineering program), and predominantly white at UT-N (ranging from 90.9% white in the engineering program to 79.8% white in the undergraduate education program)." *Id.*

having successfully desegregated TSU. *Id.* at 656. By contrast, the graduate teacher education program that the court ordered to be added at TSU produced a student enrollment that was approximately 53% black and 47% white. *Id.* at 655-56. The level of diversity there was viewed by the court as successful desegregation, but that success was limited to that single program. *Id.* at 655.

These increases in other-race enrollment should be sustained over time. When fashioning a remedy, a court should consider the long-term effects of successful desegregation rather than the short-term effects. For example, *Knight* characterizes a practicable remedy as one that would appear to be "most likely to achieve the remedial purpose into the future." *Knight v. Alabama*, 900 F. Supp. 272, 285 (N.D. Ala. 1995) [hereinafter *Knight II*]. Furthermore, *Knight* reflected that an analysis of the desegregation trends at HBIs which have been relatively successful in attracting white students indicates that desegregation occurs gradually and over long periods of time. *Id.* at 320.

Where there has been unnecessary program duplication, successful desegregation at the system level should also address the overall imbalance in unique program offerings available at the HBIs as compared to the TWIs. For example, when analyzing duplication in Mississippi, the Fifth Circuit noted that as a group, the TWIs continued to have significantly more high-demand, non-core programs than the HBIs. *Ayers*, 111 F.3d at 1218. To the extent that the TWIs collectively offer more unique, high-demand programs than the HBIs, this structural inequity may reveal an ongoing violation. *See Ayers II*, 879 F. Supp. at 1442-43 (analyzing the percentage of statewide duplication between HBIs and TWIs throughout the state system of higher education). Therefore, a successful remedy may need to address the systemic disparities reflected

by the overall imbalance in unique program offerings associated with the limited missions of HBIs and the extensive unnecessary duplication of their program offerings.

### IV. The remedial plans implemented in most of the other higher education desegregation cases largely failed to desegregate the HBIs.

There are four states – Alabama, Louisiana, Mississippi, and Tennessee – where higher education desegregation cases resulted in a court ordered and/or mutually agreed upon remedial plan. The remedies were first implemented in Alabama in 1995,[77] in Louisiana in 1981,[78] in Mississippi in 1995,[79] and in Tennessee in 1979[80]. As the table below shows, in three of the

[77] A summary of the procedural history and remedies in *Knight v. Alabama* is outlined in Appendix 2. Litigation was initiated in Alabama in 1983, the parties were ordered to develop a remedial plan in 1991, after *Fordice* a remedial order was entered in 1995, and a settlement agreement was reached in 2006 to resolve the issues outstanding following the 1995 order. *See Knight I,* 787 F. Supp. 1030 (N.D. Ala. 1991), *aff'd in part, rev'd in part, vacated in part,* 14 F.3d 1534 (11th Cir. 1994); *Knight II,* 900 F. Supp 272 (N.D. Ala. 1995); *Knight v. Alabama,* 469 F. Supp. 2d 1016 (N.D. Ala. 2006), *aff'd, United States v. Alabama,* 271 F. App'x. 896 (11th Cir. 2008).

[78] A summary of the procedural history and remedies in *United States. v. Louisiana* is outlined in Appendix 3. The United States sued Louisiana in 1974 alleging that the State maintained racially discriminatory practices in higher education in violation of the Fourteenth Amendment and the Civil Rights Act of 1964. The resulting settlement, litigation related to liability, appeal and consent decrees can be found in the *United States v. Louisiana* line of decisions. *See United States v. Louisiana.,* 527 F. Supp. 509 (E.D. La. 1981) (first consent decree later overturned); *United States v. Louisiana.,* 692 F. Supp. 642 (E.D. La. 1988) (finding ongoing court jurisdiction and requiring a new remedial order); *United States v. Louisiana,* 811 F. Supp. 1151 (E.D. La. 1992) (ordering remedial plan); *United States. v. Louisiana.,* 9 F.3d 1159 (5th Cir. 1993) (vacating the district court's remedial plan due to, *inter alia,* facts that remained in dispute thereby requiring a trial on the merits rather than a liability determination on summary judgment).

[79] A summary of the procedural history and remedies in *Ayers* is outlined in Appendix 4. Litigation was initially filed in 1987. After the district court found that Mississippi fulfilled its affirmative duty to disestablish its formerly segregated system of higher education by adopting race-neutral policies and practices related to student admission and recruitment, faculty and staff hiring and resource allocation, the case was appealed and overturned by a panel of the Fifth Circuit, which reversed and remanded, but upon rehearing *en banc* the Fifth Circuit subsequently affirmed the district court decision. After the U.S. Supreme Court decided *Fordice,* the case was remanded back to the district court, which found that traceable policies and practices had ongoing segregative effects, and entered a remedial plan. Plaintiffs appealed, and the Fifth Circuit affirmed in part, reversed in part, and remanded. The parties signed a settlement agreement in 2001, which was approved by the district court in 2002. *See Ayers v. Allain,* 674 F. Supp. 1523 (N.D. Miss. 1987) ("Ayers I"), *rev'd,* 893 F.2d 732 (5th Cir. 1990) ("Ayers II"), *aff'd and reinstated en banc,* 914 F.2d 676 (5th Cir. 1990); *vacated and remanded, United States v. Fordice,* 505 U.S. 717 (1992); *Ayers II,* 879 F. Supp. 1419 (1995), *aff'd in part, rev'd in part, vacated in part,* 111 F.3d 1183 (5th Cir. 1997); *Ayers v. Musgrove,* No. 4:75CV009-B-D, 2002 WL 91895 (N.D. Miss. Jan. 2, 2002) (approving settlement agreement).

[80] A summary of the procedural history and remedies in *Geier* is outlined in Appendix 5. Litigation was initiated in Tennessee in 1968, the district court eventually ordered institutional merger in 1979, and there was an initial stipulation and settlement agreement in 1991, followed by a final settlement agreement in 2001. A summary of the relevant procedural history and remedies in *Geier* is outlined in Appendix 5. *See Sanders v. Ellington,* 288 F. Supp. 937 (M.D. Tenn.1968), *sub nom. Geier v. Blanton,* 427 F. Supp. 644 (M.D. Tenn. 1977), *aff'd sub nom. Geier v.*

states, these plans failed to dismantle the extreme racial identifiability of the HBIs. Only in Tennessee, where the geographically proximate TWI was merged into the HBI, has there been some success in attracting appreciable numbers of white students.

**Fall 2013 Enrollment of HBIs in Alabama, Louisiana, Mississippi, and Tennessee**

| Institution | Total Students | Total White Students | Percentage White |
|---|---|---|---|
| **Alabama A&M (AL)** | 5020 | 254 | 5.1% |
| **Alabama State (AL)** | 6075 | 206 | 3.4% |
| **Southern University and A&M College (LA)** | 6777 | 265 | 3.9% |
| **Southern University at New Orleans (LA)** | 2292 | 63 | 2.7% |
| **Grambling State (LA)** | 5071 | 112 | 2.2% |
| **Alcorn State (MS)** | 3249 | 108 | 3.3% |
| **Mississippi Valley (MS)** | 2201 | 75 | 3.4% |

*Univ. of Tennessee*, 597 F.2d 1056 (6th Cir. 1979); *Geier v. Alexander*, 593 F. Supp. 1263 (M.D. Tenn. 1984), *aff'd*, 801 F.2d 799 (6th Cir. 1986); *Geier v. Sundquist*, 128 F. Supp. 2d 519 (M.D. Tenn. 2001) (consent decree).

| | | | |
|---|---|---|---|
| **Jackson State (MS)** | 8452 | 508 | 6.0% |
| **Tennessee State (TN)** | 8833 | 2160 | 24.5% [81] |

For the most part, the experiences in Alabama, Louisiana, and Mississippi are instructive as examples of what components of a remedial plan are unlikely to have a significant impact on desegregation.[82] Accordingly, this Court must review those cases with the understanding that a different strategy will be required in order to achieve a meaningful level of desegregation in Maryland as mandated by *Fordice.*

### A. Alabama[83]

In Alabama, there are two public HBIs which were implicated in the litigation. By the fall of 2013, only 5.1% of the total number of students enrolled at A&M University ("AAMU")

[81] *See* Alabama Comm'n on Higher Educ., Alabama Statewide Student Database (2013) [hereinafter Alabama Student Database], http://www.ache.alabama.gov/content/StudentDB/SDBReports.aspx; Mississippi Public Universities, Enrollment Fact Book & A Ten-year Enrollment Comparison & Selected Information on Diversity (2013) [hereinafter Mississippi Fact Book], *available at* http://www.mississippi.edu/research/downloads/2013enrollmentbook.pdf; Tennessee Higher Educ. Comm'n, Tennessee Higher Education Fact Book (2014) [hereinafter Tennessee Fact Book], *available at* https://www.tn.gov/thec/Legislative/Reports/2014/2013-2014%20FACTBOOK.pdf; National Center on Education Statistics, IPEDS Data Center [hereinafter NCES IPEDS Data Center] Enrollment Data (Fall 2013), *available at* https://nces.ed.gov/ipeds/datacenter/InstitutionByName.aspx; The National Center for Education Statistics (NCES) is the primary federal entity for collecting and analyzing data related to education in the U.S. and other nations. NCES is located within the U.S. Department of Education and the Institute of Education Sciences. NCES fulfills a Congressional mandate to collect, collate, analyze, and report complete statistics on the condition of American education; conduct and publish reports; and review and report on education activities internationally. This information is provide from: https://nces.ed.gov/about/ The Data Center is available for users to pull data regarding specific institutions. At https://nces.ed.gov/ipeds/datacenter/InstitutionByName.aspx, one can type in a particular institution and data options related to enrollment, completion, years, etc. are available for the user to choose from.

[82] Throughout this brief, enrollment figures for programs and institutions are reported where available and when they are the source is noted. In Alabama, enrollment information is not available disaggregated by race at the program level. It is, however, available at the institutional level through the National Center for Educational Statistics IPEDS database. Therefore, some tables will reflect enrollment numbers. Others may reflect the number of degrees awarded by program by race, which is the data available on IPEDS.

[83] A summary of the procedural history and remedies in *Knight v. Alabama* is outlined in Appendix 2.

identified as white. That same year, only 3.4% of the total enrollment at Alabama State University ("ASU") identified as white.[84] By this measure, the remedial plan in Alabama failed to produce meaningful white enrollment at the two HBIs.

Following years of litigation, the district court issued a lengthy decision and remedial decree in 1991 which found numerous actionable vestiges of discrimination surviving within Alabama's system of higher education.[85] After *Fordice* was decided, the 1991 remedial decree was vacated in part and remanded. The Eleventh Circuit held that "[t]he state is obligated to adopt, from among the full range of practicable and educationally sound alternatives to the challenged policy, the one that would achieve the greatest possible reduction in the identified segregative effects." *Knight,* 14 F.3d at 1541 (citing *Fordice,* 112 S. Ct. at 2744 (O'Connor, J., concurring)).

In 1995, the district court entered a new remedial decree. *See Knight II,* 900 F. Supp. at 348-75. Applying the analysis outlined in *Fordice,* the court fashioned a remedial plan to address traceable policies and practices with continuing segregative effects. *Id.* With respect to unnecessary duplication, the court ordered less duplication of programs at geographically proximate institutions and mandated a few programmatic enhancements at the HBIs. *Id.* at 370-72. However, the court analyzed duplication in a way that essentially resulted in a finding of minimal unnecessary duplication by the TWIs and narrowed the remedy ordered. *See id.* at 291-303, 305-08, 315-22.

---

[84] *See* ALABAMA STUDENT DATABASE, http://www.ache.alabama.gov/content/StudentDB/SDBReports.aspx.

[85] *See Knight I,* 787 F. Supp. at 1368.

In the end, the remedial order implemented pursuant to *Knight* failed even by the court's own standards. The court intended to fashion what would be "the most desegregative remedy that is educationally sound and practicable." *Id.* at 280. The court recognized that an educationally sound and practicable remedy should, among other considerations, have a "likelihood of continued success," *id.*, and "be most likely to achieve the remedial purpose into the future." *Id.* at 285. The court articulated that success should be measured by the "practical effect on institutions or students" to achieve desegregation. *Id.* at 285. The court reasoned that small increases in white student enrollment would not satisfy the constitutional obligation to desegregate, but rather "a critical mass" of white students at HBIs would be necessary. *Id.* at 319-20.

*Knight*'s failure to desegregate the HBIs suggests that the court's underlying assumptions about student choice were not well founded. First, the court failed to eliminate program duplication and even exacerbated such duplication by adding programs that it considered high-demand without considering whether the program was sufficiently unique;[86] second, the court over-estimated the de-segregative potential of non-programming remedies such as financial aid and advertising.[87] Ultimately, the court's actions with regard to both new and existing programming created a program structure that failed to cultivate unique programmatic niches for HBIs. With regard to existing programs, *Knight* acted against the recommendations of "many

[86] *See Knight II,* 900 F. Supp. at 315-17. *Knight* explicitly considered the duplicative nature of the proposed engineering program at AAMU, but ultimately decided that high market-demand alone would attract white students to AAMU by asserting: "a quality engineering program at an HBI can also attract significant numbers of white students even when there is a high quality, proximate PWI". *Id.* at 315-16, 371-72. *See* Appendix 27 which illustrates current enrollment statistics in AAMU's and UAH's engineering programs and shows that the engineering program at AAMU failed to attract white students, which overwhelmingly attend UAH.

[87] *See id.* at 318-20.

experts, including the court-appointed experts" by opting to generally reject "program transfers as an educationally sound or practicable remedy." *Id.* at 315.

With regard to the Huntsville area, the *Knight* court declined to eliminate duplicative programs in nursing, business, and education between AAMU and three geographically proximate TWIs. *Id.* at 294-296, 315-18, 349-75. The court limited its remedial decree to only one minimal constraint on duplicative programs at one of the TWIs: an upper cap on the TWI's enrollment. *Id.* at 359. The court likewise failed to eliminate existing duplicative programs in the Montgomery area in business and education, as well as distance education between ASU and two proximate TWIs. *Id.* at 299-303, 349-75. The court only implemented two minimal remedial constraints on the proximate TWIs: placing a five-year moratorium on the development of a Masters in Accounting, *id.* at 371, and enjoining a TWI from expanding its physical plant in the Montgomery area. *Id.* at 372.

*Knight* appears to have overestimated the extent to which other measures might desegregate the schools, specifically other-race scholarships, recruitment, and extra funding. Of these, the court presumed that scholarships would have the most powerful desegregative effect. *See id.* at 318-20 ("other-race scholarships are the most educationally sound and practicable mechanism to eliminate those particular perceptive barriers [that foster segregation]"; "[f]inancial aid is a powerful magnet in attracting white students to HBIs"; "financial aid, economic considerations, and factors involving the accumulation of debt, all play a very important role in the student choice"; and "offering carefully designed other-race financial aid is an important mechanism to promote desegregation"). The emphasis on financial incentives resulted in a remedial decree that did little to address the dual curricular structure. *Id.* at 349-75.

### B. Mississippi[88]

Similarly, the *Ayers* litigation did little to achieve long-term desegregation at the state's HBIs. In Mississippi, there are three public HBIs: JSU, Alcorn, and MVSU. *See Ayers I,* 674 F. Supp. at 1529. Pursuant to the court-ordered desegregation and subsequent settlement, a number of new and enhanced programs were added at all three institutions.[89] Twenty years later, those campuses remain racially identifiable. During the fall of 2013, enrollment at JSU was 90% black, enrollment at Alcorn was 94% black, and enrollment at MVSU was 89% black.[90]

The 1995 remedial decree and 2001 settlement proposal added or enhanced a number of programs at all three HBIs[91]. Prior to approving the settlement, the district court observed that the "parties' plan acknowledges only in a cursory fashion the heart of this case, desegregation."[92] With respect to the proposed programs at MVSU, the court expressed concern that "a significant portion of those programs is already offered at nearby Delta State University ("DSU"), approximately forty miles away, and therefore merely duplicates DSU's present offerings and would not promote desegregation by attracting white students to MVSU."[93] The court recognized that "when new academic programs are instituted at historically black universities which merely duplicate existing programs at nearby historically white universities, the effect is not to help

---

[88] A summary of the procedural history and remedies in *Ayers* is outlined in Appendix 4.

[89] The brief summary of the relevant procedural history and an overview of the relevant aspects of the 1995 remedial decree and 2001 settlement are outlined in Appendix 3 and attached to this brief. The court ordered desegregation plan and subsequent settlement agreement are outlined in detail in the *Ayers* decisions. *See Ayers II,* 879 F. Supp. 1419 (1995), *Ayers v. Fordice*, 111 F.3d 1183 (5th Cir. 1997), *Ayers v. Musgrove*, No. 4:75CV009-B-D, 2002 WL 91895 (N.D. Miss. Jan. 2, 2002). References to the specific programs added at JSU, Alcorn and MVSU addressed here were not overturned or altered by subsequent decisions.

[90] *See* MISSISSIPPI FACT BOOK, *supra* note 72.

[91] *See* Pls.' App. 4.

[92] *Ayers v. Musgrove*, Civ. No. 4:75CV009-B-D. (N.D. Miss. May 8, 2001), *available at* casetext.com/case/ayers-v-musgrove-2.

[93] *Id.*

desegregation but rather to decrease existing areas of desegregation, by causing black students taking those courses at historically white universities to leave and go to historically black universities for the same courses."[94]

The proposed programs to be added or enhanced pursuant to the settlement were not informed by the court-ordered institutional study of Alcorn and MVSU, which was expected to identify those programs which would offer desegregative potential. *Ayers v. Musgrove*, No. 4:75CV009-B-D, 2002 WL 91895, at *2 (N.D. Miss. Jan. 2, 2002) ("The IHL Board was ordered by this court and by the Court of Appeals in 1997 to present a plan to the court for consideration but, as yet, the court has not received a plan to attract white students to ASU and MVSU"). The district court noted it may have been "overly lenient" not to set deadlines for those studies, which were never submitted. *Id.*

In light of those concerns, the results may be unsurprising. As demonstrated by the tables in Appendices 21 to 23, most of the programs referenced in the settlement agreement are offered at other institutions throughout the state and have not resulted in significant levels of white enrollment.[95] At Alcorn, the 2001 settlement agreement contemplated eight new programs, with enhancements in four others.[96] The table in Appendix 21 shows programs currently offered at

---

[94] *Id*.

[95] The tables in Appendices 21 to 23 show the programs or degrees available at JSU, Alcorn and MVSU as reflected by the 2013 Degree Book. *See* MISSISSIPPI PUBLIC UNIVERSITIES, AY 2010 – AY 2013 DEGREES AWARDED AND TOP-TEN DEGREES & MAY 2013 ACADEMIC PROGRAM INVENTORY (2013) [hereinafter 2013 DEGREE BOOK], *available at* http://www.mississippi.edu/research/downloads/2013_degreebook.pdf. The tables include those degrees or programs either specifically identified in the Mississippi Agreement to be added or enhanced at the HBIs, or a degree within the programmatic area consistent with those identified in the settlement. For example, the programs to be added or enhanced at Alcorn included those within a "school of allied health" or sciences such as "biology, chemistry, physics." In that event, all courses within those areas were identified and included on the tables.

[96] *See* Settlement Agreement, *Ayers v.* Musgrove, No. 4:75CV009-B-D, 2002 WL 91895 (N.D. Miss. Jan. 2, 2002) [hereinafter Mississippi Agreement], *available at* http://www.mississippi.edu/ayers/downloads/settlement_agreement_ayers.pdf. As of 2013, thirteen of those programs appear to have students enrolled. Three programs which were identified in the 2001 settlement agreement

Alcorn which are consistent with those identified in the agreement. Of the 13 programs which enrolled students in fall 2013, 11 were also offered at other public colleges or universities in Mississippi. Ten had less than 20% white enrollment. Whites comprised 8.7% of the total enrollment in the programs specifically addressed by the settlement.[97]

Appendix 22 shows the fall 2013 enrollment in the potential new programs identified for JSU in the settlement agreement.[98] Fourteen of those programs actually enrolled students that year.[99] Of those, eight were also offered at another public college or university in Mississippi. Thirteen reflect white student enrollment levels of less than 20%, and seven had white enrollment of less than 10%. Whites comprised 8.9% of the total enrollment in the programs addressed in the settlement.[100]

The settlement agreement identified seven programs to be added and five program areas to be enhanced at MVSU.[101] Appendix 23 shows the fall 2013 enrollment in those programs.[102] Of those, eight programs had students enrolled that year, and all had less than 15% white enrollment. Only the Masters in Bioinformatics appears to be a unique program, but that program

---

to be placed at Alcorn did not reflect students enrolled in fall 2013 according to IPEDS data and did not appear to be available according to the institution website. The reasons are unclear.

[97] *Id.*

[98] *See id.* at 7-8.

[99] Five of the programs the settlement agreement contemplated for JSU did not appear to enroll students that year, and the university website only showed one of those five programs as being currently offered. The reasons are unclear.

[100] *Id.*

[101] *See id.* at 5-8.

[102] Two of the programs identified in the settlement agreement to be added or enhanced at MVSU had no enrollment that year and do not appear to be currently offered according to a search of the university website. The reasons are unclear.

only had two white students. Whites comprised 4.8 % of the total enrollment in the programs addressed in the settlement.[103]

In addition, Mississippi's HBIs still collectively offer fewer programs and degrees than the TWIs:

**Mississippi HBI Unique Programs and Programs Offered**

| | **Jackson State University (HBI)** | **Alcorn State University (HBI)** | **Mississippi Valley State University (HBI)** |
|---|---|---|---|
| **Unique Programs** | 31 | 12 | 10 |
| **Total Programs Offered** | 94 | 40 | 35 |
| **Percentage Unique at Institution** | 33.0% | 30.0% | 28.6%[104] |

Meanwhile, the TWIs continue to offer a robust set of programs and degrees, many of which are also offered at the HBIs:

**Mississippi TWI Unique Programs and Programs Offered**

[103] *Id.*

[104] *See* 2013 DEGREE BOOK, *supra* note 87, at 16-24.

| | **Delta State Univ. (TWI)** | **Mississippi Univ. for Women (TWI)** | **Mississippi State Univ. (TWI)** | **Univ. of Mississippi (TWI)** | **Univ. of Southern Mississippi (TWI)** | **Univ. of Mississippi Medical Center (TWI)** |
|---|---|---|---|---|---|---|
| **Unique Programs** | 20 | 19 | 95 | 72 | 109 | 28 |
| **Total Programs Offered** | 63 | 52 | 179 | 143 | 209 | 36 |
| **Percentage Unique at Institution** | 31.7% | 36.5% | 53.1% | 50.3% | 52.2% | 77.8%[105] |

Mississippi considered but ultimately rejected early proposals to place geographically unique, extremely high-demand and prestigious programs like medicine, law, and pharmacy at JSU. Instead of transferring or adding these unique, high-demand programs to the HBI, the court accepted the conclusion that *additional* student demand did not justify or necessitate new law or pharmacy programs at JSU. [106]

---

[105] *See* 2013 DEGREE BOOK, *supra* note 87, at 16-24.

[106] In 1995, the district court noted that while the U.S. urged consideration of affiliating JSU with the medical school in Jackson, the evidence did not establish how that would increase diversity at JSU or within the medical profession. Especially persuasive was the administration's position that JSU did not see the need for that affiliation. *Ayers II*, 879 F. Supp. at 1485. By January of 2001, the district court ordered that having found no unmet demand for additional legal education in the Jackson area, the Board need not establish a law school at JSU as part of its obligation to desegregate that institution. In addition, it was held that the existing pharmacy program at UM met the state need for pharmacy education so that the addition of such a program at JSU was neither feasible nor educationally sound. With that, the court found the remedial decree satisfied with respect to JSU. *Ayers v. Thompson*, 358 F.3d 356, 367 (5th Cir. 2004).

### C. Louisiana[107]

There are four public HBIs: Southern University and Agricultural and Mechanical College in Baton Rouge ("SUBR"), Southern University at New Orleans ("SUNO"), Southern University at Shreveport ("SUSBO"), and Grambling State University ("Grambling"). The HBIs in Louisiana remain racially identifiable. In fall 2014, the white enrollment at SUBR was 3.0%, at SUNO it was 2.7%, at SUSBO it was 7.8%, and at Grambling it was 2.3%.[108]

In 1974, the U.S. commenced litigation to challenge Louisiana's racially discriminatory practices in higher education. *See United States v. Louisiana*, 527 F. Supp. 509, 513 (E.D. La. 1981). A consent decree was eventually entered in 1981, *id.* at 515, but before it expired the parties filed cross-motions for summary judgment on the question of whether the State continued to maintain a dual system of higher education. *United States v. Louisiana*, 692 F. Supp. 642, 643 (E.D. La. 1988). The district court found liability, *id.* at 659, and after *Fordice* it ordered a remedial plan; but the remedial plan was vacated and remanded by the Fifth Circuit for a full trial on the merits rather than a decision issued on summary judgment. *See United States v. Louisiana*, 9 F.3d 1159 (5th Cir. 1993). The parties settled prior to trial and entered a settlement agreement in 1994 ("Louisiana Agreement"). *See United States v. Louisiana*, No. 80-CV-3300 (E.D. La. Nov. 14, 1994) [hereinafter Louisiana Agreement].[109]

---

[107] A summary of the procedural history and remedies in *United States. v. Louisiana* is outlined in Appendix 3.

[108] *See* Statewide Student Profiling System – Student Headcount Enrollment by Student Major (Fall 2014-2015) [hereinafter Student Headcount Enrollment], *available at* http://regents.louisiana.gov/data-and-publications/fall-2014-2015-data/

[109] *See also* Pls.' App. 3.

The 1994 Louisiana Agreement addressed a number of issues, including the addition and funding of new programs at SUBR, SUNO, and Grambling.[110] *See* Louisiana Agreement at 10-13 ¶ 13. The Louisiana Agreement also outlined the process by which duplicative programs might be eliminated, but by its terms that process seemed problematic.[111] The 1993 Board of Regents Master Plan ("Master Plan") adopted by the Louisiana Agreement outlined a four-step process to identify which duplicative programs would be examined for elimination.[112]

On its face, that process did not appear to offer strong protections against unnecessary program duplication. Duplicative programs could be deemed "necessary" and avoid elimination if they were categorized as: within the traditional disciplines of the arts, the humanities, and the sciences; necessary for the attainment of the role, scope, mission of the institution;[113] had such high student demand that no one institution was capable of administering the program; had sufficiently different admission standards; or was in high demand by business or industry.[114] The process also articulated a commitment to avoid a "disproportionate effect on any one institution."[115] Accordingly, there appear to be a number of conditions under which program duplication would continue to exist.

---

[110] The institution websites reveal that some of the proposed programs in the 1994 Settlement Agreement are not currently offered at the institution. The reasons are unclear.

[111] *See* Appendix E, Regents for Review of Academic Programs entitled "Elimination of Academic Programs While Broadening Access", The Master Plan for Higher Education, Board of Regents, State of Louisiana, April, 1994, 78-79; Settlement Agreement § 17. The Louisiana Agreement incorporated this program elimination plan and specifically emphasized that questions of fact remained as to whether existing program duplication constituted a constitutional violation and required elimination. *See* Louisiana Agreement at 17 ¶ 16.

[112] *Id. See also* Appendix 3 (describing the four step process for program elimination adopted in the 1993 Master Plan).

[113] Appendix A to the 1994 Settlement Agreement addressed the goal of differentiating institutional missions. Even so, a significant degree of overlap appears to have been tolerated. *See* Appendix 3.

[114] *See* Appendix E, Settlement Agreement § 17.

[115] *Id.*

Perhaps unsurprisingly, several of the programs added to the HBIs pursuant to the 1994 Louisiana Agreement are also available at many of the other public colleges and universities in Louisiana, and many have low levels of white student enrollment. The tables in Appendices 24 to 26 show the fall 2014 enrollment in programs or program areas discussed in the 1994 settlement. They reveal that at all three HBIs, many of the programs expected to enhance these HBIs and their ability to attract students of all races are also available at another – or several other – public colleges or universities throughout the state. Consequently, the percentage of white enrollment in many of those institutions is low: 2.3% overall at Grambling, 3.0% overall at SUBR, and 2.7% overall at SUNO.[116]

Of the six programs added at Grambling with students enrolled in fall 2014, every single one of them is offered at multiple institutions. Of the two programs added at SUNO with students enrolled that same year, both were offered multiple schools and had insignificant levels of white enrollment.[117] Of the 16 programs contemplated for SUBR, only eight had students enrolled that year[118] and five were also offered at multiple institutions throughout the state. None had meaningful levels of white student enrollment. In addition, many of the added programs have low overall enrollment as well as insignificant white enrollment,[119] previewing their limited effectiveness in terms of desegregating those campuses.

[116] Louisiana HBI enrollment data from Statewide Student Profiling System – Student Headcount Enrollment by Student Major, Fall 2014 – 2015. *See* Pls.' Apps. 24-26 for programs added to institutions pursuant to the Louisiana Agreement. Many of those identified in the Louisiana Agreement either were never offered or are no longer offered at those institutions. The reasons are unclear. For a more complete description of the programs added, see Appendix 4.

[117] Four of the six programs contemplated for SUNO are not currently available and three do not show as available on the university's website. The reasons are unclear.

[118] Seven programs identified to be added at SU had no headcount enrollment data available and did not appear to be available on the university's website. The reasons are unclear.

[119] The master of social work and master of criminal justice at SUNO, the bachelor of criminalistics at Grambling, and the bachelor of criminal justice at SU all have very high levels of overall enrollment but low white enrollment.

## V. In a unitary system, the HBIs have a distinctive institutional identity created by a meaningful number of unique, high-demand programs organized around programmatic niches.

The recommendations offered by Plaintiffs respond to the fundamental failure of other states to refine the programmatic identity of the HBIs to ensure that each fulfills a unique role within a state's coordinated, cost-effective system of affordable, high-quality institutions. Adding or enhancing discrete programs which are *unique but not high-demand*, or *high-demand but not unique*, does relatively little to influence student choice or alter the racial identifiability of those institutions. Instead, successful desegregation requires the strategic cultivation of programmatic niches consistent with an institution's distinct role in the overall system of higher education.

A dual curriculum structure is one in which there is a substantial amount of unnecessary program duplication between the TWIs and HBIs and where the HBIs are largely defined by race.[120] On the other hand, a unitary curriculum structure is characterized by program uniqueness and schools which have a distinct institutional identity.[121] Where unnecessary program duplication has been found to perpetuate a dual structure of higher education, the remedy should seek to confront this lack of programmatic identity which encourages white students to enroll at the HBIs. An effective remedy for the duplication found here must therefore ensure that a meaningful number of sufficiently unique, high-demand programs are placed at the HBIs and organized around distinct programmatic niches.

[120] *See* Conrad Expert Rep. II, PTX 70, at 7-8.

[121] *See id.*

### A. Unique, high-demand programs are the most effective way to ensure that HBIs can attract students of all races.

One of the most effective ways to remediate unnecessary duplication involves the placement of unique, high-demand programs at the HBIs to allow them to attract students of all races. There is a "strong 'symbiotic relationship'" between programs and schools. *Knight II,* 900 F. Supp. at 315. "Indeed, evidence presented . . . indicates that well-planned programs that respond to the particular needs and interests of local populations can help to desegregate historically black institutions. . . . [P]rograms not duplicated at proximate institutions, targeted to local demands, and in many cases offered through alternative delivery systems (such as off-campus, evening, or weekend programs) have had success in attracting white students to historically black institutions in other states." *See Ayers*, 111 F.3d at 1213-14.

Unique programs are the key to fashioning an appropriate remedy for duplication, and "meaningful uniqueness" requires a reasonable number of high-demand, non-core programs at a university that are not duplicated elsewhere in the system. *See Ayers II,* 879 F. Supp. at 1442. At the same time, those unique programs must be sufficiently high-demand to generate the "critical mass" of other-race students necessary to overcome the presumption that HBIs are academically inferior. *Knight II,* 900 F. Supp. at 319-20. High-demand programs are those which a disproportionately large number of students can be expected to select as their major field of study. If they are not replicated at institutions with overlapping service areas, these high-demand programs are often the epicenter of institutional identity.[122]

Maryland recognizes that the enhancement and development of unique, high-demand programs will lead to the desegregation of the HBIs. For example, the 2000 Partnership

[122] *See id.* at 8.

Agreement committed to implementing new unique, high-demand programs at the HBIs "for the purpose of promoting their institutional competitiveness and ensuring that these institutions attract students regardless of race…consistent with available resources, and with the mission, student profiles, academic program mix and degree levels of the institution."[123] The blue ribbon panel it convened in 2008 confirmed that Maryland's HBIs were not yet comparable to or competitive with the state's TWIs and made specific recommendations related to capital improvements and funding.[124] Moreover, Maryland's 2009 State Plan for Higher Education reiterated the importance of the HBIs ability to recruit, retain, and graduate an academically, racially, culturally, and ethnically diverse student body.[125] Maryland has therefore implicitly conceded the practicability and educational soundness of this approach to desegregation.

This Court also agrees that unique, high-demand programs are "a key reason [why] white students attend HBIs in other states," and that without them the HBIs "are identified by their racial history as opposed to [their] programs."[126] It has been shown that where white students can satisfy their curricular desires at a TWI but not at an HBI, they are discouraged from attending the HBI. *See Fordice*, 505 U.S. at 738-39. On the other hand, unique programs empower institutions to attract a diverse student body.[127] Thus, for racial desegregation to occur at Maryland's HBIs, they must offer programs *not* offered at geographically proximate TWIs.[128]

---

[123] 2000 Partnership Agreement, PTX 4 at 34.

[124] *See* 2008 HBI Study Panel, PTX 2 at 24-27.

[125] 2009 State Plan for Higher Education, PTX 1 at 27.

[126] Memorandum Opinion at 46 (citing Conrad Expert Rep. II, PTX 70, at 5).

[127] *Id.* at 54 (citing 1/18/12 AM Trial Tr. 91, 112 (Allen); Allen Expert Rep., PTX 661, at 8-9); *Knight*, 14 F.3d at 1541).

[128] *Id.* at 52-53 (citing Conrad Expert Rep. II, PTX 70, at 4; 1/18/12 Trial Tr. 88-89 (Allen)).

For example, a number of programs at University of Maryland Eastern Shore ("UMES") that are unique to the region reflect high levels of diversity as measured by white enrollment.[129] As demonstrated by the table in Appendix 9, many of those programs show meaningful levels of white enrollment including the Masters in Special Education, the Doctorate in Pharmacy, and the unduplicated Doctorate in Physical Therapy. Even at the undergraduate level, unique programs at UMES reveal higher levels of white enrollment, as reflected by enrollment data for the Bachelors in Hotel and Restaurant Management. Similarly, as demonstrated by the table in Appendix 6, approximately 18.2% of the students enrolled in the unique Masters in Education/Student Personnel at Bowie identified as white.

This experience is not limited to Maryland. Unique programs at the HBIs in other states reflect similarly high rates of white participation within those discrete programs, even when the institution as a whole remains highly segregated. In some instances, more than half of total degrees awarded in unique programs went to students who identified as white.

In Mississippi, for example, Alcorn offers a unique Bachelors in Elementary Education and Teaching.[130] Approximately 65% of the students who received that degree in 2012 identified as white.[131] At the graduate level, the unique Masters in Registered Nursing/Nursing Administration[132] awarded 43% of the total number of degrees granted in 2012 to white

---

[129] *See* Pls.' App. 9.

[130] 2013 DEGREE BOOK, *supra* note 84, at 16-24.

[131] All statistics for the degrees awarded at the following institutions and within discrete programs at those institutions were pulled from IPEDS for the 2011-2012 academic year. Programs identified as unique are offered at the HBI but are not offered at the geographically proximate TWI (LSU – Baton Rouge) according to an analysis of the programs available at each institution as reflected by IPEDS, meaning they are unique to the region. *See* NCES IPEDS Data Center, COMPLETION DATA (2011-2012).

[132] 2013 DEGREE BOOK, *supra* note 84, at 16-24. The Masters in Registered Nursing/Nursing Administration is unique to the region.

students.[133] In fall of 2013, Alcorn as a whole had 3.3% white enrollment,[134] confirming that Alcorn remains extremely segregated but experienced some of its highest levels of diversity in its unique programs. Meanwhile, only 6% of the overall enrollment at JSU was white in the fall of 2013.[135] Even so, JSU offers a unique Masters in Communication Sciences and Disorders.[136] In 2012, approximately 42% of those degrees went to students who identified as white. That same year, 36% of the unique Masters in Engineering were awarded to white students.[137]

In Alabama, only 5.6% of the degrees awarded by ASU in 2012 went to students who identified as white.[138] *See* Appendix 13. Even so, ASU offers a unique Doctorate in Physical Therapy, and a unique Masters in Occupational Therapy.[139] Approximately 39% of the Doctorates in Physical Therapy and 36% of the Masters in Occupational Therapy were awarded to white students.[140] AAMU has an overall student enrollment that is only 5.1% white. *See* Appendix 12. AAMU offers a unique Masters in Speech-Language Pathology as well as a unique Masters in Secondary Education and Teaching.[141] In 2012, 67% of the Masters in Speech-Language Pathology and 46% of those Masters in Secondary Education and Teaching went to

---

[133] *See* NCES IPEDS Data Center, COMPLETION DATA (2011-2012).

[134] *See* ALCORN STATE UNIVERSITY FACT BOOK (2012-2013) [hereinafter ALCORN Fact Book], *available at* http://ira.alcorn.edu/factbooks/Fact_Book_2012_13.pdf.

[135] JACKSON STATE ENROLLMENT FACT BOOK (FALL 2013) [hereinafter JSU Fact Book], *available at* http://www.jsums.edu/institutionalresearch/files/2013/10/Fall_2013_enroll_disp_eth_gen-2.pdf.

[136] 2013 DEGREE BOOK, *supra* note 84, at 16-24.

[137] *See* NCES IPEDS Data Center, COMPLETION DATA (2011-2012).

[138] *See* NCES IPEDS Data Center, COMPLETION DATA (2011-2012).

[139] Unique degrees are those not offered by the geographically proximate TWI (Troy State or Auburn University – Montgomery) according to data available on NCES IPEDS Data Center 2011-2012 Student Completion, meaning that they were unique to the region.

[140] *See* NCES IPEDS Data Center, COMPLETION DATA (2011-2012).

[141] Unique programs are those offered at AAMU but are not offered at the geographically proximate TWI (University of Alabama – Huntsville) meaning that they are unique to the region according to data available on NCES IPEDS Data Center 2011-2012 Student Completion.

white students.[142] Again, unique programs are the areas in which those campuses see some of the greatest levels of desegregation.

In 2012, only 3.7% of the total enrollment at SUBR in Louisiana was white, confirming that SUBR remains racially identifiable.[143] *See* Appendix 18. At the same time, SUBR offers several unique programs that attract a greater percentage of other-race students.[144] For example, 42% of the unique masters degrees awarded in Vocational Rehabilitation Counseling/Counselor were to white students, 26% of the unique Masters in Family Practice Nurse/Nursing were awarded to white students, and 20% of the unique masters degrees awarded in Audiology/Speech Language/Pathology went to white students. [145] At Grambling, only five students were awarded its unique Doctorate of Education in 2012, but 60% of those went to white students.[146] Unfortunately, that campus also remains highly segregated with only 2% of the overall total enrollment in 2013 identifying as white. *See* Appendix 17.

This is consistent with the experiences of the HBIs in other states, as well. In 2012, approximately 11% of the total degrees granted at North Carolina Central University ("NCCU") went to white students.[147] Even so, 67% of the degrees in the unique Masters in Curriculum and Instruction were awarded to white students, 47% of the degrees in the unique Masters in Special Education were awarded to white students, and 58% of the degrees in the unique Masters in

---

[142] *See* NCES IPEDS Data Center, COMPLETION DATA (2011-2012).

[143] *See id.*

[144] Unique programs are those offered at SU which are not duplicated at the geographically proximate TWI (LSU – Baton Rouge) according to data available on NCES IPEDS Data Center 2011-2012 Student Completion.

[145] Unique programs are those offered at SU but not offered at the geographically proximate TWI (LSU – Baton Rouge) according to data available on NCES IPEDS Data Center 2011-2012 Student Completion.

[146] *See* NCES IPEDS Data Center, COMPLETION DATA (2011-2012).

[147] *See id.*

Communication Sciences and Disorders were awarded to white students, again demonstrating the ability of such programs to attract students of all races.[148] In Delaware, Delaware State University offers a unique Masters in Social Work[149] and in 2012, 40% of the students who earned that degree identified as white.[150] At Kentucky State University ("KSU"), the unique Associates degree in Registered Nursing[151] awarded 65% of the total number of those degrees to white students.[152] The unique Bachelors in Information Technology awarded 50% of those degrees to students who identified as white.[153] In Oklahoma, unique programs at Langston University[154] reflect substantially high levels of white enrollment at both the graduate and undergraduate levels. Langston University has a unique Doctorate in Physical Therapy, and just under 70% of those degrees awarded in 2012 were earned by white students. At the undergraduate level, 30% of the unique Bachelors in Rehabilitation Science were awarded to white students.[155]

---

[148] *See* NCES IPEDS Data Center, COMPLETION DATA (2011-2012).

[149] Unique programs are those offered at DSU which are not offered at the geographically proximate TWI (University of Delaware) according to data available at NCES IPEDS Data Center 2011-2012 Student Completion, meaning that they are unique to that region.

[150] *See* NCES IPEDS Data Center, COMPLETION DATA (2011-2012).

[151] Unique programs are those offered at KSU which are not offered at the geographically proximate TWI (University of Kentucky) according to data available at NCES IPEDS Data Center 2011-2012 Student Completion., meaning that they are unique to that region.

[152] *See* NCES IPEDS Data Center, COMPLETION DATA (2011-2012).

[153] *See id.*

[154] Unique programs are those offered at Langston which are not offered at the geographically proximate TWI (Oklahoma State) according to data available at NCES IPEDS Data Center 2011-2012 Student Completion, meaning that they are unique to that region.

[155] *See* NCES IPEDS Data Center, COMPLETION DATA (2011-2012).

### B. The creation of programmatic niches composed of a meaningful number of unique, high-demand programs may require new, enhanced, or transferred programs at the HBIs.

To dismantle a dual curricular structure through the creation of a meaningful number of unique, high-demand programs at the HBIs will require enhancing, adding, or transferring such programs to the HBIs in order to establish distinctive programmatic identities for those campuses. Establishing new programs at the HBIs, as well as eliminating or transferring existing programs which duplicate those offerings, will enable the HBIs to develop institutional identities anchored in distinctive programmatic niches.

As a strategy, enhancing existing unique, high-demand programs at the HBIs also holds the possibility of increasing other-race enrollment in those programs. In some circumstances that approach can be effective where an institution has a demonstrated capacity and accreditation to offer that program, and the program is already drawing a meaningful number of other-race students.

For example, enrollment in the UMES Doctorate in Pharmacy program is oversubscribed. According to Dr. Juliette Bell, President of UMES, every year that program turns away applicants due to its limited capacity. The same might be said of the Doctorate in Physical Therapy at UMES, which is both unique in the region *and* high-demand and represents one of the most integrated programs on that campus.[156]

As a remedial strategy, the finite number of new programs which are *both* unique and high-demand may necessitate the select transfer of existing programs from TWIs to the HBIs. Targeted transfers of particularly high-demand and diverse programs from a TWI to a

---

[156] *See* Appendix 9.

geographically proximate HBI with demonstrated capacity – and accreditation – to absorb those programs can potentially offer high desegregative potential even though some white students may not choose to pursue their degree at the HBI. Such a strategy is consistent with the State's constitutional obligation to dismantle the dual structure of education and may be especially worthy of consideration where the HBI is currently offering a few unique programs within a broader curricular niche, but the portfolio of discrete programs and degree levels which constitute that niche are dispersed among multiple institutions.

The potential effects of this on student enrollment can be demonstrated by the impact of MHEC's decision to divide the engineering programs between Morgan and University of Maryland Baltimore County ("UMBC").[157] Instead of establishing an exclusive engineering niche at Morgan by concentrating these programs at the HBI, it permitted UMBC to offer similar degrees in the same service area. Today, UMBC offers a number of engineering degrees at all levels which have compromised the status of Morgan's engineering programs.

In 1947, a state commission recommended that an engineering program be established at Morgan.[158] Approval for that program did not come until the early 1980s, however, when Morgan was authorized to offer electrical, civil, and industrial engineering, each of which was unique in the Baltimore area.[159] MHEC denied repeated requests from UMBC to add similar programs given the concern that to do so would unnecessarily duplicate those programs at Morgan.[160] Later, MHEC permitted UMBC to offer a degree in general engineering and permitted University of Maryland College Park ("UMCP") to offer chemical and mechanical

[157] *See* PTX 39 at 44-45.

[158] *See* PTX 18, at 353.

[159] *See* 1/9/12 Trial Tr. at 12 (Popovich).

[160] *See* PTX 39, at 44.

engineering at the UMBC campus.[161] Division of these programs denied Morgan the ability to establish a distinctive institutional identity anchored in unique, high-demand programs within the engineering and sciences niche.[162] The consequences have been dramatic.

Today, Morgan offers four bachelors degrees, one masters degree, and one doctoral degree in engineering.[163] Total aggregate enrollment in those programs is high but overwhelmingly black. In the four undergraduate programs, a total of 828 students were enrolled in fall of 2013, but none of those programs had more than 10% white enrollment. At the graduate level, only 5.6% of the masters students and just 4.9% of the doctorate students identified as white.[164]

**Morgan State Engineering Enrollment 2013**

| | **Total Enrolled** | **Number Of Enrollments - White** | **Percentage Of Enrollments - White** |
|---|---|---|---|
| **Bachelors - Civil, Construction, And Transportation Engineering** | 204 | 15 | 7.4% |
| **Bachelors - Electrical, Electronics, And Communications** | 476 | 10 | 2.1% |
| **Bachelors - Industrial And Management Engineering** | 119 | 4 | 3.4% |
| **Bachelors - Engineering** | 29 | 3 | 10.3% |

[161] *See* PTX 39 at 59.

[162] *See* 1/12/12 PM Trial Tr. at 27-30 (Richardson).

[163] *See* 2013 Undergraduate and Graduate Enrollment by Institution by Degree Program provided by Maryland Higher Education Commission.

[164] All enrollment data for fall 2013 provided by State.

| | | | |
|---|---|---|---|
| **Technologies** | | | |
| **Masters - Engineering, General** | 54 | 3 | 5.6% |
| **Doctorate Research/Scholarship - Engineering, General** | 61 | 3 | 4.9% |
| **Total** | 943 | 38 | 4.0% [165] |

On the other hand, UMBC offers a large and robust portfolio of engineering programs, including four undergraduate degrees in engineering, two certificates, five masters, and five doctorate degrees. Taken together, the UMBC engineering offerings outmatch those at Morgan both in terms of size and diversity. In fall of 2013, at least 18% of the students enrolled in each of those programs at UMBC identified as white. All of the engineering degrees at UMBC are extremely high-demand as demonstrated by their enrollment numbers.

**UMBC Engineering Enrollment 2013**

| | **Total Enrolled** | **Number Of Enrollments - White** | **Percentage Of Enrollments - White** |
|---|---|---|---|
| **Bachelors - Mechanical Engineering** | 543 | 323 | 59.5% |
| **Bachelors - Other, Engineering** | 326 | 161 | 49.4% |
| **Bachelors - Chemical Engineering** | 281 | 129 | 45.9% |
| **Bachelors - Engineering, General** | 171 | 95 | 55.6% |
| **Masters - Other, Engineering** | 69 | 37 | 53.6% |

[165] 2013 Undergraduate and Graduate Enrollment by Institution by Degree Program provided by Maryland Higher Education Commission.

| | | | |
|---|---|---|---|
| **Masters - Mechanical Engineering** | 32 | 15 | 46.9% |
| **Masters - Electrical, Electronics, And Communications** | 15 | 7 | 46.7% |
| **Masters - Chemical Engineering** | 5 | 2 | 40.0% |
| **Masters - Civil, Construction, And Transportation Engineering** | 8 | 2 | 25.0% |
| **Doctorate Research/Scholarship - Electrical, Electronics, And Communications** | 34 | 11 | 32.4% |
| **Doctorate Research/Scholarship - Mechanical Engineering** | 38 | 11 | 28.9% |
| **Doctorate Research/Scholarship - Chemical Engineering** | 23 | 5 | 21.7% |
| **Doctorate Research/Scholarship - Other, Engineering** | 18 | 4 | 22.2% |
| **Doctorate Research/Scholarship - Civil, Construction, And Transportation Engineering** | 11 | 2 | 18.2% |
| **Postbac Cert - Other, Engineering** | 11 | 6 | 54.5% |
| **Postbac Cert - Chemical Engineering** | 3 | 1 | 33.3% |
| **Total** | 1588 | 811 | 51.1% [166] |

Given the number and variety of engineering programs available at UMBC, Morgan has been severely disadvantaged both in terms of overall enrollment and other-race enrollment. This

[166] Id.

invites serious consideration of targeted transfers where appropriate. For example, transferring the civil and electrical engineering programs at the masters and doctorate level, would have a desegregative effect and also complement existing programming at Morgan. Such a transfer offers the potential to increase white enrollment. The Masters in Civil Engineering has small enrollment, but in fall of 2013 it was 25% white. The corresponding doctorate degree had 18.2% white enrollment that same year, and the Masters in Electrical Engineering was over 46% white.

The MBA at Morgan offers another example of an opportunity to achieve meaningful desegregation through targeted program transfer. The duplication of Morgan's MBA program began in 1975 with the entry of University of Baltimore ("UB") into the public system of higher education.[167] Enrollment in Morgan's MBA program precipitously declined following the availability of the MBA at UB. In 1975, Morgan enrolled 54 white students and 176 black students. In 1985, UB awarded 177 degrees to white students and 14 to black students. Meanwhile, the degrees awarded to white students at Morgan that same year dropped to zero and the number awarded to black students was 48.[168] Over the strenuous objections of Morgan, despite concerns expressed by OCR, and against the advice of the Attorney General at that time, MHEC reversed its initial decision to reject the development of a joint MBA at Towson and UB and allowed it in 2005.[169] The MBA at Morgan today continues to experience low white enrollment. In fall 2013, the MBA program at Morgan enrolled 129 students but only two

---

[167] *See* Plaintiffs' Proposed Findings of Fact and Conclusions of Law, D.E. 355 at 317.

[168] For 1975, enrollment data is provided for the Morgan MBA program. In 1985, data was reported as the number of degrees awarded. *See id.* at 287 (citing to PTX 184 at 9). *See also* PTX 39 at 58 (showing that after UB became a public campus in 1975, the number of MBAs awarded by UB essentially doubled during the next 20 years while the number of MBAs awarded by Morgan dropped by nearly half during that same time period).

[169] Memorandum Opinion at 51.

(approximately 2%) identified themselves as white. Meanwhile, the masters at Towson enrolled a total of 233 students that same year, and 148 (approximately 64%) of them identified as white.

**2013 White Student Enrollment in Maryland Public MBA Programs**

| Institution | Total Enrolled | White Students Enrolled | % White Students Enrolled |
|---|---|---|---|
| **UB** | 677 | 308 | 45.5% |
| **Towson University** | 233 | 148 | 63.5% |
| **Morgan State** | 129 | 2 | 1.6% |
| **Totals** | 1039 | 458 | 44.0% [170] |

It is important to note that the evidence also shows that high-demand, but less competitive programs with low barriers to entry do *not* offer the same desegregative potential when placed at an HBI. Adding such programs at the HBIs will only increase the available supply for those degrees and will not lead to meaningful desegregation. Historically, there has been an overreliance on engineering, business, education, and nursing programs to desegregate

[170] 2013 Undergraduate and Graduate Enrollment by Institution by Degree Program Provided By Maryland Higher Education Commission.

the HBIs, regardless of whether those programs are already offered at TWIs with overlapping service areas. The outcomes confirm that these attempts to remedy duplication by adding high-demand but less competitive programs to the HBIs when they already exist at the TWIs will tend to reinforce the racial identifiability of those institutions.

Alabama's decision to order the creation of an undergraduate electrical and mechanical engineering program at the HBIs demonstrates the shortcomings of this approach. *See Knight II*, 900 F. Supp. at 315-17. First, the engineering programs were not unique: the proximate TWI already had a successful engineering program. *See id. Knight* justified the duplicative programming on the basis that engineering was such a "high-demand" program that it would still attract other-race students, a claim based upon the observation that HBIs in other states had attracted other-race students through duplicated engineering programs. *Id.* at 316. However, *Knight* failed to analyze whether engineering programs were sufficiently in high-demand among white Alabama students. Indeed, *Knight* recognized Alabama already had a high number of engineering programs. *Knight I*, 787 F. Supp. at 311-12. Perhaps more troubling still, *Knight* only found that minority students needed more access to engineering programs rather than finding white Alabama students demonstrated a high demand for more engineering programs. *Knight II*, 900 F. Supp. at 316.

As demonstrated by the table in Appendix 27, which shows the level of white and black enrollment in the engineering programs at AAMU and University of Alabama – Huntsville ("UAH"), duplication of programs leads to almost totally segregated programs. The two institutions offer three identical degrees, and for each degree, AAMU's student population is

overwhelming black and UAH's student population is overwhelmingly white.[171] This racial segregation is also reflected within AAMU's four engineering programs that are not explicitly duplicated by UAH.[172] The low enrollment of whites in AAMU's engineering programs compared with the high white enrollment rates in UAH's engineering programs underscore the critical error made in *Knight*: additional programming will not desegregate an HBI merely because it is high-demand since it must *also* be unique or sufficiently competitive.

As shown by the table below, duplicated engineering programs were highly segregated:

**Degrees Awarded By Race 2012 - Alabama A&M and University Of Alabama Huntsville Duplicated Engineering Programs**

| | AA&M Total | AA&M White | AA&M White % | AA&M Black | AA&M Black % | UAH Total | UAH White | UAH White % | UAH Black | UAH Black % |
|---|---|---|---|---|---|---|---|---|---|---|
| **Civil Engineering, General / Bachelors** | 15 | 2 | 13.3% | 13 | 86.7% | 30 | 24 | 80% | 1 | 4.3% |
| **Mechanical Engineering / Bachelors** | 24 | 1 | 4.2% | 23 | 95.8% | 141 | 124 | 87.9% | 5 | 3.5% |
| **Electrical And Electronics Engineering / Bachelors** | 34 | 0 | 0.0% | 34 | 100.0% | 46 | 26 | 56.5% | 9 | 19.6% |
| **Total** | 73 | 3 | 4.1% | 70 | 95.9% | 204 | 169 | 82.8% | 9 | 4.4%[173] |

[171] *See* Pls.' App. 27.

[172] *See id.*

[173] 2013 Undergraduate and Graduate Enrollment by Institution by Degree Program Provided By Maryland Higher Education Commission.

### C. Unique but low-demand programs will not make a significant contribution to the desegregation of an institution.

The Mississippi experience shows that the addition of discrete programs which are not clustered around a programmatic niche, or the addition of unique but low-demand programs, will have limited desegregative effect.[174] Where the objective is to dismantle a dual system of education produced by and reinforced by unnecessary duplication, new unique programs must be sufficiently high-demand in order to generate the "critical mass" of other-race students necessary to overcome the presumption that HBIs are academically inferior. *See Knight II,* 900 F. Supp. at 319-20. The experience of other states reveals that the addition of discrete, unique but low-demand programs at the HBIs will have limited desegregative effect.

In Mississippi, the district court ordered the addition of a masters and a doctorate in urban planning at JSU. *Ayers II*, 879 F. Supp. at 1494. Today, those degrees are unique to that institution and are not offered elsewhere in the state.[175] In 2012, 40% of the masters degrees in Urban Planning awarded were to white students, confirming that unique programs do appear to draw students of all races. However, JSU only awarded four of those degrees to white students.[176] The same could be said about the Masters in Communication Sciences and Disorders, another unique program[177] added at JSU pursuant to the settlement.[178] In 2012, approximately 42% of the Masters in Communication Sciences and Disorders were awarded to white students but the total number awarded was just eight.[179] In other words, low-demand

[174] *See generally* Appendix 4 (summarizing the procedural history and remedies in *Ayers* litigation).

[175] *See* 2013 DEGREE BOOK, *supra* note 84, at 16-24 (confirming program not offered at other Mississippi schools).

[176] *See* NCES IPEDS Data Center, COMPLETION DATA (2011-2012).

[177] *See* 2013 DEGREE BOOK, *supra* note 84, at 16-24 (demonstrating the program is not currently offered at another four year public institution in Mississippi).

[178] *See* Mississippi Agreement, *supra* note 85, at 6.

[179] *See* NCES IPEDS Data Center, COMPLETION DATA (2011-2012).

programs offer low yield in terms of desegregation, especially if they are not clustered around programmatic specialties or niches.

Similarly, Mississippi added a unique Masters in Bioinformatics[180] at MVSU.[181] In 2012, 50% of those degrees went to white students, again demonstrating the high desegregative potential of unique programs. Unfortunately, that program has low yield in terms of overall numbers – only three white students earned that degree in 2012.[182] Because of its more limited mission, MVSU offers fewer graduate-level programs and therefore has fewer unique non-core programs than other institutions throughout the state. Another problem MVSU faces is that those programs it does have are not sufficiently high-demand to create a meaningful desegregative effect.

In Alabama, AAMU has a unique Bachelors in Special Education and Teaching and a unique Masters in Educational Leadership and Administration.[183] The levels of diversity in both of those programs appears high – in 2012, 50% of the degrees awarded in those programs were awarded to white students.[184] However, total enrollment in each of those programs was four students. Between those two programs, AAMU only awarded four degrees to white students, even though they were unique.[185] Similarly, 22% of the unique Bachelors in Secondary

[180] Program not currently offered at another four year public institution in Mississippi. *See* 2013 DEGREE BOOK, *supra* note 84, at 16-24.

[181] *See* Mississippi Agreement, supra note 84, at 7.

[182] *See* NCES IPEDS Data Center, COMPLETION DATA (2011-2012).

[183] According to IPEDS, these programs are not currently offered by the geographically proximate TWI (UA-H).

[184] *See* NCES IPEDS Data Center, COMPLETION DATA (2011-2012).

[185] *See id.*

Education at AAMU were awarded to white students, but that only yielded two white students out of a total of seven.[186]

### D. Placing duplicative programs at the HBIs is unlikely to lead to meaningful desegregation.

Mississippi further demonstrates the limited desegregative effect of adding new but duplicated programs at the HBIs. The court decree in *Ayers* added programs which were not unique to JSU.[187] The outcomes generally demonstrate the limited ability of duplicated programs to desegregate a school. For example, the Doctorate in Business Administration is offered at both Mississippi State University ("MSU") and University of Mississippi ("UM").[188] In 2012, JSU awarded just two of those doctorates to white students.[189] Similarly, it only awarded three Masters in Business Administration degrees to white students.[190] That same degree is also offered at three TWIs, including MSU, UM, and USM.[191] In 2012, MSU awarded 161 Masters in Business, and 135 of those went to white students; UM granted 71, and 63 of those were to white students; and USM awarded 32 Masters in Business, 25 of which went to white students.[192]

To illustrate further, the settlement added a Doctorate in Higher Education at JSU,[193] a degree that students may also earn from UM and USM.[194] Consequently, only two of the

---

[186] *See id.*

[187] *See* Pls.' App. 4 (identifying programs added to the HBIs in Mississippi pursuant to the 1995 court ordered remedial plan).

[188] *See* 2013 DEGREE BOOK, *supra* note 84, at 16-24.

[189] *See* NCES IPEDS Data Center, COMPLETION DATA (2011-2012).

[190] *See id.*

[191] *See* 2013 DEGREE BOOK, *supra* note 84, at 16-24.

[192] *See* NCES IPEDS Data Center, COMPLETION DATA (2011-2012).

[193] *See* Mississippi Agreement, *supra* note 85, at 7.

[194] *See* 2013 DEGREE BOOK, *supra* note 84, at 16-24.

Doctorates in Higher Education awarded by JSU in 2012 were granted to white students.[195] The Civil and Computer Engineering bachelors degrees added to JSU pursuant to the settlement[196] are also available at MSU.[197] In 2012, JSU awarded just four Bachelors in Civil Engineering and four Bachelors in Computer Engineering to white students.[198]

The settlement also required that an MBA be placed at Alcorn.[199] However, that degree is also offered by a number of institutions throughout the state.[200] In 2012, none of the MBAs awarded by Alcorn was granted to a white student.[201] However, MSU awarded 161 Masters in Business and 135 of those were to white students.[202] UM awarded 71 Masters in Business, and 63 of those were granted to white students.[203] USM awarded 32 Masters in Business, and 25 of those were to white students.[204] The Masters in Teacher Education added at Alcorn is similarly available at DSU, MVSU, and JSU. In 2012, Alcorn only awarded three of those masters degrees to white students.[205] Again, this suggests that a remedy which places non-unique (unnecessarily duplicated) programs at an HBI is likely to have limited success in desegregating that campus.

The Mississippi settlement also required enhancements to Alcorn in mathematics, science, and computer science. Today, Alcorn offers a Bachelors in Mathematics and a

---

[195] *See* NCES IPEDS Data Center, COMPLETION DATA (2011-2012).

[196] *See* Mississippi Agreement, *supra* note 85, at 6.

[197] *See* 2013 DEGREE BOOK, *supra* note 84, at 16-24.

[198] *See* NCES IPEDS Data Center, COMPLETION DATA (2011-2012).

[199] *See* Mississippi Agreement, *supra* note 85, at 6.

[200] *See* 2013 DEGREE BOOK, *supra* note 84, at 16-24.

[201] *See* NCES IPEDS Data Center, COMPLETION DATA (2011-2012).

[202] *See id.*

[203] *See id.*

[204] *See id.*

[205] *See id.*

Bachelors in Chemistry, each of which is available at every institution in Mississippi.[206] Alcorn now offers a Bachelors in Computer Science, a degree which is also offered by MVSU, JSU, MSU, and USM.[207] In 2012, there were no bachelors degrees in math or chemistry and only one in computer science awarded by Alcorn to white students.[208] This demonstrates the inability of these types of core undergraduate programs to influence student choice. At the graduate level, the Masters in Computer Science now offered at Alcorn is likewise available at JSU, MSU, and USM.[209] In 2012, Alcorn did not award any Masters in Computer Science to white students, again suggesting that duplicated programs are unlikely to lead to significant increases in white enrollment within those programs.[210]

Alabama offers additional examples of how new but duplicated programs will not necessarily desegregate the HBIs.[211] *Knight* also failed to place unique programs at AAMU and ASU, choosing to disregard concerns about duplication in favor of market demand. The decree allowed AAMU and ASU to develop their new programs in areas already occupied by the proximate TWIs. Specifically, *Knight*'s remedial decrees provided that AAMU should be allowed to develop an engineering program and should receive preference for any new teacher education programs in the Huntsville area. *Knight I*, 787 F. Supp. at 1380; *Knight II*, 900 F. Supp. at 293-95, 315-17, 371-72. Each of these programs was duplicated by nearby TWIs. *Id.* at 293-295, 315-17.

---

[206] *See* 2013 DEGREE BOOK, *supra* note 84, at 16-24.

[207] *See id.*

[208] *See* NCES IPEDS Data Center, COMPLETION DATA (2011-2012).

[209] *See* 2013 DEGREE BOOK, *supra* note 84, at 16-24.

[210] *See* NCES IPEDS Data Center, COMPLETION DATA (2011-2012).

[211] *See generally* Pls.' App. 2 (summarizing the procedural history and remedies in *Knight* litigation).

The court in *Knight* explicitly considered the duplicative nature of the proposed engineering program at AAMU, but ultimately decided that high demand alone would attract white students to AAMU: "a quality engineering program at an HBI can also attract significant numbers of white students even when there is a high-quality, proximate PWI".[212] *Knight II*, 900 F. Supp. at 316. As discussed above, the 2011-2012 statistics on student completion in engineering programs at AAMU and UAH disprove *Knight*'s prediction that high-demand programs will attract other-race students even when duplicated at proximate TWIs.

The other remedial programs specifically ordered in *Knight* were similarly duplicative of programming at proximate TWIs: AAMU was given preference for creating new teacher education programs, but *Knight* allowed the proximate TWI to continue its already existing education programs, *id.* at 293-95, 315-17, 371-72; ASU would receive enhancement funds to develop an allied health program even though a proximate TWI had one program in this area, *id.* at 306, 370-71; ASU would have sole authority in Montgomery to offer a Masters in Accounting for a period of five years, after which time TWIs could duplicate the degree program. *Id.* at 371-72. Moreover, the court's mandate that general preference be given to HBIs in developing new programs from 1991-1995 only emphasized that these programs be in "high-demand" and notably did not require that the new programs be non-duplicative. *Knight I*, 787 F. Supp. at 1380. In sum, *Knight*'s remedial decree failed to eliminate program duplication and failed to strategically add programs designed to enhance each HBI's unique institutional identity.

[212] The 1995 remedial decree does mandate that AAMU and UAH meet to coordinate their programs to minimize duplication, but also emphasizes that accreditation concerns should have ultimate priority. *See Knight II*, 900 F. Supp. at 371.

### E. In rare circumstances, extremely high-demand and competitive professional programs offer strong desegregative potential for the HBIs – even when duplicated.

In a few rare circumstances, it may be that extremely high-demand and competitive programs at the HBIs still offer desegregative potential, even if those programs are duplicated at a TWI. This may be true where the demand for the program far exceeds the slots for admission and where the other institution which is offering that program is also a flagship institution with higher admissions standards.

For example, Morgan offers three graduate-level programs in architecture.[213] In 2013, 47.4% of the students enrolled in the Masters of Architecture program at Morgan identified as white. More importantly, approximately 72.7% of the students enrolled in the Masters in Landscape Architecture are white. In addition, there are more students enrolled in the bachelors program at Morgan than at the flagship, UMCP, highlighting the fact that the architecture program at Morgan is extremely high-demand. Together, the architecture programs at Morgan enrolled 38 students in 2013 who identified as white, which is approximately 42% of the total enrollment in those programs. This highlights the desegregative potential of *extremely* high-demand programs where the duplicated program is *only* offered at a competitive flagship institution where admission is highly competitive.

**2013 White Student Enrollment in Undergraduate And Graduate Architecture Programs At Morgan State University and University Of Maryland College Park ("UMCP")**

| | Morgan State Total Enrollment | Morgan State White Enrollment | Morgan State % White Enrollment | UMCP Total Enrollment | UMCP White Enrollment | UMCP % White Enrollment |
|---|---|---|---|---|---|---|

[213] Morgan and UMCP both offer a Masters in Landscape Architecture; a Masters in City, Community and Regional Planning and Architecture; and a general Masters in Architecture.

| | | | | | | |
|---|---|---|---|---|---|---|
| **Bachelors - Architecture** | 259 | 35 | 13.5% | 177 | 99 | 55.9% |
| **Bachelors - Landscape Architecture** | N/A | N/A | N/A | 49 | 22 | 44.9% |
| **Masters - Architecture** | 38 | 18 | 47.4% | 64 | 42 | 65.6% |
| **Masters - Landscape Architecture** | 22 | 16 | 72.7% | 27 | 21 | 77.8% |
| **Masters Architecture, City/ Community / Regional Planning** | 30 | 4 | 13.3% | 83 | 33 | 39.8% |
| **Total** | 349 | 73 | 20.9% | 400 | 217 | 54.3% [214] |

This might also account for the high level of diversity in the UMES pharmacy program, which is also offered at the University of Maryland Baltimore ("UMB"). The UMES program is therefore unique to the region, but not unique in the state. As demonstrated by the table below, the level of white enrollment in the Doctorate of Pharmacy at UMES is nearly the equivalent of the percentage of white enrollment at UMB, although the overall enrollment at UMB is still higher.

**2013 White Student Enrollment in Pharmacy Programs at University of Maryland Eastern Shore ("UMES") and University of Maryland Baltimore ("UMB")**

[214] 2013 Undergraduate and Graduate Enrollment by Institution by Degree Program Provided By Maryland Higher Education Commission.

| | UMES Total Enrollment | UMES White Enrollment | UMES % White Enrollment | UMB Total Enrollment | UMB White Enrollment | UMB % White Enrollment |
|---|---|---|---|---|---|---|
| **Doctorate** | 166 | 49 | 29.5% | 638 | 210 | 32.9% [215] |

The enrollment demographics within these programs in Maryland may suggest that selected programs which are prestigious and high-demand may offer unusually strong desegregative potential for an HBI. While there are very few such programs, law is one example of a degree which is consistently both extremely high-demand and extremely competitive. As demonstrated by the table below, in many states, a law program at an HBI may attract meaningful levels of white enrollment even when there is another law degree available at a geographically proximate TWI.

**Law Degrees Awarded to White Students at HBIs and Proximate TWIs 2012 – 2013**

| Institution | Total Degrees Awarded | Degrees Earned By White Students | % Degrees Earned By White Students |
|---|---|---|---|
| **Louisiana** | | | |
| **Southern University Law Center (Baton Rouge)** | 217 | 73 | 33.6% |
| **LSU Baton Rouge Paul Herbert Law Center (Baton Rouge)** | 218 | 157 | 72.0% |
| **North Carolina** | | | |

[215] *Id.*

| | | | |
|---|---|---|---|
| **North Carolina Central University (NCCU)** | 167 | 66 | 39.5% |
| **University Of North Carolina Law School (UNC Chapel Hill)** | 247 | 116 | 47.0% |
| **Florida** | | | |
| **Florida Agricultural & Mechanical University (FAMU)** | 224 | 77 | 34.4% |
| **Florida State University (FSU)** | 239 | 179 | 74.9% |
| **Texas** | | | |
| **Texas Southern University (TSU)** | 161 | 31 | 19.3% |
| **University Of Houston Law Center (Houston)** | 272 | 166 | 61.0% [216] |

Together, the experience in these states seems to imply that in limited circumstances, a highly desirable *and* highly competitive degree may offer strong desegregative potential in spite of the fact that the program is duplicated. This has worked with respect to degrees in fields like architecture, pharmacy, and law but is less successful in fields such as engineering and business administration.

### F. Joint programs can reinforce the desegregative effects achieved through other remedies, but on their own may not desegregate an institution.

Joint programs between a TWI and HBI may increase other-race enrollment at the HBI and may reinforce the desegregative effects achieved through other remedial measures. This is

[216] *See* NCES IPEDS Data Center, COMPLETION DATA (2012-2013).

particularly true where a joint graduate degree complements an established programmatic niche at an HBI which consists primarily of undergraduate programs.

However, the experience in Alabama demonstrates some of the limitations of joint or cooperative programming in terms of attracting other-race students to an HBI.[217] The court in Alabama encouraged cooperative programming between the schools in such programs as business, education, and allied health. *Knight I,* 787 F. Supp. at 1329-31, 1379-81; *Knight II,* 900 F. Supp. at 299-300. However, the cooperative arrangements described in *Knight* did not eliminate the duplicative degree programs between the institutions, but merely facilitated voluntary cross-enrollment and required some business and education majors to cross-enroll in two courses at the other institution. *Knight II,* 900 F. Supp. at 299-300.

These programs did not significantly increase white enrollment at the HBI: only 30 students at Auburn University at Montgomery ("AUM"), a TWI, enrolled in a course at ASU (an HBI) in the 1995 spring semester, and the court does not specify how many of these 30 students were white. *Id.* at 300. While the court in *Knight* interpreted these numbers to signify that cooperative programming offered some potential for desegregation, *id.*, current statistics that indicate ongoing racial identifiability between AUM and ASU demonstrate *Knight* erred in over-relying on such cooperative arrangements to desegregate the campuses. The enrollment statistics – AAMU with 5.1% white enrollment and ASU with 3.4% white enrollment – show that these cooperative programs have not sufficiently increased AAMU's and ASU's ability to attract other-race students.[218]

---

[217] *See generally* Pls.' App. 2 (summarizing the procedural history and remedies in *Knight* litigation).

[218] *See* ALABAMA STUDENT DATABASE.

### G. Institutional mergers may have transformative desegregative potential and should be given serious consideration.

The courts have recognized that in specific circumstances, unnecessary program duplication may require an assessment of whether the maintenance of multiple institutions within an overlapping service area perpetuates segregation. Even *Fordice* anticipated the possibility that closing or merging institutions might be required in order to remedy the vestiges of discrimination in Mississippi's system of higher education. *Fordice*, 505 U.S. at 741-43 ("closure of one or more institutions would decrease the discriminatory effects of the present system" but the court was unable to say on the present record whether such action was constitutionally required).

On remand, the court in *Ayers* found that "the most segregative aspect of the State system of higher education is the maintenance of eight universities with differential admissions standards between the HWIs and HBIs, thereby maintaining the racial identifiability of the universities." *Ayers II*, 879 F. Supp. at 1490. In addition to addressing admission policies, the district court required an institutional study to determine if institutional merger of Delta State University and MVSU was necessary to eliminate duplication in that region. *See id.* at 1495. While the court ultimately accepted the conclusion that merger was impracticable, the experience in Mississippi confirms that there may in fact be circumstances in which such a remedy may be required.[219]

The experience in Tennessee also demonstrates that in certain circumstances institutional merger may be practicable, educationally sound, and necessary to remedy the vestiges of past

---

[219] *See generally* Pls.' App. 4 (summarizing the procedural history and remedies in *Ayers* litigation).

discrimination in spite of anticipated disruption to the system.[220] The plaintiffs in the original case sought to enjoin the proposed construction and expansion of the traditionally white University of Tennessee Nashville ("UTN"). *Sanders v. Ellington*, 288 F. Supp. 937 (M.D. Tenn. 1968).[221] The plaintiffs alleged, *inter alia*, that the State maintained racially segregated institutions contrary to the Fourteenth Amendment, and that the proposed expansion of UTN would perpetuate racial disparities between UTN and TSU. *Id.* at 939. The district court did not initially grant the injunction, but found that a dual system of higher education had been established by law and that Tennessee had failed to dismantle such a system by instituting race neutral admissions. *See id.* at 942-43.

The court held the State had an affirmative duty to dismantle its dual system of higher education and required a plan to desegregate higher education institutions across the state. *Id.* From 1968-76, the defendants submitted various plans and progress reports. *See Geier v. Blanton*, 427 F. Supp. 644, 646-56 (M.D. Tenn. 1977). The court repeatedly found that impermissible racial segregation continued to exist in Nashville at UTN and TSU. *See id.* The court directed defendants to revise their desegregation plans, emphasizing that the defendants ensure a "substantial white presence on the [TSU] campus". *Id.* at 654 (internal quotation marks omitted). When satisfactory progress still had not been made by 1974, the court transferred all of the graduate educational programs to TSU, observing the most effective method of desegregating TSU appeared to be "the exclusive allocation of programs to it." *Id.* at 649.

---

[220] *See generally* Pls.' App. 5 (summarizing the procedural history and remedies in *Geier* litigation).

[221] While the early decisions in *Geier* pre-date *Fordice*, the history is relevant to the determination that previous efforts to desegregate the HBI and TWI in Nashville had been unsuccessful and necessitated merger.

Given the lack of progress desegregating TSU, the court invoked its equitable powers to mandate a merger. *Id.* at 661. Previous reliance on joint, cooperative, and exclusive programs had not eliminated the competition between the schools. *Id.* at 656. Desegregation was stymied by the lack of centralized authority to resolve ongoing disagreements about program allocation, and the Tennessee Higher Education Committee tended to defer to the politically powerful UTN. *Id.* 656-57. Based on the educational and economic benefits of merger, most of the experts agreed that merger was the best long-range solution for desegregating the Nashville area. *Id.* at 657-59. The type of students that TSU needed to attract for a more diverse student enrollment – adult students who primarily commuted and took evening courses – were the type of students that UTN served. *Id.* at 652. In 1984, the parties entered a stipulation and settlement agreement merging UTN under TSU, which was later upheld by the Sixth Circuit. *See Geier v. Alexander*, 593 F. Supp. 1263, *aff'd*, 801 F.2d 799 (6th Cir. 1986).

The courts concede that institutional merger may be a "drastic" remedy, but it may offer one of the most effective ways of remedying the systemic competition fostered by unnecessary program duplication. *See Geier*, 427 F. Supp. at 660; *Ayers II*, 879 F. Supp. at 1490. The Tennessee district court noted that following the merger, TSU did see a drop in white student enrollment and white faculty. *Geier*, 593 F. Supp. at 1266. It found the deterioration at TSU "particularly disheartening," observing that prior to the merger, black first-time freshmen represented 69.7% in 1976 but increased to 90.2% by 1983. *Id.* Yet the court did *not* reverse course. Instead, the district court retained jurisdiction to effectuate the decree and "modify the remedies if found to be inefficacious." *Id.* at 1267. Today, TSU has an integrated campus with 24.5% white enrollment in fall 2013.[222] *See* Pls.' App. 20.

[222] *See* TENNESSEE FACT BOOK, *supra* note 72.

The recent reorganization and restructuring of the higher education system in Georgia confirms that institutional merger and systemic realignment can be practicable and sound educational policy independent of the obligation to desegregate a system of higher education. While desegregation played no role in the Georgia mergers, program duplication and institutional duplication were considerations in the reorganization of that state's system of higher education.[223] Starting in 2011, the University System of Georgia ("USG") has undertaken four mergers (consolidating eight institutions into four).[224] Those mergers were approved in 2012,[225] and USG recently approved two more mergers in January 2015 which will begin over the next year.[226] The mergers have been substantial in scope and have varied in terms of the relationships between the merged institutions.[227] Merged institutions have consistently been geographically proximate, but there is variation as to the degree of similarity between the two merged universities with regard to each university's scope, mission, and student population served.[228]

---

[223] *See Regents Approve Principles for Consolidation of Institutions*, UNIVERSITY SYSTEM OF GEORGIA NEWSROOM, Nov. 8, 2011, http://www.usg.edu/news/release/regents_approve_principles_for_consolidation_of_institutions; *Serving our Students, Serving the State*, UNIVERSITY SYSTEM OF GEORGIA, http://www.usg.edu/consolidation/ (last modified Feb. 17, 2015); GEORGIA BOARD OF REGENTS, RECOMMENDED CONSOLIDATIONS, UNIVERSITY SYSTEM OF GEORGIA, http://www.usg.edu/docs/consolidations.pdf (detailing mergers approved in 2012); GEORGIA BOARD OF REGENTS, USG CONSOLIDATIONS: PHASE II, UNIVERSITY SYSTEM OF GEORGIA, Nov. 12, 2013, http://www.usg.edu/docs/consolidations.pdf (detailing merger finalized in 2015 between Kennesaw State University and Southern Polytechnic State University); GEORGIA BOARD OF REGENTS, USG CONSOLIDATIONS: PHASE III, UNIVERSITY SYSTEM OF GEORGIA, Jan. 6, 2015, http://www.usg.edu/docs/GA_State-GPC_Consolidation.pdf (detailing the merger approved in 2015 between Georgia State University and Georgia Perimeter College).

[224] *See* Laura Diamond, *Historic vote merges eight Georgia colleges into four*, ATLANTIC J. CONST., Jan. 8, 2013, http://www.ajc.com/news/news/local/regents-give-final-ok-to-merge-georgia-colleges/nTqH4/.

[225] *Id.*

[226] *See Board Approves Merger of Georgia State, Georgia Perimeter Colleges*, DIVERSE ISSUES IN HIGHER EDUCATION, Jan. 6, 2015, http://diverseeducation.com/article/68701/. *See also Report: Plans to Merge Georgia State U. With a Community College*, INSIDE HIGHER ED., Jan. 6, 2015, https://www.insidehighered.com/quicktakes/2015/01/06/report-plans-merge-georgia-state-u-community-college.

[227] *See* GEORGIA BOARD OF REGENTS, RECOMMENDED CONSOLIDATIONS, *supra* note 215; GEORGIA BOARD OF REGENTS, USG CONSOLIDATIONS: PHASE III, *supra* note 215. *See also* Diamond, *supra* note 216; *Report: Plans to Merge Georgia State U. With a Community College*, *supra* note 218.

[228] *Id.*

Georgia merged institutions with similar programmatic missions, but it has also merged a four-year college with a two-year college[229] and merged schools with distinctly different institutional missions and student populations (ranging in their level of college-preparedness).[230] The scope and impact of the mergers has been significant, as demonstrated by the following numbers from the 2012 mergers: "the affected campuses teach more than 36,500 students – including more than 4,700 from metro Atlanta – and represent nearly 12% of the system's total enrollment."[231] The 2012 mergers decreased the number of state universities from 35 to 31 (eight institutions merged into four institutions).[232] With the two more mergers recently approved, the number of projected institutions will be under 30.[233]

In planning this systemic realignment, USG identified a six guiding principles which offer guidance here.[234] These include the avoidance of the duplication of academic programs, the potential for economies of scale, and the objective of streamlining administrative services and maintaining quality.[235] USG anticipates significant cost savings as a result of the consolidations, as well as administrative efficiency, economies of scale, increasing more comprehensive course

---

[229] *Report: Plans to Merge Georgia State U. With a Community College*, *supra* note 218.

[230] *See* GEORGIA BOARD OF REGENTS, RECOMMENDED CONSOLIDATIONS, *supra* note 215, at 12, 15; *Report: Plans to Merge Georgia State U. With a Community College*, *supra* note 218; *Board Approves Merger of Georgia State, Georgia Perimeter Colleges*, *supra* note 218.

[231] *See* Diamond, *supra* note 216.

[232] *Id.*

[233] *See Board Approves Merger of Georgia State, Georgia Perimeter Colleges*, *supra* note 215; *Report: Plans to Merge Georgia State U. With a Community College*, *supra* note 218.

[234] *See Serving our Students, Serving the State*, *supra* note 215. *See also* GEORGIA BOARD OF REGENTS, RECOMMENDED CONSOLIDATIONS, *supra* note 215, at 3; GEORGIA BOARD OF REGENTS, USG CONSOLIDATIONS: PHASE II, *supra* note 215, at 3; GEORGIA BOARD OF REGENTS, USG CONSOLIDATIONS: PHASE III, *supra* note 215, at 3.

[235] *See id.*

programming, and consolidating resources to enhance responsiveness to regional needs.[236] The two most recently approved mergers particularly emphasized that eliminating program duplication was a motivating factor for the merger.[237] Additional anticipated benefits include increased collaboration between institutions, enhanced responsiveness to regional economic and development needs, and a coordinated and strategic approach to higher education.[238]

In fact, in 2011 the Maryland Board of Regents prepared a report analyzing a potential merger between the UMCP and UMB. [239] That potential merger did not anticipate the absorption of one institution into another; instead it was proposed that a merged institution would improve the competitiveness of both.[240] In reviewing that proposal, the State identified a number of considerations and criteria to assess the impact on the University System of Maryland ("USM").[241] Those included the mission and quality of learning; the quality, reputation, and rankings of institutions; cultural and locational issues; and cost and administrative issues.[242]

Ultimately, the Board rejected the proposed merger after analyzing the projected risks and benefits.[243] Even so, the consideration of this merger remains useful as an example of the

---

[236] *See Serving our Students, Serving the State*, *supra* note 215. *See also* GEORGIA BOARD OF REGENTS, RECOMMENDED CONSOLIDATIONS, *supra* note 215, at 3,6, 8-9, 11-12, 14-15; GEORGIA BOARD OF REGENTS, USG CONSOLIDATIONS: PHASE II, *supra* note 215, at 5; GEORGIA BOARD OF REGENTS, USG CONSOLIDATIONS: PHASE III, *supra* note 215, at 5.

[237] *See* GEORGIA BOARD OF REGENTS, USG CONSOLIDATIONS: PHASE II, *supra* note 215, at 5; GEORGIA BOARD OF REGENTS, USG CONSOLIDATIONS: PHASE III, *supra* note 215, at 5.

[238] *Regents Approve Principles for Consolidation of Institutions, supra* note 215.

[239] UNIVERSITY SYSTEM OF MARYLAND BOARD OF REGENTS, RESPONSE TO THE 2011 JOINT CHAIRMEN'S LANGUAGE: BOARD OF REGENTS REPORT ON THE STUDY EXAMINING THE ADVANTAGES AND DISADVANTAGES OF MERGING UNIVERSITY OF MARYLAND, COLLEGE PARK AND UNIVERSITY OF MARYLAND, BALTIMORE, (Dec. 9, 2011), http://www.usmd.edu/BORPortal/MergerStudy/UMB-UMCPMergerReport.pdf.

[240] *Id.* at 6.

[241] *Id.* at 2, A4-A7.

[242] *Id.*

[243] *Id.* at 3, 29-31.

extent to which the disruption caused by a merger may be analyzed and managed. It is important to note that the purpose of that proposed merger was not desegregation, and merger may be more appropriate in circumstances where prior efforts to eliminate duplication may have failed.

## VI. Eliminating unnecessary duplication is practicable and sound educational policy.

Courts must assess the practicability and soundness of educational practices when determining remedies as well as liability. *United States v. Louisiana*, 9 F.3d 1159 at1164 (5th Cir. 1993), *adopted by Ayers,* 111 F.3d at 1192-93. However, as addressed above, under *Fordice* the state bears the burden of determining whether the segregative effects of a traceable policy or practice can be remedied through practicable and educationally sound practices. *Knight*, 14 F.3d at 1551-52 (noting that the burden with respect to the second and third inquiries under the *Fordice* test lies with defendants). In order for Maryland to show that existing duplication may not practicably be eliminated, it must show that its legitimate educational objectives cannot be accomplished through "less segregative means."[244] Again, this is a "substantial burden." *Ayers,* 111 F.3d at 1213.

Courts will consider whether a remedy furthers higher education goals regarding college participation rates and quality of educational programs; aids in the creation of stronger institutions; provides incentives to "do right" with minimal court oversight; takes into account and works within normal political, educational, and administrative processes as far as possible; minimizes the collateral and unintended effects on a state's system of higher education as far as possible; acknowledges that achieving and maintaining accreditation is crucial to institutions;

[244] Memorandum Opinion at 23-24 (citing *Fordice*, 505 U.S. at 744 (O'Connor, J., concurring)).

maintains integration at the TWIs; and brings the state and its system of higher education into compliance with the Constitution, Title VI, and *Fordice*. *See Knight II*, 900 F. Supp. at 284-85.

Practicability contemplates not only the associated costs and benefits of a proposed remedy, but also the risks and returns. *Knight II*, 900 F. Supp. at 285. The courts have determined that a practicable remedy is that most likely to achieve the remedial purpose into the future. *Id.* The court should consider the "full range of all possible alternative remedies, including closure, when determining which would achieve the greatest possible reduction in the identified segregative effects." *Knight*, 14 F.3d at 1541 (citing *Fordice*, 112 S. Ct. at 2743).

Remedies which may disrupt the system or produce systemic inefficiencies are not *per se* impracticable or inconsistent with sound educational policy. For example, in Alabama, the Eleventh Circuit reversed the lower court holding that the allocation of land grant funds between Auburn University and AAMU did not constitute a vestige of discrimination. *See id.* at 1551-52. The State argued that a remedy requiring the partial reallocation of land grant funds would lead to a research and extension system "somewhat less efficient than the one currently operating under Auburn's monopoly". *Id.* Even so, the Eleventh Circuit observed in that:

> "The [district] court's finding that Alabama's current land grant system is 'the most economically efficient means of delivering the services needed in aid of the state's agricultural interest, does not necessarily resolve the question that is relevant under *Fordice*: whether, from among the full range of alternative remedies, including plaintiffs' proposed remedy and closure, there are any practicable and educationally sound alternative remedies that would reduce or dismantle the identified segregative effects. In other words, even if it were true that partial reallocation of the land grant funds would result in a research and extension system somewhat less efficient than the one currently operating under Auburn's monopoly, *it would not inescapably follow that such inefficiency would render the proposed modified system impracticable or educationally unsound.*"

*Id.* at 1551 (emphasis added) (internal citations omitted). Accordingly, the case was remanded to the district court to determine whether Auburn's disproportionate share of land grant funds had ongoing segregative effects on student choice, and whether the full range of alternative remedies could be addressed through practicable and sound educational practices. *See id.* at 1551-52. When conducting that analysis, the Fifth Circuit reiterated that "the burden of proof lies with defendants." *Id.* at 1552.

While university systems differ from K-12 education in important ways, the Supreme Court recognized that where a school district has been deliberately constructed and maintained to enforce racial segregation, a remedy may be "administratively awkward, inconvenient, and even bizarre in some situations and may impose burdens on some; but all awkwardness and inconvenience cannot be avoided in the interim period when remedial adjustments are being made to eliminate the dual school systems." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 28 (1971). There are limits to "how far a court can go" in ordering a remedy, but the objective is to dismantle the dual school system. *Id*. In the end, a remedial plan designed to establish a unitary system of education will be judged by its effectiveness in correcting past constitutional violations. *See id.* at 25.

## VII. In addition to remedying the effects of past duplication, Plaintiffs seek revision of the program approval process to prevent unnecessary duplication moving forward and a process to enforce compliance with the remedial plan.

Three sections of Maryland's Code are relevant for assessing the MHEC's process for regulating program duplication: Md. Code Ann., Educ. § 11-206 ("New, modified, discontinued duplicative programming"); Md. Code Ann., Educ. § 11-206.1("Proposals to establish or abolish programs"); Code of Maryland Regulations ("COMAR") 13B.02.03.09. As noted above, the

Court has already determined that the regulatory process outlined in those statutes and regulations have essentially exacerbated the duplication which contributes to the racial identifiability of Maryland's HBIs.[245]

The current statutory regime gives MHEC the authority to assess and eliminate existing *unreasonable* duplication – as opposed to unnecessary duplication – within Maryland's higher education system, but it does not specifically mandate that MHEC do so. Under Md. Code Ann., Educ. §11-206(e)(4), MHEC "*may* make a determination that an *unreasonable* duplication of programs exists on its own initiative or after receipt of a request for determination from any directly affected public institution of postsecondary education." (emphasis added). This power is permissive rather than mandatory, as reflected by the repeated use of the term "may" within the statute itself. When reviewing unnecessary duplication, the MHEC "may" take a number of steps including requiring any affected governing board to engage in negotiations or submit a plan to resolve the duplication. Md. Code Ann., Educ. 11-206(5)(i). Moreover, if MHEC is not satisfied by the plan it "may then seek to eliminate the duplication by revoking the authority of a public institution of postsecondary education to offer the unreasonably duplicative program." Md. Code Ann., Educ. §11-206(5)(iv).

Maryland's regulations also fail to protect against discriminatory unnecessary program duplication. First, it uses the term "unreasonable" rather than "unnecessary" when describing duplicative programming to be eliminated, which suggests a different standard than that outlined in *Fordice*. *See* COMAR 13B.02.03.09. Furthermore, it is unresponsive to existing unnecessary duplication and is focused exclusively on prospective duplication, ignoring a state's obligation to

245 Memorandum Opinion at 50.

address existing unnecessary program duplication that was produced as a result of traceable policies or practices. As the Court observed, Maryland's mechanisms are only "forward facing – they do not address the substantial duplication that existed since, essentially, the beginning of Maryland's system of public higher education."[246]

Perhaps more problematically, the current process functions independently of the State's affirmative obligation to avoid unnecessary duplication which perpetuates ongoing segregative effects. In determining whether a program is unreasonably duplicative, MHEC is to consider a number of factors:

> C. Determination of Duplication
>
> (1) In determining whether a program is unreasonably duplicative, the Secretary shall consider:
> (a) The degree to be awarded;
> (b) The area of specialization;
> (c) The purpose or objectives of the program to be offered;
> (d) The specific academic content of the program;
> (e) Evidence of equivalent competencies of the proposed program in comparison to existing programs; and
> (f) An analysis of the market demand for the program.
> (2) The analysis shall include an examination of factors, including:
> (a) Role and mission;
> (b) Accessibility;
> (c) Alternative means of educational delivery including distance education;
> (d) Analysis of enrollment characteristics;
> (e) Residency requirements;
> (f) Admission requirements; and
> (g) Educational justification for the dual operation of programs broadly similar to unique or high-demand programs at HBIs.
>
> COMAR 13B.02.03.09(C).

As the Court noted, in 2012 Maryland amended its regulations to specifically include an analysis of the "'[e]ducational justification for the dual operation of programs which are broadly

[246] *Id.*

similar to unique or high-demand programs at HBIs,' COMAR 13B.02.02.09(C)(2)(g)."[247] This revised regulatory framework permits the State to approve a proposed program which has an "educational justification" rather than requiring it to consider whether there is a less segregative alternative available to meet the State's legitimate educational needs which is practicable and consistent with sound educational policy. COMAR 13B.02.03.09(C)(2)(g).

This framework creates a tension with the State's affirmative obligation under *Fordice*, which requires that once a traceable policy has been determined to have ongoing segregative effects, the State must assess whether there are practicable and educationally sound alternatives which have less segregative effects. *Fordice*, 505 U.S. at 731. The Court specifically rejected Maryland's approach to program approval, observing that "[t]o the extent the State offered any sound educational justification for existing duplication, it consistently focused on 'good' reasons for approving a particular duplicative program rather than a thorough analysis of whether there were less segregative means of obtaining the same goal as required by *Fordice*."[248]

In addition, the regulation does not specify how to balance or weigh the factors that MHEC is permitted to assess. Because this framework permits the State to consider the role and mission when analyzing duplication, COMAR 13B.02.03.09(C)(2)(a), there is little protection against mission creep between institutions. As the Court noted, "MHEC itself has recognized that '[m]ission creep' is a problem across the state's institutions of higher learning, undermining the competitiveness and uniqueness of each institution, not because the state's mission-

[247] *Id.* at 52, n.12.

[248] *Id.* at 56.

assignment policies need to be reformed, but because the state is accepting 'program proposals exceed[ing] the boundaries of [institutional] missions.'"[249]

The 2001 consent decree in Tennessee offers one example of a revised program approval process specifically designed to protect the exclusivity of an HBI's programmatic offerings.[250] That decree obligated the Tennessee Board of Regents and the Tennessee Higher Education Commission to approve and terminate programs consistent with the state's programming plan. *Geier v. Sundquist*, 128 F. Supp. 2d 519 at 534 (M.D. Tenn. 2001). In addition, the decree specifically required that any new program proposed by an institution be assessed to determine its potential impact on the desegregation of Middle Tennessee institutions. *Id*. The consent decree provided that:

> 1. In the exercise of these procedures, the [Tennessee Board of Regents] and [Tennessee Higher Education Commission] shall require of any new program proposal that an assessment of the program's potential impact on the desegregation of Middle Tennessee institutions (universities and two-year schools) be made and that *no negative effect* be discernible. Program approvals must be consistent with an institution's mission and not infringe or diminish the educational mission of any other institution.

*Id.* (emphasis added). The decree also required the State to "disclose to the parties those requirements it intends to put in place to ensure that a desegregation impact analysis is performed." *Id.* at 534-35.

A desegregation impact analysis similar to that agreed to in Tennessee may offer greater protection against unnecessary duplication for the foreseeable future. At the very least, the

---

[249] *Id.* at 29 (citing MHEC "Review of Mission Statements" (Jan. 11, 2012), PTX 866, at 19).

[250] *See* Pls.' App. 5 (summarizing the procedural history and remedies in *Geier* litigation).

program approval process in Maryland requires a more thorough analysis of unnecessary program duplication which takes into account the State's obligation to consider the extent to which a request by a TWI to offer a new program may not only duplicate a specific program or degree, but might infringe upon the programmatic niche established for an HBI.

To a large extent, much of the mission creep in Maryland has been produced by the ability of TWIs to offer programming which is similar to – even if not identical to – programs already offered by a geographically proximate HBI. One example of this is that despite the fact that Morgan was specifically authorized to specialize in computer engineering, MHEC permitted UMBC to offer a degree in electrical engineering which allowed that institution to compete for students who do not necessarily differentiate between specific degrees within a field or curricular niche.

Plaintiffs also request that an Independent Monitor or Monitoring Committee be established to monitor the program approval process and ensure full compliance with, and implementation of, the remedial proposal. Either a Monitoring Committee or an Independent Monitor was part of the remedial proposals in Mississippi (*Ayers II*, 879 F. Supp. at 1494 (Monitoring Committee)), Alabama (*Knight II,* 900 F. Supp. at 368-69 (Long Term Planning and Oversight Committee)), Louisiana (Louisiana Agreement at 24-25 ¶ 24 (Monitoring Committee)), and Tennessee (*Geier*, 128 F. Supp. 2d at 546 (Monitor)). Furthermore, given Maryland's longstanding tolerance for unnecessary duplication, it is essential for Plaintiffs to have the ability to challenge or appeal the approval of programs in court where it is believed that the program will unnecessarily duplicate a program or compromise its established and recognized curricular niche.

**PLAINTIFFS' REMEDIAL RECOMMENDATIONS TO DISMANTLE MARYLAND'S DUAL SYSTEM OF HIGHER EDUCATION**

Consistent with this Court's order and *Fordice*, Plaintiffs propose a variety of strategies to desegregate Maryland's HBIs. The recommendations of Dr. Allen and Dr. Conrad are summarized below, and are described in Appendix 1 to this document. As previewed above, given the finding that the State's program approval process failed to prevent (and indeed exacerbated) the segregation at Maryland's HBIs caused by unnecessary duplication, Plaintiffs seek first to reform the procedures by which institutions seek approval for the development and implementation of new programs, and to establish adequate mechanisms to ensure compliance with the remedial plan and prevent further unnecessary duplication.

Plaintiffs specifically recommend the following strategies to establish unique programmatic niches for Maryland's HBIs:

- Select enhancement of existing programs within each HBI's core areas of competency;
- Addition of new unique, high-demand programs at the HBIs consistent with identified programmatic niches;
- Targeted transfer and/or merger of programs as needed to refine those areas of expertise;
- Institutional merger of the University of Baltimore into Morgan State;
- Joint or collaborative programs between the HBIs and TWIs where appropriate; and
- A reconfigured role for University of Maryland University College and the delivery of on-line degrees within Maryland's public system of higher education.

To the extent Plaintiffs seek to create distinctive institutional identities by establishing programmatic niches and programmatic realignment, Plaintiffs offer a practicable and

educationally sound approach to desegregating Maryland's HBIs. Establishing distinctive niches of non-core, high-demand programs is essential to developing an institutional identity at the HBIs that will attract students of all races. Within each proposed niche, expansion of program offerings must occur at all four of the HBIs at the bachelors and masters degree levels.

The programmatic niches recommended for each institution by Dr. Allen and Dr. Conrad were informed by information submitted by the presidents of each of the HBIs. In addition, they anticipate the local and regional labor market demand and consider student demand. The specific programmatic niches for each HBI are described in more detail in Appendix 1, but are summarized below:

**Morgan State University:**
- Institutional merger of UB into Morgan
- Engineering and the Sciences
- Business and Entrepreneurship
- Urban Environment, Community Health, and Sustainability Studies

**Coppin State University:**
- Applied Aging Studies
- Criminal/Public Justice Administration/Public Safety and Forensic Studies

**University of Maryland Eastern Shore:**
- Engineering and Aviation Sciences
- Agriculture and Environmental Sciences
- Pharmacy, Nursing, and Physical Therapy

**Bowie State University:**
- Computer and Information Sciences/Networking Administration
- Nursing and Social Work

**CONCLUSION**

For the foregoing reasons, Plaintiffs request that the Court order into effect the remedial plan set forth in Appendix 1.

Dated: May 5, 2015

Respectfully submitted,

/s/

Michael D. Jones, Esq. (Bar No. 08634)
Karen N. Walker (Bar No.14181)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200
Email: michael.jones@kirkland.com

Jon Greenbaum (*pro hac vice*)
Brenda Shum (*pro hac vice*)
Genevieve Bonadies (*pro hac vice*)
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1401 New York Avenue, N.W., Suite 400
Washington, DC 20005
Telephone: (202) 662-8600
Facsimile: (877) 303-5039
Email: jgreenbaum@lawyerscommittee.org

John C. Brittain (*pro hac vice*)
ATTORNEY AT LAW
2513 Gadsby Place
Alexandria, VA 22311
Telephone: (832) 687-3007
Email: jbrittatty@comcast.net