# A-1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

THE COALITION FOR EQUITY AND EXCELLENCE IN MARYLAND HIGHER EDUCATION, INC., et al.,

Plaintiffs,

v.

MARYLAND HIGHER EDUCATION COMMISSION, et al.,

Defendants.

Civil No. 06-2773-CCB

**REMEDIAL PROPOSAL PREPARED BY**

**DR. CLIFTON F. CONRAD AND DR. WALTER ALLEN**

# Table of Contents

Appendix 1 .....1

THREE STRATEGIES FOR ELIMINATING THE VESTIGES OF MARYLAND'S DUAL SYSTEM .....1

Expert Report by Dr. Walter Allen and Dr. Clifton Conrad .....1

A. Develop a Program Approval Process that Ensures Progress Toward a Unitary System .....3

B. Cultivate the Institutional Identities of Maryland's HBIs by Creating Distinctive Programmatic Niches Along with Expanding Program Offerings in These Niches .....4

1. Create Distinctive Programmatic Niches by Establishing New High-Demand Programs .....4

2. Create Distinctive Programmatic Niches by Eliminating Programs at TWIs and Transferring Programs from TWIs to HBIs .....4

3. Elevate Morgan State University's Identity as the "Premier Public Urban Research University" in Maryland by Merging the University of Baltimore with Morgan State .....5

C. Enhance Program Offerings at the HBIs .....5

1. Strengthen Current Program Offerings at the HBIs .....5

2. Establish Joint Programs .....5

PROGRAMMATIC REALIGNMENT AT TWO HBIs IN THE BALTIMORE REGION: MORGAN STATE UNIVERSITY AND COPPIN STATE UNIVERSITY .....5

D. Morgan State University: Two Recommendations .....5

a. Business and Entrepreneurship .....8

b. Urban, Environment, Community Health, and Sustainability Studies .....9

c. Engineering and the Sciences .....11

E. Coppin State University .....12

1. Programmatic Niches .....12

a. Applied Aging Studies ....12

b. Criminal/Public Justice Administration/Public Safety and Forensic Studies ....13

PROGRAMMATIC NICHES FOR THE HBI ON THE EASTERN SHORE: UNIVERSITY OF MARYLAND EASTERN SHORE ....14

F. University of Maryland Eastern Shore ....14

1. Programmatic niches ....15

a. Engineering and Aviation Sciences ....15

b. Agriculture and Environmental Sciences ....15

c. Pharmacy, Nursing, and Physical Therapy ....16

PROGRAMMATIC NICHES FOR THE HBI IN THE REGION WHICH INCLUDES PRINCE GEORGE'S COUNTY, MONTGOMERY COUNTY, AND CHARLES COUNTY: BOWIE STATE UNIVERSITY ....18

G. Bowie State University ....18

1. Programmatic Niches ....18

a. Computer and Information Sciences/Networking Administration ....18

b. Nursing and Social Work ....19

H. ENSURE COORDINATION AND COLLABORATION BETWEEN UMUC AND THE HBIs TO ELIMINATE PROGRAM DUPLICATION AND DIRECT COMPETITION IN ONLINE, DISTANCE LEARNING, AND BLENDED COURSES AND PROGRAM OFFERINGS ....19

I. Background and Context ....19

J. Bowie State University and University of Maryland University Campus ....21

K. Morgan State University and UMUC ....23

L. UMUC Remedy Recommendation ....24

CONCLUDING NOTE ....27

## THREE STRATEGIES FOR ELIMINATING THE VESTIGES OF MARYLAND'S DUAL SYSTEM

Three overarching strategies are proposed to eliminate the remaining vestiges of segregation in Maryland's system of higher education. The first strategy, which will require the State to restructure the process by which institutions propose and secure approval for new programs, is to develop a program approval process that ensures ongoing progress—from the present to the foreseeable future—toward Maryland becoming a unitary system of higher education by avoiding the introduction of new programs in the TWIs that unnecessarily duplicate programs at geographically proximate HBIs.

The second strategy is to cultivate the institutional identities of Maryland's HBIs by creating distinctive programmatic niches at each institution through establishing new high-demand programs, eliminating programs at the TWIs, and selectively transferring high-demand programs from TWIs to the HBIs within these niches. In so doing, Maryland must address existing inequality with respect to the number and degree level of program offerings between the TWIs and the HBIs. To these ends, programmatic niches are proposed, and for each niche new degree programs—especially high-demand, unique programs—that would bring distinctiveness to the program offerings at the HBIs that are proposed. It is also recommended that specific programs be phased out at the TWIs and transferred to the HBIs. Moreover, it is proposed that the University of Baltimore be merged with Morgan State University to ensure that Morgan's program offerings—at the bachelors, masters, and doctoral level—are consistent with its designation as the "premier public urban research university" in Maryland.

Within the programmatic niches proposed, expansion of program offerings must occur at all four of Maryland's HBIs at both the bachelors and masters levels. Moreover, both Morgan State and UMES should have their respective institutional identities enhanced at the doctoral level by the introduction of new doctoral programs. Finally, it is recommended that any new doctoral programs introduced at Coppin and Bowie should be jointly established with one or more of the three doctoral-granting TWIs in the State of Maryland.[1] It is further recommended that any new doctoral programs introduced at Frostburg State University and St. Mary's should be jointly established with one or more of Maryland's two doctoral-granting HBIs.

Establishing distinctive programmatic niches at Maryland's HBIs—especially programmatic niches which are comprised of unique (not duplicated at geographically proximate TWIs), non-core, high-demand programs—is fundamental to developing institutional identities that go beyond race and, in turn, attract not only white students but students regardless of race. It is these distinctive programmatic niches—as much as the specific programs housed within them—that often attracts students to HBIs. Put another way, students are often attracted to HBIs

[1] An exception should be the proposed Doctor of Nurse Practice (DNP), which has already obtained preliminary approval.

because of the identity of a cluster of unique programs (programmatic niche) which are variously allied and often offer overlapping courses and learning experiences across a broad field of study. (Undergraduate students frequently decide to pursue different majors than they had originally intended when they entered college—such as changing a major from Computer Science to Electrical Engineering.)

In accenting the importance of programmatic niches, it is important to emphasize that even though fewer students enroll in graduate study (at the masters, professional, and doctoral levels) than at the undergraduate level, students across degree levels are more likely to choose to enroll at an institution with a programmatic niche in which they are interested in studying *if* the institutions has distinctive programmatic niches at the masters and doctoral levels (as well as the bachelors level) that are not offered at geographically proximate institutions. Why? Programmatic niches at the graduate and professional levels tend to strengthen not only the institutional identities, but also the reputations of colleges and universities, which in turn enhances the likelihood of white students choosing to attend HBIs at both the undergraduate and graduate levels.

In summary, establishing new programs at the HBIs (especially unique, high-demand programs), eliminating programs at the TWIs that unnecessarily duplicate programs at the HBIs, and transferring high-demand programs from the TWIs to the HBIs—all within distinctive programmatic niches—will go a long way toward advancing a unitary and equal system of higher education in Maryland. In such a system, the HBIs would be able to develop distinctive institutional identities anchored in a meaningful number of unique, high-demand programs and achieve equality with respect to the program offerings at their peer institutions.

The third overarching strategy for desegregating Maryland's dual system is aimed at enhancing the quality of program offerings at the HBIs. To that end, several initiatives are proposed to strengthen program offerings at the HBIs, including the development of joint degree programs with TWIs.

Before elaborating on these three strategies, the consideration of potential programs to be established at or transferred to Maryland's HBIs should be guided by five criteria designed to maximize their effectiveness in desegregating these institutions:

1. Each program under consideration should contribute to strengthening a programmatic niche which enhances the distinctiveness of the institutional identity of the HBI.

2. Decision makers should consider local and regional labor market demand as well as current and long-term opportunities in establishing new programs and transferring programs, while sustaining the viability of programs at the HBIs.

3. There should be current and projected student demand for the program, which must include other-race students.

4. As appropriate, potential programs should complement programs at the same degree level and establish a sustainable pathway across degree levels.

5. Programs should not unnecessarily duplicate those at geographically proximate TWIs.

## A. Develop a Program Approval Process that Ensures Progress toward a Unitary System

Program duplication—especially the absence of high-demand, non-core programs at Maryland's HBIs—continues to be a serious problem in USM and has frustrated efforts to achieve a unitary public system of higher education. Time and time again, substantial progress in attracting white student enrollment—through the presence of unique, high demand programs offered at HBIs—has been reversed by the establishment of broadly similar programs at nearby TWIs. Given the choice between duplicated programs at TWIs and HBIs, white students have consistently chosen to pursue their degrees at TWIs.

Extensive written rules, guidelines and agreements exist which restrict TWIs from the establishment of academic programs that unnecessarily duplicate the offerings of proximate HBIs. Had these rules been strictly observed, applied and enforced by MHEC and the State, USM would today be much closer to desegregation and a unitary system. However, due to lax oversight and failure to restrict program duplication, Maryland has been unable to eliminate vestiges of the prior racially dual system of higher education. Progress has been slow, uneven, and often reversed. For example, Computer Science at Bowie and Business Administration at Morgan initially attracted significant white student enrollments but lost these students when duplicate programs opened at nearby TWIs.

Maryland knows the detrimental consequences of unnecessary program duplication at proximate TWIs with respect to attracting white student enrollment at HBIs. The State is also aware of the many written guidelines and agreements that restrict the creation and approval of such duplicative programs. What the State has lacked is the will and/or the ability to firmly and consistently prevent duplication of HBI academic programs by geographically proximate TWIs.

We therefore recommend creation of a program approval process that will ensure progress towards a racially unitary system of higher education in Maryland. In order to protect against and effectively eliminate program duplication this process must include strong oversight and certification mechanisms. Oversight should be provided by a court-appointed "Special Master" or by an "Experts Committee." This oversight body should be charged with monitoring

and approving USM actions to create all new, transfer or modified academic programs at TWIs deemed to duplicate academic courses, programs, and programmatic niches or "Centers of Excellence" at HBIs. The oversight body should receive quarterly reports from MHEC and certify compliance with the court order governing program duplication. The initial term for the oversight body would be 15 years with Court option to renew and extend.

## B. Cultivate the Institutional Identities of Maryland's HBIs by Creating Distinctive Programmatic Niches Along with Expanding Program Offerings in These Niches

### 1. Create Distinctive Programmatic Niches by Establishing New High-Demand Programs

At a minimum, Maryland should establish at each HBI at least two programmatic niches of high-demand programs within five years. Within these niches a minimum of six new high-demand programs (including at least two programs at the graduate level) should be offered—including high-demand programs not offered at geographically proximate TWIs. It is imperative that at least two promising niches be initiated at each of the HBIs in order for them to establish an institutional identity distinct from the TWIs in overlapping service areas. Offering fewer than six new high-demand programs within each of these niches is highly unlikely to ensure that the HBIs have meaningful institutional identities—identities that will draw a diverse student body.

Introducing high-demand programs at the graduate level is important, particularly in professional fields. In the last several decades, masters degrees have become an important part of the landscape of higher education—roughly one masters degree is awarded for every three bachelors degrees. Moreover, masters programs in many professional fields are relatively low-cost compared to bachelors programs.

### 2. Create Distinctive Programmatic Niches by Eliminating Programs at TWIs and Transferring Programs from TWIs to HBIs

Remedying the vestiges of discrimination in Maryland's dual system of higher education will require some transfer of programs and elimination of unnecessarily duplicated programs if there is to be a successful transition to a unitary and equal system. Specific programs to be eliminated in the TWIs or transferred from the TWIs to HBIs are proposed in this remedial plan. This plan includes the coordination and collaboration between UMUC and the HBIs to eliminate program duplication by UMUC and with respect to online, distance learning, and blended course and program offerings.

### 3. Elevate Morgan State University's Identity as the "Premier Public Urban Research University" in Maryland by Merging the University of Baltimore with Morgan State

## C. Enhance Program Offerings at the HBIs

### 1. Strengthen Current Program Offerings at the HBIs

The quality of existing programs at the HBIs should be assessed and initiatives undertaken to strengthen program quality in light of their revised missions and program offerings.

### 2. Establish Joint Programs

Joint programs between TWIs and HBIs—especially unique, high-demand programs—can enhance the program offerings at Maryland's HBIs and increase their other-race enrollment. Where a TWI currently offers a very high-demand program not currently available at a nearby HBI, some consideration should be given to replacing current programs at the TWIs with "joint programs" in which the TWIs and the HBIs collaborate to build on the strengths of the faculty, staff, and facilities of the respective institutions. In most instances, this will require new resources (faculty, staff, student support, and facilities) at the HBIs to ensure that the programs are "joint programs." While establishing joint programs can make a contribution to desegregation, it is important to emphasize that joint degree programs, by themselves, will clearly not be sufficient to achieve the goal of a desegregated, unitary system of public higher education in Maryland.

# PROGRAMMATIC REALIGNMENT AT THE TWO HBIS IN THE BALTIMORE REGION: MORGAN STATE UNIVERSITY AND COPPIN STATE UNIVERSITY

## D. Morgan State University: Two Recommendations

The first recommendation is the institutional merger of the University of Baltimore with Morgan. Plaintiffs stress that this recommendation deserves serious consideration by the Court as the most immediate and effective means of correcting the longstanding institutional and program duplication in the Baltimore region. Plaintiffs also propose enhancement of the institutional identity of Morgan by creating distinctive programmatic niches—in concert with expanding program offerings within these niches—that give expression to its designation as Maryland's "premier public urban research university."

**Recommendation #1: Merge the University of Baltimore with Morgan State University**

As observed by the Court, Maryland failed to execute its commitment to "avoid [] unnecessary program duplication" and to create "unique, high-demand programs at HBIs."[2] In so doing, the State ignored the "independent segregative effects that unnecessary program duplication has had in Maryland."[3] In order for racial desegregation to occur at the HBIs, they "must offer programs not offered at TWIs."[4]

Nowhere in Maryland is unnecessary program duplication greater than in the Baltimore region.[5] In Baltimore alone, seven public institutions of higher education have overlapping service areas and directly compete for students. These institutions include the University of Baltimore, University of Maryland Baltimore County, Towson University, University of Maryland Baltimore, University of Maryland University College and two HBIs: Morgan State University and Coppin State University[6]. Major investments by the state over the past decade—such as expanding UB to include freshmen and sophomores and allowing the duplication of Morgan's MBA program—only enhanced extensive duplication in the Baltimore area and the racial identifiability of Morgan and Coppin.

If the *de jure* system is to be dismantled, public higher education in this region must be transformed in ways that will reduce the extensive unnecessary program duplication and offer the HBIs programmatic niches and accompanying identities that differentiate them from the HWIs. Only then will they develop institutional identities that go beyond race. It is within this context that Plaintiffs propose the merger of UB with Morgan as the most effective means of dismantling the vestiges of segregation in the Baltimore region.

Combining Morgan with UB will establish Morgan as a comprehensive urban university with a distinctive identity. Although it is identified as the "premier public urban research university" in Maryland, Morgan currently has little mission distinctiveness—much less as an "urban university"—as reflected in its program offerings. Morgan currently offers few high-demand undergraduate and graduate programs that are often offered at many urban universities, and few non-core programs that are not duplicated at one or more of the TWIs in the Baltimore area. Merging UB with Morgan, along with adding select program transfers, would

---

[2] 2013 Opinion at 49.

[3] *Id*. at 52

[4] *Id*. at 52-53 (citing Conrad Expert Report II, PTX 70, at 5).

[5] *See id*. at 45.

[6] *See* Pls.' App. 29

establish Morgan as the most distinctive public university in Baltimore, serving students of all races from the baccalaureate to the doctoral level.

By way of illustration, one major area of duplication between the two campuses is business. Both campuses have an extensive array of traditional programs in the field, with UB currently having numerous business specialties. As a single institution, the merged campus would not only be able to offer a full range of traditional business programs, but would also be inclusive enough to support numerous specializations.

In addition to elimination of unnecessary program duplication and the cultivation of a distinctive urban identity at the merged institution, there are a number of other advantages in merging the two campuses:

- The merged institution would be diverse in terms of the racial/ethnic and age composition of the student body and mix of full-time and part-time students. Combining these institutions would allow the merged institution to offer a much wider range of educational experiences for traditional and non-traditional students who would likely be the most racially and ethnically diverse in the state.
- Combining duplicated programs would strengthen the respective programs.
- According to residence data published by the coordinating board, Morgan and UB are the most popular choices of Baltimore residents attending a public four-year campus in Maryland. With the exception of Towson, a relatively small number of Baltimore residents enroll at suburban campuses. Because the appeal of a convenient, accessible urban campus is often strong for many white residents, the merged institution (Morgan) would serve a large, diverse, local student market that would ensure stability and provide for future growth.
- The locations of the two campuses complement one another. Morgan's campus is highly residential, away from downtown and not easily accessible by mass transit. UB is located near the business district and has excellent access to mass transit. Morgan's programs that are attractive but not convenient for working adults could be offered at the downtown site of the merged institution.
- Considerable savings would be realized by merging the campuses. Each campus would no longer need to maintain parallel central administrative infrastructures. Facilities could be coordinated to utilize buildings more efficiently and limit expenditures for duplicative facilities. The savings reallocated to operations and development could be substantial. Merger would contribute to economies of scale not currently possible at two separate institutions.
- Placing both campuses under the Morgan governing board would allow it to prioritize and focus on developing the merged institution. Morgan has benefitted from—and

would continue to benefit from—having its own governing board independent from competing interests.

- A merged campus would be well positioned to attain designation as a Carnegie High Research Activity University. This offers Baltimore an advantage it does not currently have in attracting external funding and professionals to the area.

While even with such a merger there would continue to be several other public campuses in the Baltimore region, the proposed merger of UB with Morgan would establish an institution significantly differentiated from the other public four-year campuses in the region.

Recommendation #2: Create Distinctive Programmatic Niches

Although designated the "premier public urban research university" in Maryland, Morgan State University has little mission distinctiveness as reflected in the relatively modest program offerings across degree levels. To enrich Morgan's urban mission by making it a much more distinctive institution from the baccalaureate to the doctoral level, its revised mission would include clearly defined programmatic niches and would incorporate new high-demand programs in professional fields related to its urban mission to serve the needs of individuals of all races and contribute to the public good in the Baltimore metropolitan area.

Plaintiffs propose the establishment of three distinct programmatic niches in which to establish high-demand programs (especially high-demand programs that are unique) at the HBIs. For Morgan, programmatic niches in business and entrepreneurship; urban environment, community health, and sustainability studies; and engineering and the sciences—along with a joint program with the University of Baltimore Law School if UB is not merged into Morgan—would benefit from synergies with existing programs at Morgan and strengthen the institutional identity of Morgan.

**a. Business and Entrepreneurship**

Maryland should establish a programmatic niche in Business and Entrepreneurship at Morgan, which has long been a strength of this university. The Partnership Agreement specifically provided that Maryland will avoid unnecessary program duplication by the TWIs unless there is sound educational justification for the duplication of broadly similar programs. Even though Morgan had an MBA program, Maryland did not provide a sound educational justification for introducing the program when it approved the UB/Towson Joint MBA program in 2006. Maryland missed a golden opportunity to expand Morgan's MBA into a world-class, diverse program that would have had a wide-ranging positive impact on the university, as well as burnishing the State's reputation and economy. We therefore recommend the following:

<u>Recommended New Programs in Business and Entrepreneurship</u>

Marketing (PhD)
Finance (PhD)
Supply Chain Management (PhD)
Actuarial Science (MS)

Programs Recommended for Transfer from the University of Baltimore/Towson University

Masters of Business Administration and Online MBA (Merge with Morgan's MBA)

Recommended Joint Program with the University of Baltimore Law School
Business and Law (MBA at Morgan and JD at UB)

**b. Urban Environment, Community Health, and Sustainability Studies**

Urban environment, community health, and sustainability studies cuts across a wide range of fields of study. Programs in this area explore sustainable development, environmental policies, ethics, ecology, landscape architecture, city and regional planning, economics, natural resources, sociology, and anthropology, as well as ways these traditional disciplines interplay with one another in today's increasingly interconnected world. Advanced study could include specializations in sustainable urban policy applications, material development and application, and the implications of current technological, economic, and cultural trends. Significantly, introducing new programs in this niche would build on current program offerings at Morgan in city and regional planning, architecture, landscape architecture, and engineering. Aligning and developing curricula within currently offered programs, in concert with the addition of new programs at both the undergraduate and the graduate level, would go a long way in providing a programmatic niche at Morgan.

The twenty-first century world we live in is increasingly shaped by finite resources and, in response, many traditional disciplines of study in our colleges and universities are beginning to draw upon the expertise of those versed in sustainable practice. The effects of this are already apparent in Maryland and beyond. Maryland's Department of Labor, for example, anticipates significant growth in the "green sector," and is investing both state and federal resources in job development in a number of sustainable initiatives.[7]

Recommended New Programs in Urban Environment, Community Health, and Sustainability Studies
Bio-Environmental Science (MS)
Public Health (BS) with interdisciplinary concentrations in Health Sciences, Public Health Education, Health Services Administration, and Health Communications
Nutritional Forensics (BS)
Environmental Health (MS)
Health Policy and Management (MS, PhD)

[7] See http://www.dllr.state.md.us/greenjobs/.

Social and Behavioral Science (MS, PhD)
Epidemiology (MS, PhD)
Biostatistics (MS)
Nutritional Science (MS)
Public Administration and Policy (MPA, PhD)

Programs Recommended for Transfer from UMUC

Community College Leadership (PhD)

The UMUC Doctorate duplicates the Morgan doctorate in Community College Leadership. Transferring the doctorate in Community College Leadership at UMUC to Morgan would combine with doctorates in the related fields of higher education and urban educational leadership to form a distinctive programmatic niche at Morgan consisting of unique, high-demand programs.

The program at Morgan in community college leadership is one of four interrelated programs in school and college educational administration and one of a total of 15 doctoral offerings at the university. The programs were unique among colleges in the Baltimore metropolitan area when approved; however, a program similar in course content and designed to prepare students for the same career fields as the Morgan program was subsequently established at the University of Maryland University College (UMUC).

The Maryland Higher Education Commission initially denied UMUC approval to offer a program in community college leadership on the grounds that it would be unnecessarily duplicative of the Morgan program. On appeal, the commission reversed itself by artificially restricting enrollment in the on-line, internet-based program to out-of-state students. This has to be one of the first times since 1954 that any state government permitted one of its public (or private) institutions of higher education to arbitrarily deny taxpayers of that state access to its programs and services.

This illustrates the larger problem of duplication that the UMUC as a public on-line operation presents for all state institutions of higher education. In addition to siphoning off students from the traditional campuses, UMUC deprives those institutions of important tuition funds. HBIs like Morgan are disproportionately impacted because of their limited program inventories, underfunding and under-development.

Recommended Joint Program with the University of Baltimore Law School
Law and Urban Environment and Sustainability Studies
(JD at UB and MS in Urban Environment and Sustainability Studies at Morgan)

### c. Engineering and the Sciences

Morgan currently offers bachelors degrees in Civil Engineering, Electrical and Computer Engineering, and Industrial Engineering. It also offers a generic masters degree in Engineering (MEng), a doctorate in Engineering (DEng.), and a masters degree in Electrical Engineering. Yet, relatively few white students are now enrolling in these programs. UMBC's programs in Computer Engineering (BS, MS, and PhD) were all approved over Morgan's objections that they unnecessarily duplicated Morgan's programs in Electrical and Computer Engineering. In this context, it is important to emphasize that the alignment of engineering programs in public higher education in Maryland in the mid-1980s assigned civil engineering and electrical engineering exclusively to Morgan State University. With respect to these engineering programs, transferring them to Morgan would be consistent with that alignment of degree programs. Transferring such programs as UMBC's Computer Engineering programs (BS, MS, PhD) as well as UMBC's Electrical Engineering (BS, MS, PhD) and Civil Engineering (BS, MS, PhD) programs to Morgan would help to resolve this unnecessary program duplication (in a cost-effective manner) and add to the distinctiveness of Morgan's engineering offerings.

<u>Recommended New Programs in Engineering and the Sciences</u>
Data Sciences (MS)
Biomedical Science (MS)

<u>Programs Recommended for Transfer from UMBC to Morgan</u>
Computer Engineering (BS, MS, PhD)
Electrical Engineering (BS, MS, PhD)
Civil Engineering (BS MS, PhD)
Information Systems (BS, MS, PhD)

A State commission recommended in 1947 that an engineering program be established in Baltimore at the Morgan campus. Actual approval of an engineering program came in the early 1980s as Maryland fended off efforts by the U.S. Department of Justice to cut-off all federal funding to the State because of its lack of progress toward dismantling its dual system of higher education. The authority provided for the establishment of a programmatic cluster of programs, to include electrical, civil and industrial engineering. Each of the programs was unique among public institutions in the Baltimore metropolitan area and complemented Morgan's doctoral-granting, urban university, mission and its related emphasis on urban, built environment, studies. The engineering programs were foundational, providing considerable opportunity for expansion through interdisciplinary offerings. Morgan has also characterized engineering as a "signature program" by which the campus is identified, nationally recognized and differentiated.

Consistent with federal law and the 1985 desegregation agreement between the State and the U.S. Department of Education (Office of Civil rights), initial requests from the

University of Maryland Baltimore County (UMBC) to the Maryland Higher Education Commission for similar programs were repeatedly denied as illegal duplication between an HBI and a geographically proximate TWI. The commission granted as a compromise, the authority for UMBC to offer a degree in general engineering and for the University of Maryland College Park to offer on the UMBC campus programs in chemical and mechanical engineering. Division of the programs between the two campuses automatically denied Morgan the advantage of establishing unique, high demand programs across the various fields of engineering.

As state policy shifted during the late nineties and early 2000, MHEC reversed its earlier decision and allowed UMBC to duplicate Morgan's programs by offering civil, electrical, and computer engineering. The UMBC duplication has adversely impacted the operational efficiency and effectiveness of engineering education at Morgan, its competitiveness for students regardless of race; its attractiveness for funding from government agencies, private foundations and other philanthropists and its overall capacity to responding to the needs of students, business, government and general community. As a result, UMBC is now able to offer a much larger contingent of programs than Morgan, the institution originally designated to offer engineering education in Baltimore.

The court noted specifically, the State's development of UMBC and other TWIs rather than building on the success of the HBIs in Baltimore, and the harmful effects and illegality of historic and present-day unnecessary duplication. No area of the duplication is more representative of that harm than engineering. Therefore, reestablishing the uniqueness of those offerings through a transfer of programs is the only viable strategy for repairing the damage within the expressed goals and commitments of the state plan for higher education and without adversely affecting student access to the programs under consideration.

<u>Recommended Joint Program with the University of Baltimore Law School</u>
Law and Engineering
(JD at UB and MS in Urban Environment and Sustainability Studies at Morgan)

## E. Coppin State University

Establishing programmatic niches, especially at the baccalaureate and masters levels in applied aging studies and criminal/public justice administration/public safety and forensic studies, would not only strengthen Coppin's institutional identity, but would build upon Coppin's existing programs to position it to better meet the needs of the urban community of Baltimore.

### 1. Programmatic Niches

#### a. Applied Aging Studies

Gerontology focuses on the human aging process and our aged human populations. Study in this and related fields will increasingly need to harness the knowledge and methods of the social sciences, psychology and the biological and health sciences to better support and improve the quality of life and experience of the aged. As our society becomes increasingly aged, many traditional disciplines are beginning to draw on the findings of scholars of gerontology while seeking to apply those lessons in interdisciplinary ways. Deliberately organizing a number of related disciplines under one interdisciplinary set of programs will promote greater understanding of the challenges facing our aging populations while simultaneously laying a solid foundation to solve those challenges through innovation and application of advanced scholarship.

Recommended New Programs in Applied Aging Studies
Nursing Education (MS) Clinical Research (BS)
Gerontology (BS)
Social Work (MSW)
Biology and Life Sciences (BS)
Exercise Science (BS)
Health (BS, MS)
Health Education (BS)
Healthcare Administration (BS)
Health Information Management (MS)
Telehealth (BS)

Recommended Joint Programs with UMBC
Doctor of Nursing Practice (DNP)
Nursing Practice (FN.)
Gerontology (MS)

**b. Criminal/Public Justice Administration/Public Safety and Forensic Studies**

Degree programs in criminal justice, public justice administration/public safety and forensic studies prepare professionals for a range of careers related to keeping society just and safe through extensive training in the enforcement of law. Such programs include correctional sciences, organizational and administrative strategies, leadership skills, and the latest forensic techniques. The most inclusive programs offer participants a solid background in the law and ethics. Criminal justice programs at the bachelors and masters levels are in high demand in Maryland and will continue to grow for the foreseeable future. Developing and expanding interdisciplinary and specialized offerings around existing criminal justice programs will attract students while fostering “communities of practice” in the field. Coppin is the most obvious place to develop this cluster of related degree programs. With the addition of select programs listed above, the current Criminal Justice/Safety Studies and Corrections/Criminal/Justice programs at Coppin could be expanded and enhanced to serve more

students, fill a niche labor need, and help Coppin to further develop its own identity within the system.

Recommended New Programs in Criminal/Public Justice Administration and Forensic Studies

Criminal Justice (BS with Certificate in Forensics)
Cybersecurity (BS)
Criminal Justice/Police Science (BS)
Corrections Administration (BS, MS)
Community Psychology (BS)
Forensic Psychology (BS)

Programs Recommended for Transfer from Towson University to Coppin State

Human Resources Development (BS)
Integrated Homeland Security Management (MS)
Forensic Science (MS)

The TU Human Resources Development BS program duplicates, or closely parallels, Coppin bachelors degree programs in management and management science. Transferring the TU Human Resources Development BS program to Coppin would also enhance the Coppin programs in: Job Development and Job Placement Services (Post BA Certificate), Vocational Evaluation, Work Adjustment (Post BA Certificate) and Human Services Administration (MA Joint with UB). Together these unique, high-demand programs would establish a cluster of excellence at Coppin.

Programs Recommended for Transfer from the University of Baltimore to Coppin State

Criminal Justice/Police Science (BS)

**PROGRAMMATIC NICHES FOR THE HBI ON THE EASTERN SHORE: UNIVERSITY OF MARYLAND EASTERN SHORE**

**F. University of Maryland Eastern Shore**

While UMES is a land-grant institution, it offers relatively few high-demand programs associated with the mission of land-grant institutions. As a land-grant university, the overarching mission of UMES should focus on the teaching of engineering, science, agriculture, and military science without excluding the liberal arts. Yet, UMES offers few undergraduate and graduate programs in engineering, science, and agriculture. At the undergraduate level, UMES offers but a single degree in engineering (Aerospace Engineering, Computer Engineering, Electrical Engineering, and Mechanical Engineering are offered as specializations). At the

graduate level, UMES does not offer a single degree program in engineering at the masters or doctoral level.[8]

UMES offers only four undergraduate degree programs in the sciences (Aviation Sciences, Biology, Chemistry, and Environmental Sciences); five programs at the master's level in the sciences (Chemistry, Marine-Estuarine-Environmental Sciences, Toxicology, Professional Science, and Quantitative Fisheries and Resource Economics); and two PhD programs in the sciences (Marine-Estuarine-Environmental Sciences and Toxicology). In terms of degree programs in agriculture, UMES offers only one undergraduate degree program (Agriculture), one program at the masters level (Food and Agricultural Sciences), and one program at the doctoral level (Food Science and Technology).

Plaintiffs propose strengthening the institutional identity of UMES by significantly expanding program offerings (especially unique, high-demand programs, in three programmatic niches that are closely tethered to the land-grant mission of UMES: Engineering and Aviation Science, Agriculture and Environmental Sciences, and Health Sciences and Allied Health.) Establishing new degree programs in these three fields not offered at TWI Salisbury—especially high-demand programs from the bachelors to the doctoral level—is critical not only if UMES is to realize its land-grant mission, but also to ensure that UMES has programmatic uniqueness as reflected in its offering a meaningful number of high-demand programs that are not offered at the geographically proximate Salisbury.

### 1. Programmatic Niches

#### a. Engineering and Aviation Sciences

UMES would greatly benefit from more high-demand engineering programs across all degree levels if it is to embrace its land-grant mission. Of particular note, general engineering programs at the master's and doctoral level offer opportunities for interdisciplinary studies, such as linking engineering to environmental studies and agriculture to permit students to explore emerging and interdisciplinary fields of study that address real-world problems.

<u>Recommended New Programs in Engineering and Aviation Science</u>
Aerospace Engineering (BS)**
Civil Engineering (BS)**
Electrical Engineering (BS)**
Mechanical and Industrial Engineering (BS)**

#### b. Agriculture and Environmental Sciences

[8] All Engineering programs are all housed in a single department that is located in the School of Business and Technology.

Three major challenges facing society are: (1) the increasingly technology-driven production of food; (2) identifying and managing sustainable sources of food, especially ocean-based food; and (3) preventing pollution of the environment and food sources. Programs in agricultural economics and food science/ technology, along with programs in aquaculture and the management of our water resources, addresses these challenges while giving UMES a growing niche in Agriculture. Moreover, programs in animal sciences; aquaculture; water, wetlands, and marine resources management; and veterinary science (such as a combined program with College Park) merit serious consideration.

Environmental Sciences include a range of rapidly expanding interdisciplinary fields. As a land-grant institution, UMES has the opportunity to build upon traditional fields and incorporate emerging fields of study that address the myriad challenges in managing and preserving our natural environment and resources. A wide variety of programs could be introduced at the bachelors, masters, and doctoral levels. For example, new masters programs in conservation biology and sustainable development; water, wetlands, and marine resources management; and rural sociology merit consideration.

At the doctoral level, a PhD in environmental studies program is highly recommended. Such a program would be an interdisciplinary program in which a student and her/his advisor could develop the student's program of study. For example, a student might combine basic courses in environmental studies with courses in engineering and social sciences. Students might pursue their studies in restoration ecology, agricultural economics, or energy resources. For example, UMES currently offers a PhD in Marine Estuarine-Environmental Science, with major emphasis on fisheries science, environmental molecular biology, and biotechnology. A PhD program in environmental studies would complement that program while having a separate identity anchored in an interdisciplinary focus that invites students to pursue advanced studies and research real-world problems.

Recommended New Programs in Agriculture and Environmental Sciences
Environmental Sciences (PhD)
Veterinary Technology (BS)**

### c. Pharmacy, Nursing, and Physical Therapy

Today's rapidly changing demographics is putting new demands on our health care system, at least in terms of serving traditionally underserved populations—including women and geographically isolated low-income communities. UMES has the opportunity to be ahead of the curve in preparing the next generation of health practitioners to support our changing and underserved populations, especially in rural areas, by addressing the preeminent health care challenges they are facing. The new and transfer programs listed below would join with the currently strong unique, high-demand programs in pharmacy and physical therapy to form a

unique, high-demand cluster of academic programs with the domain of health sciences and health services.

Pharmacy, nursing and physical therapy represent very promising opportunities for the establishment of collaborative joint programs between UMES and Salisbury. As a rule the success of institutional collaborations depends on the identification of high student demand and the development of high quality academic programs. The best collaborative programs bring institutions together based on shared goals, mutual strengths, mutual interests and mutual respect. In other words, successful collaborative programs represent "win-win" propositions where each partner makes distinctive contributions and each receives clear benefits. The proposed collaborative programmatic niches of joint programs between UMES and Salisbury in pharmacy, nursing and physical therapy is an opportunity for the two institutions to combine their distinctive strengths in complementary areas into a "Center for Excellence" with several unique, high-demand academic programs.

UMES has robust unique high-demand programs in pharmacy and physical therapy; Salisbury also has very strong unique, high-demand programs in nursing and nursing practice. In recent years student demand has consistently exceeded the capacity of these three programs. It is also the case that employer and state demands continue to demand more graduates in these areas. Collaboration around these programs would add to UMES' distinctive institutional identity as a Land Grant University and also raise the national academic prominence of UMES, Salisbury and the USM system. A successful collaboration between UMES and Salisbury in the areas of pharmacy, nursing and physical therapy would produce a final product where "the sum was greater than the parts."

We recommend that UMES and Salisbury establish collaborative arrangements and joint programs under the umbrella of "Pharmacy, Nursing and Physical Therapy." The State will need to upgrade faculty, staff and facilities in these programs to enhance their academic quality and to expand their capacity. It will also be necessary to enhance and upgrade affiliated academic programs that the core programs of "Pharmacy, Nursing and Physical Therapy" rely on for students, related courses, facilities and faculty e.g., UMES—toxicology, rehabilitation counseling rehabilitation counseling; Salisbury —respiratory therapy, applied health physiology, social work.

Collaborative arrangements and Joint Programs between UMES and Salisbury could be similar to the USM "Strategic Alliance" between UMCP and UMB ("Response to the 2011 Joint Chairmen's Language: Board of Regents Report on the Study Examining the Advantages and Disadvantages of Merging UMCP and UMB, Dec 9, 2011). This model for cooperation provides for joint faculty appointments, combined research, technology transfer, shared facilities, expanded student educational options and shared budgets between USM institutions with maximum benefits for the state of Maryland. The study process that supported

creation of the Strategic Alliance confirmed the feasibility, advisability and practicability of such cooperative efforts with respect to relevant financial, academic, logistic, student, reputational and professional accreditation criteria.

Recommended New Joint Programs in Pharmacy, Nursing and Physical Therapy
Applied Biology (MS)
Rehabilitation Services (MA)
Dietetics/ Nutrition (MA)
Food Science and Technology (MA)
Rehabilitation Psychology (MA)
Environmental Health (BA, MA)
Social Work (BSW, MSW)

**PROGRAMMATIC NICHES FOR THE HBI IN THE REGION WHICH INCLUDES PRINCE GEORGE'S COUNTY, MONTGOMERY COUNTY, AND CHARLES COUNTY: BOWIE STATE UNIVERSITY**

## G. Bowie State University

### 1. Programmatic Niches

#### a. Computer and Information Sciences/Networking Administration

Computer and information sciences/networking administration focus on current applications of computing, computer science, and information science and systems. Given the widespread use of these systems and their application in contemporary society, the range of specialization and level of study are limited only by our imagination. Advanced study in this area would include research aimed at theoretical advancement as well as application of knowledge and skills for the workplace.

According to the U.S. Department of Labor, as well as labor market journalists, computer sciences, information sciences, and network administration are among the fastest career growth areas in the nation. In Maryland, according to the State Department of Labor, five of the top eight growth careers are computer science or network related careers. At the present time and for the foreseeable future, computer and information sciences and related disciplines are among the most high-demand program offerings in the University of Maryland system. In fact, five of the seven TWIs examined in this study, and three of the four HBIs, offer at least a bachelors degree program in computer and information science. Offering new degree programs in interdisciplinary fields of study that are closely related to (and require) computer science (such computer systems analyst) not currently offered at Bowie would strengthen its programmatic identity and advance meaningful differentiation between computer science programs within the USM.

Recommended New Programs in Computer and Information Sciences/Networking Administration

Cyber Security and Information Assurance (BS)
Data Science (BS)
Network Technology (MS)
Computer Systems Analyst (BS)
Health Information Technology (BS)
Computer Science (MS, PhD)
Forensic Studies in Accounting (BS)

Programs Recommended for Transfer from the University of Baltimore to Bowie State
Management of Information Systems (PhD)

The UB doctorate in Management of Information Systems duplicates or overlaps with the following Bowie programs: Computer Science (PhD), Management Information Systems (MS), Database Management/ Artificial Intelligence (Post BS Certificate) and Bioinformatics (BS). The transfer would create a programmatic niche consisting of unique, high-demand programs.

**b. Nursing and Social Work**

Following national trends and implementation of the Affordable Health Care Act, increased emphasis has been placed on Wellness and Preventive Health. As a result specialties in Nursing and Social work will be in even greater demand for the foreseeable future.

Recommended New Programs
Nursing (MS)
Social Work (MSW)

## H. ENSURE COORDINATION AND COLLABORATION BETWEEN UMUC AND THE HBIS TO ELIMINATE PROGRAM DUPLICATION AND DIRECT COMPETITION IN ONLINE, DISTANCE LEARNING, AND BLENDED COURSES AND PROGRAM OFFERINGS

### I. Background and context

The University of Maryland University College ("UMUC") is strategically positioned to advance the goal of creating a unitary system of public higher education in the state. UMUC is a leader in worldwide student enrollment among all four-year institutions in the US. In 2012, UMUC online programs enrolled over 34,000 Maryland students, second only to the flagship College Park in total student enrollment. When out-of-state students are subtracted

from the total enrollment at College Park, UMUC actually enrolls more Maryland students than any other state institution.

UMUC currently offers over 100 certificate, BA, MA and doctoral programs online and on- site at 21 locations in Maryland (e.g., Shady Grove, Hagerstown, Prince George's Community College, Eastern Shore Higher Education Center) to a largely non-traditional student body. UMUC online enrollment offers the diversity, access, and quality that represents the goal for all Maryland institutions of public higher education. UMUC students are non-traditional, 34% are black, 47% are minority students, 78% are adults employed full-time and 49% are working parents. UMUC represents a distinct opportunity and challenge among MHEC institutions. Nested in this context, Plaintiffs ask: How might UMUC's success in achieving diverse student enrollment; serving black/non-traditional student populations and demonstrated expertise in online/distance learning technologies, be leveraged to achieve a unitary system of public higher education in Maryland?

UMUC began as an evening college program at the University of Maryland in 1948. In 1959, this College of Special and Continuation Studies became UMUC, which gained independent university status in 1970 and joined the USM in 1988. Over the years, the role of UMUC in the Maryland system of higher education has been expanded and transformed, not only in enrollment and degrees awarded, but also in terms of independent institutional status. Notwithstanding the contributions of UMUC, its growth, expansion and redefinition constitutes "mission creep." Originally founded to support and supplement other MHEC universities through the vehicles of special and continuation studies, over the years UMUC has grown into a full-fledged independent competitor institution. As a result, UMUC now duplicates or overlaps with many academic and degree programs offered at other Maryland public universities. In these instances, UMUC competes directly with other universities with respect to the academic programs and degrees offered. Maryland's HBIs have been particularly hit hard by competition from UMUC.

It is clear that Maryland's public HBIs—particularly Bowie and Morgan—have been negatively affected by UMUC's "mission creep" in two major ways. One, the burden placed on the HBIs from UMUC's degree program expansion is reflected in numerous lost opportunities to establish unique, high-demand academic programs within distinctive programmatic niches. In numerous instances, the development of unique, high-demand academic and degree programs by HBIs has been precluded by location of these programs at UMUC. Two, the consequences for HBIs are evident in those instances in which UMUC established degree programs that duplicated or closely paralleled unique, high-demand academic programs already offered by HBIs. The creation of competitive degree programs at TWIs has consistently resulted in declining enrollments of White students at HBIs. In particular, establishment of a broadly similar academic program at UMUC has resulted over time in declining white student enrollment in similar programs at Morgan as students shift to UMUC.

The demonstrated and inevitable consequence of such direct competition between programs at UMUC and HBIs has been the increase of unnecessary program duplication and racial segregation among MHEC institutions. Ultimately, UMUC's duplication of unique, high-demand academic and degree programs offered by the HBIs has undermined efforts to create a unitary system of public higher education in Maryland.

### J. Bowie State University and University of Maryland University Campus

No HBI has been more adversely affected by state policies regarding UMUC than Bowie. Forty years ago, Bowie's enrollment was 37% White. Bowie was by far the most integrated of all public four-year campuses in the state. Today, its White enrollment stands at only 4%. In 1972, Bowie had 1039 White students enrolled. Although White enrollment at the campus dropped to fewer than 600 by 1983, it rebounded to a high of 1223 in 1990. By 2000, White enrollment had again dropped to 665 and it has continued to drop since that time, which includes the period covered by the State's 2000-05 Partnership Agreement. Currently, there are only about 200 White students enrolled at Bowie.

Historically, Bowie has benefitted from its proximity to Washington, D.C. and government workers seeking to continue their education. It has also had a large market for teacher education due to its location within and near counties with large school systems. Its proximity to military bases further broadened its market. It has not been adversely affected by its proximity to College Park, which is more selective in both its undergraduate and graduate admissions and serves more traditional students at the graduate level.

While Bowie once complemented College Park's academic and degree programs, the ongoing expansion of program offerings at UMUC has led to UMUC becoming a direct competitor of Bowie, despite the fact that both campuses have been under the same governing board since 1988. Its primary focus since its founding has been to serve working adults, a group that has been the foundation of Bowie's graduate programs.

While UMUC's online offerings likely have a considerable impact throughout the state, the location of its campuses near Bowie where students take classes on site almost certainly has had an adverse impact on Bowie's enrollment of White students. Four major locations where UMUC also offers classes near the Bowie campus are Adelphi (UMUC headquarters), Largo, Laurel, and Prince George's Community College. Also nearby, but slightly further away, is the Dorsey Station Site. UMUC also offers courses at nearby Fort Meade and Andrews Air Force Base. Bowie no longer offers courses at the military installations in its region. It is not clear that approval of a program at UMUC by the coordinating board is restricted to a particular site. Significantly, because UMUC is a major profit center for the USM, the system has every incentive to maximize its enrollment regardless of whether Bowie is adversely affected.

Several programs that were earlier successful at Bowie are no longer successful in part because of the increased competition from UMUC. For example, Bowie's undergraduate program in Computer Sciences had 364 majors in 1999, but now has only 87; the masters program in Computer Science has declined from 62 majors in 2001 to 18; and the masters program in Management Information Systems has declined from 157 to 65 over the same period. Meanwhile, these and other Computer Science programs offered by UMUC have experienced large enrollments in recent years. Below is a listing of UMUC's Computer Science degree offerings, year approved by MHEC, and the fall 2012 enrollment.

| **Degree Level** | **Program Name** | **Year Approved** | **Fall 2012 Enrollment** |
|---|---|---|---|
| Bachelors | Digital Media and Web Technology | 2000 | 426 |
| Bachelors | Computer Science | 2000 | 872 |
| Bachelors | Information Systems Management | 2000 | 924 |
| Bachelors | Computer and Information Science | 2000 | 921 |
| Bachelors | Computer Networks and Security | 2000 | 1580 |
| Bachelors | Cyber Security | 2007 | 2182 |
| Masters | Information Technology | 2000 | 1779 |
| Masters | Cyber Security | 2009 | 1369 |
| Masters | Cyber Security Policy | 2010 | 176 |
| Masters | Cyber Forensics & Cyber Investigation | 2012 | 41 |
| Masters | Software Engineering | 1995 | 3 |

In addition, UMUC offers an even broader array of technology-related certificates at both the undergraduate and post-baccalaureate level. It is apparent that because UMUC's computer-related program inventory is relatively comprehensive, it would be difficult for Bowie to find a meaningful segment of the market that is not being served. It also should be noted that five of the programs listed above were approved in 2000, the point at which Bowie began to

experience enrollment declines in its corresponding programs. Ten of the eleven programs were approved over a twelve year period from 2000 to 2012.

Similarly, the masters in Business and the masters in Administrative Management programs were once successful at Bowie. These no longer are high enrollment programs at Bowie. On the other hand, these programs are thriving at UMUC. Among other programs offered by UMUC that are related are: Accounting (BS), Management Studies (BA), Communication Studies (BA), Marketing (BA), Technology Management (Post BA Cert), Non-profit and Association Financial Management (Post BA Cert), Financial Management in Organizations (Post BA Cert), Accounting (Post BA Cert), Governance/Resource/Volunteer Management (Post BA Cert), Financial Management and Information Systems (Post BA Cert), Public Relations (Post BA Cert), Accounting and Financial Management (MA), Accounting and Information Systems (MA), and Non-profit and Association Management, concentration in management (MA).

The conclusion is clear: It is unlikely that Maryland can identify new high-demand programs for Bowie that are not currently offered at UMUC without rolling back and/or transferring the programs offered at nearby UMUC. The most realistic and substantive remedy for UMUC's encroachment on Bowie's academic and degree programs may be to concentrate on UMUC's on-site programs and the courses offered there to address program duplication. The sites in Maryland have been erected for a purpose, namely, to serve markets where UMUC can attract enrollment and make money. The discussion above about the overlap between Bowie and UMUC in certain program areas is partly based on the highly reasonable assumption that the UMUC sites around Bowie are taking away students who would have otherwise enrolled at Bowie. The State needs to collect data that would more definitively demonstrate whether this is in fact true.

**K. Morgan State University and UMUC**

The academic degree programs at UMUC also overlap substantially with academic program degree offerings at Morgan. In the following analysis, we detail selected instances of significant academic and degree program duplication between UMUC and Morgan. It is in the interests of all parts of the MHEC system, the State and the public to achieve better coordination of academic program offerings between UMUC and Morgan.

Significant Program Duplication Currently Exists Between UMUC and Morgan:

a) UMUC: BA/BS programs in Accounting, Finance, Business Administration, Management Studies, Marketing, Human Resources Management, Health Services Management, and Public Safety Administration
Morgan: BA/BS programs in Accounting, Finance, Business Administration,

Management, Services and Supply Chain Management, Hospitality Management, Marketing, Health Administration

b) UMUC: MS/MBA/MSM programs in Bio-Informatics (4 degree programs), Accounting and Financial Management, Accounting and Information Systems, Business Administration, Management (14 degree programs), Global MBA, Health Care Administration, International Management (4 degree programs)
Morgan: MA /MS /MBA programs in Professional Accountancy, Accounting, Finance, International Management, Management, Marketing Management, Marketing Research, Hospitality Management,

c) UMUC: Doctorate in Management for Community College Policy and Administration
Morgan: Doctoral programs in Business Administration, Community College Leadership

As a point of departure in addressing the extensive duplication between UMUC and Morgan, UMUC should develop and implement in close collaboration a Morgan a model to ensure that the Business programs at Morgan State University are widely available to students across the state. UMUC would provide the technical assistance and support necessary to help Morgan develop and enhance its own technical platform for distance, online, and blended delivery of courses/ degree programs. UMUC would also grant Morgan full use and access to the established technical platforms UMUC currently uses to provide distance, online and blended courses for students, courses and degree programs. In addition, UMUC would no longer offer business courses and/or degrees since these compete with Morgan's offerings in the area and are a disincentive for white students to enroll in Morgan's business courses and degree programs. Instead, UMUC would partner with Morgan to jointly provide business courses under the direction of Morgan faculty, with degrees to be awarded exclusively by Morgan State University. The on-campus component of blended courses would only be available on Morgan's campus and/ or be taught by Morgan faculty at locations around the state (e. g., MHEC Regional Higher Education Centers). Morgan would be able to develop "feeder relationships" with the many 2-year and 4-year business programs at Maryland TWIs and to provide pipeline opportunities for students from these programs to continue working toward MBA and PhD degrees in Business at Morgan.

## L. UMUC Remedy Recommendations

UMUC operates the most innovative, far-reaching and effective online and blended learning platform (i.e., combination online or distance and on-site instruction) for higher education in Maryland. It is reasonable, therefore, to seek ways to expand the benefits of the UMUC platform to other universities in the system. At the same time, the goal should be to eliminate unnecessary program duplication and the waste of resources due to unnecessary program redundancy or duplication. This could be accomplished by redefining UMUC's role

relative to other universities in the Maryland system. Along with transferring selected academic degree programs to Maryland's HBIs, UMUC should more closely coordinate and cooperate with other Maryland public higher education institutions—both the HBIs and TWIs—to jointly offer unique, high-demand academic degree programs that use online, distance learning and blended courses (e.g., combination online and on- site platforms).

Attempts to regulate UMUC and the HBI academic program duplication are greatly complicated by the current and swiftly evolving status of online technology. For instance, questions of proximity between academic programs at traditional TWIs and HBIs are relatively straightforward. It is relatively easy to calculate mileage between the HBI and TWI campuses, academic courses and/or programs to make an empirical determination about program duplication. In the case of online or distance programs, however, such determinations are infinitely more complex and elusive, given the reach and penetration of Internet technology. To what extent can UMUC's virtually delivered academic programs be seen as duplicating unique, high-demand programs delivered in traditional, classroom settings on the HBI campuses? Certainly the UMUC online academic courses and programs are universally available to any students who have internet access—even students sitting in the HBI campus libraries or classrooms. These are complex, evolving questions that will need to be resolved in future.

As a general way to proceed in the future, we propose that the Court accept and apply a four step process as a template for identifying and addressing questions of academic program duplication between UMUC and the HBIs in the Maryland system of public higher education:

1. Inventory academic program duplication between UMUC academic programs (in all forms of delivery--online, on-site or blended, i.e., combination online/on-site) and specific HBIs. This inventory should include assessments over time of enrollment trends in areas where there is academic program duplication between UMUC and the HBIs.
2. Develop, outline and implement plans to discontinue or modify UMUC academic programs that duplicate academic programs at HBIs. This should include plans to ensure UMUC supports the technology platforms at the HBIs for successful implementation of replacement online and blended academic programs.
3. Consider selected academic degree programs for transfer from UMUC to HBIs. The establishment of joint, academic and degree programs between UMUC and HBIs should also be considered.
4. Evaluate compliance and progress of efforts to eliminate program duplication between UMUC and the HBIs.

In addition, with respect to the specific cases of academic program duplication between Bowie and UMUC and Morgan and UMUC, we also recommend:

1. The State should be required to collect data about enrollments by program at each of UMUC's physical locations in Maryland and to treat these locations as any other campus would be treated. It would then be expected to oversee and control duplication with UMUC's physical centers the way duplication is supposed to be controlled among other campuses in close proximity by avoiding it. The fact that students taking face-to-face courses at UMUC are those most likely to otherwise have taken a face-to-face course elsewhere is very likely to effectively prevent unnecessary duplication between UMUC and proximate HBIs.
2. In addition, UMUC's on-line operations, where feasible, should utilize the courses and programs already offered by Maryland campuses. For a fee, UMUC should provide the technology platform for campuses to deliver coursework in their respective areas of uniqueness. This would reduce duplication of effort and provide both UMUC and the provider campus with income streams.
3. We recommend collaborations between UMUC, Bowie and Morgan in selected joint academic programs where, as "supporting partner," UMUC provides the technical expertise and technical platform for online/ distance/ blended courses. These distance learning courses would be supplemented by on-campus, direct contact programs at Bowie or Morgan, which would grant the earned degrees from these collaborative academic programs as the "primary partner."
4. Transfer degree programs in the field of Business (BS, MS, and PhD) and closely aligned fields from UMUC to Morgan. This recommendation is driven by the extensive duplication of academic degree programs between UMUC and Morgan in these areas. The recommendation is also based on the accumulated research and practice record which proves the integrative effects of locating (or relocating) unique, high-demand academic programs at HBIs.
5. Progress to this end will require the respective institutions to conduct detailed inventory of course and degree program offerings to identify areas of program overlap or duplication.
6. Plans should then be developed, outlined and implemented over three to five years to divide responsibilities between Morgan and UMUC such that final degree granting authority resides with Morgan. UMUC should support and supplement the Morgan's degree programs in Management, Business Management and closely aligned fields by providing the necessary technology platform for online and blended learning experiences.
7. Plaintiffs request that the Court require annual reports to evaluate compliance and progress toward implementation of this proposed realignment between Morgan and UMUC in course and program offerings in the fields of Management, Business Administration and allied areas.

Cooperation and coordination between Bowie, Morgan and UMUC would greatly facilitate the goal of creating a unitary, racially desegregated system of public higher education

in Maryland. One result would be to help cultivate distinctive programmatic identities at Bowie and Morgan. The effect would be to create and enhance clusters of unique, high-demand programs at BSU and MSU that will attract White student enrollment. A side benefit would be the enhancement of the quality of existing academic programs at both HBIs. Another benefit would be to ensure scarce financial, institutional, and other resources are used in the most effective and efficient manner possible.

Collaboration between UMUC, Bowie, and Morgan would also provide lessons and models for similar cooperation and coordination between UMUC and other campuses across Maryland's state system of higher education. Both Maryland's HBIs and TWIs would benefit from such collaboration with UMUC to more effectively and efficiently service the state's demand for high-quality, widely-accessible, and more affordable higher education.

## CONCLUDING NOTE

This remedial proposal arises from the lawsuit Plaintiffs filed against the State of Maryland pursuant to Title VI of the Civil Rights Act of 1964 and the Equal Protection Clause of the Fourteenth Amendment. In an opinion dated October 7, 2013, the Court found Maryland liable for violating the Constitution through its policy of unnecessary program duplication and "strongly" suggested that the parties "enter mediation to attempt to generate a suitable plan to address this problem."[9]

According to the Court's Opinion, the distinguishing feature of Maryland's Historically Black Institutions (HBIs) remains their "racial identifiability" (about 5% of the students at Maryland's HBIs are white). The Court found that the State has in place a policy—a policy rooted in its earlier officially segregated system—that continues to maintain the racial identifiability of Maryland's HBIs: a dual structure of higher education. This dual structure consists of widespread unnecessary program duplication between Maryland's Traditionally White Institutions (TWIs) and HBIs such that there is not meaningful program uniqueness at the HBIs. That is, there is an absence of a meaningful number of unique (not duplicated at geographically proximate TWIs), high-demand programs at the HBIs that would attract non-black students to these institutions by providing them with an institutional identity beyond race.

Therefore, the fundamental challenge that must be addressed in remedy is how to dismantle the dual structure of higher education in Maryland—a structure which ensures that the distinctive feature of Maryland's four HBIs is no longer their racially identifiability. To be successful the remedy must enlarge and enrich the institutional identities of the HBIs by establishing new unique, high-demand programs within distinct programmatic niches at all four of these institutions.

---

[9] Coal. for Equity & Excellence in Maryland Higher Educ. v. Maryland Higher Educ. Comm'n, CIV. CCB-06-2773, 2013 WL 5550394 at *59 (D. Md. Oct. 7, 2013)(hereinafter 2013 Opinion).

Recent enrollment statistics for Maryland's Historically Black Institutions reveal formidable challenges with respect to dismantling the State's racially dual system of higher education. In 2013 white student enrollment was extremely low at Morgan State University (3%), Bowie State University (3%) and Coppin State University (1%). Meanwhile, white student enrollment for 2013 was 15% at the University of Maryland—Eastern Shore. It is revealing that White student enrollment was highest in unique, high-demand programs at University of Maryland- Eastern Shore: Special Education MA (64%), Ecology (60%), Education, Industrial Arts, Vocational and Technical Education MA (59%) and Business and Management (57%). White student enrollment was also highest in unique, high-demand programs at Morgan State University: Landscape Architecture (73%), Architecture (47%); and at Bowie State University: Secondary Education MA (38%). While some unique, high-demand programs at Maryland's HBIs are attracting significant numbers of white students, there are very few of these programs (an average of three at the HBIs)—far too few of these programs to accomplish the goal of dismantling the dual structure of higher education.

The experiences of other states that grappled with the challenges of dismantling racially dual systems of public higher education are instructive for Maryland. Tennessee was successful because of a merger plan which enhanced the capacity of Tennessee State University to offer unique, high-demand programs. These programs helped to dismantle the racially dual system of higher education by creating a distinctive academic identity—an identity anchored in a wide range of high-demand, unique (not duplicated at proximate TWIs) programs for this Historically Black Institution that attracted white student enrollment. In 2012 white students at Tennessee State University represented 24% of enrollment and 32% of degree recipients; other non-black students represented 10% of total student enrollment and 8% of all degree recipients.

The remedial plans in Mississippi, Alabama, and Louisiana had very limited success because none focused principally on dismantling the racially dual system of higher education by enhancing the programmatic identities of the HBIs as reflected in meaningful numbers of unique, high-demand programs and eliminating unnecessary program duplication. Even when new programs—including high-demand programs—were introduced in these three states, most of these programs were already offered at nearby TWIs (hence they were not "unique" programs).

As the Court is aware, the controversial Towson/UB MBA program is illustrative. The Morgan State MBA program attracted a critical mass of white students before the Towson/UB MBA was introduced. Since then, however, white student enrollment in Morgan's MBA program has declined precipitously. In 2013, 129 students were enrolled in Morgan's MBA program and only 2 of these 129 students were white students. Meanwhile, that same year, total student enrollment in the MBA program at UB was 677 and 308 (or approximately 45.5%) of those students were white. Towson's MBA program enrolled 233 students that same year, and 148 of those students (or approximately 63.5%) were white confirming that a

significant number of white students are pursuing their MBA at Towson and UB. Not insignificantly, the major programs at HBI Morgan State University that are currently attracting significant numbers of white students are unique, high-demand programs such as the bachelor's degree in Industrial Engineering (12% white students) and the bachelor's degree in Engineering Physics (20% white students).

While the task of realigning academic programs within the Maryland system of higher education may be characterized by some to be as disconcerting as was post-Brown integration, the creation of a unitary system of higher education in Maryland presents a unique opportunity. A unitary system of public higher education would advance a new vision for higher education that is aligned with several of Maryland's own higher education commissions and panels, which consistently called for elevating the status of Maryland's HBIs rather than creating or enhancing competing TWIs. The Court's decision opens up the possibility for transforming Maryland's higher education system into a 21st century model for public higher education.

# A-2

# APPENDIX 2

# ALABAMA

***Summary of Remedies Implemented in Alabama***

The United States along with African-American students and faculty commenced a suit in 1983 to enforce the Fourteenth Amendment and Tile VI of the Civil Rights Act, challenging the State's maintenance of practices traceable to the *de jure* segregated era. The plaintiffs argued a number of policies were impermissibly segregative, including: admissions standards, funding and facility maintenance, program duplication, restrictive missions, and the underrepresentation of African-Americans in faculties and administrations. *See Knight v. Alabama*, 14 F.3d 1534, 1539 (11th Cir. 1994) (providing a procedural history of the case).

In 1991, the Alabama court found numerous "actionable vestiges of discrimination surviving" in Alabama's system of higher education. *See Knight v. Alabama,* 787 F. Supp. 1030, 1367 (N.D. Ala. 1991) [hereinafter *Knight I*]. Such violations included: faculty and administrative employment, state funding for higher education, facilities at the HBIs, admissions policies, and program duplication. *Id.* at 1368.

After the Supreme Court's decision in *Fordice, United States v. Fordice,* 505 U.S. 717 (1992), the Eleventh Circuit remanded the case to the district court for reconsideration under *Fordice*'s analytic framework. *Knight*, 14 F.3d at 1556-57.

On remand, the district court entered a new remedial decree in 1995 which, in addition to the prior vestiges, declared the State's land-grant funding scheme to be unconstitutional. *See Knight v. Alabama*, 900 F. Supp. 272, 332-333 (N.D. Ala. 1995) [hereinafter *Knight II*]. The court fashioned a remedial decree that it hoped would "be most likely to achieve the remedial purpose into the future." *Id.* at 285.

In 2006, the parties entered into a settlement agreement to resolve remaining issues and continue the desegregative programs. *See* Br. of U.S. as Plaintiff-Appellee, No. 07-10235-BB, 2007 WL 3690480 (11th Cir. 2007).

Altogether, the two court-ordered remedial decrees resulted Alabama's two HBIs, Alabama State University (ASU) and Alabama A&M (AAMU), receiving a total of $215 million in state funding to eliminate the vestiges of historical financial discrimination as a result of this litigation.[1] Br. of U.S. as Appellees 2007 WL 3690480 (11th Cir. 2007) at *11 (citing the 2005 Annual Report submitted to the court). The 2006 settlement further required the State to provide over $33 million in capital funding to AAMU and ASU, and to support a request to the legislature for an additional $12 million in capital funding for these two universities.[2] *See* Br. of U.S. as Plaintiff-Appellees at *13.

---

[1] Br. of U.S. as Appellees, No. 07-10235-BB, 2007 WL 3690480 (11th Cir. 2007) at *11 (citing the 2005 Annual Report submitted to the court).

[2] *Id.* at *13.

***Overview of the remedies ordered that were ordered, and not vacated, by the 1991 remedial decree, the 1995 remedial decree, and 2006 settlement***

- **Creation of the Alabama State University Trust for Educational Excellence**

The decree created an endowment program (the Trust for Educational Excellence) at both ASU and AAMU that would provide ASU and AAMU state funds of up to $2 million on an annual basis, for fifteen years, to be used for educational purposes (*e.g.*, scholarships, endowment of department chairs, subsidizing faculty salaries). *Knight II*, 900 F. Supp. at 349-56.

The 2006 settlement required the State to continue to fund the Trusts for Educational Excellence established by the 1995 Remedial Decree under the terms and for the duration set forth in that decree.

- **Funding for Scholarships and Recruitment to desegregate the State's HBIs**

The decree ordered that for a period of ten years the State must provide $1,000,000 to ASU and $1,000,000 to AAMU on an annual basis to fund scholarships to assist in diversifying the universities' student bodies.[3] *Id.* at 356.

- **Restrictions Placed on the TWIs to Allow HBIs to Compete for Other-Race Students**

The 1995 remedial decree placed three restrictions on TWIs' expansion to allow HBIs to compete for other-race students.

First, the 1995 decree restrained and enjoined Calhoun State Community College (TWI) from increasing college enrollment at its Huntsville campus beyond 5% of its current levels of enrollment. *Id.* at 359. Furthermore, the court enjoined Calhoun State Community College from offering classes other than during the lunch hour, evenings, and weekends. *Id.*

Second, the 1995 decree restricted the expansion of two-year and technical colleges in Montgomery and Huntsville so as to help ASU and AAMU in their efforts to attract more non-minority students to their programs. *Id.* at 358-59. Specifically, the remedial decree enjoined and restrained the State from creating any new community or junior colleges in the regions currently occupied by HBIs. With regard to the three currently existing technical colleges in the area, the State was enjoined from expanding the schools in a manner outside of traditional trade school offering or in any manner which offers traditional courses which could be credited toward a bachelors degree at any community college, junior college or senior college in Alabama technical colleges in the regions of Huntsville or Montgomery. *Id.*

Third, the 1995 decree prohibited Troy State University (TWI) in Montgomery from any further expansion in Montgomery of its physical plant without first receiving the approval of the court and a finding that such addition or expansion will not adversely impact on desegregation of Alabama State University. *Id.* at 322.

- **Unification of the Alabama Cooperative Extension System and the Creation of an Associate Director for Urban Affairs and New Nontraditional Programs**

---

[3] For some of the ordered remedial payments, the 1995 remedial order requires AAMU and ASU to first spend the remaining money appropriated by the "Title VI Program enhancement funds" which the 1994 state legislature specifically appropriated to AAMU and ASU to assist in overcoming the vestiges of *de jure* segregation. Specifically, the district court order explains that the existing budgeted line items for the Recruiting and Minority Scholarship money must be fully expended before ASU and AAMU can seek additional funds from the State pursuant to the decree. *Id.* at 358.

The 1995 decree unified the historically separate land grant functions of Auburn University (TWI) to coordinate the system and ensure AAMU would be a "full participant" in the system with regard to the allocation of responsibilities, salaries, and resources. *Id.* at 322-33, 360-68.The decree gave AAMU some unique functions and responsibilities within the land-grant programs such as investing AAMU with the responsibility of, *inter alia*, appointing the Associate Director for Urban Affairs and New Nontraditional Programs and providing this Director with headquarters on AAMU's campus. *Id.* at 360-68. To cover the expenses of unifying the system, the decree allocated $300,000 to AAMU and $300,000 to Auburn University. Furthermore, for the life of the decree, the State was obligated to appropriate a base amount of $1,000,000 each year to AAMU to fund the extension program and an additional 10% to this base amount, with an annual increase of 10%. *Id.* at 368.

- **Programming**

The court ordered remedies in both 1991 and 1995 to increase the number of high-demand programs at HBIs to attract non-minority students.[4]

Specifically, the 1991 remedial decree directed Alabama's Commission on Higher Education (ACHE) to give the HBIs preference in the establishment of high-demand programs in either Montgomery or Huntsville if they could satisfy ACHE's normal approval processes. *Knight I*, 787 F. Supp. at 1380. *See also Knight II*, F. Supp. 900 at 382. The 1991 decree specifically emphasized that AAMU should have preference for any new teacher education programs in the Huntsville area. *Knight I*, 787 F. Supp. at 1380. The 1995 decree ended the general preference for AAMU and ASU for high-demand programs, but mandated that ACHE not approve duplicative programs in the regions occupied by HBIs and that ACHE give preference for joint and cooperative efforts between institutions whenever doing so was educationally sound. *Knight II*, F. Supp. 900 at 372.

During the period of time that the HBIs had preference, AAMU submitted six program proposals and had two proposals approved: a Bachelors of Science in Technical Studies and a Masters in Social Work.[5] *Id.* at 290-91. ASU had submitted degree proposals in four fields: doctoral programs in three fields of education, baccalaureate programs in four areas of allied health, a baccalaureate program in environmental science, and a Masters in Accountancy. None of the programs were approved by the time of the court's 1995 remedial order. *Id.* at 290.

The 1991 decree encouraged the institutions to develop joint or cooperative programming between HBIs and TWIs. The 1991 remedial decree ordered CSCC and AAMU to convene a "Consent Decree Monitoring Committee" and the Committee on Cooperation to propose solutions to the problem of program duplication between the HBIs and TWIs, and the court specifically directed the committee to focus on establishing joint or cooperative programs. *See Knight I*, 787 F. Supp. at 1329-31.

The district court's 1995 remedial order established additional high demand programs and degree offerings to be implemented at ASU and AAMU. *Knight II*, 900 F. Supp. at 370. Specifically, the 1995 decree authorized AAMU to establish an undergraduate mechanical and

---

[4] The 1991 decree, *Knight v. Alabama*, 787 F. Supp. 1030 (N.D. Ala. 1991), though vacated and reversed in part by the Eleventh Circuit, ordered programmatic remedies that later courts left undisturbed, as described in this section.

[5] The original 1995 decision states that AAMU submitted five program proposals, but the court later amended its 1995 remedial decree to provide this preference for a program that had already been prepared by AAMU under the 1991 decree's provision for preference: a master's program in science education. *Knight II*, 900 F. Supp at 382.

electrical engineering program, *Id.* at 371, and authorized ASU to establish a program in allied health. Furthermore, the court granted ASU sole authority in Montgomery to offer a Masters in Accounting for a period of five years, after which time proximate TWIs could duplicate the degree program. *Id.* at 372.

The court's 1995 remedial decree continued to emphasize the creation and exploration of cooperative programming between HBIs and TWIs. The 1995 decree specifically mandated that UAH (TWI) cooperate fully in the development of AAMU's engineering program to the extent possible and consistent with sound educational practices. *Knight II*, 900 F. Supp. at 371. The court anticipated that this cooperative programming would take the form particularly with respect to lower division courses. *Id.* at 371. The 1995 decision also applauded AUM and ASU for establishing a cooperative cross-enrollment program in business and education. *Id.* at 299-300. The court likewise praised the continued exploration of joint or cooperative programming between institutions in such fields as: a proposed joint PhD program in environmental science, a Ph.D in special education, and masters program in nursing (with an emphasis in the rural health field), music, social work, and a faculty exchange in allied health areas. *Id.* at 300. As an ultimate endorsement of joint and cooperative programming, the 1995 decree mandated that ACHE give preference for joint and cooperative efforts between institutions whenever doing so was educationally sound. *Id.* at 372.

The 2006 Settlement required the State to continue to fund the educational programs newly established at ASU under the 1995 decree for the duration of the period set forth in previous court orders. *See* Br. of U.S. as Appellees at *12-13.

- **Additional Capital Funding for HBIs Established by the 2006 Settlement**

The 2006 settlement additionally required the State to transfer $7.3 million in capital funding to AAMU, and $25 million in capital funding to ASU, to support the new educational programs ordered under the 1995 decree. *See* Br. of U.S. as Plaintiff-Appellee at *13. The settlement also acknowledged the State's agreement to request and support in the 2007-2008 education budget an appropriation to ASU of an additional $11.9 million in capital funding, and an appropriation to AAMU of an additional $365,000 in capital funding. *See* Br. of U.S. as Plaintiff-Appellee at *13.

- **Commitment to Other-Race Recruitment and Advertising**

The 1995 remedial decree required AAMU and ASU to budget a reasonable sum for advertising their schools to other-race students to enhance recruitment efforts. *Knight II*, 900 F. Supp. at 372-73.

- **Oversight**

The 1995 remedial decree created a court-appointed Long-Term Planning and Oversight Committee (the Committee). *Id.* at 368-69. The Committee would be responsible for assisting the court and parties in implementing the decree, advising the court and parties on the best method for implementing the new programs, strengthening the cooperative programs at proximate institutions, and any other requests made by the court. *Id.* at 369.The initial cost of the Committee would be borne by AAMU and ASU. *Id.*

In the 1995 remedial decree, the district court retained jurisdiction for an initial period of years, reserving the right to *sua sponte* extend the term of the decree if it deemed additional time was required to assure compliance. *Id.* at 374.

# A-3

# APPENDIX 3

## LOUISIANA

***Summary of Remedies Implemented in Louisiana***

The United States sued Louisiana in 1974 alleging that the State maintained racially discriminatory practices in higher education violating the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964, 42 U.S.C § 2000d. *United States v. Louisiana*, 527 F. Supp. 509 (E.D. La. 1981). In 1981, the court entered a consent decree whereby Louisiana committed itself to modify its admissions and recruitment practices, address attrition rates, address program duplication, enhance the state's predominantly black institutions, and recruit other-race faculty and administration. *Id.* at 515. Prior to the termination of the 1981 consent decree, the parties filed cross-motions for summary judgment on the issue of liability: whether the State continued to maintain an unlawfully segregated system of higher education.

In 1988, the district court found ongoing liability on summary judgment, holding that Louisiana had failed to dismantle its racially dual structure and, moreover, that the 1981 consent decree had failed to remedy the constitutional violation which required the formulation of a new remedial decree. *United States v. Louisiana*, 692 F. Supp. 642, 648-650 (E.D. La. 1988). Following *Fordice* the district court initially adopted the special master's recommended remedial plan, which sought to remediate discriminatory policies and practices found in Louisiana's governance structure of higher education, open admissions policies, and existing program duplication. *United States v. Louisiana*, 811 F. Supp. 1151 (E.D. La. 1992). However, the Fifth Circuit vacated and remanded for a trial on the merits, explaining that that liability should not have been decided on summary judgment on the grounds, *inter alia*, that the court relied upon facts that remained in dispute for which a full trial was appropriate. *United States v. Louisiana*, 9 F.3d 1159 (5th Cir. 1993).

Prior to holding a trial on the remanded issues of governance, open admissions, and program duplication, the parties entered a Settlement Agreement in 1994 ("Agreement") to resolve all claims under the *Fordice*[1] standard with the exception of land grant issues. Agreement, *United States v. Louisiana*, No. 80-CV-3300 (E.D. La. Nov. 14, 1994). The Settlement set forth remedies related to the State's four HBIs: Southern University and Agricultural and Mechanical College in Baton Rouge (SUBR), Southern University at New Orleans (SUNO), Southern University at Shreveport (SUSBO), and Grambling State University (Grambling). The 1994 Agreement provided a maximum of $48 million to create new programs at HBIs. Agreement at 15-16 ¶ 14.

***Remedial Provisions of the 1994 Settlement Agreement Implicating HBIs***

- **Addressing Existing Program Duplication**

The Agreement emphasized that questions of fact remained as to whether existing

[1] *See United States v. Fordice*, 505 U.S. 717 (1992).

program duplication should be eliminated. Agreement at 17 ¶ 16. The Agreement stated that program duplication would be addressed by its provisions that differentiated the missions of proximate institutions and by those that instituted a process for eliminating existing programs. Agreement at 17-18 ¶¶ 16-18.

The alleged mission-differentiation was articulated in Appendix A of the Agreement, which defined each institution's role, scope, and mission statement. However, a significant degree of overlap between HBIs' missions with their proximate institutions remained. *See* Agreement, App. A[2]. For example, SUNO's (HBI) undergraduate areas of emphasis were defined primarily as business administration and elementary education, with additional emphasis in criminal justice, science, social work, and substance abuse. The proximately located UNO (TWI) similarly was defined as having undergraduate areas of emphasis in, *inter alia*, biology, business, and education. Agreement, App. A. As part of its efforts to differentiate missions, the Agreement also designated different tiers and admissions standards to proximate institutions. With regard to the HBIs, the Agreement raised SUBR from a four-year tier III university to a four-year tier II university and instituted admissions standards that were less selective than the proximate LSU (TWI). Agreement at 3-4 ¶ 4(a)(ii). The Agreement also raised SUNO from a four-year tier V institution to a tier IV institution, and affirmed SUNO would maintain less selective admissions criteria than the proximate TWI. Agreement at 5. ¶ 4(b)(ii). Finally the agreement maintained the tiers and admissions policies of SUSBO (HBI) and Grambling (HBI) but endowed the proximate TWIs with higher tiers and higher admissions standards. Agreement at 5-6 ¶¶ 4(c), 4(d).

The adopted program elimination process incorporated the Board of Regents 1993 Master Plan ("Master Plan"), which was included as Appendix E of the Agreement.[3] The Master Plan articulated a four-step process to identify which duplicative programs would be examined for elimination. *See* Agreement, App. E. The first step removed from the pool of programs for elimination any core course offering such as those in the arts, humanities, or sciences. *Id.* The second step removed from elimination any program that was either necessary for an institution's mission, or sufficiently high in student demand to merit duplication, or served a different student base due to differing admissions standards. *Id.* The third step removed any program of high student interest and high demand from business and industry. *Id.* These initial three steps defined the pool of programs under consideration for elimination, restricting the number of programs that could be eliminated. *See id.* The fourth and final step mandated that the duplicative programs that remained in the pool for potential elimination would "be closely examined for closure" consistent with the commitment to avoid a "disproportionate effect on any [one] institution." *Id.* ¶¶ 17-18.

The Master Plan emphasized the importance of eliminating programs for the sake of fiscal responsibility and did not cite desegregation as a motivation for program elimination. *See* Appendix E at 78 (justifying program elimination on the grounds that "[f]ollowing a decade of budget reductions and continued higher education cutbacks, the Board of Regents must scale down higher education offerings"). The Agreement only considered segregative impact at one

---

[2] Appendix A, Role, Scope and Mission Statements for Louisiana's Public Institutions of Higher Education, The Master Plan for Higher Education, Board of Regents, State of Louisiana, April, 1994, pp. 18-32, Settlement Agreement at § 4.

[3] Appendix E, Regents for Review of Academic Programs entitled "Elimination of Academic Programs While Broadening Access", The Master Plan for Higher Education, Board of Regents, State of Louisiana, April, 1994, 78-79; Settlement Agreement at § 17.

moment whereby it states that "[b]efore taking any action, however, the Regents shall also consider and issue a written analysis concerning the probable effect of such action on desegregation." Agreement at 18 ¶ 18. Under this analytic structure, a duplicated program's segregative impact did not prompt program elimination but served more as a potential bar to proposed elimination.

- **Governance**

While the 1994 Agreement set forth a variety of provisions to modify HBIs' programming, mission designation, and facilities, the Agreement did not incorporate the district court's order, though vacated pending trial, to consolidate the four different governing boards into one single statewide governing board. The district court observed that the evidence "suggests Louisiana's multi-board arrangement has led to unnecessary and costly program duplication." *United States v. Louisiana*, 718 F. Sup. 499, 508 (E.D. La. 1989). The district court strongly believed that Louisiana's "excessive duplication" required the creation of a single governing board whose statewide perspective would enable it to minimize duplication through a program elimination or approval processes. *Id*. at 513. While the Agreement did invest limited authority in the State Board of Regents to eliminate programs under certain circumstances, the Agreement retained the system of four different governing boards. Agreement at 1 ¶ 1.

- **Development of New Programs at HBIs: $48 Million**

The Agreement established a number of new programs at Louisiana's HBIs. Agreement at 10-16 ¶¶ 13-14. The Agreement capped the costs of such programs at $48 million over a ten year period. Agreement at 16 ¶ 14. The Agreement prohibited proximate TWIs from adding programs that would duplicate the newly developed HBI programs. Agreement at 10 ¶ 13.

<u>SUBR (HBI): New Programs Awarded</u>

The Agreement developed new programs at SUBR (HBI) and also articulated joint, dual, and cooperative programming between SUBR and the proximately located LSU (TWI). Specifically, the Agreement authorized implementation of four new doctorate programs at SUBR, among the following seven course options: PhD in Science and Mathematics Education; PhD in Biomedical Sciences; PhD in Public Policy; PhD in Nursing; PhD in Administration and Information Systems; PhD in Urban Forestry; PhD in Material Science. Agreement at 10-11 ¶ 13.

The Agreement further authorized the implementation of five new masters programs at SUBR: Master of Science in International Business; Master of Engineering; Master of Science in Physics; Master of Science in Urban Forestry; Master of Arts in Criminal Justice. Although the Agreement gave SUBR's governing board the option of substituting accreditation of the SUBR School of Business or its Masters in Accountancy Program or both for a masters program listed previously of equivalent cost. Agreement at 11 ¶ 13.

The Agreement also authorized SUBR to establish four new baccalaureate and associate programs: Bachelor of Sciences in Actuarial Science; Bachelor of Arts in Criminal Justice; Bachelor of Sciences in Physical Therapy; Associate in Arts in Criminal Justice. Agreement at 11 ¶ 13.

<u>SUNO (HBI): New Programs Awarded</u>

The Agreement authorized SUNO to implement a new masters degree in criminal justice, which was already approved by the Board of Regents. Furthermore, SUNO was authorized to

develop and implement masters degree programs in the areas of: transportation; substance abuse; teaching; computer information systems. Agreement at 11-12 ¶ 13.

However, SUNO's governing board would have the option of substituting reaccreditation of SUNO's Masters of Social Work for one of the aforementioned programs at equivalent cost.

The Agreement also authorized SUNO to develop three centers, which would be self-supporting: a Community Resource Center; a Center for Community and Economic Development; a Center for African and African-American Studies. Agreement at 11-12 ¶ 13.

<u>Grambling (HBI): New Programs Awarded</u>

The Agreement authorized Grambling to develop and implement one doctoral program: an EdD in Curriculum and Instruction/Educational Leadership, in consortium with Louisiana Tech and Northeast. Agreement at 12-13 ¶ 13

Grambling was further authorized to offer two masters programs, Master of Sciences in Mass Communication and Master of Sciences in Nursing, in addition to seeking accreditation of its Masters of Business Administration.

Finally Grambling was authorized to establish four baccalaureate/associate programs: a BS in Banking/Insurance; a BS in Paralegal Studies; a BS in Criminalistics; an AS in Paralegal Studies. Agreement, at 12-13 ¶ 13.

<u>Joint, Dual, and Cooperative Programming Between HBIs and TWIs</u>

The Agreement formalized several ongoing joint, dual, and cooperative programs between proximate institutions, and encouraged the implementation of additional cooperative programs. The existing and proposed efforts were articulated in Appendices B[4], D[5], and F[6].

- **Joint and Cooperative programs between LSU (TWI) and SUBR (HBI), Appendices, B, D, and F**

Appendix D of the agreement articulated a host of "Joint, Dual, and Cooperative Efforts" between LSU and SUBR within a number of colleges including the colleges of: Arts and Sciences, Basic Sciences, Business Administration, Education, Engineering, and Music. *See* Agreement, App. D.

As an additional means of cooperation, Appendix F of the Agreement articulated the agreement between LSU and SUBR to establish mechanisms aimed at increasing the number of SUBR graduates entering LSU's graduate programs and vice versa. *See* Agreement, App. F. Mechanisms included targeted recruitment efforts as well as giving preference to SUBR graduates when awarding enhanced assistantships, tuition waivers, and fellowships. *Id.*

Finally, and perhaps most significantly, Appendix B[7] of the Agreement laid out a plan for a community college in Baton Rouge that would be jointly administered by LSU and SUBR, called the "LSU/SU Joint University Center" (University Center). *See* Agreement, App. B. Appendix B set forth the joint administration structure whereby half of the twelve member

[4] Appendix B, The Initial Plan for the Community College in Baton Rouge entitled "LSU/SU Joint University Center Higher Education, Settlement Agreement at § 10.

[5] Appendix D. Joint, Dual, and Cooperative Effects. Settlement Agreement at § 15.

[6] Appendix F. Graduate Programs Articulation Agreement. Settlement Agreement at § 19.

[7] Appendix B, Settlement Agreement at § 10.

advisory board would be members of LSU's Board of Supervisors while the other half would be comprised of members of SUBR's Board of Supervisors.

- **Joint and Cooperative Programs between UNO and SUNO, Appendix D**

The Agreement also incorporated as Appendix D an agreement between SUNO and UNO "to continue and enhance their joint, dual and cooperative efforts." Agreement, App. D at 7-10. The agreement provided that the schools would cooperate, in general, with regard to cross-registration, transportation, and recreation. They also agreed to collaborate in the following program areas: art education; journalism; physics/engineering; urban transportation; aging and gerontology; social work and public administration. *Id.*

Furthermore, both schools promised to expand course offerings to non-traditional students, including the addition of a General Studies degree at SUNO. Students would continue to cross-enroll in classes and UNO would provide SUNO space to teach classes on their satellite campuses. *Id.* at 8-9.

Finally, the agreement provided scholarships for other-race students at each school and created a joint committee to coordinate the existing and new program initiatives. *Id*. at 9-10

- **Joint and Cooperative Programming Between Proximate Law Schools: LSU and Southern, Appendix F**

The Agreement stated that LSU and SU would "develop and implement a structured arrangement which will channel graduates of each institution into graduate and professional programs of the other institution as other-race students." Agreement at 18 ¶ 19. Appendix F[8] contained the full articulation agreement between the two schools. The Agreement's major provisions provided that LSU would recruit and support other-race enrollment through scholarships, enhanced recruitment efforts, flexible admissions standards, preferences for African-American candidates, and faculty appointments. Southern would invest in other-race recruitment efforts, reserve a number of other-race assistantships and fellowships, and develop professional and support networks for other-race students.

Furthermore, the Agreement formalized a series of joint and cooperative programming including: shared library facilities, joint degree programs, the appointment of a faculty member to direct and expand upon cooperative efforts between the law schools.

The Agreement also incorporated a second LSU-Southern agreement with regard to joint and cooperative programming through their law centers (LLC and SLC respectively). *See* Agreement, App. H.[9] The agreement between law schools articulated three major commitments. First, the schools committed to improving the quality of Southern Law Center's (SLC) physical facilities and academic offerings. With regard to the latter, the agreement augmented SLC's curriculum by creating more programmatic support for bar preparation and legal writing skills. *Id.* at 1-2. Second, the schools committed to articulating the fundamental differences in the mission of the two schools. The agreement observed that SLC placed a greater focus on non-traditional students and also notes SLC's investment in its clinical programs. *Id.* at 3-5.

Third, the schools committed to increasing access of African-American students to LLC (through recruitment, scholarships, and various remedial and retention programs). *Id.* at 6-8.

---

[8] Appendix F, Settlement Agreement at § 19.

[9] Appendix H, The Law Centers in Baton Rouge, dated December 8, 1992, Source: State Response to Show Cause Order of Sept. 10, 1992, Regarding Merger of Law Schools, Settlement Agreement at § 21.

- **Exceptions to Admissions Criteria to Admit Other-Race Students**

As detailed above, the Agreement tiered proximate institutions' admissions criteria in an attempt to differentiate between proximate institutions' missions and avoid program duplication. Agreement at 7 ¶ 5. The Agreement did permit each institution to have 15% of its entering class set aside for admissions exceptions, 10% of which was to be used for admitting other-race students and the remaining 5% to be used for other institutional interests. Agreement at 8 ¶ 8.

- **Capital Outlay Funding**

The Agreement obligated the State to fund pending capital outlay projects which were not completed under the prior Consent Decree. Agreement at 18-19 ¶ 20.

- **Other-Race Recruitment And Retention**

The Agreement mandated that each state institution would develop a comprehensive program for recruitment and retention of other-race students, faculty, administrators, and staff. Such comprehensive programs were required to include: at least one admissions officer whose primary function is to recruit other-race students; the adoption of a written equal opportunity policy; a significant campaign to advertise the institution to prospective other-race students; the development of outreach programs to high schools in predominantly other-race areas; the establishment of other-race scholarships; and a plan to aggressively recruit qualified, other-race employees. Agreement at 20-24 ¶¶ 22, 23.

- **Oversight and Dispute Resolution**

The Agreement established a three-member committee ("Monitoring Committee") to monitor compliance, selected by the parties and subject to court approval. Agreement at 24-25 ¶ 24. The Monitoring Committee was tasked with filing annual evaluations with the court and providing advice and assistance to the parties to resolve a dispute.

The Agreement set an expiration date of December 31, 2005. Agreement at 27 ¶ 28.

# A-4

# APPENDIX 4

# MISSISSIPPI

***Summary of Remedies Implemented in Mississippi***

There are three public historically black institutions ("HBIs") in Mississippi: Jackson State University is a comprehensive institution located in Jackson; Alcorn State University ("Alcorn") is a regional institution located in the southwestern corner of the state; and Mississippi Valley State University ("MVSU") is a regional institution in the Mississippi Delta. Following the U.S. Supreme Court decision in *United States v. Fordice*, 505 U.S. 717 (1992), the district court in Mississippi determined on remand that the State had not yet dismantled its formerly segregated system of higher education. *Ayers v. Fordice*, 879 F. Supp. 1419 (N.D. Miss. 1995) [hereinafter *Ayers II*]. After trial, the district court found traceable policies and practices related to undergraduate admissions, institutional missions, funding to the extent it was tied to mission, equipment and library allocations to the extent they follow mission, program duplication, separate land grant programs, and the continued operation of all eight universities. *Id.* at 1477.

The remedies adopted to desegregate the higher education system in Mississippi are primarily outlined in the district court's 1995 remedial decree and 2001 settlement agreement, and are summarized below. *Ayers v. Musgrove*, No. 4:75CV009-B-D (N.D. Miss. Feb. 15, 2002).[1] As amended by the agreement, the remedies in Mississippi included a number of new and enhanced programs at each of the three HBIs. Between the remedial decree and settlement, the HBIs were to receive up to a total of $516,980,000[2] in funds to support new and enhanced programs, specific capital improvements, other-race recruitment, and other-race scholarships. The most relevant aspects of the 1995 court decree and 2001 settlement are summarized below.

- **New and Enhanced Programs at the HBIs**

Both the court's 1995 remedial decree and the later settlement anticipated a number of new and enhanced programs at the HBIs. In terms of programmatic enhancements, the 1995 decree required the Board to identify select programs in allied health not offered by the University of Mississippi Medical Center ("UMMC") in Jackson or which might be jointly offered with UMMC to be implemented at JSU. *Ayers II*, 879 F. Supp. at 1494. A Doctorate in Social Work, a Masters and Doctorate in Urban Planning, and a Doctorate in Business Administration were to be placed at JSU. *Id.* The decree also ordered the Board to take whatever steps were necessary to vest complete institutional control of the Universities Center[3] in Jackson at JSU. *Id.*

According to the 2001 agreement, the HBIs were to "develop, implement, strengthen,

---

[1] Unreported decision available online at www.casetext.com/case/ayers-v-musgrove-5.

[2] This amount does not include the additional $4 million a year in matching funds to be provided to the ASU Small Farm Center pursuant to the 1995 remedial decree.

[3] A number of TWIs offered extension programs in Jackson that competed with JSU. *Ayers v. Allain*, 674 F. Supp. 1523, 1542 (N.D. Miss. 1987) [hereinafter *Ayers I*]. Those were addressed in the state's 1974 desegregation plan ultimately rejected by the U.S. Department of Education Office for Civil Rights ("OCR"). *Id.* at 1530.

review, and modify the programs identified" consistent with sound educational practices, the objective of desegregation, and resources available over time. *See* Settlement Agreement, *Ayers v. Musgrove*, No. 4:75CV009-B-D, 5 (2001) [hereinafter "Settlement"].[4] The Settlement proposed a number of programs to be added or enhanced at JSU. These included a Doctorate in Business, a Masters and Doctorate in Urban Planning, a Doctorate in Social Work, a Bachelors in Civil Engineering, a Bachelors in Computer Engineering, a Bachelors in Telecommunications Engineering, a Masters and Doctorate in Public Health, a Bachelors in Health Care Administration, a Masters in Communicative Disorders, a Doctorate in Higher Education, a pharmacy initiative, a School of Allied Health, a School of Public Health, and a School of Engineering. JSU was also to receive enhancements in business and education. *Id.* at 8.

The 1995 remedial order gave Alcorn a Small Farm Development Center and a Masters in Business Administration at the ASU Natchez Center. *Ayers II*, 879 F. Supp. at 1483, 1486. The settlement then identified a number of additional programmatic additions and enhancements for Alcorn. These included a Masters in Accounting, a Bachelors in Finance, a Masters in Physician Assistants, a Masters in Biotechnology, a Bachelors in Computer Networking, a Bachelors in Environmental Science. The agreement specifically provided enhancements at Alcorn in the areas of nursing, teacher education, math and science (biology, chemistry, physics) and computer science. *See* Settlement at 6-8.

Because of a proposed merger between MVSU and Delta State University ("DSU"), MVSU did not receive additional programs until the 2001 settlement, by which time the Board had concluded and the district court had agreed that the merger was impracticable. *See Ayers v. Thompson*, 358 F.3d 356, 362 (5th Cir. 2004) (referencing procedural history prior to the appeal and district court decisions following 1997). The settlement established at MVSU a Bachelors in History, a Bachelors and Masters in Special Education, a Masters in Computer Science, a Masters in Bioinformatics, a Masters in Leadership Administration, and a Masters in Business Administration at the HBI. MVSU also received enhancements in biology, chemistry, computer science, math and special education. *See* Settlement at 7-8.

- **Funding For Programs: $249,480,000 + $4 Million Annual Matching Funds**

The 1995 remedial decree did not identify the actual level of funding necessary to implement court ordered programmatic enhancements, but it did note that the State must ensure the funding necessary to implement all measures outlined in the decree. *See Ayers II*, 879 F. Supp. at 1496. In addition, it ordered the State to provide up to $4 million in annual matching funds for a new Small Farm Center at Alcorn mentioned above. *See id.* at 1486.

The settlement agreement provided a total of $245,880,000 to be distributed between the institutions over 17 years on an annual basis, with each institution receiving a pro rata share outlined in the agreement and described below. Funding required to implement the agreement was not to supplant regular funding for the HBIs. *See* Settlement at 14-15. Finally, the agreement released $3.6 million which had been previously frozen by the district court, to be allocated equally between Alcorn and MVSU for the implementation and enhancement of the identified programs. *Id.* at 17.

- **Capital Funding: $90 Million**

[4] *Available at* http://www.mississippi.edu/ayers/downloads/settlement_agreement_ayers.pdf.

The 1995 remedial plan provided a total of $15 million to JSU in order to permit it to acquire land and enhance its campus. The settlement agreement identified a number of capital improvements for the HBIs. Between 2002 and 2006, the State agreed to provide $15,000,000 per year for a total of $75,000,000 to the Board for capital improvement projects identified by the agreement and allocated between the HBIs by the Board after consultation with the HBI presidents.[5] *See id.* at 13. The later settlement provided an additional $75 million to all three HBIs to complete specific capital improvement projects at each campus, which are referenced in more detail below. *See id.* at 16.

- **Endowments for Other-Race Scholarships and Diversity Programs: $115 Million**

The 1995 order established a $5 million endowment for JSU as well as for Alcorn (for a total of $10 million combined) to fund other-race scholarships and diversity programs. *Ayers II*, 879 F. Supp. at 1495.

The settlement established a publicly funded endowment in the amount of $70,000,000 over a 14 year period, [6] which was to be managed by a seven person committee.[7] *See* Settlement at 9. The income was to be allocated 28.3% to Alcorn, 43.4% to JSU, and 28.3% to MVSU and was to be used for other-race marketing and recruitment, including other-race recruiting personnel and other-race scholarships. The income could also be used for new academic programs and enhancements as provided for by the agreement. *See id.* at 9, 11.

The agreement also established a private endowment in the amount of $35,000,000 over a 7 year period, which was to be managed by the same committee managing the public endowment.[8] The income would be allocated between the three HBIs using the same pro rata percentages,[9] and could be used for other-race marketing, recruitment and scholarships. *See id.*

- **Student Financial Aid: $62.5 Million**

The settlement provided another $6,250,000 over a 10 year period to supplement

---

[5] Alcorn was to receive $1.1 million for equipment for the new Masters in Business Administration, another $9 million for a new fine arts center, $3.5 million to repair and renovate Dumas Hall to assist its efforts to receive accreditation of its business program, $1 million to purchase property to improve security and access to its Lorman campus, and another $10.5 million for a biotechnology building. JSU was granted $20 million for an engineering building and $3.3 for the Allstate building. MVSU was to receive $5 million for library enhancements, $16.7 million for a science and technology building, $3 million for landscape and drainage, and $1.9 million for repairs and renovations. These estimates, and excess funds could support other capital projects at the institution but expenditures for these projects were not to exceed the amounts identified. *See* Settlement at 13.

[6] The state legislature was to appropriate to the Board $5,000,000 per year for 11 years, for a total of $55,000,000. After that, a $15,000,000 trust would be terminated through special appropriations of $5,000,000 annually for three years either to the Board or the HBIs directly, if the HBIs reached specific other-race enrollment targets outlined in the agreement. If an HBI reached 10% other-race enrollment and sustained that for a period of three consecutive years, the Board was to transfer to the school the specified pro rata share of the existing principal of the public endowment. *See* Settlement at 10.

[7] The committee was to consist of the presidents of the HBIs, the Commissioner of Higher Education, two Board members (the president and the president's designee), and another member to be agreed upon by the other members. *See* Settlement at 9.

[8] The Board would control the private endowment until an HBI attained 10% other-race enrollment for three years, at which point the HBI would receive its pro rata share of the existing principal.

[9] The principal was not to be invaded. *See* Settlement at 11.

financial aid to be used to improve student access to summer developmental education programs for those affected by financial considerations, so that eligibility would be based on student financial need. *See id.* at 4, 15.

- **Mission Designation: JSU Identified as a Comprehensive Institution**
  Prior to the 2001 settlement agreement, JSU was identified as a regional institution serving the Jackson area. That designation was not altered by the remedial decree or subsequent court orders. *See generally Ayers v. Thompson,* 358 F.3d. 356. The agreement designated JSU as a comprehensive institution and noted that the programs and facilities enhancements identified within the agreement were consistent with that classification. Settlement at 17-18.

- **Oversight: Monitoring Committee and Ongoing Federal Jurisdiction**
  The 1995 remedial plan established a Monitoring Committee to review the court ordered studies and reports required by the plan, and recognized that ongoing federal court supervision was necessary to ensure implementation of the order. *See Ayers II,* 879 F. Supp. at 1495.

***Brief Procedural History of Ayers v. Fordice***

In 1975, black citizens of Mississippi initiated a class action against various state officials alleging that the state's dual system of public higher education violated the constitution and federal civil rights statutes. After twelve years of unsuccessful negotiation, the case went to trial. The district court held that Mississippi had fulfilled its affirmative duty to eliminate its *de jure* segregated system by adopting race-neutral policies related to admissions, faculty and staff hiring, and resource allocation. *See Ayers v. Allain*, 674 F. Supp. 1523 (1987). A panel of the Fifth Circuit reversed and remanded, but on rehearing the Fifth Circuit vacated that decision and reinstituted the district court findings of fact and conclusions of law. *See Ayers v. Allain,* 914 F.2d 676 (5th Cir. 1990) (*en banc*).

That decision was overruled by *United States v. Fordice,* 505 U.S. 717 (1992), which held that the adoption of race-neutral policies and practices had not dismantled the formerly dual system of higher education in Mississippi. The Supreme Court concluded that "[i]f policies traceable to the *de jure* system are still in force and have discriminatory effects, those policies too must be reformed to the extent practicable and consistent with sound educational practices." *Id.* at 729.

On remand, the district court determined that the State had not discharged its duty to dismantle a dual system of higher education. *See Ayers II*, 879 F. Supp. at 1419. Applying *Fordice,* the court found that a number of the State's traceable policies and practices had ongoing segregative effects, including those related to the provision of duplicative offerings between geographically proximate and racially identifiable institutions. *See id*. at 1477. The court entered a remedial plan with specific programmatic enhancements, funding, endowments, and other measures. *See id.* at 1494-96.

The district court found "without a doubt" that the arrested development of JSU was traceable to *de jure* segregation, and agreed in part with plaintiff's contentions that the lack of professional programs at JSU more likely than not affect its position and reputation vis-à-vis the white comprehensive universities, especially with respect to the "types of programs that promise the greatest degree of desegregation, e.g., pharmacy, law, engineering." *Id.* at 1484. The court anticipated that the proposed funds to purchase adjoining land and enhance the campus would correct JSU's image. *See id.* at 1485.

In addition to the new and enhanced programs at JSU described above, the court ordered a study of programmatic enhancements which might ensure a "reasonable degree of desegregation" at JSU. *Id.* at 1486. This study was to determine the relative strengths and weaknesses of existing programs "with the express purpose of determining the nature and direction of those programs slated to be implemented, as well as further programmatic expansion at JSU, to best achieve the urban emphasis of its mission." *Id.* at 1494-95. This included consideration of whether there was need for an additional law school at JSU, or whether one state law school placed at JSU would help enhance JSU, and whether an engineering school and a professional five-year pharmacy program should be placed at JSU.[10] *See id.* at 1485.

The decree further directed that special funds up to an aggregate of $15 million over no more than five fiscal years to fund property acquisition, campus entrances, security and grounds enhancement, and that income from the $5 million endowment be used to fund "continuing educational enhancement and racial diversity, including recruitment of white students and scholarships for white applicants in a number and an amount determined by the court upon recommendation from the Monitoring Committee." *Id.* at 1495. A $5 million endowment trust was also to be created for the benefit of Alcorn.[11] *See id.*

In addition, the Board was to "take steps toward developing strong articulation agreements between JSU and surrounding community colleges within its service area" capable of ensuring "alteration in the percentage of students enrolled in upper division courses, thereby creating the potential of increasing its funding under the formula." *Id.* at 1495.

With respect to Alcorn, in addition to the Masters in Business and Small Farm Development Center mentioned above, the court ordered the State to provide extension funds to match dollar-for-dollar federal funds up to an aggregate of $4 million a year. *See id.* at 1486. The State was also to provide "special funding" for the business program, including "related capital improvement". *Id.* at 1495.

The district court believed that "the most segregative aspect of the State system of higher education is the maintenance of eight universities with differential admissions standards between the TWIs and HBIs, thereby maintaining the racial identifiability of the universities," *id.* at 1490, and that this continued to foster segregative choice in the Delta and perpetuated the racial identifiability of Mississippi Valley State University ("MVSU"). As a result, the remedial decree provided that the proposed consolidation of MVSU and Delta State University ("DSU") be studied. *Id.* at 1495.

The court found that the Board's existing program approval process was an "educationally sound way of managing duplication in the system," and therefore presumed that uniform admissions, programmatic enhancements and funding would "realistically promise to obviate or lessen whatever segregative effects" produced by unnecessary duplication. *Id.* at 1486. Even so, a Monitoring Committee was established to ensure the implementation of the terms of

---

[10] JSU does not currently offer law or pharmacy. *See* May 2013 Academic Program Inventory Degree Book ("2013 Degree Book"), Academic Programs Summary Chart A at 16-24, http://www.mississippi.edu/research/downloads/2013_degreebook.pdf

[11] The Board was authorized to control and account for the expenditure of funds outlined in the decree, but the court specifically provided that the State "shall provide the funding for all such measures ordered by this decree." *Ayers II*, 879 F. Supp. at 1496.

the remedial decree.[12] Furthermore, the court retained jurisdiction over the implementation of the decree. *Id.* at 1496.

The remedial plan was later challenged by plaintiffs. The Fifth Circuit affirmed in part, reversed in part, and remanded for further proceedings. *See Ayers v. Fordice,* 111 F.3d 1183 (5th Cir. 1997). The court of appeals substantially affirmed the findings regarding the additional resources for the HBIs, but did instruct the lower court to reconsider new programs at Alcorn and MVSU. *See id.* at 1209-1225. The Fifth Circuit agreed that the original remedial decree should have required the consideration of adding new programs with the potential to desegregate MVSU and Alcorn. *Id.* at 1214.

Plaintiffs appealed the conclusion that new programs would not desegregate MVSU, and requested further relief with respect to Alcorn. *See id.* at 1212. The Fifth Circuit agreed that steps might be taken to desegregate MVSU in light of the district court holding that the HBIs in other states have been successful in integrating their student bodies through a variety of approaches and measures, although determining what those steps might be required further study. *See id.* at 1213. In particular, the court of appeals noted that the evidence presented below seemed to show that well-planned programs responsive to the particular needs and interests of local populations can help desegregate the HBIs. *See id.* at 1214.

Consequently, the lower court was ordered to clarify whether the proposed consolidation between MVSU and DSU offered an educationally sound and practicable means of desegregating the Delta. *See id.* at 1214, 1228. If not, the Board was to study other effective methods of desegregating MVSU, including the possibility of adding academic programs. *See id.* The Fifth Circuit acknowledged that "measures that have been successful in desegregating historically black institutions in other states may have the potential over the longer term to be effective also at Alcorn State." *Id.* at 1214. As a result, it ordered that the previously ordered study of JSU also include an assessment of whether new academic or land grant programs might increase other-race enrollment at Alcorn. *See id.* at 1214, 1228.

After that decision, the district court conducted a number of hearings to review the implementation of its decree.[13] By June 1998, it was determined that the proposed consolidation between MVSU and DSU was impracticable. Instead, the Board was ordered to study programs to be implemented at MVSU capable of attracting other-race students. *See Ayers*, 358 F.3d at 363. In October 1999, the district court considered the Board to be in full compliance with several of its obligations related to JSU. *See id.* By January 2001, the district court ordered that having found no unmet demand for additional legal education in the Jackson area, the Board need not establish a law school at JSU as part of its obligation to desegregate that institution. In addition, it was held that the existing pharmacy program at UM met the state need for pharmacy education so that the addition of such a program at JSU was neither feasible nor educationally sound. *See id.* at 364.

In 2001, the parties entered a settlement agreement which identified a number of additional program areas to be implemented or continued at each of the HBIs and funded over a seventeen year period.[14] *See Ayers v. Musgrove,* No. 4:75CV009-B-D, 2002 WL 91895 (N.D.

[12] The Monitoring Committee was to consist of three objective persons with experience in higher education, agreed to by the parties and approved by the court. *Ayers II,* 879 F. Supp. at 1494.

[13] While not all of the district court decisions appear to be reported, some are summarized in *Ayers v. Thompson*, 358 F.3d 356, 363 (5th Cir. 2004).

[14] The specific new and enhanced programs for each HBI are identified above and are not listed again here.

Miss. Jan. 2, 2002). The court held several hearings and conferences regarding the proposal. *See id*.

When presented with the proposed settlement, the district court expressed concern about the high cost and long duration contemplated by the proposed agreement.[15] *Id.* at *3. Even so, the court noted that it preferred all cases end in an agreement between the parties. *See id.* at *4. The district court ultimately approved the settlement after a fairness hearing and confirmation that the state legislature would fund the terms of the court approved settlement. *See id.* at *3. Dissatisfied with the scope of relief in that agreement, some of the private plaintiffs appealed that order and requested that the settlement be invalidated. Among other things, the appellants sought more funding and programs for the HBIs. *See Ayers*, 358 F.3d at 370-71 (2004). After determining that these issues had been addressed by prior court rulings, the Fifth Circuit affirmed the district court decision approving the settlement agreement after finding no abuse of discretion by the lower court. *See id.*

[15] In an unreported order scheduling a hearing and directing notice to the proposed settlement class, the district court noted that the parties plan "acknowledges only in a cursory fashion the heart of this case, desegregation" and noted that "the true issue in this case, the issue upon which the case has been tried at every court hearing, is desegregation." *See* D.E. 751, Scheduling Order, *Ayers v. Musgrove*, Civil Action No. 4:75CV009-B-D, 3 (N.D. Miss. May 8, 2001).

# A-5

# APPENDIX 5

# TENNESSEE

***Summary of Remedies Implemented in Tennessee***

The litigation to desegregate Tennessee's higher education system commenced when plaintiffs filed suit in 1968 to challenge the State's maintenance of a racially segregated system of higher education contrary to the Fourteenth Amendment. *See Sanders v. Ellington*, 288 F. Supp. 937 (M.D. Tenn. 1968). Specifically, plaintiffs sought to enjoin the proposed expansion of the University of Tennessee-Nashville Center (UT-N), a historically white institution (TWI), which would exacerbate racial disparities between UT-N and Tennessee State University (TSU), a historically black institution (HBI). *Id.* at 939. The district court did not initially grant the injunction, but found that Tennessee had maintained a dual system of higher education and its institution of an "open-door" admissions policy did not satisfy to its obligation to dismantle the discriminatory system. *Id.* at 942-43.

After finding liability, the district court ordered defendants to submit a plan to desegregate higher education institutions across the state. *Id.* at 943. From 1968 through 1976, the defendants submitted various desegregation plans and progress reports on the state's higher education institutions. *See Geier v. Blanton,* 427 F. Supp. 644, 646-56 (M.D. Tenn. 1977). The court repeatedly found that the desegregation of TWIs showed promising progress but that impermissible racial segregation continued to exist in Middle Tennessee with regard to TSU (HBI) which retained its racial identifiability, due in significant part to its competition with UT-N (TWI). *Geier,* 288 F. Supp. at 652. The court repeatedly directed defendants to revise their desegregation plans and took preliminary steps to increase white enrollment at TSU by transferring several specific programs from UT-N to TSU. *Id.* at 649.

When progress towards desegregating TSU remained insufficient by 1976, eight-years after the initial desegregation order, the court invoked its equitable powers by mandating a merger between TSU and UT-N to be completed by July 1, 1980. *Id.* at 600-61, *aff'd Geier v. Univ. of Tennessee*, 597 F.2d 1056 (6th Cir. 1979). The merger was implemented and the court retained jurisdiction to consider what further remedies might be required to dismantle the dual system. *Id.* at 651, 662; *see also Geier v. Alexander,* 593 F. Supp. 1263, 1267 (M.D. Tenn. 1984) (affirming court's ongoing jurisdiction over the matter). In 1984, the parties entered a Stipulation and Settlement Agreement to resolve remaining issues. *See Geier v. Alexander*, 593 F. Supp. 1263 (M.D. Tenn. 1984), *aff'd Geier v. Alexander,* 801 F.2d 799 (6th Cir. 1986).

In 1994 the defendants filed a motion to declare unitary status, which plaintiffs opposed. *See* Br. of Plaintiffs, 2003 WL 25745337, at *14 (describing procedural history). The parties recommenced negotiations and they entered a Consent Decree in 2001. *Geier v. Sundquist,* 128 F. Supp. 2d 519 (M.D. Tenn. 2001). The 1984 and 2001 settlements are described in further detail below.

Altogether, plaintiffs offered a "conservative estimate" that the total relief obtained by the litigation prior to the 2001 Consent Decree should be valued at more than $320 million, an estimate that reflected the remedial actions pursuant to the 1984 Settlement as well as the prior, court-ordered merger. Br. of Plaintiffs, 2003 WL 25745337, at *15-16. The 2001 Consent

Decree provided additional relief in the amount of approximately $75 million resulting in a total amount of approximately $395 million awarded in remedial relief. Br. of Plaintiffs at *15-16.

***Remedial Provisions of the 1984 Settlement: Approximately $320 Million when Combined with the Court-Ordered Merger***

- **TSU: Mission Enhancement, Programmatic Realignment, Facility Assessments, and Scholarships**

The Settlement elevated TSU's academic reputation by requiring remedial actions with regard to a physical facility assessment, mission-enhancement, and programmatic realignment. First, TSU's physical facilities would be assessed and a plan would be developed to accomplish all necessary renovations and new constructions within five years. *Geier v. Alexander*, 593 F. Supp. 1263 (M.D. Tenn. 1984). Second, the Settlement required the State Board of Regents (SBR) and the Tennessee Higher Education Commission (THEC) to develop a plan to endow TSU with a unique, specialized mission to ensure TSU could achieve status as the regional urban university for Middle Tennessee. *Id.* at 1272-73.

Finally, the Settlement required programmatic realignment through several remedial actions. First, for five years the State Board of Regents had to accord TSU first priority for all new graduate program proposals in the Middle of Tennessee. *Id.* at 1273. In addition to this priority, the Settlement placed limits on programming at the two proximate TWIs which were prohibited from proposing doctoral programs, and from seeing a net-increase in their masters degree programs during this five-year term. *Id.* Second, the State Board of Regents had to develop an Institute of Government at TSU and provide TSU consultants to assist in developing the new program, strengthening TSU's current program in public administration, and identifying new programs to offer. *Id.*

Beyond the actions specific to TSU, the Settlement required the two proximate TWIs and TSU to discuss detrimental program duplication and develop a plan for the realignment of certain specified programs in order to support TSU's enhanced mission. *Id.* In addition, the Settlement directed the three institutions to develop a plan to facilitate cross-enrollment between their institutions. *Id.* at 1274.

- **The Creation of a Desegregation Monitoring Committee and Benchmark Objectives**

The 1984 Settlement created the Desegregation Monitoring Committee to formulate a procedure for monitoring and reporting progress to the court on the desegregation of all institutions. *Id.* at 1268-69. The plans set forth "benchmark objectives" to be achieved by the end of each year. *Id.* at 1269. With regard to objectives at TSU, the 1993 interim objective would be set at 50% white full-time equivalent enrollment. *Id.* The long range objectives for the racial composition of students at TSU will be set on the same basis as the objectives are set at all other institutions in the state. *Id.*

- **Studies to Determine How Current Policies Should Be Revised to Promote Desegregation Among Higher Education Institutions**

The Settlement required defendants to conduct a number of studies to assess how policies exacerbated racial segregation and, relatedly, whether policy revisions would have a desegregative impact. Specifically, the Settlement ordered studies to examine: whether there was

a racial disparity in college enrollment and graduation rates by race; whether awarding other-race students tuition discounts, loans, scholarships, and/or other incentives would be feasible and effective at desegregating institutions; whether any institution projects an image as being racially identifiable; and whether there are any inequities in awarding public and private financial aid. *Id.* at 1269-70. If these studies revealed racial inequities, the Settlement directed the development of desegregation plans and/or modification of existing plans to more effectively dismantle the state's dual system of education. *Id.* at 1269-70.

- **Specific Actions With Regard to Revising Admissions Requirements, Recruitment Strategies, and Scholarship Awards to Promote Desegregation**

In addition to studies, the Settlement explicitly mandated that certain actions be taken with regard to admissions, recruitment and scholarships to dismantle the dual system of education. With regard to TSU, admissions requirements would be raised over a period of five years. *Id.* at 1270. Throughout the higher education system, the State Board of Regents and the University of Tennessee would monitor, develop and coordinate a statewide other-race recruiting program, utilizing bi-racial recruiting teams. *Id.* Finally, the Settlement included provisions to provide funding to promote the enrollment and retention of minority students in the state's graduate and professional schools. *Id.* at 1270-71.

- **Attracting Other-Race Faculty and Administrators to Institutions**

Under the Settlement, defendants agreed to develop programs to attract other-race faculty and administrators to the state's higher education institutions. *Id.* at 1272.

- **Jurisdiction and Further Relief**

Under the 1984 Settlement, the court retained jurisdiction to oversee the Settlement's implementation. *Id.* at 1274. Furthermore, plaintiffs could return to the court to request further relief if the normal budgetary processes did not provide sufficient funding to implement the Settlement's provisions, or to enforce compliance with the Settlement should defendants not proceed in good faith. *Id.* at 1269.

***Remedial Provisions of the 2001 Consent Decree: Approximately $75 million***

- **TSU: Programmatic Development and Exclusivity**

The Consent Decree provided that, during the term of the agreement, if a public law school was to be established in Middle Tennessee, it must be established at TSU. *Geier*, 128 F. Supp. 2d at 531-32. Parties agreed that TSU would enter negotiations with the Nashville School of Law, a proximately located private institution, to discuss merger. *Id.* at 532. However, the State was not obligated to secure a merger agreement. *Id.*

In the event the discussions did not result in a merger, the Consent Decree provided funding for further programmatic development at TSU. *Id.* Specifically, if the merger did not occur the State agreed to provide TSU with up to $5,000,000 in start-up funding for several new programs including: a new, high-demand doctoral degree in an area that would attract other-race students; start-up costs associated with establishing a College of Public Service and Urban Affairs, and one new program to be started therein; up to two new high-demand programs at the baccalaureate or masters level that would attract non-traditional students to TSU's downtown

Williams Campus. *See id.* The Consent Decree mandated that the programs created through this funding had to be non-duplicative of existing programs at proximate, public institutions. *Id.* at 532-33. Once approved, TSU must retain programmatic exclusivity in these areas. *Id.*

Moreover, the Consent Decree mandated that TSU maintain its current exclusivity in Middle Tennessee for all programs in which it enjoyed exclusivity as of the 2001 Consent Decree. *Id.* at 525. An exception could only be made if there was a demonstrated need for duplication and a showing that such duplication would not adversely affect the desegregation of TSU. *Id.*

- **Requirements Placed on the Proposed, Proximate Community College And Funding To Ensure TSU Could Attract Other-Race, Non-Traditional Students**

The Consent Decree ensured that if a proximate, community college was created it would not be subsumed or become a branch of an existing university, as such a structure could undermine TSU's ability to attract non-traditional students. *Id.* at 533. Furthermore, the Consent Decree mandated that TSU and any such community college must formulate articulation and transfer agreements. *Id.* Finally, the Tennessee Board of Regents was obligated to proactively ensure there were strong linkages between the community college and TSU, such as utilizing TSU faculty to teach community college students. *Id.* As a final measure to protect TSU's ability to attract non-traditional, other-race students, the state would provide funding to enable 350 community college students to transfer to TSU without increasing their tuition rates, as the difference in the tuitions would be supplemented by the state. *Id.*

- **Specific Restrictions and Agreements Related to Proximately Located Institutions**

Beyond granting TSU program exclusivity in already occupied areas, the Consent Decree limited the number of PhD programs that could be offered by Middle Tennessee State University (MTSU). As a general restriction, the Consent Decree only permitted MTSU to convert Doctorate of Arts programs to PhD programs if they were noncompetitive and non-duplicative of TSU's existing doctoral programs. *Id.* at 533-34. Furthermore, during the first two years of the Consent Decree MTSU could only convert three of its Doctorate of Arts programs to PhDs. *Id.* at 533-34. Finally, the number of MTSU's PhD programs could at no time exceed the number offered at TSU. *Id.* at 534.

As an additional restriction, the Consent Decree clarified that for the term of the agreement, MTSU could not offer courses for credit at any physical location in Davidson County. *Id.*

The Consent Decree also required three public institutions located in Middle Tennessee – TSU (HBI), MTSU (TWI), APSU (TWI) – to form a committee to encourage cross-enrollment between the institutions through the creation of coordinated calendars and transfer agreements. *Id.* In addition, the Consent Decree created committees to explore the expansion of cooperative extension and agricultural research programs between TSU (HBI) and UTIA (TWI). *Id.* at 545.

- **Approval Process for New Programs and Program Termination to Protect TSU's Program Exclusivity**

In addition to the general statement that TBR and THEC were obligated to approve and terminate programs consistent with the state's programming plan, the Consent Decree explicitly articulated the requirement that any new proposed program must undergo an assessment to determine its potential impact on the desegregation of Middle Tennessee institutions. *Geier*, 128

F. Supp. 2d at 534-35.To be approved, it was required that the program assessment showed "no negative effect be discernible." *Id.* Moreover, it was required that the added program "not infringe or diminish the educational mission of any other institution." *Id.*

- **TSU: Recruitment of Other-Race, Non-Traditional Students Through Advertising, Targeted Recruitment, and Revitalization of the Downtown Campus**

The Consent Decree directed TSU to develop and implement a plan to recruit other-race, non-traditional students. *Id.* at 524.The Consent Decree further mandated that TSU's Dean of Admissions be provided with at least two recruiters, support staff, and the resources necessary to recruit other-race students. *Id.* As part of this larger effort, the Consent Decree specifically required TSU to strengthen its outreach to the local business community to better fulfill its mission as the major state-supported urban and comprehensive university in Middle Tennessee. *Id.* at 527.

Additionally the Consent Decree mandated a two-year public relations campaign targeting local, non-traditional students to increase awareness about TSU's academic offerings. *Id.* at 524. The campaign would be funded jointly with the State contributing 65% of the costs, not to exceed $400,000 over the two-year campaign period. *Id.* at 525.

The Consent Decree further mandated the revitalization of TSU's Downtown Williams Campus as part of a major effort to attract more non-traditional students. *Id.* at 530-31. The State agreed to provide the capital funding necessary to renovate the Williams Campus. Furthermore, the State agreed to provide $3,750,000 over five years to fund a scholarship program for local, non-traditional students to attend TSU. *Id.* at 530. Finally, the revitalization of the Williams Campus would include the development of new curriculum programs that would appeal to working, adult students. *Id.* at 531. The Consent Decree directed the TSU Committee to develop a plan and proposed budget to be submitted to the Monitor and all parties for approval. *Id.*

- **Establishment of the TSU Endowment for Educational Excellence**

The 2001 Consent Decree created the TSU Endowment for Educational Excellence which could be used for educational purposes, including: merit-based scholarships, faculty development, research grants and support, Chairs of Excellence and Centers of Excellence, support of lectures by nationally known authorities, the enhancement of library services, and/or management fees associated with the Endowment's management. *Id.* at 525-26.

The State agreed to contribute $1,000,000 annually to the Endowment for ten years and, additionally, match TSU's privately raised funds up to $10,000. *Id.* at 526. Thus, if TSU secures a full match of private funds, the provision cumulatively mandates the State provide TSU with $20,000 for its endowment. *Id.*

- **TSU: Facilities Review**

The 2001 Consent Decree mandates a facilities review of TSU to determine whether the vestiges of discrimination have been removed. *Id.* at 527. The review should inform a report and recommendations for submission to the Monitor and parties of record. *Id.* If the parties are unable to agree on the appropriate course of action, the parties may raise the issues with the court. *Id.*

- **Oversight, Dispute Resolution, and Data Collection Under the 2001 Agreement**

The 2001 Consent Decree mandated the appointment of a Monitor to facilitate implementation of the Consent Decree's provisions and to mediate controversies in the event disagreements could be resolved without court action. The Consent Decree required the Monitor to "be committed to the removal of the vestiges of segregation" and the Consent Decree's objectives. *Id.* at 546. Additionally, the Consent Decree recommended the Monitor be permitted to seek the assistance of nationally-recognized experts, and also directed the Monitor to report to the court and the parties twice a year on the status of the implementation and the State's compliance with the Consent Decree. *Id.*

Throughout the various provisions, the Consent Decree structured a process to resolve disputes, which proceeded as follows: (i) when a provision required a report and recommendation, such materials would be delivered to the Monitor and parties of record; (ii) if the parties agreed on the course of action through mediation with the Monitor, the agreement would be filed with the court; (iii) if the parties did not agree, the Monitor had the discretion to call upon nationally recognized experts to better inform the mediation; (iv) if the parties still did not agree, the Monitor would so inform the court and file a recommendation for court action. *See, e.g.*, *Id.* at 523-24, 528-31, 536, 541-44, 546 (describing the process to resolve disputes, repeated a total of twelve times throughout the Consent Decree). The Consent Decree provided that the State would be responsible for the reasonable costs of the Monitor. *Id.* at 546.

In addition to the Monitor's role, both parties retained the right to petition the court to review acts of alleged non-compliance, as long as the parties first attempted to resolve the dispute with the aid of the Monitor. *Id.* at 545-46.

To further ensure that all parties were appraised of the Consent Decree's implementation, the Consent Decree required the parties to agree upon the data that should be collected to measure the effects of the Consent Decree. *Id.* at 546-47. This data would be collected on an annual basis.

The court retained jurisdiction for five years, or for the period of time necessary to ensure full compliance with the Consent Decree's provisions. *Id.* at 547. After five years, the State could move the court for a declaration of unitary status at which time any party could file an opposition. *Id.*

- **Creation of a TSU Coordinating Committee**

The 2001 Consent Decree created the racially diverse "TSU Committee" composed of faculty, administrators, students, (traditional and nontraditional), and Davidson County business leaders who would be responsible for coordinating and implementing the various obligations imposed upon TSU. *Id.* at 522.

- **TSU: Administrative Enhancements**

The 2001 Consent Decree directed TSU to institute a study and develop a plan to improve TSU's admissions, financial aid, and registrar services to eradicate the polices that continued to foster segregation. *Id.* at 522-24.

- **TSU: Raising Admissions Standards**

TSU agreed to raise its admissions standards over the course of three years, with the caveat that the changes could not have an unacceptable detrimental effect on access for first-time freshmen wishing to attend TSU. *Id.* at 528-29. TSU would also assess post-admission support in an effort to enhance student retention rates. *Id.* at 529-30.

- **Additional Provisions**

The Consent Decree also contained a number of provisions to ensure predominantly white institutions enhanced their recruitment and retention of minority students and faculty, including: the establishment of two statewide committees dedicated to furthering the recruitment and retention of African-American faculty and administrators; funding for post-doctoral fellowship programs and scholarships for minority students; a promise to maintain existing affirmative action guidelines in hiring practices; a study on how to enhance minority enrollment and retention, and proposed plan to enhance such efforts. *Id.* at 537-45.

# A-6

# APPENDIX 6

## 2012- 2013 Student Enrollment by Race
## Bowie State University

| | Students Enrolled -- 2013 | White Students (By Type) -- 2013 | % White |
|---|---|---|---|
| **Total** | 5,561 | 201 | 3.6% |
| **Associates** | N/A | N/A | N/A |
| **Bachelors** | 4,358 | 103 | 2.4% |
| **Masters** | 1,099 | 89 | 8.1% |
| **Post -Baccalaureate / Masters Certificate** | 18 | 2 | 11.1% |
| **Professional** | N/A | N/A | N/A |
| **Doctorate** | 86 | 7 | 8.1% |

| | |
|---|---|
| **Total Number Of Programs** | 50 |
| **No. Where 8 Or More White Students Enrolled In 2013** | 6* |
| **Percent** | 14.0% |

| Programs Where 8 Or More White Students Were Enrolled In 2013 | Total | White Students | % White |
|---|---|---|---|
| Bachelors - Nursing | 647 | 17 | 2.6% |
| Masters - Nursing | 132 | 13 | 9.8% |
| Bachelors - Business Management And Administration | 737 | 13 | 1.8% |
| Masters - Psychology For Counseling | 345 | 12 | 3.5% |
| Masters - Education, Student Personnel | 55 | 10 | 18.2% |
| Masters - Secondary Education, General | 24 | 9 | 37.5% |

*Undecided, Undeclared, or Unknown programs were not included

"N/"A refers to program not available.

Source: Data provided by the State of Maryland - 2013 enrollment

# A-7

# APPENDIX 7

## 2012- 2013 Student Enrollment by Race
## Coppin State University

| | Students Enrolled -- 2013 | White Students Enrolled -- 2013 | % White |
|---|---|---|---|
| **Total** | 3,382 | 51 | 1.5% |
| **Associates** | N/A | N/A | N/A |
| **Bachelors** | 2,925 | 40 | 1.4% |
| **Masters** | 443 | 10 | 2.3% |
| **Post Masters Certificate** | 15 | 1 | 6.7% |
| **Professional** | N/A | N/A | N/A |
| **Doctorate** | N/A | N/A | N/A |

| | |
|---|---|
| **Total Number Of Programs** | 51 |
| **No. Where 8 Or More White Students Were Enrolled In 2013** | 1 |
| **Percent** | 2.0% |

| Programs Where 8 Or More Students Were Enrolled In 2013 | Total Students | White Students | % White |
|---|---|---|---|
| Bachelors - Nursing | 719 | 10 | 1.4% |

“N/A” refers to program not available.

Source: Data provided by the State of Maryland - 2013 enrollment

# A-8

## APPENDIX 8

### 2012- 2013 Student Enrollment by Race
### Morgan State University

| | Students Enrolled -- 2013 | White Students Enrolled (By Type) -- 2013 | % White |
|---|---|---|---|
| **Total** | 7,546 | 256 | 3.4% |
| **Associates** | N/A | N/A | N/A |
| **Bachelors** | 6,252 | 126 | 2.0% |
| **Masters** | 732 | 74 | 10.1% |
| **Post Masters Certificate** | N/A | N/A | N/A |
| **Professional** | N/A | N/A | N/A |
| **Doctorate** | 562 | 56 | 10.0% |

| | |
|---|---|
| **Total Number Of Programs** | 84 |
| **No. Where 8 Or More White Students Were Enrolled In 2013** | 8 |
| **Percent** | 9.5% |

| Programs Where 8 Or More Students Were Enrolled In 2013 | Total | White Students Enrolled | % White |
|---|---|---|---|
| Bachelors - Architecture | 259 | 35 | 13.5% |
| Doctorate - Educational Administration | 285 | 30 | 10.5% |
| Masters - Architecture | 38 | 18 | 47.4% |
| Masters - Landscape Architecture | 22 | 16 | 72.7% |
| Bachelors - Civil, Construction, And Transportation Engineering | 204 | 15 | 7.4% |
| Bachelors - Foods And Nutrition | 83 | 11 | 13.3% |
| Bachelors - Electrical, Electronics, And Communications | 476 | 10 | 2.1% |
| Bachelors - Nursing | 427 | 9 | 2.1% |

"N/A" refers to program not available.

Source: Data provided by the State of Maryland - 2013 enrollment

# A-9

## APPENDIX 9

### 2012- 2013 Student Enrollment by Race
### UM - Eastern Shore

| | Students Enrolled -- 2013 | White Students Enrolled -- 2013 | % White |
|---|---|---|---|
| **Total** | 4,220 | 634 | 15.0% |
| **Associates** | N/A | N/A | N/A |
| **Bachelors** | 3,530 | 409 | 11.6% |
| **Masters** | 270 | 82 | 30.4% |
| **Post Masters Certificate** | N/A | N/A | N/A |
| **Professional** | 257 | 96 | 37.4% |
| **Doctorate** | 163 | 47 | 28.8% |

| | |
|---|---|
| **Total Number Of Programs** | 53 |
| **No. Where 8 Or More White Students Enrolled In 2013** | 26* |
| **Percent** | 52.8% |

| Programs Where 8 Or More White Students Were Enrolled In 2013 | Total | White Students | % White |
|---|---|---|---|
| Professional – Pharmacy | 166 | 49 | 29.5% |
| Professional - Physical Therapy | 91 | 47 | 51.6% |
| Bachelors – Ecology | 57 | 34 | 59.6% |
| Bachelors - Hotel And Restaurant Management | 167 | 27 | 16.2% |
| Bachelors - Biology, General | 409 | 26 | 6.4% |
| Bachelors - Other, Business And Management | 46 | 26 | 56.5% |
| Bachelors - Engineering Technologies | 121 | 24 | 19.8% |
| Bachelors - Physical Education | 243 | 24 | 9.9% |
| Doctorate Research/Scholarship - Interdisciplinary/Transfer Studies | 86 | 22 | 25.6% |
| Bachelors - Engineering, General | 137 | 21 | 15.3% |

| **Programs Where 8 Or More White Students Were Enrolled In 2013** | **Total** | **White Students** | **% White** |
|---|---|---|---|
| Bachelors - Home Economics, General | 204 | 21 | 10.3% |
| Bachelors - Law Enforcement And Corrections | 439 | 21 | 4.8% |
| Masters - Education, Student Personnel | 83 | 20 | 24.1% |
| Bachelors - Special Education, General | 40 | 17 | 42.5% |
| Doctorate Research/Scholarship - Educational Administration | 41 | 17 | 41.5% |
| Bachelors - Other, Health Professions | 176 | 16 | 9.1% |
| Masters - Education, Industrial Arts, Vocational, And Tech Education | 22 | 13 | 59.1% |
| Bachelors - Agriculture, General | 49 | 11 | 22.4% |
| Bachelors - English, General | 160 | 10 | 6.3% |
| Bachelors - Transportation And Public Utilities | 65 | 10 | 15.4% |
| Masters - Special Education, General | 14 | 9 | 64.3% |
| Bachelors – Accounting | 102 | 8 | 7.8% |
| Bachelors - Business Management And Administration | 183 | 8 | 4.4% |
| Bachelors - Chemistry, General | 47 | 8 | 17.0% |
| Bachelors - Other, Interdisciplinary/Transfer Studies | 164 | 8 | 4.9% |
| Bachelors - Sociology | 190 | 8 | 4.2% |

*Undecided, Undeclared, or Unknown programs were not included

"N/A" refers to program not available.

Source: Data Provided By the State Of Maryland - 2013 Enrollment

# A-10

**APPENDIX 10**

**Morgan State Engineering Enrollment 2013**

| | **Total Enrolled** | **Number Of Enrollments - White** | **Percentage Of Enrollments - White** |
|---|---|---|---|
| Bachelors - Civil, Construction, And Transportation Engineering | 204 | 15 | 7.4% |
| Bachelors - Electrical, Electronics, And Communications | 476 | 10 | 2.1% |
| Bachelors - Industrial And Management Engineering | 119 | 4 | 3.4% |
| Bachelors - Engineering Technologies | 29 | 3 | 10.3% |
| Masters - Engineering, General | 54 | 3 | 5.6% |
| Doctorate Research/Scholarship - Engineering, General | 61 | 3 | 4.9% |
| **Total** | 943 | 38 | 4.0% |

Source: 2013 Undergraduate and Graduate Enrollment by Institution by Degree Program Provided By Maryland Higher Education Commission.

# A-11

# APPENDIX 11

## UMBC Engineering Enrollment 2013

| | Total Enrolled | Number Of Enrollments - White | Percentage Of Enrollments - White |
|---|---|---|---|
| Bachelors - Mechanical Engineering | 543 | 323 | 59.5% |
| Bachelors - Other, Engineering | 326 | 161 | 49.4% |
| Bachelors - Chemical Engineering | 281 | 129 | 45.9% |
| Bachelors - Engineering, General | 171 | 95 | 55.6% |
| Masters - Other, Engineering | 69 | 37 | 53.6% |
| Masters - Mechanical Engineering | 32 | 15 | 46.9% |
| Masters - Electrical, Electronics, And Communications | 15 | 7 | 46.7% |
| Masters - Chemical Engineering | 5 | 2 | 40.0% |
| Masters - Civil, Construction, And Transportation Engineering | 8 | 2 | 25.0% |
| Doctorate Research/Scholarship - Electrical, Electronics, And Communications | 34 | 11 | 32.4% |
| Doctorate Research/Scholarship - Mechanical Engineering | 38 | 11 | 28.9% |
| Doctorate Research/Scholarship - Chemical Engineering | 23 | 5 | 21.7% |
| Doctorate Research/Scholarship - Other, Engineering | 18 | 4 | 22.2% |
| Doctorate Research/Scholarship - Civil, Construction, And Transportation Engineering | 11 | 2 | 18.2% |
| Post-Baccalaureate Certificate - Other, Engineering | 11 | 6 | 54.5% |
| Post-Baccalaureate Certificate - Chemical Engineering | 3 | 1 | 33.3% |
| **Total** | 1588 | 811 | 51.1% |

Source: 2013 Undergraduate and Graduate Enrollment by Institution by Degree Program Provided By Maryland Higher Education Commission.

# A-12

## APPENDIX 12

### 2011 – 2012 Degrees Awarded by Race
### Alabama A & M

| | **Degrees Conferred 2012** | **Degrees Conferred To White Students (By Type) --2012** | **% White** |
|---|---|---|---|
| **Total** | 752 | 61 | 8.1% |
| Bachelors | 532 | 14 | 2.6% |
| Masters | 195 | 45 | 23.1% |
| Post Masters Certificate | 14 | 1 | 7.1% |
| Professional | N/A | N/A | N/A |
| Doctorate | 11 | 1 | 9.1% |

| | |
|---|---|
| **Total Number Of Programs** | 70 |
| **No. Where 4 Or More White Students Received Degrees In 2012** | 4 |
| **Percent** | 5.7% |

| **Programs Where 4 Or More Students Received Degrees In 2012** | **Total** | **White Graduates** | **% White** |
|---|---|---|---|
| Masters - Secondary Education And Teaching | 26 | 12 | 46.2% |
| Masters - Social Work | 43 | 11 | 25.6% |
| Masters - Language/Pathology | 9 | 6 | 66.7% |
| Masters - Elementary Education And Teaching | 7 | 4 | 57.1% |

“N/A” refers to program not available.

Source: National Center for Education Statistics' IPEDS Data Center - 2011-2012 Completion Data

# A-13

# APPENDIX 13

## 2011 – 2012 Degrees Awarded By Race
## Alabama State

| | Degrees Conferred 2012 | Degrees Conferred To White Students (By Type) --2012 | % White |
|---|---|---|---|
| **Total** | 789 | 44 | 5.6% |
| Bachelors | 542 | 9 | 1.7% |
| Masters | 184 | 19 | 10.3% |
| Post Masters Certificate | 20 | 0 | 0.0% |
| Professional | N/A | N/A | N/A |
| Doctorate | 43 | 16 | 37.2% |

| | |
|---|---|
| **Total Number Of Programs** | 49 |
| **No. Where 4 Or More White Students Received Degrees In 2012** | 4 |
| **Percent** | 8.2% |

| Programs Where 4 Or More Students Received Degrees In 2012 | Total | White Graduates | % White |
|---|---|---|---|
| Doctorate - Physical Therapy/Therapist | 33 | 13 | 39.4% |
| Masters - Teacher Education, All Levels | 60 | 6 | 10.0% |
| Masters - Educational/Instructional Technology | 7 | 4 | 57.1% |
| Masters - Occupational Therapy/Therapist | 11 | 4 | 36.4% |

"N/A" refers to program not available.

Source: National Center for Education Statistics' IPEDS Data Center - 2011-2012 Completion Data

# A-14

## APPENDIX 14

### 2011 – 2012 Degrees Awarded By Race
### Alcorn State (MS)

| | Degrees Conferred 2012 | Degrees Conferred To White Students (By Type) --2012 | % White |
|---|---|---|---|
| **Total** | 561 | 73 | 13.0% |
| Associates | 22 | 8 | 36.4% |
| Bachelors | 380 | 38 | 10.0% |
| Masters | 161 | 27 | 16.8% |
| Post Masters Certificate | 0 | 0 | 0.0% |
| Professional | N/A | N/A | N/A |
| Doctorate | N/A | N/A | N/A |

| | |
|---|---|
| **Total Number Of Programs** | 38 |
| **No. Where 4 Or More White Students Received Degrees In 2012** | 6 |
| **Percent** | 15.8% |

| Programs Where 4 Or More Students Received Degrees In 2012 | Total | White Graduates | % White |
|---|---|---|---|
| Bachelors - Registered Nursing/Registered Nurse | 59 | 18 | 30.5% |
| Masters - Elementary Education, Teaching | 23 | 13 | 56.5% |
| Bachelors - Elementary Education, Teaching | 17 | 11 | 64.7% |
| Masters - Registered Nursing, Nursing Administration, Nursing Research And Clinical Nursing, Other | 21 | 9 | 42.9% |
| Associates - Registered Nursing/Registered Nurse | 22 | 8 | 36.4% |
| Bachelors - Accounting | 17 | 4 | 23.5% |

“N/A” refers to program not available.

Source: National Center for Education Statistics' IPEDS Data Center - 2011-2012 Completion Data

# A-15

# APPENDIX 15

## 2011 – 2012 Degrees Awarded By Race
## Mississippi Valley

| | Degrees Conferred 2012 | Degrees Conferred To White Students (By Type) --2012 | % White |
|---|---|---|---|
| **Total** | 473 | 28 | 5.9% |
| **Associates** | N/A | N/A | N/A |
| **Bachelors** | 345 | 20 | 5.8% |
| **Masters** | 128 | 8 | 6.3% |
| **Post Masters Certificate** | N/A | N/A | N/A |
| **Professional** | N/A | N/A | N/A |
| **Doctorate** | N/A | N/A | N/A |

| | |
|---|---|
| **Total Number Of Programs** | 37 |
| **No. Where 4 Or More White Students Received Degrees In 2012** | 2 |
| **Percent** | 5.4% |

| Programs Where 4 Or More Students Received Degrees In 2012 | Total | White Graduates | % White |
|---|---|---|---|
| Bachelors - P.E. Teaching And Coaching | 35 | 7 | 20.0% |
| Bachelors - Biology/Biological Sciences, General | 20 | 4 | 20.0% |

"N/A" refers to program not available.

Source: National Center for Education Statistics' IPEDS Data Center - 2011-2012 Completion Data

# A-16

## APPENDIX 16

### 2011 – 2012 Degrees Awarded By Race
### Jackson State (MS)

| | Degrees Conferred 2012 | Degrees Conferred To White Students (By Type) --2012 | % White |
|---|---|---|---|
| **Total** | 1,559 | 108 | 6.9% |
| Associates | N/A | N/A | N/A |
| Bachelors | 1,064 | 41 | 3.9% |
| Masters | 412 | 51 | 12.4% |
| Post Masters Certificate | 23 | 3 | 13.0% |
| Professional | N/A | N/A | N/A |
| Doctorate | 60 | 13 | 21.7% |

| | |
|---|---|
| **Total Number Of Programs** | 86 |
| **No. Where 4 Or More White Students Received Degrees In 2012** | 10 |
| **Percent** | 11.6% |

| Programs Where 4 Or More Students Received Degrees In 2012 | Total | White Graduates | % White |
|---|---|---|---|
| Masters - Social Work | 53 | 9 | 17.0% |
| Masters - Communication Sciences And Disorders, General | 19 | 8 | 42.1% |
| Masters - Public Health, General | 34 | 6 | 17.6% |
| Bachelors - Accounting | 74 | 6 | 8.1% |
| Bachelors - Biology/Biological Sciences, General | 97 | 6 | 6.2% |
| Masters - Computer And Information Sciences, General | 7 | 4 | 57.1% |
| Masters - City/Urban, Community And Regional Planning | 10 | 4 | 40.0% |
| Masters - Engineering, General | 11 | 4 | 36.4% |
| Bachelors - Civil Engineering, General | 17 | 4 | 23.5% |

| | | | |
|---|---|---|---|
| Bachelors - Computer Engineering, General | 18 | 4 | 22.2% |

“N/A” refers to program not available.

Source: National Center for Education Statistics' IPEDS Data Center - 2011-2012 Completion Data

# A-17

**APPENDIX 17**

**2011 – 2012 Degrees Awarded By Race**
**Grambling State (LA)**

| | Degrees Conferred 2012 | Degrees Conferred To White Students (By Type) - -2012 | % White |
|---|---|---|---|
| **Total** | 897 | 24 | 2.7% |
| Associates | 16 | 0 | 0.0% |
| Bachelors | 686 | 15 | 2.2% |
| Masters | 197 | 6 | 3.0% |
| Post Masters Certificate | 2 | 0 | 0.0% |
| Professional | N/A | N/A | N/A |
| Doctorate | 6 | 3 | 50.0% |

| | |
|---|---|
| **Total Number Of Programs** | 63 |
| **No. Where 4 Or More White Students Received Degrees In 2012** | 1 |
| **Percent** | 1.6% |

| Programs Where 4 Or More Students Received Degrees In 2012 | Total | White Graduates | % White |
|---|---|---|---|
| Bachelors - Registered Nursing/Registered Nurse | 103 | 15 | 14.6% |

"N/A" refers to program not available.

Source: National Center for Education Statistics' IPEDS Data Center - 2011-2012 Completion Data

# A-18

## APPENDIX 18

### 2011 – 2012 Degrees Awarded By Race
### Southern University and Agricultural and Mechanical College at Baton Rouge (LA)

| | Degrees Conferred 2012 | Degrees Conferred To White Students (By Type) --2012 | % White |
|---|---|---|---|
| **Total** | 1,137 | 42 | 3.7% |
| Associates | N/A | N/A | N/A |
| Bachelors | 798 | 12 | 1.5% |
| Masters | 294 | 25 | 8.5% |
| Post Masters Certificate | 3 | 0 | 0.0% |
| Professional (Law School Data Not Reported) | 0 | 0 | 0.0% |
| Doctorate | 43 | 5 | 11.6% |

| | |
|---|---|
| **Total Number Of Programs** | 77 |
| **No. Where 4 Or More White Students Received Degrees In 2012** | 3 |
| **Percent** | 3.9% |

| Programs Where 4 Or More Students Received Degrees In 2012 | Total | White Graduates | % White |
|---|---|---|---|
| Masters - Vocational Rehabilitation Counseling/Counselor | 24 | 10 | 41.7% |
| Masters - Family Practice Nurse/Nursing | 35 | 9 | 25.7% |
| Bachelors - Registered Nursing/Registered Nurse | 67 | 5 | 7.5% |

“N/A” refers to program not available.

Source: National Center for Education Statistics' IPEDS Data Center - 2011-2012 Completion Data

# A-19

## APPENDIX 19

### 2011 – 2012 Degrees Awarded By Race
### Southern University at New Orleans (LA)

| | Degrees Conferred 2012 | Degrees Conferred To White Students (By Type) --2012 | % White |
|---|---|---|---|
| **Total** | 468 | 15 | 3.2% |
| Associates | 27 | 3 | 11.1% |
| Bachelors | 304 | 4 | 1.3% |
| Masters | 153 | 9 | 5.9% |
| Post Masters Certificate | 0 | 0 | 0.0% |
| Professional | N/A | N/A | N/A |
| Doctorate | N/A | N/A | N/A |

| | |
|---|---|
| **Total Number Of Programs** | 28 |
| **No. Where 4 Or More White Students Received Degrees In 2012** | 1 |
| **Percent** | 3.6% |

| Programs Where 4 Or More Students Received Degrees In 2012 | Total | White Graduates | % White |
|---|---|---|---|
| Masters - Social Work | 109 | 6 | 5.5% |

"N/A" refers to program not available.

Source: National Center for Education Statistics' IPEDS Data Center - 2011-2012 Completion Data

# A-20

# APPENDIX 20

## 2011 – 2012 Degrees Awarded By Race
## Tennessee State

| | Degrees Conferred 2012 | Degrees Conferred To White Students (By Type) --2012 | % White |
|---|---|---|---|
| **Total** | 1,642 | 492 | 30.0% |
| Associates | 139 | 83 | 59.7% |
| Bachelors | 963 | 176 | 18.3% |
| Masters | 404 | 167 | 41.3% |
| Post Masters Certificate | 64 | 17 | 26.6% |
| Professional/Doctorate (Not Split Up In Data) | 72 | 49 | 68.1% |

| | |
|---|---|
| **Total Number Of Programs** | 80 |
| **No. Where 4 Or More White Students Received Degrees In 2012** | 36 |
| **Percent** | 45.0% |

| Programs Where 4 Or More Students Received Degrees In 2012 | Total | White Graduates | % White |
|---|---|---|---|
| Associates - Registered Nursing/Registered Nurse | 103 | 56 | 54.4% |
| Bachelors - Teacher Education, Multiple Levels | 121 | 39 | 32.2% |
| Masters - Audiology/Audiologist And Speech-Language Pathology/Pathologist | 49 | 38 | 77.6% |
| Masters - Registered Nursing/Registered Nurse | 61 | 38 | 62.3% |
| Associates - Dental Hygiene/Hygienist | 36 | 27 | 75.0% |
| Doctorate - Physical Therapy/Therapist | 30 | 26 | 86.7% |
| Masters - Occupational Therapy/Therapist | 25 | 18 | 72.0% |
| Bachelors - Registered Nursing/Registered Nurse | 60 | 16 | 26.7% |
| Doctorate - Educational Leadership And Administration, General | 22 | 14 | 63.6% |

| Programs Where 4 Or More Students Received Degrees In 2012 | Total | White Graduates | % White |
|---|---|---|---|
| Masters - Curriculum And Instruction | 32 | 11 | 34.4% |
| Bachelors - Criminal Justice/Law Enforcement Administration | 66 | 11 | 16.7% |
| Bachelors - Psychology, General | 82 | 10 | 12.2% |
| Masters - Business Administration And Management, General | 23 | 9 | 39.1% |
| Masters - Elementary Education And Teaching | 12 | 8 | 66.7% |
| Bachelors - Dental Hygiene/Hygienist | 15 | 8 | 53.3% |
| Bachelors - Civil Engineering, General | 13 | 7 | 53.8% |
| Bachelors - Respiratory Care Therapy/Therapist | 24 | 7 | 29.2% |
| Bachelors - History, General | 14 | 6 | 42.9% |
| Post Masters - Educational Leadership And Administration, General | 24 | 6 | 25.0% |
| Bachelors - Health And Physical Education/Fitness, General | 25 | 6 | 24.0% |
| Masters - Psychology, General | 31 | 6 | 19.4% |
| Bachelors - Early Childhood Education And Teaching | 7 | 5 | 71.4% |
| Masters - Agriculture, General | 18 | 5 | 27.8% |
| Bachelors - Business/Managerial Economics | 25 | 5 | 20.0% |
| Bachelors - Accounting | 26 | 5 | 19.2% |
| Doctorate - Psychology, General | 6 | 4 | 66.7% |
| Post Masters - School Psychology | 6 | 4 | 66.7% |
| Bachelors - General Studies | 7 | 4 | 57.1% |
| Masters - General Studies | 8 | 4 | 50.0% |
| Masters - Counselor Education/School Counseling And Guidance Services | 9 | 4 | 44.4% |
| Post-Baccalaureate Certificate - Family Practice Nurse/Nursing | 10 | 4 | 40.0% |
| Masters - Special Education And Teaching, General | 15 | 4 | 26.7% |

| Programs Where 4 Or More Students Received Degrees In 2012 | Total | White Graduates | % White |
|---|---|---|---|
| Masters - Public Administration | 20 | 4 | 20.0% |
| Bachelors - Political Science And Government, General | 21 | 4 | 19.0% |
| Bachelors - Family Resource Management Studies, General | 28 | 4 | 14.3% |
| Bachelors - Biology/Biological Sciences, General | 48 | 4 | 8.3% |

Source: National Center for Education Statistics' IPEDS Data Center - 2011-2012 Completion Data

# A-21

# APPENDIX 21

## Alcorn State Programs by Race Pursuant to 2001 Settlement Agreement - Enrollment Fall 2013

| | Total Enrolled | Number of Enrollments - White | Percentage of Enrollments - White | Shows Available on Website? | Identical program available? | Similar, but not identical, program? |
|---|---|---|---|---|---|---|
| Bachelors - Registered Nursing/ Registered Nurse[1] | 86 | 24 | 27.9% | Yes | DSU, MUW, USM, UMMC | |
| Bachelors - Biology / Biological Sciences, General[4] | 700 | 22 | 3.1% | Yes | DSU, MUW, MVSU, JSU, MSU, UM, USM | MUW - BA, UM - BA |
| Masters - Registered Nursing, Nursing Administration, Nursing Research and Clinical Nursing, Other[1] | 61 | 17 | 27.9% | Yes | DSU, UMMC | |
| Masters - Business Administration | 54 | 14 | 25.9% | Yes | DSU, MVSU, JSU, MSU, UM, USM | |
| Associates - Registered Nursing / Registered Nurse[1] | 67 | 12 | 17.9% | Yes | MUW | |
| Masters - Teacher Education[2] | 68 | 9 | 13.2% | Yes | DSU, MVSU, JSU | |
| Masters - Biology/Biological Sciences, General[4] | 25 | 4 | 16.0% | Yes | JSU, MSU, UM, USM | |
| Masters - | 36 | 3 | 8.3% | Yes | JSU, | |

| | Total Enrolled | Number of Enrollments - White | Percentage of Enrollments - White | Shows Available on Website? | Identical program available? | Similar, but not identical, program? |
|---|---|---|---|---|---|---|
| Computer and Information Sciences, General | | | | | MSU, USM | |
| Bachelors - Mathematics, General[4] | 23 | 2 | 8.7% | Yes | DSU, MUW, MVSU, JSU, MSU, UM, USM | MUW - BA, MSU - BA, UM - BA |
| Bachelors - Computer and Information Sciences, General | 13 | 1 | 7.7% | Yes | MVSU, JSU, MSU, UM, USM | UM - BA |
| Masters - Biotechnology | 12 | 0 | 0.0% | Yes | | |
| Bachelors - Computer Networking[3] | 49 | 0 | 0.0% | Yes | | |
| Bachelors - Chemistry, General[4] | 42 | 0 | 0.0% | Yes | DSU, MUW, MVSU, JSU, MSU, UM, USM | MSU - BA, UM - BA |
| Masters - Accounting[5] | N/A | N/A | N/A | Yes | MUW, MVSU | DSU - BBA, JSU - BBA, MSU - BAccy, UM - Baccy, USM - BSBA |
| Bachelors - Finance | N/A | N/A | N/A | No | | |
| Masters - Finance | N/A | N/A | N/A | No | | |
| Masters - Physician | N/A | N/A | N/A | No | | |

| | **Total Enrolled** | **Number of Enrollments - White** | **Percentage of Enrollments - White** | **Shows Available on Website?** | **Identical program available?** | **Similar, but not identical, program?** |
|---|---|---|---|---|---|---|
| Assistants | | | | | | |
| Bachelors - Environmental Science[6] | N/A | N/A | N/A | Yes | | |
| **Total** | 1236 | 108 | 8.7% | | | |

[1]Under general nursing category.

[2]For this teacher education category, the program titled, "Teacher Education, Multiple Levels - Masters" seemed to fit best. There are also the following teacher programs - Elementary Education and Teaching - Bachelors, Elementary Education and Teaching - Masters, Elementary Education and Teaching - Post Master's certificates, and Secondary Education and Teaching - Masters.

[3]The computer networking bachelors is titled, "System, Networking, and LAN/WAN Management/Manager"

[4]This fits under the mathematics and sciences (biology, chemistry, physics) category.

[5]There is an accounting bachelors, but not masters

[6]Titled "Environmental Biology"

“Shows as Available on Website” refers to a specific program is shown as available on that institution’s website.

“Identical Program Available” refers to the exact same program being offered at the listed other institution(s).

“Similar, but Not Identical” refers to a similar program being offered at the listed institution(s), but not the exact same program.

Source: Alcorn State University 2012 - 2013 Fact Book; Office of Institutional Research and Assessment - Fall 2012 Enrollment Data, pp. 61 – 70 and Mississippi Public Universities – Academic Year 2010-2013 Degrees Awarded and Top-Ten Degrees

# A-22

## APPENDIX 22

**Jackson State Programs by Race Pursuant to 2001 Settlement Agreement – Enrollment Fall 2013**

| | Total Enrolled | Number of Enrollments - White | Percentage of Enrollments - White | Shows Available on Website? | Identical program available? | Similar, but not identical, program? |
|---|---|---|---|---|---|---|
| Bachelors - Civil Engineering | 176 | 32 | 18.2% | Yes | MSU | UM - BSCE |
| Bachelors - Computer Engineering | 248 | 20 | 8.1% | Yes | MSU | |
| Bachelors - Business Administration | 322 | 14 | 4.3% | Yes | ASU, DSU, MSU, UM | MUW - BS, MVSU - BS, USM - BS, USM - BSBA |
| Masters - Communicative Disorders | 37 | 12 | 32.4% | Yes | | |
| Masters - Public Health | 119 | 9 | 7.6% | Yes | USM | |
| Doctorate - Urban Planning | 49 | 9 | 18.4% | Yes | | |
| Bachelors - Health Care Administration | 250 | 7 | 2.8% | Yes | | MSU - BAT |
| Doctorate - Higher Education | 76 | 6 | 7.9% | Yes | UM, USM | |
| Masters - Business Administrators | 52 | 5 | 9.6% | Yes | ASU, DSU, MVSU, MSU, UM, USM | |
| Doctorate - Business Administrators | 28 | 5 | 17.9% | Yes | MSU, UM | |
| Doctorate - Social Work | 39 | 4 | 10.3% | Yes | | |
| Post-Masters Certificate - | 23 | 3 | 13.0% | No | MSU, | DSU - EdD, MSU |

| | Total Enrolled | Number of Enrollments - White | Percentage of Enrollments - White | Shows Available on Website? | Identical program available? | Similar, but not identical, program? |
|---|---|---|---|---|---|---|
| Education General[1] | | | | | USM | - EdD, UM - EdD, USM - EdD |
| Masters - Urban Planning | 17 | 2 | 11.8% | Yes | | |
| Bachelors - Telecommunications Engineering | 2 | 0 | 9% | Yes | | |
| Doctorate - Public Health | N/A | N/A | N/A | Yes | | |
| Mississippi Interinstitutional Pharmacy Initiative[2] | N/A | N/A | N/A | No | | |
| Masters - Civil Engineering | N/A | N/A | N/A | No | | |
| Masters - Computer Engineering - | N/A | N/A | N/A | No | | |
| Masters - Telecommunications Engineering | N/A | N/A | N/A | No | | |
| **Total** | 1436 | 128 | 8.9% | | | |

[1]There are 24 other education-related programs.

[2]No programs related to pharmacy.

"Shows as Available on Website" refers to a specific program is shown as available on that institution's website.

"Identical Program Available" refers to the exact same program being offered at the listed other institution(s).

"Similar, but Not Identical" refers to a similar program being offered at the listed institution(s), but not the exact same program.

Source: Jackson State University - Enrollment Data by Discipline, Ethnicity, and Gender, Fall 2013 and Mississippi Public Universities – Academic Year 2010-2013 Degrees Awarded and Top-Ten Degrees.

# A-23

## APPENDIX 23

### MS Valley State Programs by Race Pursuant to 2001 Settlement Agreement - Enrollment Fall 2013

| | Total Enrolled | Number of Enrollments - White | Percentage of Enrollments - White | Identical program available? | Similar, but not identical, program? | Shows Available on Website? |
|---|---|---|---|---|---|---|
| Bachelors - Biology | 188 | 10 | 5.3% | ASU, DSU, MUW, MVSU, MSU, UM, USM | MUW - BA, UM - BA | Yes |
| Masters - Business Administration | 40 | 4 | 10.0% | ASU, DSU, MVSU, MSU, UM, USM | | Yes |
| Masters - Bioinformatics | 15 | 2 | 13.3% | | | Yes |
| Bachelors - Chemistry | 16 | 2 | 12.5% | ASU, DSU, MUW, MVSU, MSU, UM, USM | MSU - BA, UM - BA | Yes |
| Bachelors - Computer Science | 78 | 1 | 1.3% | ASU, MVSU, MSU, USM | UM - BA, UM - BSCS, USM - BS | Yes |
| Bachelors - Mathematics | 55 | 1 | 1.8% | ASU, DSU, MUW, MVSU, MSU, UM, USM | MUW - BA, MSU - BA, UM - BA | Yes |
| Bachelors - History | 19 | 0 | 0.0% | ASU, DSU, MUW, MVSU, MSU, UM, | | Yes |

| | **Total Enrolled** | **Number of Enrollments - White** | **Percentage of Enrollments - White** | **Identical program available?** | **Similar, but not identical, program?** | **Shows Available on Website?** |
|---|---|---|---|---|---|---|
| | | | | USM | | |
| Masters - Special Education | 5 | 0 | 0.0% | | DSU - MEd, MVSU - MS, MSU - MS, USM - Med | Yes |
| Masters - Computer Science[1] | N/A | N/A | N/A | | | No |
| Masters - Leadership Administration | N/A | N/A | N/A | | | No |
| **Total** | 416 | 20 | 4.8% | | | |

[1]There is a computer science bachelors, but not masters

"Shows as Available on Website" refers to a specific program is shown as available on that institution's website.

"Identical Program Available" refers to the exact same program being offered at the listed other institution(s).

"Similar, but Not Identical" refers to a similar program being offered at the listed institution(s), but not the exact same program.

Source: Mississippi Valley State Fact Book 2013-2014 - Fall 2013 Enrollment data, pp. 37-39 and Mississippi Public Universities – Academic Year 2010-2013 Degrees Awarded and Top-Ten Degrees

# A-24

**APPENDIX 24**

**Fall 2014 Enrollment in Academic Programs Placed at Grambling State University Pursuant to 1994 Settlement Agreement**

| | Total Enrolled | Number of Enrollments - White | Percentage of Enrollments - White | Identical Program? | Shows as Available on Website? |
|---|---|---|---|---|---|
| Masters - Nursing / Registered Nurse[1] | 46 | 16 | 34.8% | Southern U A&M, McNeese State, Nicholls State, Northwestern State, Southeastern Louisiana U, U of L Lafayette | Yes |
| Masters – Nursing/ Family Practice Nurse[1] | 2 | 2 | 100.0% | LSU Health Sciences Center (NO), Southern U A&M, Southeastern Louisiana U | Yes |
| Bachelors - Criminalistics[2] | 406 | 2 | 0.5% | LSU Alexandria, LSU Shreveport, Southern U A&M, SUNO, McNeese, Northwestern State, Southeastern LU, U of L Lafayette, U of L Monroe | Yes |
| Doctorate - Educational | 10 | 1 | 10.0% | LSU A&M, LSU Shreveport, | Yes |

| | Total Enrolled | Number of Enrollments - White | Percentage of Enrollments - White | Identical Program? | Shows as Available on Website? |
|---|---|---|---|---|---|
| Leadership | | | | Southern U A&M, Louisiana Tech U, McNeese State, Nicholls State, Northwestern State, Southeastern Louisiana U, U of L Lafayette, U of L Monroe, UNO | |
| Masters - Mass Communications | 26 | 0 | 0.0% | LSU A&M, Southern U A&M | Yes |
| Bachelors - Paralegal Studies | 2 | 0 | 0.0% | McNeese | No |
| Doctorate - Curriculum and Instruction | 0 | 0 | 0.0% | | Yes |
| Masters - Business Admin[3] | 0 | 0 | 0.0% | | No |
| Bachelors - Banking/Insurance | N/A | N/A | N/A | | No |
| Associates - Paralegal Studies | N/A | N/A | N/A | | No |
| **Total** | 502 | 21 | 4.2% | | |

[1]Both of these programs could fit under the general "Masters in Nursing" mentioned in the agreement.

[2]The program title according to IPEDS is, "Criminal Justice/Safety Studies"

[3]Institution does not offer a master’s in business but does offer a bachelor’s in business.

# indicates that the program is available at the institution

“N/A” refers to program not available.

“Shows as Available on Website” refers to a specific program is shown as available on that institution’s website.

“Identical Program Available” refers to the exact same program being offered at the listed other institution(s).

“Similar, but Not Identical” refers to a similar program being offered at the listed institution(s), but not the exact same program.

Source: Statewide Student Profile System - Student Headcount Enrollment by Student Major - Fall 2014-2015.

# A-25

## APPENDIX 25

### Fall 2014 Enrollment in Academic Programs Placed at Southern University at New Orleans Pursuant to 1994 Settlement Agreement

| | Total Enrolled | Number of Enrollments - White | Percentage of Enrollments - White | Identical Program? | Shows as Available on Website? |
|---|---|---|---|---|---|
| Masters - Social Work | 265 | 11 | 4.2% | LSU A&M at Baton Rouge, Southern U A&M, Grambling, Northwestern State U, Southeastern LU, U of Louisiana (Monroe) | Yes |
| Masters - Criminal Justice | 99 | 0 | 0.0% | Southern U and A&M (Baton Rouge), Southern University at Shreveport, Grambling, McNeese State U, University of Louisiana (Lafayette), University of Louisiana (Monroe) | Yes |
| Masters - Transportation | N/A | N/A | N/A | | No |
| Masters - Substance Abuse | N/A | N/A | N/A | | No |

| | **Total Enrolled** | **Number of Enrollments - White** | **Percentage of Enrollments - White** | **Identical Program?** | **Shows as Available on Website?** |
|---|---|---|---|---|---|
| Masters - Teaching | N/A | N/A | N/A | | No |
| Masters - Computer Information Systems | N/A | N/A | N/A | | Yes |
| **Total** | 364 | 11 | 3.0% | | |

# indicates that the program is available at the institution

"N/A" refers to program not available.

"Shows as Available on Website" refers to a specific program is shown as available on that institution's website.

"Identical Program Available" refers to the exact same program being offered at the listed other institution(s).

"Similar, but Not Identical" refers to a similar program being offered at the listed institution(s), but not the exact same program.

Source: Statewide Student Profile System - Student Headcount Enrollment by Student Major - Fall 2014-2015

# A-26

## APPENDIX 26

### Fall 2014 Enrollment in Academic Programs Placed at Southern University and Agricultural and Mechanical College at Baton Rouge Pursuant to 1994 Settlement Agreement

| | Total Enrolled | Number of Enrollments - White | Percentage of Enrollments - White | Identical Program? | Shows as Available on Website? |
|---|---|---|---|---|---|
| Bachelors - Criminal Justice | 367 | 5 | 1.4% | LSU Alexandria, LSU Shreveport, SUNO, Grambling, McNeese, Northwestern State, Southeastern LU, U of L Lafayette, U of L Monroe | Yes |
| Doctorate - Science and Mathematics Education[1] | 35 | 2 | 5.7% | | Yes |
| Doctorate - Public Policy[2] | 44 | 2 | 4.5% | | Yes |
| Doctorate and/or Masters - Urban Forestry[3] | 46 | 1 | 2.2% | | Yes |
| Masters - Criminal Justice | 70 | 1 | 1.4% | SUNO, Grambling, McNeese, U of L Lafayette, U of L Monroe | Yes |
| Doctorate - Nursing - Nursing Science[4] | 12 | 0 | 0.0% | LSU Health Sciences Center (NO) | Yes |

| | Total Enrolled | Number of Enrollments - White | Percentage of Enrollments - White | Identical Program? | Shows as Available on Website? |
|---|---|---|---|---|---|
| Doctorate - Nursing - Nursing Practice[4] | 6 | 0 | 0.0% | LSU Health Sciences Center (NO), Northwestern State, Southeastern LU, U of L Lafayette | Yes |
| Masters - Engineering | 40 | 0 | 0.0% | Louisiana Tech U, McNeese, U of L Lafayette | Yes |
| Masters - Physics[5] | 0 | 0 | 0.0% | | Yes |
| Doctorate - Biomedical Sciences | N/A | N/A | N/A | | No |
| Doctorate - Administration and Information Systems | N/A | N/A | N/A | | No |
| Doctorate - Material Science | N/A | N/A | N/A | | No |
| Masters - International Business | N/A | N/A | N/A | | No |
| Bachelors - Actuarial Science | N/A | N/A | N/A | | No |
| Bachelors - Physical Therapy[6] | N/A | N/A | N/A | | No |
| Associates - Criminal | N/A | N/A | N/A | | No |

| | **Total Enrolled** | **Number of Enrollments - White** | **Percentage of Enrollments - White** | **Identical Program?** | **Shows as Available on Website?** |
|---|---|---|---|---|---|
| Justice | | | | | |
| **Total** | 620 | 11 | 1.8% | | |

[1]There is a program titled, "Teacher Education and Professional Development, Specific Subject Areas, Other" but it is unclear if this specifically includes Science and Mathematics Education

[2]Program titled "Public Policy Analysis, General" in Statewide Student Profile System

[3]Institution offers both a Masters and a PhD in Urban Forestry, but enrollment data is only reported for both degrees combined graduate

[4]Both of these programs could fit under the general "PhD in Nursing" mentioned in the agreement.

[5]Institution does not offer a masters in Physics but does offer a bachelors in Physics

[6]Institution offers a bachelors in vocational rehabilitation and recreational therapy, but not explicitly physical therapy.

“N/A” refers to program not available.

“Shows as Available on Website” refers to a specific program is shown as available on that institution’s website.

“Identical Program Available” refers to the exact same program being offered at the listed other institution(s).

“Similar, but Not Identical” refers to a similar program being offered at the listed institution(s), but not the exact same program.

Source: Statewide Student Profile System - Student Headcount Enrollment by Student Major - Fall 2014-2015

# A-27

# APPENDIX 27

## Alabama A & M and Univ. Alabama Huntsville Engineering Completion by Race 2011 - 2012

| | AA&M Total | AA&M White | AA&M White % | AA&M Black | AA&M Black % | UAH Total | UAH White | UAH White % | UAH Black | UAH Black % |
|---|---|---|---|---|---|---|---|---|---|---|
| Bachelors - Civil Engineering, General | 15 | 2 | 13.3% | 13 | 86.7% | 30 | 24 | 80.0% | 1 | 3.3% |
| Bachelors - Mechanical Engineering | 24 | 1 | 4.2% | 23 | 95.8% | 141 | 124 | 87.9% | 5 | 3.5% |
| Bachelors - Mechanical Engineering, Related Technologies | 4 | 1 | 25.0% | 3 | 75.0% | N/A | N/A | N/A | N/A | N/A |
| Masters - Industrial Technology, Technician | 6 | 1 | 16.7% | 4 | 66.7% | N/A | N/A | N/A | N/A | N/A |
| Masters - Engineering, Other | 4 | 0 | 0.0% | 4 | 100.0% | 1 | 0 | 0.0% | 1 | 100.0 % |
| Bachelors - Electrical And Electronics Engineering | 34 | 0 | 0.0% | 34 | 100.0% | 46 | 26 | 56.5% | 9 | 19.6% |
| Bachelors - Electrical And Electronics Engineering, Technology, Other | 6 | 0 | 0.0% | 5 | 83.3% | N/A | N/A | N/A | N/A | N/A |
| Bachelors - Industrial Technology, Technician | 6 | 0 | 0.0% | 6 | 100.0% | N/A | N/A | N/A | N/A | N/A |
| Bachelors - Chemical | N/A | N/A | N/A | N/A | N/A | 13 | 7 | 53.8% | 3 | 23.1% |

| | AA&M Total | AA&M White | AA&M White % | AA&M Black | AA&M Black % | UAH Total | UAH White | UAH White % | UAH Black | UAH Black % |
|---|---|---|---|---|---|---|---|---|---|---|
| Engineering | | | | | | | | | | |
| Bachelors - Computer Engineering, General | N/A | N/A | N/A | N/A | N/A | 0 | 0 | 0.0% | 0 | 0.0% |
| Bachelors - Computer Engineering, General | N/A | N/A | N/A | N/A | N/A | 39 | 34 | 87.2% | 1 | 2.6% |
| Bachelors - Engineering, Other | N/A | N/A | N/A | N/A | N/A | 3 | 3 | 100.0% | 0 | 0.0% |
| Bachelors - Industrial Engineering - | N/A | N/A | N/A | N/A | N/A | 15 | 9 | 60.0% | 3 | 20.0% |
| Masters - Aerospace, Aeronautical And Astronautical/ Space Engineering | N/A | N/A | N/A | N/A | N/A | 7 | 5 | 71.4% | 0 | 0.0% |
| Masters - Computer Engineering, General | N/A | N/A | N/A | N/A | N/A | 11 | 9 | 81.8% | 0 | 0.0% |
| Masters - Engineering, General | N/A | N/A | N/A | N/A | N/A | 125 | 91 | 72.8% | 4 | 3.2% |
| Doctorate - Aerospace, Aeronautical And Astronautical/Space Engineering | N/A | N/A | N/A | N/A | N/A | 1 | 1 | 100.0% | 0 | 0.0% |
| Doctorate - Civil Engineering, | N/A | N/A | N/A | N/A | N/A | 1 | 0 | 0.0% | 0 | 0.0% |

| | AA&M Total | AA&M White | AA&M White % | AA&M Black | AA&M Black % | UAH Total | UAH White | UAH White % | UAH Black | UAH Black % |
|---|---|---|---|---|---|---|---|---|---|---|
| General | | | | | | | | | | |
| Doctorate - Computer Engineering, General | N/A | N/A | N/A | N/A | N/A | 1 | 1 | 100.0% | 0 | 0.0% |
| Doctorate - Electrical And Electronics | N/A | N/A | N/A | N/A | N/A | 4 | 2 | 50.0% | 0 | 0.0% |
| Doctorate-Engineering, Other | N/A | N/A | N/A | N/A | N/A | 2 | 0 | 0.0% | 0 | 0.0% |
| Doctorate - Industrial Engineering | N/A | N/A | N/A | N/A | N/A | 6 | 4 | 66.7% | 0 | 0.0% |
| Doctorate - Mechanical Engineering - | N/A | N/A | N/A | N/A | N/A | 1 | 0 | 0.0% | 0 | 0.0% |
| Post-Baccalaureate Certificate - Computer Engineering, General | N/A | N/A | N/A | N/A | N/A | 1 | 0 | 0.0% | 0 | 0.0% |
| **Total** | 99 | 5 | 5.5% | 97 | 93.3% | 448 | 340 | 75.9% | 27 | 6.0% |

"N/A" refers to program not available.

Source: National Center for Education Statistics' IPEDS Data Center - Completion 2011-2012 Data

# A-28

## APPENDIX 28

### Law Degrees Awarded to White Students at HBIs and Proximate TWIs 2012 – 2013

| Institution | Total Degrees Awarded | Degrees Earned By White Students | % Degrees Earned By White Students |
|---|---|---|---|
| **Louisiana** | | | |
| Southern University Law Center (Baton Rouge) | 217 | 73 | 33.6% |
| LSU Baton Rouge Paul Herbert Law Center (Baton Rouge) | 218 | 157 | 72.0% |
| **North Carolina** | | | |
| North Carolina Central University (NCCU) | 167 | 66 | 39.5% |
| University Of North Carolina Law School (UNC Chapel Hill) | 247 | 116 | 47.0% |
| **Florida** | | | |
| Florida Agricultural & Mechanical University (FAMU) | 224 | 77 | 34.4% |
| Florida State University (FSU) | 239 | 179 | 74.9% |
| **Texas** | | | |
| Texas Southern University (TSU) | 161 | 31 | 19.3% |
| University Of Houston Law Center (Houston) | 272 | 166 | 61.0% |

Source: National Center for Education Statistics' IPEDS Data Center - Completion 2012 - 2013 Data

# A-29

## APPENDIX 29

| **Institution** | **Abbreviation** |
|---|---|
| **Alabama** | |
| Alabama A&M | AAMU |
| Alabama State University | ASU |
| Auburn University | AU |
| Auburn University at Montgomery | AUM |
| Calhoun State Community College | CSCC |
| Calhoun State Community College at Huntsville | CSCC-H |
| Jacksonville State University | JSU |
| Livingston University | LU |
| Troy State University at Montgomery | TSUM |
| University of Alabama at Birmingham | UAB |
| University of Alabama at Huntsville | UAH |
| University of Northern Alabama | UNA |
| **Louisiana** | |
| Delgado Community College | DCC |
| Elaine P. Nunez College | EPNCC |
| Grambling State University | Grambling |
| Louisiana State University and Agricultural and Mechanical College | LSU |
| Louisiana State University at Alexandria | LSUA |
| Louisiana State University at Eunice | LUSE |
| Louisiana State University at Shreveport | LSUS |
| Louisiana Tech | LA Tech |
| Northeast Louisiana University | NLU |
| Southern University and Agricultural and Mechanical College at Baton Rouge | SUBR |
| Southern University at New Orleans | SUNO |
| Southern University at Shreveport | SUSBO |

| Institution | Abbreviation |
|---|---|
| **Maryland** | |
| Bowie State University | Bowie |
| Coppin State University | Coppin |
| Frostburg State University | Frostburg |
| Morgan State University | Morgan |
| St. Mary's College of Maryland | St. Mary's |
| Towson University | Towson |
| University of Baltimore | UB |
| University of Maryland, Baltimore | UMB |
| University of Maryland, Baltimore County | UMBC |
| University of Maryland, College Park | College Park/ UMCP |
| University of Maryland Eastern Shore | UMES |
| University of Maryland University College | UMUC |
| **Mississippi** | |
| Alcorn State University | Alcorn |
| Delta State University | DSU |
| Jackson State University | JSU |
| Mississippi State University | MSU |
| Mississippi University for Woman | MUW |
| Mississippi Valley State University | MVSU |
| University of Mississippi | UM |
| University of Mississippi Medical Center | UMMC |
| University of Southern Mississippi | USM |
| **Tennessee** | |
| Austin Peay State University | APSU |
| East Tennessee State University | ETSU |
| Middle Tennessee State University | MTSU |
| Tennessee State University | TSU |
| Tennessee Technological University | TTU |
| University of Memphis | UM |

| **Institution** | **Abbreviation** |
|---|---|
| University of Tennessee | UT |
| University of Tennessee Chattanooga | UTC |
| University of Tennessee Institute of Agriculture | UTIA |
| University of Tennessee Knoxville | UTK |
| University of Tennessee Martin | UTM |
| University of Tennessee Nashville | UTN |