**EXH. 01**



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

COALITION FOR EQUITY AND
EXCELLENCE IN MARYLAND
HIGHER EDUCATION, et al.
Plaintiffs
vs. Case No. CCB-06-cv-2773
MARYLAND HIGHER EDUCATION
COMMISSION, et al.
Defendants
___________________________________/

The Videotaped deposition of WALTER ALLEN, Ph.D., was held on Thursday, September 8, 2016, commencing at 9:10 a.m., at Kirkland & Ellis, LLP, 655 Fifteenth Street, N.W., Suite 1200, Washington, D.C., 20005, before Christine A. Gonzalez, CSR, RPR, Notary Public.

REPORTED BY: Christine A. Gonzalez, CSR, RPR

APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:
BRENDA L. SHUM, ESQUIRE
GENEVIEVE BONADIES, ESQUIRE
Lawyers' Committee for Civil Rights Under Law
1401 New York Avenue, N.W., Suite 400
Washington, D.C. 20005
Telephone: 202.662.8600
Email: bshum@lawyerscommittee.org

ON BEHALF OF THE DEFENDANTS:
CYRIL V. SMITH, ESQUIRE
Zuckerman Spaeder, LLP
100 East Pratt Street, Suite 2440
Baltimore, Maryland 21202
Telephone: 410.332.0444
Email: csmith@zuckerman.com

APPEARANCES: (Continued on Next Page.)



APPEARANCES CONTINUED:

ON BEHALF OF THE DEFENDANTS:
JENNIFER A. DEROSE, ESQUIRE
Assistant Attorney General
Educational Affairs Division
Office of the Attorney General
200 St. Paul Place
Baltimore, Maryland 21202
Telephone: 410.576.6318
Email: jderose@oag.state.md.us

ALSO PRESENT: Allan Lichtman, Ph.D.
Eliza Spikes, Videographer



INDEX
Deposition of WALTER ALLEN, PH.D.
September 8, 2016


| Examination By: | Page |
|---|---|
| Mr. Smith | 7 |
| Ms. Shum | 322 |
| Mr. Smith | 338 |

| Exhibit No. | | Marked |
|---|---|---|
| Exhibit 1 | Binder of Reports Dr. Walter Allen | 7 |
| Exhibit 2 | Article by Dr. Walter Allen The Color of Success: African-American College Student Outcomes at Predominately White and Historically Black Public Colleges and Universities | 33 |




INDEX (Continued)
Deposition of WALTER ALLEN, PH.D.
September 8, 2016


| Exhibit No. | | Marked |
|---|---|---|
| Exhibit 3 | Article by Dr. Walter Allen Racial Privilege in the Professoriate: An Exploration of Campus Climate, Rentention and Satisfaction | 43 |
| Exhibit 4 | Article by Dr. Walter Allen Keeping Race in Place: Racial Microaggressions and Campus Racial Climate at the University of California, Berkeley | 55 |
| Exhibit 5 | Excerpt from Book "Towards a Brighter Tomorrow" by Dr. Walter Allen | 96 |
| Exhibit 6 | Demonstrative Exhibits of Dr. Walter Allen | 152 |
| Exhibit 7 | Second Expert Report of Dr. Allan Lichtman dated August 30, 2016 | 309 |

Page 6

PROCEEDINGS

VIDEOGRAPHER: We are now on the record in the matter of Coalition for Equity and Excellence versus Maryland Higher Education in the United States District Court for the District of Maryland, Case No. 1:2006-cv-02773.

Today's date is August 8th, (sic) 2016. The time is 9:10. This is the video-recorded deposition of Dr. Walter Allen being taken at 655 15th Street, Northwest, Washington, D.C., 20005, Suite 1200.

My name is Eliza Spikes on behalf of Gore Brothers Reporting & Videoconferencing located at 20 South Charles Street, Baltimore, Maryland, 21201, Suite 901. The court reporter is Christine Gonzalez, also from Gore Brothers.

Will all attorneys please identify themselves and anyone with them and the parties they represent, beginning with the party noticing this proceeding?

MR. SMITH: This is Cy Smith and with me is Jennifer DeRose for the defendants.

Page 7

MS. SHUM: My name is Brenda Shum with the Lawyers' Committee for Civil Rights and with me is Genevieve Bonadies Torres on behalf of the plaintiffs.

MR. SMITH: And I just want to note for the record, you may have said August 8th, but I think it's September 8th of 2016.

VIDEOGRAPHER: Christine, may you please administer the oath?

PROCEEDINGS

(Allen Exhibit 1 was marked for purposes of identification.)

Whereupon,

WALTER ALLEN, PH.D.,

called as a witness, having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

DIRECT EXAMINATION BY MR. SMITH:

Q. Good morning, Dr. Allen. We met a couple minutes ago, but I think you understand that I'm an attorney representing the defendants in this case, this case that's been going on for some ten years, and that

Page 8

we're taking your video-recorded deposition today, which may be played back at the trial of this matter in January and February of next year.

And I know that you have testified at deposition many, many times, but just to refresh your recollection or tell you how I'd like to proceed, I'm going to ask you the questions one at a time. I hope that they make sense to you. If they don't make sense or you don't understand them, let me know that, and I'll try and rephrase them if that's helpful.

But if I put a question to you and I don't hear something like that from you, I'll assume that you heard the question, that you understood it, and you're doing the best that you can personally to give me a truthful, accurate, and a complete answer.

Is that satisfactory?

A. Okay.

Q. All right. And is there any reason -- physical, mental, spiritual -- that you couldn't provide complete and accurate testimony today?

A. No, sir.

Page 9

Q. Okay. It's customary to ask the witness what did he do to prepare for deposition. So let me ask you that: What did you do to prepare for your testimony today?

A. In preparation for today's deposition, I reviewed the reports that we had submitted, myself in conjunction with Dr. Cliff Conrad. I reviewed other materials and -- and reports from the defendants. I went through, just honestly, a vast rash, you know, a whole set of materials, doing some review online of -- of the website materials for the different institutions, and then, of course, met with the attorneys in preparation sessions.

Q. Okay. And you have in front of you what we've marked as Exhibit 1, which I think you may have had a chance to flip through beforehand. It's intended to be all of the reports that you've authored in this case starting in 2015.

A. Yes, sir.

Q. So after the trial in the case, there was a report or a remedial recommendation in 2015, and then

there have been successive versions of it. Is it correct that Exhibit 1 contains all of those reports from 2015 on?
A. May I take a moment and look through it?
Q. Sure.
A. Yes. Thank you for your patience. These are the reports that we reviewed.
Q. And to be clear, the -- we haven't attached the exhibits, except to the last one, the one dated July 6th of 2016, and we've also added in correspondence from your attorneys, explaining various changes that have been made in the reports, but you have in front of you in Exhibit 1 a complete set from 2015 on; is that right?
A. I do.
Q. Okay. I understand that you have -- actually, let me back up for a second. You said that you reviewed reports prepared by the defendants or -- or people retained by the defendants. Which ones in particular?
A. The first report or response by



Dr. Lichtman, I had the opportunity to review in considerable detail, and the second report has come relatively recently, and I've not been able to review it to the same level of detail but did at least familiarize myself with it.
Q. Okay. And did you review the report on accreditation by Sylvia Manning?
A. No, I have not seen that.
Q. And do you consider yourself an expert in the field of accreditation of degree programs, courses, programs in higher education?
A. I have considerable experience both nationally and internationally, and so in that respect, I would answer yes.
Q. And have you ever sat on an accrediting body?
A. I've been part of an accrediting team, if -- if that answers the question.
Q. Okay.
A. Several teams, I should say.
Q. Several teams, okay.



Now, I understand you have an extensive history of testimony in cases that are, in some respects, similar to this, so they have to do with desegregation in higher education; is that fair?
A. Yes, sir.
Q. All right. And you have testified, for example, in cases involving Mississippi, Alabama, Tennessee, and Louisiana; is that right?
A. That's correct.
Q. Have you ever been retained by one of the defendants, for example, by a state university system or a state college or university in any proceeding related to higher education desegregation?
A. Yes, I have been.
Q. Okay. And when was that, and if there's more than one, tell me about that.
A. I will have to refresh on the date, but the case was the University of Maryland defending itself against a suit from Podberesky, and the issue at hand was -- should I say more?
Q. No, you can keep going.



A. The issue at hand was, was whether the University of Maryland could continue to operate a program tailored to attract high ability African-American students under the Banneker -- Benjamin Banneker scholars program.
Q. Okay. And so the brunt of your testimony was that there were reasons that Maryland should be allowed to offer other race scholarships or similar means of increasing other race representation?
A. That was a part of it, and an additional element was simply the focus, in my specific piece of the research, on the impact of the Benjamin Banneker scholars program in terms of changing the -- and improving the climate on the campus in terms of introducing and changing impressions about the abilities of African-American students and just an assessment of the program and its impact on the university, its impact on the students and faculty and students outside the program who came into contact with scholars.
Q. Other than the Podberesky case, have you

ever been retained by a state defendant or one of the defendants in a higher education desegregation case?
A. No, sir. I think that is the only instance.
Q. Okay. And you are -- have been retained here by the -- actually, who did retain you in this case?
A. I am retained, to the best of my understanding, by the Michigan -- by the -- by MHEC, the Coalition for -- for Excellence in Higher Education and working, of course, in conjunction with the attorneys of that case.
Q. Right. And I think you might have said MHEC, a slip of the tongue. You understand that MHEC is an agency or instrumentality of Maryland state government?
A. I'm sorry. It was my -- my mistake, yes.
Q. So you have an --
A. By -- by the Coalition for Equity and Excellence in Maryland Higher Education. Sorry for the mistake.



Q. Sure. And we'll just call that -- we'll call that the Coalition.
If you had been asked by Maryland to represent or to work for Maryland in the defense of this matter, is that an engagement you would be willing to take?
A. It's something I would have considered, particularly if -- if the goal were to address the issues at hand and with an eye toward trying to improve the -- the areas of concerns that are in the record.
Q. I see.
A. So I would have given it serious consideration. Yes, sir.
Q. You would have given it serious consideration --
A. I would have.
Q. -- yes, if Maryland had come to you saying that it wanted to improve the conditions for recruitment of other race students at Maryland's HBIs; is that fair?
A. If -- if Maryland had come to me and -- and



said that the goal was one of trying to address issues of diversity and -- and disparities within the system with an eye toward improving the -- improving access and -- and achievement for all the students in the state, absolutely, yes, that's what I do.
Q. Sure. And if Maryland had come to you and said, "We'd like to retain you as an expert but simply to defend against the allegations that the plaintiffs have made and to address the question of whether there should be any remedy whatsoever," is that something that you would have seriously considered?
A. I would have engaged the conversation, and if, at the end of the day, it were simply a matter of, not addressing the concerns I mentioned a moment ago, of improving equity in the system, access, and -- and achievement across the system and helping the system to become what I think it has the possibility and opportunity to be, that is a model for other state systems, in terms of how to deal with the increasingly diverse student populations that would like to have access, then, yes, I would have been -- I would have



been inclined.
Q. Sure. Now, since we started, Professor Allan Lichtman of American University has walked in, and I think you see him there.
Would you have been willing to simply switch places with Mr. Lichtman and present opinions about whether the plaintiffs' experts had demonstrated that there was unnecessary program duplication and attacked their methodology? Is that something that you would have been willing to do?
A. No. I probably would have taken his salary and switch in that respect, but in terms of the positions in his report, no, sir.
Q. I see. And I see that you've also testified in a number of different cases that don't have to do with higher education desegregation, correct?
A. Yes, sir.
Q. And many of those involve civil rights claims, although I saw there was also a wrongful death claim as well; is that right?

Page 18

A. Yes. Yes, that is correct.
Q. And is it accurate to say that in each of those cases you have represented the plaintiff making an allegation that there was a violation of the civil rights law or seeking some kind of remedy against the defendant?
A. I'm trying to -- give me just a moment, please --
Q. Sure.
A. -- to think about it. Certainly, in the majority of those cases, that would -- that would be true. So I'd say yes.
Q. And have you ever looked at a state system of higher education -- and other than, I guess, perhaps the Podberesky case -- and found no evidence or minimal evidence of discrimination in the operation of that higher education system?
A. Well, as you know, in the Podberesky case, it was not the system but rather the College Park campus. I have been involved and engaged in examinations of other individual campuses: University

Page 19

of Michigan, Ann Arbor, and the University of -- of California, Berkeley.
So I'm -- I'm parsing a bit because I really have not reviewed the entire systems under that point that you made, outside of the ones that we've already talked about in Alabama, Mississippi, and now here in Maryland.
Q. Okay. Is it fair to say that in the cases where you have been retained to look at an entire system, the cases that we mentioned at the outset --
A. Yes, sir.
Q. -- in each of those cases, you were retained to offer opinions that regarded the fact that the system had not desegregated; is that fair?
A. I was -- I -- I think I have to qualify it a bit. I was retained to offer opinions about the status of desegregation in the systems.
Q. Right.
A. And -- and I make that clarification because I wanted to be certain that it was understood that I was not given the conclusion beforehand.

Page 20

Q. Right.
A. But rather asked to examine the circumstances and then reach a conclusion.
Q. Right. And in each of the cases where you were retained to offer opinions about the status of desegregation for an entire system, you did reach the conclusion that the system was not desegregated and that certain remedies would be required; is that --
A. That's correct. That's fair enough.
Q. And have you ever reached the conclusion in the course of one of those system-wide engagements that a particular remedy was not required?
A. Oh, yes.
Q. Okay. And when you have been engaged with respect to individual campuses, you mentioned, for example, the University of Michigan and Cal Berkeley, in any of those instances, have you reached the conclusion that the institution was not responsible for actions that led to segregation or a failure to desegregate?
A. In each of those instances, I recognized

Page 21

the complexity of the issues on the table and, of course, did recognize that there were some areas and instances that were beyond the university's responsibility. So a qualified yes.
Q. So when you've looked at individual campuses, you reached the conclusion that there have been progress in some areas, a failure to make progress in other areas, and, therefore, they continue to maintain a segregated system; is that fair?
A. I -- I did indeed find progress on some fronts and a need for further improvement on other fronts and reached the conclusion that those campuses could do a better job desegregating. I don't know that I decided or concluded that those campuses were segregated campuses.
Q. I see. And you mentioned a moment ago that there have been instances where you concluded -- you have concluded that no particular remedy was required. Is that true in any of the system-wide cases where you have testified, for example -- let me just finish -- in Mississippi, Alabama, Tennessee, and Louisiana?

Page 22

A. I -- I'm sorry for interrupting. I was simply trying to -- to clarify that, as I heard your question, it wasn't a matter of reaching a conclusion that no remedy was -- was required, but rather I had understood your question to be, were there some remedies that could've been proposed that I didn't think were warranted, and that was the basis for my saying that, yes, there were these instance where some remedies I didn't think would be reasonable --
Q. Right.
A. -- or even feasible.
Q. I'm sorry. And have there -- in any of the institution-wide cases or system-wide cases where you've testified, have you ever reached the conclusion that no program transfers or -- or -- well, that no program transfers were required?
A. I've been in a position of -- of recommending or at least considering transfers and then arriving at a judgment that they were not necessarily feasible. They would have been advantageous and would have been the most effective way of achieving the end

Page 23

sometimes, but in some instances, it just wasn't going to be a possibility.
Q. And when do you recall that you have reached the conclusion that transfers would be effective but not feasible?
A. The one instance I remember had to do with the case in Mississippi and the desire to strengthen, to make more attractive Jackson State University and considering, for example, putting in place programs such as a medical school.
And then, ultimately, in consultation with all of the principals reading the data, the parties reading the data, etc., etc., concluding that it just wasn't going to be feasible or something that was simply not going to happen. So the ideal was there, but the reality suggested that it would not happen. So that's the one instance I think about.
Q. Thank you. And in Mississippi, do you recall any -- strike that.
In Mississippi, did you recommend any other program transfers other than the medical school to

Page 24

Jackson State?
A. We considered a law school there as well and that simply, again, did not come to be. Those are the two major ones that I remember.
Q. When you say you considered a law school, did you recommend moving a law school or creating a law school --
A. Yes.
Q. -- at Jackson State?
A. Yes.
Q. And did the Court accept that or not?
A. The Court did not accept it. And actually, the -- well, no, the Court did not accept it. And some of the process along the way was such that we just decided that, from an educational point of view, it was not necessarily going to be the best option.
Q. Right. And with respect to the med school, you ended up not recommending the transfer or it was vetoed by the Court?
A. It was a process of -- of recommendation and interaction with the various constituent

Page 25

universities that were participating in the action. And so, ultimately, I -- I just can't remember whether we brought the recommendation forward to the Court and then it was denied or whether we simply did not see fit to bring it any further than the preliminary recommendations.
Q. I see. So is it accurate to say, then, that in all of the system-wide cases where you have testified before, you have recommended program transfers in each of those of one kind or another, not including the med school perhaps in Mississippi, but you have recommended program transfers?
A. I can't say I've recommended them. They've been considered. They've been part of the analysis and assessment of what might be effective remedies.
Q. Is it accurate to say that in each of those cases -- Mississippi, Alabama, Tennessee, and Louisiana -- that program transfers have been recommended by the plaintiffs, the people who are suing about segregation issues in higher education?
A. I can't say that is accurate, no.

Page 26

Q. Okay. I saw somewhere that you have done work for the University of Georgia; is that right?
A. Yes, sir.
Q. And what was that?
A. That work was -- actually, I was retained by the Department of Justice, and the case in that instance, my work focused on the racial climate and what the university could do, some of the issues that were presented for black students on the campus and the challenges of the university in terms of attracting and retaining black students, and what the university could do in response to the summaries and reports that we produced about the status of black students on the campus.
Q. Right. Have you ever been retained by either the university system of Maryland, the State of Maryland or by any individual Maryland public college or university?
A. Okay. That's back to -- yes.
Q. Other than Podberesky?
A. Podberesky, yes.

Page 27

Q. Podberesky.
A. Yes.
Q. Okay. And remind me when that was. Was that the mid-1980s thereabouts?
A. I'd have to consult my notes.
Q. Okay. That's fine.
A. It's been awhile.
Q. Okay. Now, I understand that you have -- I guess I looked at Exhibit 2 to your July 6, 2016, report, which is your resume, and I understand that you have published many, many articles over the past several decades; is that true?
A. Yes, sir.
Q. Okay. And is it also true that many of them have been in the -- for want of a better phrase, some of the leading journals that address sociology in education?
A. I'd say so, yes.
Q. Okay. For example -- and I'm not a sociologist, but I saw the Harvard Educational Review. Is that a prominent publication?

Page 28

A. It is.
Q. And is it accurate to say that most or -- well, first, is it accurate to say that most of the articles that you list in Exhibit 2, your resume, which is part of the July 16th report, were published in peer-reviewed publications; is that fair?
A. That's correct. Yes.
Q. Are there any exceptions? In other words, do you list anything in there as a publication that was not in a peer-reviewed publication?
A. I -- the -- the short answer is yes, but with the qualification that those reports that were published were reviewed but not under the traditional peer-review system.
Q. Okay.
A. So there's a whole section of reports from research and from contracts that were published but published not in the standard peer-review system but published after extensive review.
Q. I understand. So tell me what -- when you say "the traditional peer-review system," are you

Page 29

talking about blind submissions?
A. Academic journals with -- with peer review, yes.
Q. Okay. And what is the significance of blind review? What's the -- what is -- what effect does that have? What's its relevance?
A. Well, it is traditionally accepted as a means of -- of ensuring the overall academic quality of the publications by ensuring that they are subjects of independent review or subjected to independent review.
Q. Right. And you said there are some exceptions to that, that those are -- I think you said grants or technical publications?
A. Technical reports --
Q. Okay.
A. -- for grants. And interestingly enough, the review process for some of the books is slightly different than a standard blind review of the sort you'd have for an academic journal.
Q. Got it.
A. But emphasizing that in each instance, we

are, by the standards of the profession, required to solicit independent assessment and review. And as part of our process, we engage in an iterative process where you refine based on the feedback. You make corrections based on the feedback --
Q. Sure.
A. -- with an end toward improving the ultimate product.
Q. Right. I understand that's the objective.
I saw a couple of references to -- in your list of publications to special issues of journals?
A. Yes.
Q. Okay. What is a special issue of a journal?
A. A special issue of a journal is a topical issue that generally has invited editors from the outside, who then replicate the process for the permanent or long-term editors of the process.
Q. Okay. In addition to invited editors, does it have invited authors?
A. It depends. Often, one simply announces a



special issue and solicits submissions, and so the process is the same as the regular process of submitting to that journal for publication.
Q. Okay. So sometimes the invited editors would simply take over the existing role of the regular editors, right?
A. Yes, that's -- that's the structure.
Q. Sure. And are there also instances where the invited editors themselves invite authors to submit?
A. Yes, as is the case with -- with journals and the regular editors. You -- you will solicit colleagues to submit but always with the understanding that there are no guarantees, that those submissions will have to go through that standard editorial process that you and just discussed.
Q. Right. Now, when an author is invited to submit and submits an article, it's not going to be blind, blindly reviewed, correct?
A. No, that's not correct. It's -- it -- the invitation goes forth, and the submission comes to the



editors, but then the editor will, as I said, engage in that standard review process where you -- where you circulate the manuscript for review by independent reviewers, blind reviewers.
Q. Is it your testimony that that occurs in each case where a special issue or edition of a journal is --
A. I can --
Q. -- published?
A. I can only talk to you about the special issues I've been involved in.
Q. I see. Okay. I mentioned the Harvard Educational Review, and I believe that you published an article there in 1992. Does that ring any bells with you?
A. Yes, sir.
Q. Okay. And do you happen to recall what the topic of that was?
A. That was a comparative study, if I remember correctly, of black students attending historically black colleges and universities compared with those on



traditionally white college campuses. It was a publication drawn from a national study.
Q. Okay. And it represented original scholarship by you; is that fair?
A. Yes, sir.
MR. SMITH: I'm gonna hand you what we'll mark as Allen Exhibit 2.
(Allen Exhibit 2 was marked for purposes of identification.)
BY MR. SMITH:
Q. And is this, in fact, the article, the 1992 article, from the Harvard Educational Review?
A. Yes, it is.
Q. And you're the sole author, correct?
A. That's correct.
Q. And is it accurate to say that this did go through the traditional blind peer-review system that you've described?
A. That's accurate.
Q. Were you --
A. Although, I should say that the Harvard

Educational Review has a review process that's similar to the process that is used by law journals, and so you have the independent review, but you also have a detailed review by assigned editors within the editorial board for the publication.
Q. Okay. So two -- two levels of review: one blind and then the other perhaps after it's been accepted for publication?
A. Yes.
Q. All right. And the focus here was on student outcomes, correct, for African-American students at different types of public colleges and universities?
A. That's correct.
Q. And you wanted to determine the effect on student outcomes of a large number of independent variables; is that fair?
A. That's correct.
Q. And did you also want to determine whether or not conclusions could be generalized from the original research that you had done and presented here?



A. That's correct.
Q. And is it correct that you drew what you believed was a large and random sample of African-American students in order to test the effect of these independent variables?
A. I did so for this particular study and for this particular set of research questions, yes.
Q. Right.
A. And that's to imply that there are oftentimes or other times when I have different kinds of questions, and so the research sample and indeed the research approach varies.
Q. I understand. I'm really just asking you about 1992. Is it accurate to say that you drew a large and random sample in order to test the effect of multiple independent variables on student outcomes?
A. And yes, in this case.
Q. Okay. And is it true that you started off in this case with questionnaires that were sent to your large, random sample?
A. Yes. This is a survey-based study.



Q. Okay. And before you sent the questionnaires out, you had some pretesting and revision; is that true?
A. Correct.
Q. And what was the purpose of that pretesting and revision?
A. To refine the instrument and to be certain that the substantive goals of the study were going to be accomplished in terms of data that was collected and the analyses that would be the result and, of course, the conclusions.
Q. And the instrument in this case is the questionnaire itself, the survey instrument; is that fair?
A. That's correct.
Q. Okay. And you sought and were able to get a large, random sample covering three years of student matriculations; is that correct?
A. Give me just a second to remind myself whether this was indeed the longitudinal study. The first part is correct. It was a large study. So yes,



over -- over a three-year period. Correct.
Q. Let me just go back to the questionnaire. I think you said you wanted to refine the instrument. How were you able to refine the instrument by the pretesting and the revisions that you undertook?
A. You go through an iterative process, which involves pretesting the instrument, and then an assessment and analysis of the results to, for example, establish which items are understood by the subjects, which items are eliciting the information that you're seeking, and then you do a next revision and perhaps even an additional pretest with a next revision.
So it's an iterative process of -- of essentially tightening up the survey so that it is accomplishing the goals that you set for it.
Q. And did you accomplish all of this pretesting and revision before you actually sent your questionnaire out to your large, random sample?
A. I did.
Q. And is that a best practice in the field, to do that pretesting and revision?

A. When one is conducting a sample survey, yes. But as -- and I'm sorry, I know you want me to stay narrow with the answers, I think, but the point is, that that's for -- that's true for a particular brand of research when you're addressing a particular set of questions.
Q. Of course. And I think you -- after presenting some of the results of your study or describing its methodology, you noted a caveat that it was important to note that it was not necessarily reliable because of the response rates that you got back from the large, random sample; is that correct?
A. I would need to see where you're referring. It's not --
Q. Page 34.
A. And you are referring to --
Q. The next to last paragraph, where it says, "It should be noted, however, that the validity of this study's findings might be attenuated as a result of less than optimal response rates."
A. I will accept that phrasing. Yes.



Q. Okay. Yeah, I hope you will. I hope you will.
A. That it would be attenuated but not -- not completely dismissed.
Q. Of course. And in that case, the -- the response rates were in the range of 25 to 35 percent of all of the student population, relevant student population, correct?
A. That is correct. And with the additional context of -- of the fact that for mail surveys, that is surveys conducted in the mail, an outstanding, amazing response rate is 50 percent.
Q. I understand.
A. 'Cause given this population, students, students of color, etc.
Q. Okay. And although you had a large, random sample, you also were careful to note that the findings from your research could not be generalized to the national black college population without qualification; is that right?
A. And we're, again, referring to the same



point that you --
Q. Bottom of page 34 --
A. -- referred me to?
Q. -- top of page 35.
A. I made the point that this was not a perfect data set, but it was actually the best available at that time. It was essentially the gold standard for that particular time but recognizing that it wasn't a perfect study, and there is no such thing.
Q. Well, actually, I asked a different question. Didn't you tell your reader that you could not generalize the results of your study to the national black college population without qualification?
A. That's the key, without qualification, yes, 'cause I simply heard you earlier say that they could not be generalized.
Q. Okay.
A. But they have to be generalized with qualification, recognizing the attenuated point.
Q. Understood. And is it also true that in



the case of this study that you used a common technique in quantitative analysis of correlational analysis; is that correct?
A. Correlational analysis, multiple regression analysis, yes.
Q. Okay. You used both of those, correct?
A. I did.
Q. And in the case of the correlational analysis, you were looking at a predictor variable and an dependent variable; is that right?
A. I was looking at a set of predictor variables and -- and dependent variable, yes.
Q. Right. But in the individual correlations that you looked at, you would have one predictor variable and one independent variable?
A. If it was a correlation, but for a multiple regression, multiple --
Q. I understand.
A. -- predictors.
Q. I'm just taking it one step at a time.
A. Okay. So yes, sir.

Q. So in the case of the individual correlations, it was one and one, and then in the case of the multiple regression analysis, you were able to look at the effect of many independent variables; is that right?
A. Correct.
Q. And in this case, the dependent variable was some measure of student outcomes; is that right?
A. Correct.
Q. And the predictor variable or among the predictor variables were factors that might have an effect on the student outcomes, right, things that might have predictive power; is that fair?
A. Yes, sir. That's fair.
Q. And your analysis included outcome measures for all of the students in your sample, all of the ones that you were able to reach with your questionnaire, correct?
A. All of those who responded, yes.
Q. And not just a preselected set of them that might have had, for example, high outcomes, right?



A. That's correct. I did that in later studies, because there are times when you want to drill down on particular populations.
Q. I understand. But in this one, you were trying to find out the effect of these predictor variables on the entire set of students, true?
A. That's correct.
Q. Okay. I want to ask you about a different study you might have performed, sir. So you can put that down if you like.
A. Okay.
(Allen Exhibit 3 was marked for purposes of identification.)
BY MR. SMITH:
Q. Doctor, I've handed you another published article. This one from the Journal of Higher Education in -- I should know what the date is. Do you happen to know the date of this one, 2009?
A. 2009.
Q. Okay. Thank you. And the Journal of Higher Education, also a leading publication in the



field, correct?
A. That's correct.
Q. And also, in this instance, a blind peer-reviewed study, correct?
A. That is correct.
Q. And in this case, also the work that you did was original research, correct?
A. That's correct.
Q. And it was based on a national survey, correct?
A. That is correct.
Q. And you had -- I'm sorry. What were you trying to measure in this case?
A. The focus here was on faculty -- on -- we were exploring campus climate and issues of faculty retention and satisfaction for faculty of color.
Q. Okay. And you were trying to determine the effect of various predictor variables on faculty satisfaction; is that right?
A. That's correct.
Q. All right. And in this case, I understand



you were able to get a pretty high response rate; is that right?
A. Well, the faculty survey had a 41 percent response rate.
Q. Right.
A. So it was higher than the 35 percent so --
Q. Right.
A. -- I'd say yes, in that way.
Q. Okay. But I mean, you felt comfortable that that was -- 41 percent response was, in your judgment, a good number?
A. It was.
Q. All right. And once you had your response rate back, you had some institutions where there just weren't very many faculty of color, and so you deleted those institutions from the pool that you were examining, correct?
A. We did -- that is correct, and it's correct for the reason of and -- and for the reason or the fact that the numbers were so small on some of those campuses, that it just wasn't statistically meaningful,

Page 46

so they did indeed have to be excluded.
Q. Okay. And maybe you can educate me a little bit. It says you also eliminated missing cases on the dependent variable. What does that mean?
A. That simply means incomplete survey data.
Q. They didn't tell you about their level of satisfaction or --
A. Yeah, right, or some other key data elements were missing, sufficient that you could not reasonably do the analysis with that case.
Q. Okay. And you took out some institutions because there just weren't enough faculty of color response -- responses, and, therefore, it was not statistically significant, and you also sought to break down the measures among different types of faculty of color; is that true?
A. Yes, that is true.
Q. So, for example, African-American, Latino -- and by the way, I want to make sure I have this right. You use the phrasing Latina, slash, o. What is the best way to say that orally?

Page 47

A. Latino is fine. Latina. I think -- let's say Latina --
Q. Latina.
A. -- and it will be the generalized reference to Latinas and Latinos.
Q. All right. So -- so you wanted to break down your -- your findings among African-Americans, Latina, and other subgroups of color, fair?
A. Yes, sir, but also with an analysis and comparison to the white faculty on the campus. Yes.
Q. Okay. And -- and you were able to do that for some where there were a large number of responses, but you weren't able to do it for the American Indian or Alaskan Native subset because of the small sample size?
A. True. And for -- and as you pointed out a moment ago or as we agreed a moment ago, I also was not able to do it for certain campuses because of the fact that there just simply weren't sufficient numbers of faculty of color on those campuses.
Q. And as a result of the limitation either in

Page 48

the number of faculty at the campus or the number of people in the subgroup, it would not produce a statistically significant or meaningful result; is that fair?
A. It would not produce a statistically significant result. Yes.
Q. And in this study, you identified a large number of independent variables or predictor variables; is that right?
A. Yes.
Q. In fact, you list a number of --
A. Multiple indicators. I don't know if I'd say a large number. I'm sorry for interrupting.
Q. Well, okay. You list a number of them at the bottom of page 547?
A. I do.
Q. And that's just a subset, right? There's some additional ones as well?
A. Appendix B basically gives the summary of the -- the independent variables.
Q. Okay. And once you identified the clean

Page 49

data so it had good responses, it had a large number of responses and so on, you ran a regression analysis to see the effect of each of your predictor or independent variable, right?
A. I did so, as was appropriate for the questions being asked in this study and the data set being used. Yes.
Q. Right. And it says in here at the bottom of page 547 -- and again, maybe you can help with my limited education in this area. It says, "In creating the regression model for analyses, a few variables were omitted to avoid problems with multicolinearity."
What does that mean?
A. Multicolinearity is simply a problem with variables that are intercorrelated and, as such, violate the assumption of independent distributions, and so they're just two closely correlated, and so it becomes a question whether you're studying A or B.
Q. I see.
A. And so it's best just to eliminate those variables.

Q. So in an examination like this when you've got independent variables that are too closely aligned with one another, that could -- it would have the potential at least for throwing off your results?
A. Yes, sir.
Q. And that's why you chose to eliminate some of your predictor variables because of that potential for alignment or colinearity?
A. Redundancy. Yes, sir.
Q. Redundancy.
A. Yes, sir.
Q. All right. Now, the -- the two studies we've just looked at are both quantitative studies, correct?
A. Yes, sir. That's correct.
Q. And have you also done what are known as qualitative studies?
A. Yes, I have, as well as mixed-method studies that are a combination of the two.
Q. Okay. For example, I read an article that you authored in the Chicano-Latino Law Review in 2002,



which appeared to be a qualitative study; is that right?
A. I would like to check the notes, but I think it is correct. Is that the paper with Daniel Solorzano and Grace Carroll?
Q. Well, let's see here.
A. Yes, it is. Chicano-Latino Law Review.
MS. SHUM: Where are you looking?
THE WITNESS: I'm on page 17 of my Exhibit 2.
MS. SHUM: Do you have the article, Cy?
MR. SMITH: I do.
BY MR. SMITH:
Q. So that's the one with Daniel -- I'm sorry. How is his last name pronounced?
A. Solorzano.
Q. Solorzano.
Let me just back up for a second. In terms of the quantitative studies that you've done, can you give me an example of where you performed a regression analysis on a preselected subset of the dependent



variable, in other words, the outcome variable?
A. Would you -- would you -- I'm not sure I'm following the question, so I'd -- if you could repeat it or clarify it for me.
Q. Sure. So in -- in the first two studies that we've looked at from 1992 and then 2009, being Defendants Exhibits 2 and 3, you took a large, national sample, correct?
A. Yes.
Q. In both instances?
And then you performed regression analyses looking at the effect of the independent or predictor variables on the entire sample, correct?
A. Yes, correct.
Q. Okay. Have you ever done a study where you obtained a large sample and then excluded from all analysis of that sample all but a preselected subset of it?
A. Oh, yes, absolutely.
Q. Okay. Give me a --
A. I would -- I would characterize that as a



subgroup analysis, for example.
Q. Okay.
A. And so, for example, if one is studying and -- and I'd have to go through and give you the specific instances, which I can do. But if one is interested to assess the status and outcome, say, for black students in a national sample, then what one does is to select out that subsample and do the analysis on the subsample without doing that analysis, in that instance, for white students.
Q. Okay.
A. So it's yes.
Q. Got it. Okay. And again, harkening back to the first two studies that we looked at from 2002 and 2009, original work by you, you chose a quantitative method in the way that you've described. And why did you choose to use a quantitative method in those instances?
A. I'm a quantitative sociologist and more -- more -- more -- more to a response to your question that's more meaningful, because in those instances that

particular approach was best suited to the research questions at hand.
Q. Okay. You need to tell me why. Why was it best suited?
A. In the instance of the national surveys, there was the goal of doing an analysis about -- let's take the first case of the Harvard Educational Review, doing an analysis of African-American student outcomes that attempted, to the best degree possible, to do that assessment for a nationally representative population.
Q. I see. Okay.
A. And there have been other instances. For example, indeed, in the case of the Solorzano paper, that was more of a qualitative study where there was a drilling down and focusing on a subgroup and -- and specific experience for a specific group on a specific campus. And so in that instance, it was more appropriate to use that qualitative approach.
Q. Okay. Could you have performed the -- and we'll get to it in one second, but the Solorzano, the study you co-authored with Mr. Solorzano, could you



have performed that in a quantitative study?
A. Well, I -- I just want to clarify that it was an empirical study in that the data were original data. The questions that we addressed in this study, with the data that were available, would not be suitable for a quantitative approach like multiple regression.
Q. Okay. Well, then let's -- let's put it in front of you so we're clear about the question.
A. Okay.
(Allen Exhibit 4 was marked for purposes of identification.)
BY MR. SMITH:
Q. So in Defense Exhibit 4, that being a 2002 study published in the Chicano-Latino Law Review, I think you said that it would not have been suitable for a regression analysis. And why is that?
A. Well, the -- first and foremost, there was not available a large scale data set with the specific items having been collected. Further, the level of interest was, in terms of student data that were best



understood in terms of student responses, not reduced to survey questions or categorical or even ordinal or numerical responses. So it was more a matter of accounts and then doing an analysis of the accounts.
It was more a matter of -- of sort of students telling their stories, if you will, sharing their experiences, and then having to conduct the analysis of -- of the content, for example, the themes that came forward out of their accounts.
Q. I understand what you're saying, and I read -- I read much of the article. Would it have been possible to convert the students' stories or their accounts to something that could be quantified in a numerical way? In other words, would it be possible to develop a scale of microaggressions, a scale of racial hostility, you know, things of that nature?
A. You can do that, and then the judgment one has to make is that there's the trade-off. So when you reduce it to surveys, then the sort of richness and the detail is lost. You just simply cannot deal with that in a standard survey format, which is fine if your goal



is to have a more broad-sweeping picture and a sense of what's generally representative.
However, in this instance, the goal was to go to the next level to literally drill down into the experiences of those students, and in which case, the qualitative approach was more appropriate.
Q. Got it. So if you were trying to be an authentic voice of the students or the informants -- I think that's the word that's sometimes used, right, of the informants' perspectives, then doing a study, such as we see in Exhibit 4, is the best way to get that point across; is that fair?
A. If we were trying to capture and -- and hear those nuances, that is -- is fair. That's a fair assessment. I should -- I should add, which I'm sure you're already aware of, that we indeed -- in this instance, we're talking about a mixed-method study because, in fact, some questionnaire data were collected from these students.
Q. Okay. Great.
A. To supplement their -- their detailed

Page 58

verbal responses.
Q. Right. And then the flip side of what we were just talking about -- and just I think I heard you correctly -- is that if you want a broadly sweeping picture and a generally representative set of results, then in that case, if it's possible, you would want to use the regression analysis approach that's shown in the first two exhibits that we've looked at?
A. I think that's fair, and understanding that there's the trade-off, that you then lose some of that very dynamic, underlying process.
Q. Right. The richness of detail?
A. The richness of detail. Yes, sir. That's correct.
Q. And the ability to be authentic to the students or the informants' voices?
A. To be true to and to have, yes, that detail.
Q. And in this case, in Exhibit 4, you were looking or you were investigating the racial climate Cal Berkeley, correct?

Page 59

A. At Cal Berkeley, yes. That is correct.
Q. And at least in part, you were doing a qualitative study that employed focus groups, correct?
A. Yes. That was a piece of the mixed-method study. Yes.
Q. And were you able, at the end of this, to generalize the results of this study to other campuses at the Cal system?
A. We were very adamant on the point that there were lessons for other campuses not only in the Cal system but nationally, because this study was related to studies we had done at the University of Michigan, Michigan State, Harvard.
Q. Okay. And my -- I think I understand what you're saying, but were you able to take the results? Let's suppose I was the administrator at Cal State Bakersfield, which is a long way from Berkeley.
A. Yes.
Q. Would I have been able to take the results of this mixed-method study and say, I now know how students are going to respond to microaggressions and I

Page 60

can predict the racial climate at Cal State Bakersfield?
A. You would have been able -- no, not exactly to apply it that way, but you would have been able to have an understanding of some of the features that perhaps were repeated or could be represented at Cal State Bakersfield informed by the lessons from Berkeley.
Q. And if I wanted to be confident about what was going on Cal State Bakersfield, I'd want to try and replicate your study there or some -- some version of it?
A. Yes, sir. That would be the ideal circumstance.
Q. And you had in this case, as I understand it, eight focus groups; is that right?
A. It sounds correct, but if I can just --
Q. It's on page 31 I think of the article.
A. Yes. We did conduct the eight focus groups in spring 2000.
Q. And why did you choose to use focus groups

Page 61

as opposed to informant interviews?
A. The goal in this instance was to elicit from students their sort of joint examination of the questions that we put before them. So the point was to try and actually achieve a balance of sorts where you can get some information from an individual interview, you can get more information and -- and clarification from a focus group where people are discussing the issue at hand or sharing their responses to the question.
Q. Is it your experience that a focus group can actually be better at extracting the -- the genuine points of view of the informants when you're talking about a charged issue such as racism on campus, microaggressions, as you study here?
A. Not always, but at times, yes.
Q. And is that why you chose to use focus groups in this case because you thought given the -- I may use the wrong word, but the racial element of the discussion, that you would probably get a higher level of candor from your focus group participants?

Page 62

A. I think a good way to respond is just simply pointing out what we -- we share at the top of page 32, and that that focus group methodology is just a way using guided group discussions that allows for a broader, richer understanding of participant experiences and beliefs on the topic of inquiry.
So it's a -- it's a yes but with some -- some additional context.
Q. Okay. So focus groups can be useful in many contexts, but in this particular context, which had a racial, for lack of a better word, a racial element to it, might be particularly useful here?
A. It was useful as a clarification of campus climate for those -- those groups of students of color. So, again, a qualified yes.
Q. And I understand that you -- when you got the focus group responses to the discussion questions -- well, I shouldn't say I understand.
You -- you conducted the focus groups and you had tape recordings, right, or maybe at this point, maybe by then, it was digital tape recordings?

Page 63

A. They were actually tapes --
Q. They were actual tapes. Okay.
A. -- at that time.
Q. Press the play and the record button --
A. Yes --
Q. -- at the same time?
A. -- with -- with a protocol that you had back-up tape-recorders and so on to make sure that you didn't miss anything.
Q. All right. What did you do once you had the tape-recordings? What was the next step with that raw data?
A. The data were -- those tapes were transcribed. The transcripts were then corrected, and then the transcribed -- the transcribed data, the transcripts, were subjected to in-depth qualitative analysis. And that's back to my point earlier of searching for themes and -- and the clarifications and the richness and the details that the students provided about the issue of their campus climate and their experience as students of color on that campus.

Page 64

Q. And I notice that you had, I think, three principal authors and five graduate students on this, correct?
A. That's correct.
Q. All right. And did any of the eight participants do a check or verify the transcriptions?
A. Oh, that was the process I described of, you first did the -- I'm sorry. I should have been even more clear.
Q. Please do.
A. You -- you produced the first transcriptions of the taped interviews, then there was a very detailed process of checking accuracy, checking transcripts against the recordings, and then double-checking and just being sure that they were accurate representations of what indeed transpired in the focus group.
Q. And is that a best practice in the field --
A. It is.
Q. -- what you described?
A. It is.

Page 65

Q. Once you had the corrected transcripts that have been checked, you said they were subjected to an in-depth qualitative analysis, correct?
A. Yes.
Q. And did that involve trying to pull out and code the things that were revealed in the transcript?
A. That was the process and, again, a process where you do parallel coding and then compare the codes, reconcile them. So, in other words, independent coding of the transcripts --
Q. Oh, okay.
A. -- and then reconciling with the two independent codes and just coming away with a more confident sense of which themes and which points were made in those focus groups.
Q. And to make sure I understand what you said, when you said "parallel," that means that you had two separate investigators code the same transcript?
A. Yes. That's correct. And where there were -- I'm sorry, but --
Q. No, no, go ahead.

Page 66

A. And where there were any inconsistencies, then a third coding and then discussion to reconcile.
Q. And were the two coders different people from ones who had conducted the focus groups?
A. Yes, absolutely.
Q. And why is that?
A. Well -- and I should clarify. There's actually -- well, the clarification I would offer is that the fact and accuracy checking at the first stage involve the person who was or the people who were present for the focus group. Then the actual coding was indeed done by -- by people who were not necessarily in those focus groups, and just, again, to try and bring as many independent and -- and perspectives to bear as possible.
Q. And is that a best practice in the field to have independent coders?
A. Where possible, yes.
Q. And are you familiar with the general concept of investigator or examiner bias, that general concern or issue in the field of the social sciences?

Page 67

A. Could you say a word further? I think I understand what you're asking me.
Q. Maybe I have the wrong -- the wrong phrase. I'm talking about the question of making sure that the interviewer or the principal, the person who's doing the work, doesn't let his or her preconceptions affect the results.
A. No, no, that --
Q. What's the right word for --
A. That was actually the correct word. I just wanted to be absolutely certain that I understood what you were saying, so I'm --
Q. Investigator bias?
A. Yes, I'm familiar with that, that notion. And it is something we strive to avoid, but we recognize that we are human beings and we bring our perspectives. That was part of the complication that was playing in the back of my head when you shared the concept with me.
Q. Sure. And -- and so the use of the two coders, who are independent of the focus group

Page 68

conductor, is an effort to try and minimize the effect of that investigator bias?
A. That's right.
Q. And that's a best practice in the field?
A. It's a -- yes, an accepted practice, a goal.
Q. Okay. And in this case, you not only did the focus groups, but you also took, it says, field notes. You did research memos, and you conducted information or obtained information from debriefs after the focus groups. That's on page 32.
A. Okay.
Q. Is that true?
A. Yes, it is true.
Q. And what was -- what's the significance of that on top of the focus groups?
A. Simply, again, trying to draw information from as many sources as possible that would help to enrich one's understanding of the questions and -- and the student responses to those questions.
Q. Did you have a hypothesis or hypotheses

Page 69

going into this research?
A. The -- the framing, yes.
Q. And they had to do with the relationship between the predictor variable and the dependent variables, correct?
A. Because -- not -- not -- not quite so.
Q. Well, I'm sorry. I shouldn't have asked it that way. Your -- your hypotheses had to do with the association between various facts about the campus and the number of microaggressions and its effect on the students; is that fair?
A. I would say that our -- the way I would phrase it is that we were interested to assess the racial -- campus racial climate at Berkeley as experienced by students of color.
Q. And did you have a theory or any sort of hypothesis? Other than measuring or observing the racial climate, did you have a theory or a hypothesis about how that racial climate was caused by or related to something else?
A. It was actually an exploratory -- the --

the -- the simple answer is no in that we conducted an exploratory study of campus racial climate sort of predicated on or influenced by an understanding that there were some challenges around that issue on the campus.

We brought to that study frames that were reflective of our training and our background. So in that sense, the work of Chester Pierce, for example, was referenced, but I honestly cannot say to you that it was the kind of strict quantitative study that would test the -- the Chester Pierce theory of racial microaggressions.

Q. Okay. And if you could just take a look at page 31 of Defense Exhibit 4, rather Allen Exhibit 4, before you dive into the research methodology, you say that this study extends Professor Pierce's construct to examine racial climate and then to answer the following questions, and one of them, No. 3 is: How do these racial microaggressions affect the ability of students of color to perform academically?

Did you have a hypothesis of that going in,



or no?

A. We -- we understood that there might be some relevance of racial microaggressions for the educational outcomes of students of color, but in terms of a hard and fast hypothesis, no, because this is qualitative research of a sort that's different from a quantitative study where the hypothesis statement is more direct of the sort that one would see in, say, some of the natural and physical sciences. A causes B, which causes C, or A plus B is equal to D. So that kind of linear, clear relationship was not hypothesized and was not a part of this study.

Q. Would you say that this sort of qualitative study that was done here, the focus group, is useful for addressing those sort of causal relationships that you just described, A causes B or A has an influence on B?

A. I think that they can be of some value as a way of understanding the -- the relationships. And interestingly enough, they can either be prior to the quantitative study or they can be after the



quantitative study. Because, as I said, the quantitative study sometimes will just give one the general patterns and parameters of -- of relationships, but then there's the need to drill down and get to that richness and nuance.

Q. Right. So is it fair to say that if you're trying to draw these causal relationships you just mentioned or to describe them accurately, a qualitative study can be useful if it is performed either before or after some quantitative work?

A. Yes. Those qualitative studies can add to the lessons and findings from a quantitative study.

Q. And is it also true that if you're trying to generate information that is predictive and generalizable to other situations and other groups of informants, that a qualitative study can be good at that, again, provided that it's conducted before or after or in conjunction with a quantitative study?

A. It can add -- yes. It can bring some value and add some information that's useful.

Q. And when you say "it," you're talking about



the --

A. The qualitative study. Yes, sir.

Q. Now, in this case, you not only had the focus groups and the field notes and so on. You also gathered some additional information with student questionnaires, student life histories, historical archives, and institutional records; is that right?

A. That's correct.

Q. And again, why not simply rely on the focus groups or the -- well, why not simply rely on the focus groups?

A. As a rule of thumb, the more data points one can generate, the better, because then one can triangulate those sources of information, 'cause literally each methodology gives a different kind of snapshot of the phenomenon you're trying to study.

And so if you can get that snapshot from the perspective of a quantitative approach, from the perspective of a qualitative approach, from their life histories, and then use those different perspectives to more fully inform the questions that you are pursuing.

Page 74

Q. And again, is that a best practice in the field?
A. It is a practice that is very commonly employed by many, many, many social scientists.
Q. Is it a recommended practice?
A. Depending on the question at hand.
Q. And whether that information is accessible?
A. Yes, whether it's accessible and indeed whether it is pertinent to the question that one is trying to ask.
Q. Okay. Right. So you wouldn't want to use those additional sources of information if they don't shed any light --
A. That's the key.
Q. -- on the question?
A. Precisely.
Q. But if they do, you would want to go get them?
A. If possible, yes.
Q. And you talked about triangulation. Is that a recognized concept in the field?

Page 75

A. It is.
Q. And what does it mean exactly?
A. It simply means, as I said, relying on different methodological approaches and then reconciling, if you will, the information that is provided by the different approaches.
Q. Got it. Just going back to a question of verification, you talked about the transcribed -- the transcriptions being corrected and then the multiple coders. Is there any practice in the field of using the interviewee or focus group participants to have them verify or comment on the accuracy of the findings from --
A. Yes.
Q. What's that called?
A. I've heard multiple terms. And as you said, it is simply an opportunity given to the respondents to verify their interpretation of the accuracy of the data. So I'm blocking now on the terms, but some call it back-checking.
Q. Informant checking?

Page 76

A. Informant checking. Use a variety of -- of terms. But the point being to give the informants, the respondents, an opportunity to review the results for accuracy from their perspective.
Q. And is that one recognized method for checking what we've described earlier as experiment or bias?
A. It is.
Q. And is triangulation also a recognized method for checking experiment or bias?
A. It's a method for -- it's -- the purpose of the triangular is, of course, it will protect against bias, but it's more in the line with the goal of -- of generating the most detailed and the -- the most detailed information possible.
Q. So triangulation can help with the experiment or bias issue, but its main purpose is to increase the reliability of the study?
A. That's fair.
Q. Same with informant checking, I guess?
A. That's a fair assessment as well. Yes,

Page 77

sir.
Q. Is it accurate to call this particular study, Defense Exhibit 4, a grounded theory approach?
A. It is.
Q. And what is your definition of grounded theory?
A. Grounded theory is -- a grounded theoretical approach is one where one does not impose a set of predetermined hypotheses on the data, does not impose a -- force the data into a predetermined theoretical framework. So literally, it's more of a process of interacting with the data and being guided by the data as one is -- is trying to understand the relationships in -- in question.
Q. Okay. And you -- I'm sorry.
A. So working from the ground up essentially. You begin with, you know, your subjects with the research process, with the research questions, and then adjust as details are revealed, as relationships are discovered that you did not -- would not necessarily have discovered had you begun with a set of blinders

Page 78

that I'm only going to look at this particular relationship.
Q. Is it important in conducting a grounded theory analysis to not come into the study with, as you said, a set of blinders or preconceptions about what the results are going to be?
A. Yes, sir, that is important. And with the caveat, recognizing that, as I said, we all bring frames to research project.
Q. Course. Because we're human beings --
A. Yes, sir, precisely.
Q. -- etc.?
But beyond the fact that we're human beings, it wouldn't be best practice in conducting a grounded theory analysis to come in with a clear agenda or an approach that you wanted to get to a certain result?
A. Yes, sir. I grant that point.
Q. And in your study, in describing the fact that you used a grounded theory approach, you cite Professors Glaser and Strauss and then, I guess,

Page 79

Professor Glaser with the way of --
MS. SHUM: (Inaudible).
MR. SMITH: I'm sorry? I'm at the bottom of page 33.
BY MR. SMITH:
Q. Professor Glaser went on, and then it became Strauss and Corbin. Do you see that?
A. That's correct.
Q. And do you recognize Strauss and Corbin, and Glaser and Strauss as authorities in the field?
A. I do.
Q. Is it also true that in this qualitative focus group analysis you did not seek to obtain a random student sample?
A. That is correct.
Q. And why not in this case?
A. In this case, the resources were simply not available 'cause those studies are much more expensive. And I must also say that, once again, it was a matter of the particular questions of -- of interest, and so the random sample is more correlated with a survey

Page 80

probability study.
Q. Okay.
A. I should say more often associated with.
Q. And you mentioned it was -- it's expensive to have a random sample. Did you conduct this study as part of litigation?
A. It was related to litigation. Yes.
Q. Okay. 'Cause I see on -- the very first page it says it was a report commissioned by the plaintiffs in a particular case.
A. That's correct.
Q. And what was the case about?
A. Relying on memory, Costinada (ph) was also related to Rios and both challenging UC Regents around issues of racial access, equity, and -- and outcomes for students of color on the Berkeley campus.
Q. And were you actually retained by the plaintiffs in that case?
A. I was.
Q. So coming back to the question of the random sample, what --

Page 81

A. I'm sorry. I need to give you a broader clarification. Retained in the sense of -- of asked to conduct the research. But honestly, these were students. They didn't have any resources. So what we did work out is that the graduate students would be retained and be compensated --
Q. Okay.
A. -- but the professionals were not.
Q. I understand.
A. Okay.
Q. Understand. So just coming back to the random student sample, how would you describe the sample that you took in this case?
A. There is a strategy of taking samples that are targeted or purposeful. So the best way for me to talk about that is if I'm interested in studying individuals or studying the impacts, say, of diabetes on an individual, then the target group is individuals who have diabetes. So that's one very key distinction, say, from a national random sample, where I would just do a large sample and then accept that I'm gonna have a

Page 82

smaller representation of that sample within that sample of the group that really is the target of my interest.

And so in that sense, you do a better service of the research process of being more purposeful and more focused and more targeted in your selection so that you literally are focusing on and dealing with individuals who are subject to and can inform the condition that you're interested in.

Q. Okay. So just using your example of diabetes, if you were trying to examine the life experiences of people with diabetes, you would want to pull out of a bigger sample just the people who have diabetes, right?

A. Depending on that set of research questions.

Q. Right.

A. And if my question, however, was "What percentage of the larger population has diabetes," then I would do a broader sample and see what percentage shows up with diabetes. But having identified that

Page 83

sample with diabetes, I would then want to drill down into that sample and can do that with mixed methods: a survey that is specific to that subgroup --

Q. Right.

A. -- and/or that survey, plus more qualitative studies of that subgroup.

Q. But if your research question -- again, going back to diabetes -- was "What causes diabetes," then you would want to look not only at people who have diabetes but at people who don't have diabetes, right?

A. Not necessarily so. It depends on what element of -- of -- for example, if the focus is on trying to understand the prevalence and the severity of diabetes, then, again, it becomes a question of where can I best expend the resource. And it does not necessarily make sense in many research settings to spend the source on individuals who don't have diabetes.

So ultimately, what I'm -- what I'm -- there's a validity in what you're saying, and I'm just simply trying to contextualize it to say that, for

Page 84

example, one will want to do population studies of broad populations to see what percentages of those populations manifest or represent or develop diabetes.

But then there are other levels of -- of -- of studies such that you then want to understand causal sequences within a population that has diabetes or even diabetic tendencies. So the question is the -- the answer would have to be a little more variable and nuanced.

Q. Sure. I understand your point about if you're trying to look at the prevalence and severity of diabetes, then you would narrow your focus --

A. Yes.

Q. -- and take a purposeful sample, as you called it, of people who have diabetes.

But if you're trying to determine what are the causal factors, what causes some people to have diabetes and some people not to have diabetes, wouldn't you need to look at a sample that included both sets of people: some people who have diabetes and some people who don't?

Page 85

A. Initially, but then recognizing -- and I'm sorry to go on about this, but sociology of health disparities is another area of mine, so... But recognizing that diet influences diabetes differently within a diabetic population --

Q. Course.

A. -- patterns of exercise, lifestyle. So that's -- that's sort of the nuance I'm trying to get at.

Q. Okay. So in order to look at the causal question "What causes diabetes," you would -- at least part of your analysis would have to look at the entire universe, some people who don't have it, some people who do, and then you would want to drill down into the people who do have it and understand if you could tease out additional causal questions; is that fair?

A. Yes, that's fair. Yes, sir.

Q. But if you completely excluded the people who don't have diabetes from your causal examination or from your causal inquiry, then you wouldn't have enough data to draw reliable, generalizable conclusions about

the causes of diabetes, why some people get it, why some people don't?
A. No, I can't agree to that. Because, see, for example, if another set of researchers have already established that first level of question you're talking about and so I know the population that has been identified as having diabetes, then it's not necessarily that -- that I conduct that first level of analysis, and so I can more reasonably do the focused analysis.
Q. Got it. Got it. Okay. So let me -- let me reask my question.
A. Okay.
Q. If there's no existing literature or study on the causal question that you're looking at, in this case "What causes diabetes," then you would need to look at people who have it and at people who don't, and then you could also drill down among the people who have it to see if you can tease out some additional causal questions. But if there's no pre-existing data on the causal question, you would need to include those



people who don't have the dependent variable, correct?
A. I can't agree to that even. I'm sorry.
Q. Really? Okay.
A. Right. No. Because you can study a population that has the disease without necessarily studying the degree to which that disease manifests in the larger, more general population, if I'm understanding what you're saying.
Q. And maybe it's my failure to communicate. I'm not talking about prevalence or about, you know, severity. I'm talking about cause of the dependent variable or cause of the particular condition.
If you're trying to get the answer to that question, what's the cause of the condition, in this case it's a health condition, and there's no previous research on what causes it, wouldn't you need to look at the people who have the condition as well as the people who don't have the condition?
A. Not necessarily. You can study the individuals who are suffering from the condition.
Q. Right.



A. They can be the focus of your research.
Q. And you can draw generalizable conclusions from looking only at the people who have it about other people elsewhere?
A. You can draw generalizical -- generalizable conclusions about that subgroup that you've studied. So, in other words, the representative study would be of those individuals who are suffering from diabetes, diabetes, and so as such, your -- your conclusions about causation would be specific to that universe or that population, which is a subsample of the larger population.
Q. Okay. I understand your testimony.
A. Am I -- am I --
Q. No, I understand your testimony.
A. Okay.
Q. Is it -- is it accurate to say that when you draw one of these purposeful samples, as you did in this Exhibit 4, that the main point or one of the main points of that is to provide additional insight into the questions that you're looking at?



A. Yes. That's correct.
Q. And then another is simply to provide a guide to further research?
A. Yes.
Q. And a third is intended to examine the lived experience, experiences of the individuals?
A. That's correct.
Q. And the guide to further research that you're looking at, if you look on page 33, directly above Roman numeral four, what does that mean exactly, that the work here from this qualitative survey or this qualitative study is a guide to further research? What does that mean?
A. I think that takes us back to your example, what we discussed about whether this study would be directly applicable to, say, Cal State Berkeley. It's --
Q. You mean Bakersfield?
A. Bakersfield, I'm sorry. Sorry. And -- and the point made there is the findings and predictions would not apply directly, but some guidelines and

Page 90

lessons that is a frame that would give those administrators, say, at Cal State Berkeley -- Cal State Bakersfield some idea of where to be looking and what might be important, so that's the sense of the guides and the suggestive patterns.
Q. Right. And in fact, the way you describe it, you say that the point of using this qualitative focus group methodology is to illustrate and elucidate the analytical categories of the relationship, right?
A. Correct.
Q. In other words, to sketch the outline of the discussion; is that fair?
A. That's correct.
Q. And we talked about Cal State Bakersfield. Would it be appropriate for someone running the SUNY system in the state of New York to take these results and simply to apply them or to assume that they are accurate across the SUNY campus?
A. The interesting thing is not directly so, is the answer. But the point being that given that, say, Stony Brook and Albany are flagship campuses

Page 91

within the SUNY system in the same way that Berkeley is a flagship campus within California, then interestingly enough the -- the parallels might be closer by virtue of the Carnegie classification of those -- the shared Carnegie classification of those -- those campuses than would be the case in terms of a comparison, say, with Cal State Bakersfield.
Q. Right. I understand how they might be closer 'cause there are similarities between the flagship --
A. Yes, sir.
Q. -- at even in New York and California. But would you feel comfortable speaking to the head of the SUNY system and saying to that person, You can apply these results from Cal State Berkeley to SUNY Purchase or SUNY Stony Brook, you know, or community colleges in Queens for that matter?
A. I would always qualify. And quite frankly, I'd qualify it even if, in both instances, the research had been a random probability study, for the simple fact that associated with random probability studies

Page 92

are degrees of confidence, that is, confidence intervals. So there's rarely, if ever, the case that they directly apply, but you can apply with a certain mathematically calculated level of confidence.
Q. Right. Of course, this is not such a study, right?
A. No.
Q. This is a qualitative study, and, therefore, it's subject to all of the qualifications that you --
A. Sure.
Q. -- lay out here, correct?
A. Sure.
Q. All right. And then you mentioned that this, what we have here, Defense Exhibit 4, is a mixed study. You also did some mixed studies as part of your book "Towards a Brighter Tomorrow"; is that right?
A. I -- I missed the term. What kind of study?
Q. A mixed-methodology study.
A. A mixed, yes.

Page 93

Q. Is that right?
A. Yes. That's correct.
Q. Both qualitative and quantitative?
A. That's correct.
Q. And would you agree with me that those mixed-methodology studies can be appropriate for studying complex social phenomenon?
A. I agree.
Q. And would you agree with me that student choice in higher education is a complex social phenomenon?
A. It is.
Q. That it can be influenced by many factors?
A. Agree.
Q. And when you have done mixed studies in the course of your career, you have used them to study complex social phenomenon; is that right?
A. I have. And I'm sorry, I must offer another qualification. I have, but at certain points, the goals or the ends of a, quote/unquote, mixed study have been accomplished not only within a single study,

but as we were talking a moment ago, you can draw your lessons and examples from someone else as a larger survey and then use your more focused study on the same topic.
So in that sense, it's a mixed study of sorts in the sense that you're guided by the work of someone else at another level of analysis.
Q. Right. So, for example, if there's already a robust quantitative study of a specific phenomenon, you can do a qualitative study, combine the two, and look at the aggregate data as a mixed-methodology study, which allows you to draw generalizable inferences, fair?
A. And sometimes you can't combine the two, but you certainly can build upon the larger studies. So yes, it's fair in that sense.
Q. So, for example, in your book "Towards a Brighter Tomorrow," you had a combination of focus groups and also uni-, bi-, and multivariate analysis, correct?
A. That's correct.



Q. And again, with your focus groups, it was not just the focus group, but you also had interviews and observations and document reviews, true?
A. That's true.
Q. And when you were done with them, you took special care to make sure that the transcripts were accurate, right?
A. Correct.
Q. Using the same methods that you've described to me before?
A. Yes, sir.
Q. All right. And you had multiple coders, right?
A. Correct.
Q. And you used the most sophisticated software for coding, something called ATLAS.ti; is that right?
A. That's correct.
Q. And is that a best practice in the field?
A. There are compete -- yes, but there are competing qualitative softwares of analytic approaches



and platforms, but the model is a recommended practice. Yes.
Q. And you used something called pattern analysis. What is that?
A. Where are you referring to in particular?
MR. SMITH: Well, let's just mark this as Defense Exhibit 5.
(Allen Exhibit 5 was marked for purposes of identification.)
BY MR. SMITH:
Q. And --
MS. SHUM: Wait. Before we get started, I'm wondering, since we've gone not quite two hours, do you think we could take a short break?
MR. SMITH: Do you mind if I have five more minutes? I think I can get done with this.
MS. SHUM: Oh, okay.
MR. SMITH: I mean, I think it's at least possible. And if not, then we'll just take a break.
BY MR. SMITH:
Q. So what I've handed you is an excerpt from



your book?
A. Yes, sir.
Q. And I love the color art. I don't know if you have any -- I mean, the cover art. Do you have any responsibility for that, or did you --
A. I did. We -- we approached Cynthia St. James, and she consented to allow us to use her -- her work. She's an accomplished artist.
Q. So --
A. Thank you.
Q. At page 30, and the excerpt addresses the methodology for your book; is that fair?
A. Yes, sir.
Q. Okay. Page 30, you say that you used pattern analysis. What is that?
A. I am trying to -- it was the analytic approach that we took from Yin, and as it's described here, it's a process of identifying the major themes or patterns in the -- in the data.
Q. Okay. And do you recognize Professor Yin as an authority in this field?

Page 98

A. I do.
Q. And is it true that you, in your book, you sought to draw causal inferences; is that fair?
A. For the set of the data analysis that was based on survey data, that would be fair.
Q. Not for the qualitative piece?
A. For the qualitative piece, I'm trying to understand as -- unless so predict, just given the nature of the data available and the methodology being used.
Q. Okay. And did you start off with hypotheses in this case?
A. This, again, was more of an exploratory study, beginning with the general understanding that college access and equity was an area of challenge for K through 12 students of color in California --
Q. Right.
A. -- and in the exploration, trying to understand the predictors of success as well as failure.
Q. Now, we've looked at both -- we've looked

Page 99

at the quantitative analysis that you did in a couple of studies, and you mentioned that you did quantitative analysis using uni- and bi- and multivariate analyses as part of your book "Towards a Brighter Tomorrow."
Is it accurate to say that in the case here, in Maryland, that you did not conduct a similar bivariate analysis for the proportion of white students at the HBIs and any one of your remedial categories or program categories, high-demand, exceptionally high-demand, unique, and combinations of those?
A. No, I wouldn't say that's correct.
Q. You believe that you did do a bivariate analysis of those?
A. We did an analysis. I wouldn't say a correlational analysis. And again, it has to do with what is the appropriate methodology. And in this instance, my understanding of what the Court requested of us was not to conduct a research study, but rather to develop a remedial plan that was the most promising plan that we could envision, given the circumstances of the case.

Page 100

Q. Yeah, but let's get back to my question.
Did you actually perform any correlation analysis --
A. No.
Q. -- in this case?
Did you perform any multiple regression analysis?
A. No. And again, because it was not appropriate for the research question and the approach that we were engaging.
Q. We'll get to appropriate in a second. But can we simply establish you did not perform --
A. No.
Q. -- any of the tests that you did in any of your other work that we've gone through in Exhibits 2 through 4 or 2 through 5; is that right?
A. That's correct. These were research studies.
Q. I understand. And why did you not perform at least a bivariate analysis looking at the relationship between the percentage of white students in the HBIs and any of your remedial program

Page 101

categories?
A. The analysis that was judged to be more appropriate was a descriptive analysis, which took the form of establishing where the white students were on those HBI campuses and which programs they were represented in sizeable numbers, and those were the programs that we pointed to, programs that were unique, programs that were high-demand, or programs that were unique and high-demand.
So literally, what we did, the analysis was an analysis of patterns of enrollment and the representation of white students in programs on HBI campuses and across the system.
Q. Right. So I think I just heard you say, you didn't do at least a bivariate analysis because you judged that a descriptive analysis was more appropriate; is that fair?
A. That's correct.
Q. And why did you judge a descriptive analysis more appropriate than a bivariate or a multivariate analysis?

Page 102

A. Because the charge was to develop a remedial program, to propose a remedial program that would address the issue of creating a unitary system in the public higher education system for the state, and so as such, it was not a research study but really a task of designing a program that -- designing an approach, I should say, that would achieve those ends.
Q. Why did you not do some testing of your remedial program by performing any bivariate or multivariate analysis?
A. The remedial program doesn't exist yet. It has not been put in place, in which case it would be tested, because that was part of the proposal we laid out as well that -- and a lesson I've learned from the previous remedial plans, that once they're in test -- in place, that's when you test them, because you monitor them and -- and literally collect those empirical indicators of how that program is -- is faring and whether it's accomplishing the ends that it is intended to accomplish.
Q. I understand the remedial program doesn't

Page 103

exist yet, but why did you not perform at least some bivariate analysis of existing data on white enrollment comparing it against, as a predictor variable, unique programs, high-demand programs, or a combination of the two?
A. It just wouldn't have made sense to me.
Q. Why would it not make sense to you?
A. For the simple fact that, first and foremost, the data would not be available of a form to achieve what I think you're asking me, why didn't I do. But I think as well because the charge was to design an approach that would help to desegregate the system, that is, help to attract white students to enrollment in unique, high-demand, unique high-demand programs, academic programs, on the black campuses, and so the testing would occur as to -- at the next stage of whether indeed it worked.
Q. Tell me -- and then we can break -- just tell me what data were not available to allow you to do the examination that we've been talking about. You told me the first reason, the data weren't available.

Page 104

Second reason, the charge was to design a remedial approach. What data were not available?
A. The data that we've been talking about, ideal designs, and an ideal design for the questions that I'm hearing you to put to me would have involved being able to interview students, being able to interview administrators and faculty on those campuses, and that was not an option that was available to me.
And -- and similarly, it would have required data that, for example, would summarize the inventory of courses offered within the system in a way that was accurate and not redundant and reliable, and -- and once again, those data weren't available, and so it was a matter of -- of working within the constraints.
And I guess I'd even go a bit further, that after a remedial plan is in place and one has a distributed population of white students and a critical mass of white students on HBI campuses, one could then do the kinds of sophisticated analyses that are preferred, but at this point, the under-representation

Page 105

of those white students in programs on campuses, on those HBI campuses, is -- is -- is just such a challenge that the data weren't available in the way that it would have been most helpful.
Q. Okay. Let's take a break here.
A. And meaningful.
Q. I'm sorry. I didn't mean to --
A. I'm sorry.
VIDEOGRAPHER: We are now going off the record. The time is 10:58.
(There was a brief recess taken.)
VIDEOGRAPHER: This is the beginning of DVD No. 2. We are now back on the record. The time is 11:17.
BY MR. SMITH:
Q. Dr. Allen, today there are white students at the four Maryland HBIs, correct?
A. Yes, in very small numbers.
Q. Very small numbers. Between the four of them all together, there are certainly hundreds of them, right?

Page 106

A. Five percent of the total, probably so.
Q. Right. In fact, probably over a thousand; is that fair?
A. I'd have to calculate to be absolutely sure.
Q. But certainly in the multiple hundreds?
A. I would agree.
Q. And is it also true that today there are, you would say, a small number, but there are unique or high-demand or both unique and high-demand programs at the HBIs?
A. That's true.
Q. Okay.
A. And those are the programs where white students tend to concentrate.
Q. I understand your testimony about that. So let me ask you about the remedial proposal that you mentioned a little while ago, and I want to focus on the current version of it, which is in your Exhibit 1, and it's the last tab. It's the one dated July 6, or maybe it's the next-to-last tab, 'cause there's also, I

Page 107

think, a letter dated August 18th or something like that.
A. I have it.
Q. Okay. And I'm -- I'm first just interested in what was the division of responsibility between you and Dr. Conrad with respect to the preparation of this document?
A. Well, we were collaborators in the strictest sense of and the fullest sense of the term in producing the document. At the same time, we divided the labor and each would take a lead on different sections of the report, after which time then the other person would weigh in, and we'd have the dialogue and exchange and refinements.
Q. So is it fair to say you would each take responsibility for the whole thing, but you each had primary areas of emphasis and wrote the first draft; is that fair?
A. Yes, sir. That's fair.
Q. All right. So which were your primary areas of responsibility where you wrote the first

Page 108

draft?
A. I would say -- and I want to be accurate, so I want to turn to those areas. And I should say it's a matter of primary responsibilities in terms of not only writing the drafts but literally doing the conceptualization for sections.
So in terms of -- of the program inventory aspects, the initial development of and reconciling of -- of the codes associated, the -- the instructional program category, category codes, CIPs associated with programs, Dr. Conrad took the lead in some instances and -- but in other instances, it depended on the campus.
So I would take the lead with the University of Maryland Eastern Shore, for example. So it was a division of labor, such that he is more the specialist in these issues than I am, but at the same time, we were working hand-in-hand in -- in producing the critical areas of the document as well as in drafting it.
Q. Oh, okay. So what you've just described to

Page 109

me, you talk about program inventory, that happens to be Exhibit 4, right, to your July report, July 2016?
And I hear you saying that it was Mr. Conrad or Dr. Conrad's responsibility primarily, but you played a significant role and also worked in particular on the Eastern Shore; is that right?
A. And on Morgan, yes. So that's correct.
Q. Okay. So that takes care of Exhibit 4.
What about the different sections of the body of the report?
A. I am pausing for the simple fact that it is genuinely a joint and shared document, but pressed to say or divide primary responsibility, for instance, Morgan State, University of Maryland Eastern Shore at different points would have been my responsibility, but it's such an iterative process that it just had to do with the stage we were in, in the process.
So, for example, the program inventory was produced, and then the analysis of representation of white students across different programs was done by campuses, done by programs. And so in some instances,

Page 110

I took the lead at Bowie and other instances,
Dr. Conrad took the lead.
Q. Well, again, you're referring to exhibits
to this substantial document. And when you talk about
white student representation, which exhibit is that?
A. The electronic, Exhibit 3 is -- is -- is --
is essentially what I was talking about, but there were
also -- you know, we also had information on just the
specific numbers within the programs --
Q. I understand.
A. -- which I believe you received.
Q. For example, Exhibit 6 says "Upated," but I
assume that means "Updated Exhibit 6 - HBI Programs
With At Least 10 White Student Enrollment." You split
that with Dr. Conrad --
A. We did.
Q. -- is that right?
A. We did, and double-checked each other.
Q. Depending on -- on which college or which
HBI?
A. We split the initial design and production

Page 111

and then double-checked each other on the process.
Q. Okay. That's fine. What about the text of
this thing that is numbered -- it covers some 58 pages,
before we get to the exhibits, covers some 58 pages and
has 336 paragraphs? First of all, did someone write a
first draft of that text?
A. Are you referring to Exhibit 3?
Q. No. I'm talking about the main body of
this, the thing that you signed and that is entitled
Section Corrected or Second Amended Reply --
A. So the entire report?
Q. Yes.
A. We allocated responsibilities in writing.
No one person wrote the entire main body. Is that what
you're asking me?
Q. Yeah. I'm asking about the main body.
Okay. Are there any particular sections of it that you
had responsibility for as opposed to Dr. Conrad?
A. I'll try to -- to repeat myself. I'm not
sure I'm communicating correctly and clearly. So, for
example, with Morgan State, we went through an

Page 112

iterative process of working out which would be the
proposed niches at that campus. I had, I suppose,
primary responsibility for a first cut in that respect,
and we divided the historically back campuses and then
would exchange and then just go back and forth about
the refinements and the revisions.
Q. Okay. Well, with respect to niches at
Morgan State, there is an exhibit to this document,
which is entitled "Remedial Proposal," that actually
identifies by course name and CIP code which courses
you want to create or transfer, correct?
A. Yes.
Q. And I do hear you correctly to say, to
testify, that you divided responsibility for that
evenly with Dr. Conrad, and that you had primary
responsibility for Maryland Eastern Shore and Morgan
State, he had primary responsibility for Bowie and
Coppin?
A. That would be -- it was a joint project,
and loosely, one of us would begin the project, and
then the others would interact. The other person would

Page 113

interact with.
Q. All right. But I'm really -- at the risk
of repeating myself, I want to get an understanding of
who wrote the body of the report and whether it was
divided up in some fashion, because it does not divide
itself cleanly into Morgan, Coppin, Bowie, etc.
A. We -- we wrote it jointly. So I would do a
first draft of the University of Maryland University
College, and Dr. Conrad would interact with that draft,
and then I would interact with his revisions, and so it
was a shared product.
Q. How many hours have you spent on this case
since the trial and mediation phase?
A. I couldn't begin to tell you. I'd have to
tally those up.
Q. Well, just give me an estimate.
A. I would say maybe a hundred hours. I'm not
sure.
Q. Okay. And about how much time -- again, an
estimate -- have you spent on this case since
November 2015, when there were some papers filed in

Page 114

court, Dr. Lichtman made his first submission, and then, as I understand it, you went back to work and began a new remedial proposal?
A. I have to tell you, I'd need to sit down and tally the figures.
Q. Just give me an estimate, sir. I mean, do you think it's --
A. I'll estimate another hundred. Honestly, it's -- it's -- it's tough.
Q. Okay. So even to a rough order of --
A. It's been -- it's been -- it's been an extensive process over a number of years.
Q. I don't question it. And I'm just really -- how about in calendar 2016, just to bring it to the present?
A. Calendar 2016. I'm trying to give you as accurate an estimate as I can.
Q. I appreciate it.
A. I would say 40 to 60 hours.
Q. And with respect to the document -- and when you say "the document," here I'm talking about the

Page 115

58-page, 330-paragraph thing -- who had control of the document? In other words, who had control of it on a computer system somewhere, if anyone?
A. We both had control of it.
Q. Did you use some kind of collaborative software to write it?
A. We would simply write it and exchange it, exchange the versions, so...
Q. So okay. So you didn't use any common editing software?
A. No, no, no, no.
Q. You simply sent drafts back and forth?
A. Sent drafts back and forth, correct.
Q. Let me ask you to take a look at pages 14 to 16 of the 58-page document. I'll just call that the report, if that's okay with you. I'm sorry. I'm talking about the main document, sir, the 58-page. I think you're in one of the exhibits. For example, if I use the paragraphs, paragraphs 85 and on.
A. Oh, I'm sorry. I'm sorry.
Q. I'll try and use paragraph references.

Page 116

A. Okay. I've got you. I've got you.
Q. Okay.
A. And -- and --
Q. All right. So my question for you, focusing you on paragraphs 85 to 96, they're under the heading F. Do you see that?
A. I do.
Q. Okay. I see in here a number of references to "Dr. Conrad did this" and "Dr. Conrad did that." Do you see those?
A. Uh-huh.
Q. In fact, I see -- I counted six in Section F.
A. Okay.
Q. Okay. And does -- when it says that Dr. Conrad did something, does it mean, in fact, that Dr. Conrad did it?
A. It means for sure that he had the initial responsibility. So for -- for 88, as the initial matter, he was the one who did the review, but it does not -- it shouldn't be interpreted that I was not

Page 117

engaged with him in the process.
Q. I understand. And if we look down at paragraph 92, it says, "Dr. Conrad then used this data to identify those programs which are considered core," and "he prepared a list of core programs."
Does that indicate then that Dr. Conrad, in fact, did this?
A. It does, and particularly, when you then taken into account what follows. It informed our joint opinions. So it was -- it was a collaborative process.
Q. Right.
A. And we then consolidated, so --
Q. I understand.
A. -- I'm trying to be clear.
Q. Right. So paragraphs 85 to 96 describe some portion of the groundwork, which was then used to inform your joint opinions; is that fair?
A. Yes. They're the basis for our opinions.
Q. Right. And the bulk of that groundwork was done in the first instance by Dr. Conrad; is that fair?
A. I'm trying to be sure. He did take the

Page 118

lead. So yes, that could be fair.
Q. With respect to paragraphs 85 to 96?
A. Yes.
Q. Is it accurate to say that from the standpoint of number crunching and coming up with the number of high-demand programs, the number or the association with the number of white students, is that also something that he took the lead on?
A. In some instances, but in other instances where the campus was more my responsibility, then it would be more accurate to say that I took the lead.
Q. Okay. Well, let's just go on a little bit further. So there's a section entitled at page 26 of the main document, paragraph 156, "Three Strategies to Eliminate Dual Curriculum Structure."
Did one of you take the lead on drafting this section of the document?
A. That was a combined product, because some of this paragraph speaks to larger patterns in the state and the HBIs' location within that state system and its relationship to the state.

Page 119

So it's conceivable that I took the first cut on this. I honestly am -- I'd need to go back through notes if it is absolutely essential that I be accurate with this.
Q. Well, let me ask you -- maybe that'll be necessary, but can I ask you to look at paragraphs 177 and 178?
A. Yes.
Q. It makes reference to Dr. Conrad's research. It says based on that "he has determined that high-demand programs," that describes something that he has done?
A. That he took the lead on, yes.
Q. And is that also true of paragraph 178 where it says, "Dr. Conrad's research shows that unique programs are very important," that's also something that he took the lead on?
A. He took the lead on it, yes. But always sort of we were in just constant and continual contact and interaction over --
Q. I'm sure.

Page 120

A. -- these conclusions.
Q. I understand. I understand. What about the section, page 44 on practicability and educational soundness. Do you see that?
A. I do.
Q. Who took the lead on that section?
A. Myself, as you will see in some of the references here.
Q. And what do you mean when you say as I'll see in the references?
A. 266, for example. That was just an area of kind of leadership for me in this section.
Q. Okay. And then continuing on from there to page 49, paragraph 289, response to Dr. Lichtman's analysis. Who took the lead in that?
A. I took a first cut response and then interacted with Cliff over it.
Q. Okay. And did anyone else draft parts of this main -- of the report?
A. You mean other than myself and Dr. Conrad?
Q. Yeah.

Page 121

A. No, Dr. Conrad and I.
Q. Okay. No one else?
A. No.
Q. Okay. Let's see here. What about Exhibit 9 to the report? That's the list of the core programs, who drafted that?
A. Just a second, please. Dr. Conrad would take the first cut. I would then go through and interact with the list and with him.
Q. Okay. And do you remember having any corrections or changes or comments on Dr. Conrad's list of what he deemed to be core programs?
A. Oh, I do. I can't remember the specifics, but absolutely, yes. We -- we went back and forth. And even as I look at the list, there's still some areas that could be debatable. Like, environmental studies, is that a GE or is it a core or is it a non-core?
Q. All right. What else are possible changes to Exhibit 9 besides environmental studies?
A. I -- I wouldn't say that they're changes.

Page 122

We concluded that it is -- it is a core, but I'm just simply saying there was some back and forth over it, and I use that as an example to share with you the process that we went through.
Q. Okay. But are there other things that don't appear here where you had an extensive debate?
A. Nothing that I can remember right now.
Q. Are there other things that do appear here where you say, "Yeah, there's a lot of debate about that, it ended up on the list, but there is a lot of debate on it."
A. We exhausted the debate and settled on this list, so I would -- would not necessarily say there's anything here that we would rethink at this point.
Q. And what is your personal definition or standard for determining whether something is a core program?
A. A core program is, in my judgment, coursework at the undergraduate level that is generally within the two general education years. So general education courses are what I would refer to as a core

Page 123

program, and so the examples are, here, English and biology and so on and so forth.
Q. Okay. And is that definition you've just described to me, is that set forth in any recognized treatise or authority?
A. It's set forth in numerous places. For example, most universities will have a specification of what are the general education courses, which are usually the first two years required courses, after which time students specialize.
Q. Is there any book or website that you would say that's authoritative and that tells you what the core programs are?
A. I would need to be able to point you to those, but they exist, yes.
Q. Is there any one that -- even if there might be many, is there any one you can think of right now?
A. No, no one that I can think of right now.
Q. All right. And I'll just ask you to maybe give that some thought during the lunch break, and

Page 124

we'll come back to it.
A. Okay.
Q. What about paragraph -- or rather Exhibit 10, immediately following?
A. Just a second please. Yes.
Q. Now, Exhibit 10 exclusively uses the pronoun "I." It says, "I define," "I identify," "I used," "I put an asterisk." Who's the "I"?
A. The "I" would be Professor Conrad, but it's important to note that I interacted with him after that initial cut --
Q. Okay.
A. -- in identification of what would be non-core programs. It's really more of the same of what we just discussed with the core program, that there would be a primary responsibility, but just given the sheer volume of the task, it was -- it was a shared task.
Q. Right. And how about Exhibit 11, which says, "I define," "I identified," "I used," and "I choose"? Is that all -- the "I" in that case is also

Page 125

Dr. Conrad?
A. Yes.
Q. Just going back to the core program -- I'm sorry -- not to the core programs, to the high-demand programs in Exhibit 10.
A. Yes.
Q. It says in here that the classifications here were based largely on MHEC data. Do you see that in the second paragraph?
A. Yes.
Q. All right. Can you tell me which, if any, programs that are listed here were not based on MHEC data?
A. The entire list was produced in reference to the MHEC degree data, but you'll also notice that it was an iterative process. We looked at IPEDS data at an earlier point.
THE COURT REPORTER: I'm sorry. What data?
THE WITNESS: I-P-E-D-S, IPEDS.
THE COURT REPORTER: Thank you.
A. The IPEDS Completion Survey, which is a

Page 126

federal data source on course offerings at universities. We also later were able to, I think, access enrollment data. So the point is that we used multiple sources to reach these conclusions.
Q. Right. And my question to you is: Which, if any, courses appear here even though they are not identified from the MHEC data as meeting a definition of high-demand?
A. To the best of my knowledge at this point, because it's been that process of cleaning it up and reconciling it, to the best of my knowledge, at this point, none.
Q. So every program on here should be classified as high-demand under MHEC standards and appearing in its data that you cite here?
A. Under -- I'd have to qualify that. It should be -- it should qualify under the combination of -- of sources that we referenced. So the MHEC enrollment data, the degree data, IPEDS data, and in some instances, we literally had to go to, and did go to, as I shared at the very beginning of this

Page 127

deposition, go to the websites and see what the universities were advertising and listing as course offerings.
Q. Well, first of all, did you use enrollment data or degree data in order to classify programs as high-demand?
A. High-demand programs were classified based on degree data in one instance, but we also reference enrollment data later on.
Q. What do you mean "later on"? I'm talking about Exhibit 10. Are these classi- --
A. Degree data.
Q. Degree data only?
A. Yes.
Q. Is that correct? Is that correct?
A. Degree data, plus the initial IPEDS Completion Survey data. Yes.
Q. Okay. And which, if any, programs appear here as high-demand because of evidence that there is market demand that there are employers who seek to employ people with these qualifications?

Page 128

A. This is -- I would say the analysis was restricted to, and focused on, the data out of MHEC. So there was not a market analysis that then paralleled high-demand data -- list high-demand programs here. This was really an assessment of where the white students are --
Q. I understand.
A. -- in the system.
Q. I understand. And so Exhibit 10 does not contain any market data?
A. No, it does not.
Q. It's limited to degree data obtained from MHEC?
A. That's correct.
Q. Now, it also says in here that, in some instances, the list here was modified to delete programs that hadn't graduated significant numbers of students since the original work was done; is that right?
A. Correct. That's correct.
Q. All right. And does that mean that there

Page 129

is some variability from year to year about the number of degrees granted in these particular fields?
A. Of necessity, yes, absolutely. That's generally the case.
Q. And so what year of data was used here?
A. 2014.
Q. Okay. For Exhibit 10?
A. Yes. And we were -- you know, we're always looking for 2015 and more current data, but we used what was available to us.
Q. Right. And when was the 2014 data or when were the 2014 data available to you?
A. I can't tell you offhand. I'd have to consult notes again.
Q. Okay. Were they available in 2015?
A. I can't say for sure. It may be later than that, to tell you the truth, 'cause it does take a while to turn around large aggregate data sets. So rather than -- I'd like to check my notes to give you a definitive answer to that question.
Q. Do you have your notes with you?

Page 130

A. No, I don't.
Q. And by "with you," I don't mean in this room. Do you have them accessible to you?
A. No, I don't. They're at home.
Q. Okay. And given the fact that there is variability from year to year, would that suggest to you that it might be appropriate to use an average, a rolling average, in order to classify programs as high-demand?
A. No. I would be of a mind that we should classify them within the years that are of focus, and assuming that one had that kind of data available, say, for a longer period of time, then perhaps, yes.
Now, what we were able to do is get a sense, for example, of which programs were attracting white students in those years when white student enrollment in HBIs was really at their highest level, say, in 1975. But the year-to-year averages, we just don't have by program. This is very detailed data, and it's just available or we were only able to access it for this period of time.

Page 131

Q. Well, I want to confine my questions, as I have been, to Exhibit 10 for right now, which is the inventory of high-demand programs. And multiple years of data are available from MHEC on that, correct?
A. I couldn't say for sure. I could only say that this analysis was conducted in 2014 -- with the 2014 data, which was the focus of our analysis.
Q. I understand. And -- but your previous report used, what, 2012? 2013?
A. Yes, and we updated it with the 2014 data.
Q. No, I get it. So that tells us there were at least two or three years of data available to you, right? This is based only on '14.
A. Okay. Correct.
Q. Okay. And so if I'm right about that and multiple years of data on degree completion are available from MHEC, wouldn't it make sense --
MS. SHUM: I'm going to object on the basis of foundation.
MR. SMITH: Yeah, okay.

Page 132

BY MR. SMITH:
Q. Wouldn't it make sense to average those data together to give you a more reliable, more robust measure?
A. I'd say no, and I'll tell you why I say no. Because, first of all, we're dealing with such small numbers of white students in these programs in the recent years, that the averaging would be less meaningful from our point of view than trying to deal with those years individually and get a sense of what's happening in those key data points as opposed to averaging across those data points.
Q. And again, I want to be very clear. I'm not asking you about white student participation in high-demand programs. I'm simply asking about the identification of high-demand programs.
And my question for you is: As set forth on Exhibit 10, whether if you had access to multiple years of data, wouldn't it have been a better measure of high-demand programs or to create an inventory of them to average together those multiple years of data?

Page 133

A. I'd say no, and I mention white students, because if you read the preamble to this table, what we were doing was, was looking at the programs that were the largest programs, with an end toward trying to understand the representation of white students across those programs at HBIs.
Q. Now, you told me that you used 2014 data in Exhibit 10 to measure high-demand or to identify high-demand programs because that was the year of focus. Did I hear that correctly?
A. For this analysis and for these -- for this exhibit, yes.
Q. Right. But the year of focus in your remedial proposal is the next 20 years, correct? You're talking about a proposal that will establish new programs or transfer existing programs and will be in place for multiple years in the future, correct?
A. The 20-year figure, I'm not sure where that comes from.
Q. How about multiple years in the future, that's the focus of --

A. Yes, multiple years in the future. Yes.
Q. Okay. And given that, why would you take just one year of data in order to identify high-demand programs?
A. Because this is the year in which we are to develop the remedial plan, and it is the most current data that we had available. We started with the most current data being 2012. When more current data came available, we moved to 2014.
Q. Okay. What about the -- now I'm going to ask you some questions about white student participation. There was a decision made to look at programs that had a minimum of ten white students per program, right?
A. Where are you? Are you looking in the --
Q. Well, for example, at Section 214 of the main report.
A. Okay. I'm just trying to be sure I follow you. 214.
Q. The number ten was selected, as it says here, in paragraph 214, right?



A. Yes, with that -- that first sentence in the context as well, in the context of the first action, just analyzing the extent to which any program was likely to attract students of all races and then using indeed the -- the figure of ten as a minimum.
Q. Right.
A. And being guided by -- again, I have to say this, being guided by the fact that whites are not randomly distributed across those HBIs, and they're not present in large numbers.
Q. I understand that.
A. So the ten was a sort of sweet spot, if you will, so that we could have a meaningful representation and enough programs to get some understanding of patterns of enrollment that would attract white students.
Q. Did you test other numbers? Did you test the sensitivity of --
A. Oh, we did.
Q. Let me finish the question. Did you test the sensitivity of this analysis using different



numbers of white students?
A. We looked at the distribution of white students across programs and finally decided that a meaningful level of minimum would be ten. So in that sense, the testing was just an evaluation and assessment of the distribution of those students across -- white students across those programs and trying to arrive at a meaningful number of programs that had some representation of -- of white students in a sizeable enough presence, being ten as a minimum, so that you could make sense of it.
Q. Right. Doctor, you understand when I use the term "sensitivity analysis," you're familiar with that term, correct?
A. No, I'm not.
Q. Do you understand it to refer to a process where different assumptions are used and the complete set of tabulations or calculations is run on those different assumptions? Is that a process that's familiar to you?
A. I would accept your -- your description of



the process. I've -- I've seen a process that's used with quantitative analysis, which is simply testing for the power of significance, but that would be a different application than here, so...
Q. My question to you is: Did you perform the set of analyses that are done in your report, the complete set of analyses, using different numbers of white student thresholds, or did you simply examine the numbers and decide that ten was the right one?
A. We did an examination and decided after some assessment that ten would be the most -- well, first of all, if you got any higher than ten, you'd have so few programs that you couldn't even do anything meaningful. So that kind of iterative and interactive process with the distribution of white students across the HBIs and programs within those HBIs was conducted.
Q. I understand that there was an iterative process. My question is whether you performed the complete set of analyses set forth in this report and its attachments using different numbers of white students, whether it was 5 or 15 or some other number?

Page 138

It sounds like the answer is no, but if I'm wrong about that, I want you to tell me.
A. The answer is no, and it's a qualified no. We did -- we did not do it for the entire system, but for smaller pieces of the system just to see what lessons or what value could come, say, from looking at 5 or looking at 25, and so out of that then equilibrated and -- and -- and settled on the most representative and meaningful number of white students in the enrollment.
Q. All right. Let's just go back to this identification of high-demand programs that we talked about before and the fact that there were multiple years of data available to you.
Did you do any investigation to see whether the changes in high-demand programs from 2012 to 2014, whether there were any trends in terms of programs dropping in or dropping out of that category? Did you do any investigation like that?
A. The closest thing to a trend analysis that we conducted was to look at white student enrollment,

Page 139

which was at its highest point in 1972, across different programs, and then from that to ascertain that it was those unique or those high-demand or those unique high-demand programs, where those white students were enrolled, and that was as close as we came to a trend analysis of the sort you're talking about, if I understand you.
Q. Does that mean that with respect to Exhibit 10, which purports to collect all high-demand programs, you didn't do any trend analysis to look at the 2014 data as compared to 2013 or 2012 or any other years to see if there were trends in terms of programs dropping in, dropping out, becoming more popular, less popular?
A. Not of the averaging or the trend within this set of years.
Q. And "this set of years" is Exhibit 10?
A. That you mentioned, 10. You mentioned years beyond Exhibit 10, I thought. I thought you mentioned 2013 and some other years.
Q. Yes. And the answer is, you didn't do any

Page 140

trend analysis looking at programs becoming more popular or less popular going into the category of high-demand or out of the category of high-demand as set forth in Exhibit 10?
A. Certainly not within that period of the three years you talked about, but as I did mention and would like to reiterate, we looked at the earlier years in white student enrollment across HBIs and, for example, established that at Bowie at a certain point when computer science was not duplicated, that white student enrollment on that campus was higher and doing similar analysis, for example, with the enrollment in the business program at Morgan State and the representation of white students at that earlier point versus a later point when you had the duplication of those programs, so that was the closest to a trend analysis.
Q. Got it. And none of that -- well, strike that.
I understand that you found three programs that were neither unique nor high-demand but attracted

Page 141

more than ten white students; is that right?
A. That's correct.
Q. And you rules them out on various bases, correct?
A. Are you referring to a specific point in the --
MS. SHUM: I'm going to object as to foundation.
BY MR. SMITH:
Q. I think that's page 35, Section 216.
A. Well, we ruled them out for the reasons specified here.
Q. Of course.
A. Yes, core programs at the BA level.
Q. So I -- I guess my first question is this: If there was a program that was not unique and it was not high-demand because it happened to be a core program, but it attracted significant numbers of white students, why did that not form part of your remedial plan?
A. For the simple fact that core courses and

Page 142

core academic programs were not demonstrated to -- well, they simply were not the place where the majority of white students were enrolled, and -- and the majority of the white students enrolling on historically black campuses in this system enroll in programs that are non-core, and not only non-core but unique, high-demand, or a combination of unique and high-demand.

Q. Right.

A. And so just to try and achieve a greater precision in the analysis and in the sort of accounting of enrollment patterns, just simply excluding because that was a rule for the analysis, that we were looking at non-core programs.

Q. Okay.

A. And indeed, those are the majority of the programs -- overwhelming majority of the programs where white students are enrolled.

Q. I understand it was a rule of your analysis, but if adopting a core program of the one that you found to be attractive could bring significant

Page 143

numbers of white students to the HBIs, why wouldn't it be appropriate to consider it for your remedial proposal?

A. Maybe I should clarify and reiterate that core programs exist on all the campuses. So English is a core program that's on every campus, so it's not a matter of adopting it as a way of attracting white students. You have English on every campus. You have biology on every campus. You have that set of general education requirements, the first two years of courses, which are core courses on every campus.

And so it is not feasible or educationally sound to talk about not offering your core courses those first two years of general education requirements on every campus. So just trying to summarize the answer, it wouldn't have made much sense to try to talk about whether the option existed of --

Q. No, I got it.

A. -- creating a core program, a core program somewhere --

Q. No, I got it.

Page 144

A. -- versus another place.

Q. That makes all the sense.

A. Okay. Thank you, sir.

Q. So what about the joint program that you identified? You identified one program that was joint between, I think, Maryland Eastern Shore and Salisbury, right, the master's of teaching?

A. Yes.

Q. And if that was a program that was neither -- well, if that was a program that attracted large numbers of white students, why didn't you include that as part of your remedial proposal?

A. Again, making professional judgments about the ultimate desegregative potential of a program and recognizing that Maryland Eastern Shore and Salisbury are a special case. But it was just the judgment we made in terms of our approach in -- in that analysis.

It just did not seem in our judgment to provide -- to offer, you know, desegregated potential in the sense that to be, quite frank, a joint program between Salisbury and -- and Maryland Eastern Shore

Page 145

would -- it distributes white students across those two campuses. It does not attract white students to Eastern Shore per se.

Q. Why are -- I'm not sure I follow you. You said Maryland Eastern Shore and Salisbury are a special case. What does that mean?

A. The region, and the fact that those -- that Maryland Eastern Shore is, strictly speaking, one of the better examples where you have -- or one of the campuses, one of the black campuses, historically black campuses, in the system that has higher rates of white enrollment relative to the other campuses, HBIs.

Q. Okay. Going back to your reasons why you ruled out the master's in teaching that's joint between Eastern Shore and Salisbury, you said you made ultimate judgments about desegregative effect, and I'm not sure I follow you, other than saying in your judgment it wasn't appropriate. I'm trying to understand whether --

A. Professional judgment.

Q. Your professional judgment.

Page 146

A. In our judgment, it wasn't --
Q. But that's fine.
A. -- it wasn't useful and helpful and informative.
Q. Okay. And that's the basic reason you excluded it?
A. Yes.
Q. Okay.
A. And with the additional clarification I shared, that it's a joint program that's shared across a TWI and an HBI. And so the question becomes of, can we reasonably talk about it as desegregating Eastern Shore when, in fact, enrollment is at Salisbury and at Eastern Shore and not white students enrolling at Eastern Shore --
Q. I see.
A. -- only, I should say.
Q. Let's just go back to the report and take a look at page 50, please, the main part of the report.
A. Yes, sir.
Q. Paragraph 296, do you see that?

Page 147

A. I do.
Q. So 296 refers to the two of you in the third person as Dr. Clifton Conrad and Dr. Walter Allen. Who wrote that paragraph?
A. I'll have to try to remember. Just a second. I wrote the first draft because, as I said, I was the -- charged with the first responsibility of responding to Dr. Lichtman.
Q. I'm just a little surprised, because I haven't seen the two of you referred to in the third person anywhere else in the report. It refers to you -- the two of you as "we." And so I'm wondering if a person, other than you and Dr. Conrad, wrote this paragraph of the report?
A. I can just tell you how we were writing as we were moving along and -- and -- and to be honest, I'm surprised you don't find more such references 'cause literally we're working and exchange our drafts and going back and forth. So this was my first draft.
Q. I see. Can you take a look at page 54 and paragraph 320?

Page 148

A. 54 and 320.
Q. Who wrote that paragraph?
A. Just a second. Oh, it's, again, consistent -- this entire section, in terms of the responses to Dr. Lichtman, I took the first lead on.
Q. And you didn't --
A. And then it was interaction.
Q. Okay. And here it refers to the two of you as plaintiffs' experts. I haven't seen that phrasing anywhere else in the report.
A. And again, I can only tell you that we were working under time deadlines, and there were times when we'd sit down and figure out that we needed to have a section written. And quite frankly, at times we'd write it on the fly, and we would exchange it back and forth. So I have to say that the editing will not be absolutely, you know, sterling.
Q. Just to be very clear about it, Dr. Allen, did someone else participate in the drafting of this portion of the report that uses phrasing that's nowhere else in the report?

Page 149

A. Dr. Conrad and I wrote the report. The sections on Dr. Lichtman, I wrote.
Q. Okay. Now, you say in here -- and I'm referring specifically to page 17 and Section 101 of the main body of the report.
A. 17, 101. Yes, sir.
Q. You say that you reviewed the proposal submitted by the administrators of the four Maryland HBIs, correct?
A. Yes.
Q. And then you cite them repeatedly in your remedial proposal; is that right?
A. That's correct.
Q. Now, if I were to ask you to take those four submissions out of the picture and say that they can't be relied upon by you in order to form your opinions, what effect, if any, would that have on your proposal or the justifications for it?
A. Very, very little because, in fact, we moved forward with our analysis and the drafting of the plan and proposals and then consulted, because those

documents were not available at the front end of our process. They were available later in the process.
So there would be, at best, minimal changes. We were encouraged that there were points of overlap, but the point -- but as there were some points of -- of difference, but essentially, it would be unchanged.
Q. Okay. Now, as I understand the essence of your proposal that involves programatic niches and specific programs that will build up those niches, the first expression of it in this case that addressed particular things at individual HBIs was at trial; is that correct?
A. I'd have to check records. I honestly believe that that -- that concept of academic niches was -- was consistent earlier on and at various points referred to Centers of Academic Excellence or --
Q. Okay.
A. So I think it was, to the best of my memory, before trial.
Q. And you can agree with me or not, but I



looked at your pretrial reports, and it didn't have any particular niches identified for specific HBIs. The first time I saw that was in your -- the slide deck that you did for trial.
MS. SHUM: I'm gonna object on the basis of foundation.
BY MR. SMITH:
Q. Does that -- does that ring a bell with you at all, or no?
A. It doesn't.
Q. Okay. But it's accurate to say that at trial you did testify about -- I think it was seven programatic niches that you thought would be appropriate for the Court to order as a remedy?
A. That sounds correct. Yes.
Q. And you said that they should be assigned to, in some cases, one or, in some cases, one or two of the HBIs, or alternatively, one or two. Is that fair?
A. I need to see that to be sure.
Q. Okay. Well, why don't we just get your slide deck out here which is somewhere -- let's see.



(Allen Exhibit 6 was marked for purposes of identification.)
BY MR. SMITH:
Q. You've been handed Exhibit 6, which is a demonstrative exhibit from trial, and it formed the basis for your testimony; is that right?
A. Yes, sir.
Q. Okay. And can you simply satisfy yourself that starting somewhere around, I think, page 53 you laid out, I think, seven remedial recommendations that had to do with creating niches at specific HBIs?
A. Okay. Just a second. If you'll give me just a moment, please. I find -- you said beginning at page, what, again? I'm sorry.
Q. Page 53 or 52, maybe, of this deck.
A. And I actually find myself going back to 46, where I started talking about missions and giving unique academic program emphases and exclusivity and coming forward --
Q. I'm talking about the specifics of it, though, right? That doesn't start at --



A. I'm just trying to locate it in a context, because I want to be sure I give you a correct answer. Okay. I am at page 53.
Q. Okay. 52 and 53, you've got one there for green sustainability studies, next page is computer sciences and information sciences, and then it goes on, you do seven of these, correct?
A. Just a second.
Q. These are not trick questions, by the way, right?
A. No, but --
Q. This is not a controversial point.
A. No, sir, I understand, but I -- I'm assuming you want an accurate answer from me.
Q. Absolutely. That's my hope. That's my goal.
A. So I do need to refamiliarize. It's been a bit. I'll do so as quickly as I can, please. Okay. Yes. I'm now back up to speed. Thank you for being patient with me.
Q. Sure. So at trial you presented seven of

Page 154

these, right, seven programmatic niches and then suggested places that they might be put into action?
A. Yes, sir.
Q. And when you testified at trial, did you feel comfortable that this was an appropriate remedy under the circumstances as you knew them?
A. I did.
Q. And did you intend that the Court rely upon your recommendations at trial, as set forth in the slide deck, in order to craft a remedy?
A. I intended to suggest to the Court a remedy that could be crafted, informed by these exemplars. But in no instance did I think of this as sort of the total representation of proposed niches for the different -- the four different campuses, HBI campuses in states.
So in other words, these are just simply examples. Well, for example, one could place on Morgan's campus. For example, one could place on Bowie State's campus. But, in fact, I did not systematically develop the recommendations for each and every campus

Page 155

similar to what I later presented.
Q. Well, did you place any qualifications on your testimony that these were examples and could not be relied upon by the Court in order to prepare a remedy?
A. I would -- I would suspect I did, and I'd look at the -- at the -- I'll have to look at my testimony, but I suspect I did.
Q. You think that you testified that these were --
A. I do.
Q. -- not decisive and that they were simply examples?
A. I think so.
MS. SHUM: I'm gonna object as to foundation.
BY MR. SMITH:
Q. Okay. And so does that mean that you felt that the Court could use these or could use some other ones, these were just suggestions; is that fair?
A. This was a framing within which, yes, I

Page 156

would assume the Court could then work.
Q. Okay.
A. Informed by multiple sources.
Q. So what work did you do in order to identify these particular niches before you presented them in your testimony at trial?
A. Reviewing -- first of all, was informed by the accumulated knowledge and experience from working with remedial proposals for desegregation of HBIs across the cases in Alabama, Mississippi, Tennessee, Louisiana, and then further engaging in assessment and analysis of course offerings as revealed in catalogs and websites and the materials about the different campuses that I refer to, and then further doing analyses of materials that talked about what were growing fields, what were trends, what were hot areas.
Just literally trying to get a sense of what might be some arenas and areas where historically black colleges in this system could achieve to what I refer to on page 46 as sort of exclusivity and -- and unique programs, so it was that kind of analysis using

Page 157

multiple sources of information and data.
Q. What materials did you consult on growing fields? What specific materials did you consult before you testified at trial?
A. I would have to look at my notes, but --
Q. Can you remember any?
A. I would imagine I mentioned some of them here. I have a set of my source material.
Q. And I'm only interested on things that pointed towards growing fields, as you described them.
A. Okay. Just a moment. I'll need a minute to go through these sources. But again, I would have to go back and -- and carefully peruse the notes. I do remember there being a -- and I'll have to find that particular source, but a state of Maryland study of employment needs and growing fields, and I'll have to find which one that is.
Q. And for the record, you're looking at exhibit what to your report?
A. 18, materials considered. That was a cumulative list.

Page 158

MS. SHUM: Can you clarify whether your question is related to materials considered in preparation of the report or materials considered in preparation for testimony at the liability trial?

MR. SMITH: In testimony at the liability trial.

A. I -- I would need time to go back through my files and then give you a reliable answer.

BY MR. SMITH:

Q. But having reviewed Exhibit 18, your materials considered, you're not able to identify anything that you did consult before testimony at trial?

A. I haven't been able to review this in any kind of way that I would say that I can answer that question confidently.

Q. Right. If you want to take some more time at lunch or during a break to look at Exhibit 18, I'm happy to have you do that.

A. Okay. Thank you, sir.

Q. Did you at any time consult any subject

Page 159

matter experts on particular fields of employment or study in order to come up with your proposed niches set forth in your trial testimony?

MS. SHUM: I'm gonna object in terms of -- on the basis of foundation and subject matter experts.

A. And I'll need some time to think about that.

BY MR. SMITH:

Q. Well, let's just -- first, the question is: At any time either before or after your trial testimony, did you consult with any subject matter expert; that is to say, someone familiar with the computer industry or the health care administration industry or anyone else familiar with the market for graduates with particular skills, at any time?

A. I did, I did, and it was a -- and I hesitate because it was a kind of rolling consultation. For example, around this area of green and sustainability, consulting with colleagues in the Institute for Environment and Sustainability at UCLA --

Q. Okay.

Page 160

A. -- sort of a collaborating faculty member there and getting a sense just in general conversation with them of what were the, quote/unquote, hot fields.

Q. Okay.

A. And -- and -- and that was one source of that kind of information.

Another source of that kind of information -- and it's not specific consultation, but another source of that kind of information came from the fact that I serve on the university-wide committee that advises our counselor on -- our chancellor on faculty appointments, promotions, tenure.

And so in that process, we literally are reviewing faculty dossiers and the stats, state of the field and one's place in the field across all the disciplines at the university, so, in that instance, always trying to get a sense of which faculty were at cutting edge and which fields seem to be under-represented and where they were looking for experts or looking for where they were expecting growth. So those were two examples.

Page 161

Q. Okay. Can you think of any other examples besides the general conversation with your colleagues at UCLA and your membership on this committee that provided advice on faculty promotions at UCLA?

A. No others.

Q. Let's go back to Exhibit 1 for a moment, if we might. We'll try and take a break in about --

A. Yes, sir, I'm here.

Q. -- five minutes or so.

So after your trial testimony, the next thing that you submitted to the Court was -- it's towards the beginning of that, and it's the -- there's two documents, one is entitled 406-1. I understand that was written by the attorneys. One is entitled 406-2 or has the number 406-2 at the top, and that's your remedial proposal, correct?

A. Oh, this is, yes. Okay. I see. 406-1. And you're asking me about 406-2?

Q. Yeah. I just want to be clear that that's the next presentation --

A. Yes, sir.

Page 162

Q. -- that you would have made to the Court on remedy?
A. Yes, sir.
Q. Okay. Again, not a trick question. And then you recall that there came a time that the Court said that, in so many words, she was not going to entertain a merger of the --
A. Absolutely.
Q. -- University of Baltimore into Morgan State --
A. Right.
Q. -- and also was going to take a dim view of dismantling the University of Maryland University College?
MS. SHUM: I'm gonna object on the basis of foundation.
BY MR. SMITH:
Q. Okay. So --
A. And I -- I would just have to clarify. We never proposed to dismantle UMBC (sic).
Q. I understand. I understand.

Page 163

A. All right.
Q. Okay. I get it. And I'm not asking you to adopt, like, every word that I use in this particular --
A. But that was an important distinction for me --
Q. Of course.
A. -- because that is -- you know, that would do a violence that's unnecessary to desegregate the system.
Q. That's -- that's something that we actually agree on.
A. It would be contrary to the goal.
Q. That's something we agree on, that dismantling UMUC would be really bad.
A. Yeah.
Q. So in any event --
A. As would dismantling any of the other campuses, I would never advocate such.
Q. I understand that that is your belief.
So you -- you then took those words from

Page 164

the Court, however we want to characterize them, and you prepared a new remedial proposal; is that right?
A. Yes, sir. That's correct.
Q. And is it accurate to say that the two main -- I think the plural is foci, but the two main emphases of your new report were to pull out the UB merger part based on instructions, right?
A. Yes. Correct.
Q. And did you also modify your proposal with regard to UMUC in any respect?
A. We did.
Q. All right. And in addition to those two things, can you -- can you recall any other significant changes that you made to your proposal? Take out UB, modify the proposal as regards to UMUC. Any other significant changes between the thing that's dated 2015 and then the next remedial proposal you presented?
A. Yes, sir, there were. I think the most significant additional change came in refocusing what had been kind of a regional analysis with Bowie State, including PG County, Montgomery County, and Charles

Page 165

County, and simply refocusing Bowie State in relation to the Baltimore area, so that --
Q. I didn't mean to cut you off.
A. Yes, sir. That's correct.
Q. So treating Bowie State as being part of a larger group that involved Baltimore and the two HBIs there and the TWIs there as well?
A. That's correct.
Q. Okay.
A. Those are, to the best of my recollection, the major change.
Q. And why is it that you decided to treat Bowie as being part of a larger geographic area that involved Baltimore as well?
A. Because as we engaged in subsequent analyses, it became our conclusion that that was the more appropriate comparison area for Bowie and the more appropriate catchment area. It was just not at all clear to talk about the PG County, Montgomery County area that also overlapped with the University of Maryland College Park and so on and so forth, so it

Page 166

just made better sense to refocus.

Q. Okay. I understand your testimony that it made better sense and that based on your analyses you decided to do it.

A. Yes, sir.

Q. What analyses were those?

A. Again, it's the -- the same pattern of looking at that set of factors that I shared with you previously.

First of all, being informed by experience and lessons from previous remedial programs and plans, some of which were implemented but not implemented fully or not protected fully or any combination of those kinds of things, so that kind of -- that source of information, the information available in terms of looking at university records and websites and any other indicators of where the students were enrolling from -- I'm sorry. Let me put a bookmark by that.

As I'm -- as I'm talking to you in looking at page 18, I see one of the sources that answers a question you asked me a moment ago.

Page 167

Q. Well, can we stay on an answer to this question?

A. Yeah. Okay.

Q. And then if you need to say something else --

A. Okay.

Q. I'm trying to understand why you decided to treat Bowie as being part of the Baltimore area, and I've heard you say it's based on looking at previous remedial plans and then you said university records. So what else?

A. And then looking at the relationship -- of looking at the relationship to the University of Maryland College Park and its relationship to the other campuses. So it was a fulsome analysis, I guess that's the point, looking at multiple factors to make that determination.

Q. Can you identify any new data that you considered before you decided to treat Bowie as being part of the Baltimore area?

A. The data of the sort that I've -- I've --

Page 168

I've sort of broadly sketched, is about the best I can do, and those data being looking at where the university centers are, looking at what the University of Maryland University College is doing and how it's affecting Bowie, and then using that to refine our proposals for Bowie.

Because as you -- as we've discussed, the judge made clear that certain elements of the proposal were not going to be accepted, and one of those elements had to do with a refocusing and redefine -- a clear redefinition of the role of University of Maryland, UMUC. And so when that particular option was no longer on the table, then it required that we rethink the proposal for Bowie State.

Q. Rethinking of University of Maryland University College does not change the geographic location of Bowie State; is that correct?

A. It changes the relationships of Bowie State in that geographic location, for the simple fact that the University of Maryland University College has multiple campuses around Bowie State that are competing

Page 169

for the same students. So UMUC is not only competing online, but they have physical campuses in close proximity to Bowie State.

And to the extent that the judge decided that the proposal that we put forward for UMUC was not viable, then it required that we rethink the proposals for Bowie State. So the region is the same, but the relationships within the region are to be considered.

Q. Other than the fact that you believe UMUC competes with Bowie, can you identify any new fact that you learned or applied before you started to treat Bowie as being part of the Baltimore area? Any specific fact?

A. Well, that is the fact with the elements of the multiple campuses, one at Laurel, one at Prince George's Center and so on.

Q. Right. Does UMUC have any locations in the Baltimore area?

A. I'd have to double-check.

Q. Okay. All right. So you prepared your new report --

Page 170

A. I'm sorry. I'm sorry for being incomplete.
I do know that UMUC has 22 sites around the state, and I'd have to confirm which ones are in Baltimore proper, but there are some within close proximity of Baltimore 'cause I did calculate and map those. Like, for example, at -- at some of the forts.
Q. Right. And you knew that fact before you prepared your 2015 remedial proposal, right?
A. I did, and then had to revise my address of the fact once the judge gave her decision.
Q. I understand. Now, you then prepared the first iteration of your new report, which is dated April 29th of 2016, correct?
A. Correct.
Q. And that's a subsequent tab here in Exhibit 1; is that right?
A. Yes, sir.
Q. Okay. And when you were done with that, did you believe that it was complete and accurate and that the Court could rely upon it?
A. For the 29th, we assumed it to be so. Yes.

Page 171

Q. Okay.
A. But as we worked with it --
Q. Well, how about just answering my question. When you completed it, did you believe that it was complete and accurate and that the Court could rely upon it?
A. We believe that within the -- the parameters of what we could achieve with what was available. Yes.
Q. You intended, in fact, that the Court carry out the remedial proposal that you made based on that expert report; is that true?
A. And just so that I'm clear, I'd say yes. Yes.
Q. Okay. Now, I understand that after you had signed it, there were some changes made to it that had to do with paragraph 321; is that right?
A. Paragraph 321. Just a --
Q. Of the April 29th...
A. I'm sorry. Now I'm going to take a look at the next version here.

Page 172

Q. Well, if I can maybe give you a little bit of assistance, if you look in your tab there on top of the report, there's a red-line of paragraph 321. It's right after that email --
A. Tab C.
Q. -- from Ms. Shum.
MS. SHUM: One page over.
Q. Keep going. Keep going. This is something that was provided to us by --
A. Okay. Just a second.
Q. -- your attorneys.
A. Uh-huh.
Q. Okay. And my question is: How did that change come to be made in the April 29th, 2016, report that you prepared?
A. Well, we continued to review and check our work as it were and then just found that this change was required.
Q. Did anyone --
A. Because it was a miscount.
Q. Okay. I'm sorry. I didn't mean to cut you off.
So you -- you reviewed it and discovered that there was an error?
A. Yes.
Q. And did anyone besides you or Dr. Conrad bring that to your attention?
A. No, no. We -- we continued to work through the report. And, in fact, as you see for the additional changes, we'd find something that had to be changed.
Q. I see. And so what did you do once you discovered this error?
A. Well, after we got up off the floor, we then corrected it and then notified the attorneys that it was of sufficient importance that it needed to be -- an errata sheet needed to be produced and --
Q. Okay. Are you -- I'm sorry. I didn't mean to interrupt you.
Are you continuing to check the drafts of your report?
A. Yes, absolutely.

Page 174

Q. And since you submitted your report on July 6th, have you discovered any other things that you believe may, either now or in the future, need to be corrected?
A. Nothing of great substance, but a typo here and there, yes.
Q. So other than typos, you're confident that the July 6th version of the report is complete and accurate and can be relied upon by the Court?
A. I am.
Q. And have you asked anyone, besides you and Dr. Conrad, to read it through and correct any mistakes or bring to your attention any errors that are located?
A. No.
Q. No one besides you and Dr. Conrad?
A. Not -- not that I asked for.
Q. And that includes your attorneys, Ms. Shum and her people; is that right?
A. I can't imagine they're not reading what we're producing and so, but you --
Q. And did they bring this error to your

Page 175

attention, paragraph 321?
A. No. I think you asked me that question before. No. Dr. Conrad and I were reading and have continued to read and when we find errors, we make our corrections.
MR. SMITH: Okay. All right. Why don't we take a break for lunch here.
VIDEOGRAPHER: We are now going off the record. The time is 12:35.
(There was a brief recess taken.)
VIDEOGRAPHER: This is the beginning of DVD No. 3. We are now back on the record. The time is 1:31.
BY MR. SMITH:
Q. Dr. Allen, I hope you had a good lunch, a good walk.
A. I did. Thank you, sir.
Q. I think when we broke we were looking at the first or the -- I think it was the first revised or the first corrected expert report that had changes to paragraph 321, and that resulted in a new version dated

Page 176

May 2nd, correct, or May 1st, which you should have in the next tab there; is that right?
A. Yes, sir.
Q. Okay. And so you made those revisions, you then signed it, as did Dr. Conrad, correct?
A. That's correct.
Q. All right. And I understand there was a subsequent series of corrections to the report. Can you tell me how that came to be?
A. There was indeed another set of corrections, and those corrections flowed from the process that I shared before break, where we continued to work through the report and found that it was necessary to make some corrections, and so, thus, the second corrected copy was -- was produced.
Q. I get it that you found there needed to be corrections. What's the process that resulted in those corrections? How were they identified? How were the errors identified?
MS. SHUM: Objection, foundation.
A. And I wasn't very clear. I said we worked

Page 177

through it. We continued to read and edit and fact check the report and found it necessary to make the corrections that appear in July. So they were refinements and just a result of us going through the report and taking into account any sort of issues that seemed to be presenting or just inconsistencies.
BY MR. SMITH:
Q. Well, so the earlier version, the one dated May 1st that you signed, was submitted to the Court, was it not?
A. It was.
Q. And did you believe when you signed it and it was sent off to the Court that it was valid, complete, and accurate?
A. We did.
MS. SHUM: Objection, foundation.
BY MR. SMITH:
Q. And did you intend for the Court to rely upon it when you signed it and sent it off?
A. We did.
Q. Okay. And when after May 1st or May 2nd,

Page 178

did you or Dr. Conrad discover that there were errors that needed to be corrected?
MS. SHUM: Objection, foundation.
A. And I would have to look at notes to tell you the specific date and give you a precise answer to that question.
BY MR. SMITH:
Q. How about an estimate? Was it a week later? Was it a month later?
A. It's my custom that when I produce a report, I can look in it later that night or the next day and see some things that I should change or I would like to have changed if I hadn't submitted it already.
So I guess that's my way of saying that it was an ongoing process. I mean, some issues presented themselves, a typo here and there, pretty early in the process, but it's only at a point where we started thinking about the need to make a more substantial adjustment that -- so it was within that span of the few weeks or so between when we resubmitted or submitted the corrected copy.

Page 179

Q. What is the process that uncovered the errors in your May 1st report? What's the actual process of examination or reflection?
A. The process is similar to what we discussed this morning, with the vetting or the reading of journal submission. You just simply go through and reread, rethink, and we're talking and we're interacting over the document, and so it was a process of that sort, where just the interactions that we were having, each of us sitting down and -- and reading through the document again and making notes and then talking about this.
Q. You mentioned vetting. You had vetted each of the previous versions, correct, the April 29th and the May 1st?
A. Oh, yes, we had. We had.
Q. Okay. And you vetted the July 6th as well?
A. That's correct.
Q. And given that, as it seems you're saying to me it's an ongoing process, how confident are you that the July 6th version is fine and there's not going

Page 180

to be any further need for correction?
A. I'm very confident.
Q. Why are you more -- are you more confident than you were on April 29th?
A. I am, because we've been working on it, and we've caught errors that we hadn't caught April 29th.
Q. I see. In other cases, you have been required to submit expert reports; is that right?
A. That's correct.
Q. And it's a common practice nowadays?
A. Yes, sir.
Q. Have you ever submitted as many as three different revised or corrected reports?
MS. SHUM: Objection, characterization. I'm objecting to the form.
A. I've submitted more.
BY MR. SMITH:
Q. You've made more than three revisions --
A. Yes, I have, I have.
Q. -- in the past? Okay.
A. Because these processes drag out over a

Page 181

long period of time, circumstances change, your interpretations change, indeed sometimes the data changes, you get more updated data.
Q. Did you obtain any new data that you didn't previously have access to between May 1st and July 6th?
A. Let me reflect on that before I give you an answer. I'm checking our changes so that I can answer that question.
Q. Well, sir, there's a cover letter from your counsel that's part of the package there. It's on top of the July 6th report. It's directed to me and my partner. It's from Mr. Greenbaum. It's dated July 6th. Maybe that will be of some assistance.
And the question on table for you: Did you obtain access to any new data that you didn't previously have access to between May 1st and July 6th?
A. We basically did an updated -- and we did a re-analysis, so I don't necessarily say that we received new data.
Q. In fact, you --
A. But we continued to --

Page 182

Q. Go ahead.
A. I'm sorry.
Q. Go ahead.
A. We continued to work with and correct our analyses of the data that we had in hand.
Q. I see. And so the answer to my question is, you didn't obtain access to any new data between May 1st and July 6th?
A. And as I think about it, I'll tell you what did happen. We were working with those CIP codes, which are a challenge, because given their very nature, one will see multiple programs listed under the same CIP code, so then we have to go and check the website to see if indeed the -- what indeed the program is that's being offered or even if it's being offered at -- at -- at the institution.
So it was that kind of re-analysis that resulted in our producing the new report. And so my answer to you is that the data weren't new per se, but the table was updated and revised to be more accurate and reflective of the data that we had, if that helps

Page 183

any.
Q. Okay. And so the answer to my question is, you had access to all the same data before May 2nd -- before May 1st as you did on July 6th, but you decided to analyze it in a different way; is that fair?
A. No, it's not fair. We decided to continue with the analysis that we had conducted and just refine it.
Q. Okay. And you don't think there's any further refinement of your analysis that's required from this point on?
A. Not to the best of my knowledge, but I will say that it's a process where we're not only interacting with the data but with reports such as Dr. Lichtman's, for example. So at this point, it's a final document, to the best of my knowledge.
Q. You understand that Dr. Lichtman's report, which was filed, I guess, early last week, provided some textual analysis and then it had a list of errata at the back as an exhibit? Did you see that list of errata?

Page 184

A. I took a quick look at that second report, as I shared earlier. I haven't had a chance to go through it carefully.
Q. Okay. And based on that list of errata, the specific corrections that Dr. Lichtman proposed be made to your report, do you plan to make any further changes to it?
A. I plan to consult those, and where I agree and where we agree, you know, obviously we'd make the changes if we think it's valid. But in some cases with the earlier report, there were misinterpretations, mis- --
Q. I'm just talking about the current one now.
A. But I have to give context because that -- I'm telling you how I will respond to --
Q. You understand we have a seven-hour limit for this deposition? So can I ask you about Dr. Lichtman's current report?
A. You can. And I'll answer you about that current report, but I must say that it is going to be related to a procedure and a process that we've

Page 185

established in dealing with the previous report.
Q. Okay.
A. And the second report, as I shared, I have not had a chance to go through thoroughly and carefully.
Q. Did you review any of the specific criticisms that Dr. Lichtman made and decide whether or not they were valid?
A. In the first report?
Q. In the second report, sir.
A. I haven't had a chance to go through the second report at this -- at this -- at this juncture.
Q. So the answer is no, you have not reviewed any specific criticisms that he made and determine whether they are valid?
A. Relative to the July report?
Q. Yes, sir.
A. I'm in the process of doing that now.
Q. Okay. And that includes not only the text of his report and the tables, but also the specific errata that are identified in the exhibit to his

report.
And to be clear what the question is: You haven't ident- -- you haven't reviewed any specific errata and determined whether or not they are valid and a correction is required?
A. In the process of doing that review now.
Q. When do you intend to complete that review?
A. Within -- as soon as I possibly can, but it would be within a week, few weeks or so. Depends on what the issues are.
Q. Uh-huh. And have you divided up that labor with Dr. Conrad, or are you doing it all yourself?
A. We're both reading separately, then we have to come back together. So that's another element that adds to the time factor.
Q. I see.
A. 'Cause we have to find a time when we can consult with each other.
Q. Okay. Now, between the 2015 proposal that you submitted, the one that's called 406-2, right, you understand which one I'm talking about, submitted in



May 2015?
A. Yes.
Q. Okay. And the -- the first revised remedial report, the one dated April 29th, you know which one we're talking about there, right?
A. I -- I lost a beat. May 1st, 2015?
Q. Yes, and then the --
A. Yes.
Q. -- first new one from 2016. So in-between that, did you happen to review any of the affidavits or declarations that were submitted by the three presidents of UMUC, UB, and UMUC?
A. I haven't seen -- I can't remember and definitively say that I did.
Q. Okay. And, therefore, you don't recall whether you made any corrections or changes to your report from 2015 until the first 2016 version based on those declarations and those submissions?
A. I cannot recall.
Q. Can you take a look at the July 6th cover letter that's sitting on top of the second corrected --



A. Tab E?
Q. Yes, I think it is Tab E in yours.
A. Okay.
Q. Okay. And that's a letter from your counsel, from Mr. Greenbaum, correct?
A. Correct.
Q. Okay. And have you -- you've seen it before today; is that right?
A. I had seen this, yes.
Q. And is it an accurate statement of the circumstances under which corrections were made to your earlier report?
A. I believe it is, and if I can just take a quick second and confirm that. Yes, it is.
Q. It says in there in the third paragraph, on the first page, it says that "...plaintiffs discovered that Dr. Conrad's list of high-demand and exceptionally high-demand programs had not been updated...."
When it says "plaintiffs," who is that referring to?
A. I would have to -- I'm not sure. I'd have



to ask Mr. Greenbaum.
Q. Well, but it's your --
A. But the plaintiffs, I would presume.
MS. SHUM: I'm gonna object on the --
A. This letter --
THE COURT REPORTER: Wait a minute. Excuse me.
MS. SHUM: -- basis of privilege and instruct my client not to answer, Dr. Allen not to answer.
MR. SMITH: Okay. Even though this issue is disclosed in a letter that was submitted both to us and to the Court, you think that that's privilege?
MS. SHUM: To the extent that the questions relate to privileged conversations between Dr. Allen and the attorneys for the plaintiffs, I am instructing Dr. Allen not to respond.
MR. SMITH: And I just want to be very clear, Brenda, that when you tell the Court how this worked, that you have waived that privilege, okay, just so there's no misunderstanding here.

Page 190

MS. SHUM: I want to make the objection on the record so that the questions that are asked do not solicit privileged information. That is my point.
MR. SMITH: Okay. So are you instructing him not to answer my question, which is: Who's the plaintiffs in the -- when it says "plaintiffs discovered"?
MS. SHUM: You may answer who are the plaintiffs in this case.
BY MR. SMITH:
Q. Let's put the question very clearly to --
A. The Coalition for Equity and Excellence.
Q. Yeah, yeah. Thank you.
The question here is: In this letter written by your attorney, Mr. Greenbaum, it says plaintiffs discovered that Dr. Conrad's list had not been updated. You see that in front of you, correct?
A. I do.
Q. And who actually discovered that Dr. Conrad's list had not been updated?
A. We discovered that.

Page 191

Q. You and Dr. Conrad?
A. Dr. Conrad and I.
Q. Okay. And it then goes on to say that "He has now updated that analysis...." The "he" in that context is Dr. Conrad, correct?
A. And again, working in conjunction with me. Yes.
Q. Is there some reason it says "he" and refers to Dr. Conrad and doesn't say anything about you?
A. You may have to speak with Mr. Greenbaum about the phrasing of the letter.
Q. Okay. That's -- that's fine. That's fine.
It then goes on to say in the next paragraph, "...Dr. Conrad updated those classifications in Exhibit 4...."
Do you have any reason to disagree with Mr. Greenbaum's letter there?
A. And in that next paragraph, it points out that Dr. Conrad and I did the refinements. So it's just -- well, I don't know about the phrasing, but I

Page 192

can tell you about a process, and the process was that Dr. Conrad would take a lead, and then I would make my corrections, and we'd go back and forth in the interactional process that we used to produce the report.
Q. Okay. And by the way, the -- on the first page of Mr. Greenbaum's letter, he speaks of the fact that the inventory was -- excuse me -- the analysis was updated using the 2014 inventory. So that's the inventory of programs at Maryland colleges, correct?
A. Yes, and the completion data.
Q. And completion data is degree completion data, correct?
A. Yes, sir.
Q. And that's from MHEC?
A. Yes.
Q. Okay. And when was the 2014 inventory and completion data available to you?
A. Well, the 2014 inventory data we'd been working with for a time, and so it was the additional -- you know, we're working with the same data.

Page 193

And as I shared a moment ago, going through the inventory, finding errors, finding inconsistencies more often than not, and just finding lack of clarity where has -- has been discussed, the same code would apply to what seemed to be a range of different classes, so the --
Q. When did you have that inventory data, sir? You had it long prior to 2016, correct?
A. We had it in time for the earlier report. Yes.
Q. Correct. Okay. What about the completion data for 2014? When did you obtain access to the completion data for 2014 that is mentioned in Mr. Greenbaum's letter?
A. Sometime in 2016, but I honestly can't give you the exact date. I could -- again, I'd have to refer to the files.
Q. But it's your testimony that degree completion data for 2014 was not available until calendar year 2016?
A. I am not saying that. I don't -- I'm

Page 194

saying that when we began to work with the data, to the best of my recollection, was in this span that we're talking about now, in 2016. Now --
Q. I'm not asking when you began to work with it. I'm asking when it became available to you?
A. And I can't answer that question.
Q. Okay. Would one place to look be the backup data that you produced through your attorneys to us so that we could review what the basis for your opinions was?
A. And the backup data being the inventories and this or the electronic version?
Q. The electronic version, sir.
A. Okay. Possibly so.
Q. All right. I want to ask you now some questions about what I'm gonna call the "end state," okay? And I don't know if there's a better term for it, but what I'm describing by that is a situation when your remedial proposal has been adopted by the Court, and it has desegregated the HBI campuses to the maximum extent that that proposal will work, okay?

Page 195

So do you understand the -- the assumption I'm asking you to make?
A. I think I do.
Q. Okay. And if you want to call it something else, is there a term of art in the field besides "end state"?
A. I'll -- I'll just follow your definition for now.
Q. Okay. So in the end state, where do you estimate that the additional white students at the HBIs are going to come from?
MS. SHUM: Let me object as to speculation.
MR. SMITH: He's an expert.
BY MR. SMITH:
Q. And let me give you some possibilities, okay, and I don't mean to be exclusive. Do you think that they're going to come from white students who are currently at the TWIs, for example?
A. I would doubt that, because I'm presuming that when you talk about an end state, you're talking about a cycle that's beyond the regular four years of

Page 196

graduation. So the students who are currently at the TBIs or at the TWIs, they would be gone.
Q. Okay.
A. So it's hard for me to answer the question, 'cause I'm not even sure what the -- one way I think about the end state is when -- when would the system be in compliance with the expectation that it is -- it is no longer a dual system.
And so to answer your question --
Q. I think I got the first part. You pointed out -- it's a very fair, very fair point -- that students who are currently at the TWIs, they're probably gonna be fully graduated by the time we reach the end state or the state of compliance, as you called it, right?
A. I think so.
Q. Okay. So when we reach that point, which is, I think you said, more than four years out, do you estimate that the additional white students will come from the pool that might otherwise have gone to a TWI, to a traditionally white institution?

Page 197

A. I think in part, yes.
Q. Okay. If it's in part, where else do you think that those additional white students are gonna come from to the TWIs?
A. I think that we will reasonably expect that some white students will be coming into Maryland from outside of the state and into those state institutions.
Q. Okay.
A. Those are two sources that occur to me, because you are working with a finite pool of students, which is why we make the proposal that we make, in terms of creating exclusivity in some program areas so that the HBIs can compete effectively so that they'll be comparable, so they'll be competitive.
Q. Okay. Do you estimate that some of them will come from the pool that might otherwise attend College Park, the flagship?
A. A few of them would.
Q. Do you estimate that some of them will come from international sources?
A. Some. Again, a smaller number.

Page 198

Q. What proportion of the additional white students that you see coming to the HBIs at this end state or compliance state do you think will be from the group that might otherwise have gone to a TWI?
MS. SHUM: Object as to foundation.
A. And I would simply say that if there is a particular program, if the plan is implemented so that if one wants to complete a program in architectural landscape and it is only available at an HBI, then it would be the entire pool of white students in the state of Maryland who are interested in completing that academic program.
BY MR. SMITH:
Q. I'm asking you in aggregate, though, in aggregate -- wait a minute. Let me ask the question.
When you reach that end state of full compliance and your remedial proposal has had all the effect that it's going to have, what proportion of the new white students at the HBIs are going to come from the pool that otherwise would have attended a TWI in the state of Maryland?

Page 199

MS. SHUM: Objection, foundation.
A. And as I understand the question, which is what I attempted to answer, if there is an exclusive program that can only be completed in-state, at an in-state institution, at an in-state TBI, on the Bowie State campus, then the proportion would be 100 percent of the students who want to complete that program in the state system.
BY MR. SMITH:
Q. Respectfully, I'm not asking about individual programs. I'm asking about in the aggregate at the four HBIs when your proposal has been adopted and it's fully effective, what proportion of the additional white students at the HBIs are gonna come from the pool that otherwise would have gone to a TWI in Maryland?
MS. SHUM: Objection, foundation.
A. I'm challenged to answer the question.
BY MR. SMITH:
Q. And as to any part of it, can you -- can you answer the question as to what proportion will be

Page 200

in-state or out, what proportion will be U.S. or international?
A. I can say that the majority of students would be in-state students because these are public, in-state institutions, and the larger proportion of that population is drawn from in-state.
Q. Do you --
A. I would --
Q. I'm sorry.
A. I would also offer that in terms of trying to have a sense of what proportion of white enrollment would be reflected on those campuses, that is going to vary depending by the campus, by the --
Q. I'm gonna get there in a second.
A. -- programs that are available and so on.
Q. No, and I'm gonna get there in a second.
I'm talking about sources now, and then we'll talk about the absolute numbers or the proportions at the HBIs in a second. I want to try and separate these out one by one, if that's okay.
Okay. Staying on the subject of where are

Page 201

the white students going to come from, do you think that the proportion that will come from the pool that otherwise would go to a Maryland TWI, do you think that's gonna vary among the four different HBIs or it's gonna be the same?
MS. SHUM: Objection.
A. I would expect that the proportion will vary, and it would vary for the simple fact that realistically the HBIs will have different numbers of unique and high-demand and unique high-demands on the programs on their campuses, and that has been the mechanism that we expect and propose will attract white students to those TBIs.
BY MR. SMITH:
Q. When you say that it will vary, can you tell me in rank order, for example, which of the HBIs are most likely to capture white students who otherwise would go to a TWI in your end state?
A. I would say the HBIs that have the most unique, high-demand, and unique high-demand programs.
Q. Well, which one is that gonna be if your

Page 202

proposal's adopted?
A. That is a -- that is a good question, and I think that time will answer it. But I would submit that certainly the two institutions that we propose the most unique, high-demand, and unique high-demand programs are Morgan State and the University of Maryland Eastern Shore, and then certainly those are also the largest two TBIs at this point.
And I'm not trying to be difficult, but it's just hard to answer the question about a projection into the future when we don't know which programs will be created on which of those campuses.
Q. Again, the premise for all of my questions is that your remedial proposal, your current one, is adopted across the board. If there's any confusion about that, that's the assumption I'm asking you to make.
In terms of that proposal as it currently stands on July 6th, what percentage of the programs in there that you advocate being moved to or created at an HBI will only be available at that HBI and not

Page 203

duplicated at some other TWI?
A. I'd have to walk through the proposal and answer you point for point, but to the degree we laid out in the proposal which programs would be unique at the TBIs, at the HBIs, and that is my answer to my question, as we answered it here.
For example, we talked about specific programs on the specific campuses and whether those programs will be unique or --
Q. I understand.
A. -- high-demand, or unique and high-demand.
Q. Can you even tell me, like, to a rough order of magnitude? More than half? Less than half?
A. I'd be hard-pressed to say that.
Q. And just going back to this question of the source of the additional white students at the HBIs once we reach the end state, is it possible for you to say to a reasonable degree of certainty that any specific proportion of them will come from the pool that otherwise would go to a Maryland TWI?
MS. SHUM: Objection, form.

Page 204

A. And generally, I would just simply remind that Maryland's public higher education system is going to be educating students of all colors in the future. It's going to be educating white students.
And so those white students who are seeking particular programs that are only available on historically black campuses, it's my assumption that that's where they will go to school.
BY MR. SMITH:
Q. Yes. Let's go back to my question. I appreciate what you're saying, but my question was whether you can tell us, once you reach the end state, to a reasonable degree of certainty what proportion of students who otherwise would attend a Maryland TWI will instead decide to attend an HBI in Maryland?
MS. SHUM: Objection.
BY MR. SMITH:
Q. What proportion, sir?
A. And the proportion I gave you was 100 percent for a program that's only available on --
Q. In the aggregate, sir. All of my questions

Page 205

are in the aggregate. I'd like an answer, please.
A. That is my answer. If I'm not -- 100 percent of the students who would like to have a degree from a public institution in the state of Maryland in agricultural architecture and if that -- I'm sorry -- in architectural --
Q. Landscaping.
A. -- landscaping, if that -- that program is only available at -- at Morgan State, then those students would go to Morgan State for that program. So that would be 100 percent of the white students in that field. So I'm not understanding.
Q. Sir, once again -- and I think you do get what I'm saying to you. I don't want to know about individual programs. I want to know in the aggregate whether you can tell us to any reasonable degree of certainty what proportion of the additional students to the HBIs as a whole will come from the pool that otherwise would have gone to a TWI, not about specific courses?
A. And honestly, I'm not --

Page 206

MS. SHUM: Objection.
BY MR. SMITH:
Q. She's objected. Go ahead.
A. Okay. Honestly, I'm not understanding you. Because when I attempted to talk about it in terms of proportionate representation of whites on the campus, as my way answering the question, you said you'd prefer that we talk about that later. So I'm -- I'm at a loss in terms of how to answer the question. Maybe if you give it to me in a different form, I'll follow.
Q. I've tried a couple times. So why don't we move on to a new one.
A. Okay.
Q. How long is it gonna take to reach the end state of complete adoption of your remedial proposal and compliance with it?
A. What normally happens with remedial programs is that they are evaluated on some fixed interval, three years, five years, whatever. And with that in mind, I think that the determination of when it is satis- -- when the requirements are satisfied, will

Page 207

be subject to those periodic evaluations.
So that's simply me saying that it's hard for me to tell you definitively where -- what that time span would be. I do know that in several court judgments and in the literature a 25-year span has been mentioned, but I have no idea whether it would even take that long or whether it might take longer.
Q. Okay. Do you think that complete compliance will take a different period of time depending on the HBI, or will they all reach it at the same time?
A. It's possible. It's very unlikely that all of those schools would be moving forward at the same pace. It's possible. But my expectation is that there would be a situation where some schools would move faster toward the goal and others less so.
Q. Do you have any sense as to which of the Maryland HBIs would move faster or slower towards that goal if your remedial proposal is adopted?
A. I can only talk about the fact that, at this point, they are at different levels of white

Page 208

student enrollment, and that then becomes a possible but not certain predictor, because it simply talks about the base from which the schools are building.
Q. Would you agree with me that it can take a considerable period of time for perception of an institution's reputation or prestige to change in the public eye?
MS. SHUM: Objection, form.
A. I think it varies, because there have been institutions that have rocketed forward in a very relatively short period of time. UMBC is not an old institution.
BY MR. SMITH:
Q. So when was UMBC founded?
A. Can't remember specifically.
Q. '60s?
A. Possibly.
Q. So it's 50 years old?
A. In terms of --
Q. Roughly?
A. In terms of when it started moving forward,

Page 209

maybe it's been there for 60 years, but in terms of its period of rocketing, the forward leap --
Q. Okay.
A. -- that time period is -- is much more constricted and more recent.
Q. All right. That's fair.
A. And that's what I would refer to.
Q. So how long did it take for UMBC's reputation to rocket forward to its current status? Did it take a year? Did it take five years? Ten years?
A. I would estimate --
MS. SHUM: Objection, foundation.
A. I would estimate that it's within the last 20.
BY MR. SMITH:
Q. So you think it's possible for an institution in as few as 20 years to make a very substantial change in its reputation, its prestige, those sort of public perception measures?
A. Absolutely.

Q. And would you agree with me also that an institution's reputation or prestige often influences student choice?
A. I agree.
Q. And would you agree with me that that is true generally but also in regard to white students considering an HBI?
A. I would place it in the context of how students think about the prestige and prominence of an institution and tie it to the kinds of programs that are available for those students on that campus.
And so to the degree that those programs of the sort that I keep hammering away at, high-demand programs, unique programs, unique/high-demand programs are present on a campus, then absolutely white students will be drawn. I mean, we've -- we've got evidence of that in our various reports. Changes notwithstanding, the conclusions have been consistent that --
Q. Yes, let me go back to --
A. -- we get those kinds of gains when we have those kinds of programs. You have that increased white



enrollment.
Q. Sir, I'm just gonna take it as a given that, generally speaking, you believe that high-demand programs at HBIs will increase white enrollment. I get that part.
My question is directed solely to the question of institutional reputation and prestige, and my question is whether that is a factor in white student choice regarding HBIs, their attendance?
A. And I agreed and tied those two traits to the programs that are available in the campus.
Q. How long do you think that it will take any one or all of the HBIs in this case to change their reputation or prestige in a way that will attract meaningful numbers of white -- additional white students?
MS. SHUM: Objection, form.
A. I think, as we've discussed, it will vary from campus to campus. I think those kinds of changes can occur within a span as brief as a cycle of four to six years. It just depends on what's going on, on that



campus, public perception.
So, for example, if one were to relocate one of the leading labs from Stanford University to Morgan State University, that is the kind of move that results in overnight changes in the prestige of an institution, and that has been documented and has happened on TWIs around the country.
BY MR. SMITH:
Q. Okay. Putting aside the Stanford to Morgan transfer -- and I get it, you're trying to give us an illustration -- give me an example of an HBI anywhere in the country that has had a substantial and sustained increase in white enrollment in as few as four to six years?
MS. SHUM: Objection, foundation.
MR. SMITH: Well taken.
A. I would point to the law school at North Carolina Central. I'd point to, well, law schools on several historically black campuses. I would point to the med school and those related allied health sciences programs at Howard. Those are two examples that occur



to me just off the top. I'd have to go back and, again, look at the data, but it is not -- it is not unheard of.
To the extent that we can accomplish those kinds of forward leaps on traditionally white campuses and that we've been able to do that by virtue of the academic programs, and in the case of these HBIs, it really has to move us beyond where this conversation is focusing us, in terms of not only identifying that campus by race, but by the academic programs that are available.
BY MR. SMITH:
Q. Okay. Again, I take that as a given.
A. So -- so it's with -- with -- with that sort of a change, you do realize these kinds of forward leaps. I mean, honestly, Troy -- I mean, Towson has had a forward leap of sorts by --
Q. My question was about HBIs. We're talking about HBIs.
A. I know, but I have to do it -- well, but HBIs are universities.

Page 214

Q. Sir, can we try answering the question that I put to you?
A. Yes. Yes, sir.
Q. So my question was: Identify an HBI that's had a substantial and sustained increase in white enrollment in as few as four to six years. The ones we have on the table are the law school at NC Central, the med school at Howard.
Can you think of any situation where that's occurred in a context of a comprehensive university, in other words, measuring the undergraduate and the graduate enrollment together, and you've had a significant and sustained increase in white enrollment in as few as four to six years.
A. Tennessee State.
Q. Because of the merger, right?
A. Tennessee State.
Q. Okay. Tennessee State, merger. Keep going. Anything else? I want to hear about them.
A. Those are the ones that come to mind for me now.

Page 215

Q. Okay. All right. Let's go back to the end state, and my question is: When you reach that state of full compliance, what is the aggregate of proportion -- aggregate proportion of white students that will be reached at the four Maryland HBIs?
A. I -- I can't answer the question definitively at this point.
Q. Can you give me a guess?
A. I can give you a guess that the numbers will -- I'll give you the expectation that the numbers will approach where they were in the 1970s, back up to 18 percent across the board, and back up to 30 percent on some of the campuses --
Q. And can you --
A. -- in some programs.
Q. Sorry, didn't mean to interrupt you.
Is your guess or expectation one that you can offer to any reasonable degree of certainty?
MS. SHUM: Objection.
A. I'm very confident about it.

Page 216

BY MR. SMITH:
Q. Okay. Very confident. 75 percent? 100 percent?
A. I'm very confident.
Q. Give me a number.
A. I have trouble putting a number, but very confident would put us above 50 percent.
Q. Okay. Great. And you think that we'll -- we'll approach the figures from the '70s, the sort of high watermark in terms of white enrollment at the HBIs once we reach the end state?
MS. SHUM: Objection.
A. I think that that is very realistic to expect.
BY MR. SMITH:
Q. You actually think it's gonna be higher than that, don't you?
MS. SHUM: Objection.
A. I think it's possible.
BY MR. SMITH:
Q. I mean, isn't it your position that the

Page 217

figures in the '70s are an understatement because that was a time when there was a dual system, and Maryland hadn't fully thrown off the shackles of de jure segregation?
A. No.
MS. SHUM: Objection.
A. No, that's not my framing. My framing is about the programs that were available on those campuses at that time and whether those programs were being duplicated by proximate or other traditionally white public institutions in the system.
BY MR. SMITH:
Q. Okay. And so let me make sure I understand that. Your point is that in the '70s, there was a lot of duplication, and even so Maryland was able to -- the Maryland HBIs were able to get to a certain level of white attendance or white enrollment?
A. Not -- not quite correct.
Q. Okay. Explain it to me then.
A. My -- my -- my premise and the data shows that those high watermarks were eroded by the

Page 218

proliferation and duplication of -- of programs.
Q. I see. Okay. Can you take a look at your July 6th report on page 11, paragraph 68? And did you write that or Dr. Conrad, or do you recall?
A. We jointly drafted it, and it would have been my -- possibly my initial drafting.
Q. Okay. So you go through and you say -- you summarize the earlier data, and you say Maryland HBIs had 16 percent some time ago. You say that does not represent -- I guess the "not" is italicized -- the threshold measure of desegregation, but you go on to say it's informative because it shows an ability of the HBIs to attract white students even at a time when Maryland had a dual system of higher education.
Is that a correct statement?
A. That's what we are asserting. Yes.
Q. And so if I -- if I understand it correctly, you're saying that in the '70s, Maryland still had a dual system and even then the HBIs were able to get to 16 percent, right?
MS. SHUM: Objection.

Page 219

A. That is right in the context of what I shared earlier about the programs that were available on the historically black campuses and the absence of duplication that, then, would draw away or effectively drew away white enrollment. Yes.
BY MR. SMITH:
Q. Okay. And I guess my question for you is: When a state has a dual system of higher education, does that tend to encourage white students to go to an HBI or to discourage them?
MS. SHUM: Objection.
A. I think on the face of it, it discourages white students from attending HBIs for reasons of program duplication and for other effects.
BY MR. SMITH:
Q. Okay. And the figure that you quoted, whether it's 16 percent or some higher number, do you think that in the end state that's gonna be -- that number's going to vary among the HBIs in Maryland?
A. Well, the figure that we quote, as -- as you're aware, comes from the Court. And as I've shared

Page 220

previously, it is entirely possible and wouldn't be terribly surprising if it didn't vary across those HBIs, simply because of the relative programming opportunities and the relative programming that those schools can mount.
Because, for example, one of those institutions is a land-grant institution. Two of them are universities compared to, well, full states comprehensive graduate research universities if they are rightly placed, and so, as such, their potential for enrolling more students is higher.
But again, it's gonna depend on the programs that are available on the campuses and how students and white students and other students respond to them.
Q. Yeah, of course, it's gonna depend on that. But I'm asking you to assume that your proposal is adopted in its entirety and that we reach a state of equilibrium where there's full compliance with your proposal. And in that end state, which of the Maryland HBIs is gonna have the highest proportion of white

Page 221

students?
A. And I don't mean to be difficult, but it's just hard for me to definitively answer the question. I'll just talk about possibilities, potentials, and tendencies.
And so two of those universities are larger and presumably would be able to offer more comprehensive -- a wider set of programs and options, and for sure we identified three niches for Morgan and three for Maryland Eastern Shore.
So it's conceivable that they would have larger enrollments, but I can't tell you definitively that that would be the case and the degree to which it would be true, but I can expect it.
Q. Okay. And -- and in terms of that expectation, I just want to be clear that I'm asking about the proportion, not the absolute numbers. You think that the proportion at Maryland Eastern Shore and Morgan would be higher than at the other two HBIs for the reasons you've just stated?
A. Potentially so. But interestingly enough,

Page 222

in the '70s, the proportions were higher at Bowie State, so that's -- that's what makes it more of a challenge to definitively answer the question. And they were higher because of the programs that Bowie State offered and because of the constituency that they served. It was a commuter institution.

Q. All right. When we reach this end state, can you tell me to any reasonable degree of certainty what proportion of those new white students are going to be, for example, attending at night, attending as commuter or non-residential students, any of those categories?

A. I -- I --

MS. SHUM: Objection, form.

A. I really cannot, and that's for reasons that I've mentioned previously, but also, for reasons of ultimately the faculties on those campuses, what their administrators will decide, make some decisions that tie to the points that you just raise, whether they will have an expanded night program, whether they will -- and the degree to which they're able to mount

Page 223

an expanded online program and so on.

BY MR. SMITH:

Q. Can you tell me to any reasonable degree of certainty what proportion of these new white students at the HBIs will be graduate as opposed to undergraduate students?

MS. SHUM: Objection, form.

A. It would depend on the number of graduate programs, so...

BY MR. SMITH:

Q. I'm talking about your remedial proposal, if it's adopted, what's it going to look like at the end of the day in terms of the proportion of new white students who are undergraduate as opposed to graduate?

A. I -- I understand --

MS. SHUM: Object to foundation.

A. I understand, and I should clarify when I say it depends on the graduate program. We propose niches that not only are the product of transfer and new programs but also the enhancement of other graduate programs that are already on the campus, and it's

Page 224

expected that you will get this synergy that will produce some new graduate programs beyond what we propose.

And so that's why I'm -- I'm leaving open the option of and fully expecting that there will be an expansion of graduate programs beyond what we are proposing.

BY MR. SMITH:

Q. Okay. So let's assume it works to the best extent that you could imagine. At the end state, what's the proportion gonna look like in terms of new white students who are undergrad as opposed to graduate?

A. I'm not able to answer that question definitively.

Q. Same question. When we -- when we get to that end point about online or hybrid courses -- and you understand what I mean by "hybrid," right?

A. I do.

Q. Okay. What proportion of those additional white students are going to be purely online enrollees

Page 225

at the HBIs?

MS. SHUM: Objection, foundation.

A. That's to be determined.

BY MR. SMITH:

Q. Okay. What proportion of those additional white students at the HBIs will be enrollees in blended online/in-person courses?

A. I don't know.

Q. When we reach this end point, can you tell us to any reasonable degree of certainty what is the effect on black enrollment at the TWIs going to be?

A. I don't know for sure.

Q. Well, would you agree with me that the programs that you propose, as you see it, will establish these niches that will be attractive to students regardless of race?

A. Yes, and further will translate into the institution being attractive to students regardless of race because we will have substituted academic identities for racial identities.

Q. So in that case, is it fair to expect that

Page 226

your new programs, when they reach their full fruition, will attract not only white students but black students and Asian-American students, etc.?
A. And Latinos, yes. Absolutely.
Q. Okay. And can you tell us to any reasonable degree of certainty what the mix is going to be of the additional students coming to the HBIs?
MS. SHUM: Objection.
BY MR. SMITH:
Q. As between African-American, white, any other subgroup that you want to talk about?
MS. SHUM: Objection.
A. I can't tell you with beyond a shadow of doubt, but I would say that if it is a system where students are choosing not based on race of the institution but on available programs, then it may and reasonably should represent the percentages in the state's population of college-going students.
BY MR. SMITH:
Q. Okay. So at that point, you're saying that the HBIs would have, what, a makeup that represents

Page 227

Maryland's makeup as a whole?
A. The incoming students is the one I thought we were talking about --
Q. Yeah, the incoming students.
A. -- that that population in a system that's not -- where the decisions are not based on race and race of the institution but on the programs that are available, and under the assumption that is inherent in our program and plan, that those institutions would be comparable and competitive across the board, then, yes, the students should reasonably, and one can expect, distribute across those schools based on the proportions in the graduating student body and the college-age, college attending student body.
Q. Now, in your remedial proposal, the HBIs retain their dual mission, correct?
A. They do.
Q. And, therefore, they provide a --
A. Well, I'm sorry. Could I -- could I ask you --
Q. Well, that's a yes or no question, isn't

Page 228

it?
A. Yeah, but you also said their dual mission.
Q. Their dual mission.
A. And I want to be sure what you're --
Q. We're talking about the dual mission of HBIs, one part of which is to offer educational opportunities to those who did not have the same type of preparation in high school and before; is that right? That's part of the dual mission?
A. Well, the earlier dual mission was to teach black students, so that's what I wanted to be clear about.
Q. I'm talking about the contemporary --
A. Teaching underserved students.
Q. Underserved, yes.
A. Yes. Then I agree with you.
Q. All right. In your remedial proposal, the current dual mission, the one that we all agree is a good idea, it remains, right?
A. Serving --
Q. Underserved students?

Page 229

A. -- underserved students, that would be an element and a part. And in my vision, frankly, that would be a mission that's shared across the system.
Q. Okay. But the proposals that you have made with regard to the TWIs only involve taking programs away from them. They don't involve changing the fundamental mission of the TWIs, correct?
A. That is correct.
MS. SHUM: Objection to the characterization of the remedial proposal.
BY MR. SMITH:
Q. Isn't that right? I mean, I see a lot of stuff about HBIs in there. I don't see you saying that, for example, Towson will change its mission. That's not a part of it?
A. But you do see me talking about the entire system changing its mission and leading the country in terms of diversity, access, equity, and literally becoming a model for the rest of the public systems in the country.
Q. So you -- you see, when your system is

Page 230

fully adopted and you reach this end state, that the HBIs will simply mirror the state's overall population makeup?
MS. SHUM: Objection, form.
BY MR. SMITH:
Q. Is that correct?
A. No, it's not correct.
Q. I thought that's what I heard you say.
A. No, you --
Q. So tell me what I got wrong.
A. You heard me say that the incoming student populations would reasonably be distributed across the different institutions in proportion to the compensation -- the composition of the -- the graduating student bodies.
What it doesn't take into account is the fact, for example, that Morgan State's a national institution. It's not only drawing black students from Maryland. It draws black students from California. And so that's the -- the sort of nuance that I wanted to be sure we were not missing.

Page 231

Q. Okay. Okay. And just coming back to what you said a moment ago, if you have four years of incoming classes to any four-year college and they all reflect the composition of the state as a whole in the graduating high school students, then at the end of that four years and for, you know, every year after that, the institution as a whole will reflect the racial balance and the makeup of the graduating high school senior class, right?
A. That assumption ignores what I just shared, that it's a national institution, and it's not only drawing its population from the state of Maryland.
Q. Okay. That's fine. So let's -- let's just concentrate, for example, on Bowie, which is not a national institution, right? Do you agree with me about that?
A. Correct.
Q. Okay. And my question is simply: Under your proposal, you think that once this reaches the end state, that Bowie will be able to attract successive classes of incoming freshman that mirror the overall

Page 232

racial composition of Maryland?
A. I think that's entirely possible, and if we reflect and sort of speculate about the ultimate composition of Bowie, I just would take my lessons from the experiences of HBCUs nationally, and there are some of them that are 100 percent white.
Q. I really just asked you about Bowie.
A. Well, but I have to answer in a context. I --
Q. Do you think you could try --
A. I'm sorry.
Q. -- answering -- sir, respectfully, I'd like to ask you to answer the question that I put to you. If she wants, Ms. Shum can ask you plenty of questions later.
A. Okay, okay.
Q. But I've got a limited period of time, and I'm gonna ask you, respectfully, as we've been doing with each other, to try and answer my question. Is that okay with you?
A. It is, and I mean no disrespect, but there

Page 233

are times when you ask a question that unless I place it in context, it is not a complete and meaningful answer.
Q. That's -- that's not actually the rule here.
So let's go back to Bowie. Can you tell me to a reasonable degree of certainty that once your proposal is adopted in its entirety and it reaches fruition, that Bowie will have incoming freshman classes that mirror the overall state of Maryland?
MS. SHUM: Objection.
A. I can't tell you with any certainty.
BY MR. SMITH:
Q. And can you tell me with any certainty whether the additional students that attend the HBIs as a result of your remedial proposal, when we reach this end state, will be a greater proportion of white students, a greater proportion of African-American students, or somewhere in the middle?
A. I can tell you with certainty and a very full expectation that changing the programs,

implementing this remedial plan would increase the white student enrollment in Bowie.
Q. I understand that. My question was about the additional black students. Can you tell me to any degree of certainty whether the additional students at the HBIs once your program is fully adopted will be greater proportion of African-American, greater proportion of white?
A. I cannot.
Q. Would you agree with me that you wouldn't want to take measures that would grow enrollment at the HBIs but take away black students who currently attend -- African-American students who currently attend a TWI?
MS. SHUM: Objection.
A. And I can't accept the premise. And you've told me that I have to just simply say yes or no, but if I were to accept that premise, I'd be -- we'd be thinking in terms of this situation where the university doesn't grow in size, and that's not a premise I would -- that's reflected in our remedial



plan.
BY MR. SMITH:
Q. Would you agree with me that when you have transfers of programs that you've got to look at the trade-offs, right, the pluses and the minuses; is that fair?
A. That's fair.
Q. Okay. And would you agree that one of those trade-offs if additional African-American students go to an HBI instead of a TWI, is that you might have resegregation at the TWIs? Is that a possibility?
MS. SHUM: Objection.
A. I categorically reject that position.
BY MR. SMITH:
Q. Okay. That's fine. When you talk about doing program transfers, where you move a program from a TWI to an HBI, as contemplated in your proposal -- first of all, do you understand that at some of these TWIs, like the University of Baltimore, there's a considerable number of African-American students that



are attending the school and are part of those programs?
Do you understand that fact?
A. I do.
Q. Okay. And when you talk about program transfer, do you know whether every student will transfer with the program or whether there will be more white students or more African-American students? Is it possible to make that kind of fine judgment?
A. When you talk about the impact of transfers on students, one has to keep in mind the fact that where programs have been phased in and phased out, there's been a phasing in and phasing out that protects students.
Q. Okay.
A. So, for instance, students who are currently in a program are generally -- they generally benefit from some arrangements being made so that they can complete the program.
Q. That's fair. Okay. So let's talk about UB in particular, right? And you understand that UB is --



has a very substantial proportion of both white students and African-American students, right?
A. I do.
Q. And that that, in particular, is true of the criminal justice program that they offer?
A. (No audible response).
Q. You need to say yes or no.
A. To the best of my understanding, yes.
Q. Yeah, okay.
A. I know it's true for the institution as a whole. I'd have to double-check the criminal justice statistics.
Q. Okay. And I appreciate your point about protecting the students who are currently enrolled, but you know that UB has had a very high proportion of African-American students for a number of years now; is that correct?
A. Yes.
Q. And is it safe to predict that five years or ten years from now, left to its own devices, UB would probably continue to have a significant number of

Page 238

African-American students?
A. We could expect that.
Q. Okay. So in terms of the criminal justice program, let's say, five years from now, so all of the current students have graduated. If that's transferred to Coppin State, as you propose, do you have any way of knowing whether the proportion of students that will be in the new criminal justice program at Coppin State, and otherwise would have gone to UB, whether there's gonna be more African-American, more white, or, you know, anybody's guess?
A. I'd have to just be very careful with the premise that you're -- you're putting forward in the sense that the way we're talking about it, it's only criminal justice as an independent, free-standing program, when, in fact, we're talking about a large Center of Excellence and academic niche that has a number of programs that are related and involved.
So I -- I have some difficulty just narrowing the focus and not paying attention to the other -- the other programs around criminal justice.

Page 239

Q. Okay. Well, let's talk --
A. But with that -- with that qualification, I can just go ahead and accept your premise.
Q. Okay.
A. But qualify its -- its expected consequence because that's not the only program that would be transferred. That's not the only program that'll grow. That is not the only program in consideration in terms of attracting white students to Coppin State.
I -- I can very reasonably expect that the -- with the proper programming and opportunities, the numbers of white students would grow at Coppin and offset that percentage of black students coming in from, say, UB's criminal justice program.
And the other thing, of course, is that we're talking percents. We have to also think about the absolute numbers of program of students under consideration. So 50 percent of a criminal justice program that only has 60 students total would only be 30 students. So that's why I'm a little stumped with the complexity.

Page 240

Q. Well, I don't think the complexity alludes you at all, that hasn't been my observation, Dr. Allen.
But the -- your point about the niche is a fair one. So Coppin State would get this whole niche. It's just not a couple of criminal justice programs, right?
A. Yes, sir.
Q. Okay. And right now UB has a substantial undergraduate and some graduate courses in criminal justice, right?
A. Correct.
Q. And all of those would be transferred to Coppin, right?
A. I'd have to see what we talked about in terms of transfer.
Q. No. All or many of them; is that fair?
A. Some of them would be, yes.
Q. Okay. And so you expect that as a result of that many, and you would, I guess, say most of the students who'd otherwise go to UB and take that criminal justice program, they're instead gonna take it

Page 241

in the future at Coppin, right?
A. That's possibly what would happen, but --
Q. That's a hope, isn't it?
A. Well, that's possibly what would happen, but what often happens is that students decide on an institution, and they're gonna go to that institution hell or high water, and so if it happens not to have the program they're interested in, they will choose some other program at that institution.
Now, that's true for some small segment or some segment of the population, so...
Q. Well, I was asking you about criminal justice and you said --
A. Okay.
Q. -- you said that students choose the institution and then they think about the programs later. Let's just focus on criminal justice for a second.
A. All right. Let me clarify. You said --
Q. Sir, sir, I have to ask a question before you can clarify, okay? We've got to do it in a

question and --
MS. SHUM: I'm gonna object because that was a mischaracterization of his response.
MR. SMITH: Okay.
THE WITNESS: And that's what I was trying to clarify.
BY MR. SMITH:
Q. So my question -- my question for you is: If all we do is look at the students who are in the criminal justice niche, if that's what the right word is, at UB, if you move the content of that niche over to Coppin, are those students likely to follow it in the future?
MS. SHUM: I'm gonna object. The proposal does not propose transferring a niche. It proposes transferring a specific program.
BY MR. SMITH:
Q. Okay. Can you answer my question, please?
A. Could you repeat it, please?
Q. When you transfer the criminal justice program from UB to Coppin, is it fair to expect that in



the future it will cause the same mix or a comparable mix of students to attend Coppin instead of UB who otherwise would be in that criminal justice program at UB?
A. I'll -- I'll give a qualified yes.
Q. In the end state of your remedial proposal, I'd just like to ask you to suppose, as a hypothetical, that all of the increased white enrollment at the HBIs is online or non-residential, 100 percent of it.
Are you with me on that?
A. I see no reason to assume that.
Q. I get to ask you questions based on assumptions. So if 100 percent of that new enrollment is online or non-residential, would you consider that a success in terms of desegregating the HBIs?
A. I have trouble answering the question because it simply lays out a premise that I just wouldn't expect to -- to happen. But assuming, just granting that it might be the case, and that's very unlikely, I -- I wouldn't consider that a successful desegregation, because it's about creating



opportunities for the students to interact with one another as well.
Q. Okay.
A. Blended programs, perhaps.
Q. Okay. What if 75 percent of the increase in white enrollment at the HBIs is in terms of online or non-residential attendance? In that case, would you consider this to be a success in terms of desegregation, a remedy that has solved the problem?
A. I have difficulty answering the question, and I'll just have to stay with the earlier answer.
Q. Does "the earlier answer" mean no, because you just don't think that's -- that's solving it, doesn't create enough interaction?
A. The earlier answer is an online -- there -- there were multiple parts to the earlier answer. First of all, I thought the premise was one that was not likely, highly unlikely, that all of the white students would be in online programs or non-residential. It just doesn't seem reasonable or possible to me.
And then the second part was that the whole



strategy of desegregating campuses is -- is to be in line with the fact that we are a multiracial, diverse society where students have to learn about each other, and you do that by face-to-face and interactions.
Q. What if 50 percent of the increased white enrollment at the HBIs in your end state is online or non-residential? Would that be a remedy that you think has solved the problem and desegregated the HBIs?
A. I'd have to think about that.
Q. Well, this is my chance to ask you questions.
A. Yes, sir, and I --
Q. We've been talking about it for a couple minutes. You just don't know the answer to the question?
A. I don't know the answer right now. I have to reflect on it.
Q. And if I say a quarter of it, do you know the answer?
A. Again, I'd have to say I'll reflect on it.
Q. What if at the end state all of the

Page 246

additional white enrollment is in graduate programs? Would that resolve the issues you see in terms of segregation? Would it desegregate the HBIs?
A. It would resolve the issues that I've been trying to speak to and that the remedial plan speaks to. It would possibly resolve the issue of recasting the identity of that HBI so that it is no longer looked at solely in terms of its race but in terms of the academic programming.
And -- and indeed, we have on those campuses now some individual programs that are close to what you -- you -- and not on the campuses necessarily in Maryland, but nationally, you have some programs that are 80 percent white on a historically black campus.
And so those programs do indeed contribute to recasting and redefining the identity of that institution so that it is more about the academic programs offered and less about the race -- historical race affiliation of the campus.
Q. So just to come back to my question, if

Page 247

100 percent of the additional white enrollment at the HBIs after we reach the end state of your proposal is graduate programs, you would consider that a desegregation of the HBIs?
A. What I would --
MS. SHUM: I'm going to object. That was not an appropriate characterization of his response.
BY MR. SMITH:
Q. I'm asking -- and respectfully, sir, it's a yes or no. Do you think that it would satisfy your criteria for success?
A. I have to think about that.
Q. Okay. What if all of the additional white enrollment at the HBIs in the end state is in adult or night school courses, such that it doesn't affect the daytime attendance at the campus? Would that -- and just to be clear what the question is, would that meet your criteria for desegregation of the HBIs?
A. I don't know.
Q. What if half of it, of the additional white enrollment is adult or night school? Would that meet

Page 248

your criteria for desegregation?
A. My criteria would be more about the identity of the HBI as determined by the academic programs that are offered. That would be the first part of my answer.
The second part of my answer is that at some point it has to be accepted that students should be able to exercise free choice. The problem to this point is that that choice has been restricted by the sort of racial constraints, the operation of a dual system.
So if we create -- if we eliminate those -- those -- those barriers, if we eliminate a situation where the students are directed not by their choice of academic programs and free choice, but rather than state decisions of which institutions have been resourced or under-resourced or defined by race, then we have to accept student choice.
Q. And does that mean that if those artificial barriers to student choice have been eliminated under your proposal and, as a result of that, half of the

Page 249

additional white enrollment is adult or night school, you would consider that to be a desegregation of the HBIs?
A. I would be satisfied if the HBI's identity had been clearly and definitively recast in terms of its academic programs and then would be -- and -- and under that assumption, would be comfortable with the notion that students are choosing for reasons other than race which schools they attend or which kinds of programs they participate in.
Q. Give me an objective measure that will tell us when an HBI's identity has been measured by -- is no longer measured only by race. Give me an objective indicator or indicia of that end state.
A. The indicator that we propose is when those institutions have vibrant, very strong academic niches that are in and of themselves definitive of the identity of those campuses. So when Morgan State becomes identified more for the business programs on the campus, when Eastern Shore is identified more for the physical therapy programs on the campus, then we

Page 250

will have achieved that state.
Q. Respectfully, my question was for an objective indicator. What is an objective indicator, a fact, an empirical fact, that can be tested against an objective standard that will tell you when the HBIs are -- their identity is no longer measured in race and your goal has been achieved?
A. The number of unique, the number of high-demand, the number of unique high-demand academic programs on the campus.
Q. Okay. So the mere existence of a substantial number of unique and high-demand academic niches on the campus will tell us that their identity has moved beyond race?
A. Absolutely.
Q. Let me ask you about the proposal that you submitted back in 2005. Actually, before I do that, let's see here, you've used the word "academic niche" and -- well, or "institutional niche" a number of times.
I think from reading your proposal, I have

Page 251

some idea of what that means, but I'd like to ask you to give me the closest analog you can in the real world to your proposal in which not simply money and not simply programs were used to change the HBI status, but instead institutional niches were established there. What do you think is the closest analogy to your proposal in that regard?
A. Well, just to clarify -- and then, also, of course, I'll answer the question, but an academic niche is going to be the sort of the Center of Excellence or the cluster of concentrated programs that are identified with an institution and that define that institution academically. That's the first part.
The second --
Q. Okay. So what's the second closest analog then?
A. UMBC is a great -- is a great analog. That campus has become the campus of -- of -- of sciences. There are -- there are also nationally analogs, where when one just Googles, for example, Centers of Excellence, you will find Carnegie Mellon and the

Page 252

concentration of courses that are defined as their Center of Academic Excellence.
So that would be my analog.
Q. What about in the remedial context for an HBI? What's the closest analogy to this idea of institutional or academic niches that you can identify?
A. The challenge there is that what's happened with the remedial programs and plans is that they've created individual departments or individual academic programs but not the cluster of academic programs that come together to form this niche of academic excellence.
So it's -- in other words, I -- I cannot identify one of the remedial plans that accomplished what we are -- are proposing. Bits and pieces have been accomplished.
Q. Okay. Coming back to your 2015 proposal, so that's the first big one in there, 406-2.
A. Yes, sir.
Q. When you submitted it, did you believe in good faith that the entire range of remedies, specific

Page 253

remedies, that you proposed in there was required in order to achieve your end state of desegregating Maryland's HBIs?
A. When we proposed it, we believe that that would be the most effective way of achieving that end.
Q. Okay. Did you believe that each of the proposals you made in there was necessary in combination with the others in order to achieve that objection?
A. To achieve the?
Q. To achieve that objective of desegregating the HBIs.
A. Essentially, what we did -- I'd say yes, in -- in the sense that if the Court were willing to and if it were possible to implement the range of proposals, then indeed that objective would be achieved and achieved sooner.
MR. SMITH: All right. Why don't we take a short break here?
(There was a brief recess taken.)
VIDEOGRAPHER: We are now going off the

record. The time is 2:48.
(There was a brief recess taken.)
VIDEOGRAPHER: This is the beginning of DVD No. 4. We are now back on the record. The time is 3:11.
BY MR. SMITH:
Q. Dr. Allen, remember this morning I asked you where that list of core programs -- I think it's exhibit -- it was one of your exhibits to your report. I asked you whether there was any well-recognized source, whether it was a book or a website, that people in the field could look to and say yes, that's -- that's how we determine what a core program is, and you said you couldn't think of one, but you were gonna give some thought to it.
Do you have any further thoughts about where we could identify something like that?
A. Not a book as such, so I haven't done -- I haven't come up with any additional content on that point.
Q. Okay.



A. Other than to point to general education programs and the courses that are usually listed in the first two years of an undergraduate education.
Q. Okay. In American academia as a whole?
A. Yes, sir.
Q. All right. And before we broke, I was asking you about your 2015 proposal, which is number 406-2, which they're in your Exhibit 1, and I asked you whether you intended this whole panoply of remedies to be adopted and, if adopted, to solve the problem that had been identified at trial of unnecessary program duplication and the bad effects that it had on the HBIs in Maryland; is that correct?
A. It's correct.
Q. Okay. And I think you told me that you believe that all of them would be required to effect those changes -- E-F-F-E-C-T -- those changes in Maryland as quickly as possible --
MS. SHUM: I'm gonna object as to the form. I don't believe that accurately characterizes his response. If we can --



MR. SMITH: The witness can tell me.
MS. SHUM: -- go back to the transcript.
BY MR. SMITH:
Q. -- then in order to effect those changes as quickly as possible, that those -- that list of remedies would be required; is that correct?
MS. SHUM: He said those -- we --
MR. SMITH: No, no, no, no. The witness can tell me what he said. You can just object to the form.
MS. SHUM: I'm going to object to the form.
BY MR. SMITH:
Q. Go ahead.
A. And what I did say was that the full set of proposals were the ideal and quickest way to achieve the changes, but at the same time, by implementing pieces of it, those changes could be achieved as well with some revisions.
Q. With some revisions?
A. Yes.
Q. And so, for example, if you take the



UB/Morgan merger out of it, you can still accomplish your objective; is that right?
A. We'll have to accomplish it under that reality. Yes.
Q. Well, you'll have to, but you believe that even taking that merger out of it, you could still accomplish your end state of desegregating the HBIs; is that right?
A. I believe it makes it more challenging, but I think that it's still possible to desegregate the systems.
Q. Okay. Do you -- can you put any -- any numbers on that? Does it make it, you know, twice as hard or anything like that?
MS. SHUM: Objection, form.
A. I can't put numbers on it.
BY MR. SMITH:
Q. Okay. And in your current remedial proposal, that is July 6th, you've got a detailed set of proposals, are any of those indispensable, or could we pull out one or more of those and leave the rest in

Page 258

and still get to your end state?
MS. SHUM: Objection, form.
A. I would answer by saying that we've proposed a set of remedies that, under no circumstances, did we think are cookie cutter and will just be accepted wholesale without any kinds of adjustment, and -- and so with that sort of framing, it would just be my expectation that, for example, when one puts programs at or proposes programs at an institution, the faculty and the administrators have to weigh in, the system has to weigh in.
So the point is that those changes are required, but the final form of them is going to be a process.
BY MR. SMITH:
Q. Okay. And did you solicit any faculty or administrative input, other than reading the HBI president submissions in connection with the mediation, before you put your July proposal together?
A. I wasn't aware that I was able to approach faculty, so no. But if that is an option, I'd be

Page 259

interested to hear faculty responses.
Q. Okay. And did you engage any consultancy firms that had expertise in higher education, other than obviously you and Dr. Conrad, before you put your proposal together?
A. No, sir.
Q. And when you say that faculty and administration have to weigh in, you're talking not just about the HBIs, but about the TWIs as well, correct?
A. I'm talking about all of the faculty who are going to be affected, but primarily, as you've reminded me, the focus here is on the HBIs and my proposal.
Q. Okay. And you said it wasn't cookie cutter, and there could be adjustments. Do you believe that any of the niches that you've proposed, the multiple niches across the four HBIs, could be deleted from your proposal and you could still get to your end state of desegregating the HBIs?
A. I don't think so. I think some of the

Page 260

niches might be modified, but I do think that there will be required, for example, three niches at Morgan State, three at Maryland Eastern Shore, and so forth.
Q. Okay. So the -- the number of niches that's in your July 6th proposal, as you see it, is the minimum number that is required to desegregate the HBIs?
A. Absolutely. Because, as you mention, there was a point when I was proposing seven but had to simply deal with the feasibility issues.
Q. Well, actually, in point of fact, don't you have -- don't you have more than seven niches that you're currently proposing?
A. Let me clarify. I was proposing seven for Maryland Eastern Shore in order to bring it to online, to a full-fledged land-grant institution.
Q. I see. I see.
A. So this is a -- these are minimum numbers for each of the campuses, but the maximum is, well, it's higher.
Q. Okay. And how did you set the minimum

Page 261

number of niches for each of the four HBIs that are now in your July 2016 proposal?
A. Dr. Conrad and I sat down and had discussions, did our analysis of other historical cases and other remedy plans, and just used our judgment and our experience and our assessment of the different campuses and their current offerings to arrive at the numbers of niches and the particular academic niches that we proposed in order to redefine the identities of those institutions.
Q. Other than your judgment and your experience, which you've testified about, can you identify any objective criteria that were used to determine what you've called the minimum number of niches for each of the HBIs?
A. The objective criteria that we used would be reduced to the particular programs that were being offered and the enrollment that was represented on those programs on the different campuses.
Q. Okay. When you talk about the enrollment that was being represented on the particular campuses,

you're talking about the additional enrollment that you seek to obtain through establishing these niches?
A. Yes, that, and also the programs and affiliated academic programs, new programs, affiliated programs, transfer programs, that would qualify under those headings of being high-demand, unique programs, and so on.
Q. And in terms of that increased enrollment at the HBIs that you sought to obtain through having this minimum number of niches, when you reach your end state and your remedial proposal has been fully implemented, how large do you think the HBIs will be in terms of enrollment?
A. The goal is not -- I have to recharacterize it. You -- you say the end state or the goal of increased enrollment. The goal is to change the academic identities of those institutions.
Q. The end state applies, as always, every time I've used it, it applies to the full implementation of your remedial proposal.
My question is: When you reach that point,



how large will the HBIs be?
A. I honestly don't know. I do know that some historical studies and some sources I've looked at would suggest that as a comprehensive institution, as the urban university, for example, Morgan State left unfettered, would probably have been around 25 to 30,000 students.
Q. Okay. What about the others?
A. I haven't really worked out numbers for those yet.
Q. And what is Morgan today, just in round numbers? 'Cause I just don't know.
A. I have to check my figures, but I think it's fewer than 10,000.
Q. Let's see. In your report, it says that currently 3.3 percent of the students are white and that's 256, so roughly 30 times that would be, like, 7,500?
A. Roughly that.
Q. I'm sorry?
A. I said roughly that, I would say. I have



the number somewhere.
Q. So you would envision a, roughly, three to four times increase.
In terms of the -- well, I'm sorry. Let's just go back to the minimum number of niches. I think you said that you determined that minimum number by looking at the increased enrollment that you wanted to achieve at the HBIs and using your judgment and experience. Are there any --
MS. SHUM: Objection to the form.
BY MR. SMITH:
Q. Are there any other factors you use to determine the minimum number of niches?
A. And -- and just to be accurate, I think I resisted the idea that I was simply calling for increased enrollment.
Q. I'm not suggesting that's the only objective.
A. Yeah, yeah. I was really talking about changing the identity of the institution.
Now, answering the question, other factors,



but I'd have to recall what they were, if -- if there were some others.
Q. Okay. But sitting here today, the ones that I've just identified are the only ones you recall?
A. Those are the ones that come to mind. Yes, sir.
Q. Okay.
A. Oh, I'm sorry. Could I -- could I expand on that answer?
Q. If you remember another one, yes.
A. I do. I remember -- and -- and this sort of takes us back to something we were discussing a moment ago of that projected size of Morgan State, I remembered looking at and reviewing sister, quote/unquote, institutions under the Carnegie classification.
So looking at other schools that are in that category and getting a sense of how large Montana State is, for example, or how large Memphis State is or what have you, the kinds of programs that they have operating and available on those campuses.

Page 266

So those are factors that helped us think through and make decisions about niches and also to project. That's the basis for my projections in terms of size.
Q. Got it. Thank you.
Okay. Now, as I understand it, inside each of these institutional niches, your proposal says that there has to be a minimum number of new programs, whether they're newly created at the HBI or transferred from a TWI.
Do I have that right?
A. There has to be, within those niches, a distinctive identity of -- of programs that shift the identity of the institution, and those programs would be composed of those categories that I keep repeating of, you know, high, high-demand and unique.
Q. Can you take a look at page 26, paragraph 159 of your July 6th report?
A. Page 26, 159.
Q. The last sentence there, can you just read that aloud, please?

Page 267

A. Yes, sir. Just a second. "Within each niche, a minimum of six new high-demand programs should be offered - including at least two at the graduate level."
Q. Okay. And is it possible to achieve the results that you want to achieve with any different number or a smaller number, fewer than six, of these new high-demand courses?
A. It's -- it's possible, but it'll be a challenge because it's about the critical mass of those academic programs.
Q. So where did the number six come from?
A. Again, our judgment and the sort of assessment that I shared, the same way we decided that there should be -- three would have to be the minimum, and within, you know, three niches --
Q. Yes.
A. -- within, say, Morgan or Eastern, and a minimum of two niches on the other campuses and, similarly, to form a niche and to be sure that you had that academic critical mass that would translate into a

Page 268

Center of Excellence, then the projection is that would require at least that number of programs --
Q. At least six?
A. -- and certainly some graduate programs, sort of a continuum from the bachelor's to the master's to possibly the Ph.D.
Q. Is there -- is there any source in academia that you can point to, whether it's an example or a text, that would tell us that you need these six new high-demand programs, or is it simply your judgment based on the circumstances?
A. Its -- it's my judgment, but it is also fueled by -- so when one looks at 159, we have to be reminded that the Maryland Higher Education Commission itself has talked about the importance of placing on these historically black campuses the kind of programs that will achieve the goals of changing the identity of that institution.
The partnership agreement we referenced with OCR, again, specifying that there should be unique programs and high-demand programs, and then further

Page 269

looking at remedial plans from the other states where I was involved as an expert witness, Alabama and Mississippi.
Q. Okay. But you've told us that no prior remedial proposal has used this academic niche approach, right?
A. Yes.
Q. Okay. And so my question is: Where did that number six come from? I haven't seen it in MHEC, and I haven't seen it in the partnership agreement. Can you point to any example or source in the literature or in academia that tells you six is the right number?
A. The six was the number we settled on, but the examples that we drew on -- for example, if you look at the remedy agreement in Alabama and in -- or the one in Mississippi, indeed they did not talk about niches, but they did talk about adding new programs.
And so those numbers that they added, in terms of new programs, were informative of the numbers we settled on here.

Page 270

Q. Well, so, what -- what number was used in Alabama? How many new high-demand programs were placed at the universities in Alabama?
A. At Alabama State -- and if memory serves, and I'll have to confirm the number, but at Alabama State, I think there were five or six programs.
Now, the dilemma and the problem with Alabama and with Mississippi is that --
Q. I just asked you how many. Is the answer five or six?
A. -- protections were not -- yes. Protections were not put in place to -- and you did ask about niches and whether they worked or not.
Q. I asked you how many in Alabama. And the answer is five or six, isn't it, sir? Sir?
A. If you tell me that's the answer.
Q. How about in Mississippi? The question is: How many additional high-demand programs were placed at the HBIs in Mississippi?
A. I would -- I would estimate about six or so, and they did not achieve the end, for reasons that

Page 271

I'm apparently not able to share with you.
Q. And -- and one of the reasons that they failed, as I understand your testimony, is that they were placed there without being part of a niche; is that right?
A. That's only a partial explanation. That's one of the factors. The other factor had to do with the fact that --
Q. I just asked, is that one reason?
A. That is only one reason. The other --
Q. Thank you.
A. -- part of the reason was that the approval process was not implemented to protect against program duplication.
Q. And again, sir, I'm gonna ask you, when you finish answering my question, can we move on to another question 'cause I've got limited time here, and I know that you're trying to be respectful of the time that I have, as I'm trying to be respectful of yours.
A. I am --
MS. SHUM: I'm going to object to the

Page 272

extent that the witness is trying to provide a full and complete and accurate answer.
BY MR. SMITH:
Q. Have you ever taken a different position, whether it's in any of these other cases, the Southern cases or anywhere else, about how many programs are required to make up an institutional or academic niche?
A. The niche framing is specific to Maryland in a way that it had not been used previously, but we have proposed additional courses, and the number of courses has varied. I've proposed probably when you look at Mississippi and the different campuses in the state, the total number of new programs we proposed exceeded ten.
Q. Okay. But because you haven't proposed niches before now, you don't recall any other occasion where you've said you need to have a niche and the niche has to have --
A. No.
Q. -- some certain number of courses or programs other than six?

Page 273

A. No.
Q. Okay. And when you made proposals in Mississippi and Alabama, did you propose either the creation or the transfer of specific courses or programs in those instances?
A. We did.
Q. You did. Okay.
A. Yes.
Q. And do you happen to have copies at your office, or someplace other than here, of the proposals that you made in Alabama and Mississippi?
A. I can look for those, but I think that they would be part of the Court record because it was --
Q. You'd be surprised. Okay. So your -- are you working off memory, or have you looked at them any time recently, the proposals?
A. I'm working off memory.
Q. Okay. In terms of the niches that you propose, is one factor in your proposal the -- what you call the institutional capacity of the HBI to absorb new programs?

Page 274

A. I'm not sure I understand the question.
Q. Well, didn't you say in your report -- and you can take a look at page 45, Section 273.
A. What we did in --
Q. Actually, can I ask the question? First, I just directed you there. So you're there on that -- on that section?
A. I am.
Q. Okay. It says there that you selected the niches after a careful analysis of existing capacity at the various institutions. That's a true statement, right?
A. It is.
Q. Okay. And when you say "the various institutions," you're talking about the HBIs; is that right?
A. That's correct.
Q. All right. And what did your careful analysis of existing capacity of the HBIs consist of?
A. I'll give you the example of engineering and Morgan, and we'll go forward and give other

Page 275

examples if -- if -- if warranted. But with respect to Morgan, first of all, making an assessment of the presence of other accredited engineering programs and an assessment and presumptions about the facilities and faculty that's required, that are required, in order to qualify for approval under those, under that -- that accrediting association for engineering, so that is one example.
In the instance of Eastern Shore, making a similar assessment around the area of -- of physical therapy and programs that are already in place and whether indeed the new programs would enhance and be enhanced by already existent programs, because that is the essence of creating that niche, building on strengths.
So that's -- that's a quick sort of shorthand way of talking about it, assessing the strengths and then trying to match the proposals of new programs to the strengths and the programs that are already up and running and doing quite well.
Q. So is it accurate to say that the

Page 276

measurement of capacity you used was to look at whether there were other related accredited programs and whether there were facilities and faculty that could support the new programs that you sought either to transfer there or to add to the HBI?
A. Yes, and under the assumption that also the new programs would add to those strengths that are already there.
Q. Okay. And accreditation actually reminds me of a question this morning. You said that you had experience working on accreditation teams. When you say "accreditation teams," do you mean that when you're -- the institution that you were teaching at came up for accreditation, that you worked on the host institution's team that dealt with the accrediting body, or do you mean something different?
A. I mean, both. I mean, I participated in re-accreditation at my institutions --
Q. Okay.
A. -- but I was also a member of the accrediting teams that Middle State sent to

Page 277

Pennsylvania State University --
Q. Okay.
A. -- that SACS, the Southern accrediting association, sent to Jackson State University, that the University of the West Indies sent to the Mona campus in order to confirm their accreditation.
Q. Okay. And were those institution-wide inquiries or department specific, or how did that work?
A. Pennsylvania State and Jackson State, institution-wide. At those campuses at the University of the West Indies, several individual departments on multiple campuses.
Q. Got it. Okay. Just coming back to the question of capacity for a second, are there any objective criteria that you can point to for measuring the capacity of college, whether it's an HBI or any other college, to accept either a new program or a transfer program?
A. I think the most persuasive criteria is the existence of a similar program on the campus and all that it implies and whether that program could earn its

Page 278

accreditation. And then, of course, as I've said and repeating myself, the assumption being that with programs will come their resources, that is, the faculty, the facilities, the investment.
Q. Okay. Looking again at -- actually, no, that's a separate question. Hold on one second here.
I noticed in your remedial proposal in your July 2016 report that you have -- first of all, you have multiple niches at each of the HBIs, right? Whatever the number is, three or four or something like that; is that fair?
A. Three at two of the institutions and two at the other two.
Q. Okay. Is it -- from your standpoint in terms of designing this remedial proposal, is it okay for the niches at the HBIs to overlap with one another?
A. To the extent that happens, but the way we designed the niches, yes, it's okay, it is.
Q. Okay. And -- and why -- why is that permitted? Why is that something that will not prevent you from reaching your ultimate objective?

Page 279

A. Of increasing white enrollment on black campuses?
Q. Right.
A. Because if that white enrollment grows on the Coppin campus or if it grows on the Bowie State campus, still the goal has been achieved.
Q. Okay. I understand your testimony.
Is there a definition -- coming back to the question of niches for a second, is there a definition of the term programatic niche that is out there in the field or in some text that you can point to?
A. As a definition of the notion of Centers of Excellence and -- but I can't point to programatic niches, but we have in various points used the -- the -- in other words, when I say I can't point to it, I'm just saying I cannot tell you a specific source that would say "a programatic niche is."
I can find you those, those kinds of references, but I can, more importantly, find you references to Centers of Academic Excellence, which are what we are proposing with those programatic niches.

Page 280

Q. So who came up with the term "programatic niche"? I mean, was it you or Mr. -- or Dr. Conrad or somebody else?
A. The two of us together.
Q. Okay. All right.
A. And in some of our earlier materials, you'll see the alternate references to academic Centers of Excellence.
Q. Let me ask you a little bit about one step up from the niches, okay? You talk in your report quite a bit about the idea of having institutional identities; is that fair?
A. We do talk about that.
Q. Quite a bit. And those are the sort of big picture, something that the institution is known for; is that fair?
A. And how people perceive the institution, yes.
Q. Okay. And the niches help support that, but they're not the same thing; is that -- is that right?

Page 281

A. The niches help redefine how white students would perceive one of those HBIs so that it is more than a campus where black kids go or where black people are --
Q. Right.
A. -- but rather it's a campus that is defined by the academic offerings.
Q. Okay. And is the institutional identity the same as an institution's mission, or is it something different?
A. It's something in addition to the mission.
Q. Okay. What's the important distinction between those two?
A. The important distinction is that an academic identity for HBIs is -- is such as it goes beyond -- you mentioned earlier in our -- in our deposition this idea of a dual mission for historically black institutions.
Now, the academic identities that we are trying to create would ultimately translate into an expanded mission, but the initial goal is just to

redefine how students perceive those campuses. And -- and if we can just move the campuses so that they're defined by their academics, then that would ultimately move their mission. So, for example, Morgan State would finally become the urban university for Baltimore.
Q. Okay. And do you see having distinct institutional identities for the HBIs as being essential to white student recruitment?
A. I do.
Q. Okay. And what if -- again, this is a hypothetical. What if it were possible to increase white enrollment at the HBIs without changing their institutional identities? Would you consider that a success when you got to the end state, in terms of desegregating HBIs?
A. I don't think that's possible. I think that's been approached in the past, and it's just failed.
Q. But I know you don't think it's possible, but if by some crazy chance it were, if the HBIs kept



their same current institutional identities but were able to add very substantial numbers of white students, would that solve the problem you've observed and result in desegregation of the HBIs?
MS. SHUM: I'm going to ask for clarification about when you say retain their institutional identity, are you saying their institutional identity --
MR. SMITH: You can just object to the form.
MS. SHUM: -- as race --
MR. SMITH: You can object to the form and --
MS. SHUM: -- in terms of race?
MR. SMITH: -- that's it. Okay.
MS. SHUM: I'm gonna object to the form.
MR. SMITH: Okay.
THE WITNESS: So I'll ask for the clarification.
BY MR. SMITH:
Q. The clarification is just if the HBIs keep



whatever their current institutional identity is, right, whatever that is, each of them has it, and -- but are somehow able to attract very substantial numbers of additional white students, would that solve the problem? Would it result in the desegregation of those HBIs?
MS. SHUM: I'm gonna object as to form.
A. If they were to keep their current identity in how they are perceived, they will be perceived as not universities that offer these wonderful academic programs but as black schools, and if that remains unchanged, then I can't even envision a situation that would translate into more white students coming there.
BY MR. SMITH:
Q. Okay. And so is it possible for you to answer my question, where I say just assume there's more students that --
A. I can't make that assumption.
Q. Okay. Do any of the HBIs currently have institutional identities?
A. All institutions have institutional



identities. And one of the challenges is that the HBIs are predominately defined by race --
Q. Okay.
A. -- and that's what we would like to propose needs to be changed.
Q. So you think that each of them, each of the HBIs is currently defined, in terms of institutional identity, by race?
A. Mostly, yes.
Q. Okay. And let me just go one by one and ask whether they have any additional or different identity. What about Morgan State? Does it have one besides race?
A. I will just offer that, as I tick through the programs on those campuses, the -- the general point I'll make and stand firm on is that their racial identity overwhelms the fact that they have good engineering programs on the campus, that they have a master's in public health on the campus.
Q. Okay. What about at Bowie State? Does it have any different or additional institutional

Page 286

identity?
A. First and foremost, I think that when those students think about Bowie, they think about it as a black institution, and it then becomes a challenge for them to understand that there are other programs on that campus, that there are academic programs on the campus.
Q. And what are those, that the students know about?
A. They should be -- they should -- that the school has a long history as a teaching institution, an institution that educates teachers, I should say. Teacher education has been one of its strengths. It nursing program, it has computer science.
But when the general populace of white students think about that campus, they think about it as a black campus. That is the identity.
Q. All right. And then what about Maryland Eastern Shore? What --
A. Eastern Shore --
Q. Let me just ask the question so it's clear

Page 287

on the record. In addition to being seen as an African-American school, as a black school, what, if any, additional institutional identity does it have?
A. These are not institutional identities. They have programs that are recognized.
Q. Okay.
A. And so the physical therapy program is recognized on that campus. But the institutional identity is as a black school.
Q. Okay. And then Coppin, I understand you believe that its institutional identity is all or maybe substantially that it is a black school. Does it have any other identity that it known to the outside world?
A. It has programs that some students may be familiar with, nursing, criminal justice, but it doesn't have the critical mass of academic programs to overwhelm its racial identity or replace it, I should say.
Q. And let me ask the question a little bit differently. Going down the four HBIs, do any of them have current programatic niches? And maybe your answer

Page 288

is gonna be: "Yeah, I just told you about them. Morgan has engineering, BSU has teaching and nursing." But if you have a different answer than what you just gave, I'd like to hear it.
A. I -- I don't see any of them having niches, as we've defined niches, which are consisting of a conglomeration of high-demand, unique programs that are sort of interrelated and that together combine to identify an area of academic excellence and identify the institution along those terms.
Q. Can you take a look at page 38 of your report and it's -- I'm sorry -- page 27, paragraph 164. And I'd particularly like you to look at the last part of it, where you talk about proposing new programs at the HBIs if they're already offered at a TWI, you say you did so only if the programs would, quote, strengthen an existing or proposed niche at the HBIs.
Do you see that?
A. I do.
Q. Okay. I get the proposed niches; that's your remedial proposal. What are the existing niches

Page 289

at the HBIs that you refer to here?
A. There are no fully formed niches on those campuses, so that really -- again, that's another instance of, if I had the time -- and I'll make a note for correcting the typo -- existing strong academic programs or proposed niche or something along those lines.
Q. Well, sir, this is the fourth version of your report, and it talks about existing niches. Can you identify any of them for me?
A. I can't identify any existing niches on those campuses. I can identify some proposed niches.
Q. I see. And you go on, on page 38, paragraph 230. Towards the bottom of that paragraph, you say that Coppin State may experience unique challenges establishing niches or unique academic institutional identity. And what are those unique challenges that you think Coppin is going to face?
A. I'm having trouble catching up.
Q. It's the last third of paragraph 230 of your report.

Page 290

A. 230.
Q. The sentence that begins "For Coppin, which may experience...."
A. Well, developmentally, Coppin is behind in terms of just the resources they have, the programs they have. They are disadvantaged not only relative to the TWIs but relative to the HBIs. So they have a situation and circumstance that -- that poses some unique and -- and greater challenges in some instances.
Q. So the -- the greater challenges that it faces or the unique challenges it faces are those of resources and programs; is that right?
A. And all that's related, the academic programs that are available, their -- their resources, their facilities, and so on.
Q. So it's resources, facilities, and programs. Anything else that Coppin faces in terms of unique challenges?
A. Those would be the ones I'd focus on.
Q. And when you say "resources," are we talking about spending?

Page 291

A. We're talking about the library, and we're talking about staffing. We're talking about faculty. We're talking about the overall resources available to operate that institution and operate it at a level of -- of much higher than where it is at this point.
Q. Okay. Well, the library is a facility, right?
A. But the books inside.
Q. Okay. So --
A. And the -- and the computer system and all of those affiliated entities.
Q. Oh, so the computer system at Coppin is also a problem; is that true?
A. It is.
Q. Okay. So what I have in terms of Coppin's unique challenges are staffing, faculty, library, computer system, facilities, and programs. Anything else that occurs to you?
A. And in terms of a relative comparison, yes.
Q. And just in round numbers, do you have a sense of how much it will cost to ameliorate those

Page 292

unique challenges at Coppin so that it can fully effectuate these programatic niches that you are advocating for Coppin?
A. I don't.
MS. SHUM: Objection, form.
BY MR. SMITH:
Q. And if I asked you that question for any of the other HBIs, do you have an estimate, even to an order of magnitude, about the cost of providing infrastructure, staffing, financial support to the HBIs so that they can fully effectuate your remedial proposal?
A. I don't, for two reasons: I'm not an expert on that financial side, and then, secondly, it's not settled what would be the -- what the final settlement would look like in terms of the programming on that campus that would be added.
Q. Okay. Let me ask you to -- I'm gonna just reask the question and ask you to assume that your remedial proposal is adopted lock, stock, and barrel. In making that assumption, can you tell me, even

Page 293

roughly, what the incremental cost might be for any of the HBIs for additional infrastructure, additional staffing, additional facilities needed to effectuate your remedial proposal?
A. No, I cannot at this time.
Q. Is that something that you intend to look into or to testify about later?
A. That is not my area of expertise.
Q. Can you identify someone else that is working on this case, whether it's Dr. Conrad or somebody else, who does have expertise about that?
A. I cannot.
Q. Okay. Let's come back to the question of institutional identities. Do the TWIs in Maryland, do they each have institutional identities?
A. I think that it would be fair to say that they do.
Q. What's the Towson institutional identity?
A. Towson is known for its teaching programs, and it's known for some of -- it's known, first of all, for academic programs, and then it has areas of -- of

Page 294

excellence and expertise.
Q. Anything else besides teaching that occurs to you?
A. I'd have to refresh, but they had several areas of -- of sort of academic excellence.
Q. And what about Salisbury? What is its institutional identity?
A. Again, I would have to refresh 'cause my focus has been on the HBIs.
Q. Okay. What about Frostburg? What's its institutional identity?
A. I know that Frostburg serves that rural population there, but beyond that, I'd have to look at the other programs that are...
Q. What is the University of Baltimore's institutional identity?
A. The law school is a very signal part of their identity.
Q. Okay. Anything else?
A. That's the one I would focus on.
Q. How about the business school? Is that

Page 295

part of its institutional identity?
A. Possibly. I don't -- I wouldn't say so. No, not necessarily. But I don't know. I'd have to refresh.
Q. You keep saying "refresh." What would you do to refresh?
A. I'd have to go look at notes. I'd have to go and refresh my memory.
Q. Okay. Do you recall at some point writing down the institutional identities of the TWIs?
A. I remember researching them.
Q. Okay.
A. Because that was kind of important, because that was part of the whole process of trying to understand the standing of the TBIs, the HBIs within the system.
Q. Right. Now, you told me earlier --
A. Could I -- could I offer that College Park's identity is as the flagship? That is -- that is just --
Q. No question.

Page 296

A. That's a no-brainer.
Q. No question. By the way, speaking of College Park, I noticed that none of your proposals involve transferring programs from College Park; is that right?
A. I suspect it is correct.
Q. And why is that?
A. Because College Park is the flagship.
Q. Okay. Why does that mean that its programs, in your estimation, should not be transferred?
A. Because College Park operates in a stratosphere that is very different from all of the other public institutions in the system.
Q. I see. Because it -- it has more selective admissions criteria; is that fair?
A. Greater resources, greater prestige, greater reputation. It's an internationally --
Q. Okay.
A. It's more international in its reputation and so on.

Page 297

Q. Did you ever consider in your various iterations of these proposals, did you ever consider proposing transferring any programs from College Park to the HBIs?
A. No. Considered collaborations and partnerships, because when College Park puts its -- its clout behind an institution, that institution can leap forward. UMBC is a great example of that.
Q. In terms of UMBC, I think you said earlier -- but you'll correct me if I'm wrong -- that UMBC's institutional identity is in engineering; is that --
A. I said in the sciences.
Q. In the sciences, okay. Including engineering; is that fair?
A. It's possible.
Q. Okay. And is that -- is engineering a programatic niche at UMBC?
A. It could be. I'd have to take a look, but I -- I -- it could possibly be so.
Q. Well, you proposed for transfer a very

large number of engineering and other STEM courses or programs from UMBC; isn't that right?

MS. SHUM: I'm gonna object as to the form.

BY MR. SMITH:

Q. Isn't that true?

A. I proposed the transfer of, I thought would be one or some engineering programs, yes, from UMBC.

Q. Okay. And once you -- your proposal is effectuated and all of those programs you've identified for transfer at UMBC come out and go to Morgan or wherever they go, and Morgan gets this engineering niche, what do you believe UMBC's institutional identity will be then?

A. I think UMBC's institutional identity will be intact, and as I recall the history of the creation of international programs in the Baltimore area, there was a division of those engineering programs proposed between UMBC and Morgan State.

So I could only envision that that would continue, that Morgan State would -- would have its engineering niche and UMBC would have an engineering



niche, to the extent it has one now.

Q. I see. So you believe that once the end state is reached and your proposal has been fully effectuated, that both UMBC and Morgan State would have engineering niches?

A. Once -- once the system is in compliance, that is entirely possible.

Q. Okay. Let me ask you a similar question about the University of Baltimore. If you remove the MBA program and you remove the criminal justice program from UB, what do you believe its institutional identity will be in the end state after your program's been --

A. I would have to look at the institution, but I think that the institution would still -- I'm confident it would maintain its institutional identity --

Q. And what --

A. -- as an academic institution, and it would be for certain programs. And I'll have to look at my notes and -- and revisit that institutional analysis to get an idea of a more specific answer to your question.



Q. Well, I'm gonna -- I'm gonna give you the facts so that you can answer it. So the University of Baltimore has a business school. It has a law school. It has a College of Arts and Sciences. It has a College of Public Affairs, which is where the criminal justice program resides.

Does that sound about right to you?

A. It does.

Q. Okay. And so you're proposing to take the MBA and certain related courses out of the business school. You're proposing to take the criminal justice program out of the School of Public Affairs, leaving the law school, the College of Arts and Sciences, and maybe some other pieces of those things.

Once that's done, assuming that I've got it right about those four pieces of it, what's the institutional identity of the University of Baltimore?

MS. SHUM: I'm gonna object as to form and the characterization of the recommendations related to the business program specifically.



BY MR. SMITH:

Q. Right, yeah. So what's the answer?

A. And I would like to see specific -- I need to look at the specific programs we're talking about transferring from the University of Baltimore.

Q. Okay. Well, why don't you pull them out from your proposal? 'Cause you do have a list of proposals being transferred -- proposal for transfer broken down by school, correct?

A. Yes, I accept that. I'm just not sure that it would take every program in that area from the university, so I have to look and be sure that that is a correct characterization.

Q. So I think it's Exhibit 3, Appendix B, which is pages 26 and 27 of Exhibit 3 to your big report. It's not in the remedial proposal itself, sir. It's in Exhibit 3, Appendix B.

A. I was actually looking at the transfers as well. But Exhibit 3, Appendix B, you said?

Q. Yeah, 'cause that only lists transfers.

A. Okay. I remember inventorying the

Page 302

University of Baltimore. Should I continue?
Q. Yeah.
A. I remember referencing -- going through the inventory of the University of Baltimore programs, and the programs -- we were very careful that we would select these programs for transfer with an eye toward building the niche at Morgan, let's say, but that did not translate into not leaving a critical mass of programs -- of high-quality programs and niches at the University of Baltimore.
So I would just have to look at what's left there, but for sure a law school is left there and all of the ancillary programs.
Q. Okay. So when you're done with your proposals with UB, at least they would keep the law school and any ancillary programs; is that right?
A. And more than that.
Q. Okay. What else?
A. That's what I'm saying. I'd have to look at -- at the -- what else is being offered on that campus.

Page 303

Q. Well, sir, I told you what the four main schools were there. Do you have any reason to disagree with that description: public affairs, arts and sciences, business --
MS. SHUM: I'm gonna object to the form because --
MR. SMITH: Can I --
MS. SHUM: -- the assumption --
MR. SMITH: Excuse me.
MS. SHUM: -- is that --
MR. SMITH: I get to ask the question --
MS. SHUM: -- program --
THE COURT REPORTER: One at a time, please.
MS. SHUM: -- is indicative of the entire center of business.
MR. SMITH: Yeah, and I'd like you to simply state an objection, and that's it.
BY MR. SMITH:
Q. Sir, do you have any reason to disagree that there's basically four elements to the University of Baltimore?

Page 304

A. What I disagree with is the characterization of the School of Public Affairs, which you mentioned --
Q. Yes.
A. -- is only the criminal justice program.
Q. Okay. And do you know whether there are any --
A. So that would be left in addition to the school of law for sure.
Q. Okay, okay.
A. There are also on that campus -- and doing this by memory, there were some programs that had to do with computer graphics and -- and publication. But again, I need to go and take a more careful, considered look at the campus. But I -- I don't accept the idea that nothing would be left except a school of law.
Q. Okay. And you mentioned just a moment ago that you thought UB had some courses in computer graphics, right? Is that right?
A. As memory, yes.
Q. Okay. So let's stay on Appendix B. Do you

Page 305

have that in front of you? Appendix B to Exhibit 3 in your remedial proposal, do you see at the bottom of page 26 it says you're gonna transfer the doctorate in information and interaction design?
Do you know what that is?
A. I do.
Q. It's --
A. And as I suggest, that's the whole of their offerings in that area.
Q. Well, do you know?
A. I would assume that it's not.
Q. Okay.
A. And that's what I was -- that's the point I was trying to make.
Q. Okay. As we sit here today, can you identify anything beyond whatever's left in the School of Public Affairs, the law school, and the College of Arts and Sciences that UB would be left with?
A. Not at this point, but I have every assurance, I have every confidence that there were programs left. I mean, that was a robust campus, is a

robust campus.
Q. I understand. And assuming that I've characterized it correctly and that is what remained, what would UB's institutional identity be in that case?
A. The University of Baltimore is going to retain its institutional identity, which is an academic identity, because it never lost that, and it wouldn't lose it --
Q. Right.
A. -- by virtue of the proposed transfers that we suggest.
Q. Right. What is that academic identity going to be, though, if it's left with the things I just described to you?
A. It would be sizably what it is now, in my judgment.
Q. Okay. Let me ask you to take a look -- this is No. 7, Exhibit 7.
Actually, before I do that, you mentioned a moment ago that when College Park puts its mind to it, that it can be very effective in putting forward a



joint program with another institution; is that correct?
A. That is a partial statement of the point I was making. I can expand it so I can be clearer, if you like.
Q. Well, let me simply ask you: If -- if there is some potential for desegregation using joint programs with College Park, then why didn't you propose any in your remedial proposal?
A. The only potential for a joint program with College Park that would achieve the ends of the remedial proposal would be if College Park established the kind of partnership that they established with the University of Maryland Baltimore County, where literally they initially planted engineering programs, helped nuture and develop those, and then eventually launch them as independent programs.
Q. I see.
A. So if -- to the degree that College Park would do a similar kind of joint programming with any one of the HBIs, then that would be potential, but I'm



just not confident that College Park is on board for that kind of an arrangement with the HBI. Certainly, the historical record doesn't show it to be so.
Q. Okay. And so when you talked about joint programs involving College Park, your -- your premise there is that they would have to be very substantial joint programs similar to what they did with UMBC?
A. That's correct.
Q. And you do propose other joint programs involving other TWIs in Maryland; is that right?
A. That's correct.
Q. And you believe that those TWIs would be willing to put the required or the commensurate effort into those joint programs such that they would help to desegregate the HBIs?
A. I think that's the case, and I would like to talk about the specific joint programs, if we -- if we need to, so that I can clarify the point.
Q. I think you've answered my question.
A. Okay.
MR. SMITH: Can we mark this, please?



(Allen Exhibit 7 was marked for purposes of identification.)
BY MR. SMITH:
Q. So, Dr. Allen, I've handed you a copy of Professor Lichtman's second report, and I think you testified you -- you have reviewed it but not in any detail; is that right?
A. Yes. It came August the 30th.
Q. Right. And if I were to ask you whether you dispute any of the calculations or the tables in here, are you in a position to answer any of those?
A. I'm not. I've just gotten this report.
Q. I see. Have you done any checking of the numbers or the calculations that are in Dr. Lichtman's report?
A. The report in front of me?
Q. Yes, sir.
A. No. I've just received this report.
Q. But when did you actually get it?
A. This week, I think. After the holiday. It only -- it's dated the 30th. Did we receive it on the

30th? It's just arrived for my purposes, and I'm presuming I'm to take it seriously, so I would have to read it and study it.
Q. Well, that is an accurate -- that is an accurate presumption. Thank you.
Now, do you -- you can put that down. I may come back to it, but --
A. I'm curious about it.
Q. Well, you can satisfy your curiosity at another time. Do you consider yourself an expert on program transfers between institutions?
A. I'm an expert on the organization of higher education and on higher education as a bureaucracy. So in that sense, I am an expert on how higher education is organized and how it's designed and how it operates, and transfers are part of that operation, but so, a qualified expert, yes.
Q. Okay. And have you ever personally been involved in any transfers to or from any of the institutions where you had an appointment?
MS. SHUM: I'm gonna object on the basis of



foundation and ask for clarification about what is meant by "transfer."
MR. SMITH: Okay.
A. I am trying to reflect back. And when you -- when you talk about transfer, you mean transfer within institutions or between institutions or any transfers?
BY MR. SMITH:
Q. Between instructions.
A. Okay. No.
Q. And in terms of the system-wide cases that you've worked on before, you have proposed program transfers. But have you been involved in evaluating the success or lack of success of any of those transfers after the fact?
A. I have been, yes.
Q. And which ones occur to you?
A. As a member of the SACS team that did the evaluation of Jackson State University after the Court ordered transfer of the University Center to Jackson State University.



Q. Okay. I would ask you --
A. The University Center was an affiliate of the traditionally white institutions in the state.
Q. Okay. I'm gonna ask you about Jackson State in a second. Other than Jackson State, have you been involved in any subsequent evaluations of transfer from any of the cases that you've worked in?
A. No, I have not.
Q. And I believe that you testified at trial or somewhere that you believe that Jackson State was a success, that the program transfer or transfers involving Jackson State were a success. Do I have that right?
MS. SHUM: I object as to foundation.
A. A success within the parameters of the kinds of qualifications I've shared previously, that the fact, for example, that there was no restrictions on program duplication, and so it's a qualified success. Yes.
BY MR. SMITH:
Q. Okay. So what were the parameters of that



qualified success? In other words, what happened that, you know, an outside observer would say amounted to a success or a qualified success at Jackson?
A. It was successful in the simple fact that the University Center continued to operate successfully. It was a qualified success in the sense that the state did not fully empower the success of that university or of that transfer.
For example, it allowed the duplication of another -- another round of program duplication that undercut the goal of the transfer. It also did not adequately resource, in my judgment, my expert opinion, it did not adequately resource and support Jackson State or that University Center. So that's where it's qualified in its success.
Q. Okay. So I heard the two qualifications: the state didn't sufficiently empower because of program duplication and insufficient resources. But what I was trying to figure out is, what's the part that is success, other than the University Center continued to operate successfully? For example, was

Page 314

white enrollment increased?
A. White enrollment increase was -- was -- was immediate on the transfer, given the fact that you had the white students who were attending that University Center.
Q. Okay. And did all of the white students or their proportionate numbers in future years, did they move over to Jackson State, or was there some fall-off?
A. There was some fall-off.
Q. And do you --
A. And there was fall-off because of the program duplication it allowed and the failure to enforce an approval process that would protect the remedy.
Q. Okay. And what -- do you happen to recall how much the needle moved in terms of white enrollment at Jackson State University?
A. I don't.
Q. But whatever those numbers were, you consider them to be a qualified success?
A. No. I'm -- I'm very disappointed in the

Page 315

numbers. I -- I felt the transfer was a qualified success in the potential that it represented. Because of the lack of the follow-through, the real benefits were not fully -- the potential benefits were not fully achieved in terms of white student enrollment, an increase in white student enrollment at Jackson State.
Q. I asked you earlier when we were going through some of these methodology questions for the different work that you've done in the past. I think I asked you whether student choice was something that was influenced by a large number of factors, student choice of college to be specific.
And I believe -- and you'll correct me if I'm wrong. I believe you said the answer was yes, there were a large number of factors that affected it; is that fair?
A. Yes.
Q. All right. Is it -- is it also true or would you agree with me that the earlier that a college or an institution is able to make itself known to a prospective student before application to college and

Page 316

so on, the earlier, the better the chances that the student will choose to attend that college?
A. I think that's a fair assessment.
Q. And is that something that's been looked at in the research, in the literature, or is that just your personal experience, or what?
A. What, the factors that drive student choice for --
Q. The question about --
A. -- higher education?
Q. The question about the earlier, the better.
A. It's been -- it's been well researched. I've actually done a good bit of the research on student choice --
Q. Okay.
A. -- and that one factor is among several factors that have been documented and studied as drivers and important influences of student choice of institutions.
Q. Let me ask you a question about UMUC, and it's really just to ask you to interpret or clarify

Page 317

your remedial proposal. When your remedial proposal speaks of moving or transferring certain programs from UMUC to HBIs, do you contemplate in there that you will only move the Maryland-facing or the Maryland-enrolled student part of it and that UMUC will continue to be able to educate out-of-state students, or do you contemplate that the entire function is going to be moved away from UMUC for a given program?
A. I, first, would leave that to be determined, but I will offer the following: I think that there had been at one point a contractual agreement that UMUC would only teach outside the state, but over the years, there seems to have been some slippage in that agreement.
Because, quite simply, it's very difficult to impose those kinds of restrictions when you're talking about an online program. People can sign-on from Abu Dhabi just as easily as they can sign-on from -- from Silver Spring, and so that's -- that's the challenge.
Q. Okay. Well, a couple questions about that.

When you say that whether it would be in-state or out-of-state is to be determined, to be determined based on what factors or what criteria in your estimation?

A. Again, that becomes a matter of the proposal on the table, then the different institutions, their administrators and their faculty working out those details.

Q. Well, what do you think? What does your proposal mean today, the one that you submitted to the Court dated July 6th? Do you interpret it to say that for a given program that has to be transferred, UMUC loses only the Maryland-facing part or the entire thing?

A. I would say for sure the Maryland-facing part should move over to the HBI.

Q. What about the other part?

A. But -- I'm about to -- you've gone from telling me to shorten my answers to stopping me when I'm trying to finish them. Okay.

So -- so that would be the first part of



the answer. Then the second part of the answer would be to -- to, as I said, leave it to those -- those constituent bodies to work out the details of the program offerings outside the state, say, in this area of finance.

Q. But what do you propose? So are you --

A. That's my proposal.

Q. So your proposal is only Maryland. The rest, it's up to somebody else; is that fair?

A. No. My proposal is only Maryland for sure and possibly the out-of-state component, but that's to be determined by those agreements that would be worked out between, say, UMUC and Morgan --

Q. Okay.

A. -- and the faculty and the administrators who are involved.

Q. Let me ask you to assume that UMUC flatly opposes the transfer of its outward-facing out-of-state teaching element for the proposed transfer courses and that Morgan wants those. So there's a flat disagreement about it.



How do you think that should be resolved?

A. That takes us to the issue of a monitoring entity that would be a tie breaker, for example, a special master, a board of visiting experts of the sort, say, that was established in the Alabama case and, of course, the Higher Education Commission playing its deciding role in breaking a tie, as it were, between those institutions.

Q. What factors should your board of experts use to break the tie on whether UMUC can continue to offer programs out of state that are being transferred for their in-state purposes to, for example, Morgan State?

A. I think one -- one looming factor would be the fact that the agreement would be under the jurisdiction of the Court, so there would be some legal issues that obviously are not my -- in other words, if you're trying to bring a system into compliance and move it from being a unitary system, that's why I'm talking about the Court would be involved. But am I wrong, the Court wouldn't be involved?



Q. Sir, do you, sitting here today, have an opinion about whether it would be a good idea or a bad idea from the standpoint of desegregating the HBIs for UMUC to transfer its outwardly-facing programs that are otherwise going to be transferred to the HBIs?

A. I think it could be a good idea, but I do think it would be a decision to be made by those bodies and entities that I was referring to.

MR. SMITH: Why don't we take five here and see what else we want to accomplish?

VIDEOGRAPHER: We are now going off the record. The time is 4:21.

(There was a brief recess taken.)

VIDEOGRAPHER: This is the beginning of DVD No. 5. We are now back on the record. The time is 4:38.

MR. SMITH: Dr. Allen, that's all the questions I have for you today. I appreciate your time.

I would like to say for the record that I hope and expect that Dr. Conrad has received a copy of

Page 322

Dr. Lichtman's report, his second report, has reviewed it and is in a position to answer questions about it next week in the way that Dr. Allen, for the reasons that he explained, was not able to do today. But that's all the questions I have for you.
THE WITNESS: Thanks, sir.
CROSS EXAMINATION BY MS. SHUM:
Q. Dr. Allen -- oh, sorry. Dr. Allen, I just want to revisit a couple of questions related to institutional identity. You were asked a number of questions related to institutional identity at the HBIs.
Do you recall that?
A. Yes.
Q. You also provided testimony today related to distinctive institutional identity. Do you recall that?
A. Yes.
Q. Do you refer to -- do you refer to distinctive or distinct institutional identity in your remedial proposal?

Page 323

A. Yes, we do.
Q. What is the relationship or relevance of distinctive institutional identity as opposed to institutional identity?
A. Distinctive institutional identity encompasses the goal of creating an academic identity or enhancing academic identity for those HBIs, but it also goes on to the point of creating, within those academic identities, distinctive areas of specialization or excellence or recognition.
Q. So what is the relevance or importance of that identity being distinctive?
A. I'll use the example of the fact that, say, nursing exists on two HBI campuses, let's say, at Coppin and at Bowie. To the extent that those programs are distinctive, they then will rise to the level of not only having an association, such that the academic identity of those campuses is tied to nursing, but then nursing specializations themselves, for example, at Coppin, the nursing program would have an emphasis on the nurse -- you know, the production of nurse

Page 324

practitioners.
And so that distinctive identity just is essential for creating, for offsetting the definition of those schools simply on the matter of race.
Q. To what extent does your proposal contemplate distinctive institutional identity for each of the HBCUs?
A. That is a major consideration in each instance.
Q. You were asked a few questions related to institutional identity at the TWIs. Do you recall that?
A. I do.
Q. You also testified that although you couldn't recall specifically what institutional identity might be associated with specific TWIs, that you did consider identity -- institutional identity for the H- -- for the TWIs when you made your recommendations in your proposal.
A. Yes, we did.
Q. To what -- you were asked a few questions

Page 325

related to duplicative niches. Do you recall that?
A. I do.
Q. You testified that duplicative niches -- I believe your phrase or your word were "okay," in terms of achieving the goal of your remedial proposal. Do you recall that?
A. Yes.
Q. So to what extent do duplicative niches contribute to distinctive institutional identity?
A. I return to the example of nursing, for example, on those two campuses. And so in that sense, the academic niches, creating and enhancing academic niches on an HBI campus helps to drive a redefinition of the campus in people's perceptions, particularly the perceptions of white students, so that when they think about those campuses, they think about those campuses in academic terms rather than or solely -- rather than solely in terms of the racial history of the campus. That's the one piece.
Then the second piece would be that when they think about -- Eastern Shore is another example,

Page 326

and think about the distinctive physical therapy programs on that campus, or on that campus the opportunities to get degrees that would range from the bachelor's of science, all the way through the Ph.D., then that becomes a distinguishing factor that contributes to the further enhancement of an identity for that campus that is -- that supercedes or goes beyond race.
Q. You also were asked a series of questions related to joint programming. How would you define, first of all, a joint program?
A. A joint program is as -- as the title suggests, a program that's shared between at least two, possibly even three, institutions, shared among them.
Q. And is there a distinction between joint programs and collaborative programs?
A. That distinction exists, but to be honest, there are variations on how people define the programs.
Q. Okay. Let's just focus specifically on joint programs. To what extent, if any, do joint programs contribute to or offer desegregative

Page 327

potential?
A. It's challenging for a joint program to offer desegregative potential for the simple fact that its joint nature, say between a TWI and an HBI, retains for students the choice of not enrolling in or graduating from the HBI.
And similarly, HBIs cannot benefit to maximum extent because it is not their program strictly speaking. It is a shared program. And in a situation where a program is shared between two unequal institutions, one of higher status and higher resources than the other, then even if it is a truly joint effort, it is going to be assumed that the program belongs to the TWI rather than to the HBI.
And I guess the last point I would offer is that in his deposition, President Schmoke spoke about the difficulties of operating a joint program between two TWIs, between Towson and UB, as regards faculty having a sense of they don't really own the program and the program does not benefit them to the maximum extent.

Page 328

So it's problematic, is my bottom line.
Q. Do you have an opinion as to what extent, if any, online programs contribute to desegregation?
A. I can only say that they could be one component of a larger set of factors that would combine to desegregate a system, but as a sole or major factor for the desegregation of a system, they're just simply not -- not sufficient.
Q. You were asked a few questions related to an estimated overall cost of your proposal. Do you recall that?
A. Yes.
Q. You testified that you did not engage in any analysis of the total projected cost of your proposal. Does that sound accurate?
A. It sounds accurate that I could not come up with a figure. Yes.
Q. Is it possible for somebody with that expertise to calculate the estimated -- an estimated overall cost of the set of remedial proposals that you and Dr. Conrad have made?

Page 329

A. Oh, absolutely. That was, in fact, part of our calculus. The thing I could not do was come up with a single figure and was reluctant to come up with a single figure for the reasons I laid out.
But in calculating -- in developing the remedial proposal, we took into consideration in the broader strokes and certainly we're cognizant of cost, and so considered, for example, the kinds of savings that would come from ending a program one place, beginning in another, that is the prices -- the programs would not continue to cost the same at both places, talked about the fact that and thought through the fact that some revenues would be generated by the new program at an HBI.
And so literally did think through and consider, just in broad strokes, the financial implications of the plan, and the bottom line being that we're confident that it was feasible and that it was doable and that it would not bankrupt the system.
Q. You were asked a series of questions related to proposed transfers. Do you recall that?

Page 330

A. Yes.
Q. Okay. You and Dr. Conrad -- in your remedial proposal, you and Dr. Conrad identify a number of programs to be transferred from TWIs to the HBIs, correct?
A. Yes.
Q. Did your remedial proposal contemplate the transfer of programatic -- let's say short of the proposed merger, institutional merger, between University of Baltimore and Morgan State University, setting that proposal aside, did your remedial proposal recommend the transfer of entire niches of programs from the TWIs to the HBIs?
A. No, we did not.
Q. Why not?
A. Because we were cognizant of those issues of educational soundness, of what is indeed practicable, and we're trying to strike this balance where key and critical programs could be contributed to and help to build those niches at HBIs, but at the same time, avoiding completely gutting, for lack of a better

Page 331

technical term, the -- the niches or those program offerings at the TWI from which, say, a single program or a set of programs would be transferred out of a niche at that TWI.
Q. You were asked a series of questions related to changes made to the reports that you filed starting in May 2015, culminating in the July 6, 2016, report and submission.
Do you recall those questions?
A. Yes.
Q. Okay. To what extent, if any, did the changes to your reports alter your finding -- let me just start with that, alter your -- the findings of your analysis?
A. Not at all.
Q. To what extent, if any, did the changes that were made alter the recommend- -- the remedial strategy that you were proposing --
A. They did not.
Q. Let me finish the question.
-- to end -- to address program duplication

Page 332

in Maryland higher education and its segregative effects?
A. It did not.
Q. You mentioned you were aware -- you had an opportunity to briefly review the second expert report of Dr. Lichtman; is that correct?
A. Yes.
Q. With that, you were directed to a list of a number of asserted errors and consequential errors. Do you recall reviewing that?
A. I did take a look at those, reviewed them very closely and carefully in the first report and perused them in the second.
Q. Do you have an idea or an estimate of how many entries are reflected in the -- or programs, I can just say programs, are reflected in the 2014 updated program inventory that you and Dr. Conrad prepared?
A. I -- I estimate well in excess of 10,000 and perhaps as many as 15,000.
Q. Okay.
A. And closer to the 15,000. I think it's

Page 333

14,000 and some change, but...
Q. I just want to clarify for the record. You mentioned at one point that UMES -- and I would have to ask the court reporter to read this back to us for a precise statement of your testimony, but I believe you referred to UMES and Salisbury as a special case.
Do you recall --
A. Yes.
Q. -- saying that today?
What -- what does that mean?
A. It is a special case compared to the Baltimore region in the sense that we are talking in that region, in Eastern Shore, about two public institutions very close, albeit quite close to one another but competing with each other, versus Baltimore where you have many, many more competing in that same space, in that regional space.
Q. How does that -- to what extent does that -- do those facts, as you describe them, determine -- how did that influence your analysis of the -- the competition that all of the institutions, the public

Page 334

institutions, in Maryland have with each other for students?
A. Well, in the Eastern Shore, the competition between those two campuses, because of the fact that it is a regional competition and because of the fact that the two competitors, that there's a more limited number of competitors, those two campuses, and then I should say UMUC also, but the fact of the matter is that there were more opportunities for the University of Maryland Eastern Shore to carve out those unique high-demand, unique high-demand programs in that region, and, therefore, fair better in the competition with Salisbury than is true for Morgan State or Coppin or Bowie in the region where they are competing with such a -- with a much larger number of traditionally white institutions.
The bottom line is that how many opportunities are there for that HBI to carve out these distinctive areas that could identify the institution and attract white student enrollment.
Q. I want to return briefly to a few questions

Page 335

you were asked related to market demand and sources or materials you might have consulted in order to assess market demand.
Do you recall --
A. I do.
Q. -- your testimony related to that?
A. Yes.
Q. You indicated that you wanted to amend or correct one of your answers related to that question. Do you recall whether there was additional information related to the question about sources consulted?
A. I do. I remember when I was looking at the document to answer another question, I was reminded by a citation in this document on page 18. I just have to find the 18, page 18 in 406-2.
Q. Okay. So just for clarification, 406-2 then would be the May 2015 remedial proposal that you and Dr. Conrad submitted?
A. Yes, yes. And I was reminded that, as we were developing our proposal for the niches, that we did consult the U.S. Department of Labor, and the state

Page 336

of Maryland State Department of Labor projections of growth areas and fields and careers.
And I should say we did something similar -- and it's cited when one looks at Maryland Eastern Shore -- in our discussion of programs in terms of sustainability unless I am -- no, no, I'm sorry, not Maryland Eastern Shore, Coppin --
THE COURT REPORTER: I'm sorry, not what?
A. Not Maryland Eastern Shore. But when we were developing our proposals for Coppin and referencing the field of nursing, again, looking at some reports that projected growth in the field of health.
And I'm hoping my memory serves me correctly on the second point, but for sure on that first point on page 18, we, in developing that proposal for Bowie, referenced the Department of Labor statistics both for the state and for the federal government in terms of areas of growth.
Q. In terms of -- sorry.
A. I'm sorry.

Page 337

Q. No, I apologize. In terms of your remedial recommendations, you were asked a couple of questions related to core programs. Do you recall that?
A. Yes.
Q. To what extent, if any, do core programs offer desegregative potential?
A. As I -- as I shared earlier, very little, because they are programs that are required on each campus because they are part of the two-year general education curriculum, so those core programs offer minimal desegregative potential.
Q. Do core programs contribute to distinctive institutional identity at an institution?
A. Not really. Everyone has them.
MS. SHUM: If I could just have one moment to consult with my colleague. Can we go off the record for just a moment?
VIDEOGRAPHER: Going off the record. The time is --
MR. SMITH: No. I insist we stay on the record.

VIDEOGRAPHER: Going off the record. The time is 4:59.
(There was a brief recess taken.)
VIDEOGRAPHER: We are now back on the record. The time is 5:04.
BY MS. SHUM:
Q. Dr. Allen, I just have one other question for you. You talked about academic identity. You talked about the goal of your remedial proposal being to create academic identity at the HBIs separate and apart from race; is that correct?
A. Yes.
Q. What is -- to what extent, if any, do programs have in contributing to that academic identity?
A. Programs play a critical role in defining the distinctive identity of campuses and defining their academic identity.
MS. SHUM: Okay. I have no further questions.
REDIRECT EXAMINATION BY MR. SMITH:



Q. I have one question. You said that you took into consideration cost in terms of the programs that you recommended for creation or transfer at the HBIs; is that correct?
A. Yes, sir.
Q. Can you identify one single program that you either put in on account of cost or took out on account of cost from your proposal?
A. I'm thinking. There were several. And I'm just trying to figure out one that would be the best example. Well, the answer is yes, and I'll have to...
Q. Can you give me one example? One single example?
A. We had originally proposed or -- or meant to propose or considered proposing the relocation of -- oh, of course, I'm sorry. We removed an entire set of proposals that had to do with moving programs between the historically black institutions and Frostburg and St. Mary's, and then just decided that it was, with the distance, just prohibitive and just would not work.
Q. Other than St. Mary's and Frostburg, can



you identify any other program where you took cost into consideration and the program either went in on account of cost or was taken out on account of cost?
A. No, sir, I can't.
MR. SMITH: Thank you. No more questions.
VIDEOGRAPHER: This concludes today's deposition. We are now going off the record. The time is 5:07.
(Deposition concluded at 5:07 p.m.)



CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me.

Any additions or corrections that I feel are necessary will be made on the Errata Sheet.

______________________________
WALTER ALLEN, Ph.D.

______________________________
DATE

(If needed, make additional copies of the Errata Sheet on the next page or use a blank piece of paper.)

Page 342

ERRATA SHEET

Case: Coalition for Equity & Excellence in Maryland Higher Education, et al., vs Maryland Higher Education Commission, et al.

Witness: WALTER ALLEN, PH.D. Date: 09/08/2016

| PAGE/LINE | SHOULD READ | REASON FOR CHANGE |
|---|---|---|

Page 343

District of Columbia

Notary Public, to wit:

I, Christine A. Gonzalez, CSR, RPR, a Notary Public of the District of Columbia, do hereby certify that the within-named witness personally appeared before me at the time and place herein set out, and after having been duly sworn by me, according to law, was examined by counsel.

I further certify that the examination was recorded stenographically by me and this transcript is a true record of the proceedings.

I further certify that I am not of counsel to any of the parties, nor in any way interested in the outcome of this action.

As witness my hand this 12th day of September, 2016.

Christine A. Gonzalez, CSR, RPR

Notary Public

My Commission Expires:

February 28, 2019