**EXH. 02**



IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

COALITION FOR EQUITY AND
EXCELLENCE IN MARYLAND
HIGHER EDUCATION, et al.
Plaintiffs
vs. Case No. CCB-06-cv-2773
MARYLAND HIGHER EDUCATION
COMMISSION, et al.
Defendants
_______________________________/

The Videotaped Deposition of CLIFTON CONRAD, PH.D. was held on Tuesday, September 13, 2016, commencing at 9:02 a.m., at the Law Offices of Kirkland and Ellis, LLP, 655 Fifteenth Street, N.W., Suite 1200, Washington, D.C. 20005, before Christine A. Gonzalez, CSR, RPR, Notary Public.

REPORTED BY: Christine A. Gonzalez, CSR, RPR

APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:
BRENDA L. SHUM, ESQUIRE
GENEVIEVE BONADIES, ESQUIRE
Lawyers' Committee for Civil Rights Under Law
1401 New York Avenue, N.W., Suite 400
Washington, D.C. 20005
Telephone: 202-662-8600
Email: bshum@lawyerscommittee.org

ON BEHALF OF THE DEFENDANTS:
CYRIL V. SMITH, ESQUIRE
Zuckerman Spaeder, LLP
100 East Pratt Street, Suite 2440
Baltimore, Maryland 21202
Telephone: 410-332-0444
Email: csmith@zuckerman.com

(Appearances Continued on Next Page)



APPEARANCES CONTINUED:

ON BEHALF OF THE DEFENDANTS:
JENNIFER A. DEROSE, ESQUIRE
Assistant Attorney General
Educational Affairs Division
Office of the Attorney General
200 Saint Paul Place
Baltimore, Maryland 21202
Telephone: 410-576-6318
Email: jderose@oag.state.md.us

ALSO PRESENT: Allan Lichtman, Ph.D.
Eliza Spikes, Videographer



INDEX

Deposition of CLIFTON CONRAD, PH.D.

September 13, 2016


| Examination By: | | Page |
|---|---|---|
| Mr. Smith | | 6 |
| Ms. Shum | | 389 |

| Exhibit No. | | Marked |
|---|---|---|
| Exhibit 1 | November 8, 1994 Report by Dr. Clifton Conrad to United States Department of Justice | 6 |
| Exhibit 2 | January 1997 Journal Article | 6 |
| Exhibit 3 | Book Chapter by Paul Sum, Andrew Light and Ronald King | 206 |




VIDEO TECHNICIAN: We are now on the record in the matter of Coalition for Equity and Excellence in Maryland Higher Education versus Maryland Higher Education Commission, et al., in the U.S. District Court for the -- for the -- in the United States District Court for the District of Maryland, Case No. CCB-06-cv-2773.

Today's date is September 13th, 2016. The time is 9:02. This is the video-recorded deposition of Dr. Clifton Conrad being taken at 655 15th Street, Northwest, Washington, D.C.

My name is Eliza Spikes on behalf of Gore Brothers Reporting & Videoconferencing located at 20 South Charles Street, Baltimore, Maryland, 21201, Suite 901. The court reporter today is Christine Gonzalez, also from Gore Brothers.

Will all attorneys please identify themselves and anyone with them and the parties they represent, beginning with the party noticing this proceeding?

MR. SMITH: This is Cy Smith and with me is

Page 6

Jennifer DeRose and -- or with me are Jennifer DeRose and Allan Lichtman.

MS. SHUM: My name is Brenda Shum with the Lawyers' Committee for Civil Rights and with me is Genevieve Bonadies Torres on behalf of the plaintiffs.

VIDEO TECHNICIAN: Christine, may you please administer the oath?

PROCEEDINGS

Whereupon,

CLIFTON CONRAD, PH.D.,

called as a witness, having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

(Conrad Exhibits 1 & 2 were premarked for purposes of identification.)

EXAMINATION BY MR. SMITH:

Q. Good morning, Dr. Conrad.

A. Good morning, Cy.

Q. We met just a moment ago, but as you know, I represent the defendants in this case, and we're here to take your videotaped deposition under oath and the

Page 7

expectation that it may be played back to the Court at some point in the future in this case, and I know that you've had your deposition taken many, many times before; is that true?

A. It is.

Q. How many times would you say?

A. I'd have to look at my vitae to give you accurate, but many, many times beginning since the early 1980s.

Q. Dozens; is that fair?

A. Well, over a dozen, yes. Way over.

Q. So I know you're very experienced in this, but just so that we're clear, I'm gonna try and ask the questions to one at a time. I hope that they make sense. If they don't make sense, if you don't understand them, let me know, I'll try and rephrase them or restate them to you.

But if I put a question to you and I don't hear anything like that back from you, then I'll assume that you heard the question, that you understood the question, and that you're also doing the best that you

Page 8

can personally to give me a truthful, accurate, and a complete answer. Is that satisfactory?

A. It is.

Q. All right. You have in front of you what was marked as Allen Exhibit 1, and that's a collection of all of the various remedial reports that you prepared in this matter; is that right?

A. Yes.

Q. Okay. And the last one of them is dated July 6th of 2016, and then it has a supplementary or a clarifying letter dated August 18th, 2016; is that right?

A. Yes.

Q. All right. And are you -- do you consider that you're now done with your research and your explanation of the research and your opinions in this case, as set forth in your July 6th report?

A. I wouldn't want to preclude any further inquiry at this juncture. I would say for the most part that I -- that I am done, yes.

Q. Is there anything else you can identify

Page 9

that's yet to be done, data you haven't looked at yet but want to, issues you want to examine but haven't yet had an opportunity?

A. I think I always like to continue to look at information and reflect on it. I think searching for truth, if you'll forgive me for that use of language, but it's what I do. It's what I've been doing my whole life, and that means that inquiry never really stops. It's a kind of a never-ending experience.

Having said that, for the most part, is this the foundation for my testimony? Absolutely.

Q. Yes. And have you reviewed the report of Dr. Lichtman, who is with us here today?

A. I've begun to review it. I've skimmed it. We've only got it quite recently, and it's, as you know, a very lengthy report and will require a great deal of exacting scrutiny for the foreseeable future, and so I will continue to reflect on it. I've looked at it in a very general way. Yes.

Q. You received it two weeks ago; is that

Page 10

right?
A. It has been almost a fortnight ago. Yes.
Q. And have you read it?
A. I have skimmed it, would be the best way I'd put it. Once again, there is such a -- such a granular level in any many ways with respect to the numbers, the data, that will require a lot more scrutiny and -- and concomitantly reflection.
Q. Do you intend to publish any additional opinions or reports in this matter?
A. Not at this time do I have any plan on so doing.
Q. Did you review Exhibit 1 to Dr. Lichtman's 2016 report which sets forth a list of errata or corrections that he proposes to your report?
A. I only glanced at it. I noticed that there was a lengthy list, yeah. That's all I noticed. I did not, once again, look at it carefully.
Q. So you've not examined any of the particular corrections that Dr. Lichtman proposes to your report?

Page 11

A. I haven't examined them in depth, no, I really haven't.
Q. Did you learn from any source that at Dr. Allen's deposition last week, I asked on the record that you take a look at Dr. Lichtman's report in detail so that you could respond to his criticisms?
A. I -- I'm not aware of that.
Q. You did not learn that from any source?
A. I don't recall that at all. No.
Q. Did you review a transcript or have described to you the contents of Dr. Allen's deposition?
A. I have a copy of his deposition now, but I have not had the time to look carefully at it at all.
Q. When do you intend to take a closer look, if that's the right phrase, at Dr. Lichtman's report?
A. I -- I plan on doing it in the foreseeable future. Once again, it's gonna take some time because of the level of detail and the quantitative analysis and so on. So I see that as taking place in the next couple months. Yeah.

Page 12

Q. Is it accurate that from 1980 until 2010, you served as a consultant and expert witness to the Department of Justice and the Office of Civil Rights?
A. In the U.S. Department of Education, yes.
Q. And is it accurate that during that time you testified for the plaintiffs or for those who were seeking system-wide changes or, in some cases, less than system-wide changes in state systems of higher education?
A. I was asked to examine whether there were dual and equal systems in -- in quite a number of states, as you know. I can list them all. And I was just asked to do an inquiry.
Q. My question was whether you testified in favor of system-wide or less than system-wide changes on behalf of the plaintiffs in all of those cases; is that true?
A. Yeah, I wouldn't use exactly that language, but in general, yes.
Q. And is it true you have never in the course of your consulting or expert witness career found a

Page 13

state system of higher education to be a unitary as opposed to a dual system?
A. I -- I have been scrutinizing that for many, many years and really searching for what we call a unitary system of higher education, and I have continued to find that there is -- have been dual systems of higher education, continue to exist in all the states that I've looked at.
Q. So the answer to my question is yes, in every single case you have found there to be a dual as opposed to a unitary system?
A. I found -- I found there -- yeah, you could put dual and unitary on a continuum, not to parse on it so early in the morning, but some are closer than others and toward -- moving toward a unitary -- unitary system. I haven't done a study that compared and contrast where the respective states are, Texas, Oklahoma, Virginia, and so on, on that continuum.
Q. I didn't ask about the continuum. In each case, did you or did you not testify that the state system you examined was still dual in your opinion?

Page 14

A. I -- in every state, once again, I think I said that, but if I didn't, let me clarify. I have found dual systems in -- in all the states.
Q. I understand that you did some work for -- not for, but in connection with the state of Oklahoma; is that true?
A. I did.
Q. Okay. And when was that, approximately?
A. That was quite a few years ago now. The OCR involvement, for the most part, ended by 2007. Early in the 21th century, I began to get involved with OCR, especially after the Mississippi remedy in 2001, so I was in Texas and Oklahoma.
Q. From about '01 to '07 in --
A. In that area, yeah, roughly.
Q. Let me put the question out. Both of us should try --
A. Yeah.
Q. -- I should especially try not to talk over you.
A. No, my apology if I did.

Page 15

Q. Your work in Oklahoma was from approximately 2001 to 2007?
A. Approximately. I think you have a record of my vitae because I've testified in so many cases and situations.
Q. Yes. And who were you engaged by in that case?
A. Office of Civil Rights.
Q. All right. And what was the -- if I asked you for a two-sentence summary of your findings or opinions, what would it be?
A. In the state of Oklahoma?
Q. Yes.
A. I found that there were remnants of the former dual system, de jure system, dual system, and we were, in the case of Oklahoma, pursuing remedy when working with the state and two HBIs and so on, and the PWIs, when OCR decided to pull out of pursuing the -- these desegregation/segregation questions.
Q. So OC- --
A. Half a dozen years ago.

Page 16

Q. So OCR, your client, decided to terminate its -- its work in that case with respect to Oklahoma?
A. They did, yes.
Q. All right. And what was the geographic part of Oklahoma that you were looking at? For example, was it Oklahoma City, Stillwater, Tulsa? Do you recall?
A. I do. I don't recall all the detail, but certainly recall the -- for the most part, the institutions, the HBIs in all the states and many of the predominately white institutions or traditionally white institutions, as you call them, in -- in Maryland. The -- one of the areas that was a bit contentious was in Tulsa, where there was a campus of OSU, among others.
Q. Okay.
A. As -- along with Langston University had a campus there.
Q. And who was the -- if you recall, who was the head of Langston at that time?
A. The president of Langston University, I do

Page 17

not recall.
Q. Okay. If you recall, who was the head of -- I think you said Oklahoma State University?
A. I don't. David Boren, of course, is the president at OU, but I do not know the president at OSU.
Q. Did you have any dealings with or become privy to the work or the positions taken by the president of the OSU system, whoever that was?
A. I think you're referring to the Oklahoma system, are you, rather than the OSU system?
Q. So my understanding in Oklahoma --
A. Oklahoma State is a separate institution.
Q. -- is that Oklahoma State is a system under state law and that there's separately a University of Oklahoma system. Is that your understanding, or not?
A. I don't recall the government structure exactly.
Q. Okay. Well, regardless of what they're called, did you have any dealings with the person who was in charge of Oklahoma State?

Page 18

A. I recall there were representatives of Oklahoma State. I met so many college presidents over the years and so on, including in these cases and otherwise, I don't recall specifics. No.
Q. Do you recall what position, if any, Oklahoma State took in that proceeding, the one that you were involved in?
A. Well, there was -- there was some resistance to -- to us trying to negotiate a deal, I do recall that, and it all stopped so -- when OCR decided to pull out.
Q. I see. And were there any claims of -- well, strike that.
I understand that you've also done some work for the Maryland Higher Education Commission; is that correct?
A. I have.
Q. All right. And was it one project or two projects?
A. Well, they've -- they asked me to -- at least two. They -- they asked me to review a program,

Page 19

I don't even remember the specifics now, as to whether it was -- would unnecessarily duplicate a program at a traditionally white institution.
Q. Right.
A. That, I remember very well. That's the primary one. I -- I pause a second. It seems to me there was a second time, but I can't recall it right now. I certainly interacted a great deal ever since 1999 with the state of Maryland, including with respect to the partnership agreement that we wrote.
Q. Just focusing, if I might, on your work where you were retained by MHEC, so one project where you looked at whether there was unnecessary program duplication --
A. I'm sorry.
Q. -- and another project that you simply don't recall; is that right?
A. Yeah. I think there was another project that I do not recall at the present time. Yeah.
Q. Right. And in your analysis of the program duplication issue, did you provide any opinions about

Page 20

whether or not programs were likely or not likely to attract white students to HBIs?
A. Well, that has been a chartreuse thread throughout my testimony in Maryland and other states, where I have expressed my perspective on whether a program unnecessarily duplicates another program at a regional, for example, or a state-wide level.
I don't recall the specifics in the state of Maryland that you're talking about.
Q. Is it accurate to say that the thrust of your opinion in Maryland was that a proposed program by a so-called TWI did unnecessarily duplicate an existing program at an HBI?
A. Well, I helped write the partnership agreement, including agreements eight and nine, respectively, written in 1999, 2000, and in that document, we -- it was either number eight or number nine talked about how the state would not -- would not offer non-core programs, including especially high-demand programs, duplicated programs at the TW- -- at the historically black institutions for the --

Page 21

originally, it was over a five-year period, yeah, and then we had the discussion of the MBA program.
Q. Right. Going back to my question about the work you did for MHEC, and my question was whether the opinion that you provided to MHEC was to the effect that the proposed TWI program unnecessarily duplicated a program at -- an existing program at an HBI?
A. I -- I did suggest that it did unnecessarily duplicate a program, yes, at an HBI.
Q. Do you recall any other opinions that you offered to MHEC when you were retained by them in that instance?
A. There might have been, but I do not recall them at the present time. No.
Q. I understand from reading your CV that you have done a large number of both quantitative and qualitative studies in the field of higher education; is that true?
A. A fairly significant number of studies.
Q. Okay. I mean, do you take "large" as a pejorative?

Page 22

A. No, no. I think there are many in the field of academe who emphasize that number of publications, rather the quality of the work.
Q. Okay. But is it true, then, you have done significant numbers of both quantitative and qualitative studies?
A. It is. Over the last several decades, I've done more qualitative studies then I have done quantitative studies.
Q. Okay.
A. And I teach classes on qualitative research and write books on them and edit books on them and write on them sometimes.
Q. All right. What is the field in which you think your opinions in this case lie? What is the subject matter on which you think you have expertise and that you're offering your opinions?
A. I've spent over 40 years in being very curious about higher education writ large, including when my father was head of the state board of higher education in North Dakota. I've always had a long

Page 23

interest in higher education, and so I -- after spending an undergraduate, getting an undergraduate degree in history, I went on to political science and soc and -- sociology and then turned to higher education 'cause that's what I wanted to study.
And I -- I've been studying our colleges and universities, been to about 800 colleges, universities across the world and the United States over that period of time.
That's been my circumscribed area of -- substantive area, is the way you asked the question, interest in -- in higher education, and more specifically, I've obviously been very interested in academic programs, teaching and learning across -- across many, many fields of study.
I've done it at the graduate level, at the undergraduate level, written books on both the undergraduate level, on undergraduate education, liberal education, graduate education at the master's, Ph.D. level and so on, and done -- done really national studies, including -- and including --

Page 24

Q. Respectfully, Doctor, I understand you have a lot of experience. My question was: What are the specific fields that you think you have expertise in and in which you are offering opinions in this case? I understand one of them is higher ed.
A. Higher ed, desegregation writ large. I think I have nearly four decades experience reflecting on segregation/desegregation --
Q. What else?
A. -- in higher education.
Q. What else?
A. Well, again, I could go on and on. But among other things, I have an obvious interest in methods, including qualitative methods.
Q. Okay. So higher education?
A. More recently. But certainly, I have a background in quantitative methods.
Q. Okay. So to be clear, the areas in which you think you have expertise, in which you propose to offer opinions, are higher education and desegregation of it, qualitative methods and quantitative methods; is

Page 25

that fair?
A. Yeah, I'd -- I'd emphasize the qualitative methods over quantitative methods, given my work in the last 20 years and the courses I teach, but...
Q. Okay. Anything else? Any other areas that respond to my question --
A. Well, I --
Q. -- about what you have expertise in and what you propose --
A. Yeah.
Q. -- to offer opinions in, in this case?
A. No, I understand your question. Higher education is a pretty broad term and can include an awful lot of territory, pretty much 48 or 50 states, if you forgive me.
Q. We can agree that there's 50 states, plus the District of Columbia.
A. Plus the District of Columbia. Thank you very much.
Q. All right. I want to ask you first about qualitative studies and ask you whether there are any

Page 26

particular authorities in the field that you recognize on the design and use of qualitative studies?
A. Oh, there are many, many people. I could go on and on.
Q. Why don't you name me the top three?
A. I -- I don't rank people like that. I think people have different areas of expertise. I know Yvonna Lincoln very well, have great respect for.
THE COURT REPORTER: I'm sorry, who?
Q. Who?
A. Yvonna Lincoln.
Q. How is Yvonna spelled?
A. I'm sorry?
Q. How is Yvonna spelled?
A. It's Yvonna, Y-V-O-N-N-A, Lincoln.
Q. Okay.
A. Has written many books, has used -- I still use as supplementary reading, John Creswell's book on qualitative methods. C-R-E-S-W-E-L-L.
Q. Okay.
A. I have always had great respect for John --

Page 27

John Bean, professor at Indiana University for many years, who stepped down a year or two ago, and his written on qualitative research.
Q. And how has Mr. Bain's --
A. I'm sorry. It's Bean, B-E-A-N.
Q. Okay.
A. Forgive me. Yeah.
Q. Thank you. What about Professors Corbin and Strauss? Do you recognize them as authoritative in this field?
A. I do. Corbin and Strauss had a split many years ago. So I was one of the first people to use grounded theory, the (unintelligible) of their work, but many years ago.
Q. Right. And when they split, it was Professors Glaser and Strauss; is that right?
A. Glaser and Strauss, yeah.
Q. And do you recognize Glaser and Strauss also as being authoritative?
A. Yeah. They have different ways of looking at qualitative research, and -- and they had very

Page 28

severe differences that began to exist three decades ago. So that can happen. One became much more committed to the rules of qualitative research and the other one viewed research in a much more open-ended way, so...
Q. What about Professor Yin, Y-I-N? Do you recognize his work as --
A. Yeah, I --
THE COURT REPORTER: Excuse me.
Q. You need to let me finish the question, and I'll let you finish the answer.
A. I'm sorry.
Q. Do you recognize Professor Robert Yin as being authoritative in the field?
A. I know his work, including his work on case studies. "Authoritative" is a pretty strong word. I -- I think his work is quite acceptable and helpful. And in my 100-page syllabus, I'm sure I recall that I've listed his work, along with the other aforementioned names.
Q. And when you say in your syllabus, you mean

Page 29

that you have assigned Dr. Yin's work for reading by your -- let me finish the question -- by your students so that they can learn about qualitative methods; is that fair?
A. I haven't used Yin very much, no. I don't think I -- I mentioned it as a reference because I want to be inclusive. So I put a lot of potential sources at the end of my syllabus, and I certainly think that I mention him. I am familiar with his work.
Q. Okay. What about Professor Douglas Toma? Do you know that name?
A. I do, yeah.
Q. And do you recognize Professor Toma's work as authoritative?
A. I think -- I think he does quite good work. Yes.
Q. And therefore, his work is authoritative, or no?
A. I don't think with academics it's an either/or. I think I have put them on a continuum in terms of the work that I really respect, and I will

Page 30

continue to do that. So I don't put people in sort of a dualism, they either are or aren't authoritative.
Q. Yeah. Didn't you edit a book in 2011 on research and educational matters?
A. I think the -- I did the big Sage Handbook on research, both a quantitative researcher, Ronald Sirwin -- Serlin, rather, in ed psych, then at the University of Wisconsin, and I did kind of a great big Sage Handbook on research.
We published it originally in 2004, and then they did a big second edition. So Sage Publications does many, if not most, of the major texts in field of education on qualitative research.
Q. Right. My question was: Did you edit a book that was published, first or second edition, in 2011 on qualitative and quantitative methods in educational research?
A. I did, yes.
Q. Okay. And isn't it true that you selected a chapter in it that was published by and written by Professor Douglas Toma?

Page 31

A. I do. I remember now, yes.
Q. Okay. And in light of that, because you chose to put one of his chapters in your book, would you recognize his work as authoritative?
A. As authoritative? I would recognize that work as illuminating and very helpful, and I respected it, and yeah.
Q. What about Professors Marshall and Rossman? Are you familiar with their work?
A. Just very generally. I haven't looked at it for a long time.
Q. Okay. You know that Professor Toma cites them in the chapter -- his chapter in your book? Did you know that?
A. He cites them, did you say?
Q. Yes, uh-huh.
A. I don't remember a recitation reference in a book as large as the Sage Handbook.
Q. What about Professors Miles and Huberman, H-U-B-E-R-M-A-N?
A. Yeah.

Page 32

Q. Are you familiar with their work?
A. Yeah.
Q. And do you consider them to be accomplished in the field?
A. I -- I view -- I think very well of them, and I may have used -- I think I used one of their books awhile back.
Q. Okay. And you mentioned Professor Creswell, and you've actually assigned his book not just on the syllabus but as a teaching materials in your class, right?
A. As I said earlier, supplementary material, yeah.
Q. Listed as reading that you would like your students -- let me finish -- you would like your students to undertake so that they might better understand the field; is that right?
A. Yes.
Q. Okay. And you know that Professor Creswell cites both Professor Yin and Professors Marshall and Rossman in his book; is that correct?

Page 33

A. I'd have to go and look once again. That's at a granular level. So, yeah, it would not surprise me in the least.
Q. And just so we're clear --
A. That's it.
Q. -- handing you -- maybe just hold that up to the video. What's the title of the book I handed you?
A. It's the "Qualitative Inquiry & Research Design."
Q. By?
A. John Creswell.
Q. By John Creswell. And that's the reading, or rather the book, that you've assigned to your students, I guess, as recently as this summer; is that right?
A. This summer and this fall, uh-huh.
Q. Okay. And you think -- you told me, I think earlier, that you consider Professor Creswell to be an authority in the field?
A. I think very highly of John, and I think

his work has been helpful. Do I agree with every one of these authorities or putative authorities on every occasion? No. But that doesn't mean I don't have great respect for them, including John.

Q. And would it surprise you to know that Dr. Yin's work is cited repeatedly throughout Dr. Creswell's book, the one that you're holding and that you assign to your students?

A. No, I think I know that. Yeah.

Q. I want to ask you some questions about -- and you can put that down, if you'd like, sir.

A. Oh, okay.

Q. I want to ask you some questions about the principles that govern the creation and the analysis of a good, high-quality qualitative study, and particularly a qualitative study that seeks to apply its findings to generate policy.

Are you with me on what I'm talking about?

A. Yes, I think so. Yeah.

Q. Okay. Would you agree with me that it is recognized in the field that qualitative studies of the



type that I've described have to meet tests of reliability and validity?

A. Well, its -- sure. That's a corner -- two cornerstones that we use.

Q. All right. And would you agree with me that another two cornerstones for qualitative studies are the test of objectivity and generalizability?

A. Well, there's generalizability. It's something that I always try to do, insofar as I can. We have -- there's been a never-ending, never-ending discourse on whether objectivity can be fully realized, whether it's with numbers or otherwise, including qualitative research. I think -- I think -- so I view that as really a kind of continuum.

I -- I do think the search and the attempt to be as objective, open-ended, and fair-minded is -- is what the cornerstone ought to be, and it's certainly something that I place at the epicenter of my inquiry and emphasize to students to try to be as rigorous as you can, along with being creative and thoughtful in the pursuit of ideas.



Q. What are some of the challenges that a qualitative researcher faces in terms of trying to be objective in the way you just described?

A. The -- there -- there are challenges just like there are challenges for quantitative researchers, including those who use questionnaires and all sorts of data. The most formidable challenge or one of the most formidable challenges is -- is -- is getting people, inviting people, encouraging, supporting them to be not only thoughtful but authentic in expressing their perspective.

And it's something that I strive for again and again, whether I'm interviewing -- and I've interviewed hundreds and hundreds and hundreds of people over my career, trying to get at the heart of their particular perspective.

And this can also be a focus group, as it is on some occasions and -- or with individuals. And so I think for me it's kind of an ongoing challenge and one that really, really high-class scholars, who are really robust scholars and take their work seriously,



strive to do is -- is to be fair-minded and continuing open.

Now, how close can you get to objective? I like to strive to get as close as I can to be objective and fair, and that means that I use various methods to try to -- to try to push and make sure that I'm getting people to speak, encouraging them and supporting them to speak authentically, whether it's college students or administrators or faculty or whoever it is that I'm interviewing, staff.

Q. Okay. Are there any other challenges to achieving objectivity besides what you've just described to me, in qualitative research?

A. I think the biggest challenge, one of them, is questioning yourself, and I found with many academics, along with many college-educated people, who have a conspicuous absence of questioning themselves, what they're finding and so on. And if you put that questioning, continually questioning yourself and others at near the epicenter or at the epicenter of your inquiry, I think that it does greatly enrich the

Page 38

-- in the end, the validity of the study.
Q. All right. I was asking you about whether both objectivity and generalizability were cornerstones. We've talked about objectivity.
A. Yeah.
Q. Would you agree with me that generalizability is also a cornerstone for a high-quality qualitative study that seeks to generate conclusions that can be used for policy?
A. Yeah, be careful with that. With respect to policy, you certainly want some generalizability. I think you have to be very careful. It's a formidable challenge. Sometimes generalizability can have all sorts of implications for your -- for you sample, who you're interviewing and so on.
So if you're in the southwest part of Mississippi, you have to be careful not to think, "Well, this may not apply up there in Maryland" and so on. I think you get my drift. I hope I'm being clear. And so you need to -- may need to sample people from other states, other settings, other institutions,

Page 39

people of different racial backgrounds, ethnic backgrounds and so on.
Q. Are you familiar with the term that Dr. Creswell uses of "purposeful maximal sampling"?
A. Yeah, I vaguely remember. Yeah.
Q. What's your understanding of that term?
A. I'd -- I'd have to look at the precise language that John uses in here.
Q. And let me just offer you a definition --
A. Okay.
Q. -- and let's see if we can use it as a frame of reference.
A. Yeah.
Q. When a sample is chosen for a qualitative study, looking for cases that show different perspectives on the problem or the issue that's being examined.
A. Yeah.
Q. Does that seem like a reasonable definition to you?
A. It's more than reasonable. I place great

Page 40

value on it, seeking different perspectives, and that's what I try to do, including in this work.
Q. Okay.
A. That's why I'm an academic.
Q. Okay. Are you familiar with the term "confirmation bias"?
A. Yes.
Q. What is that?
A. It's people who are fond of self-fulfilling prophecies, to put it in everyday language. They find what they expect to find.
Q. And do you consider that term limited to people who -- who purposefully seek out confirming evidence or people who unconsciously and without intent may look for evidence or seek evidence or find evidence that they think confirms a certain thesis?
A. Yeah, I like -- I like the way you put both groups. I most assuredly think that includes both groups. I think that's an excellent point, uh-huh.
Q. Would you agree with me that it's important in doing high-quality qualitative research, especially

Page 41

if it's gonna be used for policy purposes, to avoid confirmation bias?
A. That's one of the single most important things, and it begins with self-awareness. Yes.
Q. And is it -- is it accurate to say that there are lots of other potential sources of systemic bias in the design and analysis of qualitative studies, not just the confirmation bias, but the other sources of systemic bias?
A. Absolutely.
Q. And that it's important to guard against those when performing this study or analyzing it?
A. I couldn't begin to emphasize the importance of that.
Q. And would you agree with me that it's particularly important to guard against these forms of systemic bias when a source or the principal source of data in a qualitative study or findings is interviews with human subjects?
A. You have to be very mindful of it. Yeah.
Q. And I've read that in qualitative studies

Page 42

the interviewer is sometimes described as the instrument; is that accurate?
A. Yes.
Q. And he --
A. Can be an instrument. And that's why people, like myself, who I hope try to be extremely self-reflective, I'm always questioning myself. So if I'm involved in a study of master's degrees and interviewing a grand total of 781 people, 47 master's programs, I'm -- I'm continually sifting and winnowing, as we call it at the University of Wisconsin. I'm questioning what I found.
Q. And in your study of individuals who are getting master's degrees, how many people conducted the interviews there?
A. How many people? We had three actually, four of us in that national study. I did more than anyone else by a good -- by a good distance.
Q. All right. And did you do those interviews yourself, solo?
A. No. Sometimes we did a lot of group

Page 43

interviews, focus group interviews, individual interviews. It was quite a combination.
Q. And I'm sorry. My question wasn't -- wasn't clear. I understand some may have been individual interviews, some may have been focus groups, but did you -- when you did them, was it a single experimenter or academic who was doing the questioning or leading the focus group?
A. Yeah. At the time, I can identify the four people, the three people other than me. One was an anthropologist, Susan Millar, who got her Ph.D. at Cornell, who was very helpful, very accomplished qualitative researcher. Another was Jennifer Grant-Hayworth, who was a Ph.D. student and well on her way to a Ph.D. at that point. And then there was another woman Karen, who -- who I don't think she did very many interviews, as I recall. I'd have to think back on it.
Q. Right. And I'm sorry. My question must not have been very clear, and I apologize. It was whether when you did the individual interviewers or the

Page 44

focus groups, was there only one researcher involved or two or more?
A. There was -- sometimes there was one, a lot of -- a lot of times there were two, and I think there were a few occasions when we had three.
Q. Okay.
A. So there was a lot of variance, which is one of the ways that I like to help control for what you call bias, systemic or otherwise.
Q. And -- and why would the presence of sometimes one additional researcher, sometimes two or even -- I think you might have said all four, why would that help control for some of these sources of systemic bias?
A. I think because you're analyzing the data together, you're analyzing the way questions get asked, the way they're posed, and if you work with people who embrace collaboration, that is to say, learning with and from one another, then you're continually questioning yourself, and -- and I think it can be very helpful.

Page 45

You'll questions like, did you hear that person say such and such and get the response of one or two of the people, depending on how many other people are in the group. So it -- it can be very valuable. Sometimes it has pluses and minus.

Sometimes I like a single interview. And, for example, to illustrate the point -- forgive me for going on -- some of the best interviews I've had is where I get people out of a room like this or in another setting and walk across a mall on a campus, where people feel much more relaxed than they do in a more formal setting like a classroom.
Q. I see. Speaking of, I think you said a moment ago questioning yourself. Would you agree with me that for a high-quality qualitative study that the investigator when he reports the results of his or her study, that he or she should explicitly identify all of the biases or any preconceptions that he brings to the analysis; is that fair?
A. I think -- I think you see that very rarely, that people are open and transparent about who

Page 46

they are and how that may affect the study.

In fact, one of my favorite pieces is one that I happened to write with the help of Susan Millar. It's in the appendix of the 1993 Johns Hopkins book called "The Silent Success, Master's Education in the United States." There's an appendix that goes in a position subject, and that talks about the importance of identifying who we are, how that -- you know, and -- and giving the reader a good sense of -- of who you are. And so we wrote that.

I've used that as a -- as a methodological or positioning in studies. Sometimes when I talk about method, I begin by talking about position subject and in turn positioning myself, for example, in the book. Early in the book --

Q. Can we --

A. -- under the methods chapter, we talk about --

Q. Doctor, my question was whether -- I understand it can be difficult. But my question was whether the researcher should explicitly identify the

Page 47

biases that he or she brings to the subject. Understanding it may be difficult to make that happen, but should the person do it, as a matter of best practice?

A. I wouldn't -- this is -- talking about best practices can be very tricky, as if there's a single algorithm. I -- I -- I think, for example, it may depend on the context, and I like doing it most of the time. I invite students to do it. Would I say that it's required to ensure that the study is objective, quote/unquote, to use your word?

I think and believe strongly that quantitative, as well as qualitative researchers, would be well-advised and very thoughtful if they were to give the reader a sense of who they are and their interests in the domain of inquiry, and some of those qualities of mine that may have influenced the way the conduct -- that they conducted their -- their inquiry.

Q. And in terms of being well-advised to say who they are and what their interest is in the subject, does it make sense that the researcher should identify

Page 48

prior work that's been done in the area by the researcher, any previous opinions that he or she has expressed? Does that make sense?

A. Well, yeah. It depends on the context. In the context of this particular case, I think my involvement in this is pretty transparent, including on my vitae, so I saw no need to position it.

Q. I'm asking now about principles. Let's get away from this case and let's talk about the standards that you might teach to one of your graduate students or that you might use to distinguish okay from -- from good or high-quality work.

My question is whether it would be well-considered in the field for the researcher to identify prior opinions that he has expressed, prior work that he's done on the particular subject? Does that make sense?

A. Yeah. I think it can be very helpful. It's not a requirement. I'd say it can be helpful to be illuminating.

Q. Are you familiar with a principle of

Page 49

reflexivity?

A. I would hope so.

Q. Okay.

A. I believe so.

Q. And do you believe that that principle --

A. I would encourage --

Q. I just asked if you familiar with it.

A. Yeah.

Q. All right. And would you agree with me that the principle of reflexivity should apply to a high-quality qualitative study?

A. If there was a single principle that I would put right at the top of the list, it would be reflexivity. And giving a bit more precision to it, I think I would call it self-reflexivity --

Q. All right.

A. -- not only reflexivity on others but on one's self, in how one's self may have -- may or may not influence the inquiry.

Q. Okay. You mentioned a moment ago -- you mentioned a moment ago something about avoiding

Page 50

self-fulfilling prophecies. Did I hear you correctly?
A. Yes.
Q. Would you say that that's an important thing for a researcher to do?
A. Yes, extremely important.
Q. Would you agree with me that it's dangerous to come into an analysis of any kind with a predetermined view about how the analysis should turn out?
MS. SHUM: I'm gonna object as to form.
A. Use the word "dangerous." I think it's anti-intellectual, anti-method, yeah.
BY MR. SMITH:
Q. I'm fine with those as well. Would you agree with me that an investigator performing a high-quality study should also seek out negative cases, negative information, negative evidence?
A. I do, and I do it all the time.
Q. Okay. And separate from that, would you agree that it's a standard in the field as well that the researcher should explore all plausible rival

Page 51

explanations for the phenomenon that's being studied?
A. Absolutely. Indisputably.
Q. Okay. And would you also agree with me that if an investigator focuses early on on a single explanation, that that can be a, if you will, a harbinger of bias?
A. Absolutely.
Q. And would you agree with me that especially when an interviewer is working with human subjects, for example, one-on-one, that it's very important to avoid a situation where the answer is suggested to the subject?
A. Absolutely. That's what disturbs me about any survey instruments, if I may add that to the discourse.
Q. Okay. That's fair.
A. My voice is not invited into the five choices I have on most of the survey instruments I receive, including from academics.
Q. And I take it that you are very familiar with the concept of a purposive sample when selecting

Page 52

interviewees or selecting subjects?
A. Yes.
Q. And how would you in two sentences define a purposive sample?
A. It's -- it's a sample that is appropriate given the burning question or research question that I'm addressing, that there is a very good, strong, robust fit between the two, the (unintelligible) purpose of the study or overarching, once again, burning question.
Q. And I'm not sure I totally got that. You said that a purposive sample is one that's appropriate to the burning question that you're looking at and what? What else?
A. Well, I think that's the most --
Q. A fit, and I'm trying to understand what the fit is to.
A. You're trying to understand what the fit is?
Q. I just didn't follow your earlier answer. Let me try and restate it, and you tell me if I got it

Page 53

right --
A. Okay.
Q. -- or wrong. So if I heard you correctly, a purposive sample is one that is well-fitted to answering the question that you're trying to address; is that right?
A. Correct. Uh-huh, yes. I mean, that's how I would define it generally.
Q. All right. And when -- when a researcher takes a purposive sample, is it accurate to say that a high-quality study should explain why choosing that particular sample was done and why the choice was made to exclude other types of samples?
A. I think in general, yeah, justification for the sample is important. There are lots of constraints in academic journals, including the length, the perspectives of the reviewers and so on, so that even why we have these -- have these -- often have these thresholds, including the ones we've been talking about, one can't always address them in a, for example, in a scholarly publication, where the reviewers have

Page 54

their own biases and editors.
Q. I understand. And what you've just been describing are the types of constraints that exist in academia when you're submitting something for publication and for peer review and so on; is that right?
A. Yeah. I think, for example, that, as John Bean once put it, some of the reviews get caught up in the web of methodological correctness.
Q. Okay.
A. Instead of, for example, being -- being very pleased with the researcher who shows -- who communicates who he or she is, as in a position subject approach.
Q. Well, do you think there is a value in having peer-review refereed journals?
A. Oh, sure. Yes, absolutely.
Q. Okay. And what is that value?
A. It's having other perspectives to look at the inquiry and judge -- judge the work.
Q. All right. And would you agree with me

Page 55

that that other -- those other perspectives are more likely to be candid and searching if the peer reviewing or the refereeing is done blind, that is to say, the name of the reviewer is not known to the person who sends in the thing?
A. I don't have a correlation coefficient on that. I -- in general, yes.
Q. Okay. We've been talking a little bit about choosing samples. Would you agree with me that it's important in doing a high-quality study to avoid selection bias in choosing the sample that you examine?
A. You do the best you can to choose the sample that you think is responsive to the question you're posing and will invite diversity of perspectives.
Q. And have you heard of the concept of choosing cases with outcomes on the dependent variable? Is that a concept you're familiar with?
A. Well, I wouldn't use quite that deep -- quite use that language.
Q. Okay. Is there better language that's

Page 56

suited to a qualitative study than choosing on the dependent variable?
A. Well, it -- it depends what your dependent variable is. I can give you lots of -- lots of examples. I mean, it depends. You know, if you're in the political venue, like Dr. Lichtman is, you use dependent variables all the time, like voting Democrat, voting Republican and -- and so on.
And so we do use dependent variables all the time, including what I did in some of the work here, including what attracts white students to traditionally black institutions in the state of Maryland.
Q. All right. But I'm really now talking about principles, okay, that apply generally to the field, and we're talking right now about qualitative studies.
And would you agree with me that it's important not to select a sample that is chosen based on the dependent variable, the thing that you're trying to study?

Page 57

A. That -- I'm not very clear on your question. I'm sorry. But it's -- I've never heard a question posed quite like that before, be perfectly honest. I want to be helpful, but...
Q. I understand. Are you -- have you seen literature, for example, that cautions against selecting the population or the sample of people to be examined based on the outcome or the dependent variable?
A. Oh, based on the outcome?
Q. Yes.
A. Based on the outcome?
Q. Yes.
A. Called selection bias, yeah.
Q. Selection bias. Okay.
A. Yeah.
Q. And that's a bad thing?
A. It is a bad thing. Yes.
Q. Why is it bad? Why is it bad?
A. 'Cause you're perpet- -- you're engaged in the self-fulfilling prophesy.

Page 58

Q. Okay.
A. Called self-fulfilling. It's circular reasoning. People do it all the time.
Q. Okay. And is the corollary to that that it's best to compare not just those chosen based on the dependent variable, to compare them with additional cases that are not selected on the basis of that?
A. For the most part, yeah.
Q. And is it accurate to say that this problem of selection bias can show up, first of all, in study design but also in terms of the phenomena that one chooses to investigate? In other words, defining the terms or the terms of reference for the study?
A. Yeah, I think that's fair.
Q. And is it true that selection bias, like confirmation bias, can show up unconsciously even if there's no intent or effort by the investigator to do anything other than a careful job?
A. I -- I think it's very widespread, given the absence of self-reflexivity that we earlier discussed, even among academics, who seem to be

Page 59

uncompro- -- uncompromisingly unaware of their predispositions.
Q. All right. In light of all these issues that we've been discussing, would you agree with me that there are many, many techniques for increasing the accuracy and the reliability and the validity of the qualitative studies that are accepted in the field?
A. Yeah. There are different ways of going out, conducting inquiry. John does the fab five, here, approaches. Yeah, they're different -- different approaches to inquiry, different methods. Yeah, there's a lot of variance.
Q. Okay. But to increase accuracy and reliability and validity, would you agree with me that, for example, peer debriefing or external audits of methodology and data, those are one way of increasing the reliability, the accuracy, the validity of a qualitative study?
A. Certainly they can be helpful, yeah.
Q. And are you familiar with the concept of member checking?

Page 60

A. I'm -- I'm acutely aware of it. Yes.
Q. Okay. Is that another technique used to increase accuracy and reliability?
A. I -- I use it all the time, and it's very closely tethered self-questioning.
Q. Okay. And is another technique to increase accuracy and reliability having a complete audit trail of the methodology and the data that are used in the study?
A. Well, that, yeah, it -- it is a technique, and it can be helpful. Yeah.
Q. And would a complete audit trail include retaining the underlying data with the findings that the study is based on?
A. I guess I've never heard the term "complete" audit trail, but -- coupled that way, but that in general would make sense. Yeah.
Q. And would a complete audit trail include the method used to code or to classify --
A. Yeah.
Q. -- the responses to the interviewer's

Page 61

questions?
A. Yeah. There's quite a debate in the field over coding. I have the debate with my colleagues. I have it with students. I'm on a Ph.D. committee about once a month. We discuss whether a candidate did or didn't use NVivo, for example, coding.
And there are different ways of coding, and some ways appear to be much more technical. I code for ideas, and we call them, if you'll forgive me, Cliff headers, where you come up ideas. For example, what's attracting white students to historically back colleges and universities.
And so there are different ways of coding. I think sometimes feel, people feel that it's more rigorous if you use a formal coding, but that's a predisposition that they have, and I've -- I've actually had engaged in different ways of coding, including with a grad student a couple years ago, where we compared my Cliff coding mechanism with his using formal NVivo techniques.
THE COURT REPORTER: What? I need you to

Page 62

spell that.
THE WITNESS: NVivo. N-V-I-V-O.
Q. I understand there might be different ways to code, but would you agree with me that it's accepted in the field for a high-quality study that the methodology used to code the answers should be fully disclosed to the reader?
A. Well, I think it kind of -- it depends on the vehicle, where you're publishing it. It certainly can be -- can be helpful. I don't -- depending on the context, the -- there's debate in the field, I think where sometimes we act as if there are universal standards, and I think there is a lot of variance. Some reviewers -- and I've had this comment before -- occasionally would say, say a little bit more about your -- your coding technique and so on.
The -- there are people who do qualitative research who are more predisposed to technique and following a specific set of rules and others who follow or emphasize different rules, like self-awareness, self-reflexivity, member checks, questioning

Page 63

themselves, you know --
Q. I understand. So I understand that's variable. Putting aside whether the entire coding protocol is published --
A. Yeah.
Q. -- with the review or the research, should the entire coding protocol be available for somebody who wants to check the accuracy or try and replicate the study or review its methodology?
A. Well, that -- that's an ethical issue too. Certainly, you can't often provide transcripts of interviews that you took, they're done in private, and so -- and I'd have reservations about that anyway some of the time. So I --
Q. Put aside transcripts. Let me just be very specific. If you put aside transcripts, the method by which the transcripts were coded, the method, should the methodology be available to someone who wants to replicate the study or analyze it?
A. Well, the methodology should be certainly very clear. Do I think that the coding technique needs

Page 64

to be incorporated in that all the time? I do not, no.
Q. Okay.
A. Because there are so many different ways of coding, and once again, I engage in this debate with my colleagues and in other departments --
Q. I think you've answered my question.
A. -- at the university. Thank you. I'm glad I did.
Q. Okay. Okay. And by the way, you said there might be concerns about privacy and confidentiality. It's possible to redact or black-out identifying information from a transcript, right?
A. Well, it is, but if you're studying different institutes, for example, or different programs, I think that could be very -- often, can be very ethically problematic, and I am very, very, very careful about the integrity of my work.
Q. All right.
A. And protecting the voices of those who have been willing to share, speak openly.
Q. Are you familiar with the concept of

Page 65

triangulation as a method of increasing reliability and accuracy?
A. Yeah.
Q. All right. And do you agree that that is one technique that is accepted in the field for increasing the reliability and accuracy of qualitative --
A. Yes.
Q. Let me finish. -- qualitative studies?
A. Yes.
Q. The answer's yes?
A. Yes, triangulation, important.
Q. All right. And would you agree with me that another technique that's accepted in the field is to have multiple transcribers to check the accuracy of how the data, or rather, of how the responses are being recorded and reduced to writing?
A. Well, that can get quite expensive, and that's done relatively rarely.
Q. Because of expense?
A. Part of expense, and I think there are far

Page 66

more critical considerations than that.
Q. What about when the actual coding of a transcript is done, would you agree with me that it is a preferred practice to have multiple coders and to seek a high level of agreement between them in how responses are coded?
A. Sometimes you who've done -- one person who's done the study. I've actually done a lot of studies with other people, often where I've taken the lead, and I have very much appreciated for purposes of advancing triangulation, and what some of us call trustworthiness in the field, including John Creswell, to have multiple people look at the transcripts.
Once again, they can code in different ways. I referred moments ago to a grad student and I doing some different coding on different transcripts of the study we did in minority-serving institutions several years ago, and it was -- I think it can be very helpful to compare and contrast what your findings are respectively.
And do I think you always have that luxury?

Page 67

I don't. But it can be very helpful, and I've done it in the three-year study of minority-serving institutions I've mentioned that was published last year. I've done it in aforementioned master's degree, national studies, where we had people look across transcripts, and it's called comparing and contrasting from different perspectives and --
Q. Is there a benchmark?
A. -- I found it valuable.
Q. I'm sorry. I didn't mean to interrupt you.
I've read a benchmark, I think, in Dr. Creswell's study, but it could be somewhere else, a benchmark of seeking 80 percent agreement between different coders on a given transcript. Is that benchmark familiar to you?
A. I -- I read that benchmark, benchmark.
This is how sometime numbers people, quantitative people, kind of co-opt the terrain even of qualitative researchers. I'm uncomfortable with a particular percentage. I would say somewhere between 82 and 85 percent, if you'll forgive me, and my point is that

Page 68

you really need to have -- I would actually use a higher standard, where I'm comparing, contrast with somebody else on the trends on a transcript, and you're going back and forth.
And I think in my work I've used a much higher threshold than that, namely, do we basically agree with the finding, whatever that particular finding is, such as -- I could give many examples.
Q. I'm sure you could. Would you also agree with me that it is accepted practice in the field, particularly if seeking to generalize the results of a qualitative study for policy purposes, to seek replication of those results and to run the study on a new population in a new context?
A. This is a part of sifting and winnowing.
And what I love about this work, we're continually sifting and winnowing. What we're doing is generating hypotheses and developing them and further testing them.
And the same with quantitative fields, like with respect to climate change, we're seeing a robust

Page 69

national debate, study after study, where people are continually sifting and winnowing, trying to get a good sense about the danger and potential timetable for severe climate change.
So it -- it -- for me, it's a never-ending process. That's why I don't give answers with messianic certainty. I give kind of working hypothesis. If there's a lot of -- there's some data that supports it, I've been sifting and winnowing, and at this point, that's -- these are the findings.
Q. Well, first of all, with respect to your opinions in this case, do you consider those to be working hypotheses?
A. I do. They're never-ending hypotheses.
It's like a grounded theory.
Q. All right. And secondly --
A. I've been working on it for many years.
Q. I understand. And secondly, to go back to my question, whether it is accepted practice for a high-quality study that one seeks to apply in a different context, to seek replication of the results

Page 70

with a new population in that new context.
A. Yeah. Absolutely, I think. It's called further testing. It never stops.
Q. Okay. And I've listed or we've talked together about maybe not quite a dozen but at least a half dozen methods of increasing reliability and accuracy and validity of qualitative studies.
Would you agree with me that for a high-quality study and particularly one that you seek to generalize, it's advisable to use as many of these techniques as time will permit?
A. Well, I wouldn't quite come up with a universal. I think given the study that you're -- you're conducting, it may depend if you're doing an initial study, you may use less of these -- these -- if you're doing a study that has been conducted by you and others or a line of inquiry, you may -- you may be doing further testing, like with respect to climate change.
And so you're using more of these -- these methods of approaches, techniques to ensure reliability

Page 71

and validity. Yeah.
Q. So I'm not sure I follow you. You're saying that if you're doing the first work, so to speak, if you're trailblazing in the field, you might use fewer of these techniques -- let me ask the question -- fewer of these techniques to increase reliability, validity, and accuracy?
A. Well, yeah, because -- and -- and here's why. What -- what you emphasize is not the celebration of technique per se. You're celebrating the search for promising ideas, and that becomes at the epicenter of your inquiry.
Q. I see.
A. I don't mean to suggest that concomitantly you aren't being acutely aware of your method, your self-reflexivity, and some of the other potential biases that you may have.
Q. Okay.
A. But you spend less time on what we call verification per se and more in the search for coming up with ideas, which are, as John Updike once put it,

Page 72

very precious.
Q. I see. And so when you're doing the initial work in the field, again, trailblazing or whatever, the goal is simply the search for promising ideas?
A. I wouldn't say it's simply that. I think you clearly want to use as much rigor as you can and being careful and further testing and self-reflexive and so on. I think, as work, people do studies, whether it's you and/or other people, and you're further testing down the line.
You're looking more at verification, so you emphasize a little more the methodological rules or techniques that you -- testing techniques, as you put them, than you might earlier in the study.
Q. All right. Would you agree with me that if a researcher is challenged in a qualitative study about bad techniques, failure to follow accepted practices and so on, that generally speaking it's not a sufficient excuse to say that the researcher ran out of time or didn't have enough money or, you know, excuses

Page 73

like that?
MS. SHUM: I'm gonna object, object as to form.
BY MR. SMITH:
Q. Okay. Is that -- is that a valid defense?
THE WITNESS: Would you like him to ask it in a different way?
Q. No, you have to -- you have to answer.
A. I'm sorry. Can you repeat the question?
Q. Yeah. My question is whether if a researcher is challenged in terms of bad technique or, you know, failure to follow the accepted practices in the field, failure to take the necessary steps in terms of quality and validity and so on, that it's not a defense, it's not an explanation to say, "I didn't have enough money," I ran out of time," things like that?
A. Those are not very compelling, yeah, in the least.
MR. SMITH: All right. Why don't we take a short break here? Let's try and keep it to five minutes.

Page 74

THE WITNESS: Okay.
VIDEO TECHNICIAN: We are now going off the record. The time is 10:15.
(There was a brief recess taken.)
VIDEO TECHNICIAN: We are now back on the record. The time is 10:33.
BY MR. SMITH:
Q. Dr. Conrad, we've gone through -- we finished a long review of a series of principles that apply to qualitative studies, including avoiding selection bias, avoiding confirmation bias, ensuring objectivity by the researcher, ways of verifying and checking methodology and so on.
Would you agree with me that these same principles apply to quantitative studies as well as qualitative studies?
A. In general, I would, yes.
Q. There might be some that don't, for example, some that are specific to coding interviewee responses, but the big principles apply to the --
A. In terms of the big picture, yes.

Page 75

Q. All right. And are you familiar in the quantitative field with a descriptive as opposed to an inferential study? Are those terms familiar to you?
A. Qualitative or quantitative, yes.
Q. Okay. What's a descriptive study?
A. It's -- it's atheoretical, by definition. You're not looking at if/then relationships.
THE COURT REPORTER: I'm sorry. I didn't understand. You're not looking at --
A. You're not looking at if/then relationships.
Q. Got it.
A. You're describing. You're -- you're taking a portrait. Anthropologists, good example of a field that is long emphasized through ethnography, for example, portraiture, descriptions, whether it's sitting in a room looking at the White House and trying to capture it.
Q. Okay. Gotcha. And what is an if/then study or an inferential study?
A. It's a study that's looking at developing a

Page 76

theory looking at relationships between at least two or more concepts or what we call quantitative or qualitatively variables or concepts. Yeah.
Q. Right. And in the quantitative field, is it accurate to say that in an inferential study, or if/then, as you called it, one starts out with a hypothesis that is to be tested?
A. That can be done inductively as well as deductively, sure, either way.
Q. Okay. And if you do test a hypothesis, should one also test for the null hypothesis, in other words, the absence of the hypothesis?
A. Continuous testing and sifting and winnowing is -- is important.
Q. In your 2016 expert report that you have there, is it fair to say that there are some analyses in there that you would consider to be quantitative studies?
A. In this document?
Q. Yes, your 2016 expert report.
A. I -- I have used numbers, including the

Page 77

state of Maryland, yes.
Q. Okay. And would you -- is it fair to call those quantitative studies?
A. It most certainly is, yes.
Q. Okay. And were you testing a particular hypothesis when you did those studies?
A. Yeah, I was testing and kind of both ways. But yeah.
Q. Okay. And what was the hypothesis or hypotheses that you were testing in the 2016 expert report?
A. Well, in brief, I was looking at the relationship, for example, between unique programs, not programs not duplicated by -- offered at the HBIs, not -- non-core programs at the HBIs not duplicated at the TWIs and vice-versa. I did it both ways in my trying to capture a portrait, a view, of where we were with respect to a dual system.
But I -- I looked at a number of potential if/then relationships, as you know, including between unique -- offering unique programs at the HBIs, whether

Page 78

they would attract white students, looking at unique programs that are also high-demand programs, and also looking separately high-demand programs, whether they would attract white students to HBIs.
Q. Is it fair to say, then, one of the hypotheses you were testing was that unique and/or high-demand programs at the HBIs will attract white students to those institutions?
A. Yeah.
MS. SHUM: I'm gonna object as to form.
BY MR. SMITH:
Q. Okay. Go ahead.
A. Yes.
Q. Okay. And did you also test the null hypothesis that there's --
THE COURT REPORTER: The?
Q. The null, N-U-L-L, right. -- the null hypothesis that there is no association between unique or high-demand programs and white enrollment at HBIs?
MS. SHUM: Object as to form. Sorry. Object as to form.

Page 79

A. You know, I haven't thought about the concept of null hypothesis for a long time, so I'd have to think about that a little bit more and reflect on it. So I just would like to take a little time to look at that.
My point is that I was -- I was testing in an open-ended way whether -- whether or not there are relationships between unique and/or high-demand programs and whites going to HBC, HBIs.
BY MR. SMITH:
Q. All right. And just coming back to sort of the rules of road, if you will, in quantitative studies, in addition to the principles we've already talked about, would you agree that in a proper, acceptable quantitative study it's important to include proper comparisons and proper controls where available?
MS. SHUM: Objection, form.
A. In a quantitative study, did you say?
BY MR. SMITH:
Q. Yes, sir, uh-huh. Proper comparisons and controls.

Page 80

A. Well, insofar as you can. There are always limits, including resources. So you want to take account of the different settings, different places. So if you're studying whites attending HBIs, like to go to a lot of different con- -- you know, different settings and -- and different states, different environments. I could go on and on to elaborate on that.
Q. Okay. Sure. And would you also agree with me that in a quantitative study it's an accepted standard in the field that you should not rely on speculation or conjecture; is that fair?
MS. SHUM: Objection, form.
A. Well, I -- I think in a quantitative or a qualitative study you do not rely on speculation and so on. You sift and winnow. You're developing ideas and you're testing them, and that's essentially what I do. I use one of those five methods of John Creswell a lot of the time, which is called grounded theory.
You're trying to develop and then test concomitantly if/then relationships. And I could give

Page 81

you many examples, if you ever need any.
BY MR. SMITH:
Q. Sure. Well, why don't -- why don't we actually turn for a moment to the 1994 study that you did back in -- I guess you were at the time retained as an expert witness in both Alabama and another state; is that right?
A. In 1994?
Q. Yeah.
A. Well, we were still -- I did another study, I think, in Alabama that year.
Q. I'm actually talking about the study called Factors Contributing to White Enrollment. You know the one I'm talking about?
A. Oh, vaguely. I haven't looked at that study in a long time.
Q. Okay. But in any event, in 1994 --
A. Yeah.
Q. -- you were working on the so-called Knight, K-N-I-G-H-T --
A. I do.

Page 82

Q. -- case in Alabama?
A. Yeah.
Q. You were also working in Mississippi at the time; is that right?
A. Yes, yes.
Q. And in Louisiana as well?
A. I think Louisiana had ended by then. It began in 1980.
Q. Okay.
A. I'd have to look on my vitae.
Q. Okay. Well, so the 1994 study -- and we can be clear about this, and I'll hand you what we've marked as --
A. Are you referring to the 1997 study?
Q. No. I'm talking about the 1994 study. Handing you what we've marked as Exhibit 1, Conrad Exhibit 1, and we'll get a copy for you.
A. Oh, this study was published in -- okay. But it wasn't published till 1997.
Q. I understand.
A. I'm sorry. Yeah. I didn't know you were

Page 83

referring to this study.
Q. So you've got exhibit -- Conrad Exhibit 1 in front of you, and that's the 1994 study which you performed --
A. I did.
Q. -- and which you used in the Alabama expert testimony that you provided; is that right?
A. I did, and I was working with Dr. Leslie at the time. Yes.
Q. Okay. But that particular one, if you just flip to the cover page -- and it's on two sides, that particular one is published by you alone, correct? It doesn't list Dr. Leslie as an author.
A. Yeah, I basically did this study. Yeah.
Q. And what -- you said a moment ago that you could --
A. That's the piece I'm referring to, the --
Q. Yeah, I understand. We'll get there in a second.
A. Okay.
Q. You mentioned the five different types of

Page 84

qualitative studies. What type of qualitative study is this 1994 work?
A. Essentially -- although, I'm not sure I use the term, I did look at it again briefly last night -- it's kind of a grounded theory study, trying to come up with some hypotheses, but what are the factors that attract whites, the attributes of programs of institutions, I'm sorry, that attracts whites to HBIs.
Q. Okay. And I'm a little confused when you say that this is a grounded theory study, because don't you refer to it repeatedly as being a case study?
A. I do refer to it as a case study in the spirit of John Creswell's fab five. Yes.
Q. Okay. So which was it? Was it a grounded study -- I'm sorry, let me ask the whole question. Was it a grounded theory study or was it a case study?
A. Well, we'll call it case study for purposes of our discourse.
Q. Okay.
A. Very similar to a grounded theory method, yes. I was building off of five cases.

Page 85

Q. All right. And would you agree with me that in a case study it's important to establish a standard methodology which is applied to all of the different cases that you examine?
A. That can depend. And as you know from reading the article, I'm sure you have, you can use different approaches. You can vary whether you're using focus group, individual interviews. You might use a 10-point scale, as I did on this study for the first two institutions that I went to, as you may recall, Winston-Salem State and North Carolina A&T, where I had a -- asked people to indicate on a 10-point scale how important were factors that I was beginning to identify and listening to the voices of students, faculty, administrators.
Q. Okay. And really, my question was just whether, as a general matter, when conducting a case study, it is standard practice in the field to use the same methodology in analyzing each of the different cases? If it is, great. And if it's not, it's not. But just tell me which it is.

Page 86

MS. SHUM: Objection, form.
A. Well, I think there can be variability -- and forgive me but some of your questions, many of them are kind of either/or. There's not necessarily one right way all the time. There's a lot of different -- there are different approaches, and there's a lot of variance in the field of qualitative research.
I could go on and on, and I won't. But talking about the fab five approaches of John Creswell, for example, there's a big difference between narrative inquiry and grounded theory and -- and on and on.
BY MR. SMITH:
Q. Right. And my question, again, is only directed to case studies. And my question is simply whether there's a standard in the field, when conducting a case study, to use the same methodology to analyze each of the different cases?
MS. SHUM: Objection, form.
A. I think -- I think I answered that question moments ago.
BY MR. SMITH:

Page 87

Q. So the answer is -- if you answer is no, there's no such standard in the field, that's fine.
A. I think in general that's the default threshold, but I think there's variance, just like there is in different methods, different approaches to qualitative. There is one heck of a lot of difference between narrative inquiry, for example, and developing a grounded theory.
Q. Okay. Right now we're only talking about case studies, and let me ask you whether you can point me to any text in the field that says that it is appropriate to use different methodologies across different cases in a case study?
A. I can't make a particular reference. No.
Q. Is it accurate to say that you are relying on this 1994 study entitled -- what's the full title of the study, sir?
A. It is --
Q. It's to the left there, I think, on the title page.
A. "Factors Contributing to the Matriculation

Page 88

of White Students in Public PBI: A Foundation for Identifying Policies and Practices to Advance Desegregation in Predominantly Black Institutions."
Q. Thank you. And are you relying on the work done in that 1994 study in order to frame the elements of your remedial proposal in this case?
MS. SHUM: Objection.
A. I -- it is, right. It is one of several foundations that I'm using. Yes.
BY MR. SMITH:
Q. What are the other foundations? Well, first of all, how many -- how many additional foundations are there?
A. Well, I think maybe three.
Q. Three. Okay. Why don't you tick them off for me and give me a two-sentence description of each so I know what they are?
A. The first one is this study.
Q. Okay.
A. The first major study that looked at the burning question, is the centerpiece of the study, of

Page 89

what attracts whites to PBIs --
THE COURT REPORTER: TBIs? B- --
THE WITNESS: Well, sometimes they're used different. PBIs are TBIs in the state of Maryland.
Q. Right. So let's try and have a common frame of reference here. So sometimes we've been referring to the four Maryland black colleges as HBIs, right?
A. We have, uh-huh.
Q. Okay. Or historically black institutions. And sometimes in your study you refer to them as PBIs or predominately black institutions, right?
A. Yeah.
Q. Those are the same thing?
A. I do.
Q. Okay. Do you mind which one we use?
A. I don't -- well, I would prefer not to use PBIs, 'cause it's not used very much anymore. In the common discourse, it's HBCU. So when I go to Maryland, I have to switch it to HBIs.
Q. Do you mind if we use HBI in this

deposition?
A. Either -- either -- no, it's fair. I want to maintain, be ethical and fair about it. And that's what they're called here, so let's call them HBIs. Would you like me to amplify on my answer?
Q. Well, I wanted to know what the foundations are and --
A. Right.
Q. -- I think you said there are three for your opinions in your expert report. The first one is the study in front of us, the 1994 study called -- we'll called that "the factors" study. And then what's the second foundation? Again, I'm looking for a two-sentence description.
A. We could call it "factors," but if you wouldn't mind, I would prefer to use the term "attributes of programs" because that's the one I use in the article when I publish it three years later.
Q. Okay.
A. And I think it's -- I think it's much clearer, because they are attributes of program



offerings.
Q. But just so you and I are clear, when I -- then I won't use the use the word "factors." But when I want to talk about your Exhibit No. 1 in front of you, I'm gonna call it the 1994 study, right? With me?
A. That's fine. Either -- '94 is fine, yeah.
Q. Okay. Now, you're going back to the three foundations for your opinions in the case. The first is the '94 study. What's the second one? And again, we're looking for a two-sentence answer.
A. The second one, in a short answer, is drawing my extensive experience visiting HBCUs or, as we call them nationally for the most part, I visited somewhere between 40 and 50 out of the now 104 HBCUs.
I have on a very non-random sample but -- and fueled only by my curiosity, asked white students sometimes the general question just out of curiosity and not a systematic study, but asked what is drawing white students to a particular HBCU.
So I don't want to accent that as one of the most important, 'cause it's not. It's third most



important of the three by a long ways.
Q. Okay. What's the third?
A. Much more discipline. What's the third? As you know from the expert report and so on, did a study in state of Maryland. I wanted to find out, look at some programs and see what attributes that those programs were attracting.
Q. Got it. And so the third foundation for your testimony is the quantitative analysis that's set forth in your 2016 report; is that right?
A. That's correct.
Q. Okay. And --
A. Programs are attracting at least 10 or 15 white students. That's right.
Q. And the second foundation is what you called your extensive experience, and is it accurate to say that that's never been set forth in a written study of any kind?
A. Yes, and I -- I don't think it's publishable because it hasn't -- I haven't done it in a more systematic way with some of those considerations



that we've been talking about this morning.
Q. Okay. And is it accurate to say that you are seeking to treat your '94 study as an applied study, that is to say, one that should be used to shape public policy?
MS. SHUM: Objection.
A. I think it's a study that has potential implications, yes, for remedy.
BY MR. SMITH:
Q. And are you seeking to generalize from that study; is that fair?
MS. SHUM: Objection.
BY MR. SMITH:
Q. To Maryland?
A. I'm -- I'm suggesting as a point of departure for thinking about remedy and -- and coming up with a remedial plan. It's the one -- the single study I'm familiar with, that I'm aware of, the one study that has looked explicitly at the burning question, namely, what program attributes, one of them called factors, but program attributes, attracts white

students to HBCUs. And as you know, it was in four different states.
Q. Right.
A. Five institutions.
Q. Okay. And why did you decide to perform the analysis that's set forth in the 1994 study as a qualitative rather than a quantitative study?
A. Because basically it is a qualitative study, notwithstanding that 10-point scale I used on the first two institutions that I earlier mentioned.
Q. Right. I understand. It is qualitative in nature. But is it accurate to say that when you started out your investigation or your analysis, that you had to make an initial choice, right, about study design; is that fair?
A. Yeah.
Q. Okay. And one possibility, given the fact that you had diverse experience in the field, would have been to do a quantitative study. You might have used questionnaires, mailed them out to a random sample, and then there are other ways you could have



done it too.
My question is simply: Why did you decide to do a qualitative study as opposed to a quantitative study?
A. Because I found over the years and one of the ways that -- one of the reasons that I've returned a qualitative research over the years is that I -- I believe that the -- putting an emphasis on -- on the pursuit of ideas is, along with being, you know, methodologically sound, is very important.
And qualitative research, not the quantitative research, can't do this with numbers, but qualitative research is, I found, a very intriguing way and helpful way of beginning to develop and -- and certainly to test ideas too.
And once again, I don't mean to minimize. Numbers can be very helpful, including fields like climate change I earlier mentioned and so on. But I -- I -- I thought it was clearly the best thing since there had been no previous research that I was aware of, no theories out there, no studies of it and so on.



And so that's what I wanted. That's why I did it kind of from the ground up as case studies. But it was essentially, as I earlier said, kind of a grounded theory, trying to identify the factors associated with whites attending HBCUs.
Q. Okay. And I --
A. Some case studies, let me add, are atheoretical too. They aren't developing a theory, as in grounded theory. They're sometimes simply portraiture of cases.
Q. Got it. Okay. And I think you said a moment ago -- and I appreciate the point you're making -- that when you set out for this, there was no previous research and no theories on what might cause white students to attend an HBI; is that correct?
A. Yes, uh-huh.
Q. And when you performed the work underlying your 1994 study, were you surprised at all at the results?
MS. SHUM: Objection, form.
A. The -- it's interesting you used that word,



because when I'm conducting research, I often ask interviewees to surprise me. I believe that's one of the best interview questions ever posed.
I -- I think in many ways I had a lot of surprises, yes. I was quite surprised, as I talk about at the end of the article, the findings that I came up with are quite different than the literature on the factors identified in college choice literature.
So was I surprised that -- I think I was, and I study academic programs and have been for a long time, but that unique -- that high-demand programs that people -- that was really at the forefront, that was the first of the factors I identified, as you know, and unique programs, that is to say, not duplicated by -- by traditionally white institutions.
I think -- I think some of those factors didn't -- did surprise me. They were different than the college choice literature that I've been familiar with for a long time. Some of the other factors didn't surprise me, as you know, from the -- from the factors I've identified, like institutional prestige,

scholarship money, some of the financial support.
I don't -- I don't think I was surprised either by campus culture. I think I -- I don't know if I use climate or culture. I don't think that surprised me.
But I think I really was surprised that students were choosing programs that they want to go to high-demand programs, kind of like the -- it reminds me of the -- I'm reminded of the jobs emphasis in states like Wisconsin by various governors and so on, and how placing that at the epicenter.
My own background was in the liberal arts and sciences. So juxtapose against that and a family that felt like you went to college, first and foremost, to get a --
BY MR. SMITH:
Q. Sir, I --
A. -- better education.
Q. Professor, I understand.
A. Yeah, I'm sorry.
Q. At another time, maybe we'll have --



A. Forgive me, I'm --
Q. -- a chance to talk about that.
A. -- being a professor.
Q. Maybe we can do a case study on it.
A. Pardon me, yeah.
Q. Okay. But the -- so let me -- let me do make sure I understand. Some of the factors that you identified, campus culture and institutional quality --
A. Yeah.
Q. -- as respecting white student choice, those were not surprising. Do I have that part right?
A. That's correct. And they were -- they're in the college choice literature and have been for a long time.
Q. But some of the other findings, for example, that unique and high-demand programs were especially influenced on white student choice, those were surprising?
A. Yeah. I was a little surprised, given my background, once again, which I've just articulated, that how much -- how important jobs was in fields of



study in choosing a college.
Q. Okay. And --
A. So I got out of -- I got out of my bubble very early.
Q. I'm sorry? You got out of your?
A. I got out of my bubble very early as to why people choose different colleges.
Q. All right. And you may already have answered this question. But is it fair to say you didn't come in with any kind of fixed idea or preconception about why white students would choose HBIs, other than what you saw in the college choice literature?
MS. SHUM: Objection.
A. That's a very good -- that's a very good question, very thoughtful question. Yeah. Would you pose it again so I get exactly how you asked it? I'm still thinking about it. It's such a good question.
BY MR. SMITH:
Q. Well, I don't know whether it's good or bad. But my --



A. No, it's very thoughtful.
Q. -- question is simply if you were surprised at the findings on unique or high-demand studies and their influence. Did you come in -- does it follow, then, you didn't come in with some sort of fixed idea or preconception about whether those would be important influences on white student choice?
MS. SHUM: Objection.
A. I don't -- I don't think I had preconceptions about much, except for the variables you mentioned. I just try to be very open-ended. I was very interested, and to the extent that segregation exists and there are dual systems, that we do our best to eliminate them and by -- including by getting white students to attend HBIs.
So my own interest from the very beginning is simply to come up with identifying ideas, and I did have some predilections, as I indicated, with respect to quality in the choice literature.

BY MR. SMITH:

Page 102

Q. Right. When you say "quality in the choice literature," those are --
A. I mean high-quality --
Q. Yeah, I understand.
A. -- factors.
Q. I'm sorry. Didn't mean to interrupt.
When you say "quality in the choice literature," those are the -- what you call the variables I mentioned, the ones that had previously shown up in the literature?
A. Yeah, and continue to show up in the literature, yes, again and again and again.
Q. Okay. What was -- let's step back for a second. So Exhibit 1 was done as part of your service for the Department of Justice, right?
A. You're referring to the --
Q. Yes, sir, the '94 study.
A. Oh, Exhibit 1 and the '94 --
Q. Conrad Exhibit 1. I apologize.
A. Okay.
Q. It was done as part of your service for the

Page 103

Department of Justice? If you look on the title page, sir?
A. Yeah.
Q. Okay. Again, this is not a trick question. It's not controversial.
A. Okay.
Q. All right.
A. Thank you very much.
Q. When I get to the trick questions, I'm gonna tell you.
A. Oh, good. Oh, thank you very much for that. I'm eternally grateful.
Q. All right. Good. And what, if any, discussion did you have with the department before you set out to do this work?
A. They knew me pretty well after 14 years, and they just said: Cliff, you do this kind of research. You're the perfect person to go out and just do an open-ended search. It was nothing more than that. Let's try to begin to identify factors.
It was -- it was very simple and

Page 104

straightforward. Let's end segregation if it exists in Mississippi and so on. And as the Court indicated in the Air versus Fords decision.
THE COURT REPORTER: Sorry? As the Court indicated in?
THE WITNESS: In the Ayers versus Fordice decision. Sorry.
Q. Okay. And was your research or presentation -- what's the right word -- was it constrained in any way by the fact that it was being presented in a courtroom setting?
MS. SHUM: Objection, form.
A. For me?
BY MR. SMITH:
Q. Yeah.
A. I don't -- I'm not bounded by any particular setting, including by a legal one. I'm just searching for ideas and searching for truth in the same vein, that's simple as that. I just want to find out what works so it gets ended if it's still there.
Q. Okay. And whose idea was it to perform the

Page 105

study? I mean, there was you.
A. Yeah.
Q. There was the Department of Justice. Who came up with the idea?
A. You know, it was such a confluence, so collaborative, I think it was a combination of Franz Marshal, Lavern Younger, and Cliff, and probably Larry Leslie too. Yeah, Larry Leslie. My -- my wonderful colleague with whom I worked at the University of Arizona for many years.
Q. Okay. So it was a collaborative effort; is that fair?
A. Yes. We needed to do this. We needed to find a remedy if there's a problem and -- and come up with some ideas and do some sifting and winnowing.
Q. Okay. And I think you told me earlier, and I think it's apparent on the face of this document, the '94 study, that you actually collected data, which you discuss in here, from five different schools; is that right?
A. Yes. That's correct.

Q. All right. And how did you choose the five schools that you studied in the 1994 analysis?
A. Yeah. I talk about that a little in the -- I looked at the study again, and it was published in 1997. Two of the institutions had been more successful, so I wanted to have some variance in the sample. So two of the institutions, I think one was SUNO, that's Southern University of New Orleans, in attracting white students, and North Carolina. I think the other one was North Carolina A&T. I'm not positive. But I think that was the other one that was -- I'm not positive. I need to check it. I need to check in the article.
Q. We don't need to worry this second about --
A. Okay. Which one.
Q. So you said you chose two of them because --
A. 'Cause I wanted --
Q. -- they were more successful?
A. They seemed to be more successful than some of the others. So I want to put these institutions on



a continuum as a part of my continuing to sift and winnow.
Q. And what about the other three? Did they --
A. The other three --
Q. -- success -- let me just finish, if I might.
A. I'm sorry.
Q. The other three had been less successful or some other reason?
A. They had been less successful on the continuum.
Q. All right. And -- and why did you want to look at a mix, some that had been more successful and some that had been less successful?
A. I always use that. I want to get as much difference in the sample as I can. It's part of my trying to test, advance trustworthiness of the study and...
Q. All right. And the five that you chose were all southern schools, correct, two from North



Carolina, one in New Orleans?
A. Yeah, I wouldn't -- yeah, it depends where you place Kentucky, but yeah. Kind of on the border, I think.
Q. That's fair. Did you consider at any point collecting data from a Maryland HBI as part of this study?
MS. SHUM: Objection.
A. I -- I -- I have no recollection of whether I considered Maryland. I think my predisposition is that Maryland had moved much further along on the -- with respect to the landscape of desegregation.
BY MR. SMITH:
Q. The reason I ask is that, as you know, Maryland has four HBIs?
A. I do.
Q. Right?
A. Uh-huh, I do.
Q. Yeah. And as I understand it, at least at the time, that was the second most of any state in the country, right, only second to North Carolina?



A. Yeah. Right. Yeah. There were still HBIs, but I -- I assume that they had -- I think I assumed from my positionality that they were more desegregated.
Q. Well, okay. Can we take a look at Appendix A to your study? I guess it's toward the back.
A. Well, I do know, yeah, about the top three here at the top. Yeah.
Q. But I guess my question for you is: You say that you thought that Maryland was more desegregated. Would you agree with me that -- take a look at Table 3.
A. Yeah.
Q. That lists the HBIs by white enrollment percentage. Do you see that?
A. I do.
Q. Right. And so at the time in 1992, Maryland had one school that was in the top 10, correct?
A. Yes, two in the top eleven.
Q. Okay. Right. And then the others are

distributed down. In fact, Morgan State is, what, four or five from the bottom of the 38?
A. Oh, by then, it was only 3 percent.
Q. Right. So you had access to data that showed you the picture in Maryland was diverse at least, right?
A. Yeah.
Q. Okay. And so I'm -- again, my question -- and maybe you've already answered it. Your assumption was simply that Maryland had already been desegregated?
MS. SHUM: Objection.
A. No, I didn't -- no, I don't mean to overstate that by any means. I -- I -- I may not have looked at the data that closely with respect to Maryland. What I did is something called, what we call in grounded theory, theoretical sampling. I wanted to go to institutions where there were differences, simple as that, with respect to their relative success at attracting white students to HBIs, and I think I got that pretty well in the sample.
MR. SMITH: I'm told we have five minutes



left on our tape, so let's take a break here.
VIDEO TECHNICIAN: We are now going off the record. The time is 11:10.
(There was a brief recess taken.)
VIDEO TECHNICIAN: This marks the beginning of DVD No. 2. We are now back on the record. The time is 11:20.
BY MR. SMITH:
Q. Dr. Conrad, before we were broke -- before we broke, we were talking about Maryland and the Maryland HBIs, and I think you told me that you selected the five schools that you did because some did better, some did worse in terms of attracting white students.
And I guess my question is: Did you consider selecting your five schools along some different set of axes, like some in the Northeast, some in the South, some in the West or other -- other methods as well?
A. I did want a little variance by location. Yes.



Q. Okay. And so you got that by taking two from North Carolina, one from Kentucky, one from Georgia, and one from Louisiana?
A. Yes.
Q. Okay. And did you seek to have some sort of variety in terms of the size of the HBIs?
A. Oh, I describe the institutions briefly. There's not a lot -- well, I'd have to look at the numbers. There's -- I think there's some variance. I think SUNO is a little bit larger, but I'd have to see the numbers back in '94.
Q. Well, back at the time, sir, if you want to take a look at your Appendix A, Table 3, so it's on page 4 of Appendix A.
A. Yes.
Q. Just tell me when you're there.
A. I'm there.
Q. Okay. So back at the time, there were two pretty large HBIs, right? There was Texas Southern, and Southern University, A&M, right?
A. Yeah.



Q. Listed on page 2 of Exhibit --
A. It's on 31.
Q. Table 3. Yeah. Yeah, numbers 31 and 36. Those are both over 10,000, right?
A. Yeah. That's -- number 31 is Southern University. A&M is Southern University Baton Rouge.
Q. Right.
A. Yeah.
Q. And then there's one that was quite small, that being Lincoln University in Pennsylvania?
A. Well, yes, but that's not one of my institutions.
Q. Yeah, I understand. I'm just trying to understand --
A. The sample, why didn't I get --
Q. Yeah, little more diversity in terms of size.
And let me put the question very clearly on the record. My question is: Why didn't you seek a little more diversity in terms of the size of the HBIs?
A. I don't -- I don't -- that was not, at the

Page 114

time, a primary concern. By the way, the case was in the South. Lincoln and Cheyney and so on, are not typical HBIs in many ways, including with the respective enrollment, where they're located. So I thought I would probably learn more.
I don't mean to overstate that I thought that through in great detail at the time.
Q. Sure. And why is it -- so let's see, Cheyney State is in Pennsylvania, so is Lincoln, right? And why were they not typical HBIs, in your opinion?
A. Well, I'd have to see the enrollment back then, but it wouldn't surprise me. Which number do you have?
Q. Well, I'm --
A. For Cheyney, for Cheyney?
Q. So it's -- you have in front of you, it's page -- the second page of Table 3 in your Appendix --
A. Right, I'm there. I'm just trying to get the number.
Q. Sure. Cheyney is 33. Lincoln is 29. And my question is why you didn't consider them to be

Page 115

typical HBIs? Could be enrollment, could be something else. I'm just asking.
A. Yeah, that changed. I -- I don't remember. It would be misrepresenting to say that I thought very much about that particular factor, but I can't -- that was, again, more than 20 years ago, so...
Q. And given the lapse of time, is it -- is it fair to say that if I asked you whether you considered any other possible axes or method of selection of the HBIs, you simply don't recall?
MS. SHUM: Objection.
A. I do not recall any other consideration.
BY MR. SMITH:
Q. All right. And the following is not a trick question, okay? I just want to make sure that we understand the methodology here.
A. Yeah.
Q. So I'm gonna try and describe it and make sure. You tell me if I have it right. So you started with pre-study interviews of HBI administrators at a couple of schools; is that correct?

Page 116

A. I'd have to remember exactly. There were telephone interviews, yes, with some of them. Yes.
Q. Okay. So you started with that, and then you set off to do your actual interviews with students and administrators and faculties at -- you got through two of those of the five; is that correct?
A. Uh-huh, in North Carolina.
Q. And then after you had done that, you developed your written survey instrument, and you used that as well as Q and A interview --
A. Right, I did.
Q. -- at the remaining three HBIs; is that right?
A. I did, yeah.
Q. Okay. And let me just go back to the other --
A. It's called a multi-method study.
Q. Okay. Great. And just going back to my question about the five that you selected, did ease of access and -- well, did ease of access play a role in choosing these five?

Page 117

MS. SHUM: Objection.
A. No.
BY MR. SMITH:
Q. No?
A. No.
Q. And when I say "ease of access," I'm not just talking about how far they are from Alabama or from each other. Was -- was ease of access in terms of getting administrators and faculty to answer your calls and allow you to set up shop, was that a factor at all?
A. The only one that may have been -- and again, we're talking 22, 23 years ago now -- is at Southern University Baton Rouge, because I've been there before, so I might have had a good institutional liaison, as I call them in the article, who I felt comfortable asking me to help get interviews.
Q. Did you have any prior relationship with any of the other four outside of Southern University? And I think it might have been New Orleans; is that right? SUNO?
A. Yes, none other than SUNO.

Page 118

Q. Okay. And what about the Department of Justice or Dr. Leslie? Did they have any relationships with any of the other four?
A. I don't think so.
Q. So you -- you cold called them?
A. Yeah. I'm sorry. Did we what?
Q. You cold called them, to use the modern vernacular?
A. Oh.
MS. SHUM: Objection.
A. Correct.
BY MR. SMITH:
Q. Okay. That's fine.
A. I'm -- I'm sorry. I'm not familiar with that contemporary vocabulary.
Q. Okay. All right. Now, you mentioned a couple of times that subsequently this study was published, and we're gonna show you what's been previously marked as Conrad Exhibit 2.
A. Right.
Q. And that's the 1997 journal article,

Page 119

correct? Is that right?
A. Yes.
Q. Okay. Can you tell me how this article came to be published in the journal? And I don't want to use the whole name 'cause it's so long. The Journal of Just -- or Journal for a Just and Caring Education.
A. I -- I don't have the whole history on it. I knew the editors, Ed St. Johns (sic) and Don Hossler, Indiana University, and they were doing this special issue. I don't remember the particular context. I think it was peer-reviewed, as I recalled, and it -- as I recall, I just wanted to get it in print, and this seemed like a good way to do it.
Q. So you say you knew the editors, and I think it says here --
A. Yeah, I don't -- I don't know if that had any relationship whatsoever to my submitting the argument there -- submitting the piece there, I'm sorry. But it did seem like a special issue, so there might have been a request for publication --
Q. Okay.

Page 120

A. -- to the best of my knowledge. And therefore, I picked up on that rather than send it to the Journal of Higher Ed or one of the articles I normally would use.
Q. All right. And did you submit it anywhere else?
A. No.
Q. Okay. And do you actually have a specific and distinct recollection about whether there was blind peer review of any kind conducted on this article?
A. I do not.
Q. All right. And is it common in the case of a special issue for the submissions to be invited by the guest editors?
MS. SHUM: Objection.
A. It would be presumptive to me to assume. I think more often than not that people are invited to submit papers, that in turn go under review for purpose of a special issue. A special issue is relatively rare, relatively infrequent.
BY MR. SMITH:

Page 121

Q. But you have -- again, you have no specific recollection of any particular peer review or comments that you received on this; is that fair?
MS. SHUM: Objection.
A. I'd have to reflect on that a minute. I -- I do not.
BY MR. SMITH:
Q. What, if any, substantive changes or edits were made to your 1994 study before it was published in 1997, in Exhibit No. 2?
A. I'd -- I'd have to look carefully. Clearly, there -- there are differences. The findings, I think the overall findings is kind of a preliminary attempt to try to begin to develop an understanding, develop some ideas about what attracts whites to blacks. Yeah, I don't.
There were -- there were clearly -- it's got a different narrative. You can -- I haven't looked at this document for over two decades. I have reviewed this one (indicating). But there'd clearly be -- clearly are differences with this signature, exception

of the findings, which -- which I think are essentially
the same, it looks to me, upon brief --
Q. And for the record, when you say you
haven't looked at this document, you're talking about
the 1994 study?
A. I am. I looked at this one (indicating) as
recently as yesterday.
Q. Okay. And I just want to tell you, I've
read the two of them together, and I didn't notice any
substantial differences.
A. No.
Q. Are there any that stick out in your mind?
MS. SHUM: Objection, form.
A. There are not. And thank you for sharing
that.
BY MR. SMITH:
Q. Okay. Right. Okay. And you have two
co-authors in the --
A. Yeah.
Q. -- in this, and I understand that, let's
see, one of them Mr. -- or Professor Braxton?



A. Uh-huh.
Q. He's still in the business; is that right?
A. I think John is stepping down. He's been
at Vanderbilt for many years.
Q. Okay. And what Ms. Brier? Is she still in
the higher education business?
A. I don't know. I think she did retire a few
years ago. I haven't seen John for -- or Ellen for
several years.
Q. And did you -- what, if any, additional
contributions did they make to the article before it
was published?
A. I was thinking about that yesterday when I
reread it. I did most of this work, and I think that
comes clearer across, including the interviews and so
on. I -- I know they did some. Whether they looked at
interviews, I could not tell you with surgeon-like
precision a yes or no.
My sense is they clearly did review some of
the findings, and I think there was some
cross-checking. But -- but they were -- were -- played



an ancillary role in this particular study.
Q. All right.
A. He's also been a long friend -- long-time
friend of mine. Yeah.
Q. Now, in the 1994 study that you have there,
Exhibit 1, Conrad 1, am I correct you did not examine
any students who chose not to attend an HBI; is that
true?
A. Yes, and I put that as a limitation --
Q. Okay.
A. -- as you may recall, in the 1997 article.
Q. Right. And, in fact, you were very careful
to say that you didn't have the opportunity to
interview whites who chose not to attend HBIs, and that
those interviews might have yielded additional
insights; is that fair?
A. Absolutely. That's integral to the sifting
and winnowing that I've emphasized.
Q. Okay. And you encouraged other researchers
to interview high school students and other types of
individuals who might be choosing a college or



university; is that fair?
MS. SHUM: Objection.
A. I do. I -- I encourage others to pursue
this burning question and do it with robust scrutiny
and rigor and so on, as well as open-mindedness, in
pursuing ideas. Yeah.
BY MR. SMITH:
Q. And when you said in your 1997 article --
you said you didn't have the opportunity to interview
whites who chose not to attend an HBI?
A. Right.
Q. Did you consider at any point in designing
your study doing those types of interviews, looking at
those types of students?
MS. SHUM: Objection.
A. I think it was -- as I recall, at the time
it was a challenge in getting access to that audience,
yeah, to those people. Yeah.
BY MR. SMITH:
Q. Okay. And why would that be challenging?
A. Well, they were in different places. For

Page 126

obvious reasons, they weren't at the institutions and students, faculty, administrators and --
Q. Right.
A. -- so you've had to go down to New Orleans and, you know, find -- find a number of white students, and that would have been very tricky.
Q. Okay. I mean, I've only been --
A. Challenging.
Q. -- to New Orleans a couple of times, but I've observed there seemed to be large numbers of both white and black school-age students there --
MS. SHUM: Objection.
Q. -- and so -- let me just finish, if I might -- so why would that have been so challenging to find, for example, white high school-age students in New Orleans to talk to?
MS. SHUM: Objection.
A. Well, I think I might have had IRB challenges as well, by the way. But could you go to Jackson Square and probably for -- the last time I was there, couple years ago, and find a number of white

Page 127

students who hadn't chosen to go to HBCUs or HBIs, I'm sorry, and instead have gone to Tulane or UNO?
BY MR. SMITH:
Q. Right.
A. That could have been done. That -- that's the kind of sampling technique that is not used very often.
Q. Sure.
A. Yeah.
Q. But just as you cold called four out of the five schools you did look at, you could have cold called Tulane, right, which is a large organization that has sociologists, or you could have cold called the University of North -- or New Orleans, right --
MS. SHUM: Objection.
Q. -- and asked whether you could interview some of the freshman there? You could have done that, right?
MS. SHUM: Objection.
A. I could have. I -- I think I would have had a lot of trouble getting approval, among other

Page 128

challenges. Yeah.
BY MR. SMITH:
Q. Approval from whom?
A. From the respective institutions.
Q. But you don't -- you didn't even try, right?
A. I didn't, so I'm guessing. I'm -- I'm -- sometimes we have to anticipate, and I don't -- I actually feel like, and still to this day, that it's more important and -- and I (unintelligible) this decision to interview people who actually chose to go there --
Q. Okay. I understand.
A. -- because I'm --
THE COURT REPORTER: I'm sorry?
A. I think it's more important to -- to interview students who have chosen to go rather than who haven't. The latter category may involve individuals who have a lot of speculation and random thoughts that would not be terribly illuminating.
Q. I see.

Page 129

A. Having said that, I was the first person to put it into the study and -- and so on.
Q. Okay.
A. And as you know, purposes of trustworthiness in the study, I -- I made a -- not only had that institutional liaison but also sought out other -- other individuals who had not been recommended by the institutional liaison --
Q. I understand.
A. -- as often happens in many studies, because I wanted to increase the diversity of my sample for purposes of developing, in a very preliminary way, some ideas for attracting whites to HBIs.
Q. Have you ever interviewed white students who chose -- strike that.
Have you ever interviewed white college students who lived in a state with an HBI presence but had chosen not to attend an HBI?
A. Not interviewed, no.
Q. Okay. And we've been talking about people who've already made a college choice decision and opted

Page 130

not to attend an HBI. That's at one end of the spectrum, and the other end would be people who are about to make a college decision, right? So high school juniors and seniors, that would be another group of people who -- let me just finish -- whose decisions could be studied; is that fair?
A. They could be. Sure. Very much so.
Q. All right. And did you consider interviewing any of them as part of this research?
A. I don't -- I don't recall that, but then I think there were also time considerations, and I thought I was getting the best pool I can, under the circumstances, from within the institutions.
Q. And have you ever --
A. I still -- I still believe that.
Q. Okay. And have you ever subsequently interviewed any high school-age students about why they might or might not consider attending an HBI?
A. I have not. I'd love to conduct more research. It's one of those questions of testing and testing and testing.

Page 131

Q. Okay. Are you familiar with any research that has been done among that high school-age population?
A. I am.
Q. Okay. And what is that study or what is that research?
A. It was a study done, published in a law -- I believe it was a law journal in 2004. I think the first author's name was Sun. I remember vividly he and his colleague are faculty members at the University of North Dakota.
Q. Okay. All right. So we might come back to that. And actually, I said that one group is people who are already at college, one group is high school juniors and seniors, but another source of students for HBIs would be community college students, correct?
A. It would be. In that respective study, refer to that group, had two focus groups.
Q. Just going back to your research choices, did you consider looking at community college students, who were currently in a community college, to find out

Page 132

among those white students why they might or might not choose an HBI?
A. I certainly thought about that, but once again, it was just a point of departure, and I thought the best place to start was to -- to have less, you know, all those hypotheticals of high school seniors or community college students and instead look at -- interview students who had actually made the decision.
We often talk about decisions we might or might not have made, but what's, I think, most illuminating, and I wanted to put at the epicenter, was to interview students who had --
Q. Right.
A. -- had made that choice.
Q. And once you had taken that point of departure, did you think that at some point in the future it might be appropriate to go and look at high school students making --
A. No.
Q. Let just finish. -- high school students making college choices, community college students, and

Page 133

then white college students who had chosen not to attend an HBI?
MS. SHUM: Objection.
A. Yes. I think that can be very helpful. Testing, testing, testing. Don't ever never stop. And the landscape changes. The world in which we live changes.
BY MR. SMITH:
Q. I understand.
A. Can change from one period to the next, from one week to the next --
Q. I understand.
A. -- depending what's happening in Istanbul today or tomorrow at Aleppo.
Q. All right. And you told me a moment ago that you decided to look at the ones -- the white students who had chosen to attend an HBI because you thought it was important to interview those who, in fact, chose to go to an HBI. Okay.
Now, I want you to assume, right -- so you're an expert witness. I get to ask you to make

Page 134

assumptions. I want you to assume that there may exist systematic differences among or between the groups of students who choose to go to an HBI and those who choose not to. Are you with me on the assumption?
A. Yes, there may be. Yeah.
Q. Okay. If I'm -- if my assumption is correct, then studying only the people who choose to go to the HBI wouldn't tell you about whether or not additional students from that no -- N-O -- group, and how they might be influenced; is that fair?
MS. SHUM: Objection.
A. They -- it's fair to say, by all means, that they may identify, and that's why I want to sample them and factors that would -- would encourage them and support them to choose to attend an HBCU. Right.
BY MR. SMITH:
Q. Okay. And would you agree with me that in doing a qualitative study like this, it can be very important to examine what you've sometimes called the obverse and the "why not"?
MS. SHUM: Objection.

Page 136

A. Yes.
Q. And the 60/40 rule says that you gave -- you identified a factor as being major if at least 60 percent of students and 40 percent of the faculty or administrators identified the factors; is that right?
A. Yes.
Q. All right. And would you agree with me that there's no basis in the academic literature for weighting the responses that way; is that fair?
MS. SHUM: Objection.
A. There is nothing in the academic literature, but we all -- at the same time, we all make assumptions. I wanted to be real explicit. Obviously, I placed a different emphasis on the respective voices. Simple as that.
BY MR. SMITH:
Q. Okay.
A. And those are just numbers. That's all they are, are numbers.
Q. Right. And you just selected one as opposed to the other 'cause it appeared to be

Page 135

A. The "why nots" can often be a very useful window in understanding a problem. That would be a research question, and I would be the first to be open-minded about that and say that ideally, as I said in the article, it would, it would be good.
BY MR. SMITH:
Q. I want to ask you to take a look at the 1994 study. So, fortunately, you have that in front of you, and let me get to it myself. And can you turn to page 18 of the study?
A. Yeah.
Q. Okay. And that's the part where you summarize what you call the major factors contributing to the matriculation of white students. All right. And you use this section of the report, in fact, the very next page, to list the groups of factors that might influence white students.
A. Uh-huh.
Q. And in this page 18, you talk about how you identified the major factors, right? And you have what you call a 60/40 rule; is that right?

Page 137

reasonable to you; is that fair?
MS. SHUM: Objection, form.
BY MR. SMITH:
Q. Is that fair?
A. It seemed to me to be good reasoning. Yes.
Q. Did you consider alternative weights, for example, 50/50 or 2 to 1 in favor of --
A. I did.
Q. Let me finish. -- 2 to 1 in favor of the admin people and the faculty? Did you consider those?
A. I -- I did, because always trying to be open-minded and engage in spirited dialogue with myself and others in conducting inquiry. These are percentages, and I know many people like having a number, makes them feel more comfortable, and so I went ahead.
Sometimes it's actually easier to get published if you put in a number, I might add parenthetically, as opposed to simply put in a powerful robust 21st century idea.
Q. Okay. So if you considered different

Page 138

weights, did you look to see whether your results would be different if you assigned different weights to the faculty, admin, and the student responses?
A. I don't -- I do not recall doing that.
Q. Is it possible to determine today what would happen if you put different weights on this?
A. You mean going back to -- to these campuses?
Q. No. Going back to your raw data to look at them and say let's put a different weight, let's make it 50/50, let's make it 2 to 1.
A. I don't -- and look at the same data?
Q. Yeah.
A. I don't -- I don't think it would make much difference. But I'd have to be -- it would be premature for me to say that because I'm a very careful researcher.
Q. Do you still have the raw data today?
A. I do not.
Q. Oh. So it would be impossible, actually?
A. It would be impossible.

Page 139

Q. I see.
A. Having posed that question to me, yes.
Q. Okay. And when did you dispose of the raw data underlying your study?
A. I think by 1998 of this particular case, but honestly, I really don't know. It might have lasted much longer. I keep interviews often for -- it might have been much, much longer. Forgive my humor. I just did a three-year study, minority (unintelligible) --
THE COURT REPORTER: Minority?
A. Minority-serving institutions. And I still have all the interviews, including in hard copy packed away and will for some time.
Q. Why did you destroy the raw data underlying your '94 study in 1998?
MS. SHUM: Objection, form.
A. I -- I only had so much room in my office and at home.

BY MR. SMITH:

Page 140

Q. Okay. Did you consider providing it to the Department of Justice or the Office of Civil Rights?
A. I don't believe I did consider that. No.
Q. Did you discuss with any of the attorneys that you had dealt with at OCR or the Department of Justice the fact that you were about to destroy the raw data underlying your 1994 study and seek their counsel?
MS. SHUM: Objection.
A. Not that I recall.
BY MR. SMITH:
Q. So the work you did here in 1994 was all performed in the fall of that year; is that correct?
A. I -- I would have to look at the appendix and the document again.
Q. Take a look at page 5 of the '94 study, so that's Exhibit 1. And if you look at the second paragraph there at the bottom of the page, it says, "All five of the case studies were conducted during the fall of '94."
Does that sound right to you?
A. Yeah, uh-huh.

Page 141

Q. Did you believe that your results were representative at least of southern HBIs when they were conducted in 1994 or obtained in '94?
A. You know, I'm careful to generalize. I'm just beginning to develop ideas. I use the term kind of "preliminary" testing. You're sifting and winnowing. You're -- you're asking people, was this a factor that attracted you or didn't.
And we always in the work that we do, we academics, at University of Wisconsin or wherever, in D.C. and so on, Georgetown, GW, American University, whether quantitative or qualitative, I think the one agreement we have, most of us, if not all of us, is that we're continually sifting and winnowing and further testing ideas.
This was obviously just an initial attempt to develop some ideas, and I would be the first to admit that it, you know, needs further testing, like all these studies that we do, and taking into consideration some of the factors that you mentioned, important ones, like inviting students who chose not to

Page 142

attend, interview students who'd chosen not to attend PBIs.
Q. Does it follow from what you've just said about how these are initial ideas, subject to additional testing and so on, that your results were not necessarily representative of southern HBIs in one 1994?
MS. SHUM: Objection, form.
A. I would be the first person to be careful, whether it's a qualitative or quantitative study. We're just developing ideas and needing further questions, working with people like you, that I do, and have a wife, like I have, who continually asks me questions like, have you considered interviewing blank, blank, and blank, or gone to that setting, or a colleague or a collaborator on the study, or even speaking with a lawyer on occasion, on many occasions, who might make very helpful suggestions.
BY MR. SMITH:
Q. Sure. And I understand that you're the first person to be cautious and --

Page 143

A. I am.
Q. -- that things can be improved. No, I understand the testimony.
And my question is simply whether when you were done with this study, did you believe it was, in fact, representative of the major factors affecting white recruitment at southern HBIs in 1994?
A. I would be -- I would not overgeneralize on the study. It was a point of departure. And I think we need to continually sift and winnow, as I've said about seven times now, continually test ideas. That's what we all need to do all the time in our work, our personal, our public, workplace lives.
Q. Is it -- is it fair to say that you also thought it was important, as this point of departure, to do research in 1994 and not simply a look-back at literature or theories about student choice that dated back to the 1970s and 1980s?
MS. SHUM: Objection.
BY MR. SMITH:

Page 144

Q. Is that fair?
A. Is it fair to say it would have been helpful?
Q. No. I'm sorry. That was not a very well -- let me try to put the question to you a little bit differently.
At the time that you did this study in 1994, did you think it was important to get some fresh, up-to-date information as opposed to relying on some of the studies that had been done back in the 1970s or '80s about college choice in general?
MS. SHUM: Objection.
A. The -- it's almost invariably helpful to get useful, contemporary information and perspectives.
BY MR. SMITH:
Q. And was that one of the reasons that you did this study in 1994?
A. It was one of the reasons. If I can amplify ever so slightly, I happen to be an undergraduate history major, and I would be the first person to admit that we can learn a great deal from

Page 145

history, and we ought not to close our eyes to the lens of history, including in the state of Maryland with respect to progress or the lack thereof with respect to desegregation.
So I think -- and I would also emphasize that even if it's a contemporary study, things can change very rapidly, and there are lots of intervening variables, as we sometimes call them, that may affect things, including whites choosing to go to HBIs.
But we live in a very turbulent world, as we all know, and to -- to state with surgeon-like precision and messianic certainty that the hypothesis or theory you developed yesterday is gonna work tomorrow is highly problematic in many instances.
Q. So let me ask you about some of those rapid changes that you talked about, and let's just try and focus, if we might, on college student choice in the last, you know, couple decades.
So is it -- is it accurate to say that over the course of the last few decades, we have seen an increasing trend in mobility among students, that they

are willing to travel farther away from home, for example?
A. I don't have empirical verification. I have some observations on that. I'd say yes and no with respect to many traditionally underserved students, minority students, low income students and so on. I studied minority-serving institutions.
They have less opportunities to travel. They're taking care of families, challenges at home and the like. So students who tend to be more affluent can have more flexibility, and of course, in this country, that happens to be disproportionately white students. Yes.
Q. Okay. And by the way, are there -- are there ways that we can measure that in the literature to find out, you know, measures, even rough measures of the increased willingness of students to go away for school? Not -- we're not talking about the underserved students, but the people with options and choices.
A. Well, that'd be tricky to get at the willingness. If you wanted to look at if they made



those choices --
Q. Yes, yes.
A. -- there are some windows that we could use, some questions we could ask.
Q. Where would we look for that? What kind of data would pick that up?
A. We could spend quite a bit of time exploring the methods that we could use to do that --
Q. Let me ask you this --
A. -- and the data that we could use, including survey instruments, interviews and so on.
Q. Sure.
A. I use lots of multi-method studies. Yeah.
Q. But putting aside doing a new study, are there any accessibility databases or -- or solid measures of student choices to go farther away for college?
A. I -- I'd have to think about that more and reflect on it. It's a good question, but I don't have a short answer.
Q. Okay. And just, I understand that the



plural of anecdotes is not data. But, for example, you mentioned Tulane University. Are you aware that Tulane, for example, in the last few decades has become a destination for out-of-state students, whether they're from the mid-Atlantic or the Northeast, even New York City?
A. I would say acutely aware.
Q. And probably at your own University of Wisconsin, you've seen an increased proportion of out-of-state, nonresident students; is that fair?
MS. SHUM: Objection.
A. Yes, because we've increased the percentage of out-of-state students, and one might mention in passing that we've also increased -- this is how -- we have a volatile environment because we're concerned about funding for public higher education, we have increased the number of international students that may come to an institution by 5 percent. The international students happen to be paying more money to go to the University of Wisconsin-Madison.
BY MR. SMITH:



Q. Okay. All right.
A. So there are lots of variables that can affect this rapidly-changing environment and student choice in which we live in.
Q. Let me ask you about another variable along those lines, which is the rise of online or what's sometimes called hybrid, that is part online, part physical education. Online education courses did not exist in 1994, right?
A. Yes, did not.
Q. Right. And there has been a steady increase in the quantity and variety of online education since 1994; is that true?
A. Yes.
Q. And would you agree with me that both the quantity and the variety continues to evolve with each passing year; is that fair?
A. There's a lot of variability, and I think this refers -- it's a good example of the shifting landscape. A number of the for-profits have been under severe pressure recently. One of the most prominent

examples of online learning is UMUC, right over here in the state of Maryland.
And on the other hand, a lot of the for-profits are under -- under a lot of pressure. Enrollments are down and so on. They've been criticized rather severely, including by accreditors.
So I think you have to be careful to make predictions about online learning. I think UMUC has been doing a very good job of it. And from what I know about it, I don't know a great deal, but I have heard they have -- have been doing some good work.
Q. Okay. And UMUC existed in 1994 in a different version. It didn't have an online capability; is that correct?
A. Yeah. Yeah, that's my understanding.
Q. Okay. And so if you were trying to look at the things that might influence white student choice for an HBI or not to go to an HBI, it wasn't possible in 1994 to look at the alternative of online education; is that fair?
A. Sure. Yes.



Q. And so if you wanted to have a more accurate and more generalizable picture today of white student choice with respect to HBIs, you would want to look at current information where online education was a real alternative for them; is that fair?
MS. SHUM: Objection, form.
A. Ideally, you would, yeah. Yes.
BY MR. SMITH:
Q. And I understand that -- let's see. You talked a few minutes ago about the fact that employment and job opportunities are an increasingly important factor in student choice for college. Did I hear that correctly?
A. Yes. And some governors, like in Wisconsin, where Governor Walker has articulated a strong commitment to higher education being about jobs, jobs, and jobs.
Q. Okay. All right. I just wanted to make sure I heard that correctly.
So in your 1994 study, I understand that you interviewed a total of 36 students, correct?



A. That, I do remember. Yes.
Q. All right. And I also understand from reading your study that all of them were white, except that one of them -- I think you characterized the person as mixed race or -- I'm sorry -- a non-Caucasian other race student; is that right?
A. I vaguely remember that, yeah, but I need to look at the text.
Q. Sure. It's actually on page 6 of your 1994 study in the footnote, footnote 5.
A. Yeah.
Q. Do I have that, right?
A. Yeah, it's there.
Q. Okay. And do you happen to recall, was that person -- was he or she, did the person perhaps have one African-American parent and one white or Caucasian parent?
A. I have absolutely no recollection of who that is.
Q. Do you know whether that person identified as white?



A. I do not.
Q. I'm just curious why that person was in the study?
A. Well, I think they must have. I can infer that, that they did identify, but I also have a sense of wonder, so...
Q. A sense of wonder, you said?
A. I do.
Q. What's your sense of wonder?
A. Well, I'd be curious about exploring that more, who really was the student.
Q. And if we wanted to explore that further, probably the best source would be the raw data, correct?
A. That would be the only source that comes immediately to mind, yes.
Q. Okay. All right. So you had a total of 36 students. And how would you describe the sample that you obtained in terms of how they were -- strike that.
We talked earlier about Professor Creswell's concept of purposeful maximal sampling.

Page 154

A. Yeah.
Q. Would you say that you employed that technique when you came up with these 36 students?
A. I -- I think I came up with the sample, given the constraints of time and not having access to non, you know, white students who weren't enrolled there. You know, we always -- we always draw lines in this business. I think it was important to get disproportionate numbers of students --
THE COURT REPORTER: Disproportionate number?
A. Yes, disproportionate number of white students and so on. At the same time, I would be the first person to say that sometimes a single person, a single interview, can give you an idea.
And I'll never forget on some of the campuses, I do remember some of the interviews some years later where a faculty member might say something and -- there's a faculty member that I walked across campus with, for example, where I've just been in a focus group, and they heard the discussion for the past

Page 155

hour and 12 minutes and then they say, Cliff, you know, let me tell you what really matters, because I -- I do think we need to desegregate Kentucky State University or Lexington, Kentucky, it's about time.
Q. Okay.
A. And one occasion happened to be a black gentleman, and he said, you know, here's what I think is the most important factor that I keep hearing again and again and again. And I can even remember sometimes the language they use. Give them the damn program that they want and they will come.
Having said that, do I continue to sift and winnow with this data in this study from 22 years later, 23 years later? Yes.
And I think we -- we continue to work at this, test it, find out what's gonna work, including the state of Miss- -- of Maryland, may work in Mississippi or not work in Mississippi, but, you know, let's look here in Maryland too.
Q. Okay. Well, let's come back to my question, and it was simply whether in drawing that

Page 156

group of 36 students, do you think it's fair to say that you did use this purposeful maximal sampling or not?
A. With a little -- a generous interpretation of it, I think I could probably. I'd have to, once again, look at John's strict definition.
Q. Right. Really, to be maximal sampling --
A. Yeah.
Q. -- wouldn't it be important to include some of the no, N-O, cases?
A. It -- it would.
Q. And by "no cases," I mean white students who chose not to attend an HBI?
A. Correct.
Q. All right. And do I understand correctly that just about half of the students or a little less than half came from Southern University, the ones you interviewed?
A. I do not recall that. I read the article.
Q. I think it might only be --
A. Do you have the --

Page 157

Q. Can you go to page 15 of the study, 1994 study?
A. Of the original study?
Q. Yeah, uh-huh.
A. Well, I did say 29 people, and I believe that would be out of 86. So that would be, you know, a little more than a third, so let's not go to half.
Q. No, I don't want to do that. But just in terms of students, it says here on page 15 of --
A. 15 students out --
Q. -- that's a little --
A. -- out of --
THE COURT REPORTER: Wait.
A. That would be 15 students out of -- I believe there were 36 students interviewed.
Q. Right, right.
A. So it'd be 44, or so, percent.
Q. Okay. That's a pretty high proportion, isn't it?
A. That is a lot of it from SUNO.
Q. I've seen the term in the literature

Page 158

"sample of convenience." Is that a term that you're familiar with?
A. Very familiar with, yes.
Q. Is it -- is it fair to characterize the selection of students you have here as being a sample of convenience?
A. Well, it's all relative, and I know we're -- I feel like we're losing that concept here today, relativity. But no. I could have just gone with the students and so on, faculty that the institutional liaison identified. Instead, for example, I sought out other students on my own term.
So I think that reveals, gives you a window and the extent to which I'm also searching, including for negative examples, which evidence that that may contradict what I'm finding and not support it. That is something that too many researchers fail to do.
Q. Okay.
A. Including when they write up their research, who don't write sentences like to be sure not every interviewee in this study identified high-demand

Page 159

unique program as singularly important.
Q. I understand. And so just to come back to my question, in terms of sample of convenience, your point is, it wasn't strictly a sample of convenience because you didn't confine yourself to the students that faculty and admin had pointed out to you; is that fair?
MS. SHUM: Objection, objection, form.
A. In large measure, that's the case, yeah.
BY MR. SMITH:
Q. Okay. And then --
A. But let me just emphasize, if I could, that in many ways we don't like to use that term. But there's a lot of convenience built into most studies, quantitative and qualitative, in terms of where we get the data from, the data we collect.
Q. All right. No argument here. And I think you mentioned again that you were always searching for negative --
A. Examples, I do.
Q. Okay. And -- and one group of negative

Page 160

examples would be people who had made or were in the process of making college choices against HBIs or who had them in their future, right? And you didn't look at those?
A. The former, students who had made negative (unintelligible) --
THE COURT REPORTER: I'm sorry? Students who made negative?
A. A negative choice. In other words, they said I have -- have not chosen and will not choose to go to an HBI.
Q. Right. And with respect to the sample of convenience, your point was that you did talk to some students who had not been selected by administrators?
A. I did --
MS. SHUM: Objection.
A. -- once again, yeah.
THE COURT REPORTER: I'm sorry. I heard, "I did," "objection." I don't know if someone said something after that.
MR. SMITH: I think that's it.

Page 161

BY MR. SMITH:
Q. So the answer to my question was, you did talk to some students who were not identified by administrators?
A. Yes.
Q. Okay. And out of the 36, I think I've read that you believe you probably got 8 to 12 of them on your own and not through the administrators. Is that about right?
A. That wouldn't surprise me, but I cannot verify the number by any means.
Q. All right. Would we be able to reconstruct that data from your -- your raw materials, the raw data you had?
MS. SHUM: Asked and answered, objection.
A. The raw date that I no longer have?
BY MR. SMITH:
Q. Yes, sir. If -- I'm sorry. If it existed, would we be able to go back and say, all right, of the 36, only 8 came from your own personal selection?
A. Because I'm very careful on that sort of

Page 162

thing, I would say the likelihood is very high that we would.
Q. But does that number --
A. I would -- I would have indicated the person was in that category. Yeah.
Q. But does the number I quoted to you, somewhere between 25 and 33 percent, so a quarter to a third, might have come from your own devices?
MS. SHUM: Objection.
A. Yes.
BY MR. SMITH:
Q. Other than the students and the faculty and the administrators you interviewed, did you obtain any other sources of information for the study? Let me give you some examples: HBI documents, student documents, maybe recruitment videos, any other sources of information besides the admin, faculty, students?
A. I did not.
Q. We looked a few moments ago at the fact that your -- if we could go back to Appendix A to your 1994 study, Table 3.

Page 163

A. Yeah.
Q. So it looks to me like of your five schools, three of them had in the 2,000s in enrollment, one had 7,700, one had 4,500, just in very round numbers. And again, this not a trick question.
A. Yeah.
Q. Okay. And we saw that a little less than half came from Southern University and different numbers from the other four schools. Is it accurate to say that you did not weight, W-E-I-G-H-T, the number of students that you interviewed to the population of the school as a whole?
A. That's right.
Q. And is it accurate to say that the proportions of students and administrators that you interviewed varied from school to school?
A. It is fair, uh-huh.
Q. Is it accurate to say that the way that you selected the students you interviewed also varied from school to school?
A. I think there was modest variation. I

Page 164

think for the most part the institutional liaison was crucial, critical.
Q. Okay. And is it accurate to say that the students you chose did not necessarily line-up along the undergraduate/graduate proportions at the school?
MS. SHUM: Objection.
BY MR. SMITH:
Q. Is that a confusing question? Do you want me to --
A. No, it's clear. I don't know. I couldn't answer that question. Most of the schools didn't have many graduate students, which I think I -- I believe I emphasized or noted in the 1997 article. I don't know if I did in the 1994 piece for the Justice Department.
Q. Okay. And because of the people that you looked at, people who had already chosen to attend an HBI, it's fair to call this a retrospective study, right?
MS. SHUM: Objection.
A. Most studies are all retrospective to some extent, but yes. Correct.

Page 165

BY MR. SMITH:
Q. And would it -- strike that.
Are you familiar with the research, whether it's in the field of psychology or sociology, about the human tendency to justify past choices and to rationalize and come up with explanations for historical choices? Are you familiar with that research?
MS. SHUM: Objection.
A. I -- I have occasionally read articles on it, and everywhere from video, review books, to the New Yorker, and reflected on my personal experiences as the oldest of five children. Have I systematically gone through and looked at that literature? I have not. None of that surprises me, by the way.
BY MR. SMITH:
Q. Did you consider any of that literature in deciding on a retrospective study that looked only at people who had made the decision to attend an HBI and not at people whose choices lay in the future?
MS. SHUM: Objection.

Page 166

A. I didn't explicitly, no. No.
BY MR. SMITH:
Q. Well, did you do it implicitly somehow?
A. No. I think the answer is clearly no.
Q. We talked a little while ago about the 60/40 rule that you employed among student and faculty, administration responses. In your summary of the major factors that you have in the study -- and those are listed on page 19 of Exhibit 1 -- you don't break down the proportion of students or faculty who identified these answers, do you?
A. I do not, no.
Q. So we don't know, for example, whether an item might have ended up under student financial support because it was all of the students and none of the faculty, for example?
A. I'd have to look carefully at the article again and how I get that expression of that 60/40, those percentages. I think it -- what page were those on again?
Q. Well, I believe it was on the prior page,

Page 167

so on page 18. Oh, actually, that's a good point. So something had to be identified. It wasn't a 60/40 weight. It was a 60/40 threshold; is that right?
A. A factor was selected of at least 60 percent of the students and 40 percent of the faculty indicated it was important.
Q. Okay. Thank you.
A. I think it's pretty straightforward.
Q. Right. But if we're looking at the factors that are identified on page 19, for example, let's take student financial support, we don't know whether student scholarships were identified by 90 percent of the students and 40 percent of the faculty, or 70 percent and 50? We just don't know the actual numbers?
A. No, I don't. Didn't feel any need to explicate that.
Q. And if we look at items above student financial support, like unique and high-demand programs, we don't know, for example, whether the student number was 60 and the faculty number was 100,

Page 168

for example?
A. We do not.
Q. You've spent a lot of time in academia. Would you agree with me that faculty and administration at a modern American college and university generally are in favor of having additional programs and courses that they can offer at their institution if they can be funded; is that fair?
MS. SHUM: Objection. Objection.
A. I think one of the dominant themes among leaders and putative leaders in American higher education is that they're always searching to enrich and enlarge their mission and funding and program offerings, and so on.
There are many. You can read the New York Times two days ago about Virginia Tech's president has a new initiative with the company and so on, so it -- it goes on and on.
BY MR. SMITH:
Q. Right. Did you consider the possibility that when talking to administrators and faculty at

Page 169

these HBI about what influenced students, that their desire to get more programs and more resources for their schools might have an effect on the answers they gave to your questions?
MS. SHUM: Objection.
A. You know, I -- that's a good example where you're interviewing people, you're trying to sift and winnow, get a sense of where they're coming from, their predispositions. I really can't say anything more than that. That's something that I do, and it never stops.
I'm -- I'm -- if I'm interviewing with another person, two other people, we're trying to interpret their -- interpret the meaning of what they're saying, their authenticity, you know, and so on and on. It's challenging. And that's why later in my career I'm sometimes thinking I should go back to numbers. That would spare me from some of this reflexivity that I find absolutely critical to high-quality qualitative research and important in quantitative research.
BY MR. SMITH:

Page 170

Q. So I think I heard you just a moment ago to say that you had to be constantly evaluating the -- the statements that your informants, your faculty and administrators were giving to you. Did you make judgments about truthfulness in coding the responses that you got?
MS. SHUM: Objection.
A. You mean did I make a comment on a transcript, for example, about questioning a particular voice?
BY MR. SMITH:
Q. Right.
A. As with respect to the authenticity, for example?
Q. Yeah.
A. Yeah, I have a habit of doing that sometimes.
Q. And did the rankings that you compiled from the responses that you got, did those reflect your comments and your judgments about truthfulness and authenticity?

Page 171

A. You know, I would not be surprised. Once again, we don't have the data anymore. It's been close to a quarter of a century, so I -- I couldn't answer that specifically.
Q. Does it make sense, though?
A. It makes sense because of the, I think, incredible care and caution I use in proffering and advancing hypotheses, as in instances like this and so on.
Q. Okay. Now, you reached the conclusion, among others, that you thought that program offerings and unique program offerings were among the most promising strategies for drawing white students to HBIs, right? That's what we see here on page 19 of Exhibit 1?
A. Yes.
Q. Okay. And do you know, I haven't seen it in the study, but do you know how many programs the individual student respondents were actually in?
MS. SHUM: Objection.
BY MR. SMITH:

Page 172

Q. Let me give you an example.
A. I don't.
Q. Okay. So let me give you an example. Suppose that, you know, all or 90 percent of the students that you interviewed at Southern University happen to be there for the master's in physical therapy, okay?
A. Okay.
Q. There's no way of determining that fact from your study, right? That's not something that you recorded?
A. I did not.
MS. SHUM: Objection.
BY MR. SMITH:
Q. Not even at the time?
A. I did not. I think I was aware of that and -- because I do, I mentioned earlier, theoretical sampling. It's closely tethered to one of the grounded theory approach or sometimes case studies, which can be used for purposes of grounded theory.
I think that I've always had a lot of

Page 173

reflexivity about that, a lot of -- getting a lot of difference in the sample, and so I do that very -- that's -- that's, to me, is at the heart of purposeful sampling of trying to get exceptions, people from different perspectives and so on.
Q. Well, do you know for a fact whether you were able to achieve that level of reflexivity in this particular study or whether the students might have been concentrated in specific program areas?
MS. SHUM: Objection.
A. The best I can say on that is that I -- I remember, it is coming back now, that I did make an effort to get people from different fields of study. Now, am I saying that I have a representative, much less a random sample? I am not.
But I did some what we call purposeful sampling, and the term I prefer to John Creswell's purposeful sampling were, I'm trying to take into consideration factors that may affect whatever it is that I'm trying to identify, and I do that in everything, all the work that I do.

Page 174

Much of that, by the way, is often
invisible because you don't have enough space and
welcomingness in many journals for you to share the
extent you brought that degree of -- of thoughtfulness
to the -- to the inquiry.
BY MR. SMITH:
Q. Well, I appreciate the Yiddishkeit, but let
me simply ask you: Space limitations were not at all a
concern for your 1994 study, right?
A. Space?
Q. Space limitations. In other words,
outlining the methodology, stating whether or not you
obtained students that had diverse program backgrounds,
that wasn't a consideration in 1994?
A. Well --
MS. SHUM: Objection.
A. -- that would be an overstatement. Did I
explicate all that? No, not in the paper or here. And
as I kind of indicated just a moment ago, sometimes a
lot of that is invisible to the reader because they --
you don't have the opportunity to -- to write about

Page 175

that, especially if you're being published by a major
university press and so on, to bring that kind of
reflexivity. I do the best I can --
BY MR. SMITH:
Q. Of course.
A. -- to bring it to the table.
Q. And just a couple more questions and we'll
break for lunch. My question is simply: Space
limitations and concern about, you know, boring the
reader or the journal audience, those were not an issue
in the 1994 study that was done for the Department of
Justice to further the remedial program in Alabama; is
that right?
MS. SHUM: Objection.
A. It -- it was done. That was the driver at
the time. Although, having said that, let me qualify
that a little bit. I think because the other cases
were clearly going on at the time, it was, what can we
learn in this study that may be relevant not only here
in Alabama but in other states as this moves forward.
Again, it's a point of departure. It's an

Page 176

initial attempt to begin to identify factors, and then
I think it was a good start, and I'll leave it at that.
BY MR. SMITH:
Q. Okay. And just one more question, and I
think we can -- then we can take our break. But the --
the idea of getting diverse students who are in
different programs, I didn't see a reference to that
anywhere in the study.
I'm not talking about a specific breakdown,
but merely an intent to get students from different
courses and programs, and so do you have a specific and
clear recollection that you were, in fact, able to get
students who were in different courses of study and
different programs at their respective HBIs?
A. Well, again, I think I addressed this in
large measure a few minutes ago. But my sense is that
I was -- I was able to get some representativeness
across programs. Can I remember the numbers or
anything? I'm -- I'm -- I remember, I do remember. As
I indicated, one of the things I remember very vividly
about the study is, quite vividly, is that I did try to

Page 177

seek out students from different programs.
Q. Okay. And did you record that at the time
in your interview notes? In other words, "I spoke to
Bob" --
A. You know --
Q. Let me just finish the question. "I spoke
to Bob. He's here for marine biology."
A. I'm not certain, but I -- I think that was
likely the case.
MR. SMITH: All right. Let's take a break
here, and shall we say we'll come back at about 1:20?
Does that work?
MS. SHUM: Sure.
VIDEO TECHNICIAN: We are now going off the
record. The time is 12:31.
(There was a brief recess taken.)
VIDEO TECHNICIAN: This is the beginning of
DVD No. 3. We are now back on the record. The time is
1:23.

BY MR. SMITH:

Page 178

Q. Dr. Conrad, before the lunch break when we were talking about the schools that you looked at back in the 1994 study, I heard you to tell me that most of the schools didn't have a, you know, significant proportion of graduate students.
And in light of that, in terms of your remedial proposal, is it accurate to say that more than half and perhaps as much as two-thirds of your proposed new courses and transfer courses are, in fact, graduate programs here in Maryland; is that right?
A. I'd have to be specific. I'd have to look that up and -- and deconstruct, but the graduate student populations are important.
Q. Sure. Even if we -- I'm not trying to tie you to 66 percent or 67 percent, but would you agree with me that the majority of the new and transfer programs that you propose here in Maryland are graduate programs?
A. I'm not sure that it's a majority or not. I'd need to take a look.
Q. Okay. Well, maybe we'll come back --

Page 179

A. We'll come back when we go through the remedial proposal, if that'd be okay.
Q. Okay. Let me just ask you to assume with me for a moment that, in fact, the majority of your proposed new or transfer programs are graduate here in Maryland. You with me?
A. Yeah. I could do a quick content analysis, and yeah, I'd say that the odds are very strong that that's the case. Yes.
Q. Okay. All right. And again, we don't need to get to a specific number like --
A. Summary, yeah.
Q. But the majority of the new and transfer programs are, in fact, graduate here in Maryland. In light of the fact that your '94 study looked at schools which, as you testified, didn't have many grad students, what is the likelihood that you can generalize from that 1994 study to Maryland today, when your proposal has mostly graduate courses?
A. Well, there weren't a lot of graduate programs, and I'd have to look at the specifics of how

Page 180

many of those. But there's still -- having those programs were even more important, relatively speaking, to graduate students than they were to undergraduates, even though I didn't -- I don't think I made that point in the article per se.
It's something I'd like to inquire into further because, as we'll probably talk about later, I think graduate programs do have considerable potential for creating, building, enhancing programmatic niches that in turn attract white students at the undergraduate level, so...
Q. Okay. Well, a couple questions. First of all, you said, just now, there's something you'd like to inquire into further. What is that thing you'd like to inquire into further?
A. Oh, there's a lot of inquiry that I'd like to do further, if I could do some studies. I'd take into consideration some of the factors that you mentioned this morning, and I'd like to do it with one -- probably at least one other person who can -- we can triangulate and sift and winnow together through

Page 181

everything, through conducting the interviews, which is extremely important.
It's not just a list of questions, it's how we ask the questions that's the art, as well as the science of questions, that helps to develop answers and begin to -- to explore their plausibility in many ways. And so, yes, I would -- I would like to do further inquiry.
Q. Okay. Now, let's come back to the original question, which was, if you were looking at a student population in your '94 study that was mostly not grad students, so mostly undergrad --
A. Right.
Q. -- but you have a remedial proposal that is mostly graduate program, so master's and Ph.D., then how likely is it that you're going to be able to predict from that mostly undergrad population the utility or the attractiveness of graduate master's and Ph.D. programs?
A. Well, it's mostly undergrad, but again, I just accent the same point -- I'm sorry to repeat it --

Page 182

that there were still some graduate programs there, and they did attract students. So, you know, it's like we're doing some kind of data-based observations. I've made them back in '94, and I continue to make them.
Q. Right. Okay.
A. They're data anchored, and that's what I'm doing, is that kind of ongoing sifting and winnowing.
Q. You say that there were some grad programs in your '94 study. Do you know what proportion of the students were graduate as opposed to undergraduate?
A. I do not recall.
Q. Do you know how many different graduate program at the HBIs, in fact, were attracting students?
A. Again, I don't have the data anymore. So I would be -- I just shouldn't -- should not comment on it.
Q. Okay. And is it accurate to say that you did not observe in your study, you didn't state any observations about the particular attractiveness of graduate programs for students?
MS. SHUM: Objection, form.

Page 183

A. I don't recall stating that explicitly in anything.
BY MR. SMITH:
Q. And is it also true that you didn't state in your 1994 study that graduate programs would have an attraction for undergraduates, you know, to bring them into the school and then to have them go up to the graduate level?
MS. SHUM: Objection --
A. I haven't --
MS. SHUM: -- form. Let me make the objection, then you need to respond.
BY MR. SMITH:
Q. Go ahead.
A. I don't recall the specifics, but I -- I don't think I did.
Q. And as we sit here today, can you cite to me any -- anything more specific, some numbers, some proportions, some breakdowns, that would suggest that your findings for a primarily undergraduate body in those five colleges or five HBIs could be generalized

Page 184

to a remedial proposal that is primarily graduate students?
MS. SHUM: Objection, form.
A. I think we can learn a lot from that study, including my recollections, which I do have, that even though the numbers weren't that high of graduate students, that -- and this I do remember not specifically cited in the article but the graduate students I do remember were -- well, I need to be careful about stating this.
I think that the uniqueness and the -- the demand, the fact they had the program that they wanted was very important for graduate students. And what I remember most vividly is there really wasn't that much difference in the factors. I do remember this.
And that's, I think, why I didn't accent them, but I might have stated, that is, probably should have stated it in the article, that the factors did hold across degree levels. But again, I would still need to go back and read it, look at the '94 study to see if I did make any of those references, comparing

Page 185

grad and undergrad.
Q. Okay.
A. But one oughta always be cautious in these kind of inquiries.
Q. Right. I think you said that the -- one of the forms of further inquiry you'd like to make is to analyze a complementary set of data with another researcher who could sit in on the interviews, and do I take it from that, you didn't have another person to sit in on any of these interviews in the 1994 study?
A. That's my recollection. Yes.
Q. And is it true that that is one method, having a second set of eyes and ears, one method to prevent some of the sources of systemic bias that you talked about earlier in your testimony?
A. Yeah, another person, but let's not get caught up in the numbers. The fact is, when we add a second person who brings that degree of open-mindedness, that -- that Einsteinium and wholly curiosity, the inquiry, that ability to question him or herself and you, that is so important in the inquiry,

Page 186

and that is very, very important in conducting inquiry that is rigorous.
Q. Is it true that in a number of cases for these student interviews you didn't even or were not able to or did not actually transcribe the interview? Is that true?
MS. SHUM: Objection, form.
A. I -- I may not have transcribed some of the interviews. Once again, I'd have to go and revisit it, 'cause I -- I have not seen this for 22 years.
BY MR. SMITH:
Q. Right. Well --
A. Almost 22 years.
Q. Just to be clear, the Exhibit 1 you have in front of you, the 1994 study, you did not review it in preparation for your testimony?
A. I did not.
Q. I see. Can we take a look at page 7 of it?
A. Yes, sir.
Q. Just tell me when you're there.
MS. SHUM: I'm sorry. Did you say 27?

Page 187

MR. SMITH: No, page 7.
MS. SHUM: Oh, I'm sorry.
BY MR. SMITH:
Q. And it says on the very last sentence, it says, "Following each campus visit, field notes were made for each interview and, in some instances, entire interviews were transcribed."
So does that mean that the transcription of interviews was the exception, it was less than half the time?
MS. SHUM: Objection, form.
A. As it's stated here, it was some of each. I could not introduce any proportionality to that at this point. I do -- one can tell from the text that I had lots of quotations --
BY MR. SMITH:
Q. Right.
A. -- and that would suggest that a number of the interviews were clearly transcribed.
Q. Yes, a number. And you don't know whether that number was 20 percent or 30 percent or some other

Page 188

number; is that right?
MS. SHUM: Objection, asked and answered.
A. I don't.
BY MR. SMITH:
Q. All right. And if a number of the interviews were not transcribed, then is it fair to say you didn't do your coding of answers using a transcript of the interview?
MS. SHUM: Objection, form.
A. It's fair to say that in some instances I used Cliff notes which are often taken with exacting scrutiny, including quotations.
BY MR. SMITH:
Q. Yes, sir, right. And to use your term, in a number of these interviews, out of these 36 students conducted in 1994 in the southern United States, you simply used your own handwritten notes, including some quotations; is that fair?
MS. SHUM: Objection.
A. Yeah, in some of them. Yeah.
BY MR. SMITH:

Page 189

Q. Does that follow -- should I follow from that, that -- or does it follow from that, that you didn't -- you weren't in a position to have someone help you or to review your coding of answers. It was all on you, in effect?
A. My recollection is that it was on me. Yes.
Q. Now, I think you told me that one of the -- this morning, you told me that one of the important features about your work is your effort to be open-minded at all times and not to bring a preconceived answer or a self-fulfilling prophecy to your qualitative work; is that fair?
A. I work as hard at that as anybody I know.
Q. Okay. Now, you did share as one of the appendices to your study -- and it's the very last two pages of the 1994 study. You shared a copy of your interviewee rating instrument; is that correct? Last two pages of the whole thing.
A. Of the major report?
Q. No, the entire thing, of the document itself, very last two.

Page 190

A. Oh, yeah. Okay.
Q. Okay. And so Appendix C to your report is the interviewee rating instrument, right? That's the written document that -- I guess all documents are written. It's the document that you handed to the students and the administrators to ask them to rank the most important factors in white student matriculation.
A. As I moved along, that's my recollection. That's my recollection, yeah.
Q. Okay. And I notice here that the first item on the list here is high-demand programs and unique programs, right?
A. Yes.
Q. Okay. Are you familiar with the literature on the effects of the order of presentation in interviews of human subjects?
A. Well, it's something that I certainly am self-aware about. I would need to revisit this to recall why they were presented in this order in using this language, 'cause I would be very careful about that. I don't, as I've said repeatedly try to engage

Page 191

in self-fulfilling prophecies.
Q. Right. And that's not the point of my question. My question was: First of all, are you familiar with the literature that addresses the effect of presentation of choices or questions in interviews of human subjects?
A. Oh, I've read it over the years. Yeah, and it's something one needs to be mindful of.
Q. Sure. And -- and based on that literature, isn't it accurate to say that that primacy, in other words, the rank ordering, the first or second item listed, can sometimes elicit more positive responses? That's a phenomenon you're aware of, correct?
A. I think -- I think there has been research on that. It wouldn't surprise me at all. Yes, I recall that. Sure.
Q. And in light of that, wouldn't it be prudent to try and minimize the effects of systemic bias to use random ordering of the possible choices in an interview rating instrument like this?
MS. SHUM: Objection, form.

Page 192

A. I -- I -- I would need to revisit the study and see how I did it 'cause I'm not sure that I always did it this way.
BY MR. SMITH:
Q. Well, sir, I -- go ahead. Sorry.
A. No, I'm not. I need to take a second look at it.
Q. Okay. And all I can do is go off the copy that we have in front of us --
A. Yeah.
Q. -- that says --
A. I --
Q. Let me just finish the question. -- that Appendix C is the interviewee rating instrument that you devised after you had been to two schools.
A. To two schools?
Q. Right.
A. That might have been the case. And I wouldn't -- even those percentages at 60 percent, 40 percent and so on, those are just indicators. I'm also listening. I mean, this is qualitative research

Page 193

too, and so I -- I sometimes use numbers 'cause people feel more comfortable with them.
And so I think they can provide windows and so on. And I think I maintain fidelity being as objective as I possibly can. And once again, I'd need to be -- need to go through and revisit this to see, to see if I asked them in that -- in that order.
I think there are a lot of intervening variables. It could be the tone, the way you ask questions, how you ask them, the language you use, have you never been attracted to a unique program and so on. And I don't use that kind of language. I think that's highly suggestive.
And I have observed interviewees over the last 40 years -- interviewers, I'm sorry -- who about 95 percent of the time I see as including theirselves, even if you have the questions listed there into the interview process itself, so I try to be as fair-minded as I can.
Q. Sure. Well, let me ask you about something you just said, that the questions and the tone can be

suggestive and --
A. Oh, very much so.
Q. Is it true that in every case you did inform the interviewees that this work was being done for the Department of Justice to help support efforts to desegregate higher education for certain states like Alabama and Louisiana?
MS. SHUM: Objection, form.
A. Again, I don't know the specifics. My guess is that I -- my best recollection is I probably did that in the spirit of transparency.
BY MR. SMITH:
Q. Sure. And it --
A. Do I know that for certain? I do not. I don't have the specifics to --
Q. Right. We have to go on the text of the study, right?
A. Okay. Yeah.
Q. And for an administrator or a faculty member, for example, I think it would be reasonably clear that this might be an opportunity to get some new



programs for their school; isn't that right?
MS. SHUM: Objection, form.
A. Anything is possible.
BY MR. SMITH:
Q. Sure. Let's go back to the question of the interview instrument. Well, actually, let me ask you this: Anything is possible, but as a matter of like human behavior and talking to smart people, who, you know, have worked in the HBI world and who are knowledgeable about the litigation that was ongoing, because it was a matter of wide public knowledge in the South, isn't it a possibility at least that some or more of the faculty members and administrators might have realized that this might be an opportunity to obtain some additional programs for their institution in which they believe very strongly?
MS. SHUM: Objection, form.
A. That's a very thoughtful question, and I would only say there's some possibility that they might have thought that, given the self-interest in people. Yeah.



BY MR. SMITH:
Q. So let's just go back to the interview instrument for a second. Can you take a look at page 7 of your report, of the main body of it?
A. Yeah. I'm sorry, I didn't review this. I didn't know you were going to interrogate this 1994 document.
Q. I understand. And for the most part, I'm just asking for you to tell me whether there's more facts beyond what's revealed on the face of this. Okay. So let's just look at the face of page 7, and you say in there that "This instrument (Appendix C) was given to most interviewees at the last three institutions that I visited," and then you list them, correct?
A. Correct.
Q. Okay. And so based on what you wrote in your study, it would appear that the language of Appendix C that lists unique and high-demand programs first is the document that was presented to the interviewees in three out of the five schools?



A. Well, it does -- it does -- once again, I haven't read it, but -- again, till now. It -- it does say "most interviewees."
Q. Right. Okay.
A. And with a full self-awareness, along with an appreciation that I was sort of building this, sort of trying to build up some observations during the first two institutions that I had tentatively found in those first two, that these were some of the important and I was -- factors, and I was trying to group them. And obviously, the findings came out differently than this, this list, when you look at the ultimate findings of the 14 or so factors.
Q. Right. And so for most of the interviewees in the last three institutions you visited, you did provide an Appendix C to them at the conclusion?
A. That's what the document says. Yes.
Q. Right. And in order to determine the interviewee's perspective on things, you looked to see whether they rated a factor 7 or above on your 10-point scale, and, if so, you inferred that they found the

factor to be important; is that right?

A. I did.

Q. All right. Now, would you agree with me that --

A. But -- but could I just accent? This is qualitative research too, and it's the benefit that you don't often get in quantitative research, and that is you get people express strong feelings, and you begin to hear certain rhetoric again and again from some of the students or from administrators.

I can remember 25 years later at some of these institutions, like Kentucky State, we're hearing the language, I think it was closely tethered to a movie. Cliff, this is really simple, how do we get white students here at the grad and undergrad level. Build it and they will come. Build a program they didn't offer somewhere else, and, you know, it's a high-demand program that they want to take, get a job get a life, get a career, and they'll be here.

So let's not forget the subtlety and nuance, the careful listening upon which we begin to



draw observations. I didn't come up here with any bias about or -- predispositions whatsoever that it was -- what would work. I'm a white fellow from North Dakota. I had a lot to learn.

Q. Understand. And would you agree with me that when you're moving beyond the effort to get some preliminary indications of what might work and you're talking about moving around big chunks of a state's higher education system that could affect tens of thousands of students and cost hundreds of millions or billions of dollars, that it's important to move beyond the preliminary indications and the point of departure to more reliable and more generalizable evidence; is that fair?

MS. SHUM: Objection, form.

A. Well, I don't see this as a test. What we're trying to do and the judge has to do is come up with a remedial proposal, and I think maybe I need to be more clear about that. This isn't a study per se. We're trying to come up and generate some, as I said earlier, kind of what I might call data-driven



observations about what seems to be working based on my research, my travel. I could give some examples in other states in the study.

BY MR. SMITH:

Q. When you said a moment ago that something wasn't a study per se, were you talking about the 1994 document that we have here?

A. You know, we can parse on the language here. I -- I -- I would call this a very preliminary set of observations, study. You know, some of us use different language in talking about this, and I -- I -- we all have different world views in these kind of matters. I'll leave it at that.

Q. All right. Would you agree with me that if a qualitative study is, in fact, generalizable to other contexts, other populations, you should be able to use it in other cases with those different populations and get the same or similar results?

MS. SHUM: Objection, form.

A. Here's how I'd put it: I think we have to be, all of us, quantitative/qualitative, be careful



about generalizability because of the rapidly-changing landscape in which we live, including on such issues as race, if one lives in the United States of America.

So I just think we have to be very careful about generalizability, whether it's from one state to another, from a metropolitan area to a rural area, southwest Mississippi to up in Oxford, Mississippi, and Starkville, Mississippi, whether you're in SUNO or UNO, New Orleans or, you know, in Baton Rouge, and so on.

There are differences. So we have to be careful. At the same time, we can learn. We can begin to develop insights, try to begin to explore on a very preliminary way some ideas about what's gonna work to address the challenge that we've identified.

Q. Okay. And when you speak of the changing landscape -- and you mentioned race, for example?

A. Yeah.

Q. -- in looking to see whether a study's results could be generalized, you would also want to look at the changing landscape in terms of online education, in terms of student mobility and willingness

Page 202

to travel away for college, right?
A. Those are all factors, certainly, to consider. Uh-huh.
Q. And did you ever consider replicating your 1994 study in Maryland with the Maryland HBIs?
A. I would love to replicate my study, and I would've loved to have replicated it before we had the opportunity to meet today, but I did not.
Q. And why did you not do that?
A. Oh. Because of, among other things, a very severe timetable, and I think most important that we were invited and encouraged, the judge asked us to do a remedial proposal, not come up and do another study per se, as I've been doing.
Q. Now, in terms of the timetable -- are you okay?
A. No, I'm fine.
Q. In terms of the timetable, you've been in this case for the last six years, right?
A. Well, I think I did a 2010 study. So we'd probably have to go back to 2009 or '8.

Page 203

Q. Okay. So you've been in this case for seven or eight years, right?
A. Correct.
Q. You've had plenty of time to do a study of the type that you did in the fall of 1994, in Maryland, right?
A. Well, we were --
MS. SHUM: Objection, form.
A. You can say I've had time in any state to do it over the last six or seven or eight years.
BY MR. SMITH:
Q. Right.
A. There was a trial. I could have gone to many other states. It'd be interesting too.
Q. Yeah. But you've been providing opinions in this case, in a case in federal court, right, where you knew the stakes were high for the last seven or eight years? True?
A. Well, I provided my perspective in a 2010 report and testifying at trial. I wouldn't call them opinions. I -- I take the liberty of labeling my -- my

Page 204

voice as perspective. Perspective, yes.
Q. All right. Well, I guess the --
A. My never-ending quest for trying to find the best answers I can to the problem.
Q. I understand. I guess my question is simply: The pressure of time has not prevented you from doing a study similar to your '94 study based in Maryland at some point between 2007 until today?
MS. SHUM: Objection, form.
A. Well, I have a field of responsibilities, including being dissertation advisor to about three Ph.D. graduates every year, teaching two courses each term, and having published two books in the last four years has a way of taking up time.
BY MR. SMITH:
Q. I see. And so it's your other professional responsibilities that prevented you from doing a -- replicating your '94 study in Maryland?
A. Oh, I think there were other considerations as well.
Q. Okay. What are those?

Page 205

A. Including having funding. I didn't apply for funding, but...
Q. Okay. What else?
A. Sure. It would -- it would -- at this point, it could be a very interesting time to -- to conduct, always for me, a further study on something like this. But I -- I actually have some other priorities. So thank you for indirectly encouraging me to conduct yet another study of this, but I have plans to write another book in the foreseeable future, along with my other duties.
Q. I see. You said one reason you didn't try and replicate your study here in Maryland was that you didn't have funding, and you said you didn't apply for it.
A. Well, I mean, funding anywhere to do it. I wouldn't necessarily just do it in Maryland. I would look at other states, other -- a lot of the variables we've been talking about, grad/undergrad, etc.
Q. Sure. Did you ask anyone or discuss with anyone the possibility of getting funding or financial

Page 206

support to replicate your study here in Maryland?
A. No.
Q. You told me that you were aware of one other study that had looked at this research question of why white students choose or don't choose HBIs and that you were aware of one article, and that is the article authored by Mr. -- or Dr. Sum, S-U-M, right?
A. Yes.
Q. Sum or Sum?
A. It might be Sum, I would think.
Q. Okay. And so that we're clear what that article is, let's hand you our next exhibit.
(Conrad Exhibit 3 was marked for purposes of identification.)
A. I think it's called "Law in Society" or something like that.
BY MR. SMITH:
Q. Yeah, I think you're right. Doctor, you've been handed Defendant's -- or rather Conrad Exhibit 3, and that's the -- I'm gonna call it Sum, if that's okay, the Sum/Light article from 2004.

Page 207

That's the one you're referring to, correct?
A. Yes.
Q. And are you familiar with that article?
A. Yes. I got it, looked at it fairly recently, and I've skimmed it and then a bit more, but for the most part, skimmed it, and I've looked it over. Yeah.
Q. And do you agree or disagree with that article's conclusions?
A. Oh. Well, the authors have a number of points to make, including reverse racism and so on, at HBIs. They ask several different burning questions, and so what is preventing white students from going, what is encouraging them to go to some extent.
They also have intersecting agenda; namely, let's give us a little history of segregation. We talk about set up to the problems and scholarly articles, well, they spend a lot of time setting up the problem.
Q. And after the authors have set up the problem, they then describe their research methodology

Page 208

and they describe their findings?
A. They do.
Q. And can I simply ask you to tell me: Do you disagree or agree with their findings and conclusions about what works and what doesn't work in terms of attracting white students to HBIs?
MS. SHUM: Objection, form.
A. Well, it was interesting reading. Once again, I haven't interrogated it in depth with the aforementioned exacting scrutiny of a judge's learned hand. Having said that, I think overall I was -- as I looked at the article, I was kind of surprised that I think there -- there clearly is some overlap with what I'm suggesting. I think, you know, some of the surprising -- findings were not particularly surprising. Like scholarships, I think there's a little bit on that.
But one of the -- there were a couple. One is the academic reputation and prestige, but the other one that seems to be attracting white students is clearly jobs, jobs, and jobs, and that would mean

Page 209

programs.
As I recall, by the way, there were some differences between the groups respectively, right? There were the three groups of white students who attended, white students who went to community colleges, and I think they were mostly seniors in high school, weren't they, juniors or seniors in high school, so they had six focus groups.
BY MR. SMITH:
Q. Right.
A. Two of each. So overall, it was interesting. And then even on the uniqueness, they did this indirectly, but near the end of the article, it caught my eye where they did talk about how the HBIs were duplicating the programs at the PWIs, which is -- I don't know if you noticed that in reading the article. I don't know if I can find it here.
I want to be careful. I mean, they were approaching it from a different angle and so on, but it does cover a lot of territory, including what does, what doesn't, and as well as their overall kind of take

Page 210

on where we are with respect to segregation, right, desegregation, not least with respect to that hypothesis.
Q. Doctor, I appreciate your -- you points, and let's see if we can maybe synthesize this a little bit.
A. Sure.
Q. So I asked you whether there were things that you agreed with or disagreed in this article.
A. You did.
Q. Okay. And I heard you to say, first of all, you agree with their finding that academic reputation has a significant influence on white students' willingness to attend an HBI; is that correct?
MS. SHUM: Form. Objection, form.
A. That's correct.
BY MR. SMITH:
Q. The next thing I heard you say is that you read this article to mean that certain types of programs could attract white students to HBIs. Let me

Page 211

just say, do I have that right? Is that how you read this article?
A. Yes. Could I amplify on that slightly, 'cause they mention some of the fields that were likely to attract white students, like business.
Q. One step at a time. Okay. All right. You know that the methodology of this report was to include both community college and high school students, correct?
A. Yes.
Q. And we've established the fact that you did not or did not have an opportunity to have any of those prospective students, white students, considering an HBI in your study, correct?
A. Yes. That's correct.
Q. And in that respect, would you say that this methodology was a refinement or perhaps an improvement on your methodology?
MS. SHUM: Objection, form.
A. We -- the studies we do in the social sciences, including history, of course, all -- if you

Page 212

-- if you look down the line, they have strengths and limitations. Some studies made certain considerations, some made others.
Now, we can parse on focus groups. I found many circumstances where -- some circumstances where focus groups have been very helpful. Recent study in the Marshall Islands, where I was there with some young men in a boot camp at the end of Majuro Atoll. Depending on the research -- research questions that are posed, sometimes like these kind of questions that these people have been asking, as well as I've been asking, sometimes single interviews are an easier way to get into questions like, why didn't you come here to an HBI.
So there are certain pluses and limitations of different methods, and we can take any study and compare and contrast, and I wouldn't -- I wouldn't -- I'm not gonna engage in comparing my study with this study. I think they both have some strengths and some other things they could have done ideally. Simple as that.

Page 213

BY MR. SMITH:
Q. Okay. All right. So I understand you think there are strengths and weaknesses about the methodology used here. Let's take them one by one. Would you agree with me that the use of community college students and high school students, that is, prospective students at HBIs, that is a strength of the study?
MS. SHUM: Objection, form.
A. Yes. We've already talked about that, and I've accented that.
BY MR. SMITH:
Q. Okay. Great. And the second thing is you think sometimes focus groups may not be the best way to get information from interviewees. Is that -- do I have that right?
A. You do. But it also depends. Let me emphasize strengths and weaknesses. Who's doing the focus groups. I've done focus groups with different people. Some people ask questions that lead. Other people ask questions that do not lead.

Page 214

Q. I understand that.
A. They're much more open-ended.
Q. Right. And -- and so one way to check that, to prevent that, is to have multiple interviewers or facilitators, right?
A. Well, sometimes I think you need a mediator from outside, if I can speak freely, to invite everybody in the room to be open-minded about what we're inquiring into.
Q. Right. In terms of focus groups, you used focus groups --
A. I have used some of --
Q. Time-out. Sir, you used focus groups for some of your interviews in the 1994 study, right?
A. I did, uh-huh.
Q. Now, could you take a look at page 413 of Exhibit 3, this Sum/Light article?
A. 413?
Q. Yes. And you told me, I think, that you have read this article quite recently. Do you see in the --

Page 215

A. I skimmed, skim.
Q. Skimmed, okay, skimmed it. On page 413, do you see the last paragraph where the authors provide a warning about the limited generalizability of their findings to the larger population?
A. Yes.
Q. And you understand that this was -- this study was conducted in Mississippi, correct?
A. It was conducted in southwestern Mississippi. Southern Mississippi, which I do know.
Q. Okay. And would you agree with their point that the number of participants that they had, which, in this case, was somewhere between 54 and 96, was too small?
A. I would not have used -- I don't know how they got that number or that word, far up in Grand Forks, but I think sometimes samples can be relatively small. It's not whether -- it's actually a pretty good size sample. The problem is or the challenge is the strength and weaknesses, that those are pretty large focus groups.

Page 216

The best of my recollection, weren't some of these focus groups, like, 9 to 17 people?
Q. Is there -- is there any --
A. I know they lasted for quite awhile, but they really -- I -- I think the limit is that they -- they really, if I recall -- again, I just glanced yesterday at it -- that there were just six major focus groups, and so they only have a few hours of interviews. That's a limitation. It's not -- it's not the number. It's the way in which they inquired and interviewed these interview -- interviewed these people.
Q. Sir, to make sure I understand --
A. Mine is far more inclusive in that sense.
Q. I understand. So to make sure I understand your objection to their methodology, you're saying the focus groups they used were too large; is that right?
A. Well, I'd say that's a limitation, but I'm also saying, consummate with what I've been saying repeatedly, there are strengths and weaknesses to --
Q. Well, I think that was actually a yes or

Page 217

no. You consider that to be a weakness of the report; is that right?
A. I'd consider it a limitation.
Q. Okay. And is there anything in the literature that tells you that a focus group of 9 or 10 or 12 or 16 people is too large, and that that creates problems in the analysis?
MS. SHUM: Objection, form.
A. I -- I don't recall anything. But if I was on a Ph.D. committee and somebody said they were doing interview groups of 9 to 17, I would have reservations, at least based on my own experiences.
On the other hand, in the College of Marshall Islands, I think we had 17 young men in a room, and they -- they were an incredibly valuable resource for understanding the two burning questions I was posing to them.
BY MR. SMITH:
Q. Okay. And would you look at the very last sentence of page 413 where they said that they found a certain -- they found such consistency, but that one

Page 218

must always exercise caution in drawing conclusions from small-N, where N is the size of the sample, small-N studies.
Do you see that?
A. I do see that.
Q. And do you agree with that proposition or not?
A. I would obviously restate it in a different way that was far more coherent and compelling. I would say something, one always exercise caution in drawing conclusions from studies, all studies have pluses and minuses, and we're still working them out, whether it's climate change or whatever it is.
Q. Yes. And would you agree that it's particularly important to be cautious when drawing conclusions from a small-N or a small sample study?
A. I think a relatively small sample, yeah, but it could depend on where the study was done and all sorts of other factors.
Q. Sure. Would you take a look at page 426?
A. Yes, sir.

Page 219

Q. All right.
A. Right.
Q. And do you see towards the bottom of the page the authors' conclusion? They say, "...in choosing a school, these students were not looking for highly specialized programs as much as a generally strong reputation for quality. Some asserted that such programs might help recruitment at the margin, but others were doubtful regarding their appeal to white students."
Do you see that conclusion?
A. I -- I don't know if that's a conclusion or not or just part of the findings. I think it's part of the findings.
Q. Okay. Part of the findings. Do you have any reason to disagree with that finding of the study?
A. Any reason? Let me just take a look at this paragraph, if I could just reflect for just a minute. Well, they emphasize improved HBI programs. As you know, we talk a good deal about program enhancement, is one of the three pillars for our

Page 220

remedial proposal.
It -- it would be helpful to know what -- which of the three clusters of students that they were referring to with this particular finding, although they do seem to suggest it'll cut across all three --
Q. Yes, sir.
A. -- groups.
What's tricky, though, if we read with a little caution. "With prompting, however," notice the word "however" after the proposition that was just stated. They put, "...they tended to mention the implementation of, or improvements in, programs related to business (sic), journalism, health, and computer-rated professions."
So I'm having a little trouble as a, you know, reader. On the one hand, programs maybe not that important. On the other, they clearly could be an incentive. So I think they're a little bit of a contradictory voice in that particular paragraph, not that I'm their editor.
Q. I see. And so when the authors conclude --

Page 221

after quoting the language you just described, they say, "Still, in choosing a school, these students were not looking for highly specialized programs as much as a generally strong reputation for quality."
Do you have any specific reason to disbelieve or to doubt that, that finding, in this study?
MS. SHUM: Objection, form.
A. Only the previous sentence with the "however."
BY MR. SMITH:
Q. I see. Okay. And I'm --
A. It's a very interesting coupling of those three sentences, is it not?
Q. Well, that may or may not be, sir. I'm curious, why did you not cite this study in your expert report that covered several hundred pages?
A. I -- I had -- I wasn't aware of the study till a couple days ago, and I've been looking for a long time. Until recently -- well, wait a second. It might have been a while ago, and I think that I missed

Page 222

it. I might have gotten an email on it that I missed it, and if so, it was my fault entirely.
Q. I see. And sir --
A. And I think that was probably the case. But because of the incredible volume of information with respect to this case, I think I probably made a mistake and should have read it several months ago.
Q. I see.
A. For which I apologize.
Q. Okay. I'm just gonna ask you to assume that the pertinent conclusion of the study is what we just read through here on page 426, that these students were not looking for highly specialized programs as much as a generally strong reputation for quality.
Do you have any perspectives or opinions about why they apparently reached a different conclusion from your 1994 study?
MS. SHUM: Objection, form.
A. Well, I do think quality is important and reputation. I've -- I've written many articles, done many studies, including quantitative studies in higher

Page 223

education. That's not surprising to me.
In fact, I'm talking about quality, Walter Allen and I, when we talk about that second pillar of our remedy plan. That's program improvement.
BY MR. SMITH:
Q. Yeah.
A. That's very tightly tethered to program quality. And they have the aforementioned "however" in that paragraph. Then, in some ways, they seem to be aware that -- you know, they seem to be interested in jobs to some extent. So let's not overstate their findings in one way or the other. I understand the "still" at the end of the third of those three sentences, but...
Q. Again, going back to the sentence, it says that their main objective was a generally strong reputation for quality.
A. Yeah.
Q. And that is not the finding in your 1994 study?
A. No, but it's one of the major --

Page 224

Q. Let me finish. That is not the finding in your '94 study, is it? And I think that's a yes or no question.
MS. SHUM: Objection, form.
A. Actually, it is a major finding. If you look -- well, I think positive reputation for quality is very closely linked with that, is it not?
BY MR. SMITH:
Q. Sure.
A. And that is one of the key factors under academic program offerings in our findings.
Q. Right. You rank unique and high-demand programs first and second -- let me just finish -- and then third reputation for quality, correct?
MS. SHUM: Objection, form.
BY MR. SMITH:
Q. In your '94 study?
A. I'd have to look at the order in the '94 study to answer that. I think it was definitely in the top four or five, I think. It was ranked very highly.
Q. Okay. And these authors appear to reach a

Page 225

reverse finding. They say reputation for quality is the most important and students really aren't looking for highly specialized programs.
And my question is: If those, in fact, are the findings here, can you explain why they might have reached a different result?
MS. SHUM: Objection.
BY MR. SMITH:
Q. And maybe the answer is "I don't know," and -- but just tell me what your thoughts are.
MS. SHUM: Objection, form.
A. It's not a reverse finding, and so I think that's a severe misrepresentation of what we find here, and I think you would probably agree with me on further reflection.
BY MR. SMITH:
Q. Okay.
A. Both studies agree that reputation/quality, two overlacking -- overlapping attributes are important.
Q. How long -- I'm sorry. Let me ask you a

question.
A. Do they place as much emphasis on programs? They do not.
Q. Okay. Got it. If your remedial proposal is adopted, how long do you think it will take each of the HBIs in Maryland to reach a positive or highly positive reputation for academic quality?
MS. SHUM: Objection, form.
A. It depends entirely on the remedy proposal. If it does address, if it helps to create distinct, institutional identities at the HBIs, as anchored in their program offerings, and if that is accompanied by very strong -- excuse me, my little cough here -- the kind of program enhancement that needs to accompany that, and it will require a lot program enhancement once you're building programmatic niches like we propose, at least two in each of the four HBIs, three in a couple.
And then if you have that third element, you've still got to have that -- revising that program approval process, and we made some suggestions there,



where you're monitoring what happens in the predominately white institutions, so you're not just building up and building identities and building quality and getting the resources over in the TBIs, but, you know, you're also ensuring that the predominately white institutions don't overstep what would, then, be the bounds of -- of the identities you're trying to create at the HBIs.
BY MR. SMITH:
Q. All right. Let's come back to my question. My question was: If your remedial proposal is adopted, how long will it be until the HBIs each develop a reputation, a positive or highly positive reputation, for academic quality? And when I say "how long," I mean how much months? How many years? How many decades?
MS. SHUM: Objection, form.
A. That would be singularly inappropriate for me to be very specific about that. It depends entirely on the thoughtfulness of the plan. If the -- if --
BY MR. SMITH:



Q. We're assuming -- sir, to be clear, we're assuming your entire plan lock, stock, and barrel --
A. If our entire plan?
Q. -- is adopted. Yes. How long will it take until they get to that positive reputation for quality?
A. If fidelity is maintained to the remedial proposal -- and I wouldn't want to put a number at all on this -- I would -- I would remain very hopeful that very significant progress could be -- would begin to be made in the next five to seven years.
Q. What is the closest analog you can think to institutions developing a positive reputation for academic quality in five to seven years?
MS. SHUM: Objection, form.
A. Well, that's a good question. I may need to think about that for just a minute. I'm sure I can come up with some examples.
BY MR. SMITH:
Q. Well, how about one to start with?
A. And you prefer me to stay in the public domain?



Q. Let's start with public.
A. I -- I think some of the best examples in the public domain, because we have these flagship universities from College Park to Madison that are very dominant in the public domain, I think one of the things over the last decade or two that has inspired me hasn't come quite as far as I thought, but some of the urban universities.
Q. Like?
A. I'll mention several. One is, I think, the University of Wisconsin-Milwaukee, hasn't made as much progress as I thought it would be, but it is becoming a major urban university.
Q. Okay. That's one.
A. The kind of urban university that I think that in many ways was planned for in 1975 when -- when, you know, Morgan State was designated urban university --
Q. Right. So that's one example.
A. -- the city of, yeah.
Q. Give me another.

Page 230

A. Some of the other ones. Well, one of my favorite is actually Portland State University, which has done relatively well. They really began to urban area. You know, they got the Mark Hatfield school at Portland State.
Q. Any others?
A. Oh, yeah, there are other ones. Just give me a minute to think about. I think -- and I've been there a number of times. It's no Champaign-Urbana, but the University of Illinois-Chicago has really become a very formidable institution in many ways.
Now, do you hear about these institutions as much as you do Terrapins or Badgers or and so on?
Q. I think you've answered my question.
A. You don't, you don't. But I think they're examples of that.
Q. And are those three you just listed for me your top three examples -- University of Wisconsin-Milwaukee, Portland State, Illinois-Chicago -- as public institutions that have transformed their reputation for academic quality in five to seven years?

Page 231

A. Well, I wouldn't want to tether that to a particular timetable.
Q. Well, in that case --
A. And I'm not even gonna leave it that those are my top three. I'm just saying off the top of my head. That's the kind of question that would require, you know, some -- some thinking further about some other urban universities.
Q. Well, let me simply ask you, Doctor, while you're thinking, this is -- this is my chance to ask questions and for you to answer them.
A. Yeah.
Q. So if you -- if any others occur to you before the end of the deposition, I'll expect you to let me know. I want to be very clear here. The three you've mentioned: Wisconsin-Milwaukee, Portland State, Illinois-Chicago, you don't think they were able to transform their academic reputations or their reputation for quality in as little as five to seven years, do you?
A. Well, I think --

Page 232

MS. SHUM: Objection, form.
A. I think it's taken a period of time, and that's a pretty strict timetable. I just said make a good start on it, okay? I think it does take a lot of time.
BY MR. SMITH:
Q. Decades; is that fair?
A. Well, I think we need to be cautious --
MS. SHUM: Objection, form.
A. -- about that to the extent we consider, for example, program transfers and mergers, which is gonna become much more prominent in my -- is becoming already, or will take off in the coming years.
I think that there -- there -- things can happen much more quickly if you would move programs, whether from the flagship or other campuses, high-demand, highly respected fields and so on, like engineering, where you develop programmatic niches in those fields, have great potential to transform the reputation and, if all goes well, the quality of the institution.

Page 233

Q. Give me your top three examples where a program transfer caused a substantial increase in the reputation for quality of an academic institution.
A. Well, that's a very good question, but I have to have time to think about that because --
Q. Give me one.
A. Well, we've been very reluctant to do that in higher education, program transfers, for obvious reasons. People have vested interests. And University of Wisconsin-Madison, where I happen to work, is not very anxious to transfer programs to UW Milwaukee.
Q. Right. So I understand that program transfers are rare for various reasons.
A. Right.
Q. So name me one situation where a program transfer caused a substantial increase in the reputation for quality of the receiving, the transferee, institution.
A. I'd -- I'd have to take some time to think about that. I do think that it clearly can be done. Think about it, if you moved engineering schools or

Page 234

part of law school or medical schools and so on --
Q. I hear you saying that --
A. -- that could go a long way.
Q. I hear you saying you don't know, but you're gonna think about it. And before the end of the deposition, we'll come back to it, okay?
All right. Now, you mentioned that the transfer of programs from a flagship university can cause a big change in the reputation of the receiving institution.
A. I think it can, and that's why it's so hard to estimate, estimate years. I don't mean to circumscribe that by any stretch of the imagination.
Q. I notice that there is not a single program transfer in your remedial proposal from the University of Maryland College Park; is that true?
A. That's correct.
Q. Right. Why not?
A. There could have been.
Q. Yeah, but why isn't there?
A. That's a delicate question. Can I think

Page 235

about that till later in the day?
Q. No. Sir, if you don't -- if it's just delicate, I need to know the answer now. You obviously know the answer and you're reluctant to supply it and I'd --
MS. SHUM: Objection.
BY MR. SMITH:
Q. I'd like to hear what the actual reason is. This is our chance.
A. Well, you'd have to ask Walter Allen for his reason. It may differ from mine.
Q. Well, let's find out what yours is.
A. Flagships can make a very strong claim that they're entitled, especially if they're in a land-grant flagship, obviously, university that their -- they can offer everything. And it's very hard to, for obvious reasons, to transfer programs from a flagship.
They become part of the narrative of a state, and so when you think of the flagships, you think that -- you tend to think they offer everything, you know, and are entitled to offer everything.

Page 236

So it's very hard to disrupt the dominant narrative in American higher education with respect to flagship universities, and I see that as continuing for the foreseeable future, where people would be very reluctant to make any initiatives, other than efficiency initiatives, with respect to program offerings at flagship universities.
Q. Well, but, sir, you got to write on a blank piece of paper, right? You got to propose whatever you thought was best to solve the problem that you observed. And in light of that, why didn't you propose moving programs away from Maryland College Park?
A. From my perspective, it would disrupt the dominant narrative that the flagships are entitled to offer everything.
Q. I see. And are flagships the only schools in a state university system that can develop important narratives?
MS. SHUM: Objection, form.
A. Well, I wouldn't necessarily call it important. I'd call it the dominant narrative, a

Page 237

narrative of to some extent -- and I'm at a flagship, 1848, the flagship, I would emphasize predominately white institutions, like UMCP and University of Wisconsin-Madison.
BY MR. SMITH:
Q. All right. For example, are you familiar with UMBC?
A. I am.
Q. Okay. And is it accurate to say that UMBC itself has built up a compelling narrative about its ability to deliver education to diverse students across the STEM, S-T-E-M, fields?
MS. SHUM: Objection, form.
BY MR. SMITH:
Q. Is that true?
A. They have -- UMBC has, since being established, roughly, 40 years ago and particularly in the last two decades, has developed a reputation across a number of fields of study, and they emphasize that on their website and -- and so on, yeah.
Q. Right.

Page 238

A. Including STEM, yeah.
Q. Okay. And also for educating diverse students, true?
A. Yes. They have a fairly diverse, you know, fairly diverse student population, including in STEM fields. I -- I don't know the exact percent. I think blacks or African-Americans make up, roughly, 14 percent of STEM students or something.
Q. All right. And what -- what will be the identity of UMBC after your program transfers have been effected under your remedial proposal?
A. Well, they highlight actually a lot of different areas, domains. Remember, when I first came here, I thought it was engineering, but I think there are six or seven fields of study that they emphasize. And right off the top of my head, I can't remember them all by any means.
The -- clearly, one of the seven, if I may be forthright, is -- is engineering. I'm trying to think of one of the other ones, the really prominent -- I was mentioning last night to some of the lawyers.

Page 239

Can't think of it right now.
Q. Sure.
A. But Hrabowski, in his -- in his -- his -- when he was -- when he was interviewed by the plaintiffs, mentioned -- didn't mention engineering first. He first mentioned at least one other field. And once again, on the website, I think there's seven domains that the -- of fields of study that UMBC emphasizes, so...
Q. Which ones -- after your proposal is adopted, your remedial proposal is adopted, which fields will UMBC still have a compelling narrative or a distinct academic identity in after your work has been done?
A. You know, I --
MS. SHUM: Objection. Objection, form.
A. I have to -- I would have to go look and just reflect for a minute. It's been a long day. I do know -- I'll think of it, whether it's health or what. There were a couple other major fields.
BY MR. SMITH:

Page 240

Q. Health.
A. Up to about seven. I'm not sure about health. So I want to be very careful about that. What struck me as important here is not my encyclopedic knowledge of UMBC. The salient point is that engineering was one of the key fields, and I know very well and appreciate the work that Dr. Hrabowski has done at UMBC over the last two decades --
Q. I understand that.
A. -- in carving an institutional identity of an urban institution.
Q. You mentioned a moment ago that Dr. Allen might have different reasons from excluding College Park from program transfers. What were his reasons?
A. I don't know.
Q. Did you ask him?
A. I -- I don't recall our discussions about UMCP.
Q. Who drew up the remedial proposal that is an exhibit to your July 2016 expert report?
A. Who drew up, crafted the remedial plan?

Page 241

Q. Yeah.
A. Dr. Walter Allen and Dr. Clifton Conrad.
Q. Okay. Did you write any particular pieces of the remedial proposal?
A. I did. It was a collaboration, I think, in the very best sense. We each brought our strengths and areas of interest, curiosities. We both have a long history in higher education, almost the same, and, you know, he and I -- sometimes somebody would take a lead on a particular domain or, say, how about -- how about emphasizing the -- at Coppin, for example, I remember we talked a lot about allied health and nursing and so on, creating those programmatic niches and the programs along with that. So it was a back and forth and --
Q. I understand.
A. -- including on the writing, which is the last part of your question.
Q. Let me -- thank you for getting there. Let me ask you --
A. I'd be glad to.
Q. -- to point me to where in your 2016

Page 242

report, the July 2016 report, you analyze in a quantitative way the relationship between high-demand programs and white enrollment at the HBIs.
A. Where we emphasize the relationship between?
Q. Where you look in quantitative terms, so not just one institution or another, but a quantitative analysis that looks at the relationship between high-demand programs and white enrollment.
A. Okay. Here we go. I think it's Table 6 and 8. I thought I marked them.
Q. So the answer to my question is Table 6 and 8?
A. And if you could restate because this gets a little -- where we talk about unique and/or high-demand, would you mind restating the question?
Q. My question was: Where in your July 2016 report do you analyze in a quantitative way the relationship between high-demand programs and white enrollment? And I understand that your answer to that is Exhibit 6 and 8.

Page 243

A. Yeah. We don't do correlation coefficients. You can approach this different ways.
Q. Well, I didn't ask about that. But do you analyze -- is this the place in your report, 6 and 8, where you analyze in a quantitative way the relationship between high-demand programs and white enrollment?
A. I don't pose the question that way, though, relationship between. I mean, in a way we're obviously getting at that, but what we did in those two tables was to identify those programs at the HBIs that were attracting 10 and 15 students respectively and to look at the program attributes and program attributes to explore.
Q. Okay. And in your exploration, do you test the hypothesis in Exhibit 6 and 8 that high-demand programs increase written enrollment or are associated with white enrollment at the HBIs?
A. We don't explicitly test the hypothesis, is how I'd put it. And this is very delicate. We could parse and parse on this for quite awhile. What we try

Page 244

to do and what we did here, I think it's pretty self-explanatory, but is to look at what are some of the attributes of these programs that are attracting at least some, you know, fairly, relatively significant number of white students, 10 and 15, and just to kind of get a window in a lens and look at some of those attributes, including whether they're unique, as you can tell from the tables, demand, high-demand and so on, do they have those qualities.
Q. Right. Now, when you --
A. And you can -- you can learn some things from those two tables.
Q. Okay. And do you believe -- if you don't believe that these explicitly test the hypothesis that unique programs or high-demand programs cause white enrollment at the HBIs, do these -- do these tables or anywhere in your study do you test the null hypothesis that there's no relationship between unique or high-demand programs and white --
A. No, not directly.
Q. Let me finish. -- do you test the null

Page 245

hypothesis that have no relationship between unique or high-demand programs and white enrollment?
A. Let me emphasize. We're developing a remedial program, proposal, okay? That's what we're doing. This isn't about testing per se. It's trying to come up with some ideas for a remedial plan about what can work. That's what informed our inquiry throughout. That's exactly what we did here.
So we said along with drawing on this study that we've talked about quite a lot, visits my own research, visits to other states, observations about what's happening in other states, mostly in the South and so on, I kind of highlight a number of programs, and then looking a little bit in Maryland about what are the attributes of those programs or what are a couple attributes that this unique and high-demand show up as important, and these are pretty transparent.
Q. And in this review or this description, I heard you to say -- and correct me if I'm wrong -- this is not testing per se. It's not hypothesis testing per se.

Page 246

A. I'll -- I'll use that language, yeah.
Q. All right. And do you believe --
A. It's certainly not -- yeah. We're not using regression analysis, for example, okay, or correlation coefficients per se.
Q. Do you believe that Exhibit 6 and 8 and the work underlying them meet generally-accepted standards for quantitative studies in your field?
A. Well, quantitative studies have -- have different standards in some ways. The -- this isn't a test. I don't know how many times to say it. It's developing a remedial plan. And I just wanted to find out, and Walter, what are some of these attributes or programs 'cause we're trying to come up with some ideas.
The judge -- judge told us we needed to come up with a remedial plan. We weren't testing per se the remedial theory. You know, it'll take a long time to do a controls randomized experiment here on this particular question of what attracts white. But we do have some things we can draw on, including the

Page 247

aforementioned ones.
Q. How much time do you think it would take to do a multivariate analysis --
A. Oh --
Q. Let me finish. -- of the relationship between unique or high-demand programs and white enrollment at the HBIs in Maryland?
A. A great deal of time. And I will abstain from a more specific response on the grounds that I haven't really conducted a quantitative study now for nine years.
Q. I see. Did you read in Dr. Lichtman's 2016 report that he actually did a multivariate analysis of the relationship between high-demand or unique programs and white enrollment at the HBIs?
A. Yeah, I've taken a -- I've taken just a quick look at it.
Q. Right. Do you have any disagreement with the methodology that he used to perform that multivariate analysis?
A. Well, we've talked about that. Walter

Page 248

Allen and I have talked about that. I'm gonna take the liberty of saying that I want to defer to Dr. Allen on these -- these quantitative points. He does more quantitative work. He's a extremely well-regarded researcher and academician, and he's just better suited to address this, and I'd be -- I'm glad to admit it.
Q. Well, sir, that's very interesting, because you've testified previously that you have performed a large number of quantitative studies; isn't that true?
A. I have. If you could quote me on that, it would be helpful.
Q. Is it a fact? Let's start with that. Is it true that you have performed a large number?
MS. SHUM: I'm gonna object as to the form.
A. I did a bunch of studies, including correlates of program quality in higher education and -- and so on. I think the last quantitative study was published in 2007. I really haven't done many in the last 20 years, 25 years, quantitative studies, because I was little more interested in coming up with the ideas than just playing with numbers.

Page 249

BY MR. SMITH:
Q. Who performed the work that underlies Exhibit 6 and 8?
A. Well, I -- I did a lot of it.
Q. Okay. Okay.
A. And I don't mean to disproportionately claim. We have worked with the Lawyers' Committee, and they've been very helpful. I've provided a lot of direction to them. They've been an extraordinary resource in many ways, endless number of ways.
But when it comes down to a lot of the substantive decisions, like what's a high-demand program or what's a unique program, we defer to Cliff.
Q. Right, I understand. And so do you -- what's the best way to ask this question?
Actually, let's go back to the Lawyers' Committee. So you got a lot of support from them. Can you point to specific parts of your report that the Lawyers' Committee played a special role in?
MS. SHUM: Objection. I'm gonna instruct the client not to disclose anything that is privileged

Page 250

communication.
MR. SMITH: Okay. First of all, he's not your client, and second, I'm asking who wrote --
MS. SHUM: He's the expert.
MR. SMITH: -- his report.
BY MR. SMITH:
Q. So can you point to any particular parts of your 58-page report or the attachment to it that the Lawyers' Committee --
A. Are we in F now?
Q. Let me finish. -- the Lawyers' Committee played a special role in preparing?
MS. SHUM: I'm gonna renew my objection and instruct Dr. Conrad not to disclose confidential information.
MR. SMITH: Okay. Well, there's nothing confidential if someone else --
MS. SHUM: Of privilege -- I apologize. Confidential and privileged information. He didn't state -- and I'm gonna object to the form of the question. He did not state that the Lawyers' Committee

Page 251

drafted any section of the report.
BY MR. SMITH:
Q. For example, Doctor, first of all, can you answer my question? Which portions --
A. No.
Q. -- of your report did the Lawyers' Committee play a special role in preparing or supporting your work?
MS. SHUM: I'm gonna object to the form of that question.
A. I will not.
BY MR. SMITH:
Q. She's just objected to the form, so you're allowed to answer.
A. The most I can say is that I provided direction and -- and a great deal of prose, and I think I'll leave it at that, and analysis and so on, so I and Walter. Beyond that, I refrain from making any more specific comments.
Q. Well, what about --
A. I don't think it's appropriate.

Page 252

Q. I understand that.
A. I take responsibility, along with Dr. Walter Allen, for what's here. Every word, every number, everything.
Q. I appreciate that point. Let me ask you to look, for example, at pages 49 and on, of your report, of the main body of it, Sections 289 and on.
A. You said 49?
Q. Page 49, yeah.
A. Oh, page 49.
Q. Yeah. Okay. So that's Section 9 of the report. It's entitled "Response to Lichtman's Analysis." Do you see that?
A. Uh-huh.
Q. I'm sorry. You need to say yes or no for the transcript here.
A. Yes or no to?
Q. Yes, you do see it; is that right?
A. I do see it.
Q. Okay. Thanks. And do you see in Section 296, paragraph 296, it refers to the two of

Page 253

you. It talks about "...the remedial proposal prepared by Plaintiffs' experts Dr. Clifton Conrad and Dr. Walter Allen...."
Do you see that?
A. I'm sorry. Which number? 295?
Q. 296. Sir, I don't think you're in the most recent version of the report. Can you flip to the back?
A. Are you in the --
MS. SHUM: Listen to the instructions.
Q. Yes, just flip to the --
MS. SHUM: Just listen to what he's instructing you to do.
BY MR. SMITH:
Q. I'm sorry. You need to flip to the last big document in your book.
A. Oh.
Q. The last big one.
A. Dr. Lichtman's?
Q. No, before that. Sorry.
MS. SHUM: Just identify it by the letter

Page 254

tab.
MR. SMITH: I don't -- I just don't have the letter in front of me.
MS. SHUM: F.
THE WITNESS: G. It looks like F, of course. Yes.
BY MR. SMITH:
Q. So that's the July 6 report?
A. Yeah. Pardon me.
Q. That's fine. So can you flip to page 49, please?
A. I can. This is a little confusing. I'm sorry. Page --
Q. 49.
A. In the expert report, are we talking about?
Q. In the expert report, the main body.
A. I'm almost there. I have it.
Q. Let me know when you are.
A. I am. I've arrived.
Q. Great. So it's actually just a paragraph off from what we were talking about before, but you see

Page 255

in paragraph 296 --
A. Yeah, I do.
Q. -- there's language in there that refers to you and to Dr. Allen in the third person, right? It refers to plaintiffs' experts, Dr. Clifton Conrad and Dr. Walter Allen. Do you see that?
A. I do.
Q. Okay. And that's all part of this response to Lichtman's analysis?
A. Is that a question?
Q. Yes, sir. That's all part of Section 9, right?
A. Yeah. I'm sorry. Could you restate the way you're putting the question?
Q. I just want to make sure that you have paragraph 296 in front of you.
A. I have. I've just read it.
Q. And my question is simply whether that paragraph in this Section 9 are a portion of the report where you provided some direction, and you take responsibility for it, but that the Lawyers' Committee

Page 256

did some of the drafting for you; is that fair?
MS. SHUM: Objection, form.
A. Walter Allen and I take responsibility for this document.
BY MR. SMITH:
Q. I understand.
A. And I think I'll leave it at that.
Q. Respectfully, sir, I have -- I have to get an answer to my question.
A. I can understand.
Q. I know you take responsibility for it, I get that. My question is whether this section of the report, and in particular that paragraph, is a piece that the Lawyers' Committee played a role in drafting, although you provided direction and you do stand by the report?
MS. SHUM: Objection, form.
BY MR. SMITH:
Q. Go ahead, please.
A. I stand by the substance, and I stand by the prose.

Page 257

Q. I understand that, yes. But it was drafted by someone else with your approval, correct?
A. I did not --
MS. SHUM: Objection, form.
A. I did not say that, sir.
BY MR. SMITH:
Q. Is it true?
A. Again, I'd go back to, Walter Allen and I take full and unfettered responsibility for every substantive thing this document and -- and for the language.
Q. Right, that goes without saying. But who drafted this language?
A. I don't know.
Q. Respectfully, Doctor, you haven't answered my question. Who wrote this Section 9 of the report?
MS. SHUM: This is -- I'm going gonna. It's asked and answered.
MR. SMITH: I don't think so.

BY MR. SMITH:

Q. I'm sorry. You need to answer my question.
MS. SHUM: I'm gonna object again as asked
and answered.
MR. SMITH: I understand.
A. Could I object?
BY MR. SMITH:
Q. No, I'm afraid not. That's not how it
works. And I need -- respectfully, I need an answer to
my question. We've been waiting for a while. Doctor?
A. Yeah. I'm just re-reading 296 for the
third time here.
Q. So how about an answer to my question?
Doctor, it's not against the law if someone else wrote
this. I understand you stand behind it, but I really
need you to answer truthfully --
A. Well, it wouldn't take --
Q. -- and directly my question.
A. It wouldn't take a neuroscientist to look
at what I said over the last three and-a-half decades
on this matter, that this prose in this 296 is Cliff
language.



Q. So your testimony is you wrote Section 296?
A. I just said this is Cliff language in prose
and meaning that he said for many, many years.
Q. Who wrote it, sir? Who put those words
into the document, into the electronic document, that
became this expert report? Please. Please answer my
question.
A. Well, I can't exactly anyway because I
don't --
MS. SHUM: He's already stated that it was
a collaborative --
MR. SMITH: Do not prompt the witness.
A. I was just gonna say -- thank you. I was
just gonna say that Walter Allen and I went back and
forth on this so much. It's really hard to separate
out.
BY MR. SMITH:
Q. My question -- I'm gonna go back to it --
is whether this section, Section 9, of the report --
and I've asked this question and I want an answer now,
a truthful one from you, Doctor, whether this Section 9



of the report is one that was drafted in large part by
the Lawyers' Committee, although you approve it and you
stand behind it. And I'd like an answer to that
question.
A. And you're referring to Section B or you're
referring to 296?
Q. I'm referring, first of all, to Section 9
of the report, and then we're gonna go paragraph by
paragraph if we have to.
A. Can we take a break?
Q. No, not while you have a question pending.
A. I didn't think so.
Q. Come on, let's get it over with. Give me
an answer to the question. Let's move on.
MS. SHUM: I'm gonna object to the form of
that question, if it was a question.
BY MR. SMITH:
Q. Yeah. Doctor, we need an honest and prompt
and forthright answer to the question. Answer my
question, please.
A. I am not sure who wrote that exact language



in that paragraph.
Q. What about Section 9 as a whole? Did the
Lawyers' Committee play a role in writing the language
that appears in Section 9 of your report? The answer
is yes, isn't it?
MS. SHUM: Objection.
BY MR. SMITH:
Q. Doctor, it's not a crime, but I need a
straight answer to my question.
A. I don't know exactly. That's my answer.
Q. Because there are some sections of the
report that the Lawyers' Committee drafted, and you're
not sure whether Section 9 --
A. I didn't say that.
Q. Let me finish.
A. I didn't say that.
Q. -- you're not sure whether Section 9 is one
of them?
MS. SHUM: Objection.
A. I didn't say that.
MS. SHUM: Form.

Page 262

A. I didn't say that. I'm not sure who wrote Section 9.
BY MR. SMITH:
Q. And you don't know whether it was the Lawyers' Committee or you or Dr. Allen or some combination of the three; is that right?
A. I don't know what to say. This is Dr. Allen and Dr. Conrad's expert report.
Q. You dropped your mike, sir.
A. Whoops. No, I wouldn't want to lose that. We can't take time to --
Q. No, sir, not until we get a straight answer to these questions. Do you want to put that back on your shirt, sir, so that you've got your hands free?
Okay. Can you rule out the possibility that the Lawyers' Committee played a role in drafting Section 9 of your report?
MS. SHUM: Objection.
BY MR. SMITH:
Q. And I think that's a yes or no question. How about an answer to it, please?

Page 263

MS. SHUM: I'm gonna object.
A. So does that mean that --
BY MR. SMITH:
Q. You get to answer, and I'd like an answer now.
A. I just -- I don't know. I give you an "I don't know" response, and I'm gonna stick with that. I honestly do not know the way this got divided up who wrote what. And I'm gonna have to leave it at that. That's the best I can do as being forthright.
Q. Okay. And I appreciate that. And when you say "who wrote what," you're not sure as between you, Dr. Allen, and the Lawyers' Committee; is that fair?
MS. SHUM: Objection.
A. I'm not in a position to know who wrote what.
BY MR. SMITH:
Q. Right. And my question is: When you say "who," the "who" means you, Dr. Allen, and the Lawyers' Committee; is that right?
A. Well, I don't know who the "who" could be.

Page 264

Q. You don't know who wrote this report?
A. Well, I know that -- I don't know. I just have to go full circle. The important thing is this is Walter Allen and Cliff Conrad's report, and this is our work, and -- and, you know, our language and our findings and responses to Dr. Lichtman's analysis and so on.
Q. Right.
A. And it was -- it was just a collaborative process in doing that with Walter Allen and Cliff Conrad in the lead. We were the main "who's."
Q. Right. And if I may, sir, the other "who's" were the Lawyers' Committee?
MS. SHUM: I'm gonna object.
BY MR. SMITH:
Q. Is that -- is that correct? Again, sir, you need to answer these questions directly and honestly. That part's important here.
A. I feel like we're getting into legal terrain and --
Q. That's not your call, respectfully. I'd

Page 265

like an answer. Doctor, you gave an oath at the beginning of the deposition, right?
A. I did.
Q. That you would -- that you would answer the questions honestly, and I asked you to give me a truthful and accurate and complete answer. And my question for you -- and I want a truthful and an accurate and a complete answer -- is whether there is any part of this report that you can rule out the possibility that the Lawyers' Committee wrote it?
A. Well, that's a different question.
Q. What's the answer?
A. That's a different question.
Q. And the answer is?
A. They were under our direction, under Cliff direction for so much of this, including the whole analysis of, Is there a dual system that continues to exist in Maryland, and I -- for example, I take responsibility to that first burning question, Does there remain, you know, a dual system in the state of Maryland, so...

Page 266

And then with respect to, you know, everything else, Walter and I collaborated on, so... And we certainly overlapped a little bit even in the first domain, so... But it's -- it's our report. I don't know really what the Lawyers' Committee may have done in their respective role in this.

I know that I have and Walter have, not only crafted language after language after language, but we reviewed everything and taken responsibility for it. So I don't know what else to say.

Q. Okay. And when you say you're not sure who played what role in what has been done, the "what" is the July 2016 expert report that is sitting in front of you; is that fair?

A. Yeah. I mean, we certainly got some help from the Lawyers' Committee for -- you know, this is a huge report, facilitating our -- communicating our findings and things like that.

Q. Right. And when you say facilitating --

A. I mean, I mean, displaying -- not facili- -- let me be careful about that. In putting it in a

Page 267

format. By and large, putting it in a format that's a legal format, but that it's our report.

Q. I understand that. And with respect to --

A. This is our work. I mean, that's the driving point, I think.

Q. I understand what your testimony is. And with respect to Section 9 in particular, it is not possible for you to say whether the language that appears in Section 9 was drafted by you, by Dr. Allen, or members of the Lawyers' Committee; is that correct? Yes or no?

MS. SHUM: I'm gonna object.

A. The conclusion is a separate section, right?

BY MR. SMITH:

Q. Yes, sir. Yes, sir. Section 9.

A. I do not know who did exactly what on number 9.

Q. And to be very clear, sir, when you say you can't say who did what in Section 9, the possibilities for who are you, Dr. Allen, and the Lawyers' Committee?

Page 268

And I'd like a yes or no answer to that question.

A. Well, the Lawyers' Committee may have facilitated.

Q. Did they draft the language in Section 9?

A. Oh, I think that's -- a lot of that is clearly indisputably our language.

Q. And is some of it theirs in Section 9?

A. I don't know if there is any of their language in Section 9.

Q. Okay.

A. If there was, if there was, I know that Walter and I would have both scrutinized it. I'm just saying that's a hypothetical.

Q. Because you don't know, sitting here today, which parts of Section 9 of your report may have been drafted by you, by Dr. Allen, or by the Lawyers' Committee? And that's a yes or no question. I'd like an answer to that question, sir.

A. I know. Forgive me for trying to reframe your question, but all I -- I can only tell you all I know, is that the -- my sense is that clearly the

Page 269

substance is all Walter Allen, Cliff Conrad, of this, and there may have been some input from the Lawyers' Committee on -- or suggestions or something or comments.

Q. Or paragraphs?

A. But I'm not aware of.

Q. Or paragraphs; is that fair?

A. I don't know.

Q. Okay. Are there other sections of the report, beside Section 9, where it's not possible for you to say whether it was you or Dr. Allen or the Lawyers' Committee that wrote the report?

A. Well, it again --

MS. SHUM: I'm gonna object as to the form.

BY MR. SMITH:

Q. Right.

A. When you're talking about wrote the report, for me, the -- the substantive question is, whose ideas are there, what we're suggesting here, claiming, noting and so on, and expressing it are Walter Allen and Cliff Conrad. That's largely is.

Q. Doctor, you know what a writing -- it's largely you and Dr. Allen, but it's not exclusively you in the rest of the report, is it?
MS. SHUM: I'm gonna object as to form.
A. I can only say that, once again, to the best of my knowledge, the Lawyers' Committee helped facilitate, put this together, whether it was putting numbers on things or some of those items and so on, that would be my understanding. I don't know any more than that.
Q. You don't know -- I'm sorry.
A. I don't know exactly. You know, all I know is that Walter Allen and Cliff Conrad took the lead and did all the substance on this.
Q. Yes.
A. Okay. So this isn't -- we're -- we're responsible. This is our report. This isn't the Lawyers' Committee. This is called the experts' report.
Q. Yes. And let's go back to my question. For any other section of the report, other than



Section 9, can you rule out the possibility that the Lawyers' Committee drafted some portion of that report? That's a yes or no question.
A. I -- I can't rule out that other people, maybe white came back to life, you know, I -- I -- the Lawyers' Committee has been very helpful to Walter and I, but we clearly took the respons- -- the lead, the responsibility in the work for doing this.
And so with respect to any details, I just can't -- I can't -- I don't know. I can't specific -- what, if anything, they did and, if so, how much.
Q. Okay.
A. I'm sorry. I just -- I don't mean to be disingenuous. I really don't know.
MR. SMITH: All right. Let's take a break.
VIDEO TECHNICIAN: We are now going off the record. The time is 3:07.
(There was a brief recess taken.)
VIDEO TECHNICIAN: This is the beginning of DVD No. 4. We are now back on the record. The time is 3:27.



BY MR. SMITH:
Q. All right. Dr. Conrad, can you take a look at Exhibit 8 to your July 2016 report?
A. Yeah.
Q. I'm sorry. Exhibit 6, let's start with.
A. Six?
Q. Six.
A. Exhibit 6?
Q. Yes. They're labeled in the upper corner.
A. Yeah, I know. Got it. That's the 2010 or more. Okay.
Q. All right. You told us earlier that Exhibit 6 and Exhibit 8 were intended to try and collect some attributes of programs that enrolled significant numbers of white students; is that correct?
A. Just trying to get a sense, yeah.
Q. Okay. And with respect to coming up with a remedy that would cause more white students to go to the HBIs, did you want to find out whether these attributes were actually connected to or would cause additional white students to attend the HBIs?



A. I think the key word is "associated." Make them more likely to, link to, yeah. I don't want to get into causation right now.
Q. All right. And so if you don't want to get into causation, is it possible to predict to a reasonable degree of certainty what the effect of adding more unique or high-demand programs will have on white student attendance at the HBI?
A. Is the question, is it possible to predict? Is that what you said?
Q. Yes. To a reasonable degree of certainty if you cannot determine causation but merely association, can you make a prediction to a reasonable degree of certainty that adopting these additional programs will cause white students in significant numbers to attend HBIs?
A. I wouldn't use the word "prediction." I would say that this is a -- once again, another kind of effort aimed at trying to identify, you know, what factors or attributes are linked with whites attending, and -- and I think it can be helpful for purposes are

not -- our animating intent now is not to develop a theory per se. It's to try to figure out and get an operational sense of what's likely to work.
Q. And, therefore, you can't draw causal inferences from the data that you prepared and that underlie Exhibit 6 and 8; is that --
A. Well, I wouldn't want --
Q. Let me just finish. Let me state the whole question. -- and, therefore, you can't draw causal inferences from the data which you assembled and which underlie Exhibit 6 and 8?
A. I don't want to draw causal inferences. What I want to say is that these are kind of data-based observations. There seem to be links between the two, and I think it can help inform the remedy. Yes.
Q. Okay.
A. Is this a randomized controlled experiment? Most assuredly, it is not. Yeah.
Q. Sure. And if you think that they may help in the end that you've just described, how do you know that if you can't draw causal inferences?



A. Oh, you can know that by just looking at associations and -- and without predicting, there's some suggestions here when you look at these two tables, Exhibits 6 and Exhibit -- what's the next one, 8 --
Q. Eight, yes.
A. -- respectively, one with HBI enrolling 10 or more students and also enrolling 15 percent or more students, white students.
Q. Okay. And if you're testing the association, why not run a correlation coefficient analysis?
A. It's one way to --
Q. Let me just finish. Why not run a correlation analysis that would give you some degrees of statistical significance, for example?
A. I'd leave that to Walter Allen. I haven't been running regressions for quite a few years, so I'm gonna say that I think this is just -- there are multiple ways you can address a problem or a challenge.
Again, you're not testing a theory. You're



kind of coming up with some kind of preliminary hypotheses of what may contribute to, and I think we need to get right to the heart of that in terms of this remedial proposal.
Q. Sure. And you said you'd leave that to Dr. Allen, but you told me that you stand by every word in this report, correct? And that you were primarily responsible for Exhibit 6 and 8, right?
A. Well, I did say I stand along with Walter Allen and, most assuredly, the whole report, our report, I emphasize again and again and again. I can't say that enough.
And also, here, which -- yes, to be perfectly transparent, Walter is spending more time on this Dr. Lichtman rebut- -- response, not rebuttal, response, 'cause we're trying to find a good solution here, and Cliff is, is looking -- has spent a lot of time looking not only at remedial -- or looking at some ideas for the remedial proposal, Walter did too, but I'm the one who has obviously done all the duplication analysis, unique programs, and high-demand programs and



so on.
Q. Course, course. Okay. And my question was simply: It's not enough just to say, "Ask Walter," right? I mean, you know the reason that no correlation analysis was performed, don't you?
MS. SHUM: I'm gonna object as to form.
BY MR. SMITH:
Q. With respect to Exhibit 6 and 8?
A. Well, I chose to do it this way.
Q. Right. Right, right, right. And my question is: Why did you choose not to do, at the very least, a cor- -- take a correlation coefficient between unique or high-demand programs or unique and high-demand programs and white enrollment?
A. Well, I --
MS. SHUM: Let me state the objection, then you can answer. I'm gonna object as asked and answered.
MR. SMITH: Okay.
THE WITNESS: I'm sorry. Object to what?
MS. SHUM: Asked and answered.

Page 278

BY MR. SMITH:

Q. Yeah. The question was: You chose to do it this way. Why did you choose not to take a --

A. Because I'm not doing a test per se. I am trying to develop some insights and some attributes of programs. And, you know, you can learn a fair amount, some, I think, interesting things when you look at Tables 6 and 8.

Q. Okay. Now, so it follows from Table 6 and 8 that you didn't look at courses that were high-demand or unique that had low or no white enrollment, correct?

A. You mean programs? You said courses.

Q. Programs, yeah. You didn't look at those, correct?

A. That had low, no.

Q. And is there any reason you couldn't have looked at those programs as well, programs that did not have significant white enrollment?

A. You could have, but you wanted to get a sense of -- to get a little better sense of, you know, what attributes contribute unique and/or high-demand

Page 279

programs, and I like the way we -- I proceeded and focused on this, and I think it gives you some insight. It's not a fait accompli.

Q. All right. I'm gonna give you a hypothetical. I get to do because you're an expert. So we got 100 students in a class. We're trying to look at what causes --

A. You mean 100 students in a program?

Q. No, no, no. This is a hypothetical. We're not talking about a program now. We're talking about a class.

A. Okay.

Q. Maybe it's one of your classes, right? Okay. Got 100 students in the class. We're trying to figure out what causes high scores on the exam, and somebody looks at it and says, You know what, the top five students all use No. 2 pencils, okay, and says from that, well, it looks like there's an association between using No. 2 pencils and scoring well on the exam.

Now, is that a reasonable look at the

Page 280

association between the use of No. 2 pencils and scoring well on the exam?

A. You have to be very careful about that, including correlation coefficients, beta weights. One of the things that people do who try to develop theory and advance theory is not only do they have, you know, beta weights, correlation coefficients and so on, what they have is an explanation of why there's a link, say, between No. 2 pencils and whatever the dependent variable is.

That's a good thing to do, and too often we find that there is not an explanation that accompanies the correlation, say. You may explain 69-and-a-half percent of the variance, but you don't have an explanation, and I see that again and again and again. Yeah.

Q. Okay. Well, let's change -- let's change the hypothetical, okay? 100 students in the class, trying to figure out why they did well. Let's suppose that we learn that the top five all took a test preparation course for the final exam.

Page 281

Based on looking at those five students and seeing that there's an association between the test prep course and the high grades, would that be enough to say that there is an association between the two and that it's something we can rely upon?

A. Well, yeah, in an ongoing inquiry, it would suggest a relationship between test preparation and so on, and it would -- could be accompanied by a very plausible explanation that the two seem to have some link, potential link to one another.

Q. Okay. All right. And would you based on that evidence, and only that evidence, feel comfortable in asserting to a reasonable degree of certainty that test preparation courses caused better performance in the course on the final exam?

A. Well, yeah. It's put out there as a -- as a link that there's -- it's suggested that there is a link between the two, and then you continue to explore whether there are other variables that may be important or other factors along with test preparation.

It might be that the people who had a test

Page 282

prep course came from a rather well to-do family, that lived in the suburbs of Washington or Maryland, some parts of Maryland, Baltimore, lived on Capitol Hill, and it might be the fact that they -- they had a number of extraordinary opportunities during the year and during the summer and so on, so that that accounted for not the test preparation per se, so...

You always have be very careful about causal relationships. I'd be the first to admit that.

Q. And to tease out the effects, as you just describe it of family income and things like that, the way to separate out those effects is, for example, to do a multivariate regression analysis, correct?
A. That -- well, yes, you can make an initial stab at trying to control for those, some of those other variables.
Q. Now, let's -- I'm gonna add a fact to this. 100 students in the class, top five all took a test prep course, but it turns out that the middle 20 also took a test prep course. You with me?
A. Yes. I'm reflecting on those

Page 283

relationships.
Q. Sure. And knowing that the middle 20 also took the test prep course, it would tend to undermine the association that you saw between test prep courses and academic performance, correct?
A. Well, it might -- yeah, it might constrain it a little bit. You'd soften it, modify it, little bit less messy on certainty, yeah.
Q. And let's suppose that the bottom five students also took a test prep course. That would further undermine the association, right?
A. It -- it would a little bit, yes.
Q. Okay. But if you only looked at the top five students and saw that they took the test prep, then you wouldn't know about those other results, would you?
A. It -- it -- it would be helpful to look if you had the time, energy, resources, to look at the full, yeah, spectrum.
Q. I want to ask you about core programs. There's a list of core programs at Exhibit 9, so the

Page 284

very next page, right?
A. Yeah.
Q. And my understanding is that you excluded core programs from your liability or unnecessary program duplication analysis, correct?
A. Yes.
Q. Right, because --
A. They're expected to be offered at all colleges and universities. Correct. Yeah.
Q. But they're not actually offered at all colleges, right?
A. They are not.
Q. Okay. In fact, a number of the core programs that appear here in your Exhibit 9 are not offered in one or more of the TWIs; is that correct?
A. I haven't explored that.
Q. What about at the HBIs? Did the HBIs in Maryland all offer these core programs?
A. They do not.
Q. Okay. And you have also excluded core programs from your remedy analysis as well, right?

Page 285

A. That's correct. Although, there might be one exception that comes to mind. Yeah.
Q. Oh, what's that?
A. I don't remember. I think I did take the liberty of putting one in. I don't remember.
Q. Okay. I'd be really curious if you do know of one.
A. I will let you know if I find it, check on it when I check the report we've written.
Q. Well, does that suggest to you that in the right circumstance for the right institution and the right core program, that a core programs added to or augmented at a school could attract students in large numbers, it could be a high-demand program and maybe even a differentiating factor for that institution?

MS. SHUM: I'm gonna object as to form.

A. I have severe reservations about that, so... I -- I think we can expect duplication of core programs. And I would be the first person to admit that I think our cores are gonna shift somewhat in the coming years, as we begin to introduce more

Page 286

interdisciplinary courses, and new fields of study come in, like, global studies is a good example, becoming a much more core program than it has been historically.
BY MR. SMITH:
Q. We're gonna get to the, the changing content of the list of core programs in a second.
Right now my question is: If you were considering or maybe even did have a core program that was part of your remedy proposal, whether that suggests that the right kind of core program, perhaps augmented or put out in the right way, could actually attract white students to an HBI?
A. If it wasn't offered at a -- at a TWI, but then it would be expected to be offered more likely -- likely to be offered at a TWI, so I think it's unlikely to be for the more part a major incentive.
Q. Well, sir, if --
A. But it -- but it depends on the program to be sure.
Q. Okay. So, for example, if you look at your Exhibit 6 --

Page 287

A. Yeah, there are a number of high-demand programs.
Q. Yeah, of course. That's your list of high-demand programs, right?
A. Uh-huh.
Q. And you've excluded --
A. That's the high-demand. Sorry.
Q. You've excluded -- these are high-demand programs that --
A. Forgive me, yeah. I'm sorry.
Q. Okay. Exhibit 6.
A. I thought we were talking about core.
Q. Let's --
A. I'm sorry.
Q. Let's make sure we're clear, you and me and also our court reporter.
A. My fault, yeah.
Q. My fault. Exhibit 6, right, HBI programs with --
A. Oh, Exhibit 6. That's why I got...
Q. Yes.

Page 288

A. I thought we switched over. Okay. What page?
Q. I think you need to move to your right. Okay.
A. Right here. Okay. I'm gonna get over on that page.
Q. So these are HBI programs that attract significant numbers of white students, right?
MS. SHUM: I'm gonna object as to the form.
BY MR. SMITH:
Q. Okay. Is that a yes?
A. The question again is?
Q. HBI programs that attract significant numbers of white students.
MS. SHUM: Exhibit 6 is entitled "HBI programs with at least 10 white student enrollment."
MR. SMITH: Yeah, right.
A. I don't use the word "significant." I use the word "10 or more."

BY MR. SMITH:

Page 289

Q. Okay. HBI, let's do it your way. HBI programs with 10 or more white students. That's what this is, right?
A. It is.
Q. Okay. And one of the programs you found was chemistry, right?
A. I'm trying to remember. That is -- oh, that's the core program that -- right. So there was one core program, yeah.
Q. Right. There's actually two, right?
A. There is the psych one, which isn't terribly surprising. Yeah.
Q. Okay. And so it appears that at these HBIs they're able to deliver even a core program in such a way that it attracts significant numbers of white students, right?
A. Yeah, I was just checking to see. I think that psych is high-demand, very high-demand, exceptionally high-demand.
Q. Okay. And so does it -- does it make sense to you --

A. I'm a little surprised by the chemistry one, but yeah.

Q. Okay. But, well, the data don't lie, do they?

A. Well, they can be interpreted lots of different ways. I think we've been discussing that a lot today.

Q. Sure. This is your list, though, right?

A. It is.

Q. You don't have any reason to doubt the factual information that's on this list?

A. With respect to the factual information, I don't.

Q. Okay. And so, therefore, we can see that two out of your 30-something programs are core programs at HBIs that attracted 10 or more white students?

A. Yes.

Q. Oh, I'm sorry. There's three, right?

A. There is. We missed biology.

Q. Okay. So biology, chemistry, and psych, which are three of the most basic core programs around,



were able to attract 10 or more white students?

A. Yeah, they're three out of 34 programs.

Q. Does that suggest to you, then, that HBIs under the right circumstances, delivering the programs in the right way, can attract significant numbers of white students using core programs?

MS. SHUM: I'm gonna object to the form.

A. I'd be careful to overexaggerate this. I think that core programs, some core programs, most certainly have some potential. I think it's gonna vary over time, including with fields like psychology, for example, and chemistry. There's a lot of variability here.

BY MR. SMITH:

Q. Well, the variability that shows up here --

A. Over time.

Q. Yeah. -- that shows up in your study is three of these, and they're all core programs, right?

A. Yeah, but again, three out of 34. I don't think it accents these particular relative salience of value of core programs, if that's the hypothesis you're



advancing.

Q. Would you agree with me that the core programs, as you see it, are the basic building blocks in social sciences, humanities, and the sciences?

A. Writ large, yeah.

Q. All right. And I think you told me just a moment ago that list can change over time, correct?

A. Well, I --

Q. I think the answer's yes. Right?

A. Well, I think I'll answer the question. I've been studying general education for almost 40 years now. I think they will, yeah, over time, some changes.

Q. Okay. And that you originally took your list from the 19th century Germany curriculum; is that right?

A. From the German university?

Q. Yeah.

A. Where did you get that?

Q. Do you remember testifying previously that you originally took your list of core programs from the



19th century German universities?

A. I would have -- I would severely, seriously doubt that, but I do not remember. Was that back in 1981 or something? Because the late 19 -- late 19th century German universities?

Q. Yes, sir.

A. That would not be the place I would search for, right now, for the basic core curriculum. We tended to follow the British model much more, the British undergraduate model of undergraduate education.

Q. When did you adopt the British model for undergraduate --

A. Oh, I --

Q. Let me finish. Sir, sir, let me finish. When did you adopt the British model for undergraduate education as a template for defining core programs?

A. I -- I adopted the American model. This core -- and what's relevant is the core programs that I have today. I'm talking about American colleges and universities. You know, we can -- we can dispute these relative core programs that are Exhibit 9 and so on.

Page 294

They've -- they've -- you know, some of us have been arguing for some time, sometimes me, many times others, that it's far too Western-Centric, for example.
Q. Sir, sir, I just asked you, when did you adopt the British program that you --
A. I didn't adopt the British model. I adopted the American model.
Q. Got it, got it.
A. And that's at the epicenter of the core programs here.
Q. Okay. All right. And so --
A. But it's a generic model, let's be clear.
Q. Okay. So Exhibit 9, where did this list come from, your list of core programs?
A. That's something I've developed over the years, modified somewhat. You know, there are some artifacts representing the past, like Asian studies, which you won't find a lot of anymore. But these are major, you know, disciplines that are core fields of study. They're not fixed. I think interdisciplinary, like, global studies, you know, courses and programs

Page 295

are gonna be more important.
Q. Okay. Can you point me to any source in the field of higher education that would confirm that this is an appropriate list of core programs?
A. You will -- you will certainly find some differences, as I refer to it, and has been used extensively in court decisions and elsewhere. These are the basic programs of study in the liberal arts and sciences that have formed -- that have informed the first two years of college education, which we commonly refer to as general education. We could -- we could dispute and go through each and every one of these.
Q. We're not gonna do that yet.
A. Good.
Q. Maybe never. But my question is: Can you point to a source in the field that would confirm that this list is correct?
A. What I do is draw off so much literature. I've been writing -- I think I did my -- well, my first book on curriculum was in 1978. I did a monograph on liberal education in 1981. I've written extensively on

Page 296

undergraduate educational, along with graduate education, including the core.
Q. Two questions. Two questions. Can you point me to the most recent writing you have done that -- outside of the litigation context, that lays out the elements of a core program?
A. I don't lay it out explicitly, but in the first two chapters of the book I wrote, published in 2012, Johns Hopkins University, called "Cultivating Inquiry-Driven Learners" --
THE COURT REPORTER: Cultivating what?
THE WITNESS: "Cultivating Inquiry-Driven Learners."
THE COURT REPORTER: You need to slow down for me, please.
THE WITNESS: Sorry.
A. "Cultivating Inquiry-Driven Learners," does not explicitly but talk about the -- directly and indirectly what is kind of a core. It doesn't do it in a systematic way, but clearly --
Q. I got it.

Page 297

A. -- in fact, I refer to how the core programs are often very knowledge-centric, so anyway.
Q. Can you point to any of your writings, outside the litigation context, which explicitly lay out the elements of a core program? And I just need the name of the writing.
A. I mean, there -- national association like AAC&U.
Q. Your writing, sir. Your writing, sir.
A. Oh. Not explicitly, no.
Q. Can you point me to the closest analog in the field, even if it doesn't line up 100 percent with Exhibit 9, that would tend to confirm that this is the appropriate list of core programs?
MS. SHUM: I'm gonna object as to form.
A. I don't know as you'll find another list of core programs that will be identical.
BY MR. SMITH:
Q. Okay. How about substantially the same?
A. If you'd like a correlation coefficient of like .91, I think we could -- we could -- we could get

Page 298

a little bit over 4/5th of these programs, would show
up.
Q. That would be great. So where would I find
that?
A. Look at one of Gerald Graff's books on
general education, for example. Jerry has -- has
written a lot on it.
Q. All right. Where else?
A. Well, again, most of the major associations
just -- I do identify outcomes of a general education.
They don't talk about what are the core programs. So
finding a particular core list is -- is a little
difficult for me to identify. I mean, I can look into
it and see if I can find. I'm very comfortable
defending this.
Q. I know you are.
A. Yeah.
Q. But this is my chance to ask you questions.
So other than Gerald Graff's books on general ed,
that's the only source, outside of your writings, that
you think would come up with a list that is similar in

Page 299

some significant ways to this one?
A. You know, you can look at also Alan Bloom,
"Closing of the American Mind," a whole -- a whole set
of books over the last four decades that will identify
often, not explicitly, okay, I want to be very clear
about that, but indirectly what they consider to be or
what should be the core programs, and -- and from the
-- this -- this debate occurred during the culture wars
beginning in the 19- -- late --
Q. I got it.
A. -- late 1990s, the bell hooks on one side
and --
Q. I understand.
A. I could go on and on about what programs
ought to be included, including like women studies or
not.
Q. Okay. What are the -- so this is -- the
one you have here in Exhibit 9 is current as of 2016?
A. Well, it's what I feel comfortable with.
You know, I could parse on it ad nauseam.
Q. I'm sure you could. And what are the most

Page 300

recent additions that you made to this list?
A. I don't know as I -- I -- I did this
because our initial report was 16 months ago, whatever,
and I don't think I made any since then. So I would
have done it, you know, year and-a-half ago, and I
think I made a couple additions, changes. I left it
still pretty traditional, as you can tell.
Q. So what are the -- what are the additions
--
A. I think I might have added the --
Q. Sir, sir.
A. -- 30.9999, general/interdisciplinary
studies.
(A discussion was held off the stenographic
record.)
Q. Let's do it cleanly, and I apologize 'cause
I interrupted you.
A. No, me too.
Q. All right. So my question is: What are
the most recent additions that show up in this list?
And I think you said one of them might be 30.9999.

Page 301

A. Such as a generic category. I might have
added -- and I can't say this with certainty. I might
have added international studies.
Q. Okay. All right. Anything else occur to
you?
A. I might have -- oh, African -- didn't
African-American studies I put in?
Q. Ironic, isn't it?
A. Yes. I think I put women's and gender
studies in, maybe that haven't had before.
Q. Okay. All right. Are there any programs
that you considered adding to this list in the last,
say, five years but decided not to?
A. Not any that come to mind.
Q. Are there any programs that you deleted
from your list in the last five years? Therefore, they
don't show up on Exhibit 9.
A. I don't recall, again, the last time. It's
been a year and-a-half.
Q. All right. Going back to my earlier
questions, we saw that there's high-demand programs at

the HBIs that happen to be core, right? We saw three of those, for example?
A. That happen to be?
Q. That happen to be core programs.
A. Yes.
Q. All right. And would you agree with me that it is possible for a school to build an academic niche or an institutional identity around core programs?
A. It's very challenging because -- because most institutions offer most, if not all, of the core programs I -- I put here.
Q. Right. It's harder or more challenging?
A. Markedly harder, yeah.
Q. Markedly harder. Okay. Can you think of some institutions that have built an academic niche or an institutional identity around core programs?
A. Well, I can think of institutions that -- as the landscape of the undergraduate curriculums changed somewhat, I've now put environmental studies in core programs. The environmental studies program at



places like -- I don't know, it's a smaller -- let me get outside of the Ivy League, elite public Ivy's and go to a place like Evergreen State in -- in Washington, where they've developed a, you know, very well-regarded program in environmental studies.
Q. Right.
A. So that some in the classic, you know, liberal arts colleges, Rhodes College, have developed identities around liberal arts, including little places like Deep Springs College in California, which is quite a community.
Q. St. John's, for example?
A. Yes. Thank you for that example. I know -- know those two campuses quite well.
Q. Would St. Mary's College in Maryland also be an example of a public school that has developed an academic niche centered on core programs?
A. Yeah, I don't -- I haven't looked at it very much, as you probably know. But the -- I'm not -- I would have to look further into that. I'd not be convinced that it has, not in the visible way that



St. John's has in both of the campuses, Annapolis and the one in Santa Fe.
Q. Why did you -- speaking of St. Mary's, why did you exclude St. Mary's University and Frostburg College or Frostburg University from your schools that had programs transferred away from them?
A. Yeah. It goes way back over a decade, decade and-a-half ago, because of overlapping service areas. They just really didn't have overlapping service -- service areas with the TBIs in Maryland. It was, you know, a decision I made.
Q. We'll come back to that. Can we go back to Exhibit 6 for just a second?
A. Yes.
Q. Okay. Now, you have codes here that tell you whether or not a program is unique either proximately, as you call it, or state-wide, correct?
A. Yes.
Q. And you also have codes that tell you which school the program is at, correct?
A. Yes.



Q. And is it accurate to say that in terms of the high-demand programs that enroll at least 10 students that you list here, there aren't any in the Baltimore College Park area that are actually unique?
A. I think that's right. I just want to verify. They'll all at UMES here. (Inaudible).
THE COURT REPORTER: I can't hear you.
THE WITNESS: Sorry. I'm talking to myself. Forgive me.
THE COURT REPORTER: If I hear it, I have to take it down. I'm sorry, sir.
A. Well, some are -- it depends, proximate or state-wide. Are you -- none of them -- did you say unique state-wide?
Q. Unique --
A. State-wide or proximate, did you say?
Q. Either one. The question is whether there's a single program listed here in Exhibit 6 that is listed as unique in any respect, that's in the --
A. That's drawing at least 10 students.
Q. Yeah, in this --

A. Yeah, I don't think there is. Yeah.
Q. All right. So let's just make sure we got it clear on the record, right, 'cause we were both talking over each other.
So all of the programs here shown as enrolling at least 10 students at an HBI in the College Park area or Baltimore College Park area are not unique, either proximately or state-wide?
A. I'm almost certain that's right. I'm just double-checking the data here. Correct.
Q. All right. And another way of putting it, is to say that 20 out of the 34 programs here are at the University of Maryland Eastern Shore, correct?
A. Yes.
Q. And did you account for that fact, the very high prevalence of programs enrolling 10 or more white students at UMES? Did you account for that in any way in the quantitative analysis that you did in your report?
A. No.
Q. I want to ask you about high-demand



programs in the way that you've defined them, and I understand that you define high-demand here as a non-core program with significant numbers of students, and then you use some numerical thresholds; is that right?
A. Averaged across institutions, yes.
Q. Okay. So, for example, if we looked at page 19 -- actually, let's look at Exhibit 10 of your report.
A. Right.
Q. And is this something that you prepared, this tabulation of high-demand programs?
A. Yes.
Q. And to be clear, you're defining high-demand here in terms of degree completion, right, not enrollment but actual degrees issued?
A. Yes.
Q. All right. And in Exhibit 10 and elsewhere in your study, you set out the thresholds, right? You say to be high-demand for bachelor, 25 graduates or 25 degrees; master's 13; doctoral 6, right?



A. Once again, an average across institutions. Yeah.
Q. Okay. And you say that you used it based largely on MHEC's data on degree completion, correct?
A. Yes.
Q. Now, first of all, do you know what percentile of MHEC's lists of degree completion numbers, what percentile did you use as a cutoff for high-demand programs?
A. What percent of a...
Q. So let me -- let me try and picture it for you. So MHEC and actually you, you have a list of program inventory, correct?
A. I do. I had to develop and fine-tune in great detail, as you know.
Q. Of course. And -- and MHEC itself maintains data about the number of students who have a completed degree, bachelor's master's, or doctorate in particular courses of study, right?
A. Fields of study or programs of study?
Q. Yes, yes, exactly.



A. They do.
Q. Okay. All right. So now, my next question is: If we took your list of high-demand programs and mapped it on to MHEC's list in descending order, right, of how many people completed those degree programs, what would the percentile cutoff be? Is it the top 10 percent? Is it the top 25 percent? What would be it?
A. Oh, I don't know exactly.
Q. So you didn't use percentiles, in terms of total numbers of degree completion, in order to come up with this list?
A. No.
Q. Okay. Where did the numbers of 25, 13, and 6 come from?
A. They come from the experience and background of somebody studying this sort of an issue for a long time, a challenge for a long time. I had to set some standards. I looked at, you know, students that were graduating in -- in the programs and developed some thresholds, you know, for high-demand and so on.

Q. Well, okay. It --
A. They're -- they're different. They seem to be -- I sometimes use the word "tipping points," roughly, more or less, you'll see between, you know, 25, if you got at least 25 graduating, and there's a lot of students interested in that program, and then you'll see down from there, there may be up to 14 or 15, but, you know, I've been sifting and winnowing through these numbers for a lot of years there.
You could draw different numbers, and I'd be the first to admit that you might use 29 instead of 25 and so on.
Q. Right. Other than your judgment, experience, and feel for it, can you point to any other source that would suggest that your numbers of 25, 13, and 6 are the right ones to use here?
A. I wouldn't use the term "right" numbers or wrong numbers. I talk about good numbers or wise use of numbers to try to get at high-demand programs, and I'm very comfortable with the list if somebody goes through these lists across the respective degree levels



about the programs that I've identified 'cause, you know, the -- I think they're -- they're pretty indicative.
Q. Sure. And I understand you're comfortable with them. But my question was: Can you point to any authority or source that would suggest that your numbers are the correct ones or the appropriate ones or the ones that we, you know, people other than you, should feel comfortable with?
MS. SHUM: I'm gonna object to the form.
THE WITNESS: I'm sorry. Object, did you say?
MS. SHUM: To form.
BY MR. SMITH:
Q. You can answer.
A. I don't have any other specific source, no. I've also looked at many sources of, you know, data on high-demand programs. I've look at some data from Maryland about programs that are high-demand from the U.S. Department of Labor and so on, trying to come up with identifying what I think is a pretty good list.



And so if you look at a lot of these from architecture to environmental management and so on, you know, to aerospace engineering, it's not gonna surprise many people that these are in the high-demand category.
Q. Sure. Can you take a look at page 19 of your report?
A. Of the expert report?
Q. Yes, sir. It's paragraph 116.
A. Yes.
Q. All right. And in 116 you describe your methodology, correct?
A. Yeah.
Q. So in little "i" you say, "High-Demand programs are based largely on our analysis of MHEC's 'Degree Trend Data Workbook,'" and then it says, "Dr. Conrad placed most of his emphasis on the following average number...." Right?
A. Yeah.
Q. Okay. Now, let's go back to Exhibit 10. So if -- take a moment to get there.
A. That's just before G. Okay. Got it.



Q. Okay. So if you mostly or largely used MHEC's data on degree completion to come up with this list, can you tell me which programs on Exhibit 10 wouldn't make the top number of degree grants based on MHEC's data?
A. Boy, I would have to scrutinize that and go through the whole list.
Q. Well, but do you have a document somewhere that tells us which of the programs listed here as being high-demand don't meet your thresholds?
A. I -- I may have made some notes on that. Because I have torrential flow of documents, I don't even -- wouldn't even know how to find them. Yeah.
Q. But --
A. Yeah. Go ahead.
Q. Well, but based on the report that's supposed to have all of your opinions and explain the basis for them, we can't tell, and you don't know, which programs here were not based in their selection on MHEC's Degree Trend Data Workbook; is that fair?
MS. SHUM: I'm gonna object to the form.

Page 314

A. I would need to retreat and do the analysis again probably because I have so much paper, I do not have easy access to that. Do I think there were many of those? No.
BY MR. SMITH:
Q. Well, how many? Were there a dozen?
A. No. I don't think so, no. I don't remember how many exactly.
Q. Can you identify --
A. Which programs?
Q. -- three of them?
A. I better be careful 'cause I -- no, I'm not absolutely certain.
Q. Now, let's stay on Exhibit 10 for a second.
A. Yeah.
Q. Okay. So in the first instance, you relied mostly on MHEC data and sometimes did not. We just talked about that. It also says here that in several instances you also added programs even though the thresholds that you identified had not been realized, correct?

Page 315

A. I did, yeah.
Q. And you say, for example, in Exhibit 10, you said, "To illustrate, see the bachelor's program in Architecture identified below."
A. Right.
Q. And it says you put an asterisk next to a program like that because even though it didn't meet your thresholds, you still thought it should be categorized as high-demand; is that right?
A. Yes. I made that judgment.
Q. Okay. And first of all, how did you make the judgment that even though a program didn't meet your numeric thresholds, you should still call it high-demand?
A. Looking at the literature, research I'd seen from the Department of Labor, other places, yeah. I made that decision.
Q. So the main thing you used was degree completion, but you also looked at Department of Labor information?
A. Well, yeah, I had -- I had some data on

Page 316

high-demand program -- high-demand fields of study. Yeah.
Q. Okay. But --
A. And there were just a few that stood out. Yeah.
Q. Sure. These ones at least you say you put an asterisk next to it, right?
A. Yeah.
Q. Okay. So let's look at your example here. It says, "To illustrate, see the bachelor's program in Architecture identified below. In such instances I put an asterisk next to the program."
I'm looking down at architecture, and I don't see an asterisk.
A. I don't see the asterisk either.
Q. Okay. Does that suggest to you that you haven't actually identified all the various programs where you chose to categorize them as high-demand even though they didn't meet the numeric thresholds?
A. I'm doing a cursory analysis, and I don't see many asterisks. In fact, I would need to recheck

Page 317

that.
Q. Right. Well, sir, it's hard to know how many are missing, right? Because you're -- you're looking for something that's not there, right?
A. At the present time, it is not.
Q. Okay. And in fact, you chose to denominate some programs as high-demand even though one or more institutions were offering the program but had graduated no students in 2014, right?
A. That's correct.
Q. So there are some programs on here that don't even meet -- they not only don't meet your numeric threshold, they didn't graduate any students in 2014, right?
A. I also had some enrollment data for 2014, and some of those still had a significant number of students enrolled. The data was very tricky. That's why I went through this complex problem, challenge of coming up with the program inventory for the state of America -- Maryland, which was very much needed.
Q. Okay. And the data are not only tricky,

but they vary from year to year, right?
A. They do vary somewhat from year to year. Sure.
Q. The number of degrees awarded, particular one, they vary from time to time?
A. They often do vary somewhat. Yes.
Q. Right. And given that degree of variability, does that suggest that perhaps you should have used a blended figure averaged over a number of years?
MS. SHUM: Object to form.
A. I think -- I think ideally I would've liked to have done it over a period of years. Yes.
BY MR. SMITH:
Q. Is there anything that prevented you from using multiyear data to identify programs as high-demand or not?
A. Most -- I just didn't have the time and energy to do it.
Q. Okay. Now, the definition you use here that has the -- the numeric cutoffs, is that the



definition of high-demand programs that you've always used?
A. You mean those numbers?
Q. Yes.
A. I think I've changed those numbers somewhat. I recall definitely changing them.
Q. Okay. So from the past, haven't you used, for example, a cutoff that uses national numbers of graduating students?
A. I think I -- I think I have in the past, yeah.
Q. Right. For example --
A. I've used -- I've used different data sources. Yeah.
Q. Okay. So, for example, in Alabama once upon a time, didn't you use a cutoff for high-demand programs where you said programs that had more than .2 percent of graduating students in a given year?
A. You know, I vaguely do remember using criteria like that.
Q. Okay. And why did you chose that cutoff?



A. Like in this one, you have to move -- try to identify tipping points, and I was -- that's interesting. That was national data, you said?
Q. Well, it's your study. Did you use national data?
A. Well, you mentioned the data source. What was it again?
Q. My understanding is that in Alabama at one time you defined high-demand as being more than .2 percent of graduating students in the prior year.
A. At -- in Alabama or nationally?
Q. Nationally?
A. Nationally. I vaguely remember that. Once again, we're talking over 20 years ago.
Q. Why did you change that to a different standard?
A. Because there are often marked differences, sometimes significant, sometimes not between -- between various states and what's -- what's high-demand programs.
Q. Right. But in Maryland, you chose in some



cases to override the MHEC data by using U.S. Department of Labor, right?
MS. SHUM: Objection. It's not --
A. I said I --
THE COURT REPORTER: Wait. Go ahead.
MS. SHUM: -- a correct characterization of the response.
BY MR. SMITH:
Q. Go ahead, please.
A. Yes.
Q. Okay. So was there some factor, other than national versus state data, that caused you to change from the first standard you used in Alabama?
A. I -- I always think these things through, and I -- I decide that it may be more appropriate to use a regional state-wide threshold, and at the same time, we're looking at the future. We're trying to come up with a sustainable remedial proposal. We don't want to be a prisoner of the past.
Q. Of course. And other than your judgment about what might be more appropriate or what you felt

Page 322

more comfortable with, can you think of any other reasons that you backed away from your original definition of high demanded as being .2 percent of graduating students nationally?
MS. SHUM: Object as to the form.
A. I wouldn't use the term "backed away," as I've changed the criteria that I used -- that I used and --
BY MR. SMITH:
Q. That's fine. I'm okay with "changed the criteria." Other than feeling it was more appropriate, feeling more comfortable with it, any other reasons that you changed the criteria?
MS. SHUM: I'm gonna object to the form.
A. Not that come to mind.
BY MR. SMITH:
Q. Did you keep using that .2 percent cutoff in Alabama as a definition of high-demand, or did you change that as well?
A. I have no recollection of whether I did or did not.

Page 323

Q. All right. Now, you also analyzed the number of unique programs at the HBIs, correct, in Exhibit 4 to your report?
A. Exhibit 4, yes.
Q. Exhibit 4 is a list of programs, and it has a tag that tells you whether or not they're unique; is that right?
A. Oh, Exhibit 4, is there an early 4? Let me just double -- there's the changes and then there's the -- oh, yeah, Exhibit 4, it does, right.
Q. Okay. And you kept track of the absolute number of unique programs at the HBIs from year to year; is that right?
A. Well, I used these 2014 data. If you're referring to this table, this is based on the 2014 data.
Q. Right. And you previously had, what, 2012? 2013?
A. I had earlier data, and my earlier study went all the way back to 2006, 2007.
Q. Okay. So your original calculations were

Page 324

based on 2006 or 2007?
A. 2006/2007 based on my 2010 report.
Q. Got it. And then your new report, what we see in front of us, July 2016 used 2014 data; is that right?
A. Yes.
Q. Okay. And take a look at page 55 in your report, Section 321.
A. I'm sorry. My expert report?
Q. Yes, sir.
A. Okay. That's the most recent data.
Q. Of course, of course. And in Sections 321, 322 and 3- -- or just 321 and 322, you looked at the absolute number of unique programs at the HBIs, right?
A. I did.
Q. All right. And you saw that there was a change from your earlier data to the 2014 data, correct?
A. Yes. There were modest differences.
Q. Right. Now, do you think that's a significant number, testing the -- or describing the

Page 325

absolute number of unique programs at the HBIs?
MS. SHUM: I'm gonna object to the form.
A. Overall, and I do a lot of comparisons with the earlier report, these are not major. They're really relatively minor differences, and I'm very comfortable with that.
Q. Well, I get that. I'm not -- I'm not talking about the differences between the old report and the new report. I'm trying to figure out whether describing the absolute number of unique programs at the HBIs in any given year, whether you think that that is an important number or descriptive or illustrates an important point?
MS. SHUM: I'm gonna object to the form.
A. I -- I think that it illustrates one of the keystone points in my study without a shred of hesitation.
Q. Okay.
A. That it would be the conspicuous absence of unique programs at the H- -- at the TBIs.
Q. I want to give you a hypothetical, okay?

Page 326

Two schools that both have 10 unique programs, okay? One of them has 1,000 students and the other has 5,000 students, okay, but they both have 10 unique programs.
A. Right.
Q. In that circumstance, does it make sense to say that the two schools are in the same situation 'cause they both have 10 unique programs?
MS. SHUM: I'm gonna object to the form.
A. There -- well, it's a different -- a little different context, yeah. You would expect the school with a few more students to have a few more unique programs probably.
BY MR. SMITH:
Q. Do you think it would be a helpful number to -- to illustrate the problem or the issue here, instead of saying the absolute number of unique programs at the HBIs, to say the number of unique programs per student or per thousand students?
A. You know, size is an intervening variable, but I wouldn't -- I wouldn't choose to do that particularly. I'm comfortable with the way I did it.

Page 327

Q. So why would you choose not to measure it in a population-weighted way?
A. The -- because that implicitly justifies, and can justify, severe inequality with respect to uniqueness and the distinctiveness of the program identities of institutions, and that's -- that's always been a way that we've kind of justified keeping all these unique programs compared to institutions that are much smaller, and they would include the flagship university at the University of Wisconsin.
We built those, and so we want to justify them by the number of students we have. For example, the number of students we serve, it's a -- that becomes as nice, self-fulfilling prophecy. It has worked very conveniently for my institution.
Q. Right. And do you have any evidence that that is the justification that a per student or a weighted number of unique courses, that that justification has been used by Maryland to allow unnecessary program duplication?
MS. SHUM: I'm gonna object to the form.

Page 328

A. I would -- I have no way of disentangling that. That would be irresponsible of me to speculate on that.
BY MR. SMITH:
Q. Can I ask you to take a look at Exhibit 7 in your report here?
A. Oh, yeah.
Q. Okay. So -- so who claims paternity for Exhibit 7?
A. I'm gonna retreat from my quantitative background, and I'm gonna defer entirely to Walter John -- Walter Allen on this.
Q. So did he prepare this?
A. Clearly, he took the lead. I did not.
Q. I see. Did you --
A. And, you know, he -- this is, as I've said so many times, notwithstanding all your earlier questions, this is really a Conrad/Allen -- this is a Conrad/Allen report, so, I mean, you know, he did this, just like on the -- he's taken the lead on the Dr. Lichtman analysis and reflecting on and so on.

Page 329

Yeah.
Q. But you stand behind this, right?
A. Yeah, I think it -- I don't know. I haven't analyzed it in depth and thought about it enough so... But I have thought about it a little.
Q. Well, do you stand behind --
A. I stand behind what I know so far about it. Yeah.
Q. Okay. And do you understand Exhibit 7, which by the way --
A. I believe I do understand Exhibit 7 with, yes, unbelievable clarity.
Q. Okay. And you understand that it compares the percentage of programs that are at a given college that are unique or high-demand to the percentage of white student enrollment in those programs, right?
A. That's right.
Q. And one of them is a proportion or a fraction of the number of courses or programs, right?
A. Yeah. I think programs is a unit we want to use.

Page 330

Q. Okay. I'm gonna call it programs.
A. Forgive me for trying to be helpful here.
Q. No, I appreciate that. So the first thing that's being measured is a proportion of the number of programs, right?
A. Yeah.
Q. And the second is a proportion of the number of students, right?
A. Right.
Q. And it's the proportion of white students in particular; is that right?
A. Correct.
Q. Okay. So white students based on the analysis here you conclude are more likely to enroll in a high-demand program, right?
A. Well, yeah, sort of 1.4 ratio to 1. Yeah.
Q. Right. And can we flip back for a second to paragraph 226 in your report?
A. Yeah.
Q. Okay. And in round numbers, paragraph 226 says that in one instance across the HBIs, 40 percent

Page 331

of the programs are high demand, but 60 percent of the white students are in high-demand programs, right?
A. I'm sorry. What number is that?
Q. Paragraph 226.
A. Oh, 26 (sic).
Q. 226.
A. Yeah.
Q. 40 and 60, right?
A. Do you have -- am I in the wrong report? This is E. Oh.
Q. Yeah, let's flip --
A. That's it. No. I'm supposed to be in F.
MS. SHUM: You're in Tab F.
Q. Tab F.
A. Okay.
Q. Okay. So in round numbers, section -- or paragraph 226 says 40 percent of the programs are high-demand, 60 percent of the white students are in high-demand programs, right?
A. Yeah.
Q. Okay. Have you seen anywhere a comparison

Page 332

like this used in the field of higher education?
MS. SHUM: I'm gonna object to the form.
A. I haven't at this macro level. This is Walter's domain.
BY MR. SMITH:
Q. Well, you're an expert on higher education, right?
A. I'm not an expert on everything. And have I seen this figure before, these figures used this way? I haven't.
Q. Okay. Is there a name for this type of comparison that's used here?
A. I do not know.
Q. It's certainly not a uni- or a bi- or multivariate comparison, correct?
A. No, no. I don't think it's, no, either of those. I don't -- I don't recall seeing it before, disproportionality index.
Q. Not in your 40 or 50 years in the field; is that right?
A. I think 40 would max it out pretty much,

Page 333

yeah.
Q. Okay. All right. Let me give you a hypothetical, okay? Let's say there's 100 programs at the HBIs, okay?
A. Uh-huh.
Q. And let's say that 40 of them or 40 percent are high-demand.
A. Right.
Q. Okay. And let's say that 60 percent of the white students are in high-demand programs, right?
A. Right.
Q. So using the arithmetic that we have here in your exhibit, there would be a disproportion of 1.5, right?
A. Uh-huh.
Q. I'm sorry. You need to say yes or no for the --
A. Yes.
Q. Okay. But I'm gonna ask you to assume in another fact, okay? I'm gonna ask you to assume that 75 percent of all students are in high-demand programs.

Page 334

Are you with me?
A. Yeah.
Q. Okay. If those are the facts, what does your disproportionality analysis tell you about the ability of high-demand programs to desegregate a school?
A. In that particular case?
Q. Yes.
A. Well, without -- you know, again, I'd have to (unintelligible) little bit more carefully. It's been a long day here. But I think it would suggest limited disproportionality, for sure.
Q. Right. Did you or Dr. Allen look at any of those facts in preparing Exhibit 7 to see the total proportion of all students?
A. I did not.
Q. And do you know whether Dr. Allen did?
A. If Cliff didn't do it, Dr. Allen took the lead on it, so...
Q. Right. But I assume that you looked critically at his work as part of your collaborative

Page 335

effort; is that true?
A. Yeah. A couple of these quantitative parts are the only pieces that I didn't desegregate in this -- this -- look at, break down, parse on, and pretty much everything else, including the wording and language and meaning and interpretations ad nauseam. Yeah.
Q. I don't -- I don't follow you. What was that last part?
A. I'm referring to all the work that was done, and I spent developing this expert report with Walter Allen. It's quite a project.
Q. I'm sure it was. Right. And that's why you asked the Lawyers' Committee to help you with it; is that true?
A. Well, help in a sense that they just -- I use -- what I use, the word "facilitate" earlier. I mean, that's what they did. They -- they -- they helped us with putting -- what do you call those numbered paragraphs on things? And did get some feedback, little bit on editing once in a while, stuff

Page 336

like that.
But it's our report. I don't know how to -- that's what I didn't know how to say more clearly. It's kind of challenging because, you know, lines could get a little bit blurred, but it's our report. It's our work. It's basically our language and certainly our findings, meaning --
Q. Basically.
A. -- structure. Yeah, basically, yeah. It's -- it's our report, and I don't --
Q. Let me ask you about --
A. You know, it's one thing to get some help and assistance and, you know, advice occasionally, but -- but it's our report, and we take full and unfettered responsibility. I don't know how to --
Q. Totally got that. Can we take a look at paragraph 57 of your report?
A. Yeah.
Q. Tell me when you get there.
A. 57 of the --
Q. The main report, main body of it.

Page 337

A. We're back to F again here.
Q. Yes. You with me?
A. Yes.
Q. Okay. So this report talks about the extensive amount of duplication. It states an opinion that Maryland's actions constituted bad faith. So who wrote this section of the report?
A. Oh, a lot of that is Cliff. Now, having said that -- and I don't mean to place a disproportionality burden, if you'll forgive me for stating it that way, on Dr. Allen. But Dr. Allen has taken primary responsibility for responding to Dr. Lichtman.
Q. I understand. Right.
A. But let's be very clear about that.
Q. I -- I understand your testimony. I'm asking about paragraph 57. I think you said that's Cliff. And you're Cliff, right?
A. Oh, that would be Cliff.
Q. Okay. All right. And --
A. I think the lawyers may have suggested the

Page 338

word "opinion" as opposed to the word I think I had was "perspective," and so I decided to change it because I thought it was more of a legal term. But -- but that's Cliff, including the prose, yeah.
Q. And were there other places throughout the report where the lawyers would suggest changing the word "perspective" to "opinion," not just here?
A. They just would provide some feedback, usually something, like, they raised an issue or something. But yeah, it's -- we take full responsibility.
Q. Okay. So it says in here that Maryland's actions constitute a level of bad faith sufficient to justify various things, including program transfer. And my question is: Who -- who determined that Maryland had acted in bad faith, as you describe it here?
A. Clifton Conrad and Walter Allen.
Q. Okay.
A. Agreed.
Q. And have you --

Page 339

A. That this -- the state of Maryland does not dismantle the dual system, which Judge Blake pointed out in her 2012 decision, where she also discussed at length the implications of that.
Q. Got it. And have you, in your long career testifying for the government and for other plaintiffs, have you previously made any findings of bad faith in these desegregation cases?
A. I don't know as I've used that language before, but I have certainly found this. And somebody who is involved, including drafting partnership agreement back in the aforementioned 1999, 2000, where the whole spirit and meaning and intent of the partnership agreement wasn't -- fidelity was not maintained to where the state, you know, began to offer new unique and high-demand programs at the TWIs --
Q. Sir --
A. -- it did not contribute in any way --
Q. I asked if you had made findings or accusations of bad faith in any of your prior testimony or expert witness work. Is the answer no?

Page 340

A. The answer is that I found the states have not dismantled; therefore, bad faith, dual and unequal systems. Yeah.
Q. Have you used the words "bad faith" before?
A. I don't recall using the term "bad faith," but yeah.
Q. Okay. And so why did you use it here if you didn't do it in Alabama and Mississippi?
A. If I -- yeah, if I -- I think it was accented because of just disappointment that given the commitment made in the partnership agreement.
And I need to be careful with this language, but let me state it explicitly, that when you start introducing more unique high-demand programs at the TWIs instead of at the TBIs, you're exacerbating the problem of segregation. You're not addressing it. And that's what we were trying to do.
I was delighted to work with state of Maryland back in 1999 and 2000. I worked with some wonderful lawyers and then -- and even there the commitment, so the situation got worse.

Page 341

Q. Got it. And --
A. In terms of the dual system and the consequences for desegregative potential of the HBIs.
Q. And what is the standard that you used to find bad faith here? Is there any objective standard that we could point to and say Maryland met it or didn't meet it?
A. It's language that I think captures the meaning of what I want to say.
Q. Language that captures the meaning. So does that mean there's no objective standard you can point to?
A. I think there's a fair, there's a reasonable, there's a very solid standard, and I think that Walter and I have used it.
Q. And what is that objective standard by which you contend that Maryland has committed bad faith, acted in bad faith?
A. The fact, the simple fact that it has -- continues to have a dual structure of higher education.
Q. Okay. Got it. Now, you say --

A. That has consequences for what students enroll at what institutions.
Q. All right. You say at the end of this paragraph that, in your opinion, Maryland's actions are bad faith sufficient to justify a variety of measures, including program transfers, right?
A. Right. I -- I do think that program transfers will be very much put on the table. Judge Blake raised them as a possibility and so on.
Q. And if there's not a finding of bad faith, hypothetically, if there's not a finding of bad faith, does that mean that program transfers would not be justified?
A. Bad faith is pretty strong language.
Q. Right.
A. But I think if it was a finding that it continues to operate a dual system that -- in which there are very few unique programs and unique high-demand programs, as you know from the research that I've done in this report, that are only at the four HBIs, there are only two or three unique



high-demand programs at each of the -- of Maryland's four HBIs, they do not have a distinctive identity --
Q. Let's go back to my --
A. -- anchored -- anchored in their program offerings.
Q. Let's go back to my question. If there's not a finding of bad faith, does that mean that program transfers would not be merited or justified?
A. I -- I think program -- I think I answered your question.
Q. Well, let's try it again because I -- I listened really hard, but I don't think I hear it. Let's suppose hypothetically that there's not a finding of bad faith. In that circumstance, do you believe that program transfers would be justified?
A. I wouldn't necessarily use the touchstone of bad faith. Again, forgive me, I think -- I feel like I'm repeating my answer. If there's still a dual system and it's a -- what that means, be very clear, is that the TBIs do not have identities in their programs, their institutional identity that's distinctive, that's



anchored in what we call program niches and programs along with them, that their only identity is race, then you still have a dual system, and I think program transfers will be needed.
Q. Okay. So regardless of whether there's a finding of bad faith, provided that there's a finding of unnecessary program duplication --
A. Very extensive, unnecessary program duplication, that's right.
THE COURT REPORTER: Say that again.
THE WITNESS: Very extensive, unnecessary program duplication.
BY MR. SMITH:
Q. Therefore, in your opinion, regardless of a finding of bad faith, transfers will be required?
MS. SHUM: I'm gonna say that this is asked and answered.
BY MR. SMITH:
Q. Is that fair?
A. The transfers are very likely to be required.



MR. SMITH: Okay. Let's take a break here. I think we have about an hour to go.
VIDEO TECHNICIAN: We are now going off the record. The time is 4:46.
(There was a brief recess taken.)
VIDEO TECHNICIAN: This is the beginning of DVD No. 5. We are now back on the record. The time is 5:05.
BY MR. SMITH:
Q. Dr. Conrad, a couple of quick questions. First of all, in your remedial proposal, you advocate for the transfer of certain programs from UMUC; is that correct?
A. That is.
Q. And my question is: When those programs are transferred to the HBIs as you advocate, do you contemplate that UMUC will be able to provide those programs to non-Maryland residents to have an outward-facing program?
A. That UMUC will be able to?
Q. Yes, uh-huh.

Page 346

A. You mean those same programs in computer and environmental engineering?
Q. Whatever programs you seek to transfer from UMUC to the HBIs, after those programs go over to the HBIs, under your view of the world, can UMUC continue to offer them online to non-Maryland residents?
A. Oh, UMUC?
Q. UMUC.
A. UMUC.
Q. Yes.
A. Well, my recollection is we left that in place, didn't we?
Q. Well, I'm asking you, sir.
A. UMUC, I'm trying to remember the specifics on that. I haven't thought about that for a while.
Q. It's not clear from the proposal, so I'm asking you as its architect. When your proposal is put in place, can UMUC continue to offer those transfer programs to non-Maryland residents online?
A. I don't recall that we asked -- requested the discontinuance of those programs, did we? We might

Page 347

have, though. I'd have to look at -- can I look at the --
Q. Sure.
A. -- last part of the remedial program? I need to check. I forgot about the UMUC part on that. I think we state it clearly, don't we?
Q. No.
A. You sure we don't't? What page is that? Back here, isn't it?
Q. Let me help you, if I might.
A. Here we go, yeah.
Q. Exhibit 3 to your report, Appendix B. It's page 26 of Exhibit 3.
A. Exhibit 3. Thank you. Did you say page 26?
Q. 26, right.
A. 27?
Q. 26.
A. Sorry. Forgive my hearing.
Q. Okay. So 26 has one, two, three, and there are more programs that are gonna be transferred from

Page 348

UMUC to various -- I think to Coppin State, okay? And my question -- and they're in issues like digital forensics, forensic science, criminal justice.
After that transfer occurs, as you interpret your proposal, can UMUC continue to offer those programs out of state, online?
A. I guess I'd need to -- Walter's probably a little bit more of the lead clearly on the UMU- -- on, well, the UMBC. No.
Q. No. Okay.
A. No. I mean, I don't --
Q. All right. Next question. Next question. You've talked a couple times about program enhancements that you want to be ordered at the HBIs. Is there anywhere in your report or your remedial proposal that you spell out the exact nature of the program enhancements that you want for existing programs at the HBIs?
A. Not in depth.
Q. Who -- who -- so does it follow from that that you don't have any idea of which programs would be

Page 349

enhanced at the HBIs under your proposal?
A. Under the current -- current programs would be enhanced?
Q. Yes.
A. We don't identify them only specifically. We make loose references to them, but yeah.
Q. And does it follow from that that you don't have an idea, even to an order of magnitude, what the cost of those program enhancements would be?
MS. SHUM: I'm gonna object to the form.
A. We -- we haven't estimated that. I think we -- expert coming aboard that will do that.
BY MR. SMITH:
Q. The expert coming aboard will do that? Who is the expert coming aboard?
A. I would think that -- I don't know the legal -- I'm not an expert on expert witnesses.
Q. You mean Ms. Lapovsky? She's gonna --
A. I think that would probably be the dangling antecedent here. Yeah.
Q. Okay. All right. So you think that

Page 350

another plaintiff's expert --
A. I suspect that that's the case.
Q. Okay. Let me just put it clearly on the record because we're -- I was talking over you. You expect that another of plaintiff's expert witnesses, Ms. -- or Dr. Lapovsky will offer an opinion about that?
MS. SHUM: I'm gonna object to the form.
A. I would anticipate at some point in the process that that will be a part of the remedial process as it unfolds.
BY MR. SMITH:
Q. Right. From another of plaintiff's expert witnesses?
A. Yes. I don't think Dr. Allen or Dr. Conrad is qualified to address that.
Q. Right. And you've heard of Ms. Lapovsky, right?
A. I -- I -- it's the only other person I know who might be involved in that at that point.
Q. Okay. And when we say "program

Page 351

enhancements," can you tick off for me three things that you think would be involved in a program enhancement?
A. Oh, we mention many things in the remedial plan, as you know, but we're talking about everything from facilities to scholarships to faculty. There -- there -- definitely, it's going to be very disruptive, going to be disruptive in some ways. We tried to minimize that at the TWIs, but we've done the best we can.
Q. Okay. Let's stay on the exhibits to your report for a second. Exhibit 5.
A. Yes.
Q. Okay. That's entitled "Unique, Non-Core Programs (Including High-Demand Programs) by Degree Level...." Who is the father of Exhibit 5?
A. Five is, does it say? Mine doesn't say 5 on it.
Q. I'm guessing that it's --
A. Is this on page 31?
Q. Yes, sir. I'm guessing that it's Exhibit 5

Page 352

that was --
A. It looks like the same one.
Q. It's between 4, which is the program inventory, and 6, which is the HBI programs with at least 10, okay?
A. I hear you. Yes, sir.
Q. All right. So I think that's Exhibit 5. But who's responsible for this page?
A. Clifton Conrad.
Q. Okay. All right. And Exhibit 4, the program inventory, that is your baby also?
A. Clifton Conrad, yes.
Q. All right. Now, I want you to flip to the very last document in your binder, which is Dr. Lichtman's -- the very last document all the way back, more tabs, very last tab, keep going, got it. Okay.
Dr. Lichtman's report has, as Exhibit 1, a series of corrections or errata, or errata, to the report that you authored, correct?
A. Yes.

Page 353

Q. Exhibit 1 is all the way at the back of Dr. Lichtman's report, the last like --
A. Yeah. I do remember glancing at that. Yes.
Q. Okay. Why don't you flip there, please?
A. I think -- right.
Q. It's a nine-page document, right?
A. I don't know how many pages, but it looks like about nine.
Q. Yeah. Okay. But it's Exhibit 1 entitled "Errata." Okay. Now, Dr. Lichtman states in here -- and there's a summary on page 1. Can you go to page 1 of his Exhibit 1? He states in the summary that there are a number of corrections that need to be made to Exhibits 5, 6, and 8. See that?
A. Yeah.
Q. And also Exhibit 3, which is yours, right?
A. Somewhere, I'm sure, it's here. Yes.
Q. Page 1.
A. I see it, uh-huh.
Q. Okay. And my question is: Since you were

Page 354

responsible for the creation of Exhibits 3, 5, 6, and 8, have you looked into any of the corrections that Dr. Lichtman has put together here?
A. In his August 30th report?
Q. Yes, sir.
A. I have not.
Q. Not a single one?
A. I'd have to double-check the exhibits. I have not systematically gone through this. No.
Q. Have you looked through a single one of the corrections in here? That was my question.
A. Okay. Not to the best of my recollection. I had so many other things to do. I -- I -- I don't recall systematically looking at that.
Q. Again, my question is: Not a single one; is that right? You haven't looked at a single error that he has alleged occurs in your report?
A. Where I've taken ownership over the...
Q. Yes.
A. I haven't gone through this carefully. No.
Q. Not even on one of them?

Page 355

A. Not to the best of my recollection.
Q. All right. That's fine.
A. I -- I may have glanced at it.
Q. All right. Now, I want you to go to the body of his report, page 13. All right. So Table 4 on page 13 of Dr. Lichtman's report sets forth the degrees granted per institution at the Maryland HBIs and the TWIs, correct?
A. Uh-huh, yes.
Q. All right. Do you dispute or do you have any reason to doubt that the TWIs at every degree level graduate far more students per institution than the HBIs?
A. They do. I would never dispute that.
Q. Okay. Take a look at Table 5, which is on the very next page, which sets forth a comparison of degrees granted per institution with high-demand programs per institution. Do you see that?
A. Yeah. I haven't looked at this table before.
Q. Well, you understand, do you not, that it

Page 356

purports to analyze or seeks to analyze the degrees granted per institution with the high-demand programs per institution, right?
A. Yeah. Yes.
Q. Okay. And do you have any reason to doubt that the TWI to HBI ratio of these numbers is much greater for the number of degrees per institution than for the number of high-demand programs per institution?
MS. SHUM: I'm gonna object as to a lack of foundation. Dr. Conrad said he hasn't analyzed this table.
MR. SMITH: Don't prompt the witness. I'd like his testimony, please.
A. I -- I would be the first to say I have not systematically gone through this. I would need to reflect on this.
BY MR. SMITH:
Q. Right. But do you have any reason to doubt a finding that the degrees granted per institution as compared with the high-demand programs per institution shows a markedly greater ratio for the TWIs than the

Page 357

HBIs?
A. Probably not, but it's been a lengthy day, and I'd need to think about it a little bit more.
Q. All right. Let's keep going to Table 11 in his report, which is page 27.
A. Yeah. Yeah.
Q. Do you have any reason to doubt the finding that for the four HBIs more often than not the percentage of white students in high-demand programs is lower than the overall percentage of white students at the undergraduate or graduate level?
MS. SHUM: I'm gonna object.
A. There is -- based on our, you know, inquiry, Walter Allen, Cliff Conrad, I'm not altogether surprised at that, given some of the... Having said that -- and I think we're prepared to defend, Walter and I, that high-demand programs, especially coupled with unique programs obviously, can be an incentive for students, and we will not limit it to programs as a unit of analysis, but we'll also maintain fidelity to our emphasis on programmatic niches.

Page 358

BY MR. SMITH:
Q. I understand. Can you turn to Table 15, which is at page 40 of Dr. Lichtman's report?
A. Yes.
Q. All right. Doctor, do you have any reason to doubt Dr. Lichtman's finding that for the four HBIs half the time the percentage of white students in unique programs is lower than the overall percentage of white students at the undergraduate or graduate level?
MS. SHUM: I'm gonna object as to foundation.
A. Am I surprised at that?
BY MR. SMITH:
Q. Do you have any reason to doubt it?
MS. SHUM: I'm gonna object as to form.
A. I question everything, but on that particular case, I'm certainly not altogether surprised.
BY MR. SMITH:
Q. Okay. Can you turn to Table 17, at page 45? Table 17 is a summary of findings from

Page 359

earlier tables on unique high-demand programs at HBIs in Maryland?
A. Uh-huh.
Q. Right? And that's a yes, right? You need to say yes or no, sir.
A. I'm just glancing at the table for the first time. Would you please repeat that?
Q. Sure. Table 17 is a summary of findings from earlier data in his study on unique high-demand programs at HBIs in Maryland; is that right?
A. Uh-huh.
Q. All right. And that's a yes?
A. Yes.
Q. Okay. And do you dispute his finding or have any reason to doubt his finding that for both Baltimore College Park and the Eastern Shore HBIs, in every instance, the percentage of white students in unique high-demand programs is lower than the overall percentage of white students at the undergraduate or graduate level?
MS. SHUM: I'm gonna object.

Page 360

A. No. But once again, I need to look at it more carefully and reflect on it. First time I've seen it, yeah.
BY MR. SMITH:
Q. Sure. But does the finding surprise you at all?
MS. SHUM: I'm gonna object.
A. Not as far as I've interrogated it, but I need to look at it a bit more.
BY MR. SMITH:
Q. Right. Can you take a look at Table 18, page 47?
A. Yes.
Q. Okay. And these are regression analyses performed by Dr. Lichtman for the relationship between your programmatic categories and white enrollment percentages at all HBIs, right?
A. Yes.
Q. All right. And do you have any reason to doubt that this analysis demonstrates a lack of a statistically significant relationship between the

Page 361

percentage of white students in HBI programs and all of your categories of remedial programs, unique and high-demand?
MS. SHUM: I'm gonna object.
A. Yeah. This one, it's too premature for me to comment on. I'm sorry.
BY MR. SMITH:
Q. Okay. That's fine. That is fine. Take a look at Table 19 on page 52. So Table 19 examines a variety of things. And my question is: Do you dispute the finding that the percentage of white students in your selected non-core, non-joint programs for the Baltimore College Park region from your Exhibit 6 is actually 6.0 percent?
MS. SHUM: I object.
A. Does that surprise me? Is that your question?
BY MR. SMITH:
Q. Yes. Yes.
A. It does not. There are five TWIs in the Baltimore region.

Q. Okay. Let's go to Table 23, if we might.
A. I'm sorry. What does the word "exemplar" mean here? I happen to know the word, but...
Q. Exemplar. Example.
A. Oh, okay. I haven't used that word in a long time. Yes.
Q. And I, for my sake, have not used the word "fortnight" in a long time.
A. I prefer the word "exemplary," but that would be a different meaning.
Q. That's why we have lawsuits.
Okay. So Tables 23 to 26 examine the question of disproportionate impact of high-demand programs?
A. Uh-huh.
Q. Do you have any reason to doubt Dr. Lichtman's finding that when you take into account both the percentage of white students and the percentage of all students in your categories of remedial programs, that none of these programs show an actual disproportionate enrollment of white as opposed



to all students?
MS. SHUM: Objection.
A. Once again, I'd need to look at this more carefully, particularly the Eastern Shore region. But also even in Baltimore, I would -- I would need to interrogate that.
Q. Okay. All right. Can you flip to page 87 of Dr. Lichtman's report, Table 40?
A. Oh, yes.
Q. And you're familiar with this, correct?
A. I have seen these numbers somewhere.
Q. Right. And the question that Dr. Lichtman is looking at, is that if you have programs with 20 percent white enrollment, how many additional students would you need at the HBIs to reach a level of, say, 16 or 15 percent white enrollment, correct?
MS. SHUM: I'm gonna object as to the form. I'm not sure where you're getting 20 percent. Where are you looking? Am I on the wrong table?
MR. SMITH: Nope, you're at the right table.



THE WITNESS: No, you're at the right table.
BY MR. SMITH:
Q. Let me just ask you generally.
A. I -- I think he referred to similar numbers in the previous critique, didn't he? And I vaguely remember. And when I saw these numbers and quite taken by them. Where, in the end, the only thing I'd say, a quick reaction is, we're interested in the percentages of white students. You know, that's -- that's the bottom line here.
Q. Okay. Do you understand that Table 40 is intended to test if you had new programs that had 20 percent white enrollment averaged across the board, how many more students would you need at the HBIs to get to a figure of 16.2 --
MS. SHUM: I'm gonna --
MR. SMITH: Let me finish the question.
Q. -- to get to a level of 16.2 percent aggregate white enrollment? You understand that's the proposition?



A. I -- I --
MS. SHUM: Just wait, let him finish and then let me object.
BY MR. SMITH:
Q. Okay. You understand that's the proposition being -- the hypothesis or the proposition being tested here?
MS. SHUM: I'm gonna object. There's no foundation to demonstrate that he has the knowledge to answer that question.
BY MR. SMITH:
Q. Okay. So do you have any reason to doubt these findings?
MS. SHUM: I'm gonna object as to the form.
A. I respectfully withdraw an opinion on this at this point.
BY MR. SMITH:
Q. Well, do you disagree with the overall proposition that if you have new programs that pull in, let's say, 1 in 5 white students that, you know, 20 percent of their enrollment is white, you're gonna

Page 366

need very large numbers of additional students at the HBIs to grow the white percentage to 15 or 16.2 percent?
MS. SHUM: Objection. Excuse me. Objection, form.
MR. SMITH: Okay. Thank you.
A. You're going to have to attract, yeah, fair number of new students who are white. Yeah.
BY MR. SMITH:
Q. Well, a fair number of all kinds of students, right?
A. Well, they will -- they will come along with it. Yeah.
Q. Okay. And do you --
A. Especially in the diverse state that Maryland is rapidly becoming even more diverse. Yeah.
Q. Sure. And would you agree with me that using new high-demand and unique programs to attract white students that 20 percent white enrollment in your new programs or your transfer programs is an ambitious goal?

Page 367

MS. SHUM: Objection, form.
A. It's certainly a very worthy goal if you're gonna desegregate the dual... I think it's possible. It's higher than the 16 percent that we saw back in 1975. There was a history of segregation in this state. And on the other hand, I think as a society (unintelligible) society we're making a lot of progress toward building multicultural institutions. So we have to be very careful even with statistics in crafting some of the implications.
Q. Of course. I'm actually asking about a different point, okay? I'm asking if your new and transfer programs at the HBIs attract white students, whether those new programs are likely to have more than 20 percent enrollment in the new programs?
A. I'm -- I've -- there are programs, and we've been very careful and mindful in picking them out. There are programs that are -- that are likely to attract meaningful numbers of white students.
Q. I understand. And do you think that in terms of meaningful numbers in your new programs, that

Page 368

20 percent is a worthy goal, but it's an ambitious one?
MS. SHUM: Objection, form.
A. I think it's a worthy goal.
BY MR. SMITH:
Q. And do you think it's an ambitious one? Just answer the question, please.
MS. SHUM: Objection.
A. I think in the multicultural, multiracial society in which we live, including in the Baltimore region and -- and so on, that in the -- within the foreseeable future, percentages like 20 or 25 can be very realistic, or 30 percent, and can depend on a lot of factors. You've mentioned some of the HBCUs up in Pennsylvania where the whites are now the majority enrollment, so a lot -- a lot can happen.
BY MR. SMITH:
Q. I understand. You need to focus on my question. We're talking about in your new programs or your transfer programs --
A. Yeah, I know.
Q. -- at the HBIs, whether the enrollment in

Page 369

those programs is likely to be 20 percent or higher. My question is whether that 20 percent number is ambitious or easily achievable or some other description. That's what I'm trying to figure out.
MS. SHUM: Objection, form.
A. I think it's -- I think it's reasonable and sustainable over time if our recommendations are taken very seriously, including the way we've harnessed programmatic niches and the programs within them. Is it a challenge? Of course it is. And we refer to that numerous times, including at Baltimore with the region what we call five TWIs and three HBIs.
BY MR. SMITH:
Q. Right. And if you were able to meet this 20 percent standard, which you've just testified is doable with your new programs and your transfer programs, 20 percent white enrollment in those programs, would you agree with me that it's gonna take a very large number of additional students, many of them white, 20 percent white, many of them not white, to grow the HBI's overall percentage to something as

Page 370

high as 15 or 16.2 percent?
MS. SHUM: I object as to form. The response did not say that the --
MR. SMITH: Wait, wait, wait. Do not prompt the witness, okay? You've made your objection. Let him answer the question.
MS. SHUM: I'm gonna ask that you not mischaracterize the response.
MR. SMITH: Okay.
A. I did not hear her anyway.
Q. Okay.
A. The -- there obviously is gonna be some enrollment increase, significant enroll- -- enrollment increase. I think that -- I don't know all the demographics in Maryland. I know some of them. And so I think it's hard to predict percentages or numbers in this case, number of new students that will be -- will be needed.
Q. Do you think it's likely to be in the tens of thousands, though?
A. Well, it's likely to be a fair number of

Page 371

students. Yeah. I don't -- I think that's pretty obvious.
Q. You said a moment ago -- you mentioned the idea of institutional identities at the HBIs, right?
A. I've been mentioning that for many years. I mentioned it here again today numerous times.
Q. So your goal --
A. I think I said distinct or distinctive institutional identities.
Q. I understand. Yeah. You want -- your goal is --
A. Identities that go beyond race, if I can accent the point.
Q. Okay. So let me just try and put it on the record. Your goal is institutional identities at the HBI that are divorced from race, right? Not a trick question.
A. I didn't say -- well, it could come across as a trick question, and I'm gonna respond this way: I think it's not divorce from race. I think race can still be a part of the identity. I'm saying it goes

Page 372

beyond. I think that's a very, very careful use of the word "beyond," beyond race.
And if I can be more specific, it means an identity that's offered not in its football team, etc., other ways institutions get identity sometimes, or its track team or whatever, but it's program offerings and in particular has those programmatic niches and the programs within them, including unique and/or high-demand programs, both at the undergrad and grad level.
Q. Can you give me a two-sentence definition of an institutional identity for a college or university?
A. A two-sentence identity?
Q. A two-sentence definition. Sir, let me ask the question. Can you give me a two-sentence definition of the term "institutional identity" as it applies to a college or a university?
A. I think I just did it in my previous statement.
Q. Okay. So it is an identity that is not

Page 373

based on athletics but is based on academics; is that fair?
A. It's not -- it's not based on the student -- the characteristics, including the racial characteristics of the students. It's based on distinctive program offerings, beginning with program niches like we have here in the remedy. For example, with respect to --
Q. No, I know there's examples. I know there's example.
A. All right.
Q. Is that -- is that term "institutional identity," is it a term of art in the field of higher education?
A. It's a term that Cliff Conrad has been using for about 35 years once he began to look at desegregation cases. Institutional identities beyond race. It goes right to the heart and soul of the matter of a dual system.
Q. I understand. Can you --
A. Creating identities that go beyond race.

Q. Sir, can you show me an authoritative source, other than Cliff Conrad, where the term "institutional identity" is used in the way that you just did?
A. Well, I think -- as I said, I've been using it, forgive me, in all these cases. And I believe if memory serves me right here, United States Supreme Court used it in the Fordice decision in 1992. I have to check the exact language. But I -- I actually began to use it from the very outset as a way of getting beyond race.
Q. How do we measure in an objective way whether a school has achieved an institutional identity that is beyond race?
A. That's a good question certainly. It -- it -- we could use survey instruments and put them on a 10-point scale. I think the point would be to invite the perspectives of diverse stakeholders in the higher learning parents, students, grandparents, politicians and so on, and ask them what is distinctive about institutions, and so they will -- they will often --



oh, it's -- it could be a liberal arts school. That's a -- overlaps the core programs, but you get the idea.
Q. Right. And I get it that one way is to talk to diverse stakeholders. Is there any more ready or objective way of measuring whether an institution has achieved an identity beyond race? For example, is the number or percentage of white students, is that the test?
A. That is one of the two touchstones that we would be using in this litigation, wouldn't it?
Q. Okay. And in terms of a touchstone, what's the percent --
A. That would --
Q. Let me finish. Let me finish. In terms of a touchstone, what's the percentage that would tell you that an institution has achieved an identity that is beyond race?
MS. SHUM: Objection, form.
A. There is -- well, there are two touchstones, as I've said repeatedly here. One is ensuring that there are a meaningful number of white



students at the HBIs, and the other is that they have an identity that goes beyond race, and that would be like programmatic identity.
So there are two touchstones, and the latter refers to dismantling the dual system, which I think sometimes get lost in this litigation. It is not only about attracting white students to HBIs but also creating a distinctive programmatic identity.
BY MR. SMITH:
Q. So the question was: What's an objective way of determining whether an institution now has an identity beyond race? You said one touchstone is the proportion of white students, and then you said the other touchstone is that it has an identity beyond race.
A. Identity anchored in its program offerings, is what I said.
Q. Okay. All right. And --
A. And I say more specifically program niches. Almost like the way you can brand an institution. You say, yes, this is an engineering school. If you think,



for example, of MIT, which happens to be a private institution, right, or even if you think of Penn, a liberal arts institution at the undergrad level, you often think not only of the law school, but you think of the -- the Wharton school, right, business school, at Penn, so it created niches at institutions. I mentioned several earlier.
Q. In terms of the first touchstone, which is the proportion of white enrollment, is there a particular number that -- let me finish -- that you think would tell us we've passed that threshold in terms of an institutional identity beyond race?
MS. SHUM: Objection.
A. I sometimes used percentages in the past. I think I've withdrawn a little bit. I think it can depend on the particular setting and the environment.
BY MR. SMITH:
Q. Well, how about this setting here?
A. Little different at Jackson than it is in Philly or --
Q. How about in Maryland, sir? What's the

Page 378

touchstone in Maryland?
A. You know, it's gonna be -- I think UMES is making some good strides. As we both know, I think they're up to about 15 percent white, some programs, as you very well know, physical therapy and pharmacy, for example.
Q. What's the number at UMES?
A. I think --
MS. SHUM: Objection.
A. -- right now it's 15 percent.
BY MR. SMITH:
Q. And what would it have to be to be no longer --
A. I don't want to get --
Q. -- racially identifiable, sir?
(A discussion was held off the stenographic record.)
BY MR. SMITH:
Q. Okay. All right. You all set?
A. Yes.
Q. What is the number at UMES that would tell

Page 379

you it's no longer racially identifiable, it has an identity beyond race?
MS. SHUM: Objection.
A. I think UMES is making some good strides, and I think it's got some more work to do. I do not want to get lodged into a particular percent.
BY MR. SMITH:
Q. I see. And you wouldn't want to do that for any of the other HBIs in Maryland?
MS. SHUM: Objection.
A. I would -- I would be hesitant to give a specific percentage.
BY MR. SMITH:
Q. Right. Now, you've advocated for a number of remedial proposals in the past, right, Alabama, Tennessee, and so on?
A. Yeah.
Q. Can you identify --
A. Not Tennessee.
Q. Not Tennessee. Alabama, Mississippi, right?

Page 380

A. Louisiana, etc.
Q. Okay. Can you identify an institutional identity today at any of those HBIs that is beyond race? Let me give you an example. Alabama State University, what is its institutional identity today?
A. It's principally an HBI.
Q. How about Alabama A&M?
A. It's up north. Alabama is principally an HBI.
Q. All right. Have any of the Mississippi schools achieved an identity beyond race?
A. It's been a Sisyphean quest in many ways.
THE COURT REPORTER: I'm sorry? It's been what?
THE WITNESS: A Sisyphean quest in many ways. Uphill quest.
BY MR. SMITH:
Q. Now, let me -- let me ask, can you identify an HBI anywhere in the country that as a result of new programs, court orders, transfer programs has achieved an institutional identity that is beyond race?

Page 381

MS. SHUM: Objection, form.
A. The desegregation remedies in large measure have not addressed unnecessary duplication, i.e., the absence of institutional identities based on program offerings. They have focused on funding scholarships for 10 years and so on, and facilities, and so they have turned away in the states, away from building those identities that would move the institutions beyond race.
BY MR. SMITH:
Q. Does that mean that you can't identify any HBI that's been the subject of court orders, new programs or transfer programs that has achieved an identity beyond race?
A. I would say meaningful identity, a distinctive identity. I've used that word before.
Q. That hasn't happened?
A. I cannot, no.
Q. Can you identify any HBI, period, that for whatever reason has been able to obtain or reach an institutional identity beyond race?

A. Well, I'd have to go through the 104, so that's a question I need to reflect more on. It's a good question, but it's hard to do off the top of my head.
Q. Can't you think of one?
A. Oh, HBCUs that have identities beyond race?
Q. That have achieved an identity beyond race.
A. Oh, yeah, they have -- if we look at the private, can we go into the private domain?
Q. Sure.
A. Oh, okay.
Q. Actually, you know, time-out. Public first.
A. That's a lot more demanding.
MS. SHUM: We have 15 minutes left.
BY MR. SMITH:
Q. Can you think of one?
A. In the public domain?
Q. Yeah.
A. I think Tennessee State's made pretty good progress over the last 35 years or so at identifying



itself as a major urban institution with the merger of UT Nashville.
Q. Okay. Any more?
A. The -- let me pause just a minute here if I think about Louisiana, Mississippi, Alabama. What they've done is, they've sometimes had a couple programs or part of a land-grant mission, some of the agricultural programs at Langston, for example, out on the prairie.
Q. Can I interrupt you for one second?
A. Yes.
Q. So you named Tennessee State as a -- let me just finish the question -- as an HBI that had achieved an identity beyond race. Would you add Langston University in Oklahoma to that list?
A. I would not as an institutional identity. I'm saying I can identify particular programs, resources they have, you know, a goat farm and so on, at some of these places, Prairie View, but -- but no, that's been a very formidable challenge. These institutions are anchored in identities that are built



on their race.
Q. Okay. And Tennessee State's the only one that you can think of?
A. Well, that's been -- that was a merger in that case, and it's a big city, and I think that there were variables that affected that.
Q. But no other examples occur to you beyond Tennessee State in terms of an HBI that has achieved an institutional identity beyond race, fair?
A. I mean, I'd like to be able to pick out UMES, but I can't because it hasn't developed a land-grant reputation, for example, that goes beyond race given its modest offerings in engineering and ag.
Q. Sure. Why is it that institutional identity is related to programs instead of other qualities, for example, teaching methods, depth in core areas, relationship to the surrounding community? Why is it programs that, in your view, define institutional identity?
A. I've been using that for so long, and it's a good question. I haven't re-reflected on that very



often. I -- I think programs provide the foundation in many ways for institutions. That's what we offer. It's -- I'm not suggesting that research identities can't be very important, as we all know here today that institutions can develop areas of research and so on.
But program offerings -- and I think almost everybody I know has reflected on this -- people would put at the epicenter of an institutional identity, I think is in part anchored by the Land-Grant Act and by the core curriculum once the English version of a college, if you think about it, provided a core of what -- what the institution was about, its -- its programs.
And even when universities came into being, beginning mid-19th century, they were -- even though they were increasingly research-based, they were still banked on, anchored in programs and programs associated with research at the graduate level.
So I think it's widely-shared assumptions that -- that programs are at the epicenter of institutions and research and service accompany them.
Q. Aren't there schools, for example, liberal

Page 386

arts schools that distinguish themselves based on the high quality of their teaching?
A. Well, I think they can or in particular the reputation. One of my daughters went to Grinnell College --
Q. For example.
A. -- in Iowa.
Q. Or Kenyon, right?
A. I think very highly of Kenyon in Ohio because -- because they do have a reputation for quality. So do I think quality can be important? I do. Unfortunately, reputation often supercedes that criterion but...
Q. Can I ask you about a different distinguishing characteristic?
A. Uh-huh, sure.
Q. Aren't there universities that distinguish themselves based on their cooperative programs or their relationship with the surrounding community? I'm thinking of Northeastern College in Boston which has a co-op program.

Page 387

A. Yeah.
Q. Is it fair to say that when people think Northeastern, they don't think of their -- the things they teach, they think of their cooperative program?
MS. SHUM: Objection.
A. They're still programs, yeah.
BY MR. SMITH:
Q. Okay. Right. So it's the fact that their students can go and work and get credit, right, while they're in school? Right?
A. Uh-huh.
MS. SHUM: Objection, form.
BY MR. SMITH:
Q. Is it true? She objected. Can you answer?
A. I think they can get an identity, which is I think what you're asking?
Q. Yes.
A. -- through those programs to some extent. I'm not actually familiar with the Northeastern program.
Q. Okay. Are you familiar with the idea that

Page 388

many colleges emphasize their community service aspect?
A. I am.
Q. And that that forms an institutional identity for them?
A. Oh, I think it can contribute to that. We have the Morgridge Center for Public Service, which is one of the best examples of that in United States of America.
Q. Is there any inherent reason that an institution can't form its institutional identity based on things other than the academic programs that it offers?
A. I think they can complement with the academic programs, but I think for sustaining identities over time that that -- that you -- that the academic programs are absolutely crucial.
MR. SMITH: Okay. Well, that's all the questions I have right now. Thank you, Doctor.
THE WITNESS: Thank you. Thank you very much.
MS. SHUM: Okay. I'm gonna take a

Page 389

five-minute break.
MR. SMITH: How much do you figure you have?
MS. SHUM: I'm not sure.
VIDEO TECHNICIAN: We are going off the record. The time is 5:54.
(There was a brief recess taken.)
VIDEO TECHNICIAN: We are now back on the record. The time is 6:12.
EXAMINATION BY MS. SHUM:
Q. Dr. Conrad, are you aware that Judge Blake made a finding of a Constitutional violation in this case?
MR. SMITH: Objection, leading. Go ahead.
A. Yes, that's my understanding.
BY MS. SHUM:
Q. What is your understanding of the nature of the Judge Blake's finding?
A. That there was a dual system that continues to exist in the state of Maryland anchored in an excessive amount of unnecessary duplications of the

Page 390

TWIs -- of the TBIs, such that the TBIs have relatively few unique and/or high-demand programs, programs that in turn would be likely to attract -- programs that would be likely to attract other race, white, slash, white students.

And that that finding was based on my research where I found that there were -- there simply was not programmatic dupli- -- programmatic identities at the four HBIs in Maryland because of all the unnecessary duplication. All the programs offered were -- almost all the programs at all four HBIs were offered at the predominately white institutions. There were a few, some exceptions, including notably on the Eastern Shore.

MR. SMITH: Move to strike the last part as nonresponsive. Go ahead.

BY MS. SHUM:

Q. Dr. Conrad, after there was a finding of liability in this case, what were you asked to do? What is your understanding of what you and Dr. Allen were asked to do?

Page 391

A. We were asked to draw on our experiences, our backgrounds, our inquiry to develop a remedial proposal, and that it wasn't to test the theory per se. It was to -- to draw on those resources, knowledge, understanding, backgrounds, experiences and so on, to develop a remedial proposal that would once dismantle the former de jure system by giving the HBIs, TBIs, I'm sorry, HBIs, whatever acronym we use, to develop programmatic identities in which they had those distinctive identities, and -- and at the same time and ideally that would contribute to, or if it did, work in concert with attracting white students to HBIs.

Q. Dr. Conrad, you were asked a series of questions regarding Dr. Lichtman's second report. Did you review the backup data underlying Dr. Lichtman's analysis, including his regression analysis?

A. I have not.

MS. SHUM: I have no further questions.

MR. SMITH: None for me. Thank you.

VIDEO TECHNICIAN: This concludes the deposition. We are now going off the record. The time

Page 392

is 6:15.

(Deposition concluded at 6:15 p.m.)

Page 393

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the foregoing transcript, and the same is a true and accurate record of the testimony given by me. Any additions or corrections that I feel are necessary will be made on the Errata Sheet.

____________________________

CLIFTON CONRAD, PH.D.

____________________________

DATE

(If needed, make additional copies of the Errata Sheet on the next page or use a blank piece of paper.)

Page 394

ERRATA SHEET

Case: Coalition for Equity & Excellence in Maryland Higher Education, et al. vs. Maryland Higher Education Commission, et al.

Witness: CLIFTON CONRAD, PH.D. Date: 09/13/2016

PAGE/LINE SHOULD READ REASON FOR CHANGE

Page 395

District of Columbia
Notary Public, to wit:

I, Christine A. Gonzalez, CSR, RPR, a Notary Public of the District of Columbia, do hereby certify that the within-named witness personally appeared before me at the time and place herein set out, and after having been duly sworn by me, according to law, was examined by counsel.

I further certify that the examination was recorded stenographically by me and this transcript is a true record of the proceedings.

I further certify that I am not of counsel to any of the parties, nor in any way interested in the outcome of this action.

As witness my hand this 15th day of September, 2016.

Christine A. Gonzalez, CSR, RPR
Notary Public

My Commission Expires:
February 28, 2019