**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| THE COALITION FOR EQUITY AND | : | |
| EXCELLENCE IN MARYLAND | : | |
| HIGHER EDUCATION, *et al.* | : | |
| | : | Civil No. CCB-06-2773 |
| v. | : | |
| | : | |
| MARYLAND HIGHER EDUCATION | : | |
| COMMISSION, *et al.* | : | |
| | : | |

**MEMORANDUM**

**TABLE OF CONTENTS**

I.  INTRODUCTION ............................................................................................. 2

II.  PROCEDURAL HISTORY ............................................................................. 4

III.  PRELIMINARY ISSUES ............................................................................... 7

    A.  Standing ............................................................................................... 8

    B.  Defendants' *Daubert* Motion .......................................................... 9

        1.  Standard for Admissibility ...................................................... 10

        2.  Reliability of Conrad and Allen's Testimony ........................ 11

    C.  Permanent Injunction ....................................................................... 19

IV.  PROPOSED REMEDIES ............................................................................... 21

    A.  The State's Remedial Proposals ...................................................... 22

    B.  The Plaintiffs' Remedial Proposals ................................................ 23

        1.  New Programs .......................................................................... 25

        2.  Academic Program Transfers ................................................. 27

            a.  Faculty and Students .................................................... 28

            b.  Partnerships and Investments ..................................... 31

            c.  Maryland's Workforce Needs in STEM and Nursing .... 32

            d.  UMUC Issues ................................................................. 32

        3.  MHEC Program Approval Process ......................................... 35

        4.  Effectiveness of the Plaintiffs' Proposed Remedy ................. 38

       5.       Cost of the Plaintiffs' Remedial Proposal.................................. 40

       6.       Impact of the Plaintiffs' Proposal on Institutional Accreditation ............ 44

   C.     The HBIs' Remedial Proposals........................................................ 45

       1.       Coppin................................................................................ 46

       2.       Morgan............................................................................... 47

       3.       UMES ................................................................................ 48

       4.       Bowie ................................................................................ 48

V.    HISTORICAL RECORD.......................................................................... 49

   A.     Historical Support for Unique, High-Demand Programs ..................................... 49

   B.     Previous Remedies Under *Fordice* Standard ....................................... 54

       1.       Mississippi ......................................................................... 54

       2.       Tennessee........................................................................... 57

       3.       Alabama ............................................................................. 59

       4.       Louisiana............................................................................ 60

VI.   ANALYSIS............................................................................................. 61

   A.     New Programs...................................................................................... 63

   B.     Program Transfers................................................................................ 66

   C.     Funding for Recruitment, Financial Aid, and Marketing .................... 68

   D.     MHEC Process.................................................................................... 69

VII.  REMEDY FOR MARYLAND.......................................................................... 69

## I.  INTRODUCTION

The years of segregation under law at Maryland's public institutions of higher education came to an end some decades ago, and the State has much to be proud of in its public colleges and universities. Maryland's distinguished historically black institutions ("HBIs") serve a vital mission in our system of public higher education. Yet current policies and practices traceable to the *de jure* system, in the form of unnecessary program duplication having segregative effects at the HBIs, persist. In such circumstances, the Supreme Court has placed the burden squarely on

the state to reform such policies "to the extent practicable and consistent with sound educational practices." *U.S. v. Fordice*, 505 U.S. 717, 729 (1992).

In the several years since this court found that the plaintiffs, including the Coalition for Equity and Excellence in Maryland Higher Education ("the Coalition"), had proved the existence of unnecessary program duplication having segregative effectives at the HBIs, mediation proved unsuccessful and a lengthy remedies hearing followed. Unfortunately, the State did not engage in a serious effort to propose a remedy prior to the hearing and did not permit the Coalition's experts to consult meaningfully with relevant state actors including the presidents and faculty of the HBIs and of the state's traditionally white institutions ("TWIs").[1] As more fully explained below, the court is forced to conclude that neither side's proposed remedies are, for different reasons, sufficiently practicable, educationally sound, and likely to achieve the greatest possible reduction in segregative effects to justify ordering their imposition. Instead, the court will order appointment of a Special Master, authorized to consult with all relevant decision makers, to propose a remedial plan including funding for new programs and student recruitment at the HBIs, but not the extensive transfer of programs from the TWIs to the HBIs requested by the Coalition.

All parties need to recall that this case is not about institutions but about the constitutional right of students to attend any public college or university for which they are qualified without being required to accept racial segregation at that institution. Maryland's TWIs already meet that standard of integration; Maryland's HBIs do not. A remedial plan must encourage other-race students to attend the HBIs, but it will not be educationally sound if it

---

[1] The four HBIs are Morgan State University, University of Maryland Eastern Shore, Coppin State University, and Bowie State University. Institutions that have been referred to as TWIs include Towson University; the University of Baltimore ("UB"); the University of Maryland Baltimore County ("UMBC"); the University of Maryland University College ("UMUC"); Frostburg State University; Salisbury University; University of Maryland, College Park ("UMCP"); and St. Mary's College of Maryland.

unduly harms the students at the integrated TWIs. Crafting such a plan is a daunting task requiring the good faith collaboration of the Coalition and the State. The court urges such collaboration to strengthen and enhance Maryland's HBIs for the benefit of all Maryland students, present and future.

## II. PROCEDURAL HISTORY

This action dates back to 2006. Plaintiffs, The Coalition for Equity and Excellence in Maryland Higher Education and named individuals associated with the organization, (collectively, "the Coalition" or "the plaintiffs"), sued the State of Maryland, the Maryland Higher Education Commission ("MHEC"), and their officers in their official capacities (collectively, "the State" or "the defendants"), alleging violations of Title VI of the Civil Rights Act of 1964 and the Equal Protection Clause of the Fourteenth Amendment. After a bench trial, the court issued an opinion in 2013 holding that under *United States v. Fordice*, 505 U.S. 717 (1992), unnecessary program duplication within Maryland's system of higher education continues to have segregative effects for which the State has no sound educational justification. *Coal. for Equity & Excellence in Md. Higher Educ. v. Md. Higher Educ. Comm'n*, 977 F. Supp. 2d 507, 544 (D. Md. 2013).[2] Mediation regarding possible remedies commenced in January 2014 and continued for more than one year but was ultimately unsuccessful. (*See* Oct. 2, 2014 Order, ECF No. 398).

The parties then submitted competing remedial proposals to the court. The plaintiffs submitted an initial remedial proposal on May 5, 2015. (Pls.' First Remedial Proposal, ECF No. 406). The State filed its initial remedial proposal on November 20, 2015. (Defs.' First Remedial

---

[2] The court rejected the plaintiffs' claim that Maryland's current higher education funding policies could be traced to Maryland's *de jure* funding practices. *See Coal. for Equity & Excellence in Md. Higher Educ. v. Md. Higher Educ. Comm'n*, 977 F. Supp. 2d 507, 529-35 (D. Md. 2013)

Proposal, ECF No. 447). On February 2, 2016, the court concluded that an evidentiary hearing was needed "to inform the court on the complex question of what remedies are educationally sound, justified by the scope of the violation found, and best targeted to remedy that violation while enhancing rather than harming Maryland's system of public education." (Feb. 2, 2016 Mem. and Order, ECF No. 460).[3] The court stated that the defendants' remedial proposals "are neither adequate nor sufficiently specific," although it noted that collaborative programs—one aspect of the State's first remedial proposal—"are indeed helpful in certain circumstances." (*Id.* at 2). The court also noted that the plaintiffs' proposals "for creation of niche areas of programmatic concentration, with increased new and high-demand offerings, appear promising but need more thorough discussion." (*Id.*). Finally, the court rejected the proposal of having Morgan State University ("Morgan") take over the University of Baltimore ("UB") and noted it was unlikely to order a remedy "that would essentially eliminate" the University of Maryland University College ("UMUC"). (*Id.* at 2 n.2).

On June 1, 2016, the State filed a motion for a protective order to prevent the plaintiffs from using or relying on mediation materials prepared and shared among the parties and the mediator. In particular, the presidents of Maryland's HBIs had developed proposals listing courses (and associated funding) that each institution would prioritize in the context of a proposed settlement; the defendants sought to block the plaintiffs from using these submissions in the court proceedings on remedy. (Defs.' Mot. for Protective Order, ECF No. 469). On August 12, 2016, the court granted in part and denied in part the plaintiffs' motion. Specifically, because of the confidentiality requirement in Local Rule 607.4, the court ordered that HBI submissions

---

[3] Accordingly, the court denied the plaintiffs' motion for judgment on their remedial proposal. (Feb. 2, 2016 Mem. and Order at 2, ECF No. 460).

be stricken as exhibits from the plaintiffs' expert reports, but the court declined to strike the expert reports themselves. (Aug. 12, 2016 Order, ECF No. 485).

In the months leading up to the six-week remedies hearing—which took place in January and February 2017—the parties filed several other motions. On September 30, 2016, the State moved to exclude expert testimony concerning the effects of "programmatic niches," "high-demand" programs, and "unique" programs on HBI enrollment by other-race students, claiming such testimony is inadmissible under Fed. R. Evid. 702. (Defs.' Mot. to Exclude Expert Testimony, ECF No. 495) ("*Daubert* motion"). The plaintiffs responded in opposition to the *Daubert* motion on December 9, 2016. (Pls.' Resp. in Opp'n to Mot. to Exclude Expert Testimony, ECF No. 528) ("*Daubert* Opp."). In part, the plaintiffs urged the court not to rule on the motion to exclude expert testimony before the remedies hearing. (*Id.* at 32). The court agreed with the plaintiffs and declined to rule on the *Daubert* motion before the remedies hearing commenced in January 2017.

In addition to the *Daubert* motion, the State filed a motion to compel the plaintiffs to answer discovery requests related to the plaintiffs' Article III standing. (Defs.' Mot. to Compel, ECF No. 503). On December 16, 2016, the court denied the motion to compel additional discovery. (Mem. and Order, ECF No. 536).

Prior to the remedies trial, the two sides also filed various motions in limine. On November 30, 2016, the plaintiffs filed a motion in limine to prohibit the State from presenting evidence at trial that, according to the plaintiffs, would re-litigate the liability findings. (Pls.' Mot. in Limine, ECF No. 522). On December 16, 2016, the court granted the plaintiffs' motion in limine insofar as it sought to prevent re-litigating the liability findings but denied it insofar as it sought to strike a particular statistical analysis. (Order, ECF No. 537). Also on November 30,

2016, the State filed its first motion in limine to exclude evidence about injunctive relief at the University of Maryland Eastern Shore ("UMES"). (Defs.' First Mot. in Limine, ECF No. 520). The court again declined to rule before the hearing.

On December 14, 2016, the State filed a second motion in limine to exclude from use at trial a dissertation written by Brandon Daniels and to bar the plaintiffs' experts from relying upon it. (Defs.' Second Mot. in Limine, ECF No. 530). Also on December 14, 2016, the defendants filed a third motion in limine seeking to exclude written responses from the HBIs concerning which programs would be best suited at each HBI to desegregate that HBI and contribute to its academic identity. (Defs.' Third Mot. in Limine, ECF No. 531). On December 28, 2016, the defendants filed a fourth motion in limine to preclude the plaintiffs from presenting certain testimony and exhibits related to the proposed transfer of engineering programs from the University of Maryland Baltimore County ("UMBC") to Morgan. (Defs.' Fourth Mot. in Limine, ECF No. 538). Since the hearing, the court has ruled on the motions, which were denied. (Sept. 29, 2017 Order, ECF No. 640).

The court held a six-week hearing on remedies in January and February, 2017. Post-trial briefing concluded on June 2, 2017, and on June 8, 2017, counsel presented oral argument.

This opinion constitutes the court's findings of fact and conclusions of law under Fed. R. Civ. P. 52.

### III. PRELIMINARY ISSUES

Before reviewing the parties' proposed remedies, the court must consider three preliminary issues: standing; the admissibility of the plaintiffs' expert testimony; and the propriety of injunctive relief.

## A.      Standing

Although this court found standing in its 2013 liability ruling, and again in a 2016 memorandum issued prior to the start of the remedies hearing, the State continues to assert that plaintiffs lack standing. The court will briefly address the State's revived arguments.

Constitutional standing is a "fundamental limitation" requiring injury in fact, traceability, and redressability. *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017). The Supreme Court recently explained that "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint." *Id.* at 1651. "In the absence of injury to itself, an association may have standing solely as the representative of its members." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). The Coalition has standing in this case so long as "just one of [its] . . . members would have standing." *Retail Indus. Leaders Assoc. v. Fielder*, 475 F.3d 180, 186 (4th Cir. 2007). David Burton, the founding member of the Coalition, reiterated by affidavit that "[s]tudents enrolled at Maryland's HBIs have been members of the Coalition throughout the entire duration of this case." (Aff. of David Burton ¶ 4, ECF No. 508-1; *see also* Current Student Affs. ¶ 2, ECF Nos. 508-2, -3, -4, & -5). The State's only attempt to rebut this assertion is to note that one of the students, Chinedu Nwokeafor, a senior at Morgan State, expected to graduate in 2017.[4]  Even if Mr. Nwokeafor graduated, the Coalition still has provided declarations from three current Maryland HBI student members. (Current Student Affs. ¶ 1, ECF Nos. 508-2, -3, & -5). The Coalition seeks injunctive relief applicable to all HBI students, and the record indicates that continuing student membership in the Coalition is probable.

---

[4] The State assumes Mr. Nwokeafor intends to graduate in May 2017. The court notes that, as Morgan State holds annual graduation ceremonies in both May and December, Mr. Nwokeafor's actual date of graduation is undetermined. *Commencement Ceremonies*, MORGAN STATE UNIVERSITY COMMENCEMENT, http://commencement.morgan.edu/ (last visited October 27, 2017).

The State also argues that the student declarations fail to establish injury-in-fact. The four current student members of the coalition all provided declarations noting "the injury to students such as [themselves] based on the ongoing segregative effects of Maryland's policy of program duplication." (Current Student Affs. ¶ 5, ECF Nos. 508-2, -3, -4, & -5). The State's assertion that the currently enrolled students needed to specifically demonstrate a desire for and denial of an integrated education is without merit. As this court noted in its 2013 memorandum, "if the Coalition demonstrate[s] that any one of its members is subject to ongoing segregative policies traceable to the *de jure* era and attributable to the state . . . then the Coalition has shown a justiciable injury." (Oct. 7, 2013 Mem. at 18, ECF No. 382).

**B.      Defendants' *Daubert* Motion**

In September 2016, defendants filed a motion seeking to exclude the opinion testimony of plaintiffs' experts, Drs. Clifton Conrad and Walter Allen ("Conrad and Allen"), under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). (*Daubert* Mot., ECF No. 495).  The court deferred consideration of the motion, and Conrad and Allen testified at the remedies hearing—subject to defendants' ongoing *Daubert* objection— regarding various aspects of their remedial proposal, including the effect of programmatic niches, unique programs, and high-demand programs on HBI enrollment of white and other-race students.  Following the hearing, the parties submitted additional briefing and correspondence regarding the *Daubert* issue.  Now, defendants ask the court to grant the motion to exclude and to strike Conrad and Allen's testimony from the record.  For the reasons explained below, the court has denied the motion.

1.      Standard for Admissibility

Under *Daubert*, district courts perform a "gatekeeping" function to ensure that expert testimony is both relevant and reliable. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (citing *Daubert*, 509 U.S. at 588); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (extending *Daubert*'s analysis to expert testimony based on "technical" and "other specialized," as well as "scientific," knowledge). The source of this obligation is Federal Rule of Evidence 702, which provides that

> a witness who is qualified as an expert by knowledge, skill, experience, training, or education" may offer opinion testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The proponent of the expert testimony bears the burden to establish its admissibility by a preponderance of the evidence. *Cooper*, 259 F.3d at 199.

The Supreme Court in *Daubert* identified a flexible, non-exhaustive set of factors to guide courts in evaluating the reliability of expert testimony. *See Daubert*, 509 U.S. at 592-594. These factors include: "(1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community." *Cooper*, 259 F.3d at 199 (citing *Daubert*, 509 U.S. at 592-94). A district court need not consider every factor in every case, and "particular factors may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id.* at 200 (citing *Kumho Tire*, 526 U.S. at 150). Courts have recognized a particular need to employ a "flexible" test in areas outside of the hard sciences.

*See, e.g.*, *U.S. v. Simmons*, 470 F.3d 1115, 1122-23 (5th Cir. 2006) (admitting the testimony of a psychologist that did not satisfy all four *Daubert* factors).

### 2. Reliability of Conrad and Allen's Testimony[5]

Defendants assert that the "Plaintiffs seek to offer expert opinion testimony that is unsupported by any social science methodology at all (with regard to the effect of 'programmatic niches') and by unsound and unreliable social science (with regard to the effects of 'high-demand' or 'unique' programs)." (*Daubert* Mot., ECF No. 495, at 1). Specifically, they contend that (1) Conrad and Allen offer no social science basis for their conclusions regarding programmatic niches; (2) the methodology of Dr. Conrad's 1994 study is unreliable, and there is no social science basis for generalizing from it; (3) the methodology of the 2016 enrollment study is unreliable; and (4) Conrad and Allen's personal experiences, including campus visits and conversations with students at HBIs, are not a reliable basis for their testimony. Plaintiffs respond, among other things, that a less rigid test for reliability applies outside of the hard sciences; that Conrad and Allen's analysis complied with relevant standards; that Dr. Conrad's 1994 study is only one piece in a "vast body of evidence" upon which Conrad and Allen based their remedial proposal, (*Daubert* Opp. at 4, ECF No. 528); and that the defendants' criticisms go to the weight, rather than the admissibility, of Conrad and Allen's testimony.

---

[5] Rule 702 requires the court to determine both whether a witness is "qualified" as an expert and whether the proposed testimony is reliable and relevant. *See* Fed. R. Evid. 702; *Cooper*, 259 F.3d at 199 (citing *Daubert*, 509 U.S. at 588). Defendants challenge only the reliability, not the relevance, of Conrad and Allen's opinions. (*See Daubert* Mot. at 5 ("The reason to bar the gate in this case is the unreliability of the methodology Plaintiffs' experts deploy to support their opinions.").) Defendants also appear to challenge Conrad and Allen's qualifications to offer opinions as to remedy, although Dr. Allen was previously qualified as an expert in remedy, among other areas, and defendants do not raise specific objections to either his or Dr. Conrad's qualifications. In any case, mindful that whether a witness is qualified to testify as an expert depends upon "the nature of the opinion he offers," *see Gladhill v. Gen. Motors Corp.*, 743 F.2d 1049, 1052 (4th Cir. 1984), the court again finds that Conrad and Allen's "knowledge, skill, experience, training, or education"—including their extensive experience in the areas of higher education desegregation research and litigation—qualifies them to provide opinions in this case, *see* Fed. R. Evid. 702. The court's *Daubert* analysis thus will focus on whether their opinions are reliable.

The question before the court is whether Conrad and Allen's opinions are "based on sufficient facts or data" and are "the product of reliable principles and methods . . . [that were] reliably applied . . . to the facts of the case." *See* Fed. R. Evid. 702. For the reasons discussed below, the court finds that they satisfy this standard.

First, the record reflects that Conrad and Allen relied on a wide range of authorities in developing their remedial proposal, considering "historical factors" as well as "documents and court records." (*See* 1/19/17 AM Trial Tr. at 6). At the remedies hearing, Conrad and Allen specifically cited, among other sources: guidance from the Department of Education, Office of Civil Rights ("OCR"), (1/18/17 PM Trial Tr. at 4, 5-6 (Allen)); the 2000 Partnership Agreement between OCR and the state of Maryland, (*Id.* at 4, 6-7); the report of the Maryland Cox Task Force, (*Id.* at 5, 7); the 2006 Committee 1 report (*Id.* at 5, 7-8); the 2008 HBI panel, (*Id.* at 8); the 2009 Maryland State Plan for Higher Education, (*Id.* at 5, 8-9); the 2005 letter from the four HBI presidents, (*Id.* at 10); records associated with higher education desegregation litigation in other states, (*Id.* at 11); academic research and scholarship, (*Id.* at 5); Dr. Conrad's 1994 study, (1/24/17 Trial Tr. at 31-35 (Conrad)); enrollment trend data (1/18/17 AM Trial Tr. at 81 (Allen)); and their personal and professional experiences, (*Id.*; 1/24/17 Trial Tr. at 25 (Conrad)). Conrad and Allen reference each of these sources in some part of the Second Corrected Reply Report, and the majority of them appear in the sections of the report that defendants identify as appropriate locations for such disclosures, (*see* Reply, Mot. to Exclude Expert Testimony at 5, ECF No. 529 ("*Daubert* Reply")); "Basis for Opinions," (Final Expert Report, PRX 312 ¶¶ 85-96); "Data and Materials Considered," (*id.* ¶¶ 97-104); "Overview of Methodology," (*id.* ¶¶ 74-82), and Exhibit 18, "Materials Considered," (*id.* Ex. 18). In short, the Second Corrected Reply

Report and supporting testimony demonstrate that Conrad and Allen based their remedial proposal on "sufficient facts or data." (*See* Fed. R. Evid. 702(b)).[6]

Second, Conrad and Allen utilized processes that, despite some methodological flaws, are sufficiently reliable to support admission of their testimony. (*See* Fed. R. Evid. 702(c)-(d)). There is no one-size-fits-all test for reliability; rather, an expert's opinions are reliable if they comply with the standards of the "relevant field." *See Cooper*, 259 F.3d at 203 (quoting *Kumho Tire*, 526 U.S. at 152) ("[T]he purpose of Rule 702's gatekeeping requirement is to 'make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'"). Here, Conrad and Allen's opinions—summarized in their 240-page final report and extensive supporting testimony—encompass multiple subject-matter areas and modes of analysis. Thus, the court will look to the standards of various "field[s]," *see id.*—among them general principles of social science research, best practices in higher education desegregation, and requirements of quantitative and qualitative analysis—in evaluating the reliability of Conrad and Allen's remedial proposal.

As Dr. Allen explained at the remedies hearing, he and Dr. Conrad used "a mixed-methods approach" to arrive at their conclusions. (1/19/17 AM Trial Tr. at 5 (Allen)). They considered available information "in conjunction with and in connection to the patterns of enrollment that were existent and that were anticipated or desired." (*Id.* at 6). They "drew from multiple sources" and would "look at the data, go back and look at the patterns, look at sources, look at historical factors, look at the characteristics of the institutions, and so accepted, embraced the fact that those different dimensions are interactive." (*Id.* at 11). They produced original analysis, most notably the 2016 enrollment study, in addition to reviewing and interpreting

---

[6] Because Rule 702 requires the court to determine whether an expert has a reliable basis for his opinion, not whether corroborating evidence exists, the court will not consider plaintiffs' arguments regarding sources upon which Conrad and Allen did not rely. (*See, e.g.*, Opp. to *Daubert* Mot., ECF No. 528, at 20-23).

existing documents. Dr. Allen described their work as "an iterative process." (*Id.*). Dr. Conrad explained that they were engaged in "sifting and winnowing." (1/24/17 Trial Tr. at 148, 188, 198; 1/25/17 Trial Tr. at 19, 24, 25, 48, 65, 112, 126 (Conrad)).

Conrad and Allen's approach is "one generally employed in the social sciences." *See U.S. v. Hammoud*, 381 F.3d 316, 337 (4th Cir. 2004) (en banc).[7] In *Hammoud*, the Fourth Circuit upheld the admission of opinion testimony the expert described as follows:

> Well, we're talking about a social science here. This is not scientific research. Basic academic intellectual research combined with the techniques I was taught in . . . various courses I took as an analyst for the government both taught that the best way to go about making sense of something in the social sciences is to collect as much information as possible and to balance each new incoming piece of information against the body of information that you've built to that point . . . . So it's a constant vetting process. And the more rigorous you are, the better your information will be.

381 F.3d at 337. This explanation closely resembles Conrad and Allen's descriptions of their "iterative" process in this case, including the following account by Dr. Allen:

> As is consistent with any research process, we reviewed multiple sources of information and data. We then, in our conversations, exchanges, reading, and analysis of those data sources, formulated comprehensive strategies and, out of those strategies and out of the analysis went through a process that led to the presentation of a set of formalized or formal recommendations.
>
> I should emphasize that this process was iterative. It wasn't a strict and simple linear process. That is, things that we learned along the way, we used to inform, revise, and refocus at points the report.

(1/18/17 AM Trial Tr. at 76-77 (Allen)).

---

[7] In *Hammoud*, the Fourth Circuit affirmed a criminal defendant's convictions and sentence, considering, among other issues, the defendant's *Daubert* challenge. *Hammoud*, 381 F.3d at 336-37, 357. Subsequently, the Supreme Court granted certiorari, vacated the decision, and remanded for reconsideration in light of *United States v. Booker*, 543 U.S. 220 (2005). *See Hammoud v. US*, 543 U.S. 1097 (2005). The Fourth Circuit vacated Hammoud's sentence and remanded for resentencing under the advisory guidelines scheme set forth in Booker. *U.S. v. Hammoud*, 405 F.3d 1034 (4th Cir. 2005) (mem.). Because the Supreme Court's order did not affect the court's resolution of Hammoud's challenges to his convictions, including his *Daubert* challenge, the Fourth Circuit reinstated those portions of its prior opinion. *Id.*

Defendants contend that Conrad and Allen's opinions fail to satisfy the relevant standard because they are based on unreliable social science or have no social science basis at all. (*See Daubert* Reply at 6-8, ECF No. 529 (capitalization altered)). In particular, defendants appear to discount Conrad and Allen's reliance on any sources other than specific qualitative and quantitative studies, including historical documents. As *Hammoud* makes clear, however, the review and analysis of a body of information—whether in the form of studies, raw data, or historical documents like committee reports—is *itself* a generally accepted approach in the social science field. *See Hammoud*, 381 F.3d at 337. Such a process is especially appropriate where, as here, the subject matter is complex and not susceptible to resolution by any single mode of analysis.

Further, to the extent that Conrad and Allen base their opinions on their experience, rather than a particular social science methodology, the applicable standard is the one that governs testimony by experiential experts. An experiential expert may testify on the basis of either "experience alone" or "experience in conjunction with other knowledge, skill, training or education." *U.S. v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007) (quoting Fed. R. Evid. 702 advisory committee's note). Such testimony satisfies the reliability requirement where the expert can "explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts." *Id.* (quoting Fed. R. Evid. 702 advisory committee's note). Applying this standard, the court finds that Conrad and Allen have sufficiently explained how their experience in the field of higher education desegregation—including as expert witnesses in similar litigation—informed their recommendations in this case. (*See, e.g.*, 1/18/17 AM Trial Tr. at 74-75 (Allen) (discussing experience developing remedial proposals); 1/18/17 PM Trial Tr. at 36-38 (Allen) (discussing

experience with "what worked and didn't work" and familiarity with the role of independent

monitors and monitoring committees); 1/19/17 AM Trial Tr. at 6-7 (Allen) (discussing

experience with the use of qualitative versus quantitative data and appropriateness of quantitative

testing); 1/19/17 AM Trial Tr. at 29-30 (Allen) (discussing types of data relied on by courts in

previous cases); 1/19/17 AM Trial Tr. at 34 (Allen) (explaining that recommendations in

remedial proposal are based in part on "experiences and lessons learned from earlier remedial

proposals"); 1/19/17 AM Trial Tr. at 48-49 (Allen) (explaining that the "mixed-methods

analysis" used to create the remedial proposal incorporated "prior experience with remedial

[proposals] and prior experience with the desegregation of systems of higher education"); *see

also* 1/24/17 Trial Tr. at 184-86 (Conrad) (discussing "extensive experience visiting HBCUS").[8]

Of course, to the extent that Conrad and Allen's remedial proposal *does* rely on specific

quantitative or qualitative studies, the court must determine whether the methodology of the

studies they employed satisfies Rule 702. *See Cooper*, 259 F.3d at 200 (citing *Kumho Tire*, 526

U.S. at 152 and *Oglesby v. General Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999)). Through

the testimony of Dr. Lichtman and Dr. Bastedo, as well as exhibits filed with their *Daubert*

motion, defendants presented a number of specific criticisms of Dr. Conrad's 1994 study and the

2016 enrollment analysis, including claims related to generalizability, bias, and flaws in research

design and execution. Although, in certain instances, it is possible for such errors to warrant

exclusion, *see In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008), that is not

the case here. Dr. Conrad's 1994 study is a published work considered by multiple courts

---

[8] This is not to say that all of Conrad and Allen's statements about their experience satisfy the reliability standard articulated in *Wilson*. For example, the following statement by Dr. Allen is more vague: "[I]n terms of my own experience, it simply became a part of my preparation carrying forward, that is experience I've had visiting different campuses, assessing programs, both in the US and internationally, and just the cumulative research and expert experience I've had over my career." (1/18 17 AM Trial Tr. at 81 (Allen). On the whole, however, Conrad and Allen's explanations meet the required threshold. *See Wilson*, 484 F.3d at 274 (quoting Fed. R. Evid. 702 advisory committee's note).

deciding higher education desegregation cases, *see Cooper*, 259 F.3d at 199 (citing *Daubert*, 509

U.S. at 592-94) (citing "publication" and "general acceptance within a relevant scientific

community" as factors that bear on reliability), and the 2016 enrollment study is a piece of

rigorous quantitative analysis that defendants replicated and critiqued as part of their case, *see id.*

(listing "whether a theory or technique can be or has been tested" as a factor). "Vigorous cross-

examination, presentation of contrary evidence, and careful instruction on the burden of proof

are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*,

509 U.S. at 596. Because any methodological weaknesses present here go to weight, rather than

admissibility—and because, at the remedies hearing, defendants had the opportunity to test

Conrad and Allen's opinions through the adversarial process—there is no basis for exclusion

under Rule 702.[9] *See Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 81-85 (3d Cir. 2017)

(reversing exclusion of expert testimony where district court "erred by applying a 'merits

standard of correctness,' a higher bar than what Rule 702 demands").

Further, although the word of an expert is not enough to establish reliability, *Kumho Tire*,

526 U.S. at 157, an expert's background may bear on the *Daubert* analysis, particularly when the

nature of the subject matter "preclude[s] ideal experimental conditions and controls." *See*

*Simmons*, 470 F.3d at 1123 ("In such instances, other indicia of reliability are considered under

*Daubert*, including professional experience, education, training, and observations."). The task

here—developing a promising remedial theory under circumstances with no historical or

contemporary counterpart—is clearly one that "preclude[s] ideal experimental conditions and

controls." *See id.* As such, it is appropriate to consider Conrad and Allen's extensive

---

[9] Because plaintiffs have demonstrated a sufficiently reliable basis for Conrad and Allen's opinions without showing
that Dr. Conrad's 1994 study was replicated, the court need not consider whether the dissertation of Brandon
Daniels, (PRX 311), constitutes such a replication. *See Ruffin v. Shaw Industries, Inc.*, 149 F.3d 294, 297-99 (4th
Cir. 1998) (excluding scientist's test results as unreliable where, among other things, plaintiffs could not show that
her methodology had been independently replicated).

qualifications and experience in the field of higher education desegregation. *See Cooper*, 259 F.3d at 199 (citing *Kumho Tire*, 526 U.S. at 150, 152) (court has broad discretion in determining not just whether proposed expert testimony is reliable, but how to determine reliability).

As noted, Dr. Allen has worked as an academic, consultant, and expert witness on higher education desegregation issues since 1976. (*See* Final Expert Report, PRX 312, Ex. 2). His research involves a "broad consideration of social inequality, with a particular focus on education and educational inequalities with respect to race, socioeconomic status, and gender." (1/18/17 AM Trial Tr. at 74 (Allen)). Recently, he has focused on racial desegregation, higher education, and student choice. (*Id.*). Dr. Allen has served as an expert witness in numerous higher education desegregation cases, including *United States v. Fordice*, 505 U.S. 717 (1992); *Ayers v. Fordice*, 111 F.3d 1183 (5th Cir. 1997); *United States v. Alabama*, 828 F.2d 1532 (11th Cir. 1987); *Knight v. Alabama*, 787 F. Supp. 1030 (N.D. Ala. 1991); and *Geier v. Sundquist*, 801 F.2d 799 (6th Cir. 1986); as well as the affirmative-action cases *Grutter v. Bollinger*, 539 U.S. 306 (2003), and *Gratz v. Bollinger*, 539 U.S. 244 (2003). (Final Expert Report, PRX 312, ¶ 10). During the 2012 liability trial, Dr. Allen was qualified as an expert and testified without objection in the areas of program uniqueness, unnecessary program duplication, sound educational justification, student choice, and remedies. (1/18/12 AM Trial Tr. at 37-38 (Allen)). The court cited to his trial testimony in its 2013 liability opinion.

Dr. Conrad has worked as an academic, consultant, and expert witness on higher education desegregation issues since 1980. (Final Expert Report, PRX 312 ¶ 2). He has published extensively on academic programming and unitary and dual systems of higher education in former *de jure* states, (1/10/12 AM Trial Tr. at 7-8 (Conrad)), and he testified as an expert witness in *Fordice* and *Knight*, among other cases. (Final Expert Report, PRX 312 ¶ 6).

Dr. Conrad has served as a consultant to both OCR and Maryland on higher education issues. (1/10/12 AM Trial Tr. at 8-10 (Conrad)). Like Dr. Allen, he was qualified as an expert without objection in the 2012 trial, and he testified regarding programs, program approvals, program duplication, and the potential for unique programs to create other-race enrollment. (1/10/12 AM Trial Tr. at 10-11 (Conrad)). The court cited to his expert reports and trial testimony in its 2013 liability opinion.

Given the nature of the subject matter, the court concludes that Conrad and Allen's professional experience, education, training, and observations constitute an additional factor in favor of their reliability.

In fulfilling its gatekeeping obligations, a court determines only whether the underlying methodology is valid, not whether the expert's conclusions are correct. *TFWS, Inc. v. Schaefer*, 325 F.3d 234, 240 (4th Cir. 2003). Conrad and Allen's opinions satisfy this test. In developing their remedial proposal, Conrad and Allen reviewed facts and data from a wide range of sources. They analyzed those facts and data using principles and methods generally accepted in the relevant fields, including social science, higher education desegregation, and quantitative and qualitative analysis. And they otherwise drew on "specialized knowledge" gained through their professional experience, education, and training. *See* Fed. R. Evid. 702(a).

For these reasons, the court will admit the challenged expert report and testimony.

## C. Permanent Injunction

The defendants also challenged the propriety of injunctive relief as a remedy in this case. In its Proposed Findings of Fact and Conclusions of Law, however, the State asserted, for the first time, that the plaintiffs must meet the traditional four-factor test for permanent injunctive relief before the court can impose a remedy. To support its argument, the State relies on *eBay,*

*Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006) in which the Supreme Court held the traditional four-factor test applied to disputes arising under the Patent Act. Under the traditional four-factor test, to obtain a permanent injunction a plaintiff must demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay*, 547 U.S. at 391. The State cannot offer any examples of application of this permanent injunction standard to a *Fordice* analysis in desegregation litigation.

In the wake of *eBay*, the Fourth Circuit has applied the four-factor test to a preliminary injunction in a copyright case, *Bethesda Softworks, LLC v. Interplay Entm't Grp.*, 452 Fed. App'x 351, 355 (4th Cir. 2011), a permanent injunction under the Due Process Clause, *A Helping Hand, LLC v. Baltimore Cty., MD*, 355 Fed. App'x 773, 776 (4th Cir. 2009), and a permanent injunction under the First Amendment, *Legend Night Club v. Miller*, 637 F.3d 291, 302–03 (4th Cir. 2011). Courts have interpreted *eBay* to prohibit "mechanical rules mandating injunctive relief" in any context. *Intertape Polymer Corp. v. N.L.R.B.*, 801 F.3d 224, 247 (4th Cir. 2015); *see also, e.g.*, *Salinger v. Colting*, 607 F.3d 68, 77–78 (2d Cir. 2010) ("[N]othing in the text or logic of *eBay* suggests that its rule is limited to patent cases. On the contrary, *eBay* strongly indicates that the traditional principles of equity it employed are the presumptive standard for injunctions in any context.").

While courts ordering remedies under a *Fordice* analysis have done so without discussing the test for granting a permanent injunction, there is no doubt that, even under the traditional four-factor analysis, injunctive relief is appropriate here.

First, this court already found that the traceable *de jure* era policy of unnecessary program duplication "continues to exacerbate the racial identifiability of Maryland's HBIs," thus

causing irreparable injury to their students. (Oct. 7, 2013 Mem. at 59, ECF. No. 382). "Irreparable injury comes from the maintenance of segregative policies which are educationally unsound . . . not from the dismantling of those policies." *U.S. v. State of La.*, 815 F. Supp. 947, 955 (E.D. La. 1993). Second, monetary damages are inadequate, because "a State does not discharge its constitutional obligations until it eradicates policies and practices traceable to its prior *de jure* system that continue to foster segregation." *Fordice*, 505 U.S. at 728. Third, the *Fordice* analysis already incorporates a balance of hardships inquiry with the "practicable and educationally sound" test. Given those parameters for any remedial order, the injury to plaintiffs outweighs any burden imposed by an injunction. Fourth, "upholding constitutional rights is in the public interest." *Legend Night Club*, 637 F.3d at 303.

Given this court's prior findings of liability under *Fordice*, and considering the four-factor test for a permanent injunction emphasized in *eBay*, remedial action will be ordered to address unnecessary program duplication in Maryland's higher education system.

## IV. PROPOSED REMEDIES

Before stating its ruling on remedies, the court will provide a brief overview of the competing remedial proposals offered by the defendants and the plaintiffs, and will explore ways in which the plaintiffs' proposal reflects the contents of separate remedial proposals submitted by the four HBIs. The court will summarize testimony from university presidents and other witnesses with respect to key aspects of the plaintiffs' proposal, particularly the proposed transfer of academic programs from TWIs to HBIs. The court also will summarize testimony related to issues raised by the plaintiffs' proposal, including its cost, potential complications related to accreditation, and the plaintiffs' proposed revisions to the State's academic program approval process.

### A.     The State's Remedial Proposals

The State's initial remedial proposal, submitted on November 20, 2015, consisted of two elements. First, the State proposed the creation of a Fund for Collaborative Academic Programs ("FCAP"), a six-year initiative to support the development of new, collaborative programs between HBIs and TWIs. The State suggested FCAP might distribute $10,000,000 in grants. (Defs.' First Remedial Proposal at 3–7, ECF No. 447). Second, it proposed the establishment of four summer academies for high school students, one at each HBI. The academies would be supported by State expenditures between $500,000 and $1,000,000 per institution per year, during a proposed four-year period. (*Id.* at 7–10). On February 2, 2016, the court concluded this proposal was "neither adequate nor sufficiently specific," although it noted that "collaborative programs are indeed helpful in certain circumstances." (Mem. and Order at 2, ECF No. 460).[10]

On April 24, 2017—after the remedies trial had concluded—the State submitted a second remedial proposal. (Defs.' Second Remedial Proposal, ECF No. 621). Under the second proposal, which superseded the first, the State would provide $50 million in funding over a five-year period, divided evenly among Morgan, Bowie, and Coppin. (*Id.* at 3).[11] Each of these three HBIs could use its portion of the funding for some or all of four purposes: enrollment management, student aid, campus inclusion initiatives, and summer academies. (*Id.* at 5). According to the defendants, these uses "were supported by trial testimony" and, overall, this flexible approach is "consistent with the HBI presidents' preferences as expressed at trial" and would "avoid the risks of Plaintiffs' program-based approach." (*Id.*). "The proposal is intended

---

[10] At the remedies trial, all four HBI presidents testified that the first State proposal was inadequate. (1/9/17 PM Trial Tr. at 46 (Wilson); 1/10/17 PM Trial Tr. at 4 (Bell); 1/11/17 AM Trial Tr. at 14–16 (Burnim); 1/11/17 PM Trial Tr. at 65–70 (Thompson); PRX 1). Because the court has found the initial proposal to be inadequate, and because the State revised its proposal after the remedies trial, the court need not provide a detailed account of the criticisms discussed during the remedies trial.

[11] The State has taken the position that UMES is not entitled to relief.

to be sufficiently flexible and self-executing that no further judicial oversight would be required," according to the State. (*Id.*). No funding for new programs was included. (*See generally*, Apr. 24, 2017 Status Report, ECF No. 621).

### B.    The Plaintiffs' Remedial Proposals

The plaintiffs submitted an original remedial proposal in May 2015. (Pls.' First Remedial Proposal, ECF No. 406). At trial, however, testimony focused on the plaintiffs' revised remedial proposal, which was submitted in 2016 and was the most recent at the time of trial. (PRX 21; PRX 312). The plaintiffs' 2016 remedial proposal would employ three strategies to increase other-race enrollment at HBIs: the creation of "programmatic niches" at each HBI, various academic "enhancements" at each HBI, and a reformed State process for approving new academic programs. These strategies will be briefly discussed in turn.

The plaintiffs' proposal centers on the first strategy: the creation of two or three "programmatic niches" at each of the four HBIs. These "programmatic niches" are clusters of related undergraduate and graduate programs, at least some of which are "unique" and in high demand among students. (PRX 312 at 50–51; PRX 21 at 1). To create these unique, high demand programs, plaintiffs generally call for either the creation of new programs at HBIs or the transfer of programs from TWIs to HBIs.[12] In some instances, the plaintiffs propose new collaborations between HBIs and TWIs. According to the plaintiffs, these niches will help foster distinct institutional identities (beyond racial identities) at the HBIs, thus attracting other-race students. (PRX 312 at 50–51; PRX 21 at 1).

In addition to creating unique, high demand programs, the plaintiffs propose various academic "enhancements," such as additional funding for capital improvements, technology

---

[12] In this context, the "transfer" of a program from a TWI to an HBI generally means closure of the program at the TWI and the transfer of all resources attached to the program to the HBI. (PRX 21 at 2 n.1).

upgrades, scholarships, marketing, and recruitment activities. These funds are meant to support the programmatic niches by enhancing the quality and capacity of academic programs at HBIs. (Pls.' Proposed Findings of Fact at 133-35, ECF No. 622; PRX 312 at 29–30). Second, the plaintiffs propose reforms to the MHEC approval process for new academic programs. (Pls.' Proposed Findings of Fact at 135-43, ECF No. 622; PRX 312 at 9, 30–33).

Importantly, neither the plaintiffs' most recent proposal nor the State's original proposal reflects a consensus among key stakeholders. The State's first remedial proposal was drafted by State attorneys and two University System of Maryland ("USM") officials. (PRX 327 at 3; 1/12/17 PM Trial Tr. at 21–24 (Fielder)). That is, neither MHEC, (1/12/17 PM Trial Tr. at 35–36 (Fielder)), nor the current HBI presidents, (1/9/17 PM Trial Tr. at 46) (Wilson); 1/10/17 PM Trial Tr. at 3 (Bell); 1/11/17 AM Trial Tr. at 16–17 (Burnim); 1/11/17 PM Trial Tr. at 65–66 (Thompson)), were involved in drafting the State's original proposal. The State also did not consult with three of the TWI presidents who testified at the remedies trial. (1/30/17 Trial Tr. at 120 (Hrabowski); 2/1/17 Trial Tr. at 53 (Schatzel); 2/9/17 Trial Tr. at 136 (Schmoke)).[13] And the plaintiffs' experts were not able to consult with HBI presidents when drafting their proposal. (*See* 1/11/17 PM Trial Tr. at 93). UB President Kurt Schmoke highlighted this lack of coordination among key stakeholders and suggested it would be helpful for all sides to discuss potential remedies. "I would hope, before final decisions are made, if it is possible, that we have an opportunity to sit with the presidents of the HBIs and the TWIs," he said. (2/9/17 Trial Tr. at 136 (Schmoke)). "[O]n the programmatic side, and looking at both the quality of programs and what might attract all students – white, black, whatever – to this program, we might be able to come up with some ideas that would be – might help resolve some of these issues." (*Id.*).

---

[13] UMUC's President Miyares testified that he believes the State's plan was "shared with the presidents" at a presidents' council meeting, but that he was "not familiar with the details." (2/6/17 Trial Tr. at 132-33 (Miyares)).

Below is an overview of the plaintiffs' proposal. Where relevant, the court also describes the State's objections to the plan.

        1.      New Programs

The plaintiffs' proposal includes creating a variety of new programs at the HBIs. At Morgan, the plaintiffs propose creating three unique, high demand programs in the areas of business and management; urban environment, health, and sustainability; and engineering. To do so, the plaintiffs would both create new programs and transfer programs from TWIs. (PRX 21 at 2–7). At UMES, the plaintiffs propose the creation of three niches in the areas of engineering and aviation sciences; agriculture and environmental sciences; and pharmacy and health professions. (*Id.* at 11–14). The plaintiffs do not propose any program transfers to UMES. At Bowie, the plaintiffs recommend creating two niches: computer sciences, and professional studies: nursing, social work, and education. (*Id.* at 15–16). To create these niches, the plaintiffs propose creating a variety of new programs and transferring a doctorate program in Information and Interaction Design from the University of Baltimore. (*Id.*). At Coppin, the plaintiffs propose two niches: one in nursing and allied health, and the other in criminal justice and applied social and political sciences. (*Id.* at 8–10). For nursing and allied health, the plaintiffs propose no program transfers. For criminal justice and applied social and political sciences, they propose creating new programs and transferring programs. (*Id.*).

The plaintiffs' remedial proposal with respect to UMUC, which offers classes that are either exclusively online or a combination of online and on-site instruction, is different. Their 2016 remedial proposal called for transferring all UMUC programs that duplicated HBI programs to the HBI that offers the duplicated program. (*Id.* at 17–18). After trial, however, the plaintiffs revised their proposal with respect to UMUC, in two ways. First, they "do not seek to

transfer the parts of programs where UMUC is working under a DOD contract or engaging in specialized programming targeted towards members of the military stationed out-of-state or outside the U.S." (Pls.' Proposed Findings of Fact at 121, ECF No. 622). Second, the plaintiffs clarified that they are no longer proposing the "total transfer" of all duplicative offerings from UMUC to the HBIs. Their latest proposal suggests that some duplicative programs could be transferred in a more "limited" way. For instance, the plaintiffs suggest UMUC might continue to offer the transferred programs to out-of-state students. (*Id.*). The plaintiffs also propose transferring three programs from UMUC to Coppin (a bachelor's in criminal justice, a bachelor's in investigative forensics, and a master's in digital forensics and cyber investigation), and transferring four programs from UMUC to Morgan (a bachelor's in accounting, a master's in accounting and financial management, a bachelor's in finance, and a doctorate in community college policy and administration). (*Id.* at 131–33). The plaintiffs also suggest any remedy should include measures to help HBIs expand their capability to offer courses online and to ensure that new UMUC offerings do not adversely affect HBIs. (*Id.* at 136–38).

Several TWI presidents noted that creating new programs at the HBIs could benefit Maryland, at least in theory, by increasing the number of graduates. "We want them to have these programs too," UMBC's President Hrabowski testified. (1/30/17 Trial Tr. at 68–69 (Hrabowski)). "We need more [rather] than less." (*Id.*). At the same time, some TWI presidents worried that, in practice, the plaintiffs' proposal would harm the TWIs. UB's President Schmoke testified that, if new revenue sources are found to fund new HBI academic programs, "then not only the [HBI] institutions will benefit, but the State will benefit from the graduates of those programs." (2/9/17 Trial Tr. at 71–72 (Schmoke)). If funds for higher education remain constant, however, "then the State would likely take money from other higher education institutions in

order to fund those programs." (*Id.*). Similarly, President Miyares testified that adding the new programs to HBIs will cause TWIs to "suffer," because "there is [only] so much money that will go to higher education." (2/6/17 Trial Tr. at 59 (Miyares)).

2.     Academic Program Transfers

As noted, the plaintiffs propose transferring certain academic programs from TWIs to HBIs. HBI presidents offered mixed views on whether such transfers are necessary. According to Morgan's President Wilson, transfers must be a part of any viable remedy. "So I think it has to start there, with transferring some of the programs back," he said. (1/9/17 PM Trial Tr. at 30–31) (Wilson)). Bowie's President Burnim, by contrast, testified that program transfers are not an optimal way to build diversity at higher education institutions. (1/11/17 PM Trial Tr. at 6 (Burnim)).

TWI presidents criticized the plaintiffs' proposed program transfers. "[T]he reason that my colleagues and I are so concerned is that the proposal involves transferring programs," UMBC's President Hrabowski testified. (1/30/17 Trial Tr. at 67 (Hrabowski)). President Schmoke likened the plaintiffs' proposed transfers to a "body blow" to his institution and claimed that, for instance, the proposed transfers could force UB to shutter its business school. (2/9/17 Trial Tr. at 43–44 (Schmoke)). Similarly, Towson's President Schatzel called transfers "an ill-advised solution," (2/1/17 Trial Tr. at 57 (Schatzel)), while President Miyares estimated that the plaintiffs' proposal could cause UMUC enrollment to decline by 10–12 percent, which "would mean that UMUC would have to dramatically, significantly increase tuition or get relief from the State in increased State support." (2/6/17 Trial Tr. at 68 (Miyares)).[14] MHEC Secretary James Fielder, Jr. also criticized program transfers. "I have a significant problem with the

---

[14] After the remedial trial concluded, the plaintiffs revised their proposal with respect to UMUC. (*See* Pls.' Proposed Findings of Fact at 120–33, ECF No. 622). Accordingly, it is not clear whether, in President Miyares's view, these effects would still flow from the last version of the plaintiffs' proposal.

transfers," he testified, "[y]ou really are eliminating and removing an academic program that typically is successful . . . with the thought that it can simply be implanted somewhere else . . . . And I do think this would be very disruptive to the institutions." (1/12/17 PM Trial Tr. at 72 (Fielder)).

In summary, TWI presidents testified that program transfers would harm TWIs and the State of Maryland by (1) adversely affecting TWI faculty, students, and institutional reputations, (2) undermining partnerships and investments between the TWIs and outside institutions; and (3) hampering Maryland's goals of meeting workforce needs in science, technology, engineering, and math (STEM) and nursing. There also were unique reasons raised with respect to transferring programs from UMUC. These issues will be explored in turn below.

a. Faculty and Students

Several TWI presidents testified that the proposed transfers would harm their institutions' reputations and hamper efforts to attract and maintain talented faculty members and students.

"If the program is taken from us, it will have a devastating impact on . . . the reputation of the institution," UMBC's President Hrabowski explained. (1/30/17 Trial Tr. at 67–68 (Hrabowski)). Similarly, UB's President Schmoke testified that "there are high degree[s] of reputational risks of losing programs." (2/9/17 Trial Tr. at 72 (Schmoke)).

According to the TWI presidents, the proposed program transfers already have created a sense of instability that has made it more difficult for TWIs to retain and attract top-flight faculty members. (1/30/17 Trial Tr. at 39–40, 81 (Hrabowski); 2/1/17 Trial Tr. at 46 (Schatzel); 2/9/17 Trial Tr. at 68 (Schmoke)). President Schmoke, for instance, said the prospect that UB would lose some criminal justice programs—as proposed by the plaintiffs—has been a "cloud" hanging over faculty recruitment efforts because "people who are considering UB are concerned about

exactly where these programs will be over the next few years." (2/9/17 Trial Tr. at 68 (Schmoke)). TWI presidents also claim the uncertainty created by the plaintiffs' proposed transfers has made it harder for TWIs to recruit talented students. (2/6/17 Trial Tr. at 166–67 (Miyares); 1/30/17 Trial Tr. at 80–81 (Hrabowski); 2/1/17 Trial Tr. at 46 (Schatzel)).

Some TWI faculty members already have expressed reluctance to move to HBIs alongside any transferred programs and, if the transfers take place, these faculty members may seek employment elsewhere, TWI presidents testified. For instance, President Schmoke testified that faculty members in UB's Information and Interaction Design doctorate program have "indicated their strong objection to moving," while faculty in UB's criminal justice program expressed "great concern about moving" and indicated that they may "pursue other options" if transfers take place. (2/9/17 Trial Tr. at 59–60, 67–68 (Schmoke)). UB faculty members are concerned that they would not retain the same tenure rights and control over academic programs if they moved to an HBI, he explained. (*Id.* at 56–57). Towson's President Schatzel expected faculty members "would not transfer," because they "have the ability . . . to go wherever they want." (2/1/17 Trial Tr. at 43–44, 57 (Schatzel)).

TWI presidents also warned that transferring programs to HBIs would have adverse ripple effects throughout the affected TWIs because the programs are part of the fabric of the university rather than standalone entities. "[I]t's not about just transferring a discrete area. They are all integrated," UMBC's President Hrabowski stressed. (1/30/17 Trial Tr. at 75, 94 (Hrabowski)). "Taking away these programs would remove critical expertise, not only to a department, but to the broad academic enterprise." (*Id.*). Similarly, President Schmoke explained that faculty members who teach in UB's MBA program—which the plaintiffs propose transferring—also usually teach in other parts of the business school. (2/9/17 Trial Tr. at 40

(Schmoke)). Towson's President Schatzel, for her part, explained that an academic program "can't be lifted up and moved someplace," because the program really depends on the faculty, relationships with employers, and alumni associated with it at the TWI. (2/1/17 Trial Tr. at 43 (Schatzel)). She said transferring an accounting program to an HBI, as the plaintiffs propose, would have a "great impact" on Towson because accounting "is a core element of a business education" at Towson. (*Id.* at 47).

If the proposed program transfers take place, that also would make it harder for TWIs to attract top students, because students seek out schools that have a broad range of academic offerings available, UMBC's President Hrabowski testified. "So when thinking about recruiting really good students who are not sure, they want options. And we would limit ourselves dramatically if we did not have those options available." (1/30/17 Trial Tr. at 76 (Hrabowski)).

While testifying about the ways in which the plaintiffs' proposal may harm their institutions, the TWI presidents also made clear that their institutions currently serve diverse student populations and are committed to diversity. President Schmoke claimed that UB was "probably the most . . . racially integrated institution of the twelve in the USM system" and testified that UB's student population is 46 percent African-American and 43 percent white. (2/9/17 Trial Tr. at 25–26 (Schmoke)). President Hrabowski testified that UMBC is "seen as one of the most diverse places in the country" and noted that the student population is slightly less than 20 percent African-American and slightly less than 50 percent white. (1/30/17 Trial Tr. at 27–29 (Hrabowski)). He also stressed that UMBC wants to further diversify its students and faculty; concerning the latter, the dean of UMBC's graduate school is an African-American woman, he noted. (*Id.* at 37–43). President Schatzel testified that 20 percent of Towson's student population is African-American. She also noted that she recently created a new position – vice

president of inclusion and institutional equity – to help bolster diversity at Towson. (2/1/17 Trial Tr. at 27–28 (Schatzel)). President Miyares stressed the sheer volume of African-Americans who receive an education at UMUC. He testified that UMUC enrolls more African-American students than the four HBIs combined and awards roughly the same number of degrees to African-American students each year as do the four HBIs combined. (2/6/17 Trial Tr. at 41–42 (Miyares)).[15] He claimed the plaintiffs' proposal would harm African-American students at the TWIs. (*Id.* at 59).

The plaintiffs' witnesses downplayed some of the concerns voiced by the TWI presidents about program transfers. For instance, Dr. Lucie Lapovsky questioned the claim that TWI faculty would not move to HBIs alongside transferred programs. She testified that a variety of factors may influence whether faculty members ultimately decide to transfer to an HBI. In fact, faculty "usually will go with where their jobs are going," because "there are not a plethora of faculty jobs around these days in many fields." (1/17/17 PM Trial Tr. at 58 (Lapovsky)). Dr. Earl Richardson, a former president of Morgan, also testified that transfers are a "viable concept" and noted that Maryland has embraced transfers in the past in certain situations. (1/17/17 AM Trial Tr. at 47–49 (Richardson)).

b.   Partnerships and Investments

TWI officials also asserted that their institutions have established longstanding partnerships with business and government entities. They testified that the plaintiffs' proposal would undermine those relationships, and the relationships would not transfer to HBIs alongside transferred academic programs. At Towson, President Schatzel testified, the accounting program

---

[15] Concerning percentages, President Miyares testified that UMUC is "basically 60 percent non-white." (2/6/17 Trial Tr. at 42 (Miyares)). Although he did not elaborate on the definition of "non-white," President Miyares appears to include in that category African-American, Asian, and Hispanic students. For instance, evidence submitted by the plaintiffs suggests that, at least as of the fall of 2014, the total enrollment at UMUC was 47,906 students. Of those students, 19,344—or roughly 40 percent—were classified as "white." (*See* PRX 330 at 14–15).

has longstanding relationships with local firms where Towson alumni are employed, and these relationships create job opportunities for graduating Towson students. Although the plaintiffs propose to transfer accounting programs from Towson to Morgan, she testified that these relationships are not transferable. (2/1/17 Trial Tr. at 50–51 (Schatzel)). Similarly, Greg Simmons, UMBC vice president for institutional advancement, testified that UMBC has developed a partnership with NASA through which NASA has hired over one thousand UMBC graduates. Transferring engineering programs from UMBC, as the plaintiffs propose, would "change[] the way we're able to work with partners and prepare students in a meaningful way," he testified. (1/31/17 Trial Tr. at 41 (Simmons)). He also suggested these partnerships are not transferable. (*Id.*). Concerning investments, Mr. Simmons testified that UMBC's relationship with Northrup Grumman has yielded financial benefits. Last year, for example, Northrop Grumman gave UMBC $3 million in funding for scholarships. (*Id.* at 35–36).

### c. Maryland's Workforce Needs in STEM and Nursing

UMBC's President Hrabowski also testified that transferring academic programs would hamper Maryland's efforts to fulfill unmet workforce needs in areas like STEM and nursing. "This state needs tens of thousands of more people educated in these areas, whether it's computer engineering, computer science, and computing broadly," he explained. (1/30/17 Trial Tr. at 68 (Hrabowski)). "Taking away our program would mean reducing the numbers of people who are being educated in our state for these jobs." (*Id.*).

### d. UMUC Issues

The testimony also highlighted several issues specific to the plaintiffs' proposal regarding UMUC, an institution which offers fully online and "hybrid" classes. HBI presidents made clear that they wanted to expand online course offerings. According to President Wilson, failure to

expand online would place Morgan "in serious jeopardy of not being competitive [with] other institutions." (1/10/17 AM Trial Tr. at 29 (Wilson)). Similarly, President Bell testified that UMES wanted to move some of its unique programs online. (1/10/17 PM Trial Tr. at 67–68 (Bell)). HBIs have expanded their online presence in recent years. (2/6/17 Trial Tr. at 124–25 (Miyares)).

In his testimony, President Miyares argued against transferring programs from UMUC to other Maryland institutions. He claimed transferring online classes would do little to desegregate HBI campuses because students taking classes online do not know the race of their fellow students. (*Id.* at 53). He also claimed there is little to "transfer" in the case of UMUC online classes. For instance, there are no full-time faculty assigned to programs, and he doubted that students would transfer from UMUC to the HBIs. (*Id.* at 61, 66). More broadly, President Miyares questioned whether the plaintiffs' remedial approach is sound with respect to UMUC. While the plaintiffs considered geographic proximity when examining if program duplication exists, President Miyares claimed geographic proximity is less relevant in the age of online education. (*Id.* at 50). [16] In addition, he suggested that UMUC serves a different student population than the HBIs: unlike "most traditional institutions" in Maryland, UMUC does not target 18-year-olds but rather focuses on working adults. (*Id.* at 50–51).[17] For that reason, he claimed UMUC does not compete with other Maryland institutions. (*Id.* at 51).

---

[16] At the same time, President Miyares also explained that UMUC offers "hybrid" classes as well as classes that are entirely online. For these "hybrid" classes, UMUC uses classrooms at a variety of locations, including University of Maryland College Park (UMCP), Anne Arundel Community College, and Cecil Community College. (*Id.* at 121).

[17] As President Miyares acknowledged, however, UMUC is not unique in terms of recruiting working adults. For instance, he acknowledged that the average student age at Coppin is 30 years old and that 75 percent of Coppin's student population had children or other dependents in their home. (*Id.* at 101–02). He also acknowledged that UB serves an older student population. (*Id.* at 102; *see also* 2/9/17 Trial Tr. at 19–20 (Schmoke) (explaining that the average age of UB undergraduate students is 28 and that UB focuses primarily on students who transfer from community college, military veterans, and second-career individuals, not students recently graduated from high school)).

President Miyares also stressed that UMUC's business model and mission differ from that of the HBIs. UMUC, which was never segregated, provides low-cost education (including free course materials) primarily to working adults through fully online and hybrid classes that are offered in eight-week terms. (*Id.* at 10–13, 29–32). It is an "open" university; it readily accepts credits from other institutions and will enroll as an undergraduate any student who has graduated high school and any student who has a bachelor's degree from a regionally accredited university. (*Id.* at 15–19). In light of its focus on online instruction and global presence, UMUC has invested in call centers to support students around the globe. (*Id.* at 20–21). It has no tenure system and no research mission; adjunct faculty members teach most classes, and those classes are standardized, meaning the faculty who teach them do not design them. (*Id.* at 22, 37). One-third of UMUC students are "in state." (*Id.* at 40).

Although UMUC has collaborated with other universities, President Miyares testified that such collaborations are only beneficial for academic programs that UMUC does not already offer. (*Id.* at 78, 86–87). For instance, UMUC and Salisbury teamed up to offer a social work degree, because UMUC did not offer that degree. In that partnership, social work students were subjected to Salisbury admissions standards, studied a curriculum developed by Salisbury, and were awarded a Salisbury degree. UMUC administered the program and paid the faculty, and the two institutions split revenue. President Miyares testified that students also had access to UMUC services, such as call centers and online libraries. (*Id.* at 71–74, 142). If UMUC already offers a program, by contrast, collaboration would yield a loss for UMUC because any gains in enrollment due to the collaboration would not be significant enough to offset the split in revenues. (*Id.* at 86–87).

Miyares testified that other Maryland institutions are increasingly competing with UMUC for non-traditional students in both the fully online and hybrid formats. (*Id.* at 107).

### 3.    MHEC Program Approval Process

The plaintiffs also propose revising the MHEC academic program approval process,[18] which they claim is necessary to address program duplication between TWIs and HBIs.

The current approval process is governed by the Code of Maryland Regulations ("COMAR"). These regulations were last amended in 2012. According to Monica Wheatley, MHEC Associate Director of Collegiate Affairs, the 2012 amendments "give a more robust look at program duplication." (2/7/17 Trial Tr. at 163–64 (Wheatley); *see* PRX 28 (amended regulations)).[19]

Under the current standard, MHEC is tasked with determining, among other things, whether a proposed academic program is "unreasonably duplicative." (PRX 28 at 16 (COMAR 13B.02.03.09(C)(1)). When doing so, MHEC considers the program's market demand. Accordingly, MHEC may approve a proposed program—even if it duplicates a program at another institution—if there is "a need in the state for that type of duplication." Such a need could be demonstrated in several ways: "It could be a capacity issue at any of the institutions that have current programs; it could be based on extreme market need for a particular program," she explained. (2/7/17 Trial Tr. at 81 (Wheatley)).

---

[18] Before offering a new academic program, Maryland institutions must secure approval from MHEC. In order to receive approval, Maryland institutions first submit a proposal to MHEC. After receiving a proposal, MHEC contacts other institutions, including the HBIs, in order to inform them of the proposal and provide them an opportunity to lodge a protest. MHEC also reviews the proposed program to determine, among other things, if it would lead to program duplication. (1/12/17 PM Trial Tr. at 11–13 (Fielder)). The MHEC recommendation is ultimately submitted to the MHEC Secretary, who determines whether the program will be approved or denied. (2/7/17 Trial Tr. at 72–73 (Wheatley)). MHEC officials indicated that MHEC is focused on preventing unreasonable duplication caused by new programs but is not focused on eliminating preexisting duplication. Ms. Wheatley, for instance, testified that she was unaware of any MHEC efforts to evaluate whether existing programs are duplicative. (2/8/17 Trial Tr. at 14 (Wheatley); *see also* 1/12/17 PM Trial Tr. at 50 (Fielder)).

[19] Ms. Wheatley said, however, she has not examined whether programs that were approved under the pre-2012 regulations would not have been approved under the current regulations, because all of her work at MHEC has occurred after the regulations were amended. (2/7/17 Trial Tr. at 164–66 (Wheatley)).

Instead of the current standard of "unreasonable" program duplication, the plaintiffs claim MHEC should use an "unnecessary" program duplication standard. (Pls.' Proposed Findings of Fact at 138, ECF No. 622). Their alternative standard would preclude MHEC from approving a duplicative program simply based on market need without considering less-segregative alternatives, according to Dr. Allen. (1/18/17 PM Trial Tr. at 24–25 (Allen)). Ms. Wheatley, by contrast, saw little practical difference between the two standards: "I would consider those the same concept," she testified. (2/7/17 Trial Tr. at 81 (Wheatley)). And, regardless of the precise formulation, she claimed MHEC should retain flexibility to approve duplicative programs if there is significant market demand for graduates in that area: "[I]f we couldn't look at the need for a particular program in the market, then we are potentially not preparing as many students as we need to. And that could have a number of different consequences, including students leaving the state, areas in our workforce that aren't being developed as quickly, putting us at a competitive disadvantage as a state." (*Id.* at 82).

As part of its duplication analysis, MHEC also considers a list of factors, including any "[e]ducational justification for the dual operation of programs broadly similar to unique or high-demand programs at HBIs." (PRX 28 at 16 (COMAR 13B.02.03.09(C)(2)(g)). Asked about the meaning of this factor, Ms. Wheatley explained that MHEC officials "don't want to make a program decision that's going to undermine the specific institutional identity of an HBI or the uniqueness and focus of the institution." (2/8/17 Trial Tr. at 6 (Wheatley)). She clarified, however, that MHEC may approve a program proposed by a TWI—even if that program is broadly similar to a unique or high-demand program at an HBI—in some situations, such as when the two programs do not serve the same type of students. (*Id.* at 12–13). She could not

recall any instances where MHEC recommended disapproval of a program proposed by a TWI because it was broadly similar to a unique or high-demand program at an HBI. (*Id.* at 13).

According to Ms. Wheatley, MHEC considers the issue of duplication when reviewing proposals, even absent objections from HBIs or other institutions that could be adversely affected. "[T]here have been instances where there have been no levied objections, but we have either denied or questioned a proposing institution . . . on the basis of duplication" she testified. (2/7/17 Trial Tr. at 79 (Wheatley)).[20]

In addition to changing the standard for duplication, the plaintiffs also propose that the State only approve programs if they are proven not to infringe on any HBI's programs and that prior to approving any programs, "the State must consider whether it would be less-segregative, educationally sound, and practicable to place the program at an HBI." (Pls.' Proposed Findings of Fact at 182, ECF No. 622). According to the plaintiffs, the State also must adopt a system "to proactively identify degrees for future development" at HBIs. (*Id.*). Finally, the plaintiffs claim the State must prevent TWI expansion into areas where HBIs already have programs, and they suggest a monitoring committee that would provide input to MHEC on program approval applications. (*Id.*).

Several witnesses testified that the current MHEC program approval process is adequate. Bowie's President Burnim testified that the 2012 amended MHEC approval process is generally working as it should. (1/11/17 AM Trial Tr. at 72 (Burnim)). Dr. Houston Davis, who formerly served as the executive vice chancellor and chief academic officer of the University System of

---

[20] Both Dr. Fielder and Ms. Wheatley testified that Maryland's participation in the State Authorization Reciprocity Agreement (SARA) will make it harder for MHEC to guard against unreasonable online program duplication moving forward. Under SARA, Maryland must permit a university in another state that has joined SARA to offer online programs in Maryland if the university has been approved by SARA and the program has been approved by the other state. In that circumstance, MHEC has no ability to review online programs offered in Maryland by out-of-state universities for duplication. (1/12/17 PM Trial Tr. at 65–69 (Fielder)).

Georgia, also generally supported the current MHEC approval process. According to Dr. Davis, "the process that MHEC has out there is sound. It's a good process." (10/28/16 Dep. Tr. at 89, ECF No. 616-1; 12/9/16 Dep. Tr. at 270-71, ECF No. 616-2 (Davis)).[21] Further, President Burnim testified that, since 2012, MHEC has not approved programs over objections from Bowie, and President Thompson testified that she was unaware of any time when MHEC approved a program over an objection from Coppin. (1/11/17 AM Trial Tr. at 69-70 (Burnim); 1/12/17 AM Trial Tr. at 8 (Thompson)).[22]

    4.    Effectiveness of the Plaintiffs' Proposed Remedy

TWI and HBI presidents largely agreed that academic program offerings—especially unique, high-demand program offerings—can play some role in attracting students to a particular university. But the presidents offered different views on the relative importance of academic programs in attracting students and whether unique, high-demand programs would help HBIs attract other-race students.

TWI presidents testified that academic programs play a role in recruiting a diverse student body. According to UMBC's President Hrabowski, academic programs are an "important" component of creating a diverse student body, although "[i]t would be simplistic to say it's simply about programs . . . . The fact is that we are talking about the programs; the strategies one uses to market; the strategies to build relationships with schools, with families, with communities; and the strong ways one can use alumni to show what's possible to families, all those factors." (1/30/17 Trial Tr. at 123–24, 132 (Hrabowski)). President Schmoke testified that academic programs are a "major focus" of UB recruitment efforts because "if you are going

---

[21] After the remedies trial had concluded, the parties agreed that portions of this deposition transcript would be admitted into evidence. (*See* ECF No. 616).

[22] The joint UB/Towson MBA program was approved over Morgan's objections in 2005. (Oct.7, 2013 Mem. at 51, ECF No. 382) This program was terminated in 2015. (2/1/17 Trial Tr. at 58, 71-72 (Schatzel)).

to attract people—diverse groups, it's probably going to be based around programs." (2/9/17 Trial Tr. at 131 (Schmoke)). He said "unique" programs in particular help drive enrollment, and that "clustering" related programs together and offering related programs across degree levels may further entice students to enroll. (*Id.* at 104, 111, 120).[23] Although Towson highlights its academic offerings as part of its recruitment efforts, President Schatzel testified that a university's overall academic reputation—as opposed to specific program offerings—drives student interest. (2/1/17 Trial Tr. at 35–36, 48, 63 (Schatzel)). She stressed that there are many reasons why a student may be interested in a certain university and highlighted "marketing communication strategies" used by Towson to recruit students. (*Id.* at 29–30, 34–36, 46).

HBI presidents largely endorsed the plaintiffs' proposed strategy of creating programmatic niches centered on unique, high-demand programs. In their view, this strategy will help HBIs diversify their student bodies, although they noted the importance of other strategies as well. Morgan's President Wilson, for instance, suggested that desegregating the HBIs could best be accomplished by "instituting on those campuses unique, high-demand programs that would not be duplicated by Traditionally White Institutions nearby," while also noting the importance of scholarships in attracting other-race students to Morgan. (1/9/17 PM Trial Tr. at 22, 33–34 (Wilson)). Similarly, President Bell testified that academic programs drive enrollment at UMES. Recognizing that students are also drawn to institutions with top-notch facilities, she

---

[23] UB's President Schmoke suggested that it may be easier to attract white students to graduate programs than undergraduate programs. Drawing on his experiences at Howard University, he concluded that "white students seemed to be more attracted to the graduate, professional body than to the undergraduate." (2/9/17 Trial Tr. at 130–31 (Schmoke)). Experts testifying at the remedies trial agreed with this conclusion. According to Dr. Walter Allen, one of the plaintiffs' experts, "Master's programs are the programs that are proven effective in terms of enrolling diverse student populations." (1/18/17 PM Trial Tr. at 79 (Allen)). Similarly, Dr. Allan Lichtman, an expert offered by the defendants, testified that, generally speaking, graduate programs are associated with higher levels of white enrollment at the HBIs than undergraduate programs. (2/14/17 Trial Tr. at 20 (Lichtman)). On the other hand, President Burnim testified that his remedial proposal for Bowie focused on undergraduate programs; he suggested this was partly because graduate programs are more expensive to implement. (1/11/17 PM Trial Tr. at 13–14 (Burnim)).

testified she "believe[s] that students attend our institutions because they have interests in particular programs." (1/10/17 PM Trial Tr. at 21, 29–30 (Bell)). According to President Bell, much of the diversity at UMES is attributable to its small number of unique, high-impact undergraduate and graduate programs. (*Id.* at 22). Bowie's President Burnim agreed that students, when deciding where to enroll, "look first or perhaps most importantly to the degree programs that are offered." (1/11/17 AM Trial Tr. at 22 (Burnim)). But he agreed that other factors also are important, including price, financial aid and scholarships, campus environment, faculty, location, and marketing. (*Id.* at 82–83).

### 5.    Cost of the Plaintiffs' Remedial Proposal

The cost of the plaintiffs' remedial proposal also was debated at trial. Two TWI presidents—UB's President Schmoke and UMUC's President Miyares—warned that the plaintiffs' proposal may harm TWIs because it would be expensive to implement and may drain resources away from TWIs. (2/9/17 Trial Tr. at 71 (Schmoke); 2/6/17 Trial Tr. at 59–60 (Miyares)). But the precise cost of the plaintiffs' proposal was unclear even after weeks of testimony.

At the remedies trial, the plaintiffs provided no cost estimate for their 2016 remedial proposal. They suggested that no estimate was provided because the plaintiffs' experts had no opportunity to consult with the HBIs outside of the confidential mediation process. (*See* 1/11/17 PM Trial Tr. at 93). In Coppin's case, for example, the plaintiffs explained that, given their lack of access to Coppin's administrators, they "were not able to adequately project other resource needs such as funding for faculty and equipment." (Pls.' Proposed Findings of Fact at 85-86, ECF No. 622 (citation omitted)). Dr. Lapovsky testified that she could not estimate the costs of the plaintiffs' proposal because she did not have access to relevant personnel at the TWIs and

HBIs, although she also noted that the plaintiffs did not ask her to undertake a cost analysis. (1/17/17 PM Trial Tr. at 76–77, 96–99 (Lapovsky)). Dr. Lapovsky also testified that cost estimates for the plaintiffs' proposal could "easily" be devised "if you were able to sit down with all the players." (*Id.* at 40).

After the remedies trial concluded, the plaintiffs estimated that the operating costs for the ten proposed programmatic niches at the four HBIs would be roughly between $230 million and $650 million. (Pls.' Proposed Findings of Fact at 164, ECF No. 622). This figure does not account for capital costs, and it does not account for other program enhancements included in the plaintiffs' proposal. (*Id.*). The plaintiffs arrived at this estimate by extrapolating from cost estimates submitted by UMES and Morgan. (*Id.* at 187).[24] The plaintiffs also suggested, after conclusion of the remedies trial, that any remedy should include $50 million over a ten-year period per HBI in "enhancement funds for marketing and scholarships" and $50 million over ten years per HBI "to strengthen the support for the academic niches through upgrades in areas such as equipment, materials, and support for faculty and students." (*Id.* at 181). Despite these figures, the plaintiffs still have not been able to provide an overall, complete cost estimate for their proposal.

The State also did not provide a cost estimate for the plaintiffs' 2016 remedial proposal. Instead, the State's expert witness, Dr. Lichtman, provided a "ballpark" estimate of costs for the plaintiffs' 2015 remedies proposal, which differed significantly from the plaintiffs' 2016 proposal. He estimated the plaintiffs' 2015 proposal would cost $210 million for operating costs alone in the first year, $915 million over five years, and about $1.9 billion over ten years. (2/14/17 Trial Tr. at 84–85 (Lichtman)). Lichtman estimated the capital costs for the plaintiffs'

---

[24] Morgan, Bowie, and UMES all provided some cost estimates as part of their individual remedial proposals; Coppin did not.

2015 proposal to be $872 million over five years and $1.6 billion over ten years. (*Id.* at 88-89).

According to Dr. Lichtman, it is unclear whether the plaintiffs' 2016 proposal would be more or

less costly than the 2015 version he examined. (*Id.* at 84). Overall, however, he expected any

proposal that results in the addition of roughly 100 new or transferred programs at the HBIs—as

is the case with the plaintiffs' most recent proposal—would require billions of dollars in

operating costs. (*Id.* at 85-86). And that does not include other costs that are likely to attend such

a remedy.[25]

Dr. Lichtman estimated the operating costs of the plaintiffs' proposed new programs by

multiplying the number of students expected to enroll in each new program[26] by the average cost

to the State of each student at the HBI where the new program would be created. (2/14/17 Trial

Tr. at 56–64 (Lichtman)).[27] Similarly, Dr. Lichtman estimated the cost of proposed program

transfers by multiplying the current number of students in the program at the transferring TWI by

the average per-FTE student cost to the State at the receiving HBI. (*Id.* at 73–75). Finally, to

estimate capital costs, Dr. Lichtman examined current HBI requests for money for additional

capital projects that are not within the funded commitment of the State. (*Id.* at 88).

According to Dr. Lapovsky, the cost estimates from Dr. Lichtman are too high. (1/17/17

PM Trial Tr. at 93). She noted that Dr. Lichtman's student enrollment estimates do not account

for student attrition rates, even though graduation rates at the four HBIs are less than 50 percent.

---

[25] For instance, President Schmoke testified that the so-called teach-out of UB's MBA program would cost $7.9 million, and the teach-out of UB's criminal justice programs would cost $2.6 million. (2/9/17 Trial Tr. at 44-45, 63 (Schmoke)). Teach-outs are required in order to ensure that students enrolled at a TWI in a program slated for transfer to an HBI may complete that program.

[26] To obtain enrollment estimates, Dr. Lichtman asked USM to ask the HBIs to come up with enrollment projections for each of the proposed new programs. Three HBIs – Bowie, Coppin, and UMES – then provided such projections to USM, which passed them along to Dr. Lichtman. Morgan did not provide any projections. For that reason, Dr. Lichtman averaged the enrollment projections from the other three HBIs in order to estimate enrollment for new programs at Morgan. (2/14/17 Trial Tr. at 58 (Lichtman)).

[27] Specifically, Dr. Lichtman used the annual State operating appropriation per full-time equivalent student, or the per-FTE student cost, for the four HBIs. (*Id.* at 63).

(*Id.* at 45). This failure inflates Dr. Lichtman's operating cost estimates, Dr. Lapovsky testified, because "if you assume a hundred students start and a hundred students graduate, when in reality somewhere between 30 and 50 students will graduate, you've overestimated the enrollment throughout the life of that program." (*Id.* at 52). Dr. Lapovsky also claimed that Dr. Lichtman's use of average per-FTE student costs may lead to an inflated cost estimate, partly because the HBIs may not be operating at peak capacity. Thus, the HBIs may be able to absorb additional students without incurring additional costs in areas like administration, student services, or academic support. (*Id.* at 44). Dr. Lichtman's cost estimate also may be too high because he assumes there will be no reduction in costs at the TWIs from which programs are transferred. (*Id.* at 53–54). Dr. Lichtman also may have inflated capital costs. Dr. Lapovsky testified that many of the facilities included in the HBI "wish lists" of what the HBIs would like to see built or renovated on their campuses—which formed the basis of Dr. Lichtman's estimates of capital costs under the plaintiffs' proposal—"do not have any relevance" to the academic programs actually included in the plaintiffs' proposal. (*Id.* at 48–49).

Dr. Lichtman responded to many of these criticisms in his direct testimony. He agreed there may be some attrition, which would decrease enrollment, but he also suggested that other factors might push up enrollment numbers. (2/14/17 Trial Tr. at 61–62 (Lichtman)). He testified that it is possible that using the per-FTE average student costs resulted in cost estimates that were too high, but their use is still "a very reasonable way of getting a ballpark estimate." (*Id.* at 64–65). Further, Dr. Lichtman conceded that he did not account for cost savings resulting from program transfers in his analysis, but he said it was unclear "to what extent related programs are going to fill in for these lost students" at the TWIs. (*Id.* at 77). Finally, Dr. Lichtman testified that he advanced a conservative estimate of capital costs in light of the large numbers of new

programs being proposed by the plaintiffs, but he conceded that he did not know whether the true capital costs were higher or lower than what he estimated. (*Id.* at 88-89).

### 6. Impact of the Plaintiffs' Proposal on Institutional Accreditation

The parties also disputed whether the plaintiffs' proposal could threaten the institutional accreditation of TWIs and HBIs. Dr. Sylvia Manning—the former president of the Higher Learning Commission of the North Central Association, which is one of six regional accreditors—testified that the plaintiffs' proposal could cause both the TWIs and the HBIs to come under review by the Middle States Commission on Higher Education ("MSCHE"), the regional accrediting body for Maryland higher education institutions. (2/8/17 Trial Tr. at 131–32 (Manning)). Dr. Manning argued that the changes proposed by the plaintiffs—including shuttering programs at TWIs and starting new programs at HBIs—are significant enough that MSCHE would have to review the affected institution.

If MSCHE determines that a proposed institutional change is "substantive," it reviews the proposed change, typically before it is implemented. (*Id.* at 50–51). If MSCHE does not approve the change, the higher education institution cannot implement the proposed change unless it offers it outside the umbrella of institutional accreditation. (*Id.* at 64). There are three levels of review: substantive change; complex substantive change; and a comprehensive review. A substantive change review, the least rigorous, may be triggered if the institution proposes a significant departure from its existing curriculum or if proposed new programs would result in rapid growth in enrollment. This review may take five or six months. (*Id.* at 53–54; 79, 184). If MSCHE determines the proposed change is a "complex substantive change," MSCHE may employ external resources and undertake a "deeper level" of examination. (*Id.* at 51). A

comprehensive review, the most rigorous review, examines the entire institution and can take years to complete. (*Id.* at 59).

If the plaintiffs' proposal were enacted, Dr. Manning expects the four HBIs would come under some level of scrutiny by MSCHE in light of the volume of programs that the plaintiffs propose to create or transfer to those HBIs. At the very least, substantive change approval by MSCHE would be required. (*Id.* at 56). She testified that the TWIs also might come under review because enrollment decline caused by proposed program transfers could raise concerns about overall resources at the TWIs. (*Id.* at 71, 124). Dr. Manning expressed no opinion on the outcomes of these expected reviews. (*Id.* at 168–69).

### C.      The HBIs' Remedial Proposals

The four HBIs also crafted remedial proposals with respect to their own institutions. Generally, the HBI proposals were devised in consultation with HBI faculty and other university officials. The Morgan proposal was the product of a months-long process in which faculty members and other university officials examined the court's 2013 liability ruling and sought to determine how to prevent program duplication through the creation of academic niches. (1/9/17 PM Trial Tr. at 27–29) (Wilson)). Similarly, the UMES proposal was adapted from an original 10-year plan that UMES had developed prior to the liability ruling, which was then revised through input from deans, academic units, shared governance bodies, and faculty representatives. (1/10/17 PM Trial Tr. at 32–33 (Bell)). The Coppin proposal was crafted by Coppin faculty members. (1/11/17 PM Trial Tr. at 73 (Thompson)). Bowie submitted two proposals. One

proposal was written by the faculty senate, and the other was written by Bowie's president, provost and deans. (Pl's Proposed Findings of Fact at 80, ECF No. 622).[30]

The HBIs' remedial proposals overlap with parts of the plaintiffs' remedial proposals in terms of focus, proposed academic programs, or the ways in which the proposals seek to leverage existing capacity at the HBIs. Some overlaps are briefly discussed below.

### 1.  Coppin

The plaintiffs propose creating two niches at Coppin: nursing and allied health, and criminal justice and applied social and political science. According to President Maria Thompson, both niches build upon Coppin's current strengths and would help attract students of all races. (1/11/17 PM Trial Tr. at 89–91 (Thompson)). She testified that Coppin's proposal and the plaintiffs' proposal are consistent: "I would say the plaintiffs, what the plaintiffs recommend seems to be contained, more or less, within what the faculty's document contains." (*Id.* at 97).

The plaintiffs' proposal and Coppin's proposal both call for the creation of new health-related programs. Coppin proposes a new B.S. in Gerontology, a B.S. in Exercise Science and Physiology, a B.S. in Health Care Administration, a B.S. in Health Education, an M.S. in Addiction Counseling, and a Master's in Social Work. (PRX 46 at 8–9). Similarly, the plaintiffs propose a B.S. in Gerontology, a B.S. in Exercise Science, a B.S. in Healthcare Administration, and a Master's in Social Work. (PRX 21 at 8–10). Coppin also proposes a new B.S. in Cybersecurity, to be housed in the Mathematics and Computer Science department. (PRX 46 at

---

[30] Unless otherwise noted, the "Bowie proposal" in this memorandum refers to the proposal written by Bowie's president, provost, and deans. The Bowie faculty proposal was admitted on September 29, 2017. (*See* Pls.' Mot. to Admit Exs., ECF No. 617; Sept. 29, 2017 Order, ECF No. 640).

27).[31] Similarly, the plaintiffs propose creating a B.S. and Master's in Cybersecurity as part of the proposed criminal justice niche. (PRX 21).

<blockquote>2.      Morgan</blockquote>

At Morgan, the plaintiffs propose creating programmatic niches in business and management; urban environment, health, and sustainability; and engineering. (PRX 21 at 2). According to President David Wilson, the plaintiffs' proposal is more aligned with what Morgan would like to see as a remedy than the State's proposal. (1/9/17 PM Trial Tr. at 45–46 (Wilson)).

Similar to the plaintiff's proposed "niche" in business and management, Morgan proposes an academic "cluster" in the area of "business and entrepreneurship." The two proposals also propose creating similar new programs. For instance, Morgan proposes to add new doctoral programs in marketing, finance, and supply chain management. (PRX 402 at 12–13). Similarly, the plaintiffs propose the addition of a master's and doctorate in marketing; a master's in finance; and a master's in supply chain management. (PRX 21 at 3).[32]

Similar to the plaintiffs' proposed "niche" in urban environment, Morgan proposes to create a cluster of programs in urban sustainability, energy, and environment. These two niches appear to have some program overlap. For instance, the plaintiffs call for a new master's in environmental studies and policy and Morgan calls for "[n]ew graduate programs in energy and sustainable built environment studies, sustainable preservation, built environment informatics, and sustainable environmental design and policy." (PRX 402 at 20). Similar to the plaintiffs' proposed "niche" in engineering, Morgan proposes creating a cluster of programs in engineering,

---

[31] President Thompson testified that Coppin has a "brand new Science and Technology Center," an $83 million building. Coppin needs to "capitalize" on this building, which houses programs in computer science, mathematics, chemistry, and biology, she explained. (1/11/17 PM Trial Tr. at 79 (Thompson)).
[32] President Wilson testified that Morgan has a new building for its center for business and entrepreneurship that opened in 2015. (1/10/17 AM Trial Tr. at 67 (Wilson)).

cybersecurity, and big data. (PRX 402 at 10). Both the plaintiffs and Morgan propose to transfer engineering programs from UMBC to Morgan. (PRX 402 at 25; PRX 21 at 6–7).

### 3. UMES

The plaintiffs propose creating three programmatic niches at UMES: engineering and aviation sciences; agriculture and environmental sciences; and pharmacy and health professions. (PRX 21 at 11–14). Similarly, UMES proposed developing five "niche clusters" in the areas of agriculture; allied health professions; engineering, aviation and technology; business and technology; and science and innovation. (PRX 2 at 6). Both proposals appear to build on existing capacity at UMES. For instance, the plaintiffs propose creating four new undergraduate engineering programs. (PRX 21 at 12). According to President Juliette Bell, UMES has a "brand new building" for engineering that houses only one engineering program. "[I]f we had the resources to develop and expand [so that UMES offered more engineering programs], we believe we could attract many more students," she testified. (1/10/17 PM Trial Tr. at 40 (Bell)). Similarly, the plaintiffs propose creating new programs in the area of pharmacy and health professions, and construction of a new pharmacy building at UMES is scheduled for 2020 or 2021. (*Id.* at 43).

### 4. Bowie

The plaintiffs propose the creation of two programmatic niches at Bowie: computer sciences, and professional studies: nursing, social work, and education. The proposal submitted by Bowie's president calls for new undergraduate programs in cybersecurity and information assurance; data science; and computer systems analysis. (PRX 7 at 4–5). President Mickey Burnim testified that computer science and computer technology are programmatic strengths at Bowie. (1/11/17 AM Trial Tr. at 32 (Burnim)). Similarly, the plaintiffs propose, among other

things, creating undergraduate programs in cybersecurity and information assurance, and information systems/technology. (PRX 21). President Burnim testified, however, that, while there are some overlaps, he views the two proposals as essentially different. (1/11/17 PM Trial Tr. at 20 (Burnim)).

The plaintiffs' proposal also appears to build on new capacity at Bowie. For instance, it proposes the creation of a doctorate in nursing practice, (PRX 21 at 16), and Bowie anticipates the completion of a new building, named "The Center for Natural Sciences, Mathematics, and Nursing," in 2017, (1/11/17 AM Trial Tr. at 87 (Burnim)).

## V. HISTORICAL RECORD

The plaintiffs' proposal for new unique high-demand programs finds strong support in: (1) Maryland's own past support for creating unique, high demand programs at HBIs; and (2) previous desegregation remedies under the *Fordice* standard.

### A. Historical Support for Unique, High-Demand Programs

As explained below, there is much historical support, including recommendations endorsed by the State in the past, for the implementation of unique, high-demand programs at the HBIs to encourage other-race student enrollment. The court also found from the evidence at the liability trial that such programs "are a key reason white students attend HBIs in other states, and, without them, HBIs 'are identified by their racial history as opposed to [their] programs.'" (Oct. 7, 2013 Mem. at 46, ECF No. 382 (quoting Conrad Expert Rep. II, PTX 70 at 5)).

As an initial matter, the parties dispute whether historical documents properly may be considered as part of the remedial analysis. Dr. Bastedo, the State's methodological expert, testified that the review of historical documents "can provide context, but it doesn't provide justification for [the plaintiffs'] causal claims." (2/15/17 Trial Tr. at 104 (Bastedo)). Dr. Allen

"emphatically disagree[d]" with this position, on two grounds. First, he noted that historical factors have been causal in developing and maintaining a racially dual system of higher education in Maryland. Second, he emphasized that the historical evidence includes "carefully considered, constructed commission reports by the State . . . [and] reports and studies by federal entities that used data and that engaged in analyses," and that understanding those factors is therefore "central to any efforts to try . . . [to] correct the problems." (2/21/17 Trial Tr. at 48 (Allen)).

The court agrees with the plaintiffs that historical sources are appropriate to consider. Far from providing mere "context," (*see* 2/15/17 Trial Tr. at 104 (Bastedo)), the documents in the record reflect a longstanding consensus among key players in Maryland higher education, including the State itself, that establishing unique, high-demand programs at HBIs has a desegregative effect. Among these documents are the 2000 Partnership Agreement between the State and the Department of Education, Office of Civil Rights ("OCR"), (PTX 4); the report of the Cox Task Force, (PTX 22); the 2006 Committee I report, (PTX 8); and a 2005 document authored by the presidents of the four public HBIs on behalf of the Maryland Legislative Black Caucus, (PTX 13). These agreements and reports were authored by some of the State's foremost education experts, including high-level education officials and university presidents. They are the product of extensive data collection and analysis, often conducted over a period of years. And they reflect the conclusions of government commissions, committees, task forces, and groups of officials, rather than the "beliefs" of their individual authors. (*See* 2/15/17 Trial Tr. at 75 (Bastedo) (explaining that "people's beliefs are not a particularly good gauge for actual causes"). The court therefore will consider these documents, to the extent relevant, as substantive evidence regarding the remedial potential of unique, high-demand programs.

In the December 2000 Partnership Agreement, the State and OCR "set[ ] forth the commitments that [they] anticipate will result in agreement that Maryland is in full compliance with its obligations under federal law, particularly Title VI . . . and the standards set forth in *United States v. Fordice* . . ." (OCR Partnership Agreement, PTX 4 at 4). This document resulted from a collaborative process that included meetings between OCR and State officials, visits to all of Maryland's HBIs and some of its TWIs, and the review of "data, documents and other materials." (*Id.* at 23-25). During the process, OCR identified three issues as the focus of its review. (*Id.* at 24-25). One of these issues was "[e]nhancing Maryland's four HBCUs in order to . . . increase their attractiveness to students of all races, especially white students, including addressing the problem of unnecessary program duplication among the HBCUs and geographically proximate TWIs." (*Id.* at 24).

Among other commitments laid out in the Partnership Agreement, the State pledged to avoid unnecessary program duplication and to expand mission, program uniqueness, and institutional identity at the HBIs. (*Id.* at 36-39). Toward this end, it committed to "developing high-demand programs at HBCUs" and to ensuring the successful implementation of "new unique, high demand and other programs that are approved for HBCUs . . . for the purpose of promoting their institutional competitiveness and ensuring that these institutions attract students regardless of race." (*Id.* at 36-37). Regarding the role of particular academic programs at the HBIs, the State described its position as follows:

> [T]he State commits to developing high-demand academic programs at HBCUs and ensuring that they are not unnecessarily duplicated at nearby institutions. For these purposes, 'unnecessary program duplication' refers to those instances in which broadly similar academic programs (i.e., with respect to overarching purposes, overall curriculum content, and expectations of program graduates) are offered in areas other than the core undergraduate liberal arts and sciences at a TWI and an HBCU that are operated in locations that are geographically proximate to one another. Maryland will avoid unnecessary program duplication

unless there is sound educational justification for the dual operation of broadly
similar programs.

(*Id.* at 36).

At the remedies hearing, Dr. Allen testified that the Partnership Agreement was one of
the documents on which he and Dr. Conrad relied, (1/18/17 PM Trial Tr. at 4, 7 (Allen)), and
Conrad and Allen's expert report states that their recommendations are "consistent with the
remedial strategies relied upon by [OCR]" and that "many . . . mirror the commitments made in
2000 between OCR and Maryland," (Final Expert Report, PRX 312 ¶ 272).

Reports by various state-funded bodies, issued over several decades, provide additional
evidence of the consensus regarding unique, high-demand programs. One example is the report
of the Cox Task Force, which MCHE created in the 1970s to "propose ways of enhancing the
role and image of predominantly black public colleges in Maryland." (Cox Task Force Report,
PTX 22 at 2 (capitalization altered)). This report recommended, among other measures, that
"each historically black public college should develop its own specialty areas or programs within
the total state system of higher education  that will broaden the appeal of the institution to a more
diverse student body." (*Id.* at 20-21 (capitalization altered)). Another is the 2006 Committee I
report, which evaluated the State's progress in fulfilling the commitments set out in the
Partnership Agreement. (*See* Committee I Report, PTX 8 at 5). In this report, the committee
concluded that the establishment of unique graduate programs had "enabled Morgan to attract
significant non-black enrollments." (Committee I Report, PTX 8 at 76-77).

Creating unique, high demand programs at the HBIs also finds support in a 2005 letter
and report authored by the then-presidents of the four public HBIs on behalf of the Maryland

Legislative Black Caucus.[33]  (Report on the OCR Partnership Agreement (March 28, 2005), PTX 13).  This document, drafted prior to the expiration of the Partnership Agreement, assessed the State's performance and concluded it was unlikely that it would be able to show sufficient progress in fulfilling its commitments—among them "expand[ing] HBI missions, mak[ing] them more visible, and permit[ting] them to offer attractive academic programs without undue duplication at nearby campuses." (*Id.* at 5, 9).  The authors explained that duplication of HBI programs had increased in recent years, partly due to a "lack of State commitment" to leveraging academic programs for desegregative purposes. (*Id.* at 9).  For example, MHEC had approved an MBA program at Towson despite declining enrollment in nearby MBA programs, including Morgan. (*Id.*).  The authors also identified several strategies with the potential to significantly enhance the HBIs, including "avoiding unnecessary academic program duplication" and "implementation at HBIs of unique and/or high demand academic programs." (*Id.* at 8).  They cautioned, however, that robust program development at the TWIs, including in the years since the Partnership Agreement, had "substantially narrowed the areas in which HBIs [could] develop new programs in the future." (*Id.*).  These observations are consistent with much of the testimony presented by current HBI presidents at the remedies hearing.

The principles endorsed in these documents are consistent with the remedial strategies employed historically by the Office of Civil Rights in the higher education desegregation context.  In a 1978 guidance, for example, OCR directed that states in the process of desegregating should "give priority consideration to placing any new under-graduate, graduate, or professional degree programs, courses of study, etc., which may be proposed, at traditionally

---

[33] In a cover letter enclosing the report, President Thelma Thompson of UMES explained that the presidents of the four public HBIs had prepared that document for submission to MHEC by the Maryland Legislative Black Caucus. (Report on the OCR Partnership Agreement (March 28, 2005), PTX 13 at 1).  She noted that the HBIs themselves should not be considered to be its authors. (*Id.*).

black institutions, consistent with their missions."  (Revised Criteria Specifying the Ingredients of Acceptable Plans to Desegregate State Systems of Public Higher Education, 43 Fed. Reg. 6658, 6661 (Feb, 15, 1978)).  In light of OCR's mission and specialized expertise, this position provides further support for plaintiffs' position regarding unique, high-demand programs.

Although the above review is not exhaustive, the court is convinced that the historical record, together with the opinions of the plaintiffs' experts and both HBI and TWI presidents summarized above, provides strong support for the establishment of unique, high-demand programs at the HBIs.

**B.      Previous Remedies Under *Fordice* Standard**

In addition to relying on the historical support for unique, high demand programs within Maryland, the court also has considered four previous *Fordice* remedies adopted in Mississippi, Tennessee, Alabama, and Louisiana, as described below.

1.      Mississippi

Mississippi's long-running higher education desegregation case, initially filed in 1975, reached the Supreme Court in 1992. *U.S. v. Fordice*, 505 U.S. 717 (1992). The Court ruled that Mississippi needed to reform "policies traceable to the *de jure* system [that] are still in force and have discriminatory effects . . . to the extent practicable and consistent with sound educational practices." *Id.* at 729. In 1995, the district court for the Northern District of Mississippi updated its findings of fact in light of the legal standard articulated in *Fordice* and entered a remedial decree. *Ayers v. Fordice*, 879 F. Supp. 1419 (N.D. Miss. 1995), *aff'd*, 99 F.3d 1136 (5th Cir. 1996), and *aff'd in part*, *rev'd in part*, 111 F.3d 1183 (5th Cir. 1997) (hereinafter "*Ayers II*").

The court found that unnecessary program duplication between proximate institutions, specifically Mississippi Valley State University (MSVU), an HBI, and Delta State University

(DS), a TWI, would be eliminated by the proposed merger of the two institutions. *Ayers II*, 879 F. Supp. at 1486. The court ultimately concluded, however, that the proposed merger was "predicated to a large degree on optimistic speculation that a new university, fully integrated and without any racial identity" would likely result. *Id.* at 1492. Unwilling to order such a drastic measure based on mere "optimistic speculation," the court rejected the merger proposal and directed the Board [of Trustees of State Institutions of Higher Learning] to explore "what measures have had success in other systems of higher education" that also had a reasonable chance of success of desegregating MSVU. *Id.* If, the court noted, the Board "reaches the same conclusion that consolidation is the only educationally feasible solution, it shall substantiate that conclusion to the Monitoring Committee with data necessary for the court to make an informed decision as to its educational soundness." *Id.* The court also found that unnecessary program duplication at non-proximate institutions, defined as institutions more than fifty miles apart, did not "significantly foster[] segregation" and could be managed through the current program review process. *Id.* at 1486.

The court's remedial decree included augmentation of program offerings at two public HBIs, Jackson State (JSU) and Alcorn State (ASU). *Ayers II*, 879 F. Supp. at 1485–86. While the court found that the record did not support the educational soundness of transferring programs to Jackson State or Alcorn State, it did find that "programmatic enhancements" could realistically increase other-race enrollment. *Id.* at 1486. The court, however, analyzed the programmatic enhancements under "Missions" rather than "Program Duplication." *Id.* The remedial decree also provided special funds of $5 million each, to be delivered by the State, for JSU and ASU for "continuing educational enhancement and racial diversity, including recruitment of white students and scholarships for white applicants." *Id.* at 1495.

The court initially ordered the creation of a monitoring committee. *Ayers II*, 879 F.Supp. at 1494. Consisting of "three disinterested persons with experience in the field of higher education agreed on by the parties and appointed by the court," the committee was to be responsible for reviewing a number of required submissions by defendants and making recommendations to the court. *Id*. Although the district court envisioned a three-person monitoring committee, it eventually appointed a sole monitor. *Ayers v. Thomas*, 358 F.3d 356, 363 n.6 (5th Cir. 2004). After the parties' inability to agree on membership for the committee delayed implementation of the remedial decree, the district court solicited name submissions from each side and selected the committee from those lists. *Id*. For reasons not explained in the record, the court decided to appoint just one monitor: Dr. Jerry Boone, a former state university administrator. *Id*. at 363.

Plaintiffs appealed the district court's ruling on the remedial decree to the Fifth Circuit. *Ayers v. Fordice*, 111 F.3d 1183 (5th Cir. 1997). The rejection of the consolidation proposal was not among the issues appealed, *id*. at 1192; however, plaintiffs did appeal the enhancement of HBIs, arguing for more expansive relief than provided by the district court's remedial decree. *Id*. at 1209. "Plaintiffs' arguments in this regard encompass[ed] four interrelated areas: new academic programs, land grant programs, program duplication, and funding." *Id*. The court upheld the addition of new academic programs at JSU and ASU, directed the district court on remand to clarify the status of the proposed merger of MSVU and DS and, if the court found merger no longer an option, instruct the Board to determine whether new academic programs could have a desegregative effect at MSVU. *Id*. at 1215. The court also affirmed the district court's rulings on program duplication and directed the Board to report to the Monitoring

Committee on unnecessary program duplication between MSVU and DS if a merger would no longer be pursued. *Id.* at 1221.

In proceedings conducted after the 1997 appeal, the district court ruled out consideration of the merger of MSVU and DS. *Ayers v. Thompson*, 358 F.3d 356, 362 (5th Cir. 2004). Consistent with the 1997 Fifth Circuit opinion, the court directed the Board to study programs that could attract other-race students to MSVU. *Id.* at 362-363. In 1999, the court ruled that the state had met most of its obligations regarding new academic programs at JSU. *Id.* at 363. In 2002, the court approved a final settlement agreement identifying eleven academic programs to be added or continued at ASU, seventeen at JSU, and eleven at MSVU. *Id.* at 365, n.13; *Ayers v. Musgrove*, No. 4:75CV009–B–D, 2002 WL 91895 (N.D. Miss. Jan. 2, 2002). The settlement agreement also provided for annual appropriations for the HBIs for seventeen years, totaling $245,880,000, to fund the academic programs identified. *Ayers*, 358 F.3d at 366. The settlement agreement was upheld by the Fifth Circuit in 2004. *Id.* at 377.

2.     Tennessee

Tennessee's long-running higher education case, initially filed as a class action suit in 1968, reached its first settlement agreement in 1984. *Geier v. Alexander*, 593 F. Supp. 1263 (M.D. Tenn.1984), *aff'd*, 801 F.2d 799 (6th Cir. 1986). Not until 2001, however, was a settlement reached according to the terms of a consent decree crafted under the legal standard set forth in *United States v. Fordice*. *See Geier v. Sundquist*, 128 F. Supp. 2d. 519, 521 (M.D. Tenn. 2001). The 2001 consent decree was divided into three areas: "(1) issues related to higher education in Middle Tennessee; (2) statewide issues affecting student enrollment, faculty and staff hiring, and promotion decisions; and (3) a plan for monitoring and assessing the effectiveness of [the] Agreement." *Id.* at 522.

The decree focused on education in Middle Tennessee, specifically at Tennessee State University (TSU). TSU, a public HBI located in Nashville, had been a central focus of the desegregation case since 1968: Rita Sander Geier, the original named plaintiff, was a member of the faculty there. *Sanders v. Ellington*, 288 F. Supp. 937, 939 (M.D. Tenn. 1968).[34] The decree mandated that TSU develop and implement a plan to recruit other-race and nontraditional students to the school, and be provided with at least two recruiters, support staff, and "resources necessary to recruit other-race students to TSU." *Geier*, 128 F. Supp. 2d at 524. The decree also required the State to: establish a new College of Public Service and Urban Affairs at TSU; establish a public law school or other high-demand doctoral degree program at TSU; limit for five years the number of doctoral programs at Middle Tennessee State University (MTSU) to the number of such programs at TSU; limit future academic program approval at MTSU to preserve exclusivity of programming at TSU. *Id.* at 524–35.

The decree established a court-appointed monitor. *Greier*, 128 F. Supp. 2d. at 546. The monitor's responsibilities were "to facilitate the orderly and timely implementation of [the settlement agreement] and to mediate points of controversy between the parties." *Id.* All reasonable costs of the monitorship were paid by the State. *Id.* The monitor, Carlos Gonzales, was permitted to retain higher education experts to evaluate proposals and was required to report to the Court and the parties twice a year on the status of the settlement agreement's implementation. *Id.*

The court also addressed statewide issues. The State was directed to study and assess the effectiveness of current recruitment programs for other-race students, keeping in mind financial aid, an open, welcoming campus climate, the utilization of pre-college summer programs, and

---

[34] TSU remained the primary focus of the legislation for most of its twenty-eight year history. *See, e.g.*, *Geier v. Alexander*, 593 F. Supp. 1263, 1266 (M.D. Tenn. 1984) ("The heart of the problem is traditionally black TSU. This has been recognized by this Court in previous decrees.").

alternative admission standards. *Id*. at 541-42. Finally, the court retained jurisdiction over the case for five years to ensure compliance. *Id*. at 547. On September 21, 2006, Judge Wiseman entered a Final Order of Dismissal stating that parties had fully complied with the requirements of the 2001 Consent Decree and that the State was now operating a unitary system of public higher education. *Geier v. Bredesen*, 453 F. Supp. 2d 1017, 1018 (M.D. Tenn. 2006).

### 3. Alabama

The district court, after a six-month bench trial in 1991, concluded that vestiges of segregation remained in the area of program duplication, among others. *Knight v. State of Ala.* 787 F. Supp. 1030, 1379 (N.D. Ala. 1991). The court ordered a Consent Decree Monitoring Committee to examine the issues of program duplication between Alabama State University (ASU) and Auburn University at Montgomery in the areas of business and education, with a focus on establishing cooperative programs in those areas of study between the two schools. *Id.* at 1380. The court also ordered that ASU and Alabama A & M University be given special preference for new high-demand programs that the state established in their respective geographic areas. *Id.*

The court appointed a monitor, Carlos González, in 1993 to oversee compliance with the 1991 remedial decree. *Knight v. State of Ala.*, 829 F. Supp. 1286, 1288 (N.D. Ala. 1993). The monitor was directed to personally visit each defendant institution and to meet with representatives and counsel from all parties to familiarize himself with the organizations under the decree. *Id.* at 1289. The monitor was permitted to hire independent experts to assist his work and was required to report to the court and the parties annually on the status of defendants' compliance. *Id* at 1290.

The Supreme Court decided *Fordice* shortly after the district court's entry of the remedial order; thus, the Eleventh Circuit considered the issues on appeal under the newly articulated *Fordice* standard. *Knight v. State of Ala.*, 14 F.3d 1534, 1540 (11th Cir. 1994). The district court's ruling on program duplication was not among the issues appealed. *Id.* at 1540.

4. Louisiana

Louisiana's higher education desegregation suit began in 1974 when the Attorney General brought an action on behalf of the United States against the State and the four boards of higher education existing in Louisiana at the time. *See U.S. v. State of La.*, 692 F. Supp. 642, 645 (E.D. La. 1988). The 1994 Settlement Agreement was the first agreement in the case negotiated post-*Fordice*. *See* Scott B. Arceneaux, *Chasing the Dream: Higher Education Desegregation in Louisiana*, 69 Tul. L. Rev. 1281, 1298-1308 (1995).

The 1994 Settlement Agreement addressed program duplication through creation of new programs at all levels at two public HBIs, Southern University ("Southern") and Grambling State University ("Grambling"). *Id.* at 1305. The State appropriated $34 million to Southern and $14 million to Grambling to fund the new programs and forbade duplication of the new programs at proximate institutions. *Id.* at 1305 n.175. The Settlement Agreement also called for the Board of Regents to work towards ending program duplication at proximate institutions as soon as possible and mentioned other-race faculty and other-race scholarships for graduate students among the provisions for meeting the goal of integration. *Id.* at 1305-06. The implementation of the Agreement was overseen by a Monitoring Committee responsible for producing annual reports on its progress. *See* Alfreda A. Sellers Diamond, *Black, White, Brown, Green, and Fordice: The Flavor of Higher Education in Louisiana and Mississippi*, 5 Hastings Race & Poverty L. J. 57, 114 (2008).

The Agreement expired under its own terms in 2005, after a decade of implementation. The Monitoring Committee's tenth and final report gave an overview of progress made on the Agreement's initiatives. *Id.* While the actual enrollment of other-race students at Louisiana HBIs remained low throughout the decade of implementation, *id.*, the Committee reported that new program implementation at HBIs resulted in the award of 603 degrees during the ten-year period. *Id.* at 116. Additionally, HBIs awarded more than $750,000 in other-race scholarships. *Id.*

While there is no single uniform solution, these four cases provide additional support for the creation of new programs at HBIs, rather than transfers and mergers, to help remedy the segregative effects of program duplication. They also support the appointment of monitors or special masters to assist in creating and overseeing remedial plans.

## VI. ANALYSIS

The Supreme Court articulated a legal framework in *United States v. Fordice*, 505 U.S. 717 (1992) for determining whether a state has discharged its duty to dismantle former systems of *de jure* segregated higher education. *Fordice* laid out a three-step process for determining liability: the court must, first, analyze each state policy or practice to determine whether it is "traceable" to the prior *de jure* system of segregation; second, assess whether the challenged policies have continuing "segregative effects;" and third, evaluate whether the policies have a "sound educational justification" and cannot be "practicably eliminated." *See id.* at 731.

Plaintiffs bear the burden of "show[ing] that a challenged contemporary policy is traceable to past segregation." *Knight v. State of Ala.*, 14 F.3d 1534, 1541 (11th Cir. 1994). If plaintiffs make such a showing, "the burden of proof falls on the *State*, and not the aggrieved plaintiffs, to establish that it has dismantled its prior *de jure* segregated system." *Fordice*, 505 U.S. at 739 (emphasis in original). The state can meet this burden either by showing the

challenged policy has "no segregative effects" or by showing that there are "no less segregative alternatives which are practicable and educationally sound." *Knight*, 14 F.3d at 1541. "[T]he state's burden of proving that such alternatives are impracticable or educationally unsound is a heavy one and 'the circumstances in which a State may maintain a policy or practice traceable to *de jure* segregation that has segregative effects are narrow.'" *Id.* (quoting *Fordice*, 505 U.S. at 744 (O'Connor, J., concurring)).

"Once liability is found, the offending policies and practices 'must be reformed to the extent practicable and consistent with sound educational practices.'" *Ayers v. Fordice*, 111 F.3d 1183, 1192 (5th Cir. 1997) (quoting *Fordice*, 505 U.S. at 729). The Fifth Circuit interpreted *Fordice* as "recognizing the need to consider the practicability and soundness of educational practices in determining remedies as well as in making an initial determination of liability." *Ayers*, 111 F.3d at 1192–93 (quoting *U.S. v. La.*, 9 F.3d 1159, 1164 (5th Cir. 1993)). The Eleventh Circuit interpreted *Fordice*'s standard for remedies similarly, adding that "because the obligation to remedy the segregative effects of vestiges of segregation is an affirmative duty borne by the state, the onus is not on the plaintiffs to propose the remedy options to be considered." *Knight*, 14 F.3d at 1541.

When crafting a remedy, the court "should consider the full range of all possible alternative remedies." *Id.* Proposed remedies do not have to show a guarantee of success in order to be enacted; rather, the state "is obligated to adopt, from among the full range of practicable and educationally sound alternatives to the challenged policy, the one that would achieve the greatest possible reduction in the identified segregative effects." *Id.* (citing *Fordice*, 505 U.S. at 744 (O'Connor, J., concurring)). The state is relieved of its obligation to remedy the segregative

effects "[o]nly where there are no alternative remedies that are practicable and educationally sound." *Knight*, 14 F.3d at 1546 (emphasis added).

The court's task is to ensure "the State [does] not leave in place policies rooted in its prior officially segregated system that serve to maintain the racial identifiability of its universities if those policies can practicably be eliminated without eroding sound education policies." *U.S. v. Fordice*, 505 U.S. 717, 743 (1992). In evaluating sound education policies in this case, the court must be mindful of potential harm to TWIs, because, unlike earlier *Fordice* litigation, Maryland's TWIs are no longer segregated. Indeed, significant numbers of African-American students are educated in integrated settings at TWIs every year. Although the court agrees that TWI desegregation "does not excuse Maryland's obligations to desegregate the HBIs," (Pls. Resp. to Defs.' Proposed Findings of Fact at 37, ECF No. 628), the extent of TWI desegregation is a relevant factor when determining a final remedy. Some indirect harm, however, from redistributing funding to HBIs may be unavoidable.

### A.    New Programs

Considering the findings at the liability trial, the plaintiffs' experts' testimony, the testimony of HBI and TWI presidents, the historical record, and previous applications of the *Fordice* standard, the court concludes that creating new unique, high-demand programs at the HBIs will achieve the greatest possible reduction in the segregative effects of unnecessary program duplication in Maryland's institutions of higher education.

The plaintiffs' expert proposal to create unique "programmatic niches" at HBIs draws on guidance from the Office of Civil Rights in the Department of Justice, state-authored reports, academic research and scholarship, some of the State's own experts and offices, the testimony of presidents from both HBIs and TWIs, and previous desegregation efforts in other states. (1/18/17

PM Trial Tr. at 4, 5 (Allen)). Importantly, the plaintiffs' expert, Dr. Allen, found that leadership at the HBIs "concurred" with the view that "placing unique, high demand . . . programs on [their] campuses [was] an essential feature" for creating "a more diverse student body." (*Id.* at 10). Dr. Allen emphasized this last point. He testified that unique high-quality academic programs would allow the HBIs to attract students of all types by allowing the HBIs to shed their image as schools only for a particular racial heritage. (*Id.* at 13). The court is convinced by this testimony. It is well-supported, considered, and holistic, drawing on multiple perspectives within and without Maryland and especially attentive to the view of the affected HBIs. It is also bolstered by robust historical support for the creation of unique, high-demand programs at the HBIs.

As part of its 2000 Partnership Agreement with the Office of Civil Rights, the State agreed to expand program uniqueness at its HBIs to attract students of all races. Indeed, as early as 1978, OCR urged states to place new programs in higher educations at HBIs. This view finds support in the State's own reports. The Cox Task Force recommended that each HBI in the state should have its own unique programmatic niche. TWI leadership in this case agree: several presidents recognized the value in creating new programs at HBIs, specifically noting their ability to attract students.

Other courts applying the *Fordice* standard have followed this approach. Attempting to remedy the vestiges of *de jure* segregation, a court-ordered remedy in Mississippi included "programmatic enhancements" to attract a more diverse student body. The same is true for remedial efforts in Tennessee (requiring the state to create a new high-demand doctoral degree program at an HBI), Alabama (ordering that HBIs be given preference for new high-demand programs), and Louisiana (appropriating money for the creation of unique programs at HBIs).

In sum, there is strong and widely-accepted support for the creation of unique, high-demand programs at Maryland HBIs. The court is persuaded by the consensus in the testimony and record that unique and high-demand academic programs have the potential to attract a more diverse student body. To be sure, the record does not, nor could it, provide an exact estimate for the desegregative effects of creating these programs. Much of the State's opposition to these remedies rests on numerical analysis suggesting such efforts cannot be completely successful. But the effects of a proposed remedy need not be precisely computed before a court may adopt it. Indeed, the complexity of desegregation efforts precludes the accuracy all parties would otherwise desire. Rather, the court is tasked with adopting "from among the full range of practicable and educationally sound alternatives . . . the one that would achieve the greatest possible reduction in the identified segregative effects," not just the remedy with precisely proven effects. *Knight*, 14 F.3d at 1541. By the weight of the evidence, creating unique-high demand programs at the HBIs meets that standard.

Accordingly, as part of its Order the court will require the creation of unique, high-demand programs at the HBIs. The remedy should draw on the programmatic niches proposed by the HBIs and consider each HBIs' areas of strength and the capacity of its facilities. Since this is a state-wide remedy, UMES will be included in the court's order. But because UMES has greater integration than the other HBIs, (*See* Oct. 7, 2013 Mem. at 20-21, ECF No. 382) (stating UMES's student population is 13.3% white and 77.6% black, compared with student populations that are 1.3% white and 88.2% black at Coppin, 2.8% white and 90.7% black at Morgan, and 4.2% white and 88.4% black at Bowie); *see also* 1/10/17 PM Trial Tr. at 21-22, 29–30 (Bell)), and there did not appear to be unnecessary program duplication at the University at the time of

the liability trial, any remedy ordered for UMES must be limited to preserving and reinforcing its freedom from program duplication and degree of integration already achieved.

## B.    Program Transfers

As previously discussed, when crafting a remedy, the court "should consider the full range of all possible alternative remedies." *Knight*, 14 F.3d at 1541. To be sure, the "full range of all possible alternative remedies" includes program transfers. In examining transfers as a potential remedy, however, courts have been skeptical of, and declined to order, transfers despite "recommend[ation] by many experts, including court-appointed experts." *Knight v. State of Ala.*, 900 F. Supp. 272, 315 (N.D. Ala. 1995). The district court in *Knight* noted that, "[t]ransfer is an absolute misnomer" because, in reality, program transfer involves "discontinuing a program at institution A and starting up a new program at institution B." *Id.* The district court in *Ayers v. Fordice* held that, despite "find[ing] Dr. Conrad's effort commendable," the record did not support the feasibility and educational soundness of program transfer. 879 F. Supp. 1419, 1484–85 (N.D. Miss. 1995), *aff'd*, 99 F.3d 1136 (5th Cir. 1996), and *aff'd in part, rev'd in part*, 111 F.3d 1183 (5th Cir. 1997).

Here, both sides agree that transferring programs from TWIs to HBIs will be a difficult process that may negatively impact the affected TWIs. (*See* 1/24/17 Trial Tr. at 24 (Conrad) (suggesting that even limited program transfers will be "painful"); (1/25/17 Trial Tr. at 130 (Conrad) (explaining the plaintiffs attempted to "minimize" transfers in order to achieve the goal of desegregation while causing the "least disruption" to the USM system). Testimony from TWI presidents made clear that, of all aspects of the plaintiffs' proposal, they view the prospect of transfers as the most problematic, because it may harm the reputation of their institutions; make

it harder to attract and retain highly-qualified faculty and students; and threaten institutional accreditation in light of possible enrollment dips and resource concerns.

The HBI presidents expressed mixed views on the importance of program transfers when it comes to desegregating their institutions. Although Morgan's President Wilson claimed that transfers must be part of any viable remedy, Bowie's President Burnim testified that transfers are not an optimal way to build diversity at higher education institutions. (1/9/17 PM Trial Tr. at 30–31 (Wilson); 1/11/17 PM Trial Tr. at 6 (Burnim)). And while the plaintiffs insist that program transfers are needed, even they concede the importance of transfers varies by institution. (*See* Final Expert Report, PRX 312 at 28) (Transfers "may be particularly compelling where the HBI is currently offering a few unique and high-demand programs within a programmatic niche, but the portfolio of discrete programs and degree levels are dispersed among multiple institutions.").[49]

Further, the court is mindful that, according to TWI presidents, the uncertainty caused by the threat of program transfers may undermine faculty and student recruitment. *See, supra*, Proposed Remedies, IV.C.1; 1/30/17 Trial Tr. at 39-40, 76, 81 (Hrabowski); 2/1/17 Trial Tr. at 46 (Schatzel); 2/9/17 Trial Tr. at 68 (Schmoke); 2/6/17 Trial Tr. at 166-67 (Miyares). The court also is hesitant to order transfers that may disrupt the progress that has been made integrating the TWIs and could harm the students at those integrated institutions. According to TWI presidents, their institutions may suffer: negative reputational impacts; possible loss of valuable business and government partnerships and investments; loss of faculty who teach across more than one

---

[49] According to the plaintiffs, four out of the ten proposed niches involve program transfers. (Pls. Proposed Findings of Fact at 177, ECF No. 622). That tally appears to omit the proposed transfer of a doctorate in Management, Community College Policy & Administration from UMUC to Morgan's proposed Urban Environment, Health, and Sustainability niche. (*See* PRX 21 at 5). Although the plaintiffs revised their proposal with respect to transfers from UMUC post-trial, they still appear to endorse this transfer. (See Pls. Proposed Findings of Fact at 124-25, ECF No. 622).

program within the institution; and ripple effects across other programs. *See, supra*, Proposed Remedies IV.C.1-2; 1/30/17 Trial Tr. at 67-68, 75, 94 (Hrabowski); 2/9/17 Trial Tr. at 40, 72 (Schmoke); 2/1/17 Trial Tr. at 43, 47, 50-51 (Schatzel); 1/31/17 Trial Tr. at 35-36, 41 (Simmons). Considering the significant concerns raised by the TWI presidents and other witnesses, noted here and above in section IV, which the court finds credible, and the lack of support for such transfers in prior remedies, the court concludes that program transfers need not form a part of a final remedy in this case unless agreed to by the affected institutions.

### C. Funding for Recruitment, Financial Aid, and Marketing

The court also will require the State to provide funding to the HBIs for student recruitment, financial aid, and marketing. Like the creation of new programs, there is broad support for the desegregative effects of these initiatives. The State's second proposed remedy includes funding for the HBIs focused on enrollment management, student aid, campus inclusion initiatives, and summer academies tied to scholarships. The plaintiffs' revised remedial proposal took a similar approach, requesting additional funding for, among other things, scholarships, marketing, and recruitment. These aspects of both the State's and the plaintiffs' proposals were supported by expert testimony—funding for marketing and scholarships "further amplifies" the attractiveness of a programmatic niche, (1/18/17 PM Trial Tr. at 20-22 (Allen))—and by testimony of both HBI and TWI presidents, as cited in the State's proposal. (ECF No. 621).

Based on this consensus, the court concludes that funding to be used within the discretion of the HBIs for recruitment, financial aid, and marketing, which may include summer academies and other initiatives, is warranted to enhance the desegregative effect of new unique, high-demand programs.

### D. MHEC Process

Finally, the court finds the current MHEC program approval process adequate. As the list of factors considered already includes an educational justification for duplicative programs, there is not a significant difference between plaintiff's proposed "unnecessary" standard and the existing "unreasonable" standard. (*See* PRX 28 at 16 (COMAR 13B.02.03.09(C)(2)(g)). Additionally, Bowie's President Burnim testified that the approval process is functioning properly, and MHEC has not been approving programs over HBI objections. (1/11/17 AM Trial Tr. at 69-70, 72 (Burnim); *see also* 1/12/17 AM Trial Tr. at 8 (Thompson)). Nonetheless, as steps are being taken to avoid unnecessary program duplication, MHEC must be conscious of the court's remedy in deciding whether to approve future program requests. The court will require consultation with the Special Master before future program approvals are made by MHEC while the Remedial Order is in effect.

## VII. REMEDY FOR MARYLAND

In summary, the court finds that neither party's remedy, as currently proposed, is practicable, educationally sound, and sufficient to address the segregative harms of program duplication at the HBIs. At least in part, this results from the parties' failure or inability to consult with the other side in crafting their proposals. Further, the court has not been given sufficient information about the cost of the proposals. Instead of adopting either one as it stands, the court will appoint a Special Master to develop a Remedial Plan. The Plan will incorporate elements of the parties' proposals while also addressing the concerns articulated above. The Special Master must consult with all relevant actors to obtain all necessary information for developing a successful Remedial Plan.

The Plan should propose a set of new unique and/or high demand programs at each HBI, taking into account each HBIs' areas of strength, physical building capacity, and the programmatic niches suggested by the plaintiffs' experts. Building on HBIs' existing areas of strength offers the best chance at program success, and thus the best opportunity for new programs to lessen or eliminate the segregative effects of past program duplication. The Plan should not include program transfers or closings without agreement from the affected institutions.

Further, the Remedial Plan should provide funding for a period to be used for student recruitment, financial aid, marketing, and related initiatives. The Special Master, in conjunction with the parties, also should develop a reporting plan on the status of the remedial plan's implementation, to be submitted to the court for periodic approval.

**\*\*\*\*\***

The court will end as it began: crafting such a Plan is a daunting task requiring the good faith collaboration of the Coalition and the State. The court urges such collaboration to strengthen and enhance Maryland's HBIs for the benefit of all Maryland students, present and future.

A separate Order follows.

| Nov. 8, 2017 | /s/ |
|---|---|
| Date | Catherine C. Blake |
| | United States District Judge |